# EXHIBIT A

Westlaw.

22 U.S.P.Q.2d 1657  
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657  
**(Cite as: 22 U.S.P.Q.2d 1657)**

Page 1

Mosinee Paper Corp.  
v.  
James River Corp. of Virginia

District Court, E.D. Wisconsin

No. 88-C-968

Decided February 18, 1992, and March 13, 1992  
United States Patents Quarterly Headnotes

PATENTS

**[1] Patentability/Validity -- Anticipation -- Prior art (Section 115.0703)**
Claims for paper towel dispenser calling for structure which senses presence or absence of paper "at" or "from around" one of single pair of feed rolls are not anticipated by prior art device which uses feed rolls that have no sensing function.

PATENTS

**[2] Patentability/Validity -- Obviousness -- Secondary considerations generally (Section 115.0907)**
Other considerations that may be relevant to determination of obviousness include advantages directly flowing from invention patented, and cost reduction and simplification.

PATENTS

**[3] Patentability/Validity -- Obviousness -- Relevant prior art -- Particular inventions (Section 115.0903.03)**
Accused infringer has failed to show that claims for paper towel dispenser are invalid for obviousness, in view of long felt need for reliable and simple transfer mechanism for roll towel dispensers which would solve problem of stub roll waste, in view of commercial success of patentee's invention, and in view of application in which accused infringer's predecessor company sought its own patent on replica of plaintiff's invention and in which it represented that such replica was patentable over same prior art that it now alleges invalidates patent in suit.

PATENTS

**[4] Practice and procedure in Patent and Trademark Office -- Prosecution -- Duty of candor -- Materiality (Section 110.0903.04)**
Infringement -- Defenses -- Fraud or unclean hands (Section 120.1111)
Patentee's failure to cite prior patent does not constitute inequitable conduct, since prior patent teaches transfer system significantly different from that set forth in patentee's invention, and since examiner reviewed both classes and subclasses under which prior patent is classified yet did not cite it after examining those classes.

REMEDIES

**[5] Monetary -- Damages -- Patents -- Reasonable royalty (Section 510.0507.03)**
Reasonable royalty, in action for infringement of paper towel dispenser, should be based upon number of cases of paper sold using patented dispenser, but plaintiff's proposed percentage of 5 percent is too high, especially since accused dispenser incorporated numerous features and improvements having nothing to do with patent in suit; appropriate royalty figure is 1.5 percent of cost of towels sold.

REMEDIES

**[6] Monetary -- Damages -- Prejudgment interest (Section 510.0511)**
Appropriate rate of interest on damages awarded to patent infringement plaintiff is prime rate, rather than 52-month treasury bill rate, as calculated through end of February 1992, which is month in which injunction was issued, rather than July 31, 1991, which is date to which damages were calculated in earlier order.

REMEDIES

Particular patents -- General and mechanical -- Paper towel dispenser  
4,165,138, Hedge and Huss, dispenser cabinet for sheet material and transfer mechanism, valid and infringed.

*1657 Action by Mosinee Paper Corp. against James River Corp. of Virginia for patent infringement. Judgment for plaintiff.

Prior decision: 21 USPQ2d 1238.

James W. Dabney, Frank F. Scheck, Thomas A. Canova, and Thomas K. Landry, of Pennie & Edmonds, New York, N.Y.; Lon E. Roberts, of Ruder, Ware & Michler, Wausau, Wis., for plaintiff.

Westlaw.

22 U.S.P.Q.2d 1657    Page 2
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

Douglas W. Wyatt and Frederick J. Dorchak, of Wyatt, Gerber, Burke & Badie, New York; George H. Solveson, of Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendant.

Evans, C.J.

Mosinee Paper Corporation brought this action alleging that the James River Corporation was infringing U.S. Patent 4,165,138, entitled, "Dispenser Cabinet for Sheet Material *1658 and Transfer Mechanism," a paper towel dispenser. James River responded by claiming that the patent was invalid. Prior to trial James River had conceded that its dispensers infringed Mosinee's patent and had changed its design. The trial to the court in August 1991 proceeded on the issues of the validity of the patent and damages. The following decision constitutes the findings of fact and conclusions of law required by rule 52 of the Federal Rules of Civil Procedure.

Mosinee Paper Corporation is a Wisconsin corporation with its principal place of business in Mosinee, Wisconsin. James River Corporation is a Virginia corporation with its principal place of business in Richmond, Virginia. It is a corporation qualified to do business in Wisconsin and it has an established place of business in Waukesha, Wisconsin. Both companies, among other things, manufacture paper toweling and provide their customers with dispensers for use with the toweling.

Industrial paper towels are manufactured in two basic forms: folded and in rolls. Dispensers for folded towels ordinarily allow users to pull exposed ends of individual towels. Dispensers for roll towels typically release lengths of toweling in response to a crank or lever operated by the user.

Roll towels are cheaper to manufacture than folded towels. They are, however, more difficult to dispense efficiently. When a dispenser of folded towels is partially empty, it can simply be filled with more towels. In contrast, when a roll of toweling is partially used, there is no way to simply add on to the roll. Rather, a whole new roll must be installed, with the result that the partially used roll, or "stub" roll, is wasted.

The problem of "stub roll waste" prompted a need for a roll towel dispenser which could transfer automatically from one supply roll to another. Several attempts were made to design a successful dispenser. In 1969, a patent, assigned to the Scott Paper Company, was issued with a design for a commercially practical transfer mechanism. Some years later, on August 21, 1979, the Mosinee patent -- the patent-in-suit -- was issued.

The Mosinee patent, in three embodiments, describes a dispenser which has positions for primary and reserve rolls of paper toweling. A feed mechanism initially dispenses toweling from the primary roll to the exterior of the cabinet. The transfer mechanism senses the presence of the paper on the primary roll at the feed mechanism and, regardless of the tension of the paper between the feed mechanism and the roll, automatically transfers the beginning of the reserve roll to the feed mechanism when the end of the primary roll passes the feed mechanism.

James River raises a number of issues regarding the invalidity of the Mosinee patent. As a starting point for considering these issues, I recognize that the Mosinee patent possesses the statutory presumption of validity. 35 U.S.C. Section 282. To overcome the presumption, James River must establish its contentions regarding invalidity by "clear and convincing evidence."*Buildex Inc. v. Kason Industries, Inc., 849 F.2d 1461 [ 7 USPQ2d 1325 ] (Fed. Cir. 1988).*

James River contends that pursuant to 35 U.S.C. Section 102, the Mosinee patent is anticipated by a device, which was conceived and reduced to practice in September 1973 at Linquist Machine Company and became known as the "Aqua-Matic" dispenser. However, in answers to requests for admissions, James River admitted that the Aqua-Matic dispenser does not anticipate claims 7, 8, 13, or 14 of the Mosinee patent. It is, therefore, conclusively established that the Aqua-Matic does not anticipate these claims.

As to the other claims, James River must establish that the Aqua-Matic anticipates claims 1, 6, 9, and 22 by clear and convincing evidence. In order to make out a defense of anticipation, James River must meet its burden to show that each and every element of each of the claims is present and identically arranged in a single prior art reference, in this

COPR. © 2006 The Bureau of National Affairs, Inc.

Westlaw.

22 U.S.P.Q.2d 1657                                                                                      Page 3
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
(Cite as: 22 U.S.P.Q.2d 1657)

case in the Aqua-Matic. *Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744 [ 3 USPQ2d 1766 ] (Fed. Cir. 1987), *cert. denied,* 484 U.S. 1007 (1988). It has failed to do so.

First, there is a significant question whether the Aqua-Matic qualifies as prior art under section 102(g) and whether it was "on sale" or in "public use" more than a year prior to November 15, 1976, the filing date of the Mosinee patent application, thus qualifying as prior art under section 102(b).

I am not convinced that James River has established by clear and convincing evidence that the Aqua-Matic was developed before the invention set forth in the Mosinee patent. The evidence shows that in the late 1960's, Mr. William S. Huss was an employee of Alwin Manufacturing Company, a company which designed and supplied dispensers to the paper industry. Mr. Huss held nine patents for inventions relating to paper products, including a multiple roll tissue dispenser. He had, in the late 1960's, sketched a paper towel transfer mechanism, shown in figures 1-4 of the patent. Both Mr. James Diring, a co-worker of Mr. Huss, and Mr. Donald Krueger, another Alwin employee, *1659 testified that Mr. Huss' design was the basis of the mechanism in the patent.

After Scott Paper Company unveiled its dispenser and Fort Howard Paper Company had also produced a workable dispenser, Mosinee determined that it needed an automatic transfer dispenser of its own. Mosinee contacted Alwin and requested that the company go to work on the problem.

Alwin personnel adapted Mr. Huss's concept to the Mosinee "push the button, turn the crank" dispensers. A drawing of the system was made not later than December 12, 1974. The development of the product was directed by Mosinee employee Russell K. Hedge. After considerable work, Mr. Hedge developed a compact, one-piece transfer bar, shown in figures 9 and 10 of the patent. This design became the preferred embodiment of the invention (the "Bay West System.")

The Aqua-Matic dispenser was developed over a 3-year period between 1973 and 1976. It was a device which was, according to outside patent counsel to James River's predecessor corporation, "virtually void of patentable novelty" in view of the Liebisch patent 2,930,664. No patent was ever issued on the Aqua-Matic. Thus, James River has failed to produce clear and convincing evidence that the Aqua-Matic was prior art.

The evidence also shows that the Mosinee invention was not abandoned. At least two prototypes which did not work for one reason or another were built over the years. Then Mr. Hedge designed two further embodiments of the invention, including the one later commercialized. The work on the invention proceeded and was not abandoned by the inventors.

James River has also failed to meet its burden in establishing that the Aqua-Matic dispensers were "on sale" or "in public use" prior to November 15, 1975. Defendant's witness, Mr. William Bean, testified that prior to 1976, there were in existence five hand-built prototypes, which were being field tested. Where use of an invention is primarily experimental, section 102(b) does not apply. *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558 [ 4 USPQ2d 1210 ] (Fed. Cir. 1987).

In an abundance of caution, the Aqua-Matic will nevertheless be discussed below as if it were prior art as to the issues of both anticipation and obviousness. Even were the Aqua-Matic to qualify as prior art, James River has not shown by clear and convincing evidence that it anticipates the invention set forth in the Mosinee patent.

Claims 1, 6, 9, and 22 of the Mosinee patent recite structural and functional limitations which do not exist in the Aqua-Matic dispenser. Claim 1 recites a structure which senses the presence or absence of paper "at" or "from around" one of a single pair of feed rolls. The sensing and transferring means is further limited by the statement that sensing occurs at such feed mechanisms. In each of the three embodiments disclosed in the patent, the sensing and transferring structures are shown cooperating with a pair of parallel feed rolls, one of which has annular grooves. The sensing means is held out of the grooves in one feed roll so long as the feed roll is covered by paper from the primary supply roll. When that paper is no longer around the grooved roll, the sensing means falls into the grooves and detects that the paper is absent from around the roll. The transfer means is then activ-

Case 1:05-cv-00160-KAJ-MPT    Document 127-2    Filed 05/12/2006    Page 5 of 19

Westlaw.

22 U.S.P.Q.2d 1657                                                                                      Page 4
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
(Cite as: 22 U.S.P.Q.2d 1657)

ated in response to the sensing means falling into the grooves.

[1] The Aqua-Matic does not sense the presence or absence of paper "at" or "from around" a feed roll; rather, it senses whether the paper is present or absent over a hole in a specially constructed platform at a location above and behind the dispenser's feed rolls. The feed rolls in the Aqua-Matic have no sensing function.

Claim 6 of the Mosinee patent is dependent on claim 1. Therefore, for the same reasons that the Aqua-Matic does not anticipate claim 1, it also does not anticipate claim 6.

Claim 9 of the Mosinee patent recites a structure also having a transfer means which responds to movement of material "from around" one of a pair of feed rolls. When read in light of the specifications, this claim refers to a structure which rests on paper toweling around a grooved feed roll and which falls into the grooves when the tail end of the paper web passes from around the feed roll. The Aqua-Matic does not meet this limitation. The transfer means of the Aqua-Matic does not respond to movement of paper "from around" one of its feed rolls; rather, the Aqua-Matic transfer device responds to the movement of paper over a hole in a specially constructed platform. The hole is apart from and entirely independent of the dispenser's feed rolls.

Claim 22 of the patent also recites a structure which senses the "movement of a tail end of said primary paper web from around said one feed roll and for urging said reserve paper web into said nip in response thereto." Column 16, lines 55-58. No structure such as this exists in the Aqua-Matic dispenser.

James River has not met its burden in showing that the Aqua-Matic dispenser anticipates the Mosinee patent by possessing each and every element of a claimed invention. *1660 See _Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628 [ 2 USPQ2d 1051 ] (Fed. Cir. 1987)_, cert. denied, _484 U.S. 827 (1987)_; _Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744 [ 3 USPQ2d 1766 ] (Fed. Cir. 1987)_,cert. denied, _484 U.S. 1007 (1988)_.

[2] James River also contends that the Mosinee patent is invalid for obviousness. In order to prevail on that contention, James River must show by clear and convincing evidence that the "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. Section 103. In analyzing whether a claim is obvious,

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

_Graham v. John Deere Co., 383 U.S. 1, 17 [ 14 USPQ 459 ] (1966)_. In addition, secondary considerations such as "commercial success, long-felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."_Graham_, at 17 and 18. There are also other considerations that may be relevant. These include the advantages directly flowing from the invention patented, _Pre-Emption Devices, Inc. v. Minnesota Mining & Mfg. Co., 732 F.2d 903 [ 221 USPQ 841 ] (Fed. Cir. 1984)_, and cost reduction and simplification, _In re Cernaker, 702 F.2d 989 [ 217 USPQ 1 ] (Fed. Cir. 1983)_.

On October 4, 1990, James River identified 64 U.S. patents which it asserted, pursuant to 35 U.S.C. Section 282, it would rely on as prior art. Most of these patents were not even mentioned at trial.

The scope and content of this prior art is, nevertheless, exhaustively reviewed in plaintiff's post-trial memorandum, filed September 11, 1991. In addition, assuming that it is prior art, the Aqua-Matic mechanism will be considered as part of the prior art. I will not repeat Mosinee's analysis of the bulk of the prior art as set forth in its brief. However, I have reviewed those items to which Mosinee has directed my attention and am not convinced that James River has shown that the Mosinee patent is obvious based on those inventions.

The Mosinee invention requires two inexpensive parts over and above the components found in all dispensers. By having the feed rolls, which must exist in the dispenser in any

COPR. © 2006 The Bureau of National Affairs, Inc.

Westlaw.

22 U.S.P.Q.2d 1657                                                                                                                Page 5
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

case, double as the base of the transfer device, the Mosinee invention solved the problem of stub roll waste at much less cost, with fewer parts, and with greater reliability than anything in the prior art.

The nonobviousness of the Mosinee mechanism is revealed also by the fact that while other companies -- American Can Company, Georgia-Pacific Corporation, and Crown Zellerbach Corporation -- were working to develop a reliable transfer device, they did not succeed.

American Can was developing the Aqua-Matic, on which James River most heavily relies. The Aqua-Matic transfer device incorporates a sensing frame (which actually consists of several parts welded together), two mounting extensions, a transfer roller, and a specifically constructed guide member having a hole in it. When the end of the primary supply roll passes over the hole in the guide member, the hinge frame pivots and brings a roller into contact with the leading end of a reverse roll and one of a pair of feed rolls. The reverse roll paper is then drawn toward two keepers, the reverse roll paper buckles, and if all goes well, it is then introduced into the nip of two vertically aligned feed rolls. The "Aqua-Matic" transfer device was refused a U.S. patent.

Compared with the Bay West system, the "Aqua-Matic" transfer device has more than twice as many parts (5 versus 2); it works less reliably; and it costs more than five times as much per unit ($6.00+ versus $1.08) not counting the special, over-size cabinet which the transfer device requires.

"Aqua-Matic" dispensers have never achieved any significant market acceptance. Between 1983 and 1987, for example, the defendant's infringing dispensers incorporating the Mosinee invention outsold "Aqua-Matic" dispensers by as much as 60 to 1.

Keeping in mind that Mosinee's Bay West system is a commercial embodiment of the invention, and not the invention itself, it is nevertheless useful, I believe, to attach to this decision [omitted] photographs of the Bay West system and the Aqua-Matic system so as to reveal the extent of the differences between the two transfer devices.

The Georgia-Pacific Corporation also developed its first automatic transfer device in the mid-1970's. It was, however, never commercially produced. The co-inventor of the dispenser, Mr. Raymond F. DeLuca, devoted hundreds of hours to the project and is of the opinion that the Mosinee invention was not obvious to persons having ordinary skill in the art of designing roll towel dispensers in the 1970's.

Defendant's predecessor, Crown Zellerbach, also developed its first generation transfer device in the mid-1970's. The *1661 Crown Zellerbach system worked by sensing the drop of a roll from a suspended position, and by then metering the assumed length of toweling on the dropped roll. The dispenser was extremely complicated and costly to manufacture, and unreliable in operation.

As I stated earlier, the need for a reliable and simple transfer mechanism for roll towel dispensers was long-felt. The problem of stub roll waste was unsolved. These circumstances support a conclusion of non-obviousness. That there was a significant problem which the Mosinee invention solved where other inventions such as the Aqua-Matic did not is a factor to be considered in the analysis of obviousness.

In addition, Mosinee has been commercially successful with its embodiment of the invention in the patent. That James River began to market a device, the Towlsaver, which admittedly infringed the Mosinee patent, is an indication that the Mosinee invention was successful and not obvious. James River chose to copy Mosinee's Bay West system, rather than the Aqua-Matic system.

Finally, and very tellingly, James River itself has acknowledged that the Mosinee invention is patentable. In 1981, the predecessor company to James River applied for its own patent on a replica of the Mosinee invention, U.S. patent application serial number 320,257. In making the application, James River's predecessor corporation represented, under oath, that the replica was patentable over the very prior art it now contends invalidates the patent. Given that, it is difficult to see how James River can now contend with a straight face that the Mosinee invention is invalid and unpatentable.

[3] James River has not shown that the Mosinee invention is invalid for obviousness.

Westlaw.

22 U.S.P.Q.2d 1657    Page 6
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

James River also presents a number of other defenses. It contends that Mosinee engaged in inequitable conduct before the United States Patent and Trademark Office. In order to establish a defense of inequitable conduct, James River must prove, by clear and convincing evidence, a "failure to disclose material information, or submission of false material information, with an intent to deceive. . . ."_Kingsdown Medical Consultants v. Hollister, Inc., 863 F.2d 867 [ 9 US-PQ2d 1384 ] (Fed. Cir. 1988)_, cert. denied, 490 U.S. 1067 (1989). James River relies basically on what it sees as Mosinee's failure to inform the patent and trademark office of the Scott dispenser and the Aqua-Matic dispenser. I am not convinced that either of these omissions constitutes inequitable conduct.

[4] The facts concerning the Aqua-Matic have been discussed at some length in this decision, and that discussion indicates that the Aqua-Matic was not in fact prior art and therefore omission of any mention of it has no relevance. The Scott patent teaches a transfer system that senses the diameter of an expiring supply roll. Its transfer device is significantly different from that set forth in the Mosinee invention. In addition, the Scott patent is classified in the patent and trademark office under U.S. class 242, subclass 55.3, and U.S. class 312, subclass 39. The patent examiner reviewed both of these classes and subclasses of patents in examining the Mosinee application. The examiner did not cite the Scott patent after examining those classes. The failure of Mosinee to cite Scott does not constitute inequitable conduct.

I am further convinced that there is no evidence in this record that any omission of the Scott or the Aqua-Matic devices was done intentionally to deceive the patent examiner.

I conclude that James River was not overcome by clear and convincing evidence the presumption of validity which the Mosinee patent enjoys. James River acknowledges that it infringed the patent prior to its redesign of its dispensers. Thus the Mosinee patent is valid and infringed. The questions of damages and injunctive relief remain.

Mosinee claims, in addition to interest, the following damages:

$12,257,023   in lost royalty income

4,500,248    in lost profit [FN1]

2,820,815    for James River's cost savings

James River argues that the damage demand is excessive and unreasonable. Specifically, it says Mosinee is not entitled to its lost profits; that Mosinee's claim for royalties is inflated; and that Mosinee is not entitled to any of James River's cost savings which flowed from its infringement.

The parties agree that Mosinee, upon a finding of validity and infringement, is entitled to damages based on a calculation of a royalty. However, they disagree about what sum should be awarded. Mosinee contends that the only reasonable base for a royalty for the use of patented dispensers is the number of cases of paper sold using the dispensers. James River argues that the appropriate base would be 5 percent of the $3.23 difference in price per towel dispenser between James River's prior noninfringing transfer mechanism and the infringing device, *1662 or about 16 cents per unit sold. Further, James River argues that it can only be required to pay damages for the time period between the time the product was "marked" pursuant to 35 U.S.C. Section 287 or the time it received notice from Mosinee of the infringement (March 1987) and the time it stopped using the infringing device, September of 1988.

[5] I am convinced that the royalty in this case should be based on the amount of paper sold using the dispensers. The testimony showed that dispensers were placed in the customers' facilities for little or no charge in an attempt to sell paper which, after all, is the heart of the business. In fact, some companies configure their dispensers and towel rolls so that only their paper can be used in their dispensers.

Given that the royalty should be based on the amount of paper sold, the question becomes what percentage figure is appropriate. I reject Mosinee's claim that a 5 percent royalty is appropriate. That figure is pie in the sky. Mr. Jack Perrin, a

COPR. © 2006 The Bureau of National Affairs, Inc.

Westlaw.

22 U.S.P.Q.2d 1657
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

Page 7

semi-retired consultant in the industry, testified that James River paid a royalty of "around three percent" of the net sales price of towels less freight and other allowances. But "around three percent" would be a ceiling. Here, the royalty would be less because Perrin (actually the Perrin Manufacturing Company) had a long-standing exclusive distributor relationship with Crown Zellerbach, James River's predecessor. Moreover, the Crown Zellerbach dispensers had a number of patented and unpatented features that make any arrangement with Perrin inapplicable as a final determining factor in setting a reasonable royalty for the Mosinee patent.

Furthermore, James River's dispensers incorporated numerous patented and unpatented features and improvements having nothing to do with Mosinee's patent, including their styling, lever action, and controlled dispensing features, not to mention the high absorbency and quality of its towels themselves.

Given the totality of the circumstances here, a reasonable royalty figure would be 1.5 percent of the cost of towels sold. That sum is $3,677,107. Mosinee is entitled to interest on this sum.

I also reject James River's marking argument. The evidence shows that Mosinee began marking its product in 1980, long before the infringement in this case. Also, the evidence shows that the infringement has not fully ceased in that its previously distributed infringing dispensers have not been converted to noninfringing transfer systems.

Lost profits can be awarded only if Mosinee can prove that it would have captured the sales made by James River *but for* the infringement. In order to claim lost profits an inventor must show "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made."*Water Technologies v. Calco, Ltd., 850 F.2d 660, 672 [ 7 USPQ2d 1097 ] (Fed. Cir. 1988)*, cert. denied, 488 U.S. 968 (1988). Mosinee has not met its burden. It is pure speculation to say it would have picked up its market share of the James River sales. It is highly unlikely that James River would have been unable to hang on to its customers by offering them some other dispenser. I will not award lost profits.

Similarly, I will not award Mosinee James River's "cost savings" -- that is, the difference in price between its former transfer device and the infringing device.

Mosinee also claims that this is an exceptional case, pursuant to 35 U.S.C. Section 285, thus entitling it to an award of attorney fees. While I agree with Mosinee that James River has not been easy to deal with, I am not sure that it was the only difficult party. The pretrial proceedings and the trial in this matter did not proceed as smoothly and politely as patent trials tend to. The pretrial proceedings in this case were marred by several disputes over the scope of discovery. The disputes spilled over into the trial. To get the flavor of the disputes, and the general less-than-desirable climate in which this case was tried, I reprint here one of the many exchanges that occurred between the lawyers during the proceedings:

MR. WYATT: May I call my next witness, Mr. William Bean.

MR. DABNEY: Your Honor, I would like to note for the record this is another witness they have identified for us for the first time and the defendants refused our request to tell us what this witness knows or anything about the expected testimony.

MR. WYATT: That's untrue, Your Honor. They have not. Mr. Bean is listed. They had an opportunity if they wanted to take his deposition and they did not.

MR. DABNEY: Your Honor, we have already submitted in our motion in limine the correspondence in which I wrote the week before the trial and I asked would you please tell me who these newly named witnesses are and what they're going to talk about and Mr. Dorchak wrote me back and said discovery is now closed and you're going to have to do the best you can at trial.

*1663 Your Honor, the best I can do at trial is to say the federal rules discovery exist to prevent Mr. Wyatt from doing exactly what he's attempted repeatedly to do throughout this trial with new surprise witnesses, new surprise documents. This is just a continued situation of a pattern which I think is becoming apparent to the Court. I literally have no

COPR. © 2006 The Bureau of National Affairs, Inc.

Case 1:05-cv-00160-KAJ-MPT Document 127-2 Filed 05/12/2006 Page 9 of 19

Westlaw.

22 U.S.P.Q.2d 1657 Page 8
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

idea what connection this witness has to the case, none despite requests to opposing counsel.

I suppose he thinks I should have made a sixth motion to compel or move to reopen the discovery period while I was responding to the motion for separate trials and then the motion for summary judgment and then the motion out in California. I mean it just it's unfair to the plaintiff to require us to continually have to deal with these witnesses when they could easily have told us in a letter he's going to testify about such and such and such and such. And then we would have known if we needed to take his deposition or not.

MR. WYATT: Your Honor, we got the same list from them of people we had never heard of on that list on the eve of that prior trial date. And that letter was written on the eve of that trial. There were ten months between that letter and this time.

Mr. Bean's name is mentioned on correspondence on exhibits that have been produced. I'm going to talk to him about Defendant's Exhibit 104 which they have known about for some time and it's not a surprise to them.

MR. DABNEY: Your Honor, the exhibit, if it's the one that I think, was produced to us about a week before the trial report was produced. It was withheld until after -- until three months after the close of discovery and three weeks before trial. We got it in October of 1990, this exhibit for the first time.

MR. WYATT: Your Honor, these inflammatory statements continually withheld--

MR. DABNEY: The facts are inflammatory, Your Honor.

MR. WYATT: Will you let me, give me the courtesy of finishing and not interrupt me. Your Honor, we found that by getting an old retired employee to go in and go through old records, we looked and looked and looked for records and we finally found that record. I can bring that gentleman down here, the man that found it if I had to. It's an old -- once when James River took over American Can, the old American Can records went asunder and we got an old employee in and he looked, he looked for months and he finally found some more records and we produced them within a week of the time we found them. And I can bring a witness in if need be to prove that.

MR. DABNEY: So all throughout the discovery period they were not looking for the documents that had been requested. They produce it three months after discovery period and they not only want to offer the document in evidence but they want to offer a witness who was never previously named in discovery has now been admitted until three weeks before the original trial date.

MR. WYATT: Your Honor, we're constantly being accused of being thieves, crooks. We have done -- this is a large company with voluminous documents. Mr. Dabney has called me about every name I've ever been called in 30 years of litigation. Tom Howard was the only man that we had who knew what happened back in those days from American Can and Tom died. We produced every document that Tom Howard was able to find for us. He was an older gentleman. And after that we went out and we used every resource we had to find documents. They were just scattered around. Most of them were destroyed.

We found some and whenever a document doesn't exist, a fortiori, we're withholding documents. Just because we don't have sales records going back to the mid 80s, we're guilty of withholding evidence. I mean that's the constant accusation from Mr. Dabney. I don't think that that's correct.

MR. DABNEY: We think the question is one of fairness, whether we should be required to deal with evidence and witnesses produced long after the close of discovery. And in response to written request from counsel for an explanation as to what the witnesses are listed for and what they're going to testify about, the response from the defendant is well, sorry, tough luck, discovery is closed, we're not going to tell you. Despite the federal rules of civil procedure which require supplementation of interrogatories in these circumstances.

MR. WYATT: Your Honor, that was a week before a trial date. This is their able counsel, he could have noticed the depositions of all those people we had and certainly I'm sure he could have taken them.

COPR. © 2006 The Bureau of National Affairs, Inc.

Westlaw.

22 U.S.P.Q.2d 1657                                                                Page 9
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
(Cite as: 22 U.S.P.Q.2d 1657)

MR. DABNEY: Your Honor, it would have been a violation of rule 11 for me to serve a deposition notice in violation of the Court's discovery cut off order. We were as the Court well knows totally occupied *1664 with responding to motion after motion after motion filed by the defendant during this period. We felt that the federal rules did not allow what the plaintiff was attempting to do and we relied on the rules to protect us in this situation.

THE COURT: Well, this is the first time that a dispute has arisen where I've just sat back and let you talk. I usually have after one of you said something jumped in and said we'll do it this way or we'll do it that way. I thought I would just sit back and let the two of you keep going back and forth so the record would reflect as this case goes up on appeal the kind of things that I've heard ever since this trial started, the kinds of things I've heard at side bar conferences and so on.

It would take a two week trial to ferret out who is right and who is wrong on all of these disputes. In the 10 or 15 patent trials I've tried since I've been in this court, this is the first time I've seen such a difference of opinion between the attorneys as to what has been produced, what has been requested, what's reasonable, what's unreasonable. And I think this last interchange between Mr. Dabney and Mr. Wyatt will aptly demonstrate the difficulties that they have had in this case.

I don't intend to spend two weeks finding out who is right and who is wrong on these disputes. So far I haven't seen any great prejudice to the plaintiff so I think it's best that we just proceed and keep plowing along through this case.

MR. DABNEY: Very well, Your Honor.

THE COURT: Let's move it along.

MR. WYATT: Thank you, Your Honor.

As one can see from this transcript, this case was not tried according to the usual patent case Marquis of Queensberry rules. With the exception of the way this case was tried, it was not exceptional. It was certainly not exceptional under 35 U.S.C. Section 285. Accordingly, no attorney fees will be awarded.

James River is ENJOINED from any further use of the infringing dispensers. Mosinee may, within 10 days, submit an appropriate form of an injunction and a calculation of interest due through March 1, 1992. James River will have 5 days thereafter to object to the interest calculations and the form of the injunction. Judgment will then be entered in favor of Mosinee for $3,677,107 plus interest and injunctive relief.

*ORDER* March 13, 1992

By order dated February 18, 1992, Mosinee Paper Corporation was awarded $3,677,107 in damages based on the infringement by James River Corporation of Virginia of its patent on a paper towel dispenser. James River was enjoined from further use of the infringing dispensers. In the order, Mosinee was asked to submit a calculation of the interest to which it was entitled on the damage award and an appropriate form of injunction. James River was allowed 5 days in which to object to the submissions. Both side have filed lengthy documents.

Mosinee contends that it is entitled to interest calculated at the prime rate not just through July 31, 1991, which is the date to which the damages were calculated in the February 18, order, but through February 29, 1992. The latter date was chosen because it marks the end of the month in which I ruled that an injunction would be issued. If the appropriate date were found to be February 29, 1992, Mosinee argues that the amount of damages would correspondingly be increased from $3,677,107 to $4,027,476.76.

James River argues that Mosinee is not entitled to interest at the prime rate: it is not a bank and could not expect to earn interest at the prime. Rather, James River thinks that the 52-month treasury bill rate is appropriate. Further, James River argues that interest should run from either March 1987, the date on which Mosinee charged James River with infringement, or from mid-September 1988, when this lawsuit was filed.

I reject again James River's argument regarding the date on which infringement begins. In the decision of February 18, I rejected that argument. It has been resurrected here in a slightly different guise and fails again.

COPR. © 2006 The Bureau of National Affairs, Inc.

Westlaw.

22 U.S.P.Q.2d 1657                                                                                                          Page 10
Not Reported in F.Supp., 1992 WL 41690 (E.D.Wis.), 22 U.S.P.Q.2d 1657
**(Cite as: 22 U.S.P.Q.2d 1657)**

[6] I agree with the cases cited by Mosinee that indicate that an appropriate rate of interest is the prime rate. I also agree that interest should be calculated through the end of February 1992. I disagree that the damages should be correspondingly increased. Accordingly, interest will be awarded in accordance with exhibit B to the February 27 brief filed by Mosinee, in the amount of $1,605,573.62 for a total award of $5,282,680.65.

The form of the injunction as submitted by Mosinee is somewhat modified. The injunction which is issued today is attached to this order.

*1665 *FINAL JUDGMENT AND PERMANENT INJUNCTIVE ORDER*

Upon the findings of fact and conclusions of law set forth in the decision dated February 18, 1992, judgment is hereby ENTERED as follows:

1. This court has jurisdiction over the subject matter of this action and over the parties.

2. Plaintiff Mosinee Paper Corporation is the owner of U.S. Patent No. 4,165,138 issued August 21, 1979.

3. Claims 1, 6-9, 13, 14, and 22 of plaintiff's U.S. Patent No. 4,165,138 are valid and subsisting.

4. Defendant James River Corporation of Virginia is liable to the plaintiff for having infringed each of claims 1, 6-9, 13, 14, and 22 of U.S. Patent No. 4,165,138, and for having contributed to, caused, aided, or abetted infringements of the patent by defendant's distributors and customers.

5. Defendant James River Corporation of Virginia shall pay plaintiff $3,677,107 in damages and $1,605,574 in interest, for a total award of $5,282,681.

6. Defendant James River Corporation of Virginia, its officers, agents, servants, employees, and attorneys are hereby permanently enjoined and restrained from any further making, using, or selling, or inducing or contributing to the making, using, or selling, of roll towel dispensers covered by any of claims 1, 6-9, 13, 14, or 22 of plaintiff's U.S. Patent No. 4,165,138.

SO ORDERED.

FN1 If it gets $4,500,248 in lost profits, Mosinee's royalty demand falls to $11,731,457.

E.D.Wis.

22 U.S.P.Q.2d 1657

END OF DOCUMENT

# EXHIBIT B

Westlaw.

15 Fed.Appx. 836
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
**(Cite as: 15 Fed.Appx. 836)**

Page 1

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6, this order is not citable as precedent. It is a public record.This case was not selected for publication in the Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6, this order is not citable as precedent. It is public record. Please use FIND to look at the applicable circuit court rule before citing this opinion. Federal Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
NEWELL WINDOW FURNISHINGS, INC. and KIRSCH, INC., Plaintiffs-Appellants,
v.
SPRINGS WINDOW FASHIONS DIVISION, INC., Defendant/Cross-Appellant.
No. 00-1079, 00-1099.

July 2, 2001.

Owner of patents for cellular window shades sued competitor for infringement. The United States District Court for the Northern District of Illinois found the patents infringed, but unenforceable and invalid, and cross-appeals were taken. The Court of Appeals, Schall, Circuit Judge, held that: (1) owner had not engaged in inequitable conduct before patent examiner, but (2) first patent was invalid as anticipated and second patent was invalid as obvious.

Affirmed in part, reversed in part, and vacated in part.

Gajarsa, Circuit Judge, concurred and filed opinion.

West Headnotes

[1] Patents 291 ⇌97

291 Patents
291IV Applications and Proceedings Thereon
291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
Patent applicant's presentation of favorable results from prior litigation with competitor as evidence of patentability of cellular window shade invention, while withholding documents from litigation which called patentability of invention into question, was not inequitable conduct precluding enforcement of resulting patent, absent evidence of intent to deceive.

[2] Patents 291 ⇌66(1.25)

291 Patents
291II Patentability
291II(D) Anticipation
291k63 Prior Patents
291k66 Operation and Effect
291k66(1.25) k. Miscellaneous Claims. Most Cited Cases
Claim in patent for cellular window shade did not require shade member that was part of complete shade assembly that covered window, and thus was invalid as anticipated by competitor's shade member with comparable structure. 35 U.S.C.A. § 102.

[3] Patents 291 ⇌16.14

291 Patents
291II Patentability
291II(A) Invention; Obviousness
291k16.14 k. Miscellaneous Inventions. Most Cited Cases
Patent for cellular window shade which used multiple attachment zones between cells was invalid as obvious in light of competitor's shade, which used comparable cell structures joined by single glue lines, prior art patent which disclosed application of multiple glue lines at cell attachment zones, and evidence of motivation of those skilled in art to combine teachings of competitor's shade and prior art patent. 35 U.S.C.A. § 103(a).

Before MICHEL, SCHALL, and GAJARSA, Circuit Judges.
Opinion for the court filed by Circuit Judge SCHALL. Concurring opinion filed by Circuit Judge GAJARSA.

DECISION

SCHALL, Circuit Judge.
**\*1** Newell Window Furnishings, Inc. and Kirsch, Inc. (collectively, "Newell") sued Springs Window Fashions Division, Inc., a \*837 wholly-owned subsidiary of Springs Industries, Inc. ("Springs") for infringement of United States Patent Nos. 5,701,940 and 5,692,550 (the " '940 and '550

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15 Fed.Appx. 836                                                                                                                       Page 2
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
**(Cite as: 15 Fed.Appx. 836)**

patents"), both directed to cellular window shades, in the United States District Court for the Northern District of Illinois. By the consent of both parties, the case was tried to a magistrate judge without a jury who entered both findings of fact and conclusions of law.[FN1] The court first found that Springs' Maestro cellular shade infringed claim 1 of the '940 patent and claim 1 of the '550 patent. _Newell Window Furnishings, Inc. v. Springs Window Fashions Div., Inc._, 53 USPQ2d 1302, 1319 (N.D.Ill.1999). However, the court also found both the '940 and the '550 patent unenforceable due to inequitable conduct. _Id._ at 1327-32. In addition, the court determined that claim 1 of the '940 patent was invalid by reason of anticipation, _id._ at 1323-24, and that claim 1 of the '550 patent was invalid by reason of obviousness, _id._ at 1325-26. These were the claims of the patents that were asserted by Newell against Springs. Newell appeals the district court's finding of inequitable conduct and invalidity with respect to both the '940 and the '550 patent. For its part, Springs cross-appeals the district court's finding of infringement of both patents and urges additional grounds to support the district court's finding of inequitable conduct. For the reasons set forth below, we _reverse_ the district court's ruling of inequitable conduct, but we _affirm_ the court's rulings of invalidity with respect to claim 1 of the '940 patent and claim 1 of the '550 patent. We _vacate_ as moot the district court's rulings of infringement.

> FN1. We refer to the magistrate judge as the "district court" or the "court."

DISCUSSION

I. Inequitable Conduct

A. "Applicants for patents have a duty to prosecute patent applications with candor, good faith, and honesty." _Molins PLC v. Textron, Inc._, 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1826 (Fed.Cir.1995); _see also_ 37 C.F.R. § 1.56. A breach of this duty by "affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information, coupled with an intent to deceive, constitutes inequitable conduct." _Li Second Family Ltd. P'ship v. Toshiba Corp._, 231 F.3d 1373, 1378, 56 USPQ2d 1681, 1684 (Fed.Cir.2000). The facts relating to inequitable conduct must be established by clear and convincing evidence. _Monon Corp. v. Stoughton Trailers, Inc._, 239 F.3d 1253, 1261, 57 USPQ2d 1699, 1705 (Fed.Cir.2001). The ultimate determination of inequitable conduct is reviewed for an abuse of discretion, with the underlying factual determinations of materiality and intent reviewed for clear error. _Li Second Family_, 231 F.3d at 1378, 56 USPQ2d at 1685.

B. The inequitable conduct issue in this case grows out of prior litigation between Newell and Comfortex Corporation ("Comfortex"). In September of 1996, Newell sued Comfortex for infringement of Newell's United States Design Patent No. D 352,856 (the " '856 design patent"). The '856 design patent claims the design that is reflected in the inventions of the '940 and '550 patents. Newell alleged that Comfortex's "Solo" cellular shade infringed the '856 design patent. Eventually, the Comfortex litigation settled. The settlement included an agreement under which Comfortex would pay a graduated royalty under the '856 design patent and under which the royalty rate would increase as Comfortex's sales of the Solo increased (the "Licensing Agreement"). The parties additionally agreed that Newell*838 would dismiss its suit against Comfortex and that a previous order in the case denying Newell's application for a preliminary injunction (the "PI Order") would be vacated.[FN2] Also as part of the settlement, the parties entered into a second agreement, pursuant to which Comfortex was granted a $25,000 credit against future royalty payments under the Licensing Agreement, in exchange for the licensing of certain Comfortex patents to Newell (the "Technology Sharing Agreement"). On August 27, 1997, a consent judgment was entered dismissing the Comfortex litigation (the "Consent Judgment"). The Consent Judgment stated, in part: "The '856 [design] patent is valid and enforceable."

> FN2. In the PI Order, the district court noted that, in its view, there were "significant issues" as to whether the Solo shades infringed and whether the '856 design patent was valid because of prior art, which included a Comfortex shade called the "Rosette." The court stated: "Together these questions concerning infringement and validity of the patent loom so large that the Court must conclude as a preliminary matter that it is unlikely that

Westlaw.

15 Fed.Appx. 836
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
(Cite as: 15 Fed.Appx. 836)

Page 3

plaintiff will succeed on the merits." The PI Order apparently was never vacated.

**2 On August 12, 1997, the examiner who was considering the application for the '550 patent issued a final rejection of the application on the ground that the claimed invention was unpatentable over certain prior art, specifically the Rosette. Newell responded to the rejection on September 15, 1997, by filing amendments pursuant to 37 C.F.R. § 1.116 and by arguing that the '550 patent's claims were valid in light of the Rosette. In particular, Newell argued that claim 1, as well as other claims, were valid over the Rosette due to the fact that the Consent Judgment included the statement that the '856 design patent was valid. Newell claimed that the Consent Judgment was evidence of the '856 design patent's validity over the Rosette, and asserted that there was a correlation between the subject matter covered by the '856 design patent and the '550 patent. Newell also claimed that the Licensing Agreement between Newell and Comfortex was evidence of nonobviousness of the '550 patent. Newell, however, failed to disclose to the examiner either the PI Order or the Technology Sharing Agreement. On September 22, 1997, the examiner issued a notice of allowance for the '550 patent, and the patent issued on December 2, 1997. The '940 patent issued on December 30, 1997.

The district court concluded that Newell's failure to disclose the PI Order and the Technology Sharing Agreement to the examiner constituted inequitable conduct. Newell, 53 USPQ2d at 1332. The court reasoned that "insofar as [Newell] relied upon the [Comfortex] litigation to assert arguments of patentability, information that refutes or is inconsistent with those arguments is material under [37 C.F.R. 1.56(b)(2)(ii)]." Id. at 1330. The court found both the PI Order and the Technology Sharing Agreement inconsistent with Newell's arguments (i) that the Comfortex litigation was evidence of the '550 patent's validity over the Rosette and (ii) that the Licensing Agreement was evidence of the nonobviousness of the invention claimed in the '550 patent. Id. at 1331. The court also found that Newell "intended to mislead or deceive the examiner by withholding the [PI Order] and the [Technology Sharing Agreement] while relying upon both the [Consent Judgment] and the [Licensing Agreement] as evidence favorable to patentability." Id. at 1332.

[1] C. On appeal, Newell challenges the district court's inequitable conduct ruling on two grounds. First, it contends that the PI Order and the Technology Sharing Agreement were not material. *839 Second, it argues that the district court erred in finding that Newell intended to deceive the examiner. We see no reason to disturb the district court's finding that the PI Order and the Technology Sharing Agreement were material for purposes of the inequitable conduct analysis. However, we are unable to sustain the district court's finding of an intent to deceive.

We do not believe that the district court's finding of an "intentional scheme to mislead or deceive the examiner," Newell, 53 USPQ2d at 1332, is supported by the evidence, especially when it is borne in mind that Springs was required to prove the facts relating to inequitable conduct, such as intent, by clear and convincing evidence. First, beyond the timing of events, there is no indication that Newell's settlement of the Comfortex litigation was orchestrated in order to obtain an allowance of the '550 patent. Significantly, the district court did not rest its finding of a pattern of manipulation on the testimony of the individuals who were involved in the Comfortex litigation and the prosecution of the '550 patent. While "intent need not be proven by direct evidence," Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329, 47 USPQ2d 1225, 1230 (Fed.Cir.1998), the lack of a finding that any testimony suggests an over-arching scheme to deceive the examiner hampers the district court's ultimate finding of intent. In addition, in this case, wrongful intent cannot be "inferred from clear and convincing evidence of the surrounding circumstances," id. Even if the '550 patent and the '940 patent had not been in prosecution during the Comfortex litigation, Newell still would have had a motive to obtain the Consent Judgment, including a statement of the '856 design patent's validity, as part of the settlement of the litigation. Such stipulations are common in the settlement of patent cases. Furthermore, although the Technology Sharing Agreement reduced the significance of the Licensing Agreement, Newell still obtained the right to use Comfortex's technology in the field of cellular shades in exchange for the $25,000 credit that Comfortex received. Both parties benefited from the Licensing Agreement and the Technology Sharing Agreement, contradicting the district court's conclusion that Newell "effectively purchased" Comfortex's co-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00160-KAJ-MPT    Document 127-2    Filed 05/12/2006    Page 16 of 19

Westlaw.

15 Fed.Appx. 836
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
(Cite as: 15 Fed.Appx. 836)

Page 4

operation.

**\*\*3** Finally, in its response to the final rejection of the '550 patent, Newell disclosed declarations and depositions from both Newell and Comfortex witnesses on the issue of the '856 design patent's validity. The district court failed to take this evidence into account. Failure to "weigh all the evidence, including evidence of good faith," establishes clear error. *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384, 47 USPQ2d 1533, 1536 (Fed.Cir.1998).

We therefore conclude that, while the PI Order and Technology Sharing Agreement were material, the district court erred in finding the threshold level of intent necessary to establish inequitable conduct. Inequitable conduct must be established by clear and convincing evidence, and in this case, such evidence was not before the district court to support a finding of intent.[FN3]

> FN3. We have considered and we reject the alternative grounds Springs urges on appeal to support the district court's finding of inequitable conduct.

## II. Invalidity of the '940 and '550 patents

A. As noted above, the claims that Newell asserted against Springs and that the district court held to be invalid are claim 1 of the '940 patent and claim 1 of the '550 patent. Springs argued to the \*840 district court that claim 1 of the '940 patent was anticipated by the Rosette. It also argued that claim 1 of the '550 patent was obvious in light of the Rosette combined with United States Patent No. 4,450,027 (the " '027 patent"). The '027 patent disclosed a single-cell cellular shade, and, of relevance to this suit, disclosed the application of two glue lines at the attachment zone, so that one cell attached to the cell above it in two distinct places. '027 patent, col. 7, ll. 10-17.

The district court agreed with Springs, finding claim 1 of the '940 patent and claim 1 of the '550 patent invalid. *Newell*, 53 USPQ2d at 1323-26. The court first construed the phrase "cellular pleated shade member" in claim 1 of both patents as describing "a sample of cellular pleated fabric that contains three or more cells, with at least one of those cells exhibiting the physical characteristics described in the claim[s]." *Id.* at 1324-25. Armed with that construction, the court found that the Rosette anticipated the '940 patent because it met all of claim 1's limitations. *Id.* at 1324. The court next turned to claim 1 of the '550 patent, first noting that the Rosette did not anticipate claim 1 because the Rosette only had one attachment zone between each cell, while claim 1 required at least two. *Id.* at 1324-25. The court concluded, however, that it would have been obvious to one skilled in the art to apply the teachings found in the '027 patent, the use of multiple attachment zones between two cells, to the Rosette. *Id.* at 1325-26. The court considered, and dismissed, Newell's evidence of secondary considerations and concluded that claim 1 of the '550 patent was obvious. *Id.* at 1326.

B. On appeal, Newell argues that the district court's finding of invalidity of claim 1 of both patents is based on an improper claim construction of the phrase "cellular pleated shade member." Newell contends that this phrase limits the claims to a cellular shade member that is part of a complete shade, not a mere sample of shade material such as the Rosette. Therefore, Newell asserts, claim 1 of the '940 patent is not anticipated. Newell next argues that there was no evidence to support the district court's determination that claim 1 of the '550 patent was obvious because nothing suggests a motivation to modify the Rosette with the teachings of the '027 patent. Newell also cites its evidence regarding secondary considerations, such as long felt need and commercial success, as mandating a reversal of the district court's finding of obviousness.

**\*\*4** To determine whether a patent claim is anticipated or obvious, it must first be construed. *Key Pharms. v. Hercon Lab. Corp.*, 161 F.3d 709, 714, 48 USPQ2d 1911, 1915 (Fed.Cir.1998). The district court properly construed claim 1 of the '940 patent and claim 1 of the '550 patent to include a cellular pleated fabric that contains at least three or more cells, with at least one of those cells meeting the described claim limitations. The plain language of both claims supports the district court's construction. Claim 1 of the '940 patent requires "[a] cellular pleated shade member having a plurality of cells, at least one of the cells comprising" certain physical characteristics. '940 patent, col. 6, ll. 27-28.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15 Fed.Appx. 836　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 5
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
**(Cite as: 15 Fed.Appx. 836)**

Claim 1 of the '550 patent has a similar requirement-"[a] cellular pleated shade member having a plurality of interconnected cells, at least one of the cells comprising" certain physical characteristics. '550 patent, col. 5, ll. 53-54. Both claims only require a "member" of a cellular pleated shade, not a complete cellular pleated shade. The claims also only require one cell within this member to have the described physical characteristics.

*841 In addition, independent claims 11, 12, 18, 25, and 34 of the '940 patent and independent claims 10, 24, and 47 of the '550 patent, in contrast, describe a cellular shade "for covering a window," not simply the "shade member" that is described in claim 1 of both patents. These other independent claims expressly describe a complete shade assembly that covers a window. Under the doctrine of claim differentiation, "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023, 4 USPQ2d 1283, 1288 (Fed.Cir.1987). The fact that such an explicit requirement for a complete cellular shade for covering a window is not found in claim 1 of either patent, but found in other claims of both patents, further supports the district court's claim construction.

[2] After the claims in question are construed, the claims are compared to the prior art. *Key Pharms.,* 161 F.3d at 714, 48 USPQ2d at 1915. The district court did not clearly err in finding that the Rosette anticipated claim 1 of the '940 patent. As the district court properly found, the Rosette "was assembled from cellular shade fabric and contained three or more cells, at least one of which contained the physical structure described. It is also clear that the [R]osette met all of the remaining claim limitations." *Newell,* 53 USPQ2d at 1324. Newell's main argument against the court's finding of anticipation has been answered above; claim 1 does not require a shade member that is part of a complete shade assembly that covers a window. Therefore, the fact that the Rosette is not part of a complete shade assembly is irrelevant.

[3] We also find no error in the district court's conclusion that claim 1 of the '550 patent is obvious. The district court defined the relevant scope of the prior art ("the art of cell structure" in cellular shade design), the differences between the prior art and the claimed invention ("the presence of multiple attachment zones, with at least one on each side of the longitudinal center of the cell wall"), and the level of skill in the art (a high school education and knowledge of existing products, patents, and prior art). *Id.* at 1325. The court went on to note that the '027 patent was within the relevant scope of the prior art, and that the '027 patent taught the difference between the claimed invention and the Rosette-the use of multiple glue lines (attachment zones) between cells in a single-cell shade design. *Id.* at 1326.

**5 Contrary to Newell's contention, the district court properly found suggestions both in the prior art and the knowledge of those skilled in the art to modify the Rosette by using multiple attachment zones. First, the court determined that the '027 patent itself suggested to those skilled in the art that two glue lines, one on each side of the longitudinal center of the cell wall, could be used to attach one cell to the next. *See Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 666, 57 USPQ2d 1161, 1167-68 (Fed.Cir.2000) (noting that "the prior art references themselves" can provide a motivation to combine). The court also determined that cellular shade patents owned by Hunter Douglas, Inc., which included the '027 patent, were very important to those skilled in the art because those patents represented the "boundaries of innovation" in the industry and "posed [ ] a high risk of litigation" due to Hunter Douglas's aggressive assertion of the patents, *Newell,* 53 USPQ2d at 1325. The fact that the knowledge included in such patents, including the '027 patent, was "of special interest or importance in the field," is also evidence of a motivation to combine, *Ruiz,* 234 F.3d at 666, 57 USPQ2d at 1167-68.

*842 Finally, we see no merit in Newell's argument that the district court erred when considering Newell's evidence of secondary considerations. The evidence indicated that the success, if any, of Newell's products was based on the cellular shade industry's need for a process for making single-cell shades that was an alternative to the Hunter Douglas process. Since claim 1 of the '550 patent describes a product as opposed to a process for making a product, the district court did not clearly err in finding little or no nexus. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,* 229 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15 Fed.Appx. 836                                                                                                     Page 6
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)
**(Cite as: 15 Fed.Appx. 836)**

1120, 1130, 56 USPQ2d 1456, 1463 (Fed.Cir.2000). Accordingly, we will not disturb the ruling of the district court that claim 1 of the '940 patent and claim 1 of the '550 patent are invalid.

### III. Infringement

As noted above, Springs cross-appeals the district court's judgment of infringement. The district court found that Springs infringed claim 1 of the '940 patent and claim 1 of the '550 patent. Newell, 53 USPQ2d at 1319. Since we affirm the district court's finding that both claims are invalid, we vacate as moot the district court's findings of infringement. See, e.g., Brown & Williamson, 229 F.3d at 1122-23, 56 USPQ2d at 1465.

### CONCLUSION

For the foregoing reasons, we reverse the district court's judgment of inequitable conduct; affirm the court's judgment of invalidity of claim 1 of the '940 patent and claim 1 of the '550 patent; and vacate the court's judgment of infringement of claim 1 of the '940 patent and claim 1 of the '550 patent.

Each party shall bear its own costs.

GAJARSA, Circuit Judge, concurring.
I agree with the judgment and conclusions of the majority; however, I write separately only to clarify that the majority's decision to reverse the district court's judgment on the issue of intent to deceive is not to be taken as a suggestion that conduct, such as occurred here, cannot be the basis of a finding of inequitable conduct. Indeed, each case turns on its facts.

**\*\*6** The majority concludes that the district court's finding of intent to deceive the PTO is clearly erroneous. In particular, the majority was not persuaded that Springs had proven that Newell, the successor in interest to Kirsch's application, orchestrated the settlement or withheld the Technology Sharing Agreement to obtain allowance of the patent. Because the district court must find that Newell presented clear and convincing evidence to support a finding of intent, I agree with the result reached by the majority.

Nevertheless, in my judgment, this result rests on the inadequacy of the district court's analysis. Had the district court properly weighed the evidence before it, we may have reached a different result. Thus, our reversal is in no way based upon a finding on appeal that Kirsch's conduct was acceptable, or to suggest that material information can be withheld without consequence.

Indeed, the majority agreed with the finding of the district court that both the PI Order and the Technology Sharing Agreement were material to patentability. The circumstantial evidence was somewhat probative of deceptive intent. Because credibility determinations are virtually unreviewable, we would have been inclined to affirm had the court based its finding of deceptive intent on the credibility, or lack thereof, of Newell's witnesses. Furthermore, had the court properly weighed all of the evidence, including evidence of good **\*843** faith, I suggest that an affirmance of the district court's decision would have been in order. Because the court failed to articulate its consideration of all of the evidence critical to a finding of intent, we must reverse.

C.A.Fed.,2001.
Newell Window Furnishings, Inc. v. Springs Window Fashions Division, Inc.
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)

Briefs and Other Related Documents (Back to top)

• 2000 WL 34401362 (Appellate Brief) Reply Brief for Defendant-Cross Appellant Springs Window Fashions Division, Inc. (Jun. 13, 2000) Original Image of this Document (PDF)
• 2000 WL 34401870 (Appellate Brief) Reply-Response Brief of Plaintiffs-Appellants Newell Window Furnishings, Inc. and Kirsch, Inc. (Revised) (Jun. 02, 2000) Original Image of this Document (PDF)
• 2000 WL 34401869 (Appellate Brief) Brief for Defendant-Cross Appellant Springs Window Fashions Division, Inc. (Mar. 31, 2000) Original Image of this Document (PDF)
• 2000 WL 34401871 (Appellate Brief) Nonconfidential Opening Brief of Plaintiffs-Appellants Newell Window Furnishings, Inc. and Kirsch, Inc. (Feb. 04, 2000) Original Image of this Document (PDF)
• 00-1099 (Docket) (Nov. 22, 1999)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15 Fed.Appx. 836  
15 Fed.Appx. 836, 2001 WL 744460 (C.A.Fed.)  
**(Cite as: 15 Fed.Appx. 836)**

Page 7

- 00-1079 (Docket) (Nov. 12, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.