IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,

                Plaintiff,

     v.

GENENCOR INTERNATIONAL, INC. and
ENZYME DEVELOPMENT CORPORATION,

            Defendants.

C.A. No. 05-160-KAJ

**PART 3 OF 3**
**UNREPORTED CASES ATTACHED TO**
**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO MODIFY**
**THE SCHEDULING ORDER FOR THE PURPOSE OF AMENDING ITS COMPLAINT**

**9**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

NOT FOR PUBLICATION
United States District Court, D. New Hampshire.
**POLYCLAD LAMINATES,** INC., and Fry Metals,
Inc., d/b/a PC Fab Division of Alpha Metals,I nc.,
Plaintiffs
v.
MACDERMID, INC., Defendant
**No. CIV. 99-162-M.**

Feb. 13, 2001.

ORDER

MCAULIFFE, District J.
*1 Polyclad Laminates, Inc. ("Polyclad") and Fry Metals, Inc., doing business as PC Fab Division of Alpha Metals, Inc. ("Alpha"), bring this patent infringement action against MacDermid, Inc. See 35 U.S.C. § 271, et seq. Polyclad is the exclusive licensee of United States Patent No. 5,800,859 (the " '859 patent"). According to plaintiffs, Alpha is the only organization licensed by Polyclad to manufacture and sell the chemicals used in carrying out the patented processes. It also possesses the right, exercisable in its sole discretion, to sublicense third parties to practice the patented processes. See Amended complaint at para. 6.

The '859 patent teaches a process for copper coating circuit boards, the first step in creating a printed circuit board. Part of that coating process involves the use of a surface active agent, or "surfactant." A substantial dispute in this case relates to the type of surfactant actually claimed in the patent and whether, as MacDermid asserts, plaintiffs knew, but failed to disclose to the United States Patent and Trademark Office (the "PTO"): (1) that only a process utilizing cationic (i.e., negatively charged) surfactants was novel over prior art; and/or (2) that the processes taught by the '859 patent actually require a cationic surfactant in order to function as claimed.

Plaintiffs say that MacDermid is infringing one or more claims of the '859 patent and is actively inducing others to infringe that patent. Alternatively, it asserts that the '859 patent is invalid and unenforceable. MacDermid also raises two

counterclaims. First, it seeks a judicial declaration that the '859 patent is invalid and unenforceable due to plaintiffs' alleged "inequitable conduct" before the PTO. Next, it brings a claim for tortious interference with prospective and existing customers, based on plaintiffs' having informed MacDermid's customers of the alleged patent infringement.

Plaintiffs move for partial summary judgment with regard to MacDermid's counterclaims (as well as its third affirmative defense which, like its first counterclaim, relies upon plaintiffs' alleged inequitable conduct before the PTO). MacDermid objects and, in turn, moves for judgment of non-infringement as a matter of law. MacDermid also moves to dismiss Alpha as a party plaintiff, asserting that as a "non-exclusive licensee" of the '859 patent, Alpha lacks standing to sue for alleged infringement of that patent. See Fed.R.Civ.P. 12(b)(1).

Standard of Review

*I. Motion to Dismiss.*

"When faced with a motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), Fed.R.Civ.P., the party asserting jurisdiction has the burden to establish byco mpetent proof that jurisdiction exists." Stone v. Dartmouth College, 682 F.Supp. 106, 107 (D.N.H.1988) (citing O'Toole v. Arlington Trust Co., 681 F.2d 94, 98 (1st Cir.1982); C. Wright & A. Miller, 5 Federal Practice and Procedure § 1350, at 555 (1969 & Supp.1987)). Furthermore, the court "may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment." Lex Computer & Management Corp. v. Eslinger & Pelton, P.C., 676 F.Supp. 399, 402 (D.N.H.1987); see also Richmond, F & P R. Co. v. United States, 945 F.2d 765, 768 (4th Cir.1991); Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir.1990). But, the court "should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Richmond, 945 F.2d at 768 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027
(Cite as: Not Reported in F.Supp.2d)

to prevail as a matter of law." *Id.* (citing *Trentacosta v. Frontier Pacific Aircraft Indus., Inc.,* 813 F.2d 1553, 1558 (9th Cir.1987)).

## II. *Summary Judgment.*

*\*2* When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center,* 103 F.3d 196, 199-200 (1st Cir.1996) (citations omitted).

## Discussion

### 1. *MacDermid's Motion to Dismiss Alpha.*

According to the amended complaint, Polyclad is the exclusive licensee of the '859 patent and is vested with the right to enforce that patent and sue for all past infringements. *See* Amended complaint, at para. 5. Alpha, in turn, is alleged to be:

a licensee of the '859 patent from Polyclad and has the right and license in the United States of America, its territories and dependencies, to manufacture, use, import and sell materials and processes relating to the claimed subject matter of the '859 Patent and the right, at its sole discretion, to sublicense rights under the '859 Patent.

Amended complaint, at para. 6. Based upon those allegations and the record evidence, MacDermid claims that Alpha is merely a "bare licensee" of the '859 patent, without the right to sue for past infringement and, therefore, without standing to appear as a plaintiff in this litigation. *See, e.g., Textile Productions, Inc. v. Mead Corp.,* 134 F.3d 1481, 1484 (Fed.Cir.1998) ("a bare licensee has no standing at all."); *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.,* 52 F.3d 1026, 1034 (Fed.Cir.1995) (holding that a "bare" or nonexclusive licensee has no standing to bring or join a suit for infringement).

The Patent Act of 1952 provides that "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. Generally speaking, therefore, a party suing forp atent infringement must have held legal title to the patent at the time of the alleged infringement. *See Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1551 (Fed.Cir.1995); *Ortho Pharmaceutical Corp,* 52 F.3d at 1030. As this court has observed, however,"[ a] party need not ... hold *all* proprietary rights to a patent in order to have standing to sue for infringement as a *co-plaintiff* with the patentee." *Ricoh Co., Ltd. v. Nashua Corp.,* 947 F.Supp. 21, 23 (D.N.H.1996) (emphasis in original). For instance, under certain circumstances, a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee. Such a licensee is usually an "exclusive licensee." In contrast, a non-exclusive licensee does not have standing to sue for infringement, even as a co-plaintiff. *\*3* To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention ..., but also *the patentee's express or implied promise that others shall be excluded from practicing the invention.* It is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license. Therefore, if a party has not received a promise of exclusivity under the patent, it cannot have co-plaintiff standing in an infringement action. It is important to stress, however, that the exclusive license need not be express; it may be implied.

*Id.,* at 23-24 (citations and internal quotation marks omitted) (emphasis in original).

Here, plaintiffs assert that the allegations set forth in the amended complaint, taken together with the record evidence, establish that Alpha has been granted sufficient rights to the '859 patent to vest it with standing to proceed as a co-plaintiff in this litigation. The court agrees. Among other things, the amended complaint alleges that Alpha has the right, exercisable in its *sole* discretion, to sublicense rights under the '859 patent. Thus, Alpha plainly possesses, at a minimum, the patentee's implicit promise that others will be prevented from practicing the patented technology, absent Alpha's consent. *See, e.g., Rite-Hite,* 56 F.3d at 1552 ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027
**(Cite as: Not Reported in F.Supp.2d)**

or implied promise that others shall be excluded from practicing the invention within that territory as well."). *See also Textile Productions, 134 F.3d at 1484.*

Additional support for Alpha's assertion that it has standing as an "exclusive licensee" can be found in the record, including evidence of its intimate relationship with Polyclad and Cookson Group, PLC, the parent corporation of both companies. *See, e.g.,* Affidavit of Mark Dingley, Exhibit 3 to plaintiffs' memorandum; Affidavit of Richard Mahoney, Exhibit 4 to plaintiffs' memorandum. *See generally Ricoh*, 947 F.Supp. at 24; *Kalman v. Beryln Corp .*, 914 F.2d 1473, 1482 (Fed.Cir.1990). That evidence strongly supports plaintiffs' claim that, at a minimum, Alpha Fry, Ltd. (the assignee of the '859 patent), Polyclad (the exclusive licensee of the '859 patent), and Cookson Group, PLC (the parent corporation of all those entities) intended to vest Alpha with the right to practice the processes taught by the '859 patent *and* the right to preclude others from doing so (at least within the United States and its territories).

Alpha has, therefore, pled sufficient facts (and pointed to sufficient evidence in the record) to satisfy its burden under Rule 12(b)(1) and demonstrate that it has standing, as a co-plaintiff, to sue for alleged infringement of the '859 patent. Consequently, MacDermid's motion to dismiss is denied.

### II. *MacDermid Counterclaims.*

#### A. *First Counterclaim-Inequitable Conduct.*

**\*4** Applicants for patents and their agents are required to prosecute patent applications "with candor, good faith, and honesty." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). *See also* 37 C.F.R. § 1.56 ("Rule 56") ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, ors ubmission of false material information, coupled with an intent to deceive." *Molins,* 48 F.3d at 1178. Rule 56 defines "material information," subject to the disclosure requirement, as follows:
Under this section, information is material to patentability when it is not cumulative to information

already of record or being made of record in the application, and
(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
(2) It refutes, or is inconsistent with, a position the applicant takes in:
(i) Opposing an argument of unpatentability relied on by the Office; or
(ii) Asserting an argument of patentability.

37 C.F.R. § 1.56.

Claim 1 of the '859 patent teaches "a process for treating a metal surface to promote adhesion thereto" and specifies the use of a surfactant to form "a microroughened conversion-coated surface." Claim 8, which is dependent upon claim 1, teaches a process "according to claim 1 in which the surfactant is a cationic surfactant." Although the patent describes the use of a cationic surfactant as the "preferred embodiment" of the process described in the patent, claim 1 plainly teaches a process that utilizes surfactants that need not necessarily be cationic. That is to say, claim 1 teaches a process in which, at least theoretically, one might employ an anionic surfactant (i.e., one having a positive charge) or a nonionic surfactant (i.e., one carrying no charge).

The core of MacDermid's inequitable conduct claim is its assertion that, during the course of prosecuting their patent applications in Europe, plaintiffs (or, more accurately, their predecessors in interest) learned that: (1) use of a non-specified surfactant was taught by prior art; and, perhaps more importantly, (2) the processes taught in the '859 patent only worked when a cationic surfactant was used. In support of that argument, MacDermid points out that, in attempting to distinguish prior art, plaintiffs reported to the European Patent Office:
In accordance with the process of the present invention a metal surface is treated in order to micro-roughen it and it is submitted that is exactly the opposite of the polishing step taught in the prior art Document. *The micro-roughening treatment is obtained by incorporating into the adhesion promoting compositions as an essential ingredient a cationic surfactant....* [A] person skilled in the art would consider that *if other surfactants were substituted* for the surfactants taught in Document D1 a brilliant chemically polished surface would be obtained. Accordingly, it is submitted that Document D1 teaches exactly the opposite of the result required to be obtained by the process invention.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027
(Cite as: Not Reported in F.Supp.2d)

*5 Letter to EPO dated November 27, 1996, Exhibit C to defendant's memorandum (emphasis supplied). And, in an effort to distinguish other prior art before the EPO, plaintiffs reported:Although the solutions of document D2 contain a corrosion inhibitor they do not contain a *cationic* surfactant and *in the absence of a cationic surfactant/corrosion inhibitor* combination the copper surface is not coated.

Letter to EPO dated May 15, 1998, Exhibit F to defendant's memorandum (emphasis supplied).

Ultimately, says MacDermid, plaintiffs were forced to limit the European patent's claims to cover only a coating process that employed a cationic surfactant. And, although MacDermid seems to acknowledge that plaintiffs brought all relevant prior art to the attention of the United States Patent Office, it says plaintiffs were required (but failed) to disclose the results of testing that revealed that the process taught in claim 1 of the '859 patent would not work in the absence of a *cationic* surfactant.

At this stage of the litigation, (which, parenthetically, is prior to a *Markman* hearing and any determination of the scope of the '859 patent), the court is unable to definitively conclude, as a matter of law, that plaintiffs honored their obligations of full and candid disclosure to the PTO. If, as MacDermid asserts, plaintiffs knew that the process taught in the '859 patent could not be accomplished unless a cationic surfactant was used, and if plaintiffs failed to disclose to the PTO the results of their own testing revealing that fact, plaintiffs might well have violated their obligation of good faith and candor. Consequently, plaintiffs' motion for judgment as a matter of law as to MacDermid's first counterclaim (and its third affirmative defense) is necessarily denied, without prejudice.

### B. Second Counterclaim-Tortious Interference.

MacDermid says that it "developed and owns a chemical composition particularly useful in the production of multilayer printed circuits, covered by U.S. Patent No. 5,869,130 and marketed under the tradename MultiBond." MacDermid's Answer and Counterclaim (document no. 29), at 7. According to MacDermid, "MultiBond has no surfactant. Nor is a surfactant recommended. MacDermid is not aware of any customer using a surfactant in its MultiBond product." MacDermid's memorandum at 5.

MacDermid also asserts that plaintiffs

"misrepresented to prospective and existing MultiBond customers that MacDermid's marketing of MultiBond was a violation of the Plaintiffs' patent applications and the '859 patent." *Id.* Additionally, it claims that plaintiffs knew that the '859 patent was necessarily "limited to an adhesion promotion process incorporating a *cationic* surfactant and did not cover processes utilizing other types of surfactants or no surfactant at all." *Id.* Thus, says MacDermid, plaintiffs tortiously interfered with their business relationships with customers *and* that unlawful conduct is intimately intertwined with plaintiffs' inequitable conduct before the PTO (i.e ., conduct that resulted in its allegedly wrongful receipt of an overly broad patent).

*6 In response, plaintiffs rely on their denial of inequitable conduct before the PTO and, therefore, assert that MacDermid has failed to support an essential element of its tortious interference claim: that the patent holder was guilty of bad faith or fraudulent conduct before the PTO. *See generally Zenith Electronics Corp. v. Exzec, Inc., 182 F.3d 1340, 1355 (Fed.Cir.1999)* ("bad faith is a prerequisite to [plaintiff's] state-law tortious interference claim; without it, the claim is preempted by patent law."). *See also Polyclad Laminates, Inc. v. MacDermid,* No 99-162-M, slip op. at 1 (D.N.H. July 22, 1999). As noted above, however, the record is not sufficiently developed at this point to permit any conclusion, as a matter of law, as to whether plaintiffs did or did not engage in inequitable conduct before the PTO. Consequently, the court cannot conclude that MacDermid's second counterclaim fails to state a viable claim. That is to say, the record evidence does not establish that, as a matter of law, MacDermid's second counterclaim is preempted by federal law.

### III. *MacDermid's Motion for Summary Judgment.*

Finally, MacDermid moves the court to hold that, as a matter of law, it does not infringe the '859 patent "because its accused product, MultiBond, does not contain the 'surfactant' element required by all the claims of the '859 patent." MacDermid'sm otion for summary judgment (document no. 107) at 1. In response, plaintiffs point out that, in order to resolve MacDermid's motion, the court must first determine: (1) precisely what is meant by the term "surfactant," as used in the '859 patent; and, then, (2) whether MacDermid's allegedly infringing product actually employs a surfactant.

As noted above, the scope of the '859 patent has yet to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027
**(Cite as: Not Reported in F.Supp.2d)**

be determined (the parties having only recently requested a *Markman* hearing). Because MacDermid's motion for summary judgment is essentially one for claim construction, it must necessarily be denied, without prejudice, pending the *Markman* hearing and the court's legal construction of the scope of the '859 patent, and the meaning of the term "surfactant," as used in that patent.

### Conclusion

For the foregoing reasons, plaintiffs' motion for partial summary judgment (document no. 33) is denied, without prejudice. Defendant's motion for summary judgment (document no. 107) is likewise denied, withoutp rejudice, as is defendant's motion to dismiss (document no. 101).

Finally, thef ollowing motions ared enied as moot: plaintiff's motion to defer responding to defendant's motion for summary judgment (document no. 111); plaintiff's motion to extend time to respond to defendant's motion for summary judgment (document no. 114); and plaintiff's motion for leave to file a surreply to defendant's motion to dismiss (document no. 116).

SO ORDERED.

D.N.H.,2001.
Polyclad Laminates, Inc. v. MacDermid, Inc.
Not Reported in F.Supp.2d, 2001 WL 274722 (D.N.H.), 2001 DNH 027

Briefs and Other Related Documents (Back to top)

• 2002 WL 31886998 (Verdict and Settlement Summary) (Sep. 27, 2002)
• 2002 WL 32118731 (Verdict and Settlement Summary) (Sep. 27, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
(Cite as: Slip Copy)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
ROPAK CORPORATION, a Delaware corporation,
John W. Von Holdt, Jr., an individual, Janice
Anderson, an individual, and Plas-Tool Co., an Illinois
corporation, Plaintiff,
v.
**PLASTICAN**, INC., a Massachusetts corporation,
Defendants.
No. 04-C-5422.

Sept. 30, 2005.

Jon O. Nelson, Robert Howard Resis, Banner &
Witcoff, Ltd., Andrew William Vail, Daniel Jay
Hurtado, Jenner & Block, LLC, Chicago, IL, Bryan D.
Richardson, Stephen Sandor Korniczky, Paul,
Hastings, Janofsky & Walker LLP, San Diego, CA,
for Plaintiff.
Granger Cook, Jr., David Lesht, Jeana Rose Lervick,
Cook Alex Mcfarron Manzo Cummings Mehler Ltd.,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
COAR, J.
*1 Before this court is the motion by Defendant
Plastican, Inc. ("Plastican") to dismiss Ropak
Corporation ("Ropak") and Plas-Tool Co.
("Plas-Tool") as plaintiffs for lack of standing.
Defendant does not challenge the standing of
Plaintiffs John W. von Holdt, Jr. and Janice Anderson.
For the reasons set forth below, Defendant's motion to
dismiss Ropak as plaintiff is DENIED. Defendant's
motion to dismiss Plas-Tool as plaintiff is
GRANTED.

### I. FACTUAL BACKGROUND

For the purposes of this motion, the following facts
alleged in Plaintiffs' complaint are taken as true. John
W. von Holdt, Jr. and Janice Anderson own United
States Letters Patent No. 4,735,337 (the " '337
patent"), a valid and enforceable patent. (Am.Compl.¶
9, 11). Plas-Tool is a licensee of the '337 patent by
virtue of a license that includes the right to join as
plaintiff in any action for infringement of the '337

patent by others. (Am.Compl.¶ 10).

Plas-Tool and the original patent owner, John W. von
Holdt, Sr., successfully enforced the '337 patent
against Ropak Corporation in 1995. The dispute
yielded a Settlement and License Agreement entered
into on June 15, 1995 ("the 1995 Agreement").
(Am.Compl.¶ 11). By virtue of that Agreement,
Ropak is now a sublicensee of claims 9-12 of the '337
patent. The Agreement affords Ropak the right to join
as plaintiff in any action for infringement of the '337
patent by others. (Am.Compl.¶ 10).

At all times since issuance of the '337 patent,
Plas-Tool, under its license, has been engaged in the
business of marketing, selling, and distributing molds
used to make the plastic lids protected by the '337
patent. Since entering into its sublicense, Ropak has
been engaged in the business of making, selling and
distributing molded plastic lids covered by the '337
patent. (Am.Compl.¶ 12).

Plaintiffs Ropak, von Holdt, Jr., Anderson, and
Plas-Tool have filed suit against Defendant for
making, advertising, selling and/or offering for sale
molded plastic lids that infringe the '337 patent.
(Am.Compl.¶ ¶ 14-20).

### II. STANDARD OF REVIEW

In ruling on motion to dismiss for lack of standing, the
court must accept as true all material allegations of the
complaint and draw all reasonable inferences in the
plaintiff's favor. *Reid L. v. Illinois State Board of
Education,* 358 F.3d 511, 515 (7th Cir.2004). Whether
a licensee of a patent has co-plaintiff standing depends
upon the rights the licensee holds:
To have co-plaintiff standing in an infringement suit, a
licensee must hold some of the proprietary sticks from
the bundle of patent rights, albeit a lesser share of
rights in the patent than for an assignment and
standing to sue alone. The proprietary rights granted
by any patent are the rights to exclude others from
making, using or selling the invention in the United
States.

*Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.,*
52 F.3d 1026, 1031-32 (Fed.Cir.1995) (internal
citation omitted). The standard, stated alternatively,
requires a party to "have received, not only the right to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
(Cite as: Slip Copy)

Page 2

practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. *Rite-Hite Corp. v. Kelley Co., Inc. 56 F.3d 1538, 1552 (Fed.Cir.1995).* A licensee with such proprietary rights is generally called an "exclusive" licensee. *Ortho Pharmaceutical, 52 F.3d at 1032.* Thus, exclusive licensees have standing to sue, whereas bare licensees-those who hold nothing more than the patent owner's covenant not to sue the licensee for infringement-do not. *Id.* "But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license. *Id.*

III. ANALYSIS

**\*2** Defendant argues that neither Ropak nor Plas-Tool is an exclusive licensee of the '337 patent; therefore, they have no standing to sue. Plaintiffs argue that Ropak and Plas-Tool have exclusive rights under the '337 patent that no other licensee has been granted, and it is these exclusive rights that Defendant has infringed.

A. ROPAK'S STANDING

To determine whether Ropak has standing as a co-plaintiff, the Court looks to Ropak's agreement with the patentee. *See Ortho Pharmaceutical, 52 F.3d at 1032* (stating that "co-plaintiff standing is determined by whether or not the licensee acquired proprietary rights in the patent under the contract with the patentee"). The 1995 Agreement between Von Holdt, Sr., Plas-Tool, and Ropak grants Ropak the right to make, use, and sell plastic lids covered by claims 9-12 of the '337 patent.[FN1] The Agreement states that this license "shall be *exclusive* with respect to plastic lids ... within the following size and thickness parameters," which the Agreement then lists. (Von Holdt Decl. Ex. G § 3B) (emphasis added). The Agreement also states that, "[w]ith respect to the plastic lids for round containers which do not fall within the [specified] size and thickness parameters, ROPAK shall have a non-exclusive license." (Von Holdt Decl. Ex. G § 3C). Thus, the Agreement's terms grant Ropak an exclusive license to lids of a certain size under claims 9-12 of the '337 patent. Still, the presence of the word "exclusive" in the license, without more, does not mean that Ropak is an exclusive licensee. *Ortho Pharmaceutical, 52 F.3d at 1032.*

FN1. Claims 1-8 of the patent do not apply to Ropak, therefore there is no license granted with respect to them. (Von Holdt Decl., Ex. G § 3A).

Nor is the right to sue clause in the Agreement dispositive. The Agreement states that, with respect to infringement claims, the "parties agree to cooperate and assist each other ... at no cost to the other party, regardless of the party which prosecutes the proceedings." (Von Holdt Decl. Ex. G § 11B). The Agreement provides an example: "[I]n the event of prosecution by ROPAK and if necessary in order for such prosecution to occur, VON HOLDT and PLAS-TOOL *will agree to be joined in the prosecution as nominal parties* and/or to assign ROPAK their rights to prosecute the matter." *Id.* (emphasis added). This provision, however, does not automatically grant Ropak co-plaintiff standing. As explained in *Ortho Pharmaceutical, 52 F.3d at 1034,* "a right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent."

Rather, the Court must determine whether Ropak holds some of the proprietary sticks in the bundle. Ropak does hold the right to exclude others who might "make, use, or sell" '337 plastic lids within the size and thickness parameters specified in the Agreement. Not only does the Agreement repeatedly refer to Ropak's license as exclusive in this area, Von Holdt, Sr. and Plas-Tool warrant in the Agreement "that it will not sell molds to others which would grant implied licenses in conflict with the exclusive license granted to ROPAK, except to LANDIS [PLASTICS, INC.] under the terms [stated earlier in the Agreement]." (Von Holdt Decl. Ex. G § 3F). Thus, Ropak has received the patentee's express promise that others will be excluded from practicing '337 patent within Ropak's territory.[FN2]

FN2. Defendant raises *Ortho Pharmaceutical,* where the court concluded that the plaintiff's license was nonexclusive because the grantor still had the right to license other parties to do the same acts as the licensee. *Ortho Pharmaceutical,* 52. F.2d 1033. The Complaint here alleges precisely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 3

the opposite facts: In the 1995 Agreement, Von Holdt and Plas-Tool expressly warranted that they would not grant implied licenses that might conflict with the exclusive license granted to Ropak.

**\*3** Defendants argue that because the Agreement makes the above exception for Landis Plastics, Inc. ("Landis"), Ropakd oes not have the sole right to make, use, or sell plastic lids and therefore cannot be an exclusive licensee. Plaintiffs counter that Landis' right to make, use, or sell lids under the '337 patent is limited to lids that incorporate both the '337 technology and technology solely owned by Landis (the '135 patent), or, plastic lids with hinges. By contrast, the '337 patent is for *non*-hinged plastic lids. Thus, according to Plaintiff, Ropak still has the exclusive right to make, use, or sell non-hinged lids ('337 technology only). Defendant infringed upon the '337 technology, not the '135-'337 lid with hinges made by Landis. Therefore, Defendant infringed upon rights that Ropak has exclusively.

Construing all reasonable inferences in Plaintiff's favor, Plaintiff's explanation of Ropak's exclusive rights to '337 patent is persuasive. Moreover, Defendant is incorrect that co-plaintiff standing requires that Plaintiff be able to exclude *all* others from making, using, or selling the patented technology. The case law requires that Plaintiff only be able to exclude "others," not *all* others. *See Ortho Pharmaceutical*, 52 F.3d at 1032; *Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.*, 117 F.Supp.2d 508, 512 (E.D.Va.2000) (stating that "[t]he Federal Circuit has never stated that the licensee must have the right to exclude *all* others") (emphasis in original). Thus, the fact Ropak cannot exclude one party, Landis, from making, using and selling lids covered by both the '135 and '337 patents does not mean that Ropak cannot hold an exclusive license.

The Landis license is a nonexclusive license that predates Von Holdt, Sr. and Plas-Tool's 1995 Agreement with Ropak. (Von Holdt Decl. 7). In *Hill Phoenix,* the court found that held that the existence of previous, nonexclusive licenses did not preclude a later grant of an exclusive license:
If a patentee grants a second license that is subject to a prior-existing, nonexclusive license, but otherwise provides the second licensee with the right to exclude all others except the prior licensee, then the subsequent licensee has proprietary rights sufficient to confer standing.

*Hill Phoenix,* 117 F.Supp.2d at 513. The second

(exclusive) licensee would still "be a 'beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others.' " *Id.* at 513 (quoting Ortho Pharmaceutical, 52 F.3d at 1032.). The district court's conclusion finds support in language by the Federal Circuit: In *Abbott Laboratories v. Diamedix Corporation*, 47 F.3d 1128, 1132 (Fed.Cir.1995) (emphases added), the Federal Circuit observed that "Abbott's *exclusive license* was ... *made subject to prior licenses* granted by Diamedix." Taking this and other factors into account, the court ordered the licensee, Abbott, join the patentee, Diamedix, in an infringement suit.

**\*4** The existence of a nonexclusive license did not preclude the finding that Hill Phoenix was an exclusive licensee with standing to bring a case jointly with the patentee. Nor did the existence of a nonexclusive license preclude Abbott from serving as co-plaintiff in an infringement suit. Accordingly, the license to Landis for technology incorporating both the '337 and '335 patents does not preclude a finding that Ropak is an exclusive licensee under the '337 patent with standing to bring a case jointly with the patentee.

Finally, Defendant argues that, because Ropak lacks full rights under the 1995 Agreement to assign its license, "it must subscribe to the will of another" and therefore does not have complete proprietary rights. (Def.'s Mem. Supp. Mot. to Dismiss 11). The Agreement states that Ropak may sublicense the '337 patent, but may not assign it without the consent of Plas-Tool, unless making an assignment to a successor business. (Von Holdt Decl. Ex. G § § 6, 8). Defendant cites no case law in support of this final point and the Court does not find any. The Federal Circuit has never defined the right to assign as one of the sticks of the proprietary bundle that a licensee *must* have to be considered an exclusive licensee.

In sum, the Court finds that Ropak has the exclusive right to make, use, or sell lids under the '337 patent. Landis' prior-issued nonexclusive license to make lids that incorporate both its own '135 patent and the '337 patent does not negate this exclusivity, and Ropak has received an express promise from the patentee and Plas-Tool that others will be excluded from Ropak's territory. Because Ropak holds an exclusive (sub)license under the '337 patent, it has co-plaintiff standing. Defendant's motion tod ismiss Ropak as plaintiff is denied.

**B. PLAS-TOOL'S STANDING**

Slip Copy
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 4

Likewise, to determine whether Plas-Tool has co-plaintiff standing, the Court looks to Plas-Tool's agreement with the patentee. In 1987, John von Holdt, Sr. granted Plas-Tool a "worldwide, *nonexclusive,* royalty free license to make, use and sell the inventions covered" in the patents von Holdt, Sr. owned at the time and in the future. (Von Holdt Decl. Ex. C) (emphasis added). The '337 patent issued after the date of the 1987 grant, but was covered by the grant. Therefore, under the terms of the 1987 license grant, Plas-Tool has a nonexclusive right to make, use, and sell the invention covered in the '337 patent; that is, a plastic lid.[FN3] In 1992, Von Holdt, Sr., acting on behalf of a trust, granted Plas-Tool a *"non-exclusive, royalty-free license to make, use or sell under the Licensed Patents throughout this world."* (Von Holdt Decl. Ex. I § 2) (emphasis added). The patents covered under the 1992 agreement included the '337 patent. Von Holdt., Jr. signed this 1992 patent license agreement in 1998 as successor trustee. In 2000, von Holdt, Jr. and Anderson purchased patent properties, including the '337 patent, from the Family Trust. (Von Holdt Decl. 9). The Memorandum of Understanding accompanying the purchase mentions Plas-Tool's "status as a *non-exclusive* licensee" of the patents affected by the purchase. (Von Holdt Decl. K § II) (emphasis added). Similarly, the 1995 Agreement between Von Holdt, Sr., Plas-Tool, and Ropak describes Plas-Tool as a *"non-exclusive* licensee under the '337 patent" and contains a provision in which Plas-Tool "warrants that it has a *non-exclusive* license under the '337 patent." (Von Holdt Decl. Ex. G Pages 1, 10) (emphases added).

> FN3. The 1995 Settlement and License Agreement between Von Holdt, Plas-Tool, and Ropak also refers to Plas-Tool's "nonexclusive license under the '337 patent" in two places. (Von Holdt Decl., Ex. G Page 1, 10). That Agreement does not grant Plas-Tool any new rights under the '337 patent.

\*5 That the word "exclusive" may or may not appear in the 1987 license or any of the agreements that followed, without more, does not mean that Plas-Tool is an non-exclusive licensee of the '337 patent. *See Ortho Pharmaceutical,* 52 F.3d at 1032. Nor are the right to sue clauses in the various agreements dispositive. The agreement signed by Von Holdt, Sr. as trustee in 1992 and by Von Holdt, Jr. as successor trustee in 1998 states that actions for infringement "will be initiated upon agreement of Licensor [the Von

Holdts] and Licensee [Plas-Tool]." (Von Holdt Decl. Ex. I § 7). The 1995 Agreement between Von Holdt, Sr., Plas-Tool, and Ropak states that "VON HOLDT and PLAS-TOOL, collectively, shall have the initial right to bring and prosecute infringement proceedings involving the '337 patent." (Von Holdt Decl. Ex. G § 11B). These provisions do not automatically accord Plas-Tool co-plaintiff standing. *See id.* at 1034.

Rather the Court must determine whether Plas-Tool holds some of the proprietary sticks in the bundle of patent rights. *Id.* There are two issues: (1) whether Plas-Tool has the right to exclude others from making, using, or selling the '337 plastic lids and (2) whether Plas-Tool's alleged exclusive right to make and sell the *molds* often *used to make* the '337 plastic lids translates into the right to exclude others from making, using, or selling the '337 plastic lids. If the facts alleged in the Complaint and the attached documents-and all reasonable inferences drawn from those facts-can show either one, Plas-Tool has co-plaintiff standing.

Plaintiffs do not allege that Plas-Tool has an exclusive right to make, use, or sell the '337 plastic lids or the right to exclude others who might make, use, and sell those lids. Yet that is the very exclusive right Plaintiff would need to demonstrate to have co-plaintiff. The standard is clear: To have standing to join the patentee in an infringement suit, a licensee must be able to show proprietary rights "in *the* invention" or "on *the* patent" being infringed upon. *See Ortho Pharmaceutical,* 52 F.3d at 1031, 1032. This Court will not find what does not appear from the facts that Plaintiffs have alleged and what Plaintiffs do not argue. Plas-Tool does not have proprietary rights under the '337 patent to exclude others from making, using, and selling the plastic *lids* covered by the patent.

Rather, Plaintiffs argue that Plas-Tool is an exclusive licensee of the '337 patent because Plas-Tool "is and always has been the exclusive licensee for *making the molds* for the '337 patented products." (Pl.'s Mem. Opp. Def's Mot. to Dismiss 11) (emphasis original). Plas-Tool, Plaintiffs assert, "was the exclusive licensee to *make the molds* that Plastican used to make its infringing products." (Pl.'s Mem. Opp. Def's Mot. to Dismiss 2) (emphasis original). Plaintiffs explain: In practice, Plas-Tool is the sole-arbiter of '337 patent technology.... No license to practice '337 technology can be acquired without requesting from Plas-Tool the mold(s) to produce under that technology. Control of the distribution of Plaintiff's Plas-Tool's molds is the modus for controlling the authority to practice '337

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 5
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
**(Cite as: Slip Copy)**

patent technology.

*6 (Pl.'s Mem. Opp. Def's Mot. to Dismiss 11). Plas-Tool argues that it has the exclusive right to make and sell *molds;* therefore, almost no one can make '337 lids without purchasing a mold from Plas-Tool. *See Von Holdt Decl. 2* (declaring that all '337 lids "are *typically* fabricated using such molds") (emphasis added). Given this, Plaintiffs argue, Defendant has infringed upon Plas-Tool's exclusive rights under the '337 patent by failing to buy a mold from Plas-Tool before making and selling a plastic lid that infringed upon the '337 patent.

Plas-Tool, however, does not point to any license agreement describing Plas-Tool's exclusive right to make and sell *molds* under the '337 patent or any other patent. It merely describes itself as the "only entity licensed to make the molds that typically are used to fabricate the '337 patent products" and the "sole authorized manufacturer and provider of injection-molding molds commonly used to produce products under the '337 products." (Pl.'s Mem. Opp. Def's Mot. to Dismiss 2; Von Holdt. Decl. 2). The Court agrees with Defendant that Plas-Tool's status as an authorized, popular *mold-maker* does not convert its non-exclusive license to make, use, and sell lids into an exclusive license to make, use, and sell *lids.* (Def.'s Reply Mem. Supp. Mot. Dismiss 8).

According to Plaintiffs, the right of first refusal provision in the 1995 Agreement between Von Holdt, Sr., Plas-Tool, and Ropak is evidence of Plas-Tool's exclusive rights under the '337 patent. (Pl.'s Mem. Opp. Def's Mot. to Dismiss 12). The 1995 Agreement provides that Ropak can purchase a mold from a third party only if Plas-Tool elects not supply one. First, however, however, Ropak must submit the third party's quote to Plas-Tool to give Plas-Tool the opportunity to make the mold at the third party's rate. In addition, Ropak must include this right of first refusal provision in any sublicense agreement. Plaintiff argues that, even though Ropak has this right to purchase molds from other companies, Ropak has never exercised the right. Hence, Plas-Tool, "continues to be the 'exclusive' licensed mold-maker" for the lids that Defendant infringed. (Pl.'s Mem. Opp. Def's Mot. to Dismiss 4).

The right of refusal provision does nothing but highlight that Plas-Tool is, first and foremost, a maker of molds. The present action, however, is one for infringement of the '337 patent for plastic *lids,* not for the molds that make the plastic lids. Plas-Tool has not alleged a cause of action for infringement of an exclusive license to make molds for the '337 plastic lids. Plas-Tool has not even identified a patent for its molds. Thus, even a showing (which the Court determines that Plas-Tool cannot make) that Plas-Tool is the exclusive maker of *molds* does not amount to a showing that Plas-Tool has the right to exclude others from making, using, or selling lids.

Finally, Plaintiffs argues that the patent owners "have always had an 'ownership' interest" in Plas-Tool and "never contemplated" licensing the mold-making operation to anyone else. (Pl's Mem. Opp. Def's Mot. to Dismiss 12). "Plas-Tool is the sole licensee of the '337 patent technology, through which all subsequent licenses flow." (Id.) Plaintiffs cite *Kalman v. Belyn Corp.,* 914 F.2d 1473, 1482 (Fed.Cir.1990), for the proposition that "when then exus between the sole licensee and the patentee is so clearly defined as here, the sole licensee must be recognized as the real party in interest."

*7 The *Kalman* case is distinguishable because (a) it is restricted to a two-supplier market and (b) Plas-Tool is not a sole licensee with the meaning of *Kalman* and the cases cited therein. First, Kalman allows a sole licensee to join as co-plaintiff when the sole licensee is "damaged by an infringer in a two supplier market." *Kalman* 914 F.2d at 1482. Defendants are correct that Plaintiffs are not operating in a two-supplier market when: Since 1995, Ropak and Plas-Tool have cooperated in stopping *multiple* infringers of the '337 patent. (Von Holdt Decl.¶ 29). Second, *Kalman* granted co-plaintiff standing because the licensee was the sole licensee to *sell* the patented product. *See also Weinar v. Rollform,* Inc., 722 F.2d 797, 806 (Fed.Cir.1984) (permitting licensee with an exclusive right to *sell* patented product co-plaintiff standing); *Duplan Corp. v. Deering Milliken Research Corp.,* 522 F.2d 809, 812 (4th Cir.1975) (permitting exclusive-*use* licensee under the patent to join as co-plaintiff). Plas-Tool does not hold the sole or exclusive license to *make* '337 lids, *use* '337 lids, or *sell* '337 lids. At most, Plas-Tool has the exclusive honor of being the sole mold-maker the patent owners use.

In sum, Plas-Tool has alleged no facts that show it has the right to exclude others from making, selling, or using '337 plastic lids. At most, Plas-Tool has demonstrated its dominance of the market for molds that can be used to make '337 plastic lids. Plas-Tool has received the patentee's express or implied promise that others will be excluded from making molds that are used to make '337 lids, but not the "express or implied promise that others shall be excluded from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2420384 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 6

practicing *the invention"* in dispute, which is the '337 patent for plastic lids. *See Rite-Hite, 56 F.3d at 1552.* Because Plas-Tool has not shown the "beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing," it is not an exclusive licensee of the '337 patent. *Ortho Pharmaceutical, 52 F.3d at 1032.* Defendant's motion to dismiss Plas-Tool as plaintiff is granted.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Ropak as plaintiff is DENIED. Defendant's motion to dismiss Plas-Tool as plaintiff is GRANTED.

N.D.Ill.,2005.
Ropak Corp. v. Plastican, Inc.
Slip Copy, 2005 WL 2420384 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2174507 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Defendant Plastican's Motion for Summary Judgment of Invalidity (Jun. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 2174506 (Trial Motion, Memorandum and Affidavit) Plastican's Memorandum in Response to Plaintiffs' Supplemental Memorandum and in Opposition to Plaintiffs' Motion to Compel Discovery Responses and for Sanctions (Jun. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 1755483 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Plaintiffs' Motion for an Order De-Designating Documents, Modifying the Protective Order and for Sanctions (May 15, 2006) Original Image of this Document (PDF)
• 2006 WL 1755482 (Trial Motion, Memorandum and Affidavit) Plastican's Memorandum in Opposition to Plaintiffs' Motion to Dedesignate Documents and Modify the Protective Order (May 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1679871 (Trial Motion, Memorandum and Affidavit) (Apr. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 1679870 (Trial Motion, Memorandum and Affidavit) Defendant Plastican's Motion for Summary Judgment of Invalidity (Apr. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 1040386 (Trial Motion, Memorandum and Affidavit) Defendant Plastican's Motion to Strike

Plaintiffs' Response to Plastican's Report on Plastican's Documents Provided to Plaintiffs (Mar. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 1045540 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 740405 (Trial Motion, Memorandum and Affidavit) Reply Memorandum In Support Of Plaintiffs' Motion To Compel Discovery Responses and For Sanctions For Violating This Court's Discovery Order (Feb. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 740404 (Trial Motion, Memorandum and Affidavit) Defendant Plastican's Memorandum In Opposition To Plaintiffs' Motion To Compel Discovery Responses (Feb. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 427545 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Compel Discovery Responses and for Sanctions for Violating this Court's Discovery Order (Jan. 23, 2006) Original Image of this Document with Appendix (PDF)
• 2006 WL 427546 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiffs' Motion to Compel Discovery Responses and for Sanctions for Violating this Court's Discovery Order (Jan. 23, 2006) Original Image of this Document (PDF)
• 2004 WL 2083942 (Trial Pleading) Complaint for Patent Infringement (Aug. 17, 2004) Original Image of this Document (PDF)
• 1:04cv05422 (Docket) (Aug. 17, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**11**

Westlaw.

60 F.3d 839
60 F.3d 839, 1995 WL 375949 (C.A.Fed. (Minn.)), 39 U.S.P.Q.2d 1596
(Cite as: 60 F.3d 839)

Page 1

**H**
Briefs and Other Related Documents
NOTICE:    THIS    IS    AN    UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTAF Rule
47.6 for rules regarding the citation of unpublished
opinions.)
    United States Court of Appeals, Federal Circuit.
SCHNEIDER (EUROPE) AG and Schneider (USA)
    Inc., Plaintiffs/Cross-Appellants,
                    v.
        SCIMED LIFE SYSTEMS, INC.,
            Defendant-Appellant.
        Nos. 94-1317, 94-1410, 94-1456.

                April 26, 1995.

D.Minn., 852 F.Supp.813.

AFFIRMED.

Before MAYER, Circuit Judge, SMITH, Senior
Circuit Judge, and BRYSON,C ircuit Judge.

Concurring in part and dissenting in part opinion filed
by Circuit Judge BRYSON.PER CURIAM.
*1 Schneider (Europe) AG and Schneider (USA) Inc.,
brought this action against SciMed Life Systems, Inc.,
for infringement of United States Patent No.
4,762,129.[FN*] The United States District Court for the
District of Minnesota held that the patent was not
invalid, was infringed, and that the infringement was
not willful. Schneider (Europe) AG v. SciMed Life
Sys., Inc., 852 F. Supp. 813 (D. Minn. 1994). We
affirm.

        FN* United States Patent No. 4,762,129
        issued August 9, 1988. Reexamination
        Certificate B1 4,762,129 issued July 2, 1991.

To prove a claim was obvious, an accused infringer
must establish by clear and convincing evidence, 35
U.S.C. § 282 (1988), that a person of ordinary skill in
the relevant art would have found the claimed subject
matter obvious in ligho f the prior art at the time the
invention was made, id. § 103. Although obviousness
is ultimately a legal conclusion, it rests upon
underlying findings of fact. Kimberly-Clark Corp. v.

Johnson & Johnson, 745 F.2d 1437, 1444, 223 USPQ
603, 606 (Fed. Cir. 1984). The district court's
determination of the hypothetical person of ordinary
skill in the relevant art is one such finding of fact
subject only to review for clear error. Graham v. John
Deere Co., 383 U.S. 1, 17 (1966); Hybritech, Inc. v.
Monoclonal Antibodies, 802 F.2d 1367, 1379-80, 231
USPQ 81, 90 (Fed. Cir. 1986).

The district court found that a person of ordinary skill
in this art in 1984 was "a practicing interventional
cardiologist who performed dilation or coronary
angioplasty    dilation    procedures"    and    included
knowledgeable percutaneous transluminal coronary
angioplasty (PTCA) practitioners such as those who
had testified at trial. Viewing the prior art from this
perspective, the court held that the '129 invention
would not have been obvious in 1984.

Although the level of ordinary skill in the relevant art
is a question of fact, SciMed claims that "the legal
correctness of [the district court's] determination" is at
issue because it misread and misapplied Standard Oil
Co. v. American Cyanamid Co., 774 F.2d 448, 227
USPQ 293 (Fed. Cir. 1985).    SciMed contends,
therefore, that we may review the district court's
finding free from the clear error standard.  We do not
believe that the district court erred in applying
Standard Oil or in its factual finding of the level of
ordinary skill in the art.

Standard Oil stated: "A person of ordinary skill in the
art is also presumed to be one who thinks along the
line of conventional wisdom in the art and is not one
who undertakes to innovate, whether by patient, and
often    expensive,    systematic    research    or    by
extraordinary insights, it makes no difference which."
774 F.2d at 454, 227 USPQ at 298 (citation omitted).
SciMed argues that the district court isolated this
passage and misconstrued it to per se eliminate
engineers, designers, and others who experiment in a
given field from the definition of ordinary skill in the
art.  Extrapolating from this, SciMed contends the
district court believed only a product "user," not an
engineer or designer, could be a person of ordinary
skill in this or any other art.  SciMed also argues that
the district court further misread Standard Oil to
require limiting the prior art to only those references
that a majority of "users" would consider relevant
because only those references would constitute the
"conventional wisdom." SciMed misreads the district

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 839                                                                                          Page 2
60 F.3d 839, 1995 WL 375949 (C.A.Fed. (Minn.)), 39 U.S.P.Q.2d 1596
**(Cite as: 60 F.3d 839)**

court's opinion on both points.

**\*2** The district court did not suggest a general per se
rule eliminating engineers or designers from being
considered persons or ordinary skill. Nor did it state
that only product "users" were persons of ordinary
skill. Instead, the court evaluated the state of the art in
the relevant field at the relevant time and found it was
in its infancy and that practicing angioplastic surgeons
"designed the basic concepts in dilation in 1984 and
showed them to engineers who built them." Rather
than propounding a per se rule, the district court
evaluated the level of skill when this particular field
was far less advanced than it is now and as a factual
matter found that engineers and designers were not of
ordinary skill at that time.

Since the court's interpretation and application of
Standard Oil was not legal error, we review the court's
finding for clear error. Although the appellate record
might suggest more than one appropriate level of
ordinary skill, we will not reverse simply because we
might have chosen a different one.

In determining the person of ordinary skill in the art,
the district court found that "the PTCA field was in its
infancy" and that "[t]here were only about 200
physicians performing angioplasty procedures in the
United States by 1984.   Only about 300 were
performing them worldwide." In this infant field, the
court found that engineers responded to the directions
of the physicians. The court also heard testimony that
the physicians determined which safety features to use
in catheter design. Finally, one of SciMed's own
witnesses acknowledged that persons of ordinary skill
in the art included the same "knowledgeable PTCA
practitioners" that the district court specifically
included within its definition.

SciMed also misreads the court's analysis of the
"conventional wisdom." The court did not state or
imply that Standard Oil, 774 F.2d at 454, 227 USPQ at
298, required limiting the prior art to majority
preferences in all cases.   Rather, based on the
testimony at trial, the court found a strong majority
preference that had a substantial bearing on whether
the '129 invention would have been obvious in 1984.
That majority believed a catheter with a full-length
guide lumen was necessary to accommodate specific
medical functions. The '129 invention ran contrary to
this view.

Consideration of this evidence is exactly what
Standard Oil encourages. It does not require, nor did
the district court interpret it to require, that minority

views be dismissed without consideration when
evaluating prior art. Nor did the district court refuse to
consider the general knowledge in this field. Rather, it
considered the strength and conviction of the
conventional wisdom in the field at the time and
concluded that it would have a significant impact on a
person of ordinary skill when combining references to
determine obviousness.   SciMed is fundamentally
wrong in contending that conventional wisdom should
play no part in determining obviousness.

**\*3** SciMed next claims that the district court should
not have allowed Schneider (USA) to remain in this
case as a co-plaintiff. It is undisputed that Schneider
(Europe) has standing to sue for infringement of its
patent, but SciMed claims that Schneider (USA) had
only a "non-exclusive" sublicense that does not confer
standing to recover infringement damages.

A "bare licensee" acting alone may not sue and
recover damages for patent infringement. Waterman v.
Mackenzie, 138 U.S. 252, 255 (1891); Kalman v.
Berlyn Corp., 914 F.2d 1473, 1481, 16 USPQ2d 1093,
1099 (Fed. Cir. 1990).   But a court does not look
solely to the words of the agreement to determine the
true nature of the license. Waterman, 138 U.S. at 256
("Whether a transfer of a particular right or interest
under a patent is an assignment or a license does not
depend upon the name bywh ich it calls itself, but
upon the legal effect of the provisions."); Vaupel
Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,
944 F.2d 870, 874-75, 20 USPQ2d 1045 (Fed. Cir.
1991) (court looked to agreements and surrounding
circumstances to hold that transfer was an assignment).
The district court analyzed Schneider's corporate
structure, the intent of the parties executing the
agreement, and their business conduct under the
agreement.   It concluded this agreement was "an
assignment that provides Schneider (USA) the ability
to sue and recover for patent infringement as
co-plaintiff with Schneider (Europe)."  Similar suits
have been approved where necessary to protect the
rights of all the parties and to bring a resolution to the
underlying dispute.  See Kalman, 914 at 1481-82, 16
USPQ2d at 1099; Weinar v. Rollform, Inc., 744 F.2d
797, 806-07, 223 USPQ 369, 374 (Fed. Cir. 1984).
We see no reason to disagree with the district court
here.

SciMed also contends that the district court erred in
awarding Schneider (Europe) lost profits for SciMed's
foreign sales of infringing catheters it manufactured in
the United States.  Citing Trell v. Marlee Electronics
Corp., 912 F.2d 1443, 1445, 16 USPQ2d 1059, 1061
(Fed. Cir. 1990), and Lindemann Maschinenfabrik

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 839
60 F.3d 839, 1995 WL 375949 (C.A.Fed. (Minn.)), 39 U.S.P.Q.2d 1596
**(Cite as: 60 F.3d 839)**

GmbH v. American Hoist & Derrick Co., 895 F.2d 1403, 1406 n.2, 13 USPQ2d 1871, 1874 n.2 (Fed. Cir. 1990), SciMed argues that Schneider (Europe) could, at most, recover a reasonable royalty for the infringing manufacturing in the United States, not lost profits resulting from SciMed's foreign sales.  We are aware of no rule that a plaintiff cannot recover lost profits for foreign sales of infringing products manufactured in the United States.  Datascope Corp. v. SMEC, Inc., 879 F.2d 820, 824-27, 11 USPQ2d 1321, 1323-26 (Fed. Cir. 1989), applied the four-prong test from Panduit Corp. v. Stahlin Brothers Fibre Works, Inc., 575 F.2d 1152, 1156, 197 USPQ 726, 729-30 (6th Cir. 1978), to determine whether a plaintiff could recover lost profits for the infringer's foreign sales of infringing products manufactured in the United States. Although the court concluded that the Panduit criteria for lost profits were not met, 879 F.2d at 827, 11 USPQ2d at 1326, it would have been completely unnecessary to consider this test if that plaintiff had been prevented from recovering lost profits in the first instance. The district court did not err in awarding lost profits.  We are similarly unconvinced that the parties' remaining assignments of error warrant reversal of the judgment.

C.A.Fed.(Minn.),1995.
Schneider (Europe) AG v. SciMed Life Systems, Inc.
60 F.3d 839, 1995 WL 375949 (C.A.Fed. (Minn.)), 39 U.S.P.Q.2d 1596

Briefs and Other Related Documents (Back to top)

• 1994 WL 16182682 (Appellate Brief) SciMed's Appellant's Reply Brief and Cross-Appellee's Responding Brief (Nov. 23, 1994) Original Image of this Document (PDF)
• 1994 WL 16182680 (Appellate Brief) Brief of Plaintiffs/Cross-Appellants Schneider (Europe) AG and Schneider (USA) Inc. (Oct. 11, 1994) Original Image of this Document (PDF)
• 1994 WL 16182679 (Appellate Brief) Brief for Defendant-Appellant Scimed Life Systems, Inc. (Aug. 03, 1994) Original Image of this Document with Appendix (PDF)
• 1994 WL 16182681 (Appellate Brief) Appellant's ReplyB rief (Jun. 08, 1994) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**

LEXSEE

**WYETH, Plaintiff, v. TEVA PHARMACEUTICALS USA, INC. and TEVA PHARMACEUTICAL INDUSTRIES LTD., Defendants.**

**CASE #: 2:03-cv-01293-WJM-RJH**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2005 U.S. Dist. LEXIS 40055*

**August 3, 2005, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *Wyeth v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 20034 (D.N.J., Sept. 6, 2005)*

**COUNSEL:** [*1] For Plaintiff: Basil J. Lewris, Linda A. Wadler, Barbara R. Rudolph, Finnegan, Henderson, Farabow, Garret & Dunner, LLP, Washington, DC.

For Defendants: Henry C. Dinger, Daryl L. Wiesen, Lana A. Shvartsman, Melissa L. Paddock, Goodwin Procter LLP, Boston, Massachusetts.

For WYETH, Plaintiff: ALLYN ZISSEL LITE, LITE, DEPALMA, GREENBERG AND RIVAS, LCC, NEWARK, NJ; KEVIN J. MCKENNA, EILEEN QUINN STEINER, MARA E. ZAZZALI, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., Defendants: ALLYN ZISSEL LITE, MICHAEL E. PATUNAS, LITE, DEPALMA, GREENBERG AND RIVAS, LCC, NEWARK, NJ; KEVIN J. MCKENNA, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For TEVA PHARMACEUTICALS USA, INC., Counter Claimant: ALLYN ZISSEL LITE, LITE, DEPALMA, GREENBERG AND RIVAS, LCC, NEWARK, NJ.

For TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., Counter Claimants: MICHAEL E. PATUNAS, LITE DEPALMA GREENBERG & RIVAS, LLC, NEWARK, NJ.

**JUDGES:** William J. Martini, U.S.D.J.

**OPINIONBY:** William J. Martini

**OPINION: MARTINI, U.S.D.J.:**

Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical [*2] Industries Ltd. ("Teva") appeal from the May 13, 2005 Order of Magistrate Judge Patty Schwartz denying Teva leave to amend their answers to include an affirmative defense of unenforceability due to inequitable conduct. n1 Magistrate Judge Schwartz held that Teva had not shown good cause for amending the Pretrial Scheduling Order pursuant to *Fed. R. Civ. P. 16(b)* and, therefore, denied Teva's motion. Judge Schwartz also rendered "observations" that Teva's proposed amendment was unduly delayed, unduly prejudicial to Wyeth, and futile, and thus would likely be denied under *Fed. R. Civ. P. 15(a)* as well. But, Judge Schwartz did so without affirmatively denying Teva's motion to amend under *Rule 15(a)*. Teva appeals the May 13, 2005 Order, arguing that it is clearly erroneous and contrary to law pursuant to *Fed. R. Civ. P. 72(a)* and *L. Civ. R. 72.1(c)(1)(A)*.

---

n1 Although Teva USA and Teva Ltd. each submitted their own proposed amended answer, the parties refer to them collectively as "Teva," in the singular, for purposes of this appeal because both companies seek to amend their answers to include the same inequitable conduct defense. For the sake of consistency, the Court shall do so as well.

---

[*3]

**Background**

This is a patent infringement action. Wyeth charges Teva with infringing three of its patents: *U.S. Patent Nos. 6,274,171* B1 (the *"'171 patent"*); 6,419,958 B2 (the *"'958 patent"*); and 6,403,120 B1 (the *"'120 patent"*). These patents have substantially identical specifications and are directed to an extended release formulation of venlafaxine hydrochloride. Wyeth listed these patents in its Effexor (R)

2005 U.S. Dist. LEXIS 40055, *

XR n2 New Drug Application ("NDA") No. 20-699, which is directed to the use of venlafaxine hydrochloride extended release capsules "for the treatment of depression including depression with associated anxiety." (Steiner Decl. Ex. 3 at WYETH 004-000003).

> n2 "XR" is the abbreviation for extended release.

Teva, seeking to market a generic version of Effexor (R) XR, filed an Abbreviated New Drug Application ("ANDA") for an extended release venlafaxine formulation. As part of the ANDA process, Teva provided Wyeth with notice that Teva's ANDA contained a "Paragraph IV" certification pursuant to *21 U.S.C. § 355(j)(2)(A)(vii)(IV)* [*4] . n3 Wyeth then brought this action against Teva charging patent infringement on March 27, 2003.

> n3 A Paragraph IV certification must disclose an ANDA applicant's basis for asserting that its generic product will not infringe the patents listed in the NDA, and/or the basis for asserting that the patent claims are invalid.

Seven of the independent claims asserted against Teva claim a "method for providing a therapeutic blood plasma concentration of venlafaxine over a twenty four hour period with diminished incidences of nausea and emesis . ..." *'171 patent*, claims 20, 22, 23; '958 patent, claims 1, 3, 4; '120 patent, claim 1. Support for that claim language is found in the specifications of the patents-in-suit:

> The use of the one-a-day venlafaxine hydrochloride formulations of this invention reduces by adaptation, the level of nausea and incidence of emesis that attend the administration of multiple daily dosing. In clinical trials of venlafaxine hydrochloride ER, the probability of developing [*5] nausea in the course of the trials was greatly reduced after the first week. *Venlafaxine ER showed a statistically significant improvement over conventional venlafaxine hydrochloride tablets in two eight-week and one 12 week clinical studies.*

*'171 patent*, col. 2, ll. 46-55 (emphasis added). n4 Teva asserts that Wyeth misrepresented its invention to the U.S.

Patent and Trademark Office ("PTO") by making the italicized statement above (hereinafter "the statement") without any clinical studies in support thereof, and, as a result, committed inequitable conduct. On February 22, 2005, Teva requested leave to amend its answers to add that affirmative defense of inequitable conduct.

> n4 Because the patents have substantially identical specifications, the Court cites only to the specification of the *'171 patent*.

Before addressing the Magistrate Judge's resolution of that motion, it is necessary to go back in time so that Teva's request can be viewed in its proper context. On June 30, 2003, the Court entered [*6] a Pretrial Scheduling Order establishing December 31, 2003 as the deadline for amendment of pleadings. The parties engaged in fact discovery and on October 31, 2003, Wyeth produced its NDA. The NDA disclosed all clinical studies concerning Effexor (R) XR conducted by or for Wyeth. After reviewing the NDA, "it raised a red flag" n5 for Teva that it may have an inequitable conduct claim. However, Teva did not seek to amend its answers before the deadline, nor did it request that the deadline be extended. Teva professes that its inaction was due to its inability to determine whether the clinical studies supported the statement without the benefit of taking additional discovery. (*See* Teva Reply Br. at 7).

> n5 (5/9/05 Tr. at 6).

By October 4, 2004, Wyeth had substantially completed its document production. Teva then deposed each of the four inventors. Each inventor allegedly "confessed ignorance concerning support for the statement in the patent[s]." (Teva Reply Br. at 4). Teva then noticed a *30(b)(6)* deposition. [*7] Wyeth produced two *30(b)(6)* witnesses in February 2005, and it was at those depositions where Teva allegedly confirmed for the first time which studies Wyeth contends support the statement: 600B-208-US ("the 208 study"), 600B-209-US ("the 209 study"), and 600B-367-EU ("the 367 study"). Further, according to Teva, it was only after taking those *30(b)(6)* depositions that it was able to confirm its suspicions that Wyeth had no support for the statement. And thus, Teva filed its motion for leave to amend in February 2005.

On May 9, 2005, at the hearing on Teva's motion, Magistrate Judge Schwartz denied Teva's request, holding that Teva failed to demonstrate good cause to modify the scheduling order under *Rule 16*. Judge Schwartz reviewed Teva's request under *Rule 16* because of the June 30, 2003 Pretrial Scheduling Order, which established the De-

cember 31, 2003 deadline for amendment of pleadings. The Magistrate Judge was not persuaded by Teva's protestations that it could not reasonably have sought to amend its answers before the deadline. Rather, Judge Schwartz found that Teva had sufficient information -- the NDA and its disclosure of all clinical studies -- in October 2003 to assert [*8] an inequitable conduct defense based on lack of clinical study support. Judge Schwartz further found Teva's argument that it needed additional discovery to "confirm" the factual underpinnings of its inequitable conduct allegations to be unpersuasive: "Given that the NDA reflected all the studies that related to the XR formulation, there was really no need to wait until the end of fact discovery to investigate the claims it now seeks to lodge." (5/9/05 Tr. at 90).

Teva then appealed that decision. That appeal is now before this Court.

### Discussion

A district court may reverse a Magistrate Judge's order if it finds the ruling clearly erroneous or contrary to law. *See 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A).* The district court is bound by the clearly erroneous rule as to findings of fact, while the phrase "contrary to law" indicates plenary review as to matters of law. *Haines v. Liggett Group Inc., 975 F.2d 81, 91 (3d Cir. 1992).* According to the Supreme Court, "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on [*9] the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948).*

*Rule 16(b) of the Federal Rules of Civil Procedure* governs amendment of pleadings once a scheduling order has been entered. *See Eastern Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000).* n6 *Rule 16* provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." *Fed. R. Civ. P. 16(b).* Good cause depends on the diligence of the moving party. *Globespanvirata, Inc. v. Texas Instruments Inc., 2005 U.S. Dist. LEXIS 16348, 2005 WL 1638136, *3 (D.N.J. Jul. 12, 2005).* The moving party must show that despite its diligence, it could not reasonably have met the scheduling order deadline. *S&W Enters., LLC v. Southtrust Bank of Ala., NA, 315 F.3d 533, 535 (5th Cir. 2003).* Further, the absence of prejudice to the nonmovant is not a consideration under the good cause standard. [*10] *Globespanvirata, Inc., 2005 U.S. Dist. LEXIS 16348, 2005 WL 1638136 at *3.*

n6 Because a request to modify a pretrial order is considered to be a procedural issue unrelated to the patent laws, it is reviewed under the law of the regional circuit. *Slip Track Sys., Inc. v. Metal-Lite, Inc., 304 F.3d 1256, 1262 (Fed. Cir. 2002).*

Here, it is uncontested that a Pretrial Scheduling Order was issued on June 30, 2003 and that the Order established December 31, 2003 as the deadline for amendment of the pleadings. Consequently, Teva's motion for leave to amend its answers was properly considered under the *Rule 16(b)* "good cause" standard.

Teva argues that Judge Schwartz's finding that it was not diligent is clearly erroneous. Teva asserts that it could not have reasonably amended its answers before the December 31, 2003 amendment cutoff. According to Teva, it could not determine from Wyeth's NDA which three studies supported the statement. Teva offers two reasons why the NDA by itself was insufficient. (*See* Teva [*11] Reply Br. at 7). First, the NDA is directed to only one indication for Effexor (R) XR, the treatment of depression. However, other clinical studies, concerning other indications, could have provided support for the statement. Second, the NDA identifies studies other than the 208, 209 and 367 studies which Wyeth may have relied upon when making that statement. Put differently, Teva essentially argues that because the NDA contained more than 3 studies, and Wyeth may have relied on any group of three to make the statement, Teva had insufficient information before the amendment deadline to properly plead an inequitable conduct defense. As a result, Teva asserts that it needed to take additional discovery to determine Wyeth's alleged bases for the statement.

Teva's arguments are factually incorrect and, ultimately, unconvincing. In her thorough analysis stated on the record on May 9, 2005, Judge Schwartz found Teva had not been diligent before the amendment deadline:

> The Court has not been presented with any information as to why there was any confusion about whether the three studies in the NDA were different than those in the patent application ... Thus, it appears to this Court [*12] that there was sufficient information long before February 2005 . . . upon which Teva could have sought leave or at least could have come before this Court and sought an extension at that time. In short, it appears that, at least from October 2003, Teva had possession of the information upon which it now relies for its proposed amendment.

(5/9/05 Tr. at 89, 91). Teva's arguments fail to demonstrate otherwise.

First, the three studies Wyeth relied on in making the statement are easily recognizable. The patent refers to two eight-week and one-twelve week studies. The NDA discloses three completed studies: the 208, 209 and 367 studies. The 208 and 209 studies were eight weeks in length, while the 367 study was twelve weeks in length. Teva argues that it could not have known that these were the three relevant studies because there are two other eight-week and one other twelve-week studies. (Teva Reply Br. at 2 (citing Steiner Decl. Ex. 3 at WYETH 004-000079-81)). However, and Teva should have known this, at the time those studies were reported in the NDA, "no interim data [were] available." (Steiner Decl. Ex. A at WYETH 004-017122, 19080, 17206). Thus, Teva has presented no [*13] reasonable explanation why those three studies caused it any confusion when trying to ascertain which studies support the statement.

Teva also argues that it could not have known which studies were relied upon because the NDA includes "other studies of unidentified length" which were ongoing. (Teva Reply Br. at 3 (citing Steiner Decl. Ex. 3 at WYETH 004-000077-78)). Those other studies, Teva posits, could have been eight or twelve weeks in duration and, therefore, they potentially could have been support for the statement. However, an examination of the pages cited by Teva reveals that the duration of those studies was "6-12 mos". (*Id.*). Not surprisingly, Teva fails to explain why it confused those two studies with the 208, 209 and 367 studies.

In short, none of the five additional studies that allegedly caused Teva confusion could have been relied upon by Wyeth to show a statistically significant improvement. Further, Teva does not identify any other study that could have been confused with the 208, 209 and 367 studies. Therefore, Teva's assertion that it could not reasonably determine which three studies supported the statement is belied by the NDA.

Second, and more importantly, [*14] Teva's inequitable conduct theory by itself eliminated any potential confusion Teva may have had regarding Wyeth's support for the statement. Teva's inequitable conduct theory is predicated on the assertion that the statement -- "venlafaxine ER showed a statistically significant improvement . . . in [three] studies" -- required "that three studies *each* showed a statistically significant improvement." (Teva's Reply Br. at 7, emphasis added). According to Teva, in order to show a statistically significant improvement, a clinical study would need to compare the extended release product with the immediate release product. (*See Id.* at 8). But only one study disclosed in the NDA -- the 208 study -- made such a comparison. And Teva claims that that study did not show a significant improvement; rather, it "showed the *same* incidence of nausea for both formulations (45%)." (Teva Reply Br. at 8, emphasis in original). Further, Teva acknowledges that "nothing on the face of the [studies] themselves indicate that they provide support for any conclusion about 'statistical significance.'" (*Id.*). Consequently, because under Teva's theory of inequitable conduct none of the clinical [*15] studies disclosed in the NDA support the statement, and that should have been evident after Teva reviewed the NDA, Teva provides no reason why it could not have asserted its inequitable conduct defense before the amendment deadline. n7

n7 Teva's argument that Wyeth did not disclose that the statement was based on a "pooled" analysis of the three studies until February 2005 is irrelevant. Regardless of what Wyeth's justification was for that statement, Teva knew before the deadline that Wyeth could not be relying on three studies that each performed a comparative analysis because the NDA, which was required to contain all relevant clinical studies, did not include three such studies. Thus, Teva did not need to know that Wyeth relied on a "pooled" analysis before raising its inequitable conduct defense.

Teva responds that because allegations of inequitable conduct are serious, and because inequitable conduct must be plead with particularity under *Fed. R. Civ. P.* 9, Teva acted [*16] appropriately by conducting additional discovery to confirm the factual underpinnings of its defense. n8 Although the Court agrees with Teva that no party should blithely assert a charge of inequitable conduct, nor should a party attempt to plead inequitable conduct if it is unable to do so with particularity, n9 the Court is not convinced that the Magistrate Judge erred when determining that Teva did not act diligently under the circumstances in this case. Certainly, in some cases it may be appropriate to conduct additional discovery to ascertain or develop an inequitable conduct defense before requesting leave to amend. However, this was not such a case. In short, Teva has failed to demonstrate that Judge Schwartz's decision was clearly erroneous or contrary to law. n10

n8 In support of this argument, Teva cites three district court cases: *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F. Supp. 2d 484 (D. Del. 2003); *Douglas Press, Inc. v. Int'l Gamco, Inc.*, 2004 U.S. Dist. LEXIS 7606 (N.D. Ill. May 3, 2004); *Go Med. Indus. Pty Ltd. v. C.R. Bard, Inc.*,

2005 U.S. Dist. LEXIS 40055, *

*1995 U.S. Dist. LEXIS 22248 (N.D. Ga. July 5, 1995).* Those cases, however, are inapt. First, all of the cases decided a motion for leave to amend to add an inequitable conduct defense in the first instance. None reviewed the decision of a Magistrate Judge under the deferential standard elucidated by *Rule 72.* Second, the last two cases, *Douglas Press* and *Go Medical,* were decided under the more permissive *Rule 15(a),* not under *Rule 16(b).* And third, although *Enzo Life Sciences* was decided in part under *Rule 16,* the Court expressly found that the inequitable conduct theory was based on a new set of facts discovered after the amendment cutoff date. *270 F. Supp. 2d at 489.*

[*17]

n9 *See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1344 (Fed. Cir. 2003)* (stating that "inequitable conduct, while a broader concept than fraud, must be pled with particularity").

n10 Having affirmed the holding that Teva did not show good cause to modify the Pretrial Scheduling Order under *Rule 16(b),* the Court need not address Judge Schwartz's "observations" of undue delay, prejudice and futility under *Rule 15(a).*

**Conclusion**

For the reasons stated above, Magistrate Judge Schwartz's Order dated May 13, 2005 is affirmed.

Dated: August 3, 2005

**William J. Martini, U.S.D.J.**

**ORDER**

This matter comes before the Court on defendants' appeal from the Magistrate Judge's May 13, 2005 Order denying leave to amend its answers. Having considered the parties' submissions, and for the reasons set forth in the accompanying Opinion, and for good cause shown,

**IT IS** on this 3rd day of August 2005, hereby

**ORDERED** that the May 13, 2005 Order [*18] is **AFFIRMED.**

**William J. Martini, U.S.D.J.**