# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,

                Plaintiff,

      v.

GENENCOR INTERNATIONAL, INC., and
ENZYME DEVELOPMENT CORPORATION,

                Defendants.

C.A. No. 05-160-KAJ

## PLAINTIFF'S COMPENDIUM OF UNREPORTED DECISIONS
## IN SUPPORT OF ITS MOTION FOR PERMANENT INJUNCTION

Josy W. Ingersoll (No. 1088)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
Andrew A. Lundgren (No. 4429)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
alundgren@ycst.com

OF COUNSEL:

Joseph R. Robinson
Steven E. Lipman
Robert C. Sullivan, Jr.
David K. Tellekson
Samuel S. Woodley
**DARBY & DARBY P.C.**
805 Third Avenue
New York, New York 10022
(212) 527-7700

*Attorneys for Plaintiff*
*Novozymes A/S*

Tab

**Cases**

*Christiana Indus. Inc. v. Empire Electronics, Inc.*,
    No. 06-12568, 2006 U.S. Dist. LEXIS 54210 (*5 E.D. Mich. Aug. 4, 2006)................... 1

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
    1993 U.S. Dist. LEXIS 19959 (28 U.S.P.Q.2d 1362 )...................................................... 2

*eSpeed, Inc. v. BrokerTec USA LLC*,
    2004 U.S. Dist. LEXIS 385 (D. Del. 2004) ..................................................................... 3

*International Rectifier Corp. v. Ixys Corp.*,
    No. 06-1296, 2006 WL 2036676 (Fed. Cir. July 14, 2006)............................................ 4

*Lifescan Inc. v. Polymer Tech. Int'l Corp.*,
    1995 U.S. Dist. LEXIS 4916 (35 U.S.P.Q.2d 1225 )....................................................... 5

*Nikko Materials USA, Inc. v. R.E. Serv. Co.*,
    No. C 03-2549, 2006 U.S. Dist. LEXIS 3700 (N.D. Cal. Jan. 12, 2006) .......................... 6

*Spalding & Evenflo Cos. Inc. v. Acushnet Co.*,
    1986 U.S. Dist. LEXIS 17129 (2 U.S.P.Q.2d 1070 )....................................................... 7

# TAB 1

LEXSEE 2006 U.S. DIST. LEXIS 54210

**CHRISTIANA INDUSTRIES INC., Plaintiff, vs EMPIRE ELECTRONICS, INC., Defendant.**

**Case No: 06-12568**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 54210*

**August 4, 2006, Decided**
**August 4, 2006, Filed**

**PRIOR HISTORY:** *Christiana Indus. v. Empire Elecs., 2006 U.S. Dist. LEXIS 50607 ( E.D. Mich., July 25, 2006)*

**COUNSEL:** [*1] For Christiana Industries, Incorporated, Plaintiff: David K. Callahan Chicago, IL; Jordan S. Bolton, Clark Hill (Detroit), Detroit, MI; Matthew J. Shiels, Kirkland & Ellis (Chicago), Chicago, IL; Ronald A. King, Clark Hill (Detroit), Detroit, MI.

For Empire Electronics, Incorporated, Defendant: Daniel D. Quick, Dickinson Wright (Bloomfield Hills), Bloomfield Hills, MI; Douglas W. Sprinkle, Gifford, Krass, (Troy), Troy, MI; Robert L. Kelly, Dickinson Wright (Bloomfield Hills), Bloomfield Hills, MI.

For Christiana Industries, Incorporated, Counter Defendant: Jordan S. Bolton, Clark Hill (Detroit), Detroit, MI.

**JUDGES:** Honorable Victoria A. Roberts, United States District Judge.

**OPINIONBY:** Victoria A. Roberts

**OPINION:**

### OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant's Emergency Motion for reconsideration of the Court's Order granting a preliminary injunction and Emergency Motion to amend or correct the Order granting a preliminary injunction. For the following reasons, the Court: (1) **DENIES** Defendant's Motion for reconsideration; and (2) **GRANTS** its Motion to Amend the Order.

### II. BACKGROUND

This action arise out of [*2] the alleged infringement by Defendant of Plaintiff's patent for potted lamp sockets.

The underlying facts are fully set forth in this Court's Opinion and Order granting preliminary injunction entered July 25, 2006 [Doc. 15].

On August 2, 2006, Defendant filed an Emergency Motion for reconsideration of the preliminary injunction. It claimed that the Court misapplied prosecution history estoppel and the doctrine of equivalents test in light of *Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Company, 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)*, which held that when an amendment is added during prosecution, there is a presumption that prosecution history estoppel applies. Additionally, Defendant directs the Court to a recent Supreme Court case that it claims eliminates the presumption of irreparable harm after a showing of patent validity and infringement. Lastly, Defendant claims the Court did not adequately weigh the public interest because it contends Plaintiff is not a certified supplier to General Motors ("GM"). If the injunction is in effect, Defendant asserts GM may have to halt production because it would not be able to obtain lamp sockets from a certified [*3] supplier.

Defendant also filed an Emergency Motion to amend or correct the preliminary injunction Order. Defendant claims the language of the Order is too broad and the bond amount is inadequate.

### III. STANDARD OF REVIEW

(g) Motions for Rehearing or Reconsideration.

* * *

(3) Grounds. Generally, and without restricting the court's discretion, the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the court and the parties have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. LR 7.1(g).

## IV. APPLICABLE LAW AND ANALYSIS

### A. Prosecution History Estoppel

Defendant's first allegation of palpable defect is that the Court misapplied prosecution history estoppel. Specifically, it argues that Plaintiff's addition of the "substantially perpendicular" language to claim 8 (later claim 3), is presumed to be a narrowing amendment. Thus, according to Defendant, because Plaintiff did not offer a reason for [*4] the amendment, the Court should presume that it was offered to narrow the claim. Under this presumption, Defendant contends the Court should not have applied the doctrine of equivalents.

Defendant is correct that *Warner-Jenkinson* held that "the burden is on the patent holder to establish the reason for an amendment required during patent prosecution." *Warner-Jenkinson, 520 U.S. at 33*. However, the Court also noted that where an explanation is established that the amendment was not related to patentability, prosecution history estoppel does not bar application of the doctrine of equivalents to that element. *Id.*

Plaintiff claimed that the amendment was not made to make the claim patentable, *i.e.* to get over prior art. Rather, it claims it was for the sake of clarity. [Transcript, p.86]. Defendant actually assisted in establishing that the 'substantially perpendicular" language was not added to make the claim patentable; it introduced several prior art patents disclosing perpendicular terminals at the hearing.

Accordingly, the Court concluded, in keeping with *Warner-Jenkinson*, that the amendment to add "substantially perpendicular" language did not [*5] invoke prosecution history estoppel. This Court properly applied the doctrine of equivalents.

### B. Irreparable Harm

Defendant asserts that in *Ebay, Inc. v. Mercexchange, LLC, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*, the Supreme Court eliminated the presumption of irreparable harm for preliminary injunctions upon a showing of validity and infringement.

Plaintiff argues, and this Court agrees, that *Ebay* did not invalidate the presumption. The *Ebay* Court addressed the proper analysis for *permanent* injunctive relief. It held that courts err by categorically granting permanent injunctive relief on a showing of infringement and validity, without analyzing the traditional four factors for injunctive relief. The Court reiterated that the grant or denial of injunctive relief rests with the equitable discretion of the Court, which must consider the four factors.

This Court did precisely that in its decision that Plaintiff was entitled to a preliminary injunction.

### C. Public Interest

Defendant's argument that the Court failed to properly assess the public interest factor is unavailing. On reconsideration, Defense counsel informs the Court that a [*6] grant of injunctive relief to Plaintiff could interrupt GM's production, evidence already considered by the Court.

Additionally, Plaintiff claims the situation is not as dire as Defendant would have the Court believe. It claims, and offers an affidavit in support, that it is certified to provide several parts. [Response, Exhibit 1]. For the parts that it is not certified to provide, Plaintiff offers to license its patent to Defendant until such time as it is certified.

### D. Emergency Motion to Amend or Correct the Order

Defendant contends that the language of the Order is too broad because it enjoins the Defendant from manufacturing or selling not only the lamp sockets considered by the Court at the hearing, but also "any other product that infringes, or induces or contributes to the infringement of" the '301 patent. [Doc. 18, p.2].

The Order will be amended to enjoin Defendant only as to the lamp socket designs considered by the Court at the hearing, as defined in the Order. The additional language, quoted above, will be stricken. See *International Rectifier Corporation v. IXYS Corporation, 383 F.3d 1312, 1316-1317 (Fed. Cir. 2004)*.

Lastly, Defendant [*7] claims that the bond amount posted by Plaintiff, $ 100,000, is inadequate to protect it from potential losses. It argues that it is uncontested that it stands to lose $ 2.5 million. [Transcript, p. 74-75].

*FRCP 65(c)* provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the

2006 U.S. Dist. LEXIS 54210, *

payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Because Plaintiff does not contest the amount presented by Defendant as its potential for loss, the bond will be increased to adequately cover that amount.

## V. CONCLUSION

For the foregoing reasons, the Court: (1) **DENIES** Defendant's Emergency Motion for reconsideration of the Order granting preliminary injunction; and (2) **GRANTS** Defendant's Emergency Motion to amend or correct the Order.

**IT IS SO ORDERED**.

/s/ Victoria A. Roberts

United States District Judge

Dated: August 4, 2006

# TAB 2

LEXSEE 1993 U.S. DIST. LEXIS 19959

**CRITIKON, INC., Plaintiff, v. BECTON DICKINSON VASCULAR ACCESS, INC., Defendant.**

**Civil Action No. 93-108-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1993 U.S. Dist. LEXIS 19959; 28 U.S.P.Q.2D (BNA) 1362*

**July 16, 1993, Decided**

**DISPOSITION:** [*1] Granted.

**COUNSEL:** Arthur G. Connolly, Jr., of CONNOLLY BOVE LODGE & HUTZ, Wilmington, Delaware. Harry J. Roper, George S. Bosy, Raymond N. Nimrod, and Ellen D. Law, of ROPER & QUIGG, Chicago, Illinois. Donna H. Malin, of JOHNSON & JOHNSON, New Brunswick, New Jersey. Attorneys for Plaintiff.

Robert K. Payson, and William J. Marsden, Jr., of POTTER ANDERSON & CORROON, Wilmington, Delaware. Albert E. Fey, Lars I. Kulleseid, Richard M. Barnes, and Philippe Y. Riesen, of FISH & NEAVE, New York, New York. Edward F. Mullowney, of FISH & NEAVE, Palo Alto, California. Leslie Gordon Fagen, and Ellen M. Moskowitz, of PAUL WEISS RIFKIND WHARTON & GARRISON, New York, New York. Attorneys for Defendant.

**JUDGES:** Farnan, Jr.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

OPINION

July 16, 1993

Wilmington, Delaware

FARNAN, District Judge.

I. INTRODUCTION

Plaintiff, Critikon, Inc. ("Critikon") commenced this patent infringement action on March 1, 1993, for alleged infringement of U.S. Patent No. *4,952,207* ("Lemieux patent"). (Docket Item ("D.I.") 1). On April 1, 1993, Critikon [*2] amended its Complaint alleging infringe- ment of a second patent, U.S. Patent No. *4,978,344* ("Dombrowski patent"). (D.I. 21). Defendant, Becton Dickinson Vascular Access, Inc.'s ("Becton Dickinson") Answer to the Amended Complaint denies that Becton Dickinson infringed the Lemieux and Dombrowski pat- ents and avers that both patents are invalid and unen- forceable. (D.I. 45).

Presently before the Court is Critikon's motion to en- join Becton Dickinson from making, using, or selling its intravenous ("I.V.") safety catheter which is currently being sold under the designation Insyte(R) Saf-T- Cathe(R). Critikon alleges that the Becton Dickinson safety catheter infringes Claim 8 of the Lemieux patent, which is assigned to Critikon. Because Critikon has demonstrated a likelihood of success on the merits, and that it will suffer irreparable harm if Becton Dickinson is not preliminarily enjoined from making and selling its safety catheter, the Court will grant Critikon's motion for a preliminary injunction.

II. TECHNOLOGY BACKGROUND

An I.V. catheter is a hollow tube made of a flexible material that is inserted into the vein or artery of a person to provide them with fluids, drugs or medications. [*3] A catheter is placed in the vein through the use of an installing apparatus, which includes a steel hypodermic needle. The needle extends through the hollow passage of the catheter. The needle and the catheter are inserted into the vein together. The needle is then withdrawn by sliding it back through the catheter. The catheter is left in place with one end of the catheter exposed outside of the person's body. This end of the catheter, called the cathe- ter hub, is then connected to a source of fluids or medica- tions to be administered to the person.

After the needle is withdrawn from the catheter, the health care professional must complete a number of tasks immediately. The health care professional must secure the catheter to the patient. In addition the health care professional must cap the catheter to close access to the

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 9 of 23

Page 2

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

person's blood system and to prevent blood loss. Because of the urgency of these procedures, the health care professional will generally set the needle down at a nearby location for later disposal. The problem then is, however, that the exposed needle tip creates the danger of accidental needlesticks, which may transmit bloodborne pathogens, such as AIDS or hepatitis. [*4]

The Lemieux patent and the Becton Dickinson safety catheter are both designed to eliminate the risks of such accidental needlesticks. Both involve an improved I.V. catheter-needle apparatus that automatically caps the sharp needle tip as the needle is withdrawn from the patient. This is accomplished through the use of a small mechanical guard, called a needle guard. As the needle is withdrawn from the catheter, the needle guard automatically positions itself over the needle tip and locks into place.

III. DISCUSSION

A. Legal Standard -- Preliminary Injunction

Injunctive relief in patent cases is authorized by *35 U.S.C. § 283.* The grant or denial of a preliminary injunction is within the sound discretion of the trial court. In determining whether a party is entitled to a preliminary injunction, a court must consider whether: 1) the movant is reasonably likely to succeed on the merits at trial; 2) the movant will suffer irreparable harm if preliminary relief is not granted, 3) the balance of hardships favors granting preliminary relief; 4) the preliminary relief sought is in the public interest. *New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992);* [*5] see also *Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc., 630 F.2d 120, 136* (3d Cir.), cert. denied, *449 U.S. 1014, 66 L. Ed. 2d 473, 101 S. Ct. 573 (1980)*

B. Likelihood of Success on the Merits

Critikon has the burden of showing that there is a reasonable likelihood that it will succeed on the merits at trial. Thus, Critikon is entitled to a preliminary injunction only if it clearly shows that its patent is valid, enforceable, and infringed. *Hybritech, Inc. v. Abbott Lab., 849 F.2d 1446, 1451 (Fed. Cir. 1988); Nutrition 21 v. U.S., 930 F.2d 867, 869 (Fed. Cir. 1991)* ("The patentee carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement.").

1. Infringement

Infringement occurs when someone "without authority makes, uses or sells any patented invention within the United States during the term of the patent . . . ." *35 U.S.C. § 271* (1988). The Court's determination of whether Becton Dickinson's safety catheter infringes

Claim 8 of the Lemieux patent involves two [*6] steps. First, the Court must determine the scope of Claim 8. *Autogiro Co. of America v. U.S., 181 Ct. Cl. 55, 384 F.2d 391, 401 (Ct. Cl. 1967).* Then the Court must compare Claim 8, as interpreted, to Becton Dickinson's safety catheter to determine whether it infringes, either literally or under the doctrine of equivalents. Id.; *Hybritech, 849 F.2d at 1455.*

a. Claim Interpretation

In defining the scope of a claim for the purposes of determining whether it has been infringed, the Court begins with the language found in the claim itself.

> The claims of the patent provide the concise formal definition of the invention. They are numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. . . . Although courts are confined to the language of the claims, they are not, however, confined to the language of the claims in interpreting their meaning.
>
> . [*7] . . .
>
> In deriving the meaning of a claim, we inspect all useful documents to reach what Justice Holmes called the "felt meaning" of the claim.

Id. at 396-397 (quoting *35 U.S.C. § 112).* The words in a claim may mean either what one skilled in the art would expect the words to mean or what the inventor has defined the word to mean. In interpreting a disputed claim, the Court looks to several factors including: (1) the literal language of the claims, (2) the patent specification, (3) the prosecution history, and (4) expert testimony on how those skilled in the art would interpret the claim. *Loctite Corp. v. Ultraseal, Ltd., 781 F.2d 861, 867 (Fed. Cir. 1985); McGill, Inc. v. John Zink Co., 736 F.2d 666, 673-75* (Fed. Cir.), cert. denied, *469 U.S. 1037, 83 L. Ed. 2d 404, 105 S. Ct. 514 (1984); American Standard, Inc. v. Pfizer Inc., 722 F. Supp. 86, 92 (D. Del. 1989).* But, "interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification.'" *Intervet America, Inc. v. Kee-Vet*

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 10 of 23

Page 3

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

*Labs, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989)* [*8] (quoting *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988)).*

Claim 8 of the Lemieux patent is directed to an improved catheter with a small needle guard that encloses the tip of the catheter needle as it is being withdrawn from the catheter once the catheter is in place. Claim 8 of the Lemieux patent reads as follows:

> 8. An I.V. catheter with a self-locating needle guard comprising:
>
> a catheter assembly including a catheter attached to a catheter hub;
>
> an introducer needle assembly for connection with said catheter assembly, including a hollow needle with a distal tip and a needle hub, said needle being affixed near its proximal end to extend distally exposed from the distal end of said needle hub, and said needle including means located distal said distal end of said needle hub for engaging a needle guard; and
>
> a needle guard, initially located about said needle of the distal end of said needle hub and capable of axial movement relative to said needle, said needle guard including a proximal portion having means for engaging said engaging means of said needle and a distal portion for extending over said needle [*9] tip when said proximal portion is engaged with said engaging means of said needle; and
>
> retaining means for retaining said needle guard within said catheter hub prior to engagement of said needle engaging means and said needle guard engaging means.

After reviewing Claim 8 together with the other claims and the specification of the Lemieux patent, the relevant prior art, and the deposition testimony and affidavits of Mr. Vaillancourt, Mr. Fischell, and Mr. Luther, the Court interprets Claim 8 to require the following:

(1) First, the needle guard must be self-locating. "Self-locating" as used by Lemieux in Claim 8 means that the needle guard is automatically (without an extra step by the health care professional) positioned over the tip of the needle as the needle is withdrawn from the catheter.

(2) Second, Claim 8 requires a catheter assembly, or a catheter attached to a catheter hub. The catheter is a hollow tube which is inserted into a patient's vein or artery. The catheter hub is the external portion of the catheter which attaches to an infusion tube for administering fluids to the person.

(3) Third, Claim 8 requires an introducer needle assembly that connects to the catheter [*10] assembly. The needle assembly is comprised of a needle and a needle hub. The needle hub is that part of the catheter that is handled by the health care professional.

(4) Fourth, Claim 8 requires that the needle assembly be comprised of a hollow needle that is attached at its proximal end to a needle hub and extends distally exposed from the distal end of the needle hub. The word proximal is used to denote that end closest to the health care professional. The word distal is used to denote that end closest to the patient.

(5) Fifth, Claim 8 requires a means, located at the distal end of the needle, for engaging the needle guard as the needle is withdrawn from the catheter. This means, together with the required means on the needle guard, is what allows the needle guard to automatically move into position over the tip of the needle to protect health care professionals and patients from accidental needlesticks.

(6) Sixth, Claim 8 requires a needle guard that is initially positioned around the needle at the distal end of the needle hub and capable of axial movement around the needle.

(7) Seventh, Claim 8 requires that the needle guard contain a means in its proximal portion for engaging [*11] the corresponding means found on the needle, and a distal portion of the needle guard that covers the needle tip.

(8) Finally, Claim 8 requires a means for retaining the needle guard in its initial position within the catheter hub until the corresponding mechanisms on the needle and the needle guard engage. The purpose of this disclosure is to ensure that the needle guard remains fixed, next to the catheter hub while the needle is being withdrawn from the catheter and until it is correctly positioned over the tip of the needle. In this regard, the Court rejects Becton Dickinson's interpretation of "within" to require that the needle guard be entirely inside the catheter hub. "Within" as used by Lemieux does not limit Claim 8 to only those safety catheters in which the needle guard is completely inside the catheter hub. It merely requires that whatever portion of the needle guard is within the catheter hub remain there until the needle engages the needle guard through the means described above.

b. Literal Infringement

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 11 of 23

Page 4

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

Once the Court establishes the meaning of the claim, the claim must be read on the accused products or processes to determine whether the accused products or processes [*12] infringe on the patent, either literally or under the doctrine of equivalents. *Autogiro, 384 F.2d at 401; Palumbo v. Don-Joy Co., 762 F.2d 969, 974 (Fed. Cir. 1985).* Literal infringement occurs if each element of the claim is found in the accused device. See *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989); American Hoist & Derrick Co. v. Manitowoc Co., 603 F.2d 629, 630 (7th Cir. 1979).* The Court finds that Critikon has made a clear showing that each of the eight requirements of Claim 8, as interpreted by the Court, is found in Becton Dickinson's safety catheter. Therefore, the Court finds that there is a reasonable likelihood that Critikon will succeed on the issue of infringement.

(1). The needle guard in Becton Dickinson's safety catheter is self-locating as that term is used in Claim 8. The literature that Becton Dickinson distributes to its customers clearly demonstrates that the needle guard moves into position to cover the tip of the needle as the needle is withdrawn from the catheter. Furthermore, it is clear that [*13] this is accomplished automatically, or without any extra movements by the health care professional.

(2), (3). A visual inspection of Becton Dickinson's safety catheter convinces the Court that it contains a hollow catheter tube attached to a catheter hub, and a needle assembly for connection with the catheter assembly. Becton Dickinson contends that its needle assembly is not "connected" to the catheter assembly in the manner contemplated by Claim 8. Becton Dickinson argues that the needle assembly and the catheter assembly in its safety catheter are not "connected" because they are separated by the needle guard. The Court is not persuaded by this argument. If one picks up the Becton Dickinson device, the needle assembly and the catheter assembly are connected, and must be so connected for the catheter to be operable.

(4). A visual inspection of the Becton Dickinson needle assembly also reveals that a hollow needle attached at its proximal end to the needle hub extends distally exposed from the distal end of the needle hub. Becton Dickinson insists that its needle is not "distally exposed from the distal end of the needle hub"; but rather is enclosed by the catheter except at the [*14] very distal end. The Court finds no merit to this contention. A review of the specifications and the drawings convinces the Court that "distally exposed" does not literally mean uncovered when the device is assembled and ready to be used. The limitation "distally exposed" is found in the part of Claim 8 where the inventor was focused solely on the needle assembly, not the entire catheter assembly.

(5). The Becton Dickinson safety catheter has a means, located on the distal tip of the needle, of engaging the needle guard. This limitation found in Claim 8 is written as a "means plus function" limitation. A claim written with "means plus function" language is literally infringed if the accused product performs the identical claimed function using the same or an equivalent or interchangeable structure. *Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1041-42 (Fed. Cir. 1993); Palumbo v. Don-Joy Co., 762 F.2d 969, 974-75 (Fed. Cir. 1985).*

The engaging means found on the needle in the Becton Dickinson safety catheter performs the identical function as that described in Claim 8, i.e. to engage the needle guard. Moreover, [*15] the Becton Dickinson needle engages the needle guard using an equivalent structure as that described in the Lemieux patent. At the distal end of the needle of the Becton Dickinson safety catheter is a bump or ridge where the outside diameter of the needle increases. As the needle is pulled through the needle guard, the diameter of the ridge on the needle is too large to pass through the proximal end of the needle guard. Thus, the ridge on the needle engages with the needle guard causing the needle guard to move into position over the tip of the needle. The ridge on the tip of the needle in the Becton Dickinson device is the equivalent of the notch described in the Lemieux patent.

(6). The needle guard is initially positioned around the needle at the distal end of the needle hub and capable of axial movement around the needle.

(7). The needle guard on the Becton Dickinson's device has a means for engaging the corresponding means on the needle. Once again, this limitation is written as a "means plus function" limitation. As discussed above, the function in both devices is identical and Becton Dickinson's locking mechanism is equivalent to the notch structure described in the Lemieux [*16] patent.

(8). Finally, the Becton Dickinson safety catheter has a means to ensure that the needle guard remains fixed at the based of the catheter hub while the needle is being withdrawn from the catheter, and until the needle engages the needle guard. The retaining means limitation is also written using "means plus function" language. Therefore, the Court must determine whether the structure described in the Lemieux patent is identical to or the equivalent of the structure used by Becton Dickinson.

In the Lemieux patent, the needle guard is retained within the catheter hub by a frictional force -- the needle guard presses against the inside of the catheter hub until the needle engages with the needle guard. Mr. Vaillancourt testified that the needle guard in the Becton Dickinson device is likewise held in place by a frictional or mechanical force until the needle engages with the nee-

Case 1:05-cv-00160-KAJ-MPT     Document 172     Filed 09/01/2006     Page 12 of 23

Page 5

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

dle guard. Therefore, the Court finds that the Becton Dickinson structure is interchangeable with that described in the Lemieux specification.

### c. Doctrine of Equivalents

The Court also finds that Critikon has a reasonable likelihood of succeeding on its burden of proving that Becton Dickinson's safety catheter infringes the Lemieux patent under the doctrine of equivalents. Infringement under the doctrine of equivalents occurs when the alleged infringer's product or process performs substantially the same function, in the same manner, to obtain substantially the same result as the claimed invention. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950).* Thus, Becton Dickinson's safety catheter infringes the Lemieux patent under the doctrine of equivalents if it performs the same function, in the same manner, to obtain substantially the same result as the catheter disclosed in Claim 8 of the Lemieux patent. *Id. at 608.*

It cannot be seriously disputed that the Becton Dickinson safety catheter performs the same function to achieve the same result as Claim 8 of the Lemieux patent. They both provide for a catheter with a needle guard that moves into position passively -- without intervention by the health care professional -- for the purpose of protecting health care professionals and others from accidental needlesticks.

Furthermore, the Becton Dickinson device accomplishes this in substantially the same manner as that taught by Claim 8. The needle guard remains stationary until a means on the distal tip of the needle engages with a means on the needle guard. At this point, the needle guard becomes affixed to the tip of the needle.

### 2. Validity

In addition to contending that its safety catheter does not infringe Claim 8 of the Lemieux patent, Becton Dickinson [*17] also contends that the Lemieux patent is invalid. Becton Dickinson asserts invalidity on three grounds: (1) invalid as obvious under *35 U.S.C. § 103* in light of U.S. Patent No. *4,834,718* ("the McDonald patent") and U.S. Patent No. *4,832,696* ("the Luther patent"); (2) invalid as anticipated under *35 U.S.C. § 102* by the McDonald patent; and (3) invalid under *35 U.S.C. § 112* as inoperable. The question for the Court in resolving this motion for a preliminary injunction is whether Critikon has demonstrated a reasonable likelihood that Becton Dickinson will fail to meet its burden at trial of proving by clear and convincing evidence that the Lemieux patent Claim 8 is invalid. Although Critikon retains the burden of showing that Becton Dickinson's attack on the Lemieux patent's validity will likely fail, this determination must be made "in the context of the

presumptions and burdens that would inhere at trial on the merits." H.H. *Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 388 (Fed. Cir. 1987).* Thus, while Critikon must demonstrate that [*18] it is entitled to the preliminary injunction, the Court must make that determination in the context of the presumption of validity that the Lemieux patent would enjoy at trial and Becton Dickinson's heavy burden of establishing invalidity by clear and convincing proof.

### a. Obviousness, *35 U.S.C. § 103*

In his affidavit, Becton Dickinson's expert, Mr. Fischell, states his opinion that Claim 8 is obvious from the Luther patent. Appendix to Defendant Becton Dickinson's Memorandum in Opposition to Critikon's Motion for P.I. ("Def. Appendix"), Exhibit J, at PP 16-17. Section 103 states:

> a patent may not be obtained . . . if the differences between the subject matter sought to be patented and prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*35 U.S.C. § 103* (1988). The Court's determination of obviousness requires resolution of three issues: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the [*19] level of ordinary skill in the pertinent prior art. *Graham v. John Deere Co., 383 U.S. 1, 17, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966).* The Court must also weigh any relevant secondary considerations such as the commercial success of the challenged patent, long felt but unsolved needs in the art, and the failure of others to solve the problem. *Id. at 17-18.* A review of these considerations convinces the Court that Critikon is reasonably likely to succeed on the issue of Claim 8's obviousness.

### (1) Prior Art

The McDonald Patent. The McDonald patent discloses a catheter with a protective housing designed to cover the needle tip for the purpose of preventing accidental needlesticks. The housing is comprised of a long barrel and a guard hub. After the needle is withdrawn from the emplaced catheter, the proximal end of the housing engages with a groove on the handle, which the Court finds to be similar to the needle hub in the Lemieux patent.

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 13 of 23

Page 6

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

The Luther Patent. The Luther patent also discloses a needle with an assembly for protecting the needle tip. The assembly includes an elongated housing, a needle secured to the housing, and a needle guard positioned around [*20] the needle which slides along the inside of the housing. Following insertion of the catheter and needle into the patient, the housing, and thus the needle, is retracted. The health care professional withdraws the needle by pressing forward against a tab on the needle guard while retracting the housing and attached needle. The housing and needle thus move rearward relative to the needle guard as the needle guard slides along the inside of the housing. The needle guard remains stationary until notches on the needle guard engage with the housing. At this point the needle guard becomes fixed covering the entire needle.

(2) Differences Between Prior Art and Claim 8

As Mr. Vaillancourt points out, the McDonald and Luther patents are distinct from Lemieux Claim 8 in two significant respects. First, the Luther patent does not teach or suggest a self-locating needle guard. It does not teach an apparatus where the needle guard automatically latches onto the tip of the needle as the needle is being withdrawn from the catheter. With regard to the Luther catheter, the health care professional must actively push forward on the needle guard tab to hold the needle guard stationary, enabling it [*21] to engage with the housing.

Second, neither the McDonald nor the Luther patent teaches or suggests that the engaging means be on the needle itself. The protective mechanism in the Luther patent engages with a means on the needle hub. These differences are significant. The uniqueness of the Lemieux patent is the engaging means on the needle which enables the needle guard to lock into position over the tip of the needle without any distinct motion on the part of the health care professional.

There is nothing in the prior art to suggest that this engaging means on the needle and the passive positioning of the needle guard would have been obvious to one of ordinary skill in the art. This conclusion is supported by the evidence regarding the commercial success enjoyed by the Becton Dickinson safety catheter which incorporates these unique characteristics. For example, the chart submitted to the Court during oral argument shows that Critikon sold approximately 1.8 million safety catheters in its first year of production. It also projects sales of 2 million catheters in 1993. Moreover, Becton Dickinson notes that since its entry in the market, eighty hospitals have committed to using the [*22] safety catheter, while another four-hundred are in the process of evaluating it for possible use. This type of rapid growth convinces the Court that the disclosures contained in the Lemieux patent and incorporated in

Becton Dickinson's device were not made obvious by the Luther and McDonald patents.

b. Anticipation, *35 U.S.C. § 102*

Becton Dickinson also alleges that Claim 8 of the Lemieux patent is invalid under *35 U.S.C. § 102* as anticipated by the McDonald patent. To establish anticipation at trial Becton Dickinson would have to prove that the McDonald patent discloses each and every element of Claim 8. *Mannesmann Demag Corp. v. Engineered Metal Prods. Co., 605 F. Supp. 1362, 1367-68 (D. Del. 1985)*, aff'd, *793 F.2d 1279 (Fed. Cir. 1986); see also Diversitech Corp. v. Century Steps, Inc., 850 F.2d 675, 677 (Fed. Cir. 1988).*

As discussed above, the McDonald patent does not teach an apparatus where the engaging means is located on the needle itself. Therefore, the Court concludes that Critikon is reasonably likely to [*23] succeed at trial on the issue of anticipation.

c. Non-enablement, *35 U.S.C. § 112*

Finally, Becton Dickinson alleges that the device as described in the patent specification is inoperable. Section 112, of Title 25 of the United States Code requires that the patent specification contain a description of the invention sufficient to enable one skilled in the art to make and use the claimed invention. n1 In Mr. Fischell's opinion, the Lemieux safety catheter would not work because the needle guard would not release from the catheter as the needle is withdrawn from the patent. Mr. Fischell's conclusion is primarily based on the drawings found in the patent. However, patents themselves and drawings in a patent specification are not intended as production specifications. That some design work is necessary does not render a patent non-enabling as long as the amount of experimentation is not unduly extensive. *U.S. v. Telectronics, Inc., 857 F.2d 778, 785 (Fed. Cir.) (citing Atlas Powder Co. V. E.I. du Pont De Nemours & Co., 750 F.2d 1569, 1576 (Fed. Cir. 1984))*, cert. denied, *490 U.S. 1046 (1988). [*24]*

n1 Section 112 states in relevant part:

the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 14 of 23

Page 7

1993 U.S. Dist. LEXIS 19959, *; 28 U.S.P.Q.2D (BNA) 1362

Mr. Vaillancourt testified that the needle guard would release from the catheter hub as one of ordinary skill in the art would construct the Lemieux safety catheter after some experimentation. Mr. Luther agrees with Mr. Vaillancourt. It is Mr. Luther's opinion that the Lemieux patent could be made. Significantly, Mr. Fischell never stated that the Lemieux patent could not be made by one of ordinary skill in the art; he merely stated that the invention according to the drawings would be inoperable. Thus, on this record, the Court finds that Critikon is reasonably likely to succeed on the issue of non-enablement.

### 3. Enforceability

Finally, Becton Dickinson contends [*25] that Critikon committed inequitable conduct during the prosecution of the Lemieux patent by withholding relevant and invalidating prior art from the Patent Examiner. Specifically, Becton Dickinson alleges that Critikon should have and failed to cite the Luther and McDonald patents as prior art. Critikon argues that the Luther and McDonald patents are cumulative of other prior art provided to the Patent Office.

Rule 56(a) of Title 37, Chapter 1 of the Code of Federal Regulations provides that applicants and their attorneys must "disclose to the [PTO] information they are aware of which is material to the examination of the application." *37 C.F.R. 1.56(a)* (1989). This expresses the general duty of candor, good faith, and honesty that applicants for patents and attorneys representing applicants owe the U.S. PTO. *FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987); Hycor Corp. v. Schlueter Co., 740 F.2d 1529, 1538 (Fed. Cir. 1984); American Standard Inc. v. Pfizer Inc., 722 F. Supp. 86, 141 (D. Del. 1989)* (citing *Precision Inst. Mfg. Co. v. Automotive M. M. Co., 324 U.S. 806, 818, 89 L. Ed. 1381, 65 S. Ct. 993 (1945))*. [*26] Any knowledge or action taken by the attorney is chargeable to the applicant. *FMC Corp., 835 F.2d at 1415 n.8.*

At trial Becton Dickinson would have the burden of proving by clear and convincing evidence (1) the existence of material prior art, (2) that Critikon knew of the material prior art and its materiality, and (3) Critikon failed to disclose the material prior art to the PTO with the intent to mislead the PTO. *FMC Corp., 835 F.2d at 1415; Under Sea Industries, Inc. v. Dacor Corp., 833 F.2d 1551, 1559 (Fed. Cir. 1987).*

Information is considered material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *37 C.F.R. § 1.56(a); Specialty Composites v. Cabot Corp., 845 F.2d 981, 992*

*(Fed. Cir. 1988)*. However, an applicant need not disclose all prior art. *J.P. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553, 1559 (Fed. Cir. 1984)*, cert. denied, *474 U.S. 822, 88 L. Ed. 2d 60, 106 S. Ct. 73 (1985)*. The applicant need not disclose [*27] prior art which is no more pertinent or merely cumulative to that considered by the examiner. *Rolls-Royce, Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1107 (Fed. Cir. 1986)*.

The Court must also find an intent to mislead or deceive the PTO prior to finding inequitable conduct. *Hewlett-Packard Co. v. Bausch & Lomb, Inc., 882 F.2d 1556, 1562 (Fed. Cir. 1989)*, cert. denied, *493 U.S. 1076, 107 L. Ed. 2d 1031, 110 S. Ct. 1125 (1990)*. The Court must view the conduct in light of the totality of the circumstances, "including the nature and level of culpability of the conduct and the absence or presence of affirmative evidence of good faith." 14. (citing *Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988))*; see also *Consolidated Aluminum Corp. v. Foseco Int'l, Ltd., 910 F.2d 804, 809 (Fed. Cir. 1990); RCA Corp. v. Data General Corp., 887 F.2d 1056, 1065 (Fed. Cir. 1989)*.

The Court finds that Critikon is reasonably likely to succeed in demonstrating that the Luther and McDonald patents are cumulative of other [*28] prior art presented to the PTO during the prosecution of the Lemieux patent. Moreover, Becton Dickinson has pointed to no evidence, circumstantial or otherwise, n2 to show that Critikon acted with an intent to deceive the PTO in not disclosing the McDonald and Luther patents. n3 Therefore, the Court concludes Critikon is likely to prevail on the issue of the enforceability in addition to validity and infringement of the Lemieux patent.

n2 Because direct evidence of an intent to deceive rarely exists, the Court may rely on circumstantial evidence leading to an inference of intent to mislead as the basis for a finding of inequitable conduct. *Hewlett-Packard Co., 882 F.2d at 1562.*

n3 On June 25, 1993, Becton Dickinson submitted a letter describing newly discovered evidence which they allege shows Critikon's awareness of the "highly relevant" McDonald patent. Even if the evidence does demonstrate knowledge of the existence of the McDonald patent, it does not demonstrate that Critikon knew of its materiality with respect to the Lemieux patent nor intent to deceive the PTO.

[*29]

## C. Irreparable Harm

Critikon contends that it will be irreparably harmed by Becton Dickinson's continued alleged infringement in four ways. First, Critikon asserts that because it and Becton Dickinson are the only two competitors in the safety catheter market, it stands to lose its currently dominant market share. Second, Critikon asserts that it stands to lose prospective business opportunities as Becton Dickinson attracts prior Critikon customers. Third, Critikon asserts that its reputation and good will as an innovator in the catheter market will suffer irreparably. Finally, Critikon asserts that there is a significant risk that other potential infringers will enter the market absent a preliminary injunction.

The Court is convinced that Critikon will suffer irreparable harm absent a preliminary injunction. First, where, as here, there has been a strong showing of validity and infringement, irreparable harm can be presumed from the continued infringement of a valid patent. *Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581* (Fed. Cir.), cert. denied, *464 U.S. 996, 78 L. Ed. 2d 687, 104 S. Ct. 493 (1983); E.I. duPont de Nemours v. Polaroid Graphics, 706 F. Supp. 1135, 1144 (D.Del. 1989).* [*30] This presumption has its origin in the nature of patent rights. Because patent rights are of finite duration, the mere passage of time creates irremediable harm. *H.H. Robertson Co., 820 F.2d at 390.* In addition, the very nature of the patent right is the ability to exclude others. Once a determination is made that a patent is likely valid and infringed, the patent holder should be entitled to the full enjoyment of his patent rights. *Smith Int'l, Inc., 718 F.2d at 1581.* Finally, the "opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers." *H.H. Robertson Co., 820 F.2d at 390* (citing *Teledyne Indus., Inc. v. Windmere Products, Inc., 433 F. Supp. 710 (S.D.Fla. 1977)).* If courts refuse to grant preliminary injunctions where the infringement is as clear as it is in this case, the rights of patent holders will become diluted, and potential infringers will be encouraged to play the odds.

## D. Public Interest

Granting the preliminary injunction will also serve the public interest. Becton Dickinson [*31] has argued to the Court that a preliminary injunction would run against the public interest because hospitals have already begun to use their safety catheter. They argue that the disruption that would result from forcing the hospitals to find a new safety catheter or resort to the old catheter would place many health care professionals and patients at risk.

The Court agrees that it is in the public interest to minimize the disruption in hospitals in terms of their selection of safety catheters. However, because of the strong showing on the issue of infringement, the Court believes that such disruption will be minimized by granting the preliminary injunction. If not preliminarily enjoined, Becton Dickinson will embark on a campaign to persuade hospitals to buy and use its safety catheter. If successful, as Becton Dickinson anticipates it would be, many hospitals will begin use Becton Dickinson's device. Then, if as the Court has presently found, Critikon succeeds at trial and obtains an ultimate determination of infringement, disruption will result in not only the hospitals presently using device, but in addition, all of the hospitals which may be persuaded to begin using it between [*32] now and trial. For this reason, the Court believes that it is in the public interest to enjoin Becton Dickinson's efforts at this time.

## E. Balance of the Hardships

The Court finds the balance of hardships also tips in favor of granting a preliminary injunction. Becton Dickinson is still in the early stages of marketing its safety catheter, whereas Critikon's product has been on the market for over a year. The hardship facing Becton Dickinson in delaying its entry into the market three to six months is not as severe as that faced by Critikon by not being able to enforce its apparently valid patent, and the potential harm that will result to its reputation and goodwill as an innovator in the safety catheter market.

## IV. CONCLUSION

In sum, a review of the four factors that the Court must consider in determining the appropriateness of a preliminary injunction convinces the Court that Critikon is entitled to a preliminary injunction. The Court finds Critikon has clearly demonstrated that Lemieux patent Claim 8 is valid and enforceable. In addition, Critikon has made a clear showing that Becton Dickinson's safety catheter infringes Claim 8 literally and under the doctrine of equivalents. [*33] Further, the clear showing that Claim 8 is valid and infringed leads the Court to conclude that Critikon will suffer irreparable harm if Becton Dickinson is not preliminarily enjoined from making and selling its safety catheter. Moreover, the Court finds the balance of hardships and the public interest favor granting the preliminary injunction. Accordingly, the Court will grant Critikon's motion for a preliminary injunction.

An appropriate Order will be entered.

## ORDER

At Wilmington this 16 day of July, 1993, for the reasons set forth in the Opinion issued this date,

IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED.

Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE

# TAB 3

LEXSEE 2004 U.S. DIST. LEXIS 385

**eSPEED, INC.; CANTOR FITZGERALD, L.P.; and CFPH, L.L.C., Plaintiffs, v. BROKERTEC USA, L.L.C.; BROKERTEC GLOBAL, L.L.C.; GARBAN, LLC; ICAP PLC; OM AB; and OM TECHNOLOGY (U.S.), INC., Defendants.**

**Civil Action No. 03-612-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 385; 69 U.S.P.Q.2D (BNA) 1466*

**January 14, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *eSpeed, Inc. v. Brokertec United States, L.L.C., 2004 U.S. Dist. LEXIS 13486 (D. Del., June 15, 2004)*

**DISPOSITION:** [*1] Plaintiff's motion for preliminary injunction denied.

**COUNSEL:** For Espeed Inc, Cantor Fitzgerald LP, CFPH LLC, PLAINTIFFS: Jack B Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Brokertec USA LLC, Brokertec Global LLC, Garban LLC, Icap PLC, OM Technology US Inc, OM Technology AB, DEFENDANTS: Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM ORDER**

I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under *28 U.S.C. § 1338.* Plaintiffs in this case are eSpeed, Inc., Cantor Fitzgerald, L.P., and CFPH, L.L.C. (collectively, "eSpeed"). Defendants are BrokerTec USA, L.L.C., BrokerTec Global, L.L.C., Garban, LLC, ICAP PLC, OM AB and OM Technology (U.S.), Inc. (collectively, "BrokerTec"). The patent-in-suit, U.S. Patent No. 6,560,580 B1 (issued May 6, 2003) (the "'580 patent"), is entitled "Automated Auction Protocol Processor." (Docket Item ["D.I."] 1, Exh. A.) The named inventors of the '580 patent are Stuart A. Fraser, Howard Lutnick, and Bijoy Paul, with plaintiffs Cantor Fitzger-

ald, L.P. and CFPH L. [*2] L.C. as assignees. (*Id.*) Plaintiff eSpeed, Inc. is the exclusive licensee of the '580 patent. (*Id.*, P11.)

On June 30, 2003, eSpeed filed suit alleging that BrokerTec is wilfully and intentionally infringing the '580 patent. (*Id.*, P12.) On the same day, eSpeed also filed a motion for a preliminary injunction to prevent BrokerTec from "making, using, offering for sale, selling, licensing, or otherwise distributing electronic trading systems which embody or comprise the inventions claimed in [the '580 patent]." n1 (D.I. 3.) On December 12, 2003, the United States, on behalf of the Department of the Treasury, filed a Statement of Interest in this proceeding pursuant to *28 U.S.C. § 517.* n2 (D.I. 183.)

---

n1 After fully briefing eSpeed's motion for a preliminary injunction, the parties appeared for a hearing on October 30, 2003, (D.I. 128), and submitted proposed findings of fact and conclusions of law on December 4, 2003 (D.I. 159, 160, 167, 168).

n2 "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." *28 U.S.C. § 517 (2003).*

---

[*3]

After reviewing the submissions of the parties and the government, and the applicable law, I am persuaded that the public interest strongly outweighs any private interest eSpeed may have in obtaining a preliminary in-

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 18 of 23

Page 2

2004 U.S. Dist. LEXIS 385, *; 69 U.S.P.Q.2D (BNA) 1466

junction. eSpeed has failed to make a persuasive showing that irreparable harm will result if BrokerTec's conduct is not enjoined. Because eSpeed has not adequately shown that it is entitled to emergency relief, its motion for a preliminary injunction will be denied.

## II. BACKGROUND

Both eSpeed and BrokerTec operate electronic trading platforms that facilitate trading among wholesale purchasers and sellers of United States Treasury securities and other United States government securities. (D.I. 4 at 9; D.I. 106 at 7.) eSpeed alleges that BrokerTec's trading platform infringes the technology disclosed in the '580 patent, specifically, the "workup" protocol, which eSpeed describes as follows:

> The eSpeed electronic trading platform automatically provides the participants who are first to make a bid or offer (or the first to act on a bid or offer) with priority and a time-based right of first refusal with respect to that transaction. Only after an initial trade [*4] is done or the defined time interval lapses may others participate in the trade at the defined price. This protocol...effectively rewards participants for market participation, providing liquidity and driving the market towards the best price by preventing others from exploiting the market that the initial traders have created before they have revealed and been given the opportunity to trade their full volume. After the initial traders have finished trading with one another, the protocol allows another trader to participate in the trade without being able to exclude others from also participating.

(D.I. 4 at 13; D.I. 6, P7.) Independent claim 22 and dependent claim 23 of the '580 patent address this workup trading protocol, in particular, "its division into two periods, a period when the initial traders control the trade to the exclusion of all other participants and a period that follows in which orders placed by other participants may be executed, without others controlling the trade." n3 (D.I. 4 at 25; D.I. 6, P12.)

n3 Independent claim 22 reads as follows:

A method implemented on a distributed-workstation computer system for trading an item between participants, said method comprising:

providing a bid/offer system state wherein a first participant enters a bid or offer for the item at a select price and volume;

receiving from a second participant a trade command to hit or lift the bid or offer;

entering a trading system state wherein a trade transaction is executed between the first and second participants for a volume of the item at a defined price, and wherein (a) the first and second participants are provided a period to control trading, during which they may transact with each other additional volume of the item at the defined price to the exclusion of other participants desiring to participate in the trade, and (b) upon conclusion of the period, a new trade transaction is automatically executed at the defined price in response to a trade command entered by another participant without providing the other participant a period to control the trade.

'580 patent, col. 20, lns. 33-53. Dependent claim 23 claims the method of claim 22, "wherein the trade command entered by the other participant is entered during the period to control trading but not executed until the conclusion of said period." *Id.,* lns. 54-57.

[*5]

On May 21, 2001, BrokerTec's electronic trading platform began offering workup privileges to initial participants in a trade. n4 (D.I. 106 at 14.) BrokerTec states that the workup privileges it "grant[s] its customers...are of fixed temporal duration," and "by intentional design, [its] customers cannot 'control' a trade, as that latter term is used in the '580 patent... ." (D.I. 106 at 16.) eSpeed claims that BrokerTec's trading platform implements the same workup protocol claimed in the '580 patent, and thus literally infringes claims 22 and 23. (D.I. 4 at 26.)

n4 BrokerTec argues that eSpeed has "purposefully delayed" for over two years in seeking injunctive relief. (D.I. 106 at 12.) eSpeed, of course, denies this allegation. (D.I. 118 at 17, 18.) The parties will have the opportunity to resolve this issue at trial, as it does not impact my decision that a preliminary injunction is inappropriate given the critical public interest at stake.

In support of its motion for a preliminary injunction, eSpeed asserts [*6] that it has a high likelihood of success on the merits of its infringement claim. (D.I. 4 at 20.) eSpeed further argues that, since the '580 patent is both valid and infringed, it is entitled to a presumption of

Case 1:05-cv-00160-KAJ-MPT    Document 172    Filed 09/01/2006    Page 19 of 23

Page 3

2004 U.S. Dist. LEXIS 385, *; 69 U.S.P.Q.2D (BNA) 1466

irreparable harm. (*Id.* at 30.) Finally, eSpeed asserts that both the balance of the hardships and the public interest favor granting a preliminary injunction. (*Id.* at 34, 36.) BrokerTec disputes the validity of the '580 patent (D.I. 106 at 23, 26) and claims that eSpeed has not presented competent evidence of infringement (*id.* at 34). BrokerTec further argues that granting a preliminary injunction would adversely affect the public interest. (*Id.* at 38.) The government's position is that "the proposed injunction would effectively eliminate an electronic marketplace used by a significant percentage of traders in the secondary market for Treasury securities," resulting in "a significant, detrimental impact on the public interest." (D.I. 183 at 2.)

III. STANDARD OF REVIEW

A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).* [*7] As the moving party, eSpeed is entitled to a preliminary injunction only if it succeeds in showing (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)* (citing *Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994)).*

When deciding whether a preliminary injunction should be granted or denied, the court should weigh and measure each of the four factors against the other factors and against the magnitude of the relief requested. *Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).* Under this rule, no one factor, taken individually, is necessarily dispositive. *Chrysler Motors Corp. v. Auto Body Panels, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990).* If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of others. *Id.* If the injunction is denied, [*8] the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial. *Id.* "As a basic proposition, [granting or denying a preliminary injunction] lies largely in the sound discretion of the trial judge." *Id.* (citation omitted).

IV. DISCUSSION

**A. Public Interest**

In patent cases, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech, 849 F.2d at 1458.* Be-

cause the government has taken the extraordinary step of filing a Statement of Interest in this case that exclusively discusses the impact of eSpeed's requested preliminary injunction on the "critical market for Treasury securities," (D.I. 183 at 4), I will first consider whether the proposed injunction adversely affects the public interest.

Apart from asserting that the public interest generally favors protecting a patentee's rights, (D.I. 4 at 36 (citing *Smith Intern., Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir. 1983)),* eSpeed argues that [*9] the purpose of its motion for a preliminary injunction is not to prevent BrokerTec from using "any version of a workup protocol," but rather to "stop BrokerTec from using the protocol covered by the '580 patent" (D.I. 118 at 19). Thus, eSpeed suggests that BrokerTec and its customers may easily transition back to using an outdated, inferior, and less sophisticated trading platform without causing any disruptions in the secondary market. (D.I. 4 at 35; D.I. 128 at 58:7-10.) That suggestion is belied by the evidence and common sense. eSpeed acknowledges that "virtually all outright trading of Treasury benchmarks in the wholesale secondary market is occurring on one of two electronic marketplaces, eSpeed or BrokerTec." (D.I. 4 at 17; D.I. 5, P12.) At oral argument, counsel for eSpeed estimated that, with respect to different trading instruments, thirty-five to sixty-five percent of the trading is conducted using BrokerTec's trading platform. (D.I. 128 at 52:1-8.) Though the magnitude of reliance on BrokerTec's trading platform is highly significant by either estimate, eSpeed assiduously ignores the fact that granting injunctive relief would effectively remove BrokerTec from the secondary [*10] trading market. BrokerTec's customers, who are accustomed to its current trading platform, are not likely to revert back to an antiquated method of trading. Instead, they are more likely to turn their trading, after some delay, to the only other viable player in the secondary market, namely, eSpeed. Indeed, it is reasonable to believe that that is exactly the result eSpeed hopes to achieve. While eSpeed may ultimately be entitled to the hegemony it seeks with this injunction, the government has pointed out three particular reasons why a preliminary injunction that reaches that result will adversely impact the public interest.

First, shutting down the trading system used by a significant part of the market could reduce trading in Treasury securities indefinitely, making them less liquid and decreasing their attractiveness as an investment. (D.I. 183 at 4.) The ultimate result of reduced trading would be an increased cost to the government in borrowing money to finance the Nation's debt. (*Id.*) Second, an "injunction would increase systemic risk to the secondary market for Treasury securities by leaving only one commonly used electronic trading system, the one oper-

Case 1:05-cv-00160-KAJ-MPT     Document 172     Filed 09/01/2006     Page 20 of 23

Page 4

2004 U.S. Dist. LEXIS 385, *; 69 U.S.P.Q.2D (BNA) 1466

ated by [eSpeed]. [*11] " (*Id.* at 5.) Without an alternative trading system, the secondary trading market would be devastated if eSpeed's system went awry. Finally, "an injunction would give the plaintiffs a monopoly over the primary trading system used by the wholesale secondary market for Treasury securities." (*Id.*) In the absence of competition, the transaction fees paid by dealers who trade Treasury securities is likely to increase, with these costs being passed on to the Treasury Department when it issues securities. (*Id.*)

Not surprisingly, BrokerTec's position mirrors the one taken by the government. Brokertec asserts that eSpeed's requested relief "would directly interfere with the [government's] ability to assure itself of a competitive and efficiently operating market for the trading of Treasury securities...." (D.I. 106 at 39.) eSpeed has not set forth any persuasive reason why its private interest in vindicating its patent rights is more important than the critical public interest in maintaining a fluid, competitive market for trading Treasury securities. Therefore, I see no reason to disrupt the secondary market before a full trial on the merits of eSpeed's patent infringement claims. [*12]

**B. Likelihood of Success on the Merits**

The likelihood of success on the merits is established when the moving party demonstrates that the patent-in-suit is both valid and infringed. *Reebok Intern. Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994).* Apart from asserting that its activities do not infringe the '580 patent, BrokerTec argues that the patent is invalid due to eSpeed's inequitable conduct before the U.S. Patent and Trademark Office. n5 (D.I. 106 at 27.) "In resisting a preliminary injunction...one need not make out a case of actual invalidity. Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Amazon.com, 239 F.3d at 1359.*

n5 BrokerTec also asserts that the '580 patent is invalid because eSpeed impermissibly amended the disclosure of the invention to introduce new matter and because it is obvious in light of the prior art. (D.I. 106 at 23, 26.) eSpeed disputes these claims, (D.I. 118 at 5), and I express no opinion on them at this time.

[*13]

On February 21, 2002, the three named inventors of the '580 patent submitted declarations to the U.S. Patent and Trademark Office explaining why it had not previously occurred to them that a computer automated trading system, called the "Super System," might be considered prior art. (D.I. 106 at 28, D.I. 118 at 12.) eSpeed's predecessor, Cantor Fitzgerald, began using the Super System in 1993. (D.I. 106 at 28.) The inventors' declarations explained that, even though the Super System was being used in Cantor Fitzgerald's business, it was "an internal computer system." (D.I. 118 at 12, 13.) BrokerTec argues that the Super System "was used to support commercial screen brokerage activities and fed trade information to screens on customers' desks," citing the deposition testimony of one of the inventors of the '580 patent, Stuart Fraser, as support. (D.I. 106 at 28.) eSpeed states that "the fact that information generated by the Super System could be advertised on customers' display screens...does not mean that the system was not an internal one... ." (D.I. 118 at 13.) BrokerTec's position is that the inventors' characterization of the Super System as an internal system was "highly misleading" [*14] and led to the Patent Examiner's mistaken belief that the Super System did not constitute prior art. (D.I. 106 at 28.)

If proven, BrokerTec's claim of inequitable conduct would invalidate the entire patent. *See Winbond Elecs. Corp. v. ITC, 262 F.3d 1363, 1372 (Fed. Cir. 2001)* (noting that patent obtained through inequitable conduct may not be enforced). Without expressing an opinion on the invalidity claim, I find that BrokerTec has presented enough facts to raise a substantial question as to the validity of the '580 patent, and I conclude that the question of inequitable conduct, while not resolved, is fairly before the court. *Arthrex Inc. v. dj Orthopedics LLC, 2002 U.S. Dist. LEXIS 7634 at *10 (D. Del. Apr. 30, 2002).* Therefore, I find that eSpeed has not demonstrated a likelihood of success on the merits to a degree that would outweigh the critical public interest in the denial of an injunction. However, even if eSpeed were to make a persuasive showing of likelihood of success, eSpeed's request for injunctive relief would still be denied, given the overwhelming public interest against entering an injunction in this case. [*15] *See Cordis Corp. v. Boston Scientific Corp., 2003 U.S. Dist. LEXIS 21338 at *10 n.6 (D. Del. Nov. 21, 2003)* (even if movant demonstrated likelihood of success on the merits, in the absence of proof of irreparable harm, the public interest in maintaining competitive medical device market weighed against granting preliminary medical injunctive relief).

**C. Irreparable Harm**

As discussed, BrokerTec has raised a substantial question as to the validity of the '580 patent; thus, eSpeed is not entitled to a presumption of irreparable harm. *See Amazon.com, 239 F.3d at 1350* (presumption of irreparable harm arises where patentee proves both infringement and validity). eSpeed's only proof of irreparable harm is that, because BrokerTec is a "competitive in-

2004 U.S. Dist. LEXIS 385, *; 69 U.S.P.Q.2D (BNA) 1466

fringer," eSpeed is likely to lose market share and good-will, "eroding their hard-won image as a market leader in electronic marketplace technology." (D.I. 4 at 33.) However, "these threatened injuries, which money alone could not cure," (*id.*), together with any perceived "unfair hardship" eSpeed feels it may suffer if BrokerTec is not enjoined, (*id.* at 35), are not enough to overcome the strong public interest [*16] in having both eSpeed's and BrokerTec's trading platform remain fully functional pending a full trial. n6 *See Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991)* ("Neither the difficultly of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.")

n6 I also note that, at oral argument, eSpeed's counsel was unable to suggest a reasonable

amount of money to require as a bond in the event its injunction was granted. (D.I. 128 at 45-49.)

## V. CONCLUSION

For these reasons, it is hereby ORDERED that eSpeed's Motion for a Preliminary Injunction is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
January 14, 2004

# TAB 4

1 of 13 DOCUMENTS

**INTERNATIONAL RECTIFIER CORPORATION, Plaintiff-Cross Appellant, v. IXYS CORPORATION, Defendant-Appellant.**

**2006-1296, 2006-1425**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*2006 U.S. App. LEXIS 18693*

**July 14, 2006, Decided**
**July 14, 2006, Filed**

**NOTICE:** [*1] THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO THE RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS FOR RULES GOVERNING CITATION TO UNPUBLISHED OR NONPRECEDENTIAL OPINIONS OR ORDERS.

**PRIOR HISTORY:** *Int'l Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 2004 U.S. App. LEXIS 19181 (Fed. Cir., 2004)*

**JUDGES:** Before NEWMAN, LINN, and PROST, Circuit Judge. Richard Linn, Circuit Judge.

**OPINIONBY:** Richard Linn

**OPINION:**

ON MOTION

LINN, Circuit Judge.

ORDER

IXYS Corporation moves for a stay, pending appeal, of the injunction and execution of the judgment entered by the United States District Court for the Central District of California. International Rectifier Corporation opposes. IXYSC replies. We consider whether the case should be remanded to allow the district court to reconsider its order entering a permanent injunction in light of the Supreme Court's recent decision in *eBay, Inc. v. MercExchange, L.L.C., 547 U.S. , 126 S.Ct. 1837, 164 L. Ed. 2d 641 (2006)*.

We note that, after the district court's issuance of the permanent injunction, the United States Supreme Court decided *eBay Inc. v. Mercexchange L.L.C., 126 S.Ct. 1837, 164 L. Ed. 2d 641 (2006)*. The Supreme Court held that a district court must consider the traditional equitable factors [*2] when deciding whether to issue a permanent injunction. *Id. at 1839-41*. Here, on page 3 of its order providing findings of fact and conclusions of law regarding injunctive relief, the district court held that "[o]nce infringement and validity have been established, irreparable harm is presumed." The district court's holding and other determinations may need to be revisited in light of eBay. Thus, we deem the more judicially efficient course, because no briefs have been filed, is to vacate the injunction and judgment and remand for further proceedings, as appropriate.

Accordingly,

IT IS ORDERED THAT:

(1) The district court's injunction and judgment are vacated and the case is remanded for further proceedings as appropriate.

(2) The motion is denied as moot.

FOR THE COURT

Richard Linn

Circuit Judge