# DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE JULIE L. DAVIS EXPERT REPORT

## I.    INTRODUCTION

This Court should exclude the Expert Report and Disclosure of Julie L. Davis ("Davis Expert Report") because it is entirely premised on the false assumption that Plaintiff Novozymes A/S ("NZDK") and its subsidiary Novozymes North America, Inc. ("NZNA") may be treated as a single entity. Further, the Davis Expert Report relies on foundations that contradict the testimony of NZDK's 30(b)(6) witnesses. Accordingly, the Davis Expert Report fails to meet the "fit" requirement of Rule 702 of the Federal Rules of Evidence.

## II.    MATERIAL FACTS

The following numbered paragraphs recite the basic, material facts underlying this motion:

1.    NZDK[1] is the owner of U.S. Patent No. 6,867,031 ("'031 Patent"). NZDK sued Defendants for infringing the '031 Patent as a sole plaintiff on the day the '031 Patent issued. To this day, NZDK remains the only named Plaintiff in the suit.[2]

2.    On July 21, 2006 NZDK's damages expert, Julie L. Davis, submitted an expert report in which Ms. Davis states upfront that "[f]or purposes of this report, I have not distinguished between Novozymes A/S and Novozymes N.A. and refer to them collectively as 'Novozymes.'" (Ex. 1, Davis Expert Report at 2.)

3.    NZNA is an indirect (through a U.S. holding company), wholly owned subsidiary of NZDK. (Ex. 2, Declaration of Richard Olofson ("Olofson Decl.") at ¶¶ 4-6.) NZNA is not now, and never has been, a party to this lawsuit.

---

[1] Defendants adopt the "NZDK" label introduced by Plaintiff for consistency with Plaintiff's pending Motion for Leave to Modify the Scheduling Order for the Purpose of Amending Its Complaint.

[2] While NZDK has a motion pending to add NZNA as a co-plaintiff in the action, this motion should be denied as NZNA lacks standing to bring an infringement action on the '031 Patent. *See* Defendant's Opposition Brief, DI 157.

**B-1**

4.      NZNA simply has a nonexclusive license to the '031 Patent, as admitted by NZDK. (*See* Plaintiff's Brief in Support of its Motion for Leave to Modify the Scheduling Order, DI 145 at 3.)

5.      NZDK and NZNA are separate corporate entities. They have separate employees, pay separate taxes, have separate boards of directors, and make agreements with each other through formal contracts. (*See* Defendants' Opposition Brief, DI 157 at 5-6.)

6.      On July 25, 2006, four days after serving the Davis Expert Report, NZDK filed a motion seeking leave to amend the scheduling order in the case for the purpose of amending its complaint to add NZNA as a co-plaintiff. Defendants filed an opposition to this motion on August 18, 2006.

## III.    ARGUMENT

"[T]he Rules of Evidence—especially Rule 702—. . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert* to non-scientific experts). In compliance with this mandate, the Third Circuit requires that a trial judge ensure that potential expert testimony meets the three restrictions of Rule 702: "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 171 (3d Cir. 1994)). The Davis Expert Report should be excluded because it fails to meet the fit requirement or Rule 702—that is, it is not relevant to the case at hand.

In order to meet the "fit" requirement of Rule 702, "expert testimony must be tied to the facts of the particular case; otherwise, such testimony 'cannot be said to assist the trier of fact' as [Rule] 702 requires." *MLMC, Ltd. v. Airtouch Commc'ns, Inc.*, No. 99-781-SLR, 2001 U.S. Dist. LEXIS 26078, at *2 (D. Del. Nov. 9, 2001) (citing *Elcock*, 233 F.3d at 756 n.13). Expert damage testimony "must be based upon the proper factual foundation." *Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987) (finding district court erred in admitting expert testimony based on a fact that may not have been correct, specifically relying on plaintiff's own assessment of his future earnings capacity); *Elcock*, 233 F.3d at 756 (finding a district court abused its discretion in admitting an expert's

economic damage model where the model "relied on several empirical assumptions that were not supported by the record"); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) (finding error in admitting expert testimony lacking "a sufficient factual foundation"). The Davis Expert Report is based on assumptions that are not supported in the record and thus should be excluded.

A.    The Davis Expert Report Incorrectly Assumes NZDK and NZNA Are a Single Unit for Purposes of Damages and Thus Lacks Sufficient Factual Foundation

The entire Davis Expert Report is based on the incorrect assumption that NZDK and NZNA may be treated as a single entity for the purpose of damages. (Ex. 1, Davis Expert Report at 2 ("[f]or purposes of this report, I have not distinguished between Novozymes A/S and Novozymes N.A. and refer to them collectively as 'Novozymes").) However, this in not the proper factual foundation. NZDK is the only Plaintiff in this action. Not only is NZNA not a plaintiff in this action, it holds only a nonexclusive license to the '031 Patent and therefore should not be added as a co-plaintiff because it lacks standing. (*See* Defendants' Opposition Brief, DI 157, for further discussion of this issue.) Further, NZDK is not entitled to recover the alleged lost profits of NZNA, because a patentee is not entitled to the lost profits of a nonexclusive licensee, even where that licensee is a subsidiary. (*See* Defendants' Motion in Limine No. 3 for full discussion.)

Rather, to "be useful" to the trier of fact, the Davis Expert Report should have discussed damages that NZDK alone is entitled to collect. Ms. Davis' opinion that NZDK and NZNA as a unit should be entitled to a certain value of lost profits and price erosion fails to address the amount, if <u>any</u>, to which NZDK alone is entitled.[3] Because the Davis Expert Report is based on a false premise and it does not offer an opinion as to the damages to which NZDK alone is entitled, it should be excluded.

---

[3] While Ms. Davis' failure to distinguish between NZDK and NZNA may also impact her reasonable royalty analysis (if, for example, NZDK's likely behavior in a hypothetical licensing negotiation were different from the likely behavior of the NZDK and NZNA unit), the impact of this assumption on reasonable royalty need not be analyzed in detail as Ms. Davis concludes in her report that she was unable to determine a reasonably royalty rate from the available information, and she should thus be precluded from entering such a rate later, as explained fully in Defendants' Motion in Limine No. 2.

B.    The Davis Expert Report Relies on Foundations That Contradict Testimony of NZDK's
      30(b)(6) Witnesses and Thus Lacks Sufficient Factual Foundation

   1.    *Assumption on Incremental Cost Contradicts Testimony of 30(b)(6) Witness
          Richard Olofson*

The Davis Expert Report further fails in fitting its analysis to the facts of the case in its

calculations of the incremental profit margin for determination of lost profits. (*See* Ex. 1, Davis Expert

Report at 18-19.) Specifically, Ms. Davis claims to base her analysis of profit margins on actual

Novozymes' incremental costs. (*Id.* at 18.) However, as detailed in the Expert Report of David J. Teece

("Teece Expert Report"), the incremental costs used in the Davis Expert Report do not mirror actual

incremental costs faced by NZDK. (*See* Ex. 5, Teece Expert Report at 17-20.) Rather, the Davis Expert

Report ignores several categories of incremental costs identified by NZDK's designated 30(b)(6)

witnesses, including shipping, advertising, and technical support costs. (*See* Ex. 3, Deposition of Richard

Olofson ("Olofson Dep.") at 95:25-98:24.) In short, the Davis Expert Report bases its conclusions on a

different incremental cost structure from the actual incremental cost structure before the Court.

   2.                            

The Davis Expert Report likewise relies on improper factual foundations to calculate lost profits.

Specifically,

REDACTED

Because the Davis

Expert Report ignores this evidence, Ms. Davis' lost profit analysis is based on an incorrect foundation.

REDACTED

Because the Davis Expert Report is based on                          and on multiple other

empirical assumptions that are contradicted by the record, it should be excluded.

## IV.    <u>CONCLUSION</u>

For all these reasons, this Court should exclude the Davis Expert Report.

**B-5**

**DEFENDANTS' MOTION IN LIMINE NO. 3 TO PRECLUDE EVIDENCE AND ARGUMENT CONCERNING NOVOZYMES A/S' ALLEGED ENTITLEMENT TO NOVOZYMES NORTH AMERICA, INC.'S PURPORTED LOST PROFITS**

## I.     INTRODUCTION

This Court should preclude Plaintiff Novozymes A/S ("NZDK") from offering evidence or argument at trial in support of an argument that it is entitled to recover the purported lost profits of its subsidiary Novozymes North America, Inc. ("NZNA") resulting from alleged infringement of U.S. Patent No. 6,867,031 (the "'031 Patent") by Genencor International, Inc. and Enzyme Development Corporation (collectively, "Genencor"), because NZNA is a mere nonexclusive licensee to the '031 Patent.[1]  Patentees simply may not recover lost profits suffered by nonexclusive licensees, because such licensees do not hold any proprietary rights in the patent and therefore suffer no legal injury.  NZDK's relationship with NZNA (that of corporate parent to a subsidiary) does not alter this rule.  Accordingly, evidence of NZNA's purported lost profits is legally irrelevant to a determination of NZDK's lost profits and should be excluded from trial pursuant to Rule 401 of the Federal Rules of Evidence.

## II.     MATERIAL FACTS

The following numbered paragraphs recite the basic, material facts underlying this motion:

1.     NZDK admits that NZNA holds a nonexclusive license to the '031 Patent.  (Ex. 1, Plaintiff's Brief in Support of its Motion for Leave to Modify the Scheduling Order for the Purposes of Amending its Complaint.)

2.     NZNA received its nonexclusive license to the '031 Patent from NZDK    .



---

[1] To the extent that the Court considers the issues raised in this motion to be more appropriate for resolution on summary judgment, we note that the underlying facts that support this motion were withheld from Defendants until after the deadline for dispositive motions passed.  Defendants asked NZDK to consent to their filing a motion for summary judgment on this issue and it refused.  Defendants have asked the Court for permission to file a summary judgment motion, but believe that the issue is also properly one that can be resolved *in limine* because the basic facts are not in dispute (NZNA's nonexclusive license and NZDK and NZNA's corporate relationship).

**B-6**

REDACTED

      3.     NZNA is a wholly owned subsidiary of NZDK. *See* Novozymes A/S Brief in Support of

its Motion for Leave to Modify the Scheduling Order for the Purpose of Amending its Complaint, Docket

Item ("DI") 145. NZDK specifically structured its corporate relationship with NZNA for beneficial tax

purposes. (Ex. 3, Deposition of Richard Olofson at 23:9-22.)

## III.    <u>ARGUMENT AND POINTS OF AUTHORITIES</u>

      The law is clear – nonexclusive licensees have no proprietary interest in the patent for which they

have a license and therefore do not suffer a legal injury as a result of infringement. *See Waterman v.*

*MacKenzie,* 138 U.S. 252, 255 (1891); *Poly-America, L.P. v. GSE Lining Technology, Inc.,* 383 F.3d

1303, 1311 (Fed. Cir. 2004); *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1552 (Fed. Cir. 1995);

*Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1032 (Fed. Cir. 1995). Accordingly, the

Federal Circuit has held that a patentee cannot recover purported "lost profits" suffered by a nonexclusive

licensee allegedly resulting from patent infringement. *See Poly-America,* 383 F.3d at 1311. *See also*

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 347 F. Supp. 2d 124, 125-26 (D. Del. 2004)

(agreeing in dicta that patentees may not recover the lost profits of non-exclusive licensees). NZNA is

unquestionably a nonexclusive licensee of the '031 Patent. NZDK has characterized NZNA's interest in

the '031 Patent as a nonexclusive license and this is consistent with the underlying agreement that gives

NZNA a license. (Ex. 2, Technology License Agreement.) Accordingly, NZDK the patentee, may not

recover any lost profits allegedly suffered by NZNA its nonexclusive licensee.

      The facts in the recent Federal Court decision *Poly-America,* are much the same as this case. In

*Poly-America,* one corporation, Poly-America held title to the patent at issue, while a sister corporation,

Poly-Flex, made and sold products within the scope of the patent's claims. *See Poly-America*, 383 F.3d at 1310. Poly-Flex held a nonexclusive license to Poly-America's patent, which purported to grant Poly-America the right to recover damages accruing to Poly-Flex as a result of any infringement of Poly-America's patent. *See id*. Nonetheless, the Federal Circuit held that since Poly-Flex was not entitled to any lost profits damages as a nonexclusive licensee, awarding lost profits to Poly-America would "synthetically create lost profits for Poly-America, when it may not have suffered any." *Id*. at 1311-12.

Additionally, the Court found that a corporate relationship between the patentee and the non-exclusive licensee, by itself, was not sufficient to permit the patentee to claim the nonexclusive licensee's lost profits. *See id*. at 1311. In arriving at this conclusion, the Federal Circuit reasoned that Poly-America and Poly-Flex

> "are not simply divisions of a single corporation, but are separate corporate entities. Their parent has arranged their corporate identities and functions to suit its own goals and purposes, but it must take the benefits with the burdens. While we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product, Poly-America and Poly-Flex may not enjoy the advantages of their separate corporate structure, and, at the same time, avoid the consequential limitations of that structure – in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee. While Poly-America may have the right to sue under its patents,…it can only recover its own lost profits, not Poly-Flex's."

*Poly-America*, 383 F.3d at 1311.

Like the patentee and nonexclusive licensee at issue in *Poly-America*, NZDK and NZNA have structured their corporate identities and functions to suit their own goals and purposes, but they must accept the burdens of this structure together with its benefits.[2] In particular, NZDK structured its corporate relationship with NZNA for its own beneficial tax purposes. According to *Poly-America*, NZDK may not realize the tax benefits of separating such ownership from manufacturing and sales without accepting the burdens associated with such benefits. One such burden is the bar to recovering NZNA's profits purportedly lost because of Genencor's alleged patent infringement.

---

[2] The authority cited by NZDK in its motion to join NZNA as a co-plaintiff is not relevant to this motion *in limine* as both cases arguably involve implied exclusive licensees. *See Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed.Cir. 1990) and *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339 (Fed. Cir 1999).

**B-8**

**IV.**   <u>**CONCLUSION**</u>

As NZNA merely has a nonexclusive license to the '031 Patent, NZNA has suffered no legally cognizable injury resulting from any purported patent infringement by Genencor.  Accordingly, this Court should exclude from trial as irrelevant any evidence or argument concerning NZNA's purported lost profits for the purpose of establishing NZDK's lost profits.

1

***HIGHLY CONFIDENTIAL***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,                          :

     Plaintiff,                       :       COPY

    -VS.-                               :   C.A. NO.
                       :   05-160-KAJ

GENENCOR INTERNATIONAL,                 :

INC. and ENZYME DEVELOPMENT :

CORPORATION,                            :

     Defendants.                      :


AUGUST 3, 2006

9:43 A.M.

Videotaped Deposition of RICHARD H.
OLOFSON, taken by DEFENDANTS, at the
offices of DARBY & DARBY, 805 Third
Avenue, New York, New York before Debra
Sapio Lyons, a Registered Diplomat
Reporter, a Certified Realtime Reporter, a
Certified Shorthand Reporter and an
Approved Reporter of the United States
District Court for the Eastern District of
Pennsylvania, Notary Public of the States
of New Jersey, New York and Maryland, and
a Commissioner of Deeds for the
Commonwealth of Pennsylvania.

B-10


LEGALINK®
A MERRILL COMPANY

420 Lexington Ave
Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

2

```
 1   A P P E A R A N C E S:
 2    DARBY & DARBY
      Attorneys for the Plaintiff
 3        805 Third Avenue
          New York, New York  10022-7513
 4    BY:  ROBERT C. SULLIVAN, JR., ESQUIRE
 5
 6
      JONES DAY
 7    Attorneys for the Defendants
          Suite 240
 8        2882 Sand Hill Road
          Menlo Park, California  94025
 9    BY:  THARAN GREGORY LANIER, ESQUIRE
                  AND
10        JANE L. FROYD, ESQUIRE
11
12
      A L S O   P R E S E N T:
13
      JONATHAN POPHAM, VIDEO TECHNICIAN
14    LEGALINK ACTION VIDEO
15
16
17
18
19
20
21
22
23
24
25
```

**B-11**

3

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

09:41:56  THE VIDEO TECHNICIAN:  This is
09:41:56  the video operator speaking, Jonathan
09:41:58  Popham of LegaLink Action Video, 420
09:42:01  Lexington Avenue, New York, New York.
09:42:02  Today is August 3rd, 2006, and the time
09:42:05  is 9:43 a.m.  We're at the offices of
09:42:08  Darby & Darby, 805 Third Avenue, New
09:42:11  York, New York to take the videotape
09:42:12  deposition of Richard H. Olofson in the
09:42:15  matter of Novozymes A/S versus Genencor
09:42:19  International Incorporated and Enzyme
09:42:22  Development Corporation in the United
09:42:23  States District Court for the District
09:42:24  of Delaware, Civil Action Number
09:42:28  05-160-KAJ.

09:42:31  Will counsel please introduce
09:42:32  themselves for the record?

09:42:33  MR. LANIER:  My name is Greg
09:42:35  Lanier.  I'm with the firm of Jones
09:42:37  Day.  With me is my colleague Jane
09:42:39  Froyd, also with Jones Day.  We
09:42:41  represent the defendants.

09:42:41  MR. SULLIVAN:  And Robert
09:42:42  Sullivan of Darby & Darby representing

4

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

the plaintiff, Novozymes.

THE VIDEO TECHNICIAN:  Okay.
Will the court reporter, Debbie Lyons,
of LegaLink Manhattan, please, swear
the witness?

- - -

RICHARD H. OLOFSON, having
been first duly sworn, was examined and
testified as follows:

- - -

COURT REPORTER:  Stipulations?

MR. LANIER:  None that I know
of.

MR. SULLIVAN:  Right.  The
only thing, I just want to note for the
record at the outset before I forget is
we're going to designate this
transcript highly confidential before
we have a chance to see what is
actually said, and maybe
re-designate --

MR. LANIER:  Understood.

MR. SULLIVAN:  -- later.

MR. LANIER:  Thank you.

23

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

10:00:30  2   NZNA Board of Directors owe their
10:00:33  3   fiduciary duties as members of the Board
10:00:42  4   of Directors?
10:00:42  5        A.    The Board Members of NZNA are
10:00:45  6   made up primarily of executives of NZDK
10:00:54  7   and NZDK has control over the activities
10:00:58  8   then that go on at NZNA.
10:01:00  9        Q.    Okay.  In the sentence --
10:01:04 10   second sentence it says, "Indirectly
10:01:06 11   through NZUS, NZNA is a wholly-owned
10:01:09 12   subsidiary of NZDK."
10:01:12 13        Do you have any understanding
10:01:13 14   of the purpose for that structure, there
10:01:15 15   being one or more intervening steps
10:01:18 16   between DK and NZUS -- or NZNA?
10:01:23 17
10:01:25 18
10:01:27 19   ,
10:01:29 20               REDACTED
10:01:31 21
10:01:34 22
10:01:36 23        Q.    Last sentence of Paragraph 6,
10:01:44 24   and I'll read them for the record because
10:01:47 25   I'm going to ask you a couple of things

24

```
            1        RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL
10:01:48    2    about it.   It says,

10:01:50    3

10:01:52    4                        REDACTED

10:01:54    5

10:01:56    6

10:01:59    7              You see that sentence there?

10:01:59    8        A.    Yes.

10:02:00    9        Q.    Okay.

10:02:04   10

10:02:08   11                        REDACTED

10:02:12   12

10:02:13   13

10:02:14   14

10:02:15   15

10:02:16   16

10:02:17   17

10:02:20   18

10:02:23   19                        REDACTED

10:02:25   20

10:02:27   21

10:02:28   22

10:02:31   23

10:02:32   24

10:02:33   25
```

25

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

10:02:33   2        Q.     Has that been the situation so

10:02:41   3   far as you know during your entire time at

10:02:44   4   NZNA and its predecessor?

10:02:50   5        A.     Since as far back as I can

10:02:53   6   remember.

10:02:53   7        Q.     Let's turn to Paragraph 7.

10:03:05   8   There's a reference there to the

10:03:07   9                               in

10:03:11 10   the second sentence. Do you see that?

10:03:12 11        A.     Yes.

10:03:13 12        Q.     Okay. Were you familiar with

10:03:15 13   the                       before

10:03:17 14   whatever activities led up to the signing

10:03:19 15   of this Declaration?

10:03:20 16        A.     Yes.

10:03:20 17        Q.     Okay. And for what purposes

10:03:24 18   were you familiar with it before dealing

10:03:25 19   with this Declaration?

10:03:26 20

10:03:35 21

10:03:37 22                REDACTED

10:03:40 23

10:03:43 24

10:03:43 25        Q.     How long have you had that

REDACTED REDACTED

130

```
              1        RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL
13:11:24      2           Q.     Are you aware of any other
13:11:27      3    License Agreements into which Novozymes
13:11:32      4    A/S has entered in the U.S. that relate to
13:11:34      5    industrial enzymes?
13:11:36      6
13:11:45      7
13:11:48      8
13:11:51      9                        REDACTED
13:11:54     10
13:11:57     11
13:11:58     12
13:12:03     13
13:12:07     14
13:12:09     15           Q.     Are you aware of any specific
13:12:11     16    instances of exceptions to the general
13:12:14     17    rule you just mentioned?
13:12:15     18
13:12:16     19
13:12:17     20
13:12:21     21                        REDACTED
13:12:23     22
13:12:27     23
13:12:30     24
13:12:33     25
```

147

1  RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

13:28:34 2 change of the royalty rate that happened

13:28:36 3 in 1998.

13:28:37 4   Q. Did you do anything to

13:28:46 5 familiarize yourself with this License

13:28:48 6 Agreement specifically to prepare for this

13:28:50 7 deposition beyond just what you already

13:28:52 8 knew as part of your day-to-day work?

13:28:54 9   A. I reviewed it in more detail.

13:29:02 10 I -- I felt I was very familiar with this

13:29:04 11 document ahead of time as well.

13:29:07 12

13:29:21 13

13:29:24 14

13:29:28 15

13:29:31 16

13:29:33 17

13:29:39 18

13:29:43 19

13:29:46 20

13:29:49 21

13:29:51 22

13:29:54 23

13:29:57 24

13:29:59 25

REDACTED

148

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL

|  | 1 |
| 13:30:01 | 2 |
| 13:30:07 | 3 |
| 13:30:11 | 4 |
| 13:30:14 | 5 |
| 13:30:17 | 6 |
| 13:30:23 | 7 |
| 13:30:23 | 8 |
| 13:30:25 | 9 |
| 13:30:27 | 10 |
| 13:30:30 | 11 |
| 13:30:32 | 12 |
| 13:30:35 | 13 |
| 13:30:37 | 14 |
| 13:30:39 | 15 |
| 13:30:41 | 16 |
| 13:30:43 | 17 |
| 13:30:45 | 18 |
| 13:30:48 | 19 |
| 13:30:50 | 20 |
| 13:30:50 | 21 |
| 13:30:54 | 22 |
| 13:30:56 | 23 |
| 13:31:00 | 24 |
| 13:31:04 | 25 |

REDACTED

149

RICHARD H. OLOFSON - HIGHLY CONFIDENTIAL



1
13:31:08  2
13:31:10  3
13:31:11  4
13:31:19  5
13:31:20  6
13:31:33  7
13:31:35  8
13:31:38  9
13:31:40 10
13:31:49 11
13:31:53 12
13:31:54 13
13:31:55 14
13:31:57 15
13:31:59 16
13:32:02 17
13:32:05 18
13:32:06 19
13:32:11 20
13:32:12 21
13:32:13 22
13:32:17 23
13:32:19 24
13:32:23 25

REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,

               Plaintiff

     v.

GENENCOR INTERNATIONAL, INC., and

ENZYME DEVELOPMENT CORPORATION

               Defendants

C.A. No. 05-160-KAJ

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' FOURTH SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff Novozymes A/S ("Novozymes") hereby responds to Defendants Genencor International, Inc. and Enzyme Development Corporation ("Genencor and "EDC" and jointly "Defendants") Fourth Set of Interrogatories (the "Interrogatories"). These supplemental responses are subject to the below listed objections.

## GENERAL OBJECTIONS

1.     Novozymes objects to the definition of "Novozymes" on the grounds that it is overly broad, unduly burdensome and not likely to lead to the discovery of admissible evidence to the extent that it seeks information from non-parties to this action. Novozymes will respond on behalf of itself as a party to this action pursuant to Novozymes's obligations under the Federal Rules of Civil Procedure to produce documents in its possession or control.

2.    Novozymes objects to the Interrogatories to the extent that they seek to impose duties over and above those required by the Federal Rules of Civil Procedure and the Local Rules of this District.  Novozymes's responses shall be made only in accordance with the applicable Rule(s).

3.    Novozymes objects to the Interrogatories to the extent they seek production of information equally available to Genencor and EDC in the public domain or is already in the possession, custody or control of Genencor and EDC.

4.    Novozymes objects to the Interrogatories to the extent they seek information that is in the possession of independent parties over whom Novozymes has no control.

5.    Novozymes objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the joint defense privilege and/or the common interest privilege, that consists of attorney work-product, or that is otherwise protected from disclosure.

6.    Novozymes objects to the Interrogatories to the extent they seek proprietary and/or confidential business information, which will be produced only subject to the terms of the Protective Order.

7.    The responses given herein and documents produced, if any, shall not be deemed to waive any claim of privilege or immunity Novozymes may have as to any response, document or thing, or any question or right of objection as to authenticity, competency, relevancy, materiality, admissibility, or any other objection Novozymes may have as to a demand for further response to these or other Interrogatories, or to any objection to the use of such information, documents or things in any other proceeding filed after the production of such information or documents.

- 2 -

**B-22**

8.    Nothing contained herein may be construed as an admission relative to the existence or non-existence of any document, and no response may be construed as an admission with respect to the relevancy or admissibility in evidence of any statement or characterization contained in the Interrogatories or respecting the authenticity, competency, relevancy, materiality or admissibility of any document or thing referenced by the Interrogatories.

9.    Discovery in this matter is ongoing and Novozymes reserves the right to revise or supplement any response herein.

10.    These General Objections are applicable to and are incorporated in each specific response herein without further reference. The inclusion of specific objection(s) in response to any Interrogatory shall not be construed as a waiver of such objection.

## RESPONSES AND SPECIFIC OBJECTIONS

### INTERROGATORY NO. 21:

Describe the complete ownership history of the '031 Patent from the date the underlying application was filed through the date that you answer this interrogatory, including but not limited to identifying all legal and beneficial owners of the '031 Patent, the date(s) of ownership, the manner of acquiring ownership, and any proposals (such as proposed assignments) for a future change in ownership.

### RESPONSE:

Novozymes A/S ("NZDK") objects to this interrogatory on the ground that the phrases "beneficial owner" and "any proposals for a future change in ownership" are vague and ambiguous. The parent application from which the '031 patent ultimately was granted was assigned by the named inventors to NZDK's predecessor, Novo Nordisk A/S, by assignments dated February 29, 1996 by inventor Bisgard-Frantzen and March 4, 1996 by inventors Borchert and Svendsen. By assignment dated October 29, 2001, the application then pending in the chain

- 3 -

**B-23**

of applications of USSN 09/902,188 and any continuations, continuation-in-parts and divisions, was assigned by Novo Nordisk A/S to NZDK. NZDK has been and continues to be the legal owner of the '031 patent.



### INTERROGATORY NO. 22:

Identify all licenses and proposed licenses, of any type or nature, that include in any manner a license to the '031 Patent, including but not limited to any license of the '031 Patent itself, a license of a group of patents that including the '031 Patent, and/or any license of rights to intellectual property including the '031 Patent.

### RESPONSE:



### INTERROGATORY NO. 23:

Identify and describe in detail the manner in which _____, as stated in the July 18, 2006 email from Novozymes' counsel George Hykal to Genencor's counsel Jane Froyd and Greg Lanier entitled "NZ v GCOR -- Request for Consent."

### RESPONSE:

- 4 -



**INTERROGATORY NO. 24:**

Identify and describe in detail Novozymes North America's "interests that are being adjudicated in this lawsuit," as stated in the July 18, 2006 email from Novozymes' counsel George Hykal to Genencor's counsel Jane Froyd and Greg Lanier entitled "NZ v GCOR -- Request for Consent."

**RESPONSE:**

As Novozymes A/S' exclusive distributor of *inter alia*, Liquozymes and Termamyl products in the U.S., NZNA is directly harmed by the infringing acts of defendants. Defendants' infringing activities have resulted in lost profits and price erosion suffered by NZNA. The financial harm suffered by NZNA is directly transferred to NZDK, as explained in the response to Interrogatory No. 23.

- 5 -

**B-25**

**NOVOZYMES A/S**

Dated:     July 25, 2006

*/s/ Karen E. Keller*

Karen Keller (No. 4489)
Rolin P. Bissell (No. 4478)
Josy W. Ingersoll (No. 1088)
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
kkeller@ycst.com

Joseph R. Robinson
David Tellekson
Robert C. Sullivan, Jr.
**DARBY & DARBY P.C.**
805 Third Avenue
New York, New York 10022
(212) 527-7700

*Attorneys for Plaintiff
Novozymes A/S*

- 6 -

**B-26**

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on July 25, 2006, I caused to be served a true and correct copy of the foregoing document to the following counsel of record:

**BY ELECTRONIC MAIL AND HAND DELIVERY**

Donald E. Reid, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE  19899-1347

**BY ELECTRONIC MAIL**

Tharan Gregory Lanier, Esquire
Jane Froyd, Esquire
JONES DAY
2822 Sand Hill Road, Suite 240
Menlo Park, CA 94025

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

/s/ *Karen E. Keller*
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Novozymes A/S*

# COPY

1

\* \* \* H I G H L Y    C O N F I D E N T I A L \* \* \*

1

2  UNITED STATES DISTRICT COURT

3  FOR THE DISTRICT OF DELAWARE

4  ----------------------------------------X

5  NOVOZYMES A/S,

6                    Plaintiff,          **HIGHLY CONFIDENTIAL**

7          - against -

8  GENENCOR INTERNATIONAL, INC. and

9  ENZYME DEVELOPMENT CORPORATION,

10                    Defendants.

11  CIVIL ACTION NO.: 05-160-KAJ

12  ----------------------------------------X

13                    222 East 41st Street
                      New York, New York

14
                      August 4, 2006
15                    9:35 a.m.

16

17            HIGHLY CONFIDENTIAL DEPOSITION of

18  Defendant, GENENCOR INTERNATIONAL, INC., by

19  MAURIE G. BETO, pursuant to Notice, before

20  Melissa Gilmore, a Notary Public of the State

21  of New York.

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                REF: 81432

**B-28**

2

```
 1
 2   A P P E A R A N C E S:
 3   DARBY & DARBY, P.C.
 4   Attorneys for Plaintiff
 5        805 Third Avenue
 6        New York, New York 10022-7513
 7   BY:  STEVEN E. LIPMAN, ESQ.
              -and-
 8        GEORGE E. HYKAL, ESQ.
 9        PHONE 212-527-7697
10       FAX 212-753-6237
11       E-MAIL ghykal@darbylaw.com
12
13   JONES DAY
14   Attorneys for Defendants
15        2882 Sand Hill Road, Suite 240
16        Menlo Park, California 94025
17   BY:  JANE L. FROYD, ESQ.
              -and-
18        THARAN GREGORY LANIER, ESQ.
19        PHONE 650-739-3939
20       FAX 650-739-3900
21       E-MAIL jfroyd@jonesday.com
22
23   ALSO PRESENT:
24        VANIA M. HERDOON, Intern at Darby & Darby
25
```

**B-29**

3

```
1
2     ----------------- I N D E X ----------------
3     WITNESS                EXAMINATION BY          PAGE
4     MAURIE G. BETO    MR. LIPMAN                    4
5
6     DIRECTIONS:  PAGES 11, 14, 16, 17
7
8     ----------------- EXHIBITS -----------------
9     BETO                                         FOR I.D.
10     1A       Plaintiff's Amended Notice           5
11              of Deposition
12     2        Document with Bates numbers         107
13              GCOR002598 to GCOR002609
14
15
16
17
18
19
20
21
22
23
24
25
```

**B-30**

4

```
 1    M A U R I E    G.    B E T O,    called as a

 2         witness, having been duly sworn by a Notary

 3         Public, was examined and testified as

 4         follows:

 5

 6    EXAMINATION BY

 7    MR. LIPMAN:

 8         Q.    Good morning, Mr. Beto.

 9         A.    Good morning, Mr. Lipman.

10         Q.    Would you please state your full

11    name?

12         A.    Maurice Glen Beto.

13         Q.    What is your present residential

14    address?

15         A.    21076 North Tree Road, Killdeer,

16    Illinois 60047.

17         Q.    You remember the declaration you

18    submitted earlier in this case?

19         A.    Last fall, yes.

20         Q.    As far as your title, it says

21

22                                         Is that

23    still correct?

24         A.    Yes.

25         Q.    Is there anything you would like to
```

**B-31**

75

1               BETO - HIGHLY CONFIDENTIAL

2

3

4                        REDACTED

5

6

7               Using that basic theme and

8    terminology, what is Genencor's understanding

9    of where Valley Research stands in reaching

10   commercial quantities of selling Ultra Thin?

11

12

13

14

15

16

17                       REDACTED

18

19

20

21

22

23

24

25

**B-32**

76

1               BETO - HIGHLY CONFIDENTIAL

2        REDACTED

3          MS. FROYD:    I object to the form of

4      that question.

5

6

7

8

9

10

11

12              REDACTED

13

14

15

16

17

18

19              REDACTED

20

21

22

23

24

25

B-33



77

BETO - HIGHLY CONFIDENTIAL

REDACTED

Q.    I think our ships passed on the sea.
Maybe my question wasn't clear.

REDACTED

B-34

# NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT COURT OF DELAWARE

| | |
|---|---|
| NOVOZYMES A/S,<br><br>    Plaintiff,<br><br>  v.<br><br> GENENCOR INTERNATIONAL, INC. and<br>ENZYME DEVELOPMENT CORPORATION,<br><br>    Defendants. | C.A. No. 05-160-KAJ |

## DECLARATION OF DAVID J. TEECE

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER, TO BE OPENED ONLY BY OR AS
DIRECTED OR PERMITTED BY THE COURT

APP. 1850

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

S.N. Teece  EXHIBIT
08/31/05

B-35

REDACTED

REDACTED







REDACTED

REDACTED

REDACTED





REDACTED

REDACTED

# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOVOZYMES A/S, | \| | |
| Plaintiff, | \| | C.A. No. 05-160-KAJ |
| v. | \| | |
| GENENCOR INTERNATIONAL, INC. and | \| | |
| ENZYME DEVELOPMENT CORPORATION, | \| | |
| Defendants. | \| | |

### DECLARATION OF GREGORY K. LeFEBVRE

I, Gregory K. LeFebvre, do hereby declare as follows:

1.      I make this declaration in support of the Motion of Novozymes A/S for a Preliminary Injunction. I have personal knowledge of the facts set forth herein and if called to testify, I could and would truthfully testify to them.

2.      I am currently an employee of Novozymes of North America, Inc. ("Novozymes" may refer to either Novozymes A/S or to Novozymes of North America. Inc., as the case may be). My current job title is





**B-48**

**NON-PUBLIC VERSION -- FILED UNDER SEAL**
CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE



4.    Alpha-amylases are useful in a variety of commercial applications that involve the processing of starches -- especially in the fuel ethanol industry, where ethanol fuel is produced from starch crops such as corn, barley, and wheat. Alpha-amylase enzymes are used in this particular industry to liquefy and reduce viscosity of the starch feedstocks, thereby facilitating their processing in the manufacturing plant. In a subsequent step, another industrial enzyme, gluco-amylase (one of which is also made by Novozymes), is used to convert the liquefied starch into fermentable sugars (*e.g.*, glucose). Yeast then converts the sugars into ethanol.

5.    Novozymes produces and sells several enzyme products in the United States which are important to the fuel ethanol industry. Novozymes' Liquozyme® SC and Termamyl® are each alpha-amylase products which reduce starch viscosity by breaking complex starches into small molecules. Novozymes' Spirizyme® Fuel products are gluco-amylases which convert the less viscous, smaller liquefied starches to even smaller glucose molecules which yeast ferment into ethanol. Before Genencor introduced its infringing Spezyme® Ethyl alpha-amylase enzyme product in 2004, these Novozymes' enzyme products had gained wide-market acceptance. Novozymes also produces and sells its patented Termamyl SC alpha-amylase product to the food and beverage industry. It is used to break down starches into smaller sugars in this industry, as well

{W:\03776\6003018000\00459278.DOC *037766003018000* }  -2-

# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

6.    Absent immediate injunctive relief to return to the *status quo*, Novozymes will suffer irreparable harm. In particular, the unabated marketing and sales of Genencor's infringing alpha-amylase enzyme product have already caused, and will likely continue to cause, (i) irreversible alteration of relevant market conditions to the significant detriment of Novozymes; (ii) Novozymes' significant loss of market share, goodwill, and customers, as well as the loss of its related convoyed sales of gluco-amylase enzyme products; and (iii) Novozymes' loss of a large annual supply agreement,

REDACTED

. None of these losses, and certainly not the cumulative affect of the losses, can be adequately compensated by money damages.

7.    Genencor is establishing itself as a supplier of a competing alpha-amylase enzyme only by infringing Novozymes' '031 patent. If Genencor is permitted to continue this activity, post-litigation market conditions will change so significantly that the market will not readily return to pre-infringement conditions. In addition, the longer that present Novozymes customers can purchase infringing alpha-amylase enzyme products from Genencor, the more difficult it will be for Novozymes to re-establish its pre-infringement market conditions once Genencor's product is permanently enjoined at the conclusion of this litigation.

8.    Genencor's continued infringement will also detrimentally affect Novozymes' pre-infringement reputation.

9.    In the absence of a preliminary injunction and return to the *status quo*, it is also likely that more customers will begin to use or switch to Genencor's "me-too" infringing product. If Genencor is permitted to sell its infringing enzyme until a permanent injunction is

## NON-PUBLIC VERSION -- FILED UNDER SEAL

### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

granted after a full trial, it will be very difficult to return the market to pro-infringement conditions where Novozymes enjoyed a good reputation as a reliable industrial enzyme supplier in general, and a reliable alpha-amylase industrial enzyme supplier in particular.



12.     Novozymes has been forced to reduce the price of its Liquozyme SC alpha-amylase product line in 2005 by                    to compete with Genencor's infringing product. Novozymes remains under constant price pressure from its customers who have been offered the infringing Spezyme Ethyl alpha-amylase product. Damages resulting from this price erosion are incalculable because their effects could last                    especially where Novozymes' customers are resistant to any subsequent rise in the price of the alpha-amylase product.



{W:\03776\6003018000\00459278.DOC *037766003018000* }  - 4 -

B-51

**NON-PUBLIC VERSION -- FILED UNDER SEAL**
CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

13.     Price pressure from Genencor has translated into non-compensable lost market share where Novozymes' customers have opted to purchase the infringing Genencor product instead of the product offered by Novozymes.

14.     Before Genencor entered the market in April 2004, Novozymes had about         of the United States fuel ethanol alpha-amylase market. Since Genencor entered the market, the market share for Liquozyme SC has essentially



This trend promises to worsen as long as Genencor's infringing Spezyme Ethyl alpha-amylase product remains on the market. This loss of market share and corresponding price erosion, translates into a significant, immeasurable, and non-compensable loss to Novozymes.

15.     Novozymes' damages are further non-compensable because its lost customers and market share extend beyond the alpha-amylase market.

16.     Commercial enzyme users, at times, purchase several different types of enzymes, rather than a single enzyme. Customers may also prefer to purchase their enzyme needs from as few suppliers as possible to concentrate their buying power and receive the best pricing, supply, and service.

17.     It is common in the relevant market here that, when a customer shifts its purchases of one enzyme product from one supplier to another, the purchaser will also seek to shift its purchases of other enzyme products to that new supplier. Therefore, loss of sales and market share by Novozymes here will spread beyond alpha-amylase enzymes and will affect other Novozymes' products (such as its gluco-amylase enzyme line), unless defendants' infringing activities are stopped immediately and the previous *status quo* is maintained.

## NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

18.     Because of Genencor's infringing sales of Spezyme® Ethyl, Novozymes has suffered a loss in market share, not just of its Liquozyme SC and Termamyl alpha-amylase enzyme products, but also for its convoyed gluco-amylase enzyme sales.

19.     Both of Novozymes's alpha-amylase enzyme product lines, Liquozyme SC and Termamyl, were established product lines in the fuel ethanol and starch processing industries prior to the commencement of Genencor's infringing sales.  Every day that Genencor is allowed to offer its infringing product, Novozymes suffers irreparable harm that undermines these established product lines.

20.     I believe that Genencor will not suffer any significant undue hardship if preliminarily enjoined from infringing Novozymes' '031 patent.  Genencor sells another alpha-amylase enzyme product (called Spezyme® Fred), and it sells many other enzyme products as well.  If preliminarily enjoined, Genencor will still have other remaining non-infringing enzyme product lines to sell.

21.     Novozymes is an international leader in the research, development, and marketing of commercial enzymes.  In 1979, Novozymes opened a manufacturing facility in Franklinton, North Carolina.  Since 1990, Novozymes has spent                    on plant expansions at that facility.  It is now the largest manufacturing plant for industrial enzymes in the United States.

22.     Novozymes                                                                                          Its Franklinton facility includes a research laboratory and a pilot plant, where new enzymes and uses for enzymes are discovered and developed.  Much of this research is directed at solving problems brought to Novozymes by customers.



## NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

23.     Novozymes has built a reputation through innovation and has protected its innovations through patents. If Novozymes could not protect its proprietary technology in the U.S. through patents, it would not have invested as heavily in its research or facilities in the U.S. and will not continue to invest in this manner.

24.     Franklinton consists mainly of farms and small businesses. Novozymes is Franklinton's largest employer, and most of Franklinton's businesses depend in some part on Novozymes and its employees.

25.     Genencor has begun to sell an infringing food grade Spezyme Ethyl product to the food and beverage industry outside of the United States, and has begun sampling it to this industry in the United States. I believe it is likely that Genencor will soon begin U.S. sales of its food grade infringing product. Novozymes presently sells its patented Termamyl SC alpha-amylase product to this industry. I believe further that Genencor's sales of Spezyme Ethyl to the U.S. food and beverage industry will cause irreparable harm to Novozymes in yet another segment of the commercial enzyme business.

26.     There is a significant likelihood that, if Genencor's patent infringement is not preliminarily enjoined, Novozymes will likely continue to suffer irreversible and unfairly precipitated price reductions and loss of market share, not just for its Liquozymes SC alpha-amylase enzyme product, but also for its convoyed sales of related gluco-amylase enzyme products as well. These products are functionally related because Novozymes' gluco-amylase product is used in a subsequent process step to the use of Novozymes' alpha-amylase product in the making of ethanol.

27.     The reduced demand caused by the attendant loss of all such sales could require Novozymes to reduce operations at its sole U.S. plant, based in Franklinton, North Carolina, that

{W:\03776\6003018000\00459278.DOC *037766003018000* } - 7 -

# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

domestically produces its Liquozymes SC product, where Novozymes is the largest employer (about 400 jobs) and driver of the local economy.

28.     Genencor remained on the market even after it learned that Novozymes' allowed patent application (which led to the '031 patent) would cover Genencor's alpha-amylase enzyme product upon issuance of the patent. This was so because on September 29, 2001 Novozymes voluntarily gave Genencor a copy of the allowed patent claims from the application in the hope that Genencor would see the fruitlessness of continuing to sell its product.

29.     I am not aware of any critical public interest that would be injured by Novozymes' grant of the requested preliminary relief. However, the public interest of the people in Franklinton, North Carolina, may be adversely affected if the preliminary injunction is not granted. In particular, although the Franklinton plant makes both alpha-amylase and gluco-amylase enzyme products and only about 20% of the plant is devoted solely to alpha-amylase production, the continued loss of Novozymes' business (and profits) for both product lines could adversely affect employment opportunities at the plant.

30.     Further declarant saith not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   June 22, 2005

Gregory K. LeFebvre

{W:\03776\6003018000\00459278.DOC *037756003018000* }   - 8 -

**B-55**

# NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOVOZYMES A/S, | ǀ | |
| Plaintiff, | ǀ | C.A. No. 05-160-KAJ |
| v. | ǀ | |
| GENENCOR INTERNATIONAL, INC. and | ǀ | |
| ENZYME DEVELOPMENT CORPORATION, | ǀ | |
| | ǀ | |
| Defendants. | ǀ | |

## REBUTTAL DECLARATION OF GREGORY K. LeFEBVRE

I, Gregory K. LeFebvre, do hereby declare as follows:

1.    Previously in this case, I submitted a declaration dated June 22, 2005 in support of the *Motion of Novozymes A/S for a Preliminary Injunction* (the "PI Motion").

2.    I make this rebuttal declaration in support of the same PI Motion and in response to allegations made in (i) *Genencor's and EDC's Brief in Opposition to Novozymes' Motion for Preliminary Injunction* (the "Opposition"); (ii) the *Declaration of David J. Teece*, a copy of which is annexed to the PI Motion as Exhibit L ("Teece Declaration"); (iii) excerpts from the September 27, 2005 deposition of Dr. Teece, a copy of the transcript of which is attached to the PI Motion as Exhibit L ("Teece Depo. Tr."); and (iv) the *Declaration of Maurice G. Beto*, a copy of which is attached hereto as Exhibit 1 (the "Beto Declaration"). I have personal knowledge of the facts set forth herein and if called to testify, I could and would truthfully testify to them.

3.    I remain an employee of Novozymes of North America, Inc. ("Novozymes" may refer to either Novozymes A/S or to Novozymes of North America, Inc., as the case may be).

# NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE



# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

REDACTED

REDACTED

---

[1] Teece Declaration, ¶¶ 17-22.

**NON-PUBLIC VERSION -- FILED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE**





# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE



9.    Further in footnote 17 on page 5 of the Teece declaration, Dr. Teece alleges that:

> It [LeFebvre's claim of immeasurability] is also inconsistent with Mr. LeFebvre's deposition testimony, in which he admits that several people within Novozymes have calculated the alleged losses suffered by Novozymes as a result of the loss of sales share and price erosion, and that the calculations only took "several hours". (See Deposition of Gregory K LeFebvre, dated August 19, 2005 ("Lefebvre Deposition"), pp. 130-134.)

10.    The fact that I and others at Novozymes could calculate rough estimates of current lost profits due to lost sales and price erosion, on a working basis as of the time of such estimates, does not mean that Novozymes' damages based on these factors[7] can be calculated and relied upon in the real world. I am surprised that an economist like Dr. Teece would take such a simplistic approach to real world damage calculations. Nonetheless, it is my understanding that Dr. Teece never even saw these calculations, which he references in his declaration

11.    Based on my experience and what I have learned throughout my years as the

Novozymes had a strong





---

[7] My rough estimates and those of others at Novozymes did not take into account any of the damage factors I discuss above, such as future damages based on continued price erosion and the difficulties of raising pricing after drastic price reductions, and future damages based on loss of privileges associated with the lost sales and the lost market position of a patentee such as Novozymes.

**NON-PUBLIC VERSION -- FILED UNDER SEAL**
**CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE**

reputation in the fuel ethanol industry and was recognized as a market leader and innovator in the years prior to Genencor's infringement of the '031 patent. One of the major reasons for this strong industry reputation was the perception in the industry that Liquozyme® SC was an innovation in the marketplace that helped manufacturers reduce their prices by improving performance in the production of fuel ethanol.





# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

REDACTED

14.    Statements on Genencor's official website reveal that Genencor agrees that the

market for thermostable alpha-amylases faces imminent decline:

> Until recently, ethanol plants have cooked grains and other starchy
> feedstocks with thermostable enzymes to begin the process of



# NON-PUBLIC VERSION -- FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

> converting starch to fermentable sugars. This traditional approach might soon be surpassed by a new technology developed by Genencor International. Genencor 's STARGEN™ line of granular starch hydrolyzing enzymes converts granular or uncooked starch to fermentable sugars on a continuous basis in a simultaneous saccharification and fermentation process, without the need for a cook step.

*See* http://www.genencor.com/wt/gcor/ethanol, last visited Oct. 4, 2005 and attached hereto as

Exhibit 3.

15.



## NON-PUBLIC VERSION -- FILED UNDER SEAL
### CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE



18.    In paragraph nine of his declaration, Mr. Beto, in what I assume is an allegation directed at my statement regarding the convoyed effects between alpha-amylase and gluco-amylase products in the fuel ethanol industry, states that:

> Customers who purchase Spezyme Ethyl from Genencor need not also purchase GZYME 480 Ethanol [Genencor's gluco amylase product]. This is also true of Novozymes' products - customers who purchase Liquozyme SC need not also purchase Spirzyme Fuel. A customer could purchase both Spezyme Ethyl and Spirzyme Fuel, or Liquozyme SC and GZyme 480 Ethanol. A sale of one product (glucoamylase or alpha-amylase) simply does not guarantee sale of the other product to that customer.

19.    While Mr. Beto's statements in this paragraph are factually correct, they are not very meaningful in deciding whether there is a convoy between alpha-amylase and gluco-amylase products in the fuel ethanol industry. For a convoy effect to exist, there is no requirement that the customer is forced to buy both products. My understanding is that a "convoy" means that the purchase of one product affects the customer's decision in the purchase of another product, usually in a related market. During his deposition, Dr. Teece testified that when products are marketed and sold together, it is usually a good indication of a convoy effect.[11]



---

[11] Teece Dep. Tr., p. 117.

# NON-PUBLIC VERSION — FILED UNDER SEAL
## CONTAINS CONFIDENTIAL INFORMATION NOT FOR PUBLIC DISCLOSURE

REDACTED

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: OCT 4, 2005

Gregory K. LeFebvre

- 10 -

B-65

Page 1

```
 1
 2    *** HIGHLY CONFIDENTIAL ***
 3    IN THE UNITED STATES DISTRICT COURT
 4        FOR THE DISTRICT OF DELAWARE
 5    ---------------------------x
 6    NOVOZYMES A/S,                    )
 7                      Plaintiff, )
 8              v.              ) C.A. No. 05-160-KAJ
 9    GENENCOR INTERNATIONAL, INC. )
10    and ENZYME DEVELOPMENT        )
11    CORPORATION,                  )
12                      Defendants.)
13    ---------------------------x
14                  August 19, 2005
15                  9:35 a.m.
16
17        Deposition of GREGORY K. LEFEBVRE,
18    held at the law offices of Darby & Darby,
19    805 Third Avenue, New York, New York, pursuant to
20    agreement, before Donald R. DePew, an RPR, CRR and
21    Notary Public within and for the State of
22    New York.
23
24
25
```

B-66


LEGALINK
A WORDWAVE COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
1

2    A P P E A R A N C E S:

3

4    Attorneys for Plaintiff

5         DARBY & DARBY

6         805 Third Avenue

7         New York, New York 10022-7513

8    BY:  STEVEN E. LIPMAN, ESQ.

9         GEORGE E. HYKAL, ESQ.

10        JOSEPH R. ROBINSON, ESQ.

11

12   Attorneys for Defendants

13        JONES DAY

14        2882 Sand Hill Road, Suite 240

15        Menlo Park, California 94025

16   BY:  THARAN GREGORY LANIER, ESQ.

17        JANE L. FROYD, ESQ.

18

19   ALSO PRESENT:

20        DOUGLAS HUEBNER, Videographer

21

22

23

24

25                    B-67
```

|          |    |
|----------|----|
|          | 1  |
| 09:34:48 | 2  |
| 09:35:17 | 3  |
| 09:35:20 | 4  |
| 09:35:23 | 5  |
| 09:35:28 | 6  |
| 09:35:29 | 7  |
| 09:35:32 | 8  |
| 09:35:35 | 9  |
| 09:35:38 | 10 |
| 09:35:44 | 11 |
| 09:35:46 | 12 |
| 09:35:47 | 13 |
| 09:35:51 | 14 |
| 09:35:55 | 15 |
| 09:35:57 | 16 |
| 09:35:58 | 17 |
| 09:35:59 | 18 |
| 09:36:02 | 19 |
| 09:36:04 | 20 |
| 09:36:05 | 21 |
| 09:36:06 | 22 |
| 09:36:09 | 23 |
| 09:36:10 | 24 |
| 09:36:10 | 25 |

THE VIDEOGRAPHER:  This is the video

operator speaking, Douglas Huebner, of Action

Legal Video, 420 Lexington Avenue, New York,

New York.  Today is August 19th, 2005, and

the time is 9:35.

We're at the offices of Darby & Darby,

805 Third Avenue, New York, New York, to take

the video deposition of Gregory K. LeFebvre,

in the matter of Novozymes A/S versus

Genencor International, Inc. and Enzyme

Development Corp., In The United States

District Court, For The District of Delaware,

Case No. 05-160-KAJ.

Will counsel please introduce

themselves for the record.

MR. LANIER:  My name is Greg Lanier,

with me is my colleague, Jane Froyd.  We're

with Jones Day and we represent the

defendants.

MR. LIPMAN:  Steven Lipman with Darby &

Darby for the plaintiff.

MR. HYKAL:  George Hykal from Darby &

Darby for the plaintiff.

MR. ROBINSON:  Joseph Robinson from

|           |    |                                                    |
|-----------|----|----------------------------------------------------|
|           | 1  | Gregory K. LeFebvre                                 |
| 09:36:13  | 2  | Darby & Darby for the plaintiff.                   |
| 09:36:14  | 3  | THE VIDEOGRAPHER:  Will the court                  |
| 09:36:15  | 4  | reporter please swear in the witness.              |
|           | 5  | G R E G O R Y   K .   L E F E B V R E,      called |
|           | 6  | as a witness, having been duly sworn by the        |
|           | 7  | Notary Public, was examined and testified as       |
|           | 8  | follows:                                           |
|           | 9  | EXAMINATION BY                                     |
|           | 10 | MR. LANIER:                                        |
| 09:36:28  | 11 | Q.   Good morning, Mr. LeFebvre.                   |
| 09:36:30  | 12 | A.   Good morning.                                 |
| 09:36:31  | 13 | Q.   We met briefly before the deposition.         |
| 09:36:31  | 14 | But again, my name is Greg Lanier, I represent     |
| 09:36:33  | 15 | Genencor and EDC in this case.                     |
| 09:36:35  | 16 | Have you ever been deposed before?                 |
| 09:36:37  | 17 | A.   Yes.                                          |
| 09:36:39  | 18 | Q.   On how many occasions?                        |
| 09:36:41  | 19 | A.   Once.                                          |
| 09:36:42  | 20 | Q.   Did the case have anything to do with         |
| 09:36:44  | 21 | Novozymes?                                         |
| 09:36:45  | 22 | A.   Yes.                                          |
| 09:36:48  | 23 | Q.   Do you remember what the name of the          |
| 09:36:49  | 24 | case was?                                          |
| 09:36:52  | 25 | A.   No.                                           |

| | | |
|---|---|---|
| | 1 | Gregory K. LeFebvre |
| 09:44:07 | 2 | through NV-0170017, marked for |
| 09:44:07 | 3 | identification, as of this date.) |
| 09:44:19 | 4 | Q.    Sir, would you take a moment and glance |
| 09:44:21 | 5 | through this and let me know if you recognize it |
| 09:44:23 | 6 | to be your declaration submitted in this case. |
| 09:44:26 | 7 | A.    Sure. |
| 09:44:26 | 8 | (Witness looks at document.) |
| 09:45:09 | 9 | A.    This looks like my declaration. |
| 09:45:12 | 10 | Q.    Would you turn to the last page and |
| 09:45:14 | 11 | just tell me whether or not that's your -- or a |
| 09:45:16 | 12 | copy of your signature that appears there. |
| 09:45:18 | 13 | A.    Yes. |
| 09:45:19 | 14 | Q.    Thank you. |
| 09:45:19 | 15 | Let's go back to the first page of your |
| 09:45:21 | 16 | declaration. |
| 09:45:23 | 17 | A.    Okay. |
| 09:45:23 | 18 | Q.    In the second paragraph there is a |
| 09:45:25 | 19 | reference to two -- two companies, Novozymes A/S |
| 09:45:29 | 20 | and Novozymes of North America. |
| 09:45:31 | 21 | Now, do I understand you correctly that |
| 09:45:34 | 22 | you are employed by Novozymes of North America, |
| 09:45:37 | 23 | Inc. -- |
| 09:45:38 | 24 | A.    That's correct. |
| 09:45:38 | 25 | Q.    -- is that right? |

|             |    |                                                  |
|-------------|----|--------------------------------------------------|
|             | 1  | Gregory K. LeFebvre                              |
| 09:45:39    | 2  | MR. LIPMAN:  Wait.  Mr. LeFebvre, let            |
| 09:45:41    | 3  | Mr. Lanier finish his question first and then    |
| 09:45:45    | 4  | you may answer it.                               |
| 09:45:47    | 5  | Sorry.  Go ahead.                                |
| 09:45:49    | 6  | MR. LANIER:  No problem.                         |
| 09:45:50    | 7  | Q.    What is your understanding of the          |
| 09:45:51    | 8  | relationship between Novozymes of North America, |
| 09:45:52    | 9  | Inc. and Novozymes A/S?                          |
| 09:45:57    | 10 | MR. LIPMAN:  Objection to the extent it          |
| 09:45:58    | 11 | calls for a legal conclusion.                    |
| 09:46:02    | 12 | A.    My understanding --                        |
| 09:46:02    | 13 | MR. LIPMAN:  You may answer.                      |
| 09:46:03    | 14 | THE WITNESS:  Okay.                              |
| 09:46:04    | 15 | A.    My understanding is that Novozymes of      |
| 09:46:07    | 16 | North America is a subsidiary of Novozymes A/S.  |
| 09:46:17    | 17 | Q.    Is it wholly owned, do you know?           |
| 09:46:20    | 18 | MR. LIPMAN:  Same objection.                     |
| 09:46:21    | 19 | A.    I've heard that said, but...               |
| 09:46:25    | 20 | Q.    The next sentence talks -- mentions        |
| 09:46:27    | 21 | your job title and it gives a general statement  |
| 09:46:30    | 22 | about your responsibilities.                     |
| 09:46:33    | 23 | How long have you had the job that's             |
| 09:46:36    | 24 | mentioned there,                                 |
| 09:46:39    | 25 |                                                  |

REDACTED