# TAB 3

Part 1 of 2



```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                     BEAUMONT DIVISION                F I L E D
                                                    U.S. DISTRICT COURT
 3                                                 EASTERN DISTRICT OF TEXAS

 4   FINISAR CORPORATION        )    CIVIL ACTION NO.   JUL 1 2 2006
                                )    1:05-CV-00264
                                )                       DAVID J. MALAND, CLERK
 5        PLAINTIFF,            )    BEAUMONT, TEXAS DEPUTY
                                )
 6   VS.                        )    JULY 6, 2006
                                )    9:30 A.M.
 7   DIRECTV GROUP, INC., ET    )
     AL                         )
 8                              )
              DEFENDANTS.       )
 9

10   *************************************************************
            TRANSCRIPT OF HEARING
11       BEFORE THE HONORABLE JUDGE RON CLARK
          UNITED STATES DISTRICT JUDGE
12   *************************************************************

13   APPEARANCES:

14   FOR PLAINTIFF:      MR. C J VEVERKA
                         MR. CHARLES L. ROBERTS
15                       WORKMAN NYDEGGER & SEELEY
                         60 EAST SOUTH GATE TOWER
16                       SALT LAKE CITY, UT 84111

17                       MR. LAWRENCE LOUIS GERMER
                         GERMER & GERTZ
18                       550 FANNIN, SUITE 500
                         BEAUMONT, TX 77701
19
                         MS. LUDMILA YAMALOVA
20                       FINISAR CORPORATION
                         1389 MOFFETT PARK DRIVE
21                       SUNNYVALE, CA 94089

22
     FOR DEFENDANTS:     MR. VICTOR GEORGE SAVIKAS
23                       MR. LOUIS TOUTON
                         MR. GROGORY A. CASTANIAS
24                       JONES DAY
                         555 FLOWER STREET, 5TH FLOOR
25                       LOS ANGELES, CA 90071
```

334

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

2

1                              **MR. J. THAD HEARTFIELD, JR.**
                               LAW OFFICES OF J. THAD HEARTFIELD, JR.
2                              2195 DOWLEN ROAD
                               BEAUMONT, TX 77706
3
COURT REPORTER:        ADA V. CHRISTY, CSR, CCR
4                              8311 EARSEL LANE
                               ORANGE, TEXAS 77632
5
PROCEEDINGS RECORDED BY STENOGRAPH SHORTHAND; TRANSCRIPT
6    PRODUCED BY CAT SYSTEM.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **EXAMINATION INDEX**

2                                                                    PAGE

3    MOTIONS BY PLAINTIFF                                            5

4    **WITNESS:      BRIAN NAPPER**

5    DIRECT EXAMINATION
          BY MR. VEVERKA                                            26
6    CROSS-EXAMINATION
          BY MR. SAVIKAS                                            39
7

8    **WITNESS:      RICHARD DONALDSON**

9    DIRECT EXAMINATION
          BY MR. SAVIKAS                                            52
     CROSS-EXAMINATION
10        BY MR. VEVERKA                                            61
     REDIRECT EXAMINATION
11        BY MR. SAVIKAS                                            68

12   **WITNESS:      THOMAS MCGEORGE**

13   DIRECT EXAMINATION
          BY MR. SAVIKAS                                            69
14   CROSS-EXAMINATION
          BY MR. ROBERTS                                            72
15

     MOTIONS BY DEFENDANTS                                          77
16

     REPORTER'S CERTIFICATION                                       140
17

18

19

20

21

22

23

24

25

1          THE COURT:  PLEASE BE SEATED.  ALL RIGHT.  I

2  CALL THE FINISAR CORPORATION VERSUS DIRECTV GROUP, INC., ET AL,

3  NO. 1:05-CV-0264.  WE'RE HERE ON THE POST-TRIAL MOTIONS AFTER

4  THE JURY HAS RETURNED A VERDICT.  AND IS PLAINTIFF READY?

5          MR. ROBERTS:  YES, YOUR HONOR.

6          THE COURT:  AND IS DEFENDANT READY?

7          MR. SAVIKAS:  YES, YOUR HONOR.

8          THE COURT:  OKAY.  I HAVE RECEIVED THE VARIOUS

9  BRIEFS THAT -- AND PAPERS THAT HAVE BEEN FILED IN CONNECTION

10 WITH THIS.  THERE'S A NUMBER OF DIFFERENT ISSUES TO BE TAKEN

11 UP, THE VARIOUS JUDGMENTS AS A MATTER OF LAW, THE QUESTION OF

12 ENHANCEMENT, THE QUESTION OF WHETHER OR NOT THE CASE IS

13 EXCEPTIONAL, WHETHER ATTORNEYS SHOULD BE AWARDED, AND IF SO,

14 HOW MUCH.  THE QUESTION OF WHETHER OR NOT INJUNCTION SHOULD BE

15 ISSUED, AND IF NOT, HOW A COMPULSORY LICENSE OR OTHER

16 ALTERNATIVE MIGHT BE STRUCTURED; AND THEN FINALLY, THE MATTER

17 OF HOW TO CALCULATE PREJUDGMENT INTEREST.  A LOT TO COVER.

18 SOME OF THOSE THINGS WERE PRETTY WELL COVERED, I THINK, IN THE

19 TESTIMONY AT TRIAL, WHICH THE COURT CAN MOSTLY STILL REMEMBER,

20 WHICH IS IN THE RECORD, OF COURSE.

21          SO, PLAINTIFF, YOU CAN GO AHEAD AND PRESENT AS

22 TO WHAT YOU THINK IS MOST IMPORTANT.  THERE IS A LIMIT, BUT, OF

23 COURSE, THAT'S SIMILAR TO WHAT YOU'D SEE IN AN APPELLATE COURT.

24 YOU'RE GOING TO HAVE TO PICK THE ISSUES YOU THINK ARE STILL

25 OPEN OR NEED SOME ELUCIDATION.

1          MR. ROBERTS:  YOUR HONOR, AT THE TOP OF OUR

2   LIST, OF COURSE, IS THE INJUNCTION.  I'D LIKE TO START BY JUST

3   DISCUSSING BRIEFLY THE EBAY CASE.  I WAS SURPRISED WHEN I

4   FINALLY READ THE EBAY CASE BECAUSE IN THE NEWS REPORTS IT

5   SOUNDED LIKE EBAY HAD WON.  AND WHEN I READ THE CASE, I

6   REALIZED THAT NEITHER PARTY HAD WON.  IN FACT, WHEN YOU READ

7   THAT SUPREME COURT OPINION, YOU REALIZE THAT THE EBAY CASE IS

8   REALLY A REBUKE OF THE DISTRICT COURT'S ACTION AS MUCH AS IT

9   WAS A REBUKE OF THE FEDERAL CIRCUIT'S ACTION.

10          AND IN THAT CASE THE SAME ARGUMENTS ARE BEING

11   MADE HERE THAT ARE MADE HERE.  AND THAT IS IN A SITUATION WHERE

12   THE PLAINTIFF EXPRESSES A WILLINGNESS TO LICENSE ITS PATENTS

13   AND THE PLAINTIFF HAS A LACK OF COMMERCIAL ACTIVITY IN

14   PRACTICING THOSE PATENTS, THE DISTRICT COURT FOUND A

15   CATEGORICAL APPROACH THAT AN INJUNCTION SHOULD NOT ISSUE.  AND

16   THE SUPREME COURT TURNED THAT AROUND AND SAID THAT CATEGORICAL

17   RULE CANNOT BE SQUARE TO THE PRIOR SUPREME COURT DECISION, SUCH

18   AS THE CONTINENTAL PAPER BAG DECISION.

19          NOW, THE POINT TO BE TAKEN BY THE EBAY DECISION

20   IS THAT IS NOT MEANT TO BE A RADICAL DEPARTURE FROM PRIOR

21   PRACTICE.  IN FACT, THE SUPREME COURT REALLY EMPHASIZED THAT A

22   PAGE OF HISTORY IS WORTH A VOLUME OF LOGIC.  AND JUSTICE

23   ROBERTS NOTED THAT THE LONG TRADITION OF EQUITY PRACTICE IS NOT

24   SURPRISING GIVEN THE DIFFICULTY OF PROTECTING A RIGHT TO

25   EXCLUDE THROUGH MONETARY REMEDIES THAT ALLOW AN INFRINGER TO

1    USE AN INVENTION AGAINST THE PATENTEE'S WISHES.

2              SO, YOUR HONOR, WHAT WE'RE FACED WITH HERE IS AN

3    APPROXIMATE 200-YEAR HISTORY WHERE IN THE VAST MAJORITY OF THE

4    CASES, AN INJUNCTION IS ENTERED FOLLOWING A VERDICT SUCH AS IN

5    THE SITUATION OF OURS WHERE INFRINGEMENT IS FOUND, THE

6    APPROPRIATE REMEDY GOING FORWARD TO PROTECT THAT RIGHT TO

7    EXCLUDE IS AN INJUNCTION.  AND THAT'S WHAT WE WOULD ASK THE

8    COURT TO ENTER HERE TODAY.

9              NOW, I KNOW THE COURT HAS PREVIOUSLY EXPRESSED

10   ITS PRELIMINARY VIEW, I HOPE, THAT AN INJUNCTION IS NOT

11   APPROPRIATE IN THIS CASE, BUT I'D JUST ASK THE COURT TO

12   RECONSIDER THAT VIEW --

13             THE COURT:  WELL, KEEP IN MIND WHAT I POINTED

14   OUT WAS IS ON TWO OF THE FOUR POINTS TO BE CONSIDERED THAT

15   THERE WAS ALREADY VERY STRONG EVIDENCE IN THE RECORD.  I MEAN,

16   THAT WAS JUST A FACT AS TO WHAT EVIDENCE THERE ALREADY WAS.

17   AND THAT WAS MAINLY TO ASSIST COUNSEL ON BOTH SIDES IN USING

18   THE LIMITED TIME THEY HAVE TO FOCUS ON HOW TO DEAL WITH THAT.

19   I MEAN, THERE'S NO POINT IN IGNORING THE VERY DIRECT TESTIMONY

20   THAT'S ALREADY THERE, AND THAT WOULD BE AS TO WASTE EVERYBODY'S

21   TIME.  SO, IN TERMS OF VIEW OR NOT VIEW, IT IS -- IT WAS A

22   STATEMENT OF WHAT I SAW AS THE FACTS ALREADY IN THE RECORD ON

23   TWO OF, I THINK, FOUR MAJOR ISSUES FOR THE COURT TO CONSIDER.

24   AND OBVIOUSLY IF THERE WAS SOMETHING I MISSED IN THE RECORD,

25   THIS ALLOWED COUNSEL ON BOTH SIDES TO DIRECT MY ATTENTION TO

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
7

1    THE RECORD WHERE MAYBE I HAD MISSED SOMETHING OR TO PRESENT

2    DIFFERENT EVIDENCE.

3              MR. ROBERTS:  THANK YOU.  THE POINT I WOULD LIKE

4    TO MAKE ON THESE FACTORS IS, FIRST OF ALL, IF WE WERE A

5    COMPETITOR OF DIRECTV STANDING HERE TODAY, I DON'T THINK THERE

6    WOULD BE ANY QUESTION THAT WE WERE ENTITLED TO AN INJUNCTION.

7              NOW, THE FACT THAT WE'RE NOT A COMPETITOR DOES

8    NOT CHANGE THE ANALYSIS BECAUSE WE ARE -- HAVING FAILED TO

9    LICENSE THE PATENT, WE ARE IN A POSITION TO ENABLE A COMPETITOR

10   TO BE IN THAT POSITION OF BEING ABLE TO EXCLUDE DIRECTV.

11   WE -- AS WE POINTED OUT IN OUR BRIEF, WE COULD GO OUT AND

12   LICENSE THE PATENT TODAY ON AN EXCLUSIVE BASIS TO SOMEONE, AND

13   WHAT WE OFFER THEM IS THE RIGHT TO KEEP OTHERS OUT OF THE

14   INDUSTRY.  AND BECAUSE WE ARE UNLIKE SOME OF THESE OTHER

15   COMPANIES THAT ALREADY HAVE A HISTORY OF LICENSING ON A

16   NON-EXCLUSIVE BASIS, IF THE COURT WERE TO IMPOSE A COMPULSORY

17   LICENSE ON US, THE COURT IS, IN EFFECT, TAKING AWAY FROM US THE

18   ABILITY TO EXCLUDE THAT COMES WITH THE PATENTS.  AND WE HAVEN'T

19   VOLUNTARILY SURRENDERED THAT BY ENTERING INTO A LICENSED

20   PROGRAM WITH A DOZEN OTHER COMPANIES.  THIS IS NOT A CASE WHERE

21   WE'RE LICENSING WIDGETS FOR ABOUT $1.32 EACH, AND THE ONLY

22   THING WE'RE MISSING OUT ON IS SOME LICENSING ROYALTY.  WE

23   COULD -- WE COULD GO KNOCK ON DIRECTV'S MAJOR COMPETITOR'S DOOR

24   TOMORROW, OFFER THEM TO SELL THIS PATENT, OFFER TO LICENSE THIS

25   PATENT ON AN EXCLUSIVE BASIS AND PUT THEM IN THE VERY SHOES

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
8

 1    THAT WE OCCUPY TODAY.  AND IT IS THAT POSITION THAT THE COURT

 2    WOULD BE TAKING AWAY FROM US BY REQUIRING US TO LICENSE THIS

 3    PATENT ON A COMPULSORY BASIS.

 4              WHAT SHOULD HAPPEN HERE IS AN INJUNCTION SHOULD

 5    BE ENTERED.  THAT GIVES DIRECTV SOME OPTION.  THEY CAN EITHER

 6    DECIDE TO PULL THE PLUG ON THE WHOLE SYSTEM; THEY CAN NEGOTIATE

 7    WITH US FOR A ROYALTY; OR, THEY CAN IMPLEMENT ONE OF THE

 8    INEXPENSIVE NONINFRINGING ALTERNATIVES THAT THEY HAVE TESTIFIED

 9    AND MAINTAINED EXIST THROUGHOUT THE PENDENCY OF THIS CASE.

10    NOW, THAT IS EXACTLY THE SITUATION THAT WE SAW IN A RECENT VERY

11    FAMOUS CASE OF NTP VERSUS RESEARCH IN MOTION.  NOW -- AND THE

12    POINT I WANT TO MAKE WITH THAT CASE IS THAT THERE THE JURY CAME

13    BACK WITH A VERDICT OF $23 MILLION.  SOME YEARS LATER WHEN THE

14    INJUNCTION WAS FINALLY ENTERED WHEN THE JUDGE SAYS, YOU KNOW, I

15    SEE NO REASON NOT TO ENTER THE INJUNCTION.  IT'S GOING TO

16    ENTER, AND WE SAW PRESS RELEASES ABOUT THAT.  WE SAW GOVERNMENT

17    INTERVENING.  FINALLY THERE WAS A SETTLEMENT.  AND WHAT BECAME

18    THE REALITY THROUGH THAT SETTLEMENT IS THAT RIM HAD NO

19    NONINFRINGING ALTERNATIVES.  THEY WERE UNWILLING TO PULL THE

20    PLUG, AND SO THEY PAID THE MONEY TO GET THE LICENSE.

21              NOW, IN THAT CIRCUMSTANCES THE MARKET DETERMINED

22    WHAT THAT LICENSE SHOULD BE.  THAT WAS AN ACTUAL NEGOTIATION

23    BETWEEN TWO PARTIES.  AND IN THIS CASE IF WE'RE TRYING TO

24    SIMULATE THAT MARKET RESPONSE WITH SOME SORT OF AN ONGOING

25    ROYALTY OR SOMETHING ELSE, IT'S A VIRTUAL IMPOSSIBILITY.

9

1            NOW, I WOULD REFER THE COURT TO THE IN RE

2    MAHURKAR CASE.  THE IN RE MAHURKAR CASE IS A NORTHERN DISTRICT

3    OF ILLINOIS CASE, BUT WHAT'S INTERESTING ABOUT THAT CASE IS

4    THAT IT WAS DECIDED BY JUDGE EASTERBROOK, WHO IS ONE OF THE

5    FOREMOST ADVOCATES OF LAW ECONOMICS.  HE SITS ON THE 7TH

6    CIRCUIT.  AND IN THAT CASE JUDGE EASTERBROOK NOTED:  THE

7    INJUNCTION CREATES A PROPERTY RIGHT AND LEADS TO NEGOTIATIONS

8    BETWEEN THE PARTIES.  A PRIVATE OUTCOME OF THESE NEGOTIATIONS

9    WHETHER THEY END IN A LICENSE AT A PARTICULAR ROYALTY OR IN THE

10    EXCLUSION OF AN INFRINGER FROM THE MARKET IS MUCH PREFERABLE TO

11    A JUDICIAL GUESSTIMATE ABOUT WHAT A ROYALTY SHOULD BE.

12            SO WE'RE IN A POSITION HERE TODAY OF SAYING IF

13    AN INJUNCTION IS NOT GOING TO ENTER, WHAT DO WE DO ABOUT THAT

14    REMEDY?  IF THE REMEDY FOR THE VIOLATION OF THE RIGHT TO

15    EXCLUDE IS NOT AN INJUNCTION, HOW DO WE CALCULATE THE VALUE OF

16    WHAT THAT INJUNCTION WOULD BE?  THAT'S A VIRTUAL IMPOSSIBILITY.

17    WE CAN'T LOOK AT THE JURY'S VERDICT.  THE JURY VERDICT IS FOR

18    DETERMINING PAST ROYALTIES.  WE HAVE TO RELY ON THE MARKET TO

19    MAKE THAT DECISION.

20            NOW IN THIS CASE THERE, IS NO ESTABLISHED

21    ROYALTY FOR THIS PATENT.  AND THAT'S THE PROBLEM IS WE ARE NOT

22    SELLING WIDGETS AT $1.32 PER WIDGET OR LICENSING OUT OUR PATENT

23    TO OTHERS WHO SELL WIDGETS FOR $1.32.  SO THERE IS -- THERE IS

24    NO WAY TO APPROXIMATE WHAT THIS INJUNCTION WOULD BE WORTH TO

25    US.  AND THAT'S WHY WE SAY THE MARKET HAS TO -- HAS TO

Case 1:05-cv-00160-KAJ-MPT    Document 181-2    Filed 09/18/2006    Page 11 of 41
FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

10

```
1    DETERMINE THE VALUE OF THAT.  BY ENTERING THE INJUNCTION,

2    LETTING THESE FACTORS PLAY OUT.

3              NOW, THE OTHER PROBLEM THAT COMES UP, THE

4    SUGGESTION HAS BEEN MADE THAT THIS IS REALLY NO DIFFERENT THAN

5    THE Z4-CASE, AND WE SHOULD JUST FOLLOW WHAT JUDGE DAVIS DID

6    AND -- AND HAVE ANOTHER TRIAL OR ANOTHER ACTION TO DETERMINE

7    FUTURE DAMAGES AND JUST LET THEM GO ON WITH BUSINESS AS USUAL.

8    THERE ARE FEW DISTINCTIONS HERE.  IN THE Z4-CASE, MICROSOFT HAD

9    ALREADY SET FORTH A PLAN FOR DISCONTINUING THE USE OF THE

10   PATENTED INVENTION.  THE OTHER -- SO, IN EFFECT, THERE IS AN

11   INJUNCTION IN PLACE, A VOLUNTARY ONE BEING ADOPTED BY

12   MICROSOFT.  AND WHAT THEY'RE SAYING WAS, YOU KNOW, WE CAN'T DO

13   THIS TOMORROW, BUT HERE IS OUR PLAN.  WE'RE GOING TO TAKE THIS

14   OUT OF OUR NEW RELEASE OF WINDOWS IN 2007, WE'RE GOING TO PHASE

15   THIS OUT OF CURRENT PRODUCTS.  AND I THINK THAT THAT -- EXCUSE

16   ME, THE PLAN WAS WITHIN TWO OR THREE YEARS ALL INFRINGING RULES

17   WOULD CHANGE, AND THE VAST MAJORITY OF THAT WOULD STOP WITHIN

18   SEVEN MONTHS.  THAT'S ONE DISTINCTION.

19             THE SECOND DISTINCTION WAS IN MICROSOFT -- IN

20   THE Z4 MICROSOFT CASE, THE PATENT WAS TO A RELATIVELY MINOR

21   SOFTWARE MODULE, AND WHAT Z4 WAS ASKING WAS THAT MICROSOFT BE

22   ENJOINED FROM SELLING ITS MICROSOFT OFFICE SUITE OF PRODUCTS

23   AND ITS OPERATING SYSTEM, THE WINDOWS OPERATING SYSTEM.  SO

24   THEY WOULD HAVE THE VERY CONCERNED ADDRESSED BY THE SUPREME

25   COURT THAT YOU'VE GOT A PATENT ON A SMALL COMPONENT AND YOU'RE
```

1    ASKING THEM TO ENJOIN THE ENTIRE SYSTEM.    THAT IS NOT OUR CASE.

2    OUR PATENT AS WE'VE SEEN OVER THE TWO WEEKS OF TRIAL COVERS THE

3    ENTIRE SYSTEM.    SO WE'RE DISTINGUISHABLE ON THAT BASIS AS WELL.

4                    HERE, IF WE'RE TO ADOPT JUDGE DAVIS'S

5    APPROACH -- BECAUSE THERE HAS BEEN NO EXPRESSION OF ANY PLAN ON

6    THE PART OF DIRECTV TO STOP INFRINGING, DO WE FILE ANOTHER

7    ACTION AND THEN COME BACK IN 12 MONTHS AND TRY THAT, AND THEN

8    WHEN THAT'S OVER WE FILE ANOTHER ACTION?    WE CONTINUE DOING

9    THAT THROUGH 2012.    THAT'S THE VERY PERPETUAL LITIGATION

10   PROBLEM THAT JUSTICE STOREY -- AND WE'VE ATTACHED HIS

11   COMMENTARIES, NOTES -- ENCOURAGES THE AWARD OF AN INJUNCTION IN

12   THE FIRST PLACE.

13                   YOUR HONOR, WHAT I WOULD SUGGEST WE DO IS ENTER

14   THE INJUNCTION.    LET'S NOT TRY TO SIMULATE WHAT THE MARKET IS

15   GOING TO DO.    LET'S LET THESE FACTORS PLAY OUT.    DIRECTV HAS

16   CHOSEN TO BUILD THEIR SYSTEM ON INFRINGING TECHNOLOGY.    THEY

17   CANNOT BE HEARD TO COMPLAIN WHEN THEY'RE ASKED TO STOP DOING

18   THAT.    LET'S LET THESE FACTORS PLAY OUT.    MY SUGGESTION IS

19   THIS:    LET'S DO WHAT JUSTICE -- JUDGE EASTERBROOK DID IN THE

20   MAHURKAR CASE.    HE SAID:    I'M GOING TO ENTER THE INJUNCTION;

21   I'M NOT GOING TO STAY THE INJUNCTION; BUT I AM GOING TO GIVE

22   YOU ENOUGH TIME TO SEEK STAY BY THE FEDERAL CIRCUIT.

23                   WE ARE REALLY TREADING IN NEW GROUND HERE.    THE

24   DISTRICT COURTS ARE GOING TO BE LOOKING FOR SOME GUIDANCE FROM

25   THE FEDERAL CIRCUIT.    WHY DON'T WE ENTER THE INJUNCTION, LET

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

12

1   THEM SEEK A STAY FROM THE FEDERAL CIRCUIT.  THAT WILL GIVE THE

2   FEDERAL CIRCUIT AN OPPORTUNITY IMMEDIATELY TO REACT TO WHAT THE

3   SUPREME COURT HAS DONE AND PROCEED ON THAT BASIS.

4            THE COURT:  WHAT'S SO DIFFICULT ABOUT WHAT THE

5   SUPREME COURT HAS DONE IN TERMS OF EBAY AND JUST SAYING THAT

6   THE PROPER ANALYSIS OF AN INJUNCTION ARE THE FACTORS THAT,

7   JUDGES, YOU'VE ALWAYS USED; AND LAWYERS, YOU'VE ALWAYS ARGUED.

8   I MEAN, I -- WHAT IS SO -- I MEAN, AS YOU JUST POINTED OUT,

9   THAT'S NOT ANYTHING NEW.  THE SUPREME COURT SAID ISN'T ANYTHING

10  NEW, JUST REMINDING EVERYBODY TO STOP WANDERING OFF THE PATH,

11  GET BACK TO WHERE -- HOW WE'VE ALWAYS DONE INJUNCTIONS.

12           MR. ROBERTS:  WELL, IN THE PAST IN PATENT CASES

13  IS THAT IN THE VAST MAJORITY OF CASES AN INJUNCTION WILL ISSUE.

14           THE COURT:  RIGHT.  BUT THAT AGAIN -- WHAT THE

15  SUPREME COURT WAS REMINDING THE FEDERAL CIRCUIT AND ALL OF THE

16  JUDGES DEALING WITH PATENTS IS THAT STOP GOING OFF ON SOME

17  SEPARATE ANALYSIS, USE THE STANDARD INJUNCTION ANALYSIS, AND

18  YOU JUST SEEM TO INDICATE THAT -- YOU START OFF YOUR ARGUMENT

19  BY SAYING THIS IS NOT ANYTHING NEW, AND YOU'RE ENDING UP YOUR

20  ARGUMENT SAYING, YEAH, THIS IS -- WE NEED TO GET NEW GUIDANCE

21  FROM THE FED CIRCUIT AND THE SUPREME COURT ON WHAT TO DO WITH

22  THIS NEW IDEA.  WHAT'S NEW ABOUT THE STANDARD FACTORS SET OUT

23  IN EBAY.

24           MR. ROBERTS:  WHAT I'M CONCERNED ABOUT BEING NEW

25  IS THAT IF COURTS START DENYING INJUNCTIONS, THEN WE GET INTO

1    THESE PROBLEMS THAT WE HAVEN'T FACED BEFORE IS:  HOW DO WE

2    VALUE -- HOW DO WE VALUE THE INJUNCTION?  IF WE'RE GOING TO

3    SUBSTITUTE A MONETARY REMEDY FOR THE INJUNCTION, HOW DO WE

4    VALUE THAT?  WE SEE IN JUDGE DAVIS'S --

5              THE COURT:  HOW IS THAT DIFFERENT THAN ALMOST

6    ANY MAJOR COMMERCIAL COMPLICATED INJUNCTION CASE?  WE'VE BEEN

7    DOING THAT FOR 200 YEARS.  I MEAN, YOU'RE ACTING LIKE IT'S --

8    SHOW ME HOW IT'S DIFFERENT THAN THE SAME QUESTION YOU DEAL WITH

9    WHEN YOU SUDDENLY -- I THINK THE EXAMPLE IN THE SEMINARS IS

10   ALWAYS THE GUY COMES TO YOUR OFFICE, IT'S ALWAYS 5:00 O'CLOCK

11   ON FRIDAY, AND THEY'RE GETTING READY TO CLEAR CUT ALL OF HIS

12   LAND, AND HOW ARE YOU GOING TO HANDLE THIS?  THIS IS ACTUALLY

13   THE OPENING OF A BAR JOURNAL ARTICLE.  AND YOU'VE GOT THAT SAME

14   THING, INJUNCTION, IRREPARABLE HARM, SO ON AND SO FORTH.  HOW

15   IS THIS DIFFERENT?

16             MR. ROBERTS:  WELL, IF YOU LOOK AT THE PAGE OF

17   HISTORY THAT THE SUPREME COURT REFERS TO IN PATENT CASES, YOU

18   CAN SEE THAT WHAT IS -- WHAT IS TRADITIONALLY DONE -- AND I

19   THINK IT IS A RESULT OF THE FOUR-PRONG INQUIRY.  WHAT IS

20   TRADITIONALLY DONE IS THE INJUNCTION IS ENTERED.  AND THAT'S

21   HOW THEY GET AROUND THESE PROBLEMS.  AND SO WHERE THERE'S A

22   DIFFICULTY IN VALUING THE INJUNCTION, THE ANSWER IS NOT TO

23   VALUE THE INJUNCTION, BUT TO ENTER THE INJUNCTION.  SO THE

24   ARGUMENT REALLY IS WHERE THERE'S THOSE KINDS OF PROBLEMS THAT

25   EXIST, THE ANSWER IS TO ENTER THE INJUNCTION, NOT TO GET OFF ON

1    SOME ANALYSIS ON HOW WE'RE GOING TO VALUE THIS BECAUSE IT IS

2    THE VERY DIFFICULTY OF THAT ANALYSIS THAT ENCOURAGES THE ENTRY

3    OF THE INJUNCTION IN THE FIRST PLACE.  AND THAT'S WHY IN THE

4    ONLY CASES WHERE INJUNCTIONS SHOULD BE DENIED ARE CASES WHERE

5    THERE IS A VERY ESTABLISHED ROYALTY FOR THE PATENT, AND IT'S

6    EASY TO VALUE.  AND THIS IS NOT ONE OF THOSE CASES

7    UNFORTUNATELY.

8              THE COURT:  SO WE TAKE SEVEN CITIZENS OFF THE

9    STREET WITH MAYBE A COUPLE OF THEM HAVING A COLLEGE EDUCATION,

10   TELL THEM TO FIGURE OUT ON THE BASIS OF THE FANTASY WORLD, AS

11   SOME LAWYERS IN THIS COURT CALLED IT, WHAT THE REASONABLE

12   ROYALTY SHOULD BE.  BUT A JUDGE WHO HAS BEEN WORKING THROUGH

13   THIS FOR ALMOST A YEAR, READ ALL THE TEXT, HOPEFULLY HAD SOME

14   EXPERIENCE, AND IN THE COURT OF APPEALS WITH A VAST NUMBER

15   OF -- I MEAN, THEY'VE GOT STAFF ATTORNEYS AND ENDLESS

16   EXPERIENCE -- CAN'T DO IT?

17             MR. ROBERTS:  WELL, LET ME PUT THIS A DIFFERENT

18   WAY.  THE PROBLEM IS THIS.  THE PATENT CONFERRED THE RIGHT TO

19   EXCLUDE, AND WHAT IS THAT RIGHT FOR US?  IF THAT RIGHT IS HELD

20   BY A COMPETITOR OF DIRECTV, WHAT WOULD THAT BE WORTH TO THEM?

21   TO BE ABLE TO SHUT DOWN DIRECTV.  IF THAT'S WHAT THIS PATENT

22   DOES, IF IT SHUTS DOWN DIRECTV, WOULDN'T THAT RIGHT BE WORTH

23   MILLIONS AND MILLIONS AND MILLIONS OF DOLLARS TO A COMPETITOR?

24   WHAT I'M SAYING IS WE STILL HAVE THE ABILITY TO TAKE THIS

25   PATENT TO A COMPETITOR, GIVE THEM AN EXCLUSIVE LICENSE,

1    TRANSFER THAT RIGHT TO EXCLUDE OVER TO THEM, EITHER THROUGH A

2    TRANSFER OF TITLE, OR THROUGH A LICENSE, AND LET THEM EXERCISE

3    THAT.  SO THE PROBLEM BECOMES HOW DO WE VALUE THE VIOLATION OF

4    THAT RIGHT?  IF WE'RE GOING TO SUBSTITUTE A MONETARY AWARD FOR

5    THE INJUNCTION, HOW DO WE -- HOW DO WE VALUE THAT?  IF WE GO TO

6    DIRECTV'S COMPETITOR AND SAY:  WHAT IS IT WORTH TO YOU?  IT'S

7    WORTH MILLIONS AND MILLIONS.  HOW DO WE -- HOW DO WE ASK A

8    JURY?  HOW DO WE ASK A JUDGE?  HOW DO WE ASK A COURT OF APPEALS

9    TO VALUE THAT?  AND THAT'S WHY IN THE MAHURKAR CASE, IT SAYS:

10   JUDICIAL GUESSTIMATES DO NOT CUT IT.  YOU'VE GOT TO LET THE

11   MARKET MAKE THAT VALUE DETERMINATION.  AND THAT'S WHY ON EBAY,

12   WHEN THE JURY AWARDED 23 MILLION, THE PARTIES EVENTUALLY SOLD

13   FOR 612.5 MILLION.  WHO WOULD HAVE THOUGHT THAT THE RIGHT TO

14   EXCLUDE IN THAT CASE WAS WORTH OVER $600 MILLION?

15            AND THAT'S THE PROBLEM WE'RE DEALING WITH.  YOU

16   SAY, OKAY, THE JURY CAME BACK WITH 79 MILLION, BUT WHAT IS THE

17   RIGHT TO EXCLUDE GOING FORWARD WORTH?  IS IT 612.5?  IS IT

18   MORE?  HOW DO WE -- WE ARE NOT IN A POSITION TO MAKE THAT

19   DETERMINATION.  AND THAT IS THE VERY PROBLEM THAT WE'RE FACED

20   WITH AND WHY THE INJUNCTION SHOULD ISSUE IN THE FIRST PLACE

21   BECAUSE COURTS ARE NOT IN A POSITION TO SIMULATE THE MARKET ON

22   THIS POINT.

23            THE PUBLIC INTEREST PRONG IS ONE WHEREIN PATENT

24   CASES -- THE ONLY CASES I COULD FIND WHERE THEY FOUND THAT

25   PUBLIC INTEREST ON THE PART OF THE DEFENDANT OVERWEIGHS THE

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06                                                      16

1   RIGHT TO AN INJUNCTION OR WHETHER THERE IS A CRITICAL PUBLIC

2   INTEREST.  WE QUOTE THE HYDROTECH CASE, 849 F.2ND AT 15 --

3   EXCUSE ME, AT 1458.  THERE -- THIS WAS A PRELIMINARY INJUNCTION

4   CASE -- PRELIMINARY INJUNCTION WAS DENIED TO PRODUCTS NOT

5   HAVING TO DO WITH A CRITICAL PUBLIC INTEREST.  IN OTHER WORDS,

6   THE INJUNCTION WAS NOT ALLOWED AS TO CANCER AND HEPATITIS KITS,

7   BUT IT WAS ALLOWED FOR PREGNANCY KITS.  SO THAT'S A SITUATION

8   WHERE -- YOU KNOW, THERE IS A PUBLIC INTEREST, THEY BUILT A

9   BUSINESS ON THIS, BUT THEY SAID WHERE THERE'S A CRITICAL PUBLIC

10  INTEREST WE'RE NOT GOING TO ALLOW THE INJUNCTION.  IF YOU LOOK

11  AT THE WIND SURFING CASE, THE COURT MAKES IT CLEAR THAT -- THAT

12  WHEN YOU -- WHEN YOU BUILD YOUR ENTIRE BUSINESS ON

13  INFRINGEMENT, THAT YOU ARE NOT GOING TO BE HEARD IN A COURT OF

14  EQUITY WHEN YOU SAY, WELL, TO ENJOIN ME FROM MY INFRINGING

15  ACTIVITIES IS TO HURT MY BUSINESS.  THAT'S JUST NOT A FACTOR TO

16  BE CONSIDERED BY THE COURTS OF EQUITY.

17         SO IT SEEMS THAT IN THIS CASE ALL OF THE FACTORS

18  ARE IN DIRECTV'S FAVOR -- EXCUSE ME -- FINISAR'S FAVOR, AND

19  THERE IS NO REASON NOT TO ENTER AN INJUNCTION.  AND AGAIN,

20  WE'RE VERY MUCH DISTINGUISHABLE FROM THE APPROACH JUDGE DAVIS

21  IS TAKING IN THAT THERE -- IT'S ALMOST A DE FACTO INJUNCTION

22  WHERE MICROSOFT HAS AGREED TO TAKE THIS OFF THE MARKET.  HERE

23  WE'VE GOT UNTIL 2012 BEFORE THIS PATENT EXPIRES.  AND WHAT IS

24  OUR REMEDY FOR DOING THAT?  FILING CASE AFTER CASE, IT'S JUST A

25  PROCEDURAL NIGHTMARE.  IT'S THE TYPE OF PERPETUAL LITIGATION

1    THAT WE SHOULDN'T HAVE TO GO THROUGH.  AND THAT'S WHY AN

2    INJUNCTION SHOULD BE ENTERED IN THIS CASE.

3              IF THE COURT HAS NO FURTHER QUESTIONS ON THAT,

4    I'LL MOVE OVER TO THE ATTORNEY'S FEES ISSUE.

5              THE COURT:  OKAY.

6              MR. ROBERTS:  OF COURSE, THE PRIMARY BASIS THAT

7    WE'RE ASKING FOR ATTORNEY'S FEES IN THIS CASE IS THE JURY'S

8    UNANIMOUS FINDING OF WILLFUL INFRINGEMENT.  THE CASES ARE CLEAR

9    THAT WILLFULNESS ALONE IS SUFFICIENT TO FIND EXCEPTIONALITY AND

10   TO AWARD ATTORNEY'S FEES.  AND I SUPPOSE WE COULD CITE THE

11   COURT A HUNDRED CASES THAT STAND FOR THAT.  THERE'S ALSO

12   INSTANCES OF LITIGATION MISCONDUCT THAT WE'VE CITED TO IN OUR

13   BRIEF.  THE COURT IS FAMILIAR WITH THOSE HAVING BEEN PARTY TO

14   ALL OF THOSE MOTIONS AND HEARINGS.  THE HIGHLIGHTS OF THAT ARE

15   THAT WE FILED -- I THINK, BY OUR COUNT 19 PAPERS HAD TO BE

16   FILED.  AND I KNOW -- I DON'T MEAN MOTIONS, BUT I DO MEAN

17   PAPERS, AND WE USE THAT TERM INTENTIONALLY.  NINETEEN PAPERS

18   HAD TO BE FILED BECAUSE OF BASIC RULE VIOLATIONS, AND DIRECTV

19   NOTES IN THEIR BRIEF, YOU KNOW, SOME OF THAT IS TO BE EXPECTED.

20   I ACKNOWLEDGE THAT SOME OF THAT IS TO BE EXPECTED.  BUT IN THIS

21   CASE IT WAS AN EXTRAORDINARY AMOUNT OF PROBLEMS THAT WE

22   ENCOUNTERED.  EVERY TIME WE TURNED AROUND, WE HAD TO FILE

23   ANOTHER MOTION BECAUSE WE'RE SEEING NEW THINGS BEING POSTED ON

24   US THAT HADN'T BEEN PROPERLY DISCLOSED PURSUANT TO THE LOCAL

25   RULES, THE OBLIGATION TO DISCLOSURE.  THOSE ISSUES WERE ARGUED

1    IN NO LESS THAN SIX HEARINGS, AND THE COURT WAS A PARTY TO

2    THOSE.  I WON'T DWELL ON THOSE.

3              DIRECTV ARGUES THAT THEY'RE, IN FACT, THE

4    PREVAILING PARTY IN THIS LITIGATION.  I CAN GIVE YOU 79 MILLION

5    REASONS WHY THEY'RE NOT THE PREVAILING PARTY, BUT I WOULD

6    INSTEAD CITE TO THE BECKMAN INSTRUMENTS CASE AT 892 F.2ND AT

7    1553.  WHERE THE COURT SAID:  WHEN INFRINGEMENT IS FOUND TO BE

8    WILLFUL, THE POLICY BEHIND SECTION 285 OF DISCOURAGING

9    INFRINGEMENT MIGHT JUSTIFY IMPOSING ALL OF THE PATENT OWNER'S

10   ATTORNEY'S FEES ON THE INFRINGER EVEN IF THE INFRINGER

11   PREVAILED AS TO SOME OF THE CLAIMS IN SUIT.  SO EVEN THOUGH

12   SOME OF OUR CLAIMS WERE HELD INVALID ON EARLY SUMMARY

13   JUDGMENTS, WHEREIN THIS CASE INFRINGEMENT WAS WILLFUL, AN AWARD

14   OF ATTORNEY FEES IS JUSTIFIED, AND WE WOULD ASK FOR SUCH.

15             ON ENHANCEMENT, AGAIN WE'VE OUTLINED ALL OF THE

16   FACTORS SET FORTH IN READ V. PORTEC.  I DON'T WANT TO GO OVER

17   THE BRIEF AGAIN, BUT I WOULD NOTE THAT HERE WE HAVE A SITUATION

18   WHERE THE JURY AWARD IN COMPARISON TO DIRECTV'S ABILITY TO PAY

19   IS VERY SMALL.  I WOULD -- I WOULD DARE SAY THAT THE AWARD

20   DOESN'T EVEN SHOW UP AS A BLIP ON THEIR FINANCIAL RADAR SCREEN.

21   TO ENHANCE THAT BECAUSE PART OF THE POLICIES TO BE ENFORCED ARE

22   TO BE PROMOTED BY ENHANCING THE AWARD ARE TO DETER

23   INFRINGEMENTS.  AND BECAUSE THIS WAS FOUND TO BE WILLFUL, THE

24   ONLY WAY TO DO THAT IS TO TREBLE DAMAGES IN THIS CASE.  WE'VE

25   GOT A SITUATION WHERE THEY CLAIM:  WELL, WE ACTED IN GOOD

1    FAITH.  WE'VE GOT AN OPINION FROM COUNSEL.  BUT WHAT, IN FACT,

2    WE SAW WHEN THE EVIDENCE CAME OUT IS THAT THE OPINION THEY GOT

3    WAS RECEIVED BY IN-HOUSE COUNSEL AND PUT IN A DRAWER.  HE SAYS

4    HE REVIEWED IT.  HE SAYS HE MADE THE DECISION ON IT, BUT IF IT

5    WAS SOMETHING OF THIS MAGNITUDE, WOULDN'T THERE AT LEAST BE A

6    MEETING ABOUT THAT OPINION?  WOULDN'T THERE AT LEAST BE SOME

7    INDICATION OF THE COMPANY RELYING ON THAT OPINION?  IT'S ONE

8    THING TO GET AN OPINION.  FIRST OF ALL, THE OPINION THEY GOT WE

9    SAW EVIDENCE THAT IT WAS BASED ON INCOMPLETE INFORMATION,

10   INCOMPLETE TECHNICAL INFORMATION.  SO WHEN THE OPINION CAME IN,

11   WAS AN ENGINEER ASKED TO REVIEW THAT?  NO.  NO.  MR. ARCENEAUX

12   TESTIFIED THAT HE NEVER REVIEWED IT UNTIL HE WAS PREPARING FOR

13   HIS DEPOSITION IN THIS CASE.  NO TECHNICAL PERSON EVER REVIEWED

14   THAT OPINION TO EVEN SEE IF IT WAS ACCURATE IN SPITE OF THE

15   FACT THAT THE OPINION ITSELF SAID:  WE ASK YOU TO CONFIRM THE

16   ACCURACY OF THIS TECHNICAL INFORMATION.  LET US KNOW IF IT'S

17   NOT RIGHT SO THAT WE CAN AMEND THAT IF WE NEED TO.

18            SO WE'VE GOT A SITUATION WHERE THE OPINION IS

19   OBTAINED.  IT LOOKS LIKE THEY'RE CROSSING THEIR T'S AND DOTTING

20   THEIR I'S, BUT WHEN IT COMES IN, IT GETS PUT IN A DRAWER.  NO

21   MEETING WAS HELD TO DISCUSS IT.  WHERE IS THE CORPORATE

22   RELIANCE ON THAT OPINION?  IT'S ONE THING TO GET THE OPINION,

23   BUT YOU NEED TO HAVE A BUSINESS DECISION RELYING ON THAT

24   OPINION TO AVOID THE KIND OF PROBLEM THAT WE'RE FACING HERE

25   TODAY.

1          AND THAT IN ADDITION TO THE OTHER FACTORS ON

2    ENHANCEMENT ARE WHY THE JUDGMENT SHOULD BE TREBLED IN THIS

3    CASE.  AND AGAIN, I NOTE THAT EVEN TREBLING THE JUDGMENT IS

4    GOING TO BARELY SHOW UP ON DIRECTV'S RADAR SCREEN.

5          WE HAVE WITH US TODAY A MR. BRIAN NAPPER, WHO IS

6    OUR DAMAGES EXPERT.  I DON'T KNOW IF IT WOULD BE APPROPRIATE AT

7    THIS TIME TO PUT HIM ON THE STAND AND TO TALK ABOUT SOME OF

8    THESE ISSUES.  I GUESS SOME OF THIS DEPENDS ON WHERE THE COURT

9    IS INCLINED TO GO.  MR. NAPPER IS PREPARED TO TALK ABOUT THE

10   DIFFICULTY IN EVALUATING THE INJUNCTION, ADDITIONAL INFORMATION

11   THAT WOULD BE NEEDED TO PERFORM THAT VALUATION.  HE'S NOT HERE

12   PREPARED TO GIVE A NUMBER BECAUSE OF THE DIFFICULTY OF THAT AND

13   COMPLEXITY OF THAT ANALYSIS.  SO, I GUESS IT DEPENDS ON WHERE

14   THE COURT IS INCLINED TO GO.  IF YOU WANT TO GET INTO THE

15   DETAILS OF THAT, WE WOULD BE HAPPY TO PUT HIM ON, OR WE CAN

16   MOVE RIGHT INTO THE PREJUDGMENT AND POSTJUDGMENT INTEREST.

17          THE COURT:  OKAY.  POSTJUDGMENT INTEREST IS

18   ESTABLISHED BY STATUTE.  I DIDN'T EVEN SEE IN THE BRIEFS THERE

19   WAS MUCH DISCUSSION OR CONTROVERSY ON THAT.  THERE'S A STATUTE

20   ON THAT.  IS THERE SOMETHING I MISSED?

21          MR. ROBERTS:  NO.  I THINK YOU'RE RIGHT.

22          THE COURT:  OKAY.  PREJUDGMENT INTEREST, BOTH

23   SIDES HAVE AGREED THAT THE TEXAS STATUTORY SCHEME OF SIX

24   PERCENT IS PROPER.  YOUR CALCULATION WAS ON THE .14 PERCENT OF

25   THE ROYALTY FEE BASIS, AND THEIRS WAS BASED ON THE $1.32 PER

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

21

```
 1   SET TOP BOX BASIS.  BUT TAKING A LOOK AT YOUR CHARTS, IT COMES

 2   OUT LIKE, WHAT, WITHIN A MILLION DOLLARS OF EACH OTHER?

 3            MR. ROBERTS:  SOMEHOW WE STILL MANAGED TO BE

 4   $700,000 APART.

 5            THE COURT:  YEAH.  IT WAS FAIRLY CLOSE ON THAT.

 6   SO, YOU MIGHT TOUCH BRIEFLY ON THAT, BUT YOU'RE PRETTY DARN

 7   CLOSE, BOTH OF YOU THERE.  AND SINCE YOU'RE AGREEING ON THE SIX

 8   PERCENT, YOU'RE AGREEING ON THE STATUTORY SCHEME, YOU'RE

 9   AGREEING ON THE MONTHS, YOUR DIFFERENCES ARE FAIRLY MINOR.  YOU

10   WANT TO MAYBE HIGHLIGHT THOSE.  BUT IF YOU'VE GOT A WITNESS TO

11   BE TALKING ABOUT, AS I MENTIONED BEFORE, EITHER THE INJUNCTION

12   OR HOW ONE WOULD CALCULATE A COMPULSORY LICENSE, THIS IS YOUR

13   OPPORTUNITY TO GET THAT ON THE RECORD.

14            MR. VEDERKA:  OKAY.  YOUR HONOR, WITH RESPECT TO

15   THE PREJUDGMENT INTEREST --

16            THE COURT:  AND JUST FOR THE RECORD, SINCE WE

17   HAVE A DIFFERENT COURT REPORTER -- CHRIS IS ON VACATION --

18   PLEASE GO AHEAD AND IDENTIFY EACH SPEAKER AS YOU STAND UP.  I

19   KNOW YOU'VE ALL GIVEN YOUR NAMES, BUT I WANT TO BE VERY SURE

20   SHE HAS THAT FOR THE RECORD.

21            MR. VEDERKA:  C. J. VEDERKA ON BEHALF OF

22   FINISAR.  THAT'S SPELLED V-E-D-E-R-K-A.  THE ISSUE ON

23   PREJUDGMENT INTEREST IS TWO-FOLD, AND I CAN ADDRESS IT VERY

24   QUICKLY.  YOU'RE CORRECT THAT WE'VE AGREED ON THE TEXAS

25   STATUTORY RATE WHICH IS SIX PERCENT.  DIRECTV CONTENDS THAT
```

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06                                                    22

1   INTEREST SHOULD NOT BE COMPOUNDED, THAT IT SHOULD BE SIMPLE

2   INTEREST.  FINISAR ASKS THAT THE COURT COMPOUND INTEREST

3   ANNUALLY.  WITH RESPECT TO THE ANNUAL COMPOUNDING, WE JUST

4   BELIEVE THAT MORE CLOSELY RELATES TO THE COMMERCIAL REALITIES

5   THAT FINISAR WOULD FACE WHETHER WITH RESPECT TO LENDING OR

6   BORROWING MONEY.  I -- I CHALLENGE ANYONE IN THE ROOM TO FIND A

7   BANK THAT WILL LOAN THEM MONEY WITHOUT COMPOUNDING INTEREST.

8   AND THE PURPOSE OF THE COURT'S DISCRETION TO AWARD PREJUDGMENT

9   INTEREST IS TO PUT THE -- PUT THE AGGRIEVED PARTY IN A POSITION

10  THAT MOST CLOSELY TRACKS WHERE HE WOULD HAVE BEEN IF THEY

11  HADN'T BEEN OUT THE MONEY THAT'S GOING TO BE AWARDED.  SO WE

12  WOULD URGE THAT THE COURT COMPOUND THE PREJUDGMENT INTEREST

13  ANNUALLY.  THAT'S A CONSERVATIVE APPROACH.

14          I WOULD LIKE TO DIRECT THE COURT'S ATTENTION TO

15  ONE CASE.  THAT IS -- IT'S ACTUALLY THE BECKMAN CASE THAT WAS

16  SPOKEN TO EARLIER WHEN IT WAS ON REMAND.  THE COURT IN THAT

17  CASE COMPOUNDED THE PREJUDGMENT INTEREST ANNUALLY, AND WITH

18  RESPECT TO ATTORNEY'S FEES UNDER SECTION 285 COMPOUNDED THOSE

19  AT TEN PERCENT ANNUAL RATE QUARTERLY.  YOU COULD, IN YOUR

20  DISCRETION, COMPOUND THE INTEREST DAILY.  AND SO IT'S OUR

21  POSITION THAT COMPOUNDING ANNUALLY IS A CONSERVATIVE APPROACH,

22  AND WE'D ASK THE COURT TO ADOPT THAT.

23          WITH RESPECT TO THE OTHER DEPARTURE BETWEEN THE

24  TWO PARTIES' CALCULATIONS, ONE IS THAT OUR CALCULATION OF

25  INTEREST WHILE COMPOUNDED YEARLY TALLIES THE MONEY ON A DAILY

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
23

1   BASIS.  DIRECTV IS TALLYING THE MONEY ON WHAT IS CALLED A

2   MID-MONTH CONVENTION.  WE BELIEVE THAT OUR CALCULATION MORE

3   APPROPRIATELY TRACKS HOW DIRECTV'S BUSINESS WORKS.  I THINK

4   THAT THE COURT CAN TAKE JUDICIAL NOTICE THAT DIRECTV DOESN'T

5   GET ITS PAYMENTS FROM 15 MILLION SUBSCRIBERS ALL IN ONE DAY

6   EVERY MONTH, AND THAT THEY PROBABLY PAY THEIR MONEY EVERY --

7   YOU KNOW, PAYMENTS COME IN EVERY DAY, WHICH IS WHY WE ADDED THE

8   MONEY EVERY DAY.  WE HAVEN'T COMPOUNDED THE INTEREST EVERY DAY,

9   BUT DIRECTV IS TAKING ONE MONTH -- ONE DAY IN A MONTH AND

10  TAKING AN AVERAGE BETWEEN THE TWO TIMES.  AND MR. NAPPER'S

11  GROUP IS THE ONE THAT HAS CALCULATED THAT INTEREST FOR US AND

12  COULDN'T --

13          THE COURT:  BUT IN TERMS OF -- AS YOU TALKED

14  ABOUT -- THIS WAS A COMMERCIAL BUSINESS OR LICENSE AND MAYBE

15  THERE'S SOME EVIDENCE FOR THIS, FOR EXAMPLE, ON THEIR IMPEG

16  LICENSE OR ONE OF THE OTHERS, IT WOULD SEEM UNLIKELY THAT

17  THEY'RE MAKING PAYMENTS EVERY DAY OR CALCULATING EVERY DAY.  I

18  MEAN, NORMALLY IT WOULD BE ON A MONTHLY OR BIWEEKLY BASIS OR

19  SOMETHING LIKE THAT.  AND FOR THAT MATTER, WHEN YOU START TALK

20  ABOUT DOING IT DAILY, ARE YOU DOING IT THE DAY THAT THE

21  CUSTOMER SENT THE CHECK?  ARE YOU DOING IT THE DAY THE CHECK

22  CLEARED OR THE DAY THEY SIGNED THE AGREEMENT?  I MEAN, WHAT --

23          MR. ROBERTS:  WE'RE JUST MAKING THE POINT THAT,

24  YOU KNOW, AT LEAST IN DIRECTV'S BUSINESS, IN THE OPERATION OF

25  THEIR BUSINESS, THEY RECEIVE MONEY EVERY DAY.

```
1                    THE COURT:  WELL, YEAH.

2                    MR. ROBERTS:  AND SO IT WAS OUR POSITION THAT

3     THAT MORE CLOSELY TRACKED HOW -- THE COMMERCIAL REALITIES OF

4     DIRECTV.

5                    THE COURT:  BUT AREN'T WE TALKING ABOUT MAKING

6     YOUR CLIENT WHOLE?  IN OTHER WORDS, THE LOSS THAT THEY WOULD

7     HAVE -- AND NORMALLY THEY WOULD BE GETTING A CHECK MONTHLY,

8     MAYBE EVEN LESS FREQUENTLY THEN, I'M NOT SURE.  BUT PROBABLY NO

9     MORE THAN MONTHLY.  AND THAT WOULD BE THEIR LOST OPPORTUNITY

10    COSTS.  THEY COULD HAVE -- IF THEY HAD THAT MONEY IN HAND AT

11    THE BEGINNING OF EACH MONTH OR BEGINNING OF EACH TWO WEEKS,

12    THEY COULD PRESUMABLY HAVE EITHER INVESTED IT IN SOME GOOD

13    OPPORTUNITY OR TAKEN A LOW RISK INVESTMENT OF A TREASURY BILL

14    FOR LESS OR SOMETHING IN BETWEEN.  THAT'S WHAT THE SIX PERCENT

15    WINDS UP STATUTORILY IT BEING KIND OF A COMPROMISE.  I JUST --

16    I GUESS I'M NOT SURE -- THE POLICY ISSUE IS TO COMPENSATE YOU

17    FOR LOST OPPORTUNITY COST, AND YOU'RE GOING TO -- HOW THEY GET

18    THE MONEY IN AS OPPOSED TO HOW YOU WOULD NORMALLY GET IT.

19                   MR. VEDERKA:  RIGHT.  AND FINISAR IS IN THE

20    BUSINESS OF PART OF ITS BUSINESS IS LICENSING ITS INTELLECTUAL

21    PROPERTY, GETS MONEY IN.  THIS IS FROM FINISAR'S STANDPOINT AND

22    AT DIFFERENT TIMES.  AND WE THOUGHT THAT THAT MORE CLOSELY

23    APPROXIMATED THE COMMERCIAL REALITIES OF THE PARTIES.

24                   THE COURT:  DO YOU HAVE ANY EVIDENCE THAT

25    FINISAR LICENSES ARE GETTING DAILY CHECKS FROM SOMEBODY, OR ARE
```

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL

1    THEY NORMALLY --

2              MR. VEDERKA:  I DON'T THINK --

3              THE COURT:  I IMAGINE A BUSINESS DOING THAT, AND

4    SURELY THEY'RE SENDING THEM EVERY TWO WEEKS, EVERY MONTH OR

5    SOMETHING.

6              MR. VEDERKA:  WELL, I -- AGAIN, WE DIDN'T ADDUCE

7    ANY EVIDENCE ON EXACTLY WHEN.

8              THE COURT:  OKAY.

9              MR. VEDERKA:  BUT THAT IS PART OF THE DIFFERENCE

10   IN THE METHODOLOGY AND IN TERMS OF THE DETAILS.  WHEN

11   MR. NAPPER PRESENTS SOME OTHER TESTIMONY, WE COULD ASK HIM

12   ABOUT THAT.

13             THE COURT:  OKAY.

14             MR. VEDERKA:  WE'D LIKE TO CALL MR. BRIAN

15   NAPPER.

16             THE COURT:  VERY GOOD.

17             (THE WITNESS IS SWORN IN.)

18             MR. VEDERKA:  YOUR HONOR, I THINK WE JUST HAVE

19   THREE SLIDES WE MIGHT USE WITH MR. NAPPER.  COULD I APPROACH

20   AND BRING A COPY OF THOSE?

21             THE COURT:  PLEASE.

22                        **BRIAN NAPPER,**

23   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

24             D I R E C T   E X A M I N A T I O N

25   BY MR. VEDERKA:

1    Q.    GOOD MORNING, MR. NAPPER.

2    A.    GOOD MORNING, MR. VEDERKA.

3    Q.    AT TRIAL YOU TESTIFIED CONCERNING YOUR CALCULATIONS FOR

4    PAST DAMAGES; IS THAT CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    AND YOU UNDERSTAND THAT PART OF WHAT WE'RE DOING TODAY IS

7    CONSIDERING IMPOSITION OF DAMAGES GOING FORWARD IN LIEU OF

8    INJUNCTION, IF ULTIMATELY JUDGE CLARK DETERMINES THAT AN

9    INJUNCTION IS NOT APPROPRIATE?

10    A.    THAT'S MY UNDERSTANDING THAT THE COURT IS CONSIDERING

11    ALTERNATIVE OPTIONS, YES.

12    Q.    AND IN YOUR OPINION IN MAKING SUCH CALCULATION, WOULD YOU

13    CONSIDER DIFFERENT INFORMATION THAN YOU CONSIDERED IN

14    DETERMINING PAST DAMAGES?

15    A.    YES, ABSOLUTELY.    THE TYPES OF INFORMATION -- LET'S TAKE A

16    STEP BACK.    THE CONSTRUCT OF THE 1995 DAMAGES OPINION ARE BOTH

17    DIRECTV'S DAMAGES EXPERT, AS WELL AS MYSELF, IS A HYPOTHETICAL

18    NEGOTIATION BACK IN 1995.    AND WHAT THAT DOES IS ROLLS --

19    ESSENTIALLY ESTABLISHES A ROYALTY RATE TO BE PAID PLACING

20    VARIOUS WEIGHTS ON INFORMATION THAT ARE IN OR AROUND THE TIME

21    OF THE HYPOTHETICAL NEGOTIATION.    AND THEN AS TIME ELAPSES YOU

22    PLACE ESSENTIALLY ALL OTHER THINGS BEING EQUAL LESS WEIGHT AS

23    INFORMATION IS FURTHER OUT INTO THE PROJECTED PERIOD OF TIME.

24    SO IN THIS CASE, AS I DID, YOU PLACE LESS WEIGHT ON

25    INFORMATION, FOR EXAMPLE, 2000, THE YEAR 2000 FORWARD, 2001,

1    2002, 2003.  AND ESSENTIALLY IN COMING UP WITH AN APPROPRIATE

2    ROYALTY RATE, IT'S APPLIED AGAINST THE ROYALTY BASE.   IN MY

3    CASE I BELIEVE IT'S FINISAR'S REVENUE OF DIRECTV BECAUSE OF THE

4    ASSISTED ASPECT OF THE PATENT.  AND WHAT WE DO AND WHAT WE

5    PRESENTED TO THE JURY THEN IS APPLYING THAT RATE ON THE REVENUE

6    STREAM UP TO THE TIME OF TRIAL PRESUMING AN INJUNCTION WOULD BE

7    ISSUED BY THE COURT.

8    Q.    OKAY.  AND WOULD THAT VERY APPROACH CREATE A DIFFERING

9    RESULT, IN YOUR OPINION?

10   A.    YES.  ESSENTIALLY, WITHOUT THE PRESUMPTION OF AN

11   INJUNCTION, THEN IT ESSENTIALLY PUTS US IN A POSITION OF TODAY

12   FINISAR AND DIRECTV SITTING DOWN, AGAIN UNDER INFRINGEMENT

13   FOUND TO BE USING THE PATENT OF VALIDITY AND ENFORCEMENT, ET

14   CETERA.  AND ESSENTIALLY ALSO WITH WILLFULNESS, BEING FOUND TO

15   BE WILLFULLY INFRINGING ON THE PATENT AND THESE TWO PARTIES NOW

16   SIT DOWN TODAY.  AND IF I WERE ASKED TO REVIEW AND ANALYZE WHAT

17   THAT RESULT WOULD BE BASED UPON MY INFORMATION OR KNOWLEDGE OF

18   THE CASE, I BELIEVE THAT THERE WOULD BE OTHER INFORMATION THAT

19   I WOULD PLACE MORE WEIGHT ON THAN I DID ORIGINALLY.

20   Q.    OKAY.  WELL, YOU'VE PREPARED A SHORT LIST OF SOME OF THE

21   INFORMATION THAT YOU WOULD NEED TO CONSIDER.

22             MR. VEDERKA:  CAN YOU PUT THAT UP ON THE SCREEN,

23   PLEASE, SUE?

24   Q.    (BY MR. VEDERKA)  ALL RIGHT.  HERE IN THIS FIRST SLIDE,

25   YOU HAVE PRIMARY CHANGES FROM THE 1995 CONCEPT.  WHAT DID YOU

```
 1   INTEND TO IMPART BY THAT?

 2   A.    ESSENTIALLY WHAT I JUST SAID, WHICH IS AS WE SIT HERE NOW

 3   IN JULY 2006 THE MARKETPLACE IS COMPLETELY DIFFERENT THAN THE

 4   1995 HYPOTHETICAL NEGOTIATION BETWEEN FINISAR AND DIRECTV.

 5   Q.    AND I BELIEVE THAT YOU HAVE POINTED OUT SOME OF THESE

 6   ESTABLISHED MARKET DATA POINTS, THE FIRST ONE BEING DIRECTV'S

 7   MAJORITY MARKET SHARE.  HOW DID THAT AFFECT --

 8               THE COURT:  YES?

 9               MR. SAVIKAS:  MAY I MAKE AN OBJECTION.

10               THE COURT:  SURE.

11               MR. SAVIKAS:  WE DID NOT SEE ANY OF THESE

12   DEMONSTRATIVES, AND I THOUGHT OUR EARLIER AGREEMENT WAS WE GET

13   THEM AT 9 O'CLOCK THE DAY BEFORE, SO THIS IS THE FIRST TIME

14   THAT WE'RE SEEING THEM.

15               MR. VEDERKA:  THIS IS, YOU KNOW --

16               THE COURT:  IF YOU MADE SUCH AN AGREEMENT, I

17   MEAN, I GUESS YOU HAVE TO LIVE WITH YOURSELF ETHICALLY.  I'LL

18   LET YOU GO ON IF --

19               MR. VEDERKA:  WELL, I THINK --

20               THE COURT:  YOU CAN MAKE AGREEMENTS --

21               MR. VEDERKA:  I MADE AN AGREEMENT WITH RESPECT

22   TO THAT DURING THE TRIAL.  I HAD NOT CONSIDERED THIS HEARING TO

23   BE, YOU KNOW, A CONTINUATION OF TRIAL.  I APOLOGIZE IF I'VE

24   BROKEN SOME AGREEMENT.  I HAD NO PROBLEM -- THESE ARE NOT

25   VERY -- THESE ARE NOT CONTROVERSIAL SLIDES.
```

```
 1                   THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.
 2    BUT -- BUT GO AHEAD.
 3                   MR. VEDERKA:  OKAY.  THANK YOU, YOUR HONOR.
 4    Q.   (BY MR. VEDERKA)  WITH RESPECT TO THE FIRST DATA POINT YOU
 5    HAVE, WHAT IMPACT WOULD THAT HAVE ON YOUR ANALYSIS?
 6    A.   WELL, ESSENTIALLY -- AND YOU CAN EVEN CATEGORIZE A NUMBER
 7    OF THESE SITUATIONS WHERE THE MARKET IN 2006 IS DIFFERENT THAN
 8    IN 1995.  FOR THE DBS MARKETPLACE IN GENERAL AND DIRECTV'S
 9    POSITIONING WITHIN THAT MARKETPLACE, AND THESE ARE JUST SOME OF
10    THE OBSERVATIONS, FACTS REALLY THAT AS DIRECTV SITS HERE TODAY
11    HAVING TO NEGOTIATE RIGHTS TO THE 505 PATENT, IT WOULD BE A
12    CERTAINTY NOW VERSUS BACK IN 1995 WHERE IT WAS CLEARLY LESS
13    THAN CERTAIN.  FOR EXAMPLE, ON THE PREVIOUS SLIDE THE FACT THAT
14    THEY WERE A -- THEY ARE NOW A 56 PERCENT MARKET SHARE OWNER IN
15    A TWO-PLAYER MARKETPLACE.  THAT'S THE FIRST POINT.  THE
16    INSTALLED SUBSCRIBER BASE IS NOW 15 MILLION AND GROWING.  AND
17    THEN ESSENTIALLY THE PRODUCT ASSESS THE CURRENT PROFITABILITY.
18    IF I RECALL SOME QUESTIONS AT TRIAL REGARDING CURRENT
19    PROFITABILITY, AND CERTAINLY THE REVENUES AND PROFITS OF
20    DIRECTV NOW IS WITH CERTAINTY A VERY PROFITABLE VENTURE BY
21    PRETTY MUCH ANY MEASURE YOU WANT TO APPLY TO IT.
22    Q.   AND WITH RESPECT TO COMPETITION, THERE IS A DIFFERENCE
23    BETWEEN WHAT THE PARTIES PERCEIVED IN 1995 AND WHAT WE
24    UNDERSTAND NOW, CORRECT?
25    A.   THAT IS CORRECT.  THERE WAS -- WHILE THERE IS SOME
```

1   INDICATION THAT DIRECTV HAD A LITTLE BIT OF A FIRST MARKET

2   ADVANTAGE, THEY WERE VERY CONCERNED ABOUT OTHER COMPANIES THAT

3   WERE GETTING INTO THE DBS BASE, PRIMESTAR, ECHOSTAR CERTAINLY

4   AT THAT TIME AND OTHER COMPANIES, MAYBE THREE OR FOUR OTHERS.

5   ESSENTIALLY, AS WE -- SO ACTUALLY THE MARKETPLACE IN 1995.  NOW

6   AS WE SIT HERE IN 2006, DIRECTV ONLY HAS ONE COMPETITOR, AND

7   THAT'S ECHOSTAR.  AND SO THAT'S A DIFFERENT SITUATION NOW

8   PROVEN, IF YOU WILL, AS OPPOSED TO 1995 WHERE IT MIGHT BE AN

9   EVENTUALITY, BUT YOU HAVE TO TAKE INTO ACCOUNT THE RISK THAT

10  THAT'S GOING TO MATERIALIZE.  AND THAT A CABLE IS STILL A

11  COMPETITOR TO THE DBS MARKETPLACE, BUT EVEN NOW TO LESSER

12  DEGREE THAN WHAT WAS ANTICIPATED BACK IN 1995.

13  Q.   OKAY.   COULD WE PROCEED --

14          THE COURT:  HOLD ON A SECOND.  SO TELL ME HOW

15  COST OF ENTRY ARE GOING TO FIGURE INTO THIS, THIS KIND OF

16  SATELLITE BUSINESS.  YOU'VE ONLY GOT ONE OTHER COMPETITOR

17  BASICALLY.  I GUESS A CLASS THAT MIGHT BE CALLED OLIGOPOLY.

18  YOU'VE GOT COST OF ENTRY INTO THE MARKET, NOT A CHANCE OF

19  TRYING TO SELL TO A BUNCH OF COMPETING BUYERS.  YOU'VE --

20  ACCORDING TO YOU, WE'VE ONLY GOT ONE OTHER ONE OUT THERE AND

21  CABLE TO A LESSER DEGREE.  AREN'T THERE BOTH FACTORS THERE THAT

22  WOULD TEND TO RAISE THE VALUE AND ALSO LOWER IT?

23          THE WITNESS:  I WHOLEHEARTEDLY AGREE, YOUR

24  HONOR.  I THINK IT'S AN EXCELLENT POINT.  FOR EXAMPLE, IF YOU

25  GO BACK TO 1995, HAD AN AGREEMENT BEEN STRUCK WITH DIRECTV BACK

```
 1    IN 1995 IN THE HYPOTHETICAL WORLD, ONE COULD CONCEIVE THE

 2    ARGUMENT AS WELL THAT FINISAR WOULD HAVE HAD AN OPPORTUNITY TO

 3    LICENSE TO PRIMESTAR, TO LICENSE TO THREE OR FOUR OTHER DBS

 4    COMPANIES AT THAT POINT IN TIME WHOSE ROYALTIES ARE NOW

 5    FOREGONE POTENTIALLY OR COLLAPSED INTO FINISAR'S OPPORTUNITY

 6    WITH ECHOSTAR AND DIRECTV.

 7              THE COURT:  BUT NOW WE'RE TALKING

 8    ABOUT -- LET'S LOOK AT TODAY.

 9              THE WITNESS:  SURE.

10              THE COURT:  WE'VE ALREADY GOT WHAT THE JURY HAS

11    IN THE PAST.  BUT RIGHT NOW YOU HAVE -- WHAT YOU'RE SAYING IS

12    DIRECTV WITH 56 PERCENT MARKET SHARE AND ONLY ONE COMPETITOR

13    AND JUST -- PARTLY I WANT TO GET THIS OUT FOR THE RECORD IS:

14    WHAT ARE THE COSTS OF ENTRY INTO THIS KIND OF BUSINESS?

15              THE WITNESS:  I AGREE, YOUR HONOR, THAT IT IS A

16    FAIRLY SIGNIFICANT BARRIER TO ENTRY FOR OTHER COMPANIES AT THIS

17    POINT IN TIME.

18              THE COURT:  IN TERMS OF BILLIONS, RIGHT?  IT'S

19    UP THERE AND SO FORTH.

20              THE WITNESS:  I WOULD SAY THAT IN TERMS OF

21    BILLIONS OR MORE, PERMITTING NECESSARY TO GET SATELLITES UP

22    THERE, THAT THERE ARE -- I WOULD BE -- I'D BE MORE SURPRISED

23    THAN NOT IF THERE'S A THIRD ENTRANT INTO THE DBS MARKETPLACE.

24    THE COMPETITION IS GOING TO COME FROM CABLE AS MUCH AS IT

25    POSSIBLY CAN.
```

1           THE COURT:  ALL RIGHT, SO YOU DO HAVE THE

2   POSSIBILITY OF SELLING TO ECHOSTAR PERHAPS, AND THEN AS COUNSEL

3   HAS ARGUED THEY MIGHT HAVE THE ABILITY TO ELIMINATE DIRECTV,

4   BUT IS THAT REALISTIC IN TERMS OF THE CAPITAL REQUIREMENTS THAT

5   WOULD BE NEEDED TO TAKE OVER 15 MILLION CUSTOMERS.  FOR

6   EXAMPLE, ARE THE SET TOP BOXES INTERCHANGEABLE, OR DOES

7   ECHOSTAR HAVE A DIFFERENT KIND?

8           THE WITNESS:  THAT'S A GOOD QUESTION.  I BELIEVE

9   THERE ARE SOME DIFFERENCES.  MY IMPRESSION IS THAT THERE'S BEEN

10   SOME SORT OF CONVERGENCE IN THE MARKETPLACE, THAT THE SET TOP

11   BOX IS BECOMING MORE OF A COMMODITY BETWEEN THE TWO COMPANIES.

12   I STILL THINK THERE ARE SOME DIFFERENCES.

13           THE COURT:  AND MAYBE WITH A DISH OR WHATEVER IS

14   BRINGING IN THE SIGNAL.  THERE HAS TO BE SOME KIND OF

15   CONVERTERS, AS I RECALL ON THE DISH ITSELF COMING IN.

16           THE WITNESS:  THAT'S CORRECT.  I WOULD IMAGINE,

17   ALTHOUGH I'M NOT A TECHNICAL EXPERT, IT WOULDN'T SURPRISE ME

18   AGAIN THAT THERE IS SOME DIFFERENCES IN THE TECHNOLOGY.  SO

19   YOUR POINT IS A GOOD ONE, YOUR HONOR, IN TERMS OF THE ABILITY

20   OF ECHOSTAR TO SERVICE IF YOUR POINT IS THAT $15 MILLION -- 15

21   MILLION SUBSCRIBERS OF DIRECTV, I WOULD SAY THAT THERE WOULD

22   HAVE TO BE SOME INVESTMENT BY ECHOSTAR.  CERTAINLY BY ECHOSTAR

23   VIS-A-VIS SOME OTHER NEW ENTRY INTO THE MARKETPLACE, ALTHOUGH I

24   WOULDN'T DISMISS THAT NECESSARILY, BUT --

25           THE COURT:  AND YOU'D HAVE THE SAME KIND OF

```
 1   BARRIERS OF ENTRY OR VARIOUS EXPANSION OF THE CABLE.  WHEREAS

 2   IN THE CITY, THEY PROBABLY HAVE THEIR CABLE NETWORKS OUT IN THE

 3   AREAS WHERE, I GUESS, SATELLITE TV WAS INITIALLY POPULAR, IN

 4   THE RURAL AREAS, THERE ARE MANY AREAS STILL NOT SERVED BY

 5   CABLE, SO THERE THAT WOULD BE AT COST.

 6                   THE WITNESS:  I WOULD AGREE THAT TO EXTEND TO

 7   THOSE PARTICULAR RURAL AREAS WOULD BE SOME INVESTMENT, ALTHOUGH

 8   OBVIOUSLY WITH ECHOSTAR THEY DO HAVE THEIR SATELLITES THERE TO

 9   TRY --

10                   THE COURT:  I WAS TALKING ABOUT THE OTHER

11   COMPETITOR, CABLE.

12                   THE WITNESS:  I'M SORRY.  THE CABLE CERTAINLY

13   WOULD STILL BE CHALLENGED WITH RESPECT TO RURAL, ALTHOUGH IT'S

14   MY UNDERSTANDING HAVING DONE SOME WORK FOR A COUPLE OF CABLE

15   COMPANIES IN THE ELECTRICAL PROPERTY BASIS, THAT THEY HAVE

16   VASTLY IMPROVED THEIR ABILITY TO REACH THE RURAL AREAS BECAUSE

17   THEY KNEW THAT THAT WAS A COMPETITIVE SHORTCOMING OF THEIRS.

18                   THE COURT:  OKAY.  GO AHEAD.

19                   MR. VEDERKA:  OKAY.  SUSAN, COULD WE PROCEED TO

20   THE NEXT SLIDE?

21   Q.   (BY MR. VEDERKA)  OKAY.  AND WITH RESPECT TO ADDITIONAL

22   PRIMARY CHANGES FROM THE 1995 CONSTRUCT, YOU WOULD WANT TO

23   CONSIDER ADDITIONAL DIRECTV LICENSES?

24   A.   YES.  AS I -- THE COURT WOULD RECALL DIRECTV SIGNED AN

25   AGREEMENT WITH GEM STAR IN 2004, I BELIEVE, I TESTIFIED IN THE
```

1   1995 CONSTRUCT THAT GAVE A LITTLE BIT LESS WEIGHT TO THAT

2   BECAUSE OF THE LENGTH OF TIME BETWEEN 1995 AND 2004.  I WOULD

3   PLACE MORE WEIGHT ON THAT AS WE SIT HERE IN 2006.  A PRIMARY

4   TAKE AWAY IN ADDITION WITH THE TIVO AGREEMENT SIGNED IN 2002,

5   THE PRIMARY TAKE AWAY IS WITH CONSTRUCT.  WHAT WOULD THE

6   ROYALTY STRUCTURE LOOK LIKE?

7   Q.    AND WHAT WOULD THAT CONSTRUCT BE?

8   A.    THE CONSTRUCT EVEN FURTHER CONFIRMED BY USING THESE TWO

9   AGREEMENTS IN ADDITION TO THE MACROVISION AGREEMENTS WHICH ARE

10  THE THREE SOLE AGREEMENTS THAT DIRECTV AS AN ENTITY ASSIGNED IS

11  ALL ON A PERCENTAGE OF REVENUE OR A PER SUBSCRIBER BASIS, NOT

12  ON HARDWARE, NO ON SET TOP BOXES.

13  Q.    I BELIEVE THAT'S RELATED TO THE LAST POINT ON THE DIRECTV

14  NO LONGER HAS A CORPORATE RELATIONSHIP WITH A SET TOP BOX

15  MANUFACTURER?

16  A.    IT'S MY UNDERSTANDING THAT THE HUGHES NETWORK SYSTEM,

17  WHICH WAS A SISTER COMPANY TO DIRECTV, WAS SOLD RECENTLY

18  2004-2005 TIME FRAME, I BELIEVE, TO THOMPSON, ANOTHER SET TOP

19  BOX MANUFACTURER, SO THAT DOES MAKE SENSE.  SO DIRECTV HAS NO

20  RELATIONSHIP WHATSOEVER IN TERMS OF A CORPORATE RELATIONSHIP

21  WITH ANY SET TOP BOX MANUFACTURER.

22  Q.    OKAY.  AND I BELIEVE YOU'VE ALSO SAID THAT THERE WOULD BE

23  SOME ADDITIONAL OR UPDATED INFORMATION THAT YOU WOULD WANT TO

24  CONSIDER.

25          MR. VEDERKA:  CAN WE PROCEED WITH THE NEXT

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL

```
 1    SLIDE, SUSAN?

 2    Q.    (BY MR. VEDERKA)  AND HERE YOU'VE BROKEN THAT DOWN INTO

 3    FINANCIAL AND I BELIEVE LICENSING.

 4    A.    YES, EXACTLY.  THE TITLE INFORMATION NOT AVAILABLE AND

 5    NEEDING UPDATE IS -- I'VE BROKEN INTO TWO BUCKETS, FINANCIAL

 6    AND LICENSING.  SO THE FINANCIAL, IT WOULD BE IMPORTANT, I

 7    THINK, AGAIN FOR THE MARKET DYNAMICS TO WORK OUT WHAT WOULD BE

 8    THE AGREEMENT BETWEEN DIRECTV AND FINISAR TODAY TO LOOK AT NOW

 9    PROJECTION PREPARED TODAY FOR REVENUE OPERATING PROFIT BEFORE

10    DEPRECIATION AND AMORTIZATION, SERIALIZE THE PATENT 2012.

11              IF YOU RECALL IN THE 1995 CONSTRUCT WHILE THAT

12    WAS MENTIONED IN PASSING, LESS WEIGHT WAS PLACED ON THAT

13    INCLUDING BY THE COURT BECAUSE OF IT EXISTING SO FAR REMOVED

14    FROM THE 1995 HYPOTHETICAL NEGOTIATION.

15              IN ADDITION, THIRD PARTY ANALYST PROJECTIONS ARE

16    OFTEN USEFUL.  WE RELIED UPON SOME BACK IN THE 1995 TIME FRAME.

17    CERTAINLY I'D LIKE TO SEE WHAT THE THIRD PARTY ANALYST ARE

18    PREDICTING FOR DIRECTV FOR THE LIFE OF THE PATENT, WHICH IS

19    ONLY ABOUT SIX YEARS TO RUN FROM TODAY THROUGH 2012.

20    Q.    AND WHAT ARE -- WHAT ARE QUARTERLY EARNING COST?

21    A.    ESSENTIALLY, I BELIEVE WE ASKED FOR THIS INFORMATION

22    PREVIOUSLY, BUT DIRECTV, SINCE THEY WEREN'T A PUBLIC ENTITY IN

23    1995 THROUGH 2003, DID NOT HAVE SUCH INFORMATION.  THESE ARE

24    QUARTERLY EARNINGS CALLS FOR ANALYST WHERE DIRECTV IS

25    EXPLAINING ITS BUSINESS, PROJECTING WHERE IT THINKS ITS GROWTH
```

1    IS GOING TO BE, WHAT ARE ITS CHALLENGES, HOW IT'S GOING TO ADD

2    SUBSCRIBERS, ET CETERA.   SO THOSE ARE OFTEN USEFUL INFORMATION

3    AS KIND OF MOUTH PIECES OF DIRECTV INDIVIDUALS TO THE

4    MARKETPLACE AS TO WHAT THEY'RE INTENDING TO DO, WHAT ARE THEIR

5    FUTURE PLANS, AND NOT BY BEING ENCOMPASSED IN THE CURRENT AND

6    PROJECTED GROWTH RATES FOR SUBSCRIBERS.   I WOULD ALSO LOOK AT

7    DIRECTV'S CURRENT MARKET CAPITALIZATION, WHAT THE VALUE OF THE

8    MARKETPLACE PLACES ON THE DIRECTV CONTRASTING THAT WITH 1995

9    MARKET CAP, WHICH IS OBVIOUSLY SIGNIFICANTLY LESS.   AND I'D

10   PROBABLY WANT TO GET AN UPDATE ON ACQUISITION COSTS PER

11   SUBSCRIBER UNDER THE AUSPICES OF ESSENTIALLY DIRECTV, IF THEY

12   LOSE SUBSCRIBERS BY ANY WAY, SHAPE OR FORM AS A RESULT OF 505

13   PATENT OR LACK OF ACCESS TO IT, HOW MUCH IT WOULD COST THEM TO

14   REACQUIRE THOSE SUBSCRIBERS.

15   Q.    AND THE LAST POINT, THE NATURE OF EXISTING CONTRACTS?

16   A.    AN IMPORTANT CONSIDERATION NOW AS OPPOSED TO BACK IN 1995,

17   LESS SO IN 1995, IS DIRECTV HAS LONG TERM NOW CONTRACTS, AS I

18   UNDERSTAND IT, WITH CONTENT OR COMPONENT PROVIDERS, CONTENT

19   BEING THE MEDIA COMPANIES STREAMING THEIR CONTENT THROUGH

20   DIRECTV'S SYSTEM TO THE HOME, AND ALSO THEY HAVE SOME COMPONENT

21   PROVIDERS MEANING PERHAPS SET TOP BOX MANUFACTURERS AND OTHER

22   HARDWARE.   SO THE IMPACT TODAY OF AN INABILITY TO STREAM THEIR

23   CONTENT TO CONSUMERS MAY HAVE AN IMPACT ON THOSE CONTRACTS.

24   AND IT MAY BE DIFFERENT THAN IN 1995.

25            MR. VEDERKA:   OKAY.   LET'S PROCEED TO THE LAST

1    SLIDE, SUSAN, PLEASE.

2    Q.   (BY MR. VEDERKA)   AND HERE ARE --

3              THE COURT:   WAIT A MINUTE.   WAIT A MINUTE.

4    YOU'RE SAYING THE CONTRACTS -- TELL ME THIS AGAIN ABOUT HOW

5    THAT AFFECTS THEIR ABILITY TO STREAM CONTENT.

6              THE WITNESS:   ESSENTIALLY, AS I UNDERSTAND IT,

7    YOUR HONOR -- AND PERHAPS I MISSPOKE -- IT'S THE EXISTING

8    CONTRACTS BETWEEN DIRECTV AND CONTENT, LET'S SAY IT'S DISNEY OR

9    SOME OTHER MEDIA COMPANY THAT'S SUPPLYING CONTENT THROUGH

10   DIRECTV, AND THEY HAVE A CONTRACT WITH DIRECTV.   THE POINT IS

11   HERE IS THAT THOSE TYPES OF CONTRACTS MAY BE DIFFERENT IN 2006

12   THAN THE TERMS OR THE NUMBER OF THOSE CONTRACTS BACK IN 1995.

13   AND SO THE IMPACT OF THOSE CONTRACTS, HOW DOES THAT GET VALUED

14   NOT INTERRUPTING THOSE CONTRACTS IN TERMS OF A POTENTIAL

15   INJUNCTION OR A STOPPING OF SERVICE, I.E., DIRECTV NOT BEING

16   ABLE TO STREAM THAT CONTENT TO THE CONSUMERS, AND DOES THAT

17   HAVE AN IMPACT ON THE CONTRACTS IN PLACE OR ANY FUTURE

18   CONTRACTS THAT DIRECTV IS CURRENTLY NEGOTIATING.

19              THE COURT:   OKAY.

20   Q.   (BY MR. VEDERKA)   AND FINALLY, INFORMATION THAT YOU WOULD

21   WANT TO EVALUATE IN TERMS OF LICENSING.

22   A.   I TOUCHED ON THIS PREVIOUSLY.   THERE ARE A SERIES OF TIVO

23   AGREEMENTS FROM, I THINK, 1999 TO 2002, INCLUDING SOME RECENT

24   AMENDMENTS, AND I'D WANT TO CONSIDER, AS I SIT HERE TODAY, THE

25   TIVO AGREEMENTS, LOOK AT THEM MORE CAREFULLY.   THERE IS ONE

1   ASPECT OF THAT AGREEMENT, WHICH IS A BROADER RELATIONSHIP

2   GRANTED, THAT HAS TO DO WITH PATENT LICENSING AND TECHNOLOGY

3   LICENSING.  AND I WOULD CONSIDER THAT, AS WE SIT HERE TODAY.

4   BACK IN 1995, I DID NOT CONSIDER IT.  AND IF THERE'S ANY OTHER

5   RECENT DIRECTV AND/OR OTHER INDUSTRY AGREEMENTS THAT MIGHT HAVE

6   SOME RELEVANCE AGAIN AS WE SIT HERE IN 2006.  SO THAT'S THE

7   TYPE OF INFORMATION I THINK WOULD BE APPROPRIATE TO CONSIDER,

8   ANALYZE, AND PLACE APPROPRIATE WEIGHT ON EITHER LESS WEIGHT OR

9   MORE WEIGHT IN DETERMINING WHAT A RATE MIGHT BE EVEN IN THEIR

10  COMPULSORY LICENSE BETWEEN FINISAR AND DIRECTV.

11  Q.   OKAY.   THANK YOU.  NOW, WHEN YOU TESTIFIED AT TRIAL IN

12  CALCULATING PAST DAMAGES, YOU TESTIFIED IT WAS YOUR OPINION

13  THAT A PER SET TOP BOX ROYALTY METHODOLOGY WAS INAPPROPRIATE;

14  IS THAT RIGHT?

15  A.   THAT'S CORRECT.

16  Q.   WOULD THAT STILL BE YOUR OPINION WITH RESPECT TO DAMAGES

17  GOING FORWARD?

18  A.   I THINK EVEN MORE SO TODAY GIVEN THAT THE JUMP START

19  AGREEMENT IN 2004 AND THE ONE PATENT OR TECHNOLOGY LICENSE

20  AGREEMENT BETWEEN TIVO AND DIRECTV IN 2002 CLEARLY INDICATES TO

21  ME BACK IN 1995 ONLY HAD ONE AGREEMENT THAT HAD BEEN SIGNED

22  WITH MACROVISION BETWEEN DIRECTV AND ANOTHER TECHNOLOGY OWNER.

23  HERE NOW I HAVE, IN ESSENCE, THREE AGREEMENTS, ALL OF WHICH ARE

24  BASED ON A RUNNING ROYALTY BASED UPON A PER SUBSCRIBER WHICH

25  CORRELATES TO REVENUE OR ON A REVENUE BASIS AND NOT ON A SET

```
 1   TOP BOX.  DIRECTV IS YET TO SIGN AN AGREEMENT TO PAY ON A SET

 2   TOP BOX BASIS, AND EVEN FURTHER REMOVED FROM THAT, THEY'VE

 3   ACTUALLY GOTTEN RID OF THEIR SET TOP BOX ENTITY WHICH WAS

 4   HUGHES NETWORK SYSTEMS.  THERE WAS NO REASON REALLY TO PAY ON

 5   THE SET TOP BOX BASIS.

 6   Q.   SO, IN YOUR OPINION, BASED ON THE INFORMATION YOU DO HAVE,

 7   THE RUNNING ROYALTY METHODOLOGY IS EVEN MORE APPROPRIATE THAN

 8   IT WAS WITH RESPECT TO CALCULATION OF PAST DAMAGES?

 9   A.   I WOULD SAY THAT'S EVEN MORE -- MORE CONCRETE, THAT IT

10   WOULD BE MORE ON A RUNNING ROYALTY PERCENTAGE OF SALES BASIS;

11   YES, SIR.

12              MR. VEDERKA:  THANK YOU, MR. NAPPER.

13              MR. ROBERTS:  IF I COULD JUST OFFER SOME

14   CONCLUSIONARY REMARKS, YOUR HONOR.

15              THE COURT:  WELL, I'M GOING TO ALLOW AN

16   OPPORTUNITY FOR SOME CROSS-EXAMINATION.

17              MR. ROBERTS:  OH, THANK YOU.

18              THE COURT:  MR. SAVIKAS.

19              C R O S S   E X A M I N A T I O N

20   BY MR. SAVIKAS:

21   Q.   GOOD MORNING, MR. NAPPER.

22   A.   HI, MR. SAVIKAS, HOW ARE YOU?

23   Q.   I'M WELL.  THANK YOU.

24              ARE YOU AWARE OF ANY REPORTED CASE FROM THE

25   FEDERAL CIRCUIT IN WHICH HYPOTHETICAL NEGOTIATIONS WERE
```

```
 1   CONSIDERED AFTER A JURY VERDICT?

 2   A.   AN INTERESTING QUESTION.  I'M GOING THROUGH, I BELIEVE,

 3   VIRTUALLY ALL OF THE CASES, WITH ONE EXCEPTION THAT I'VE BEEN

 4   INVOLVED WITH WHERE THE PLAINTIFF HAS BEEN PREVAILED ON THE

 5   ISSUES OF VALIDITY AND INFRINGEMENT, HAD AN INJUNCTION ISSUED.

 6   SO THERE WOULD BE NO NEED FOR A HYPOTHETICAL -- HYPOTHETICAL

 7   NEGOTIATION.  IT WOULD BE MARKET DYNAMICS DICTATING WHAT

 8   HAPPENS AFTER THAT POINT.

 9   Q.   SO YOU'RE NOT AWARE OF THE COURT EVER CONDUCTING

10   HYPOTHETICAL NEGOTIATIONS AFTER A JURY VERDICT?

11   A.   AGAIN, IT'S ALWAYS BEEN AN INJUNCTION WITH ONE EXCEPTION.

12   Q.   ARE YOU FAMILIAR WITH THE TERM "COMPULSORY LICENSE"?

13   A.   GENERALLY, YES.

14   Q.   ARE YOU FAMILIAR WITH THE COURTS IMPOSING A COMPULSORY

15   LICENSE AFTER A JURY VERDICT AND NOT GRANTING AN INJUNCTION?

16   A.   I'M FAMILIAR WITH THAT.  I DON'T BELIEVE IT'S BEEN ANY OF

17   THE PROJECTS I'VE WORKED ON HAS THAT OCCURRED.  MY PRESUMPTION

18   IS -- AND MY KNOWLEDGE IS THAT IT'S PRIMARILY BECAUSE -- I'M

19   SORRY.  THERE'S BEEN ONE CASE I'VE WORKED ON WITH ZENITH WHERE

20   THERE WAS 30 SOME ODD LICENSES, AND SO A COMPULSORY LICENSE WAS

21   GRANTED BY THE COURT BECAUSE THAT WAS AN ESTABLISHED ROYALTY

22   RATE.  SO I'M NOT FAMILIAR -- I'M FAMILIAR WITH THAT CAN OCCUR

23   ON OCCASION.

24   Q.   AND WHAT WAS THE COMPULSORY LICENSE RATE GRANTED IN THAT

25   CASE?  DID YOU SAY IT WAS AN ESTABLISHED ROYALTY?
```