1   A.   IT WAS.

2   Q.   AND THEY DIDN'T TAKE INTO ACCOUNT, QUOTE, THE VALUE OF AN

3   INJUNCTION?

4   A.   VIRTUALLY EVERY TV MANUFACTURER HAD SIGNED UP FOR THE

5   RATE, AND THERE HAD BEEN NO VARIANCE IN THE RATE.   SO THEY --

6   THE -- ESSENTIALLY THERE WAS NO ANALYSIS PERFORMED OR DESIRED

7   IN TERMS OF THE VALUE OF AN INJUNCTION FOR THAT PARTICULAR

8   FACT.

9   Q.   NOW DURING THE TRIAL YOU TESTIFIED AS TO A REASONABLE

10   ROYALTY RATE THAT WOULD BE INCLUDED IN A LICENSE THAT WOULD BE

11   EXECUTED BY DIRECTV AND FINISAR; DID YOU NOT?

12   A.   YES.   THAT'S CORRECT.

13   Q.   AND YOU ASSUMED THE DURATION OF THAT LICENSE WOULD BE

14   UNTIL THE EXPIRATION OF THE PATENT; ISN'T THAT CORRECT?

15   A.   AS DID DIRECTV'S DAMAGES EXPERT; THAT'S RIGHT.

16   Q.   SO YOU DIDN'T -- IN YOUR TESTIMONY IN FRONT OF THE JURY,

17   YOU DIDN'T ASSUME THAT THERE WOULD BE AN INJUNCTION ENTER IN

18   COMING UP WITH YOUR ROYALTY RATE, CORRECT?

19   A.   WELL, COMING UP WITH MY DAMAGES, I ABSOLUTELY DID.   MY

20   DAMAGES CUT OFF THE REVENUES THE ACCUSED --

21   Q.   I UNDERSTAND THAT.   BUT IN DETERMINING WHAT THE RATE AND

22   THE BASE WOULD BE, YOU DID NOT ASSUME THAT THERE WOULD BE AN

23   INJUNCTION?

24   A.   ONE OF THE GEORGIA PACIFIC FACTORS IS THE DURATION OF THE

25   LICENSE AGREEMENT, AND I PRESUMED THAT THAT LICENSE AGREEMENT

1    WOULD RUN THROUGH THE LIFE OF THE PATENT; THAT IS CORRECT.

2    Q.    OKAY.    HOW DO YOU RECONCILE THE JURY VERDICT WITH YOUR

3    OPINION THAT THE DAMAGES SHOULD HAVE BEEN $1.7 BILLION?

4    A.    I HAVE -- I CANNOT RECONCILE THAT.    THERE'S ABSOLUTELY --

5    ABSENCE OF INFORMATION AS TO WHAT THE TOOLS OR ANALYSIS OR

6    EMPHASIS OR WEIGHTS THAT THE JURY PLACED ON THE INFORMATION

7    THAT IT WAS PRESENTED.

8    Q.    WE TALKED ABOUT THE IMPEG DECODERS AND ENCODERS DURING

9    YOUR TESTIMONY AT TRIAL.    AM I CORRECT THAT YOU TESTIFIED THAT

10    NONE OF THE LICENSES FOR THE IMPEG DECODERS AND ENCODERS IS

11    BASED ON A PERCENTAGE OF GENERAL REVENUE?

12    A.    TESTING MY MEMORY NOW, MR. SAVIKAS.    BUT I BELIEVE THAT IS

13    CORRECT, THAT NONE OF THOSE LICENSES ARE BASED UPON A

14    PERCENTAGE OF REVENUE BASIS FOR THE SET TOP BOXES.

15    Q.    ARE YOU AWARE OF ANY TECHNOLOGY IN THE SATELLITE

16    TELEVISION BUSINESS THAT IS BASED ON A GROSS REVENUE?

17    A.    WELL, I GUESS NOT TO -- I HESITATE BECAUSE GROSS REVENUES

18    CAN BE DEFINED AS, FOR EXAMPLE, THE MACROVISION AGREEMENT WITH

19    DIRECTV HAD TO DO WITH THE GROSS REVENUES -- THE BASE WAS THE

20    GROSS REVENUES DERIVED FROM THE USE OF THE MACROVISION

21    TECHNOLOGY FOR SECURITY ISSUES.    SO IF DIRECTV HAD A REVENUE

22    THAT THEY CHARGED YOU AND I ON A PAY PER VIEW BASIS, THEY'D PAY

23    IT ON A PERCENTAGE OF THAT REVENUE.

24    Q.    RIGHT.    BUT IT WASN'T THE GROSS REVENUES OF THE COMPANY,

25    WAS IT?

1    A.    IT WAS NOT.

2    Q.    OKAY.   EITHER MR. ROBERTS OR MR. VEDERKA SAID THAT

3    DIRECTV'S ENTERPRISE WAS BASED ON INFRINGING TECHNOLOGY.   DID

4    YOU HEAR THAT STATEMENT?

5    A.    I BELIEVE I DID, YES.

6    Q.    NOW, DIRECTV WAS IN BUSINESS AND BROADCASTING LONG BEFORE

7    THE FINISAR PATENT ISSUED, CORRECT?

8    A.    AGAIN, NOT TO QUIBBLE.   LONG BEFORE -- I BELIEVE THEY WERE

9    BROADCASTING BEFORE --

10   Q.    WELL, YOU TESTIFIED ABOUT AN AWARD THAT THEY GOT IN

11   FEBRUARY OF 1995 THAT'S THE MOST SUCCESSFUL CONSUMER

12   ELECTRONICS PRODUCT?

13   A.    YEAH.   THEY LAUNCHED -- I BELIEVE IT'S FEBRUARY 1995,

14   AGAIN NOT TO CORRECT YOU, MR. SAVIKAS; AND, YES, THEY HAD BEEN

15   BROADCASTING BEFORE.   I DON'T KNOW ABOUT LONG BEFORE, BUT THEY

16   HAD BEEN BROADCASTING BEFORE THE 505 PATENT ISSUE.

17   Q.    AND THE 505 PATENT CAME OUT IN APRIL OF 1995, CORRECT?

18   A.    THAT'S MY RECOLLECTION, YES.

19   Q.    ALL RIGHT.   ONE OF YOUR SLIDES YOU SAID THAT ECHOSTAR IS

20   THE ONLY DBS COMPETITOR; DO YOU RECALL THAT TESTIMONY?

21   A.    YES.   AS WE SIT HERE TODAY, YES.

22   Q.    ARE YOU AWARE THAT ECHOSTAR TRIED TO BUY DIRECTV ON ONE

23   OCCASION?

24   A.    YES.

25   Q.    AND ARE YOU AWARE THAT THE JUSTICE DEPARTMENT BROUGHT AN

```
 1   ANTI-TRUST SUIT AGAINST ECHOSTAR TO PREVENT THAT ACQUISITION?

 2   A.   I DON'T KNOW ABOUT THE FOUR RAMIFICATIONS, BUT I BELIEVE

 3   THERE WAS SOME TALK ABOUT IT ONLY FROM -- ON MY KNOWLEDGE ONLY

 4   FROM THE GENERAL PRESS.

 5   Q.   WELL, THE COMPLAINT WAS ATTACHED TO THE -- I'M SORRY.  THE

 6   JUSTICE DEPARTMENT COMPLAINT WAS ATTACHED TO FINISAR'S

 7   COMPLAINT IN THIS CASE.  DO YOU RECALL THAT?

 8   A.   I DON'T.  I'M SORRY.

 9   Q.   AND DO YOU RECALL THAT THE JUSTICE DEPARTMENT SAID THAT

10   THERE COULD NOT BE A SINGLE SATELLITE PROVIDER IN THIS COUNTRY?

11   A.   I DON'T RECALL THAT, EITHER.

12   Q.   DO YOU RECALL THAT A PRESS RELEASE TO THAT EFFECT IS

13   ATTACHED TO FINISAR'S COMPLAINT IN THIS CASE?

14   A.   I DON'T RECALL.

15   Q.   WOULD IT SURPRISE YOU THAT THE ECHOSTAR SET TOP BOXES ARE

16   TOTALLY INCOMPATIBLE WITH DIRECTV'S BOXES?

17   A.   AGAIN, I'VE SEEN THERE'S SOME INDICATIONS THAT THERE'S

18   SOME CONVERGENCE, A DESIRE TO COMODITIZE SET TOP BOXES AND MAKE

19   THEM COMPATIBLE.  BUT AS I UNDERSTAND IT AS WE SIT HERE TODAY,

20   THAT THEY ARE DIFFERENT.  THEY ARE DIFFERENT, THAT ONE CAN'T

21   TALK TO THE OTHER.

22   Q.   YOU HAVE -- AS I RECALL, YOU HAVE A DISH SYSTEM, RIGHT?

23   A.   I HAVE A DIRECTV SYSTEM.

24   Q.   YOU CAN'T GET A DISH SIGNAL, CAN YOU?

25   A.   NOT THAT I'M AWARE OF, NO.
```

1   Q.   OKAY.  YOU TALKED ABOUT CABLE BEING A COMPETITOR.  ARE YOU

2   AWARE OF THE INTRODUCTION OF THE FIBER OPTIC TELEVISION SYSTEMS

3   NOW BEING OFFERED BY THE LOCAL BELLS?

4   A.   NO.

5   Q.   DO YOU KNOW ABOUT VERIZON OFFERING THEIR FIOS SYSTEM?

6   A.   I DON'T.

7   Q.   THE GEM STAR MONTHLY ROYALTY THAT YOU TALKED ABOUT, THAT'S

8   NOT A PERCENTAGE OF ANY GROSS REVENUE, IS IT; THAT'S SIMPLY A

9   FIXED AMOUNT PER MONTH?

10  A.   WELL, IT'S -- IT IS BASED UPON ULTIMATELY -- NOT BASED

11  UPON -- IT RELATES TO GROSS REVENUE BECAUSE IT'S BASED UPON

12  NUMBER OF SUBSCRIBERS THAT CORRELATES TO REVENUE EARNED BY

13  DIRECTV, SO --

14  Q.   IS IT --

15  A.   -- 20 CENTS PER SUBSCRIBER PER MONTH.

16  Q.   20 CENT PER SUBSCRIBER PER MONTH.  THAT'S IRRESPECTIVE OF

17  HOW MUCH PROFIT OR REVENUE DIRECTV GENERATES.

18  A.   THAT IS NOT -- THAT IS -- YOU ARE RIGHT.  IT IS DIVORCED

19  FROM THE AMOUNT THAT SUBSCRIBER IS CHARGED FOR THE DIRECTV

20  SERVICE.  BUT OBVIOUSLY THE NUMBER OF SUBSCRIBERS RELATES TO

21  DIRECTV'S REVENUES.

22  Q.   AND YOU SAID DIRECTV NO LONGER HAS THE CORPORATE

23  RELATIONSHIP WITH THE SET TOP BOX MANUFACTURER, AS I RECALL?

24  A.   THAT WAS MY UNDERSTANDING.

25  Q.   DO YOU KNOW NOW HOW DIRECTV SECURES ITS SET TOP BOXES?

```
 1   A.   I DON'T HAVE ANY SPECIFIC KNOWLEDGE OF THAT.  I DO NOTE

 2   THAT THERE WAS SOME DIFFICULTY IN DIRECTV ACTUALLY DETERMINING

 3   HOW MANY SET TOP BOXES THAT THEY'VE DELIVERED TO CONSUMERS,

 4   WHICH DOESN'T SURPRISE ME SINCE THEY'RE NOT A SET TOP BOX

 5   MANUFACTURER.

 6   Q.   OKAY.  HAVE YOU EVER TESTIFIED IN CONNECTION WITH A

 7   COMPULSORY ROYALTY?

 8   A.   ONLY THE ONE EXAMPLE I GAVE WHERE I'M FAMILIAR WITH THE

 9   COMPULSORY -- WELL, I WOULD SAY A LICENSE THAT WAS IMPOSED UPON

10   THE INFRINGER.

11   Q.   ARE YOU FAMILIAR --

12   A.   I DON'T BELIEVE I'VE TESTIFIED -- I PROVIDED TESTIMONY IN

13   THAT CASE, SO I'M NOT QUITE SURE WHAT YOU MEAN BY COMPULSORY

14   LICENSE.

15   Q.   DID YOU -- WERE YOU THE ONE WHO OPINED THAT FIVE PERCENT

16   WAS THE APPLICABLE ROYALTY RATE?

17   A.   I DIDN'T SAY ANYTHING ABOUT A FIVE PERCENT RATE.

18   Q.   I'M SORRY, THE ESTABLISHED RATE.  YOU SAID THERE WAS AN

19   ESTABLISHED RATE IN THAT CASE?

20   A.   THERE WERE 30 AGREEMENTS THAT WERE WITHIN EYELASHES OF

21   EACH OTHER, AND SO, YES, I OPINED AS TO THAT PARTICULAR RATE.

22   Q.   AND IN GRANTING THE COMPULSORY LICENSE, THE COURT ADOPTED

23   THE RATE -- THE ESTABLISHED RATE THAT YOU TESTIFIED ABOUT?

24   A.   THEY -- I'M NOT SURE THEY RELIED UPON MY TESTIMONY AS MUCH

25   AS THEY ESSENTIALLY LOOKED AT THE 30 DIFFERENT LICENSE
```

```
 1   AGREEMENTS AND USED THAT INFORMATION TO MAKE A DETERMINATION.

 2   Q.    ALL RIGHT.

 3   A.    I'M NOT SURE HOW --

 4   Q.    IN --

 5   A.    -- WHAT RELIANCE THEY PLACED ON MY TESTIMONY.

 6   Q.    IN DECIDING THE COMPULSORY ROYALTY RATE, SHOULD THIS COURT

 7   TAKE INTO ACCOUNT THE JURY VERDICT AT ALL?

 8   A.    THE -- IT WOULD SEEM TO ME THAT THE CHALLENGE IN TAKING

 9   ACCOUNT OF THE JURY VERDICT WOULD BE TO TRY TO UNDERSTAND HOW

10   THE JURY DETERMINED THAT AMOUNT AND WHAT IT TOOK INTO

11   CONSIDERATION AND WHAT EMPHASIS IT PLACED ON THE VARIOUS

12   INFORMATION AND EVIDENCE THEY HAD AVAILABLE TO IT.  SO I WOULD

13   BE -- IT WOULD BE -- OBVIOUSLY, THE COURT BEING MORE WISE THAN

14   I IN THESE SITUATIONS SHOULD DO WHAT IT SHOULD.  IF YOU'RE

15   ASKING ME WHAT I WOULD DO, I WOULD BE VERY CAUTIOUS IN USING

16   THAT INFORMATION IN ANY MEANINGFUL WAY.

17   Q.    SHOULD THE COURT CONSIDER THE GROSS AMOUNT AT ALL?

18   A.    I THINK THE -- AGAIN, I'M NOT HERE TO TELL THE COURT

19   EXACTLY WHAT TO DO.  IF YOU'RE ASKING WHAT I WOULD DO, I WOULD

20   CONSIDER IT IN THE CONTEXT OF ALL THE OTHER PIECES OF

21   INFORMATION, WHICH I BELIEVE MAY HAVE MORE RELEVANCE THAN AN

22   AMOUNT THAT IS UNKNOWN -- OF UNKNOWN DETERMINATION, OF UNKNOWN

23   EMPHASIS ON THE FACTORS TO CONSIDER.

24   Q.    AND AM I CORRECT THAT THIS IS THE FIRST CASE IN WHICH

25   YOU'VE BEEN CALLED AFTER A VERDICT TO TESTIFY ABOUT A
```

1  HYPOTHETICAL NEGOTIATION?

2  A.   YES.

3              MR. SAVIKAS:  NOTHING FURTHER, YOUR HONOR.

4              THE COURT:  ANY MORE QUESTIONS OR MAY THE

5  WITNESS STEP DOWN?

6              MR. VEDERKA:  I DON'T HAVE ANY REDIRECT, YOUR

7  HONOR.

8              THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

9              THE WITNESS:  THANK YOU, YOUR HONOR.

10             MR. ROBERTS:  IF I MAY, YOUR HONOR.

11             THE COURT:  COUNSEL, I THINK AT THIS TIME WHAT

12  WE'LL DO IS WE'RE GOING TO TAKE A BREAK UNTIL FIVE OF TO GIVE

13  THE COURT REPORTER AND EVERYBODY ELSE A LITTLE REST, AND THEN

14  WE'LL CONTINUE.  WE'LL BE IN RECESS UNTIL FIVE OF.

15             (RECESS.)

16             THE COURT:  GO AHEAD, COUNSEL.

17             MR. ROBERTS:  THANK YOU, YOUR HONOR.  JUST A

18  COUPLE OF COMMENTS.  I WOULD SUGGEST TO THE COURT THAT THE

19  REASON MR. NAPPER HAS NOT TESTIFIED ABOUT A NEW HYPOTHETICAL

20  NEGOTIATION IN POST VERDICT CASES BEFORE IS THAT IN THOSE CASES

21  WHAT WE TYPICALLY FIND IS THERE IS AN ESTABLISHED ROYALTY.  AND

22  BECAUSE THERE'S AN ESTABLISHED ROYALTY, THERE IS NO ANALYSIS

23  NEEDED.  THAT POINT REALLY HIGHLIGHTS THE FACT WHY IN THIS CASE

24  AN INJUNCTION SHOULD BE ISSUED BECAUSE OF THE DIFFICULTY IN

25  EVALUATING THE VALUE OF THE RIGHT TO EXCLUDE.

```
 1              THE OTHER POINT I WANTED TO MAKE HERE IS THAT
 2   BECAUSE DIRECTV'S INFRINGEMENT HAS BEEN DETERMINED TO BE
 3   WILLFUL, ANY ONGOING PRACTICE OF THE PATENT BY DIRECTV SHOULD
 4   BE SUBJECT TO TREBLE DAMAGES.  SO SHOULD THE COURT DECIDE TO
 5   ENTER A ROYALTY OR SOME OTHER COMPULSORY LICENSE GOING FORWARD,
 6   THE AMOUNT THAT DIRECTV SHOULD BE PAYING UNDER THAT SHOULD TAKE
 7   INTO ACCOUNT THE FACT THAT THAT REALLY IS WILLFUL INFRINGEMENT
 8   AND THAT WE'RE LICENSING WILLFUL INFRINGEMENT.
 9              THE COURT:  THAT'S A NEAT ARGUMENT, COUNSEL, BUT
10   AS A MATTER OF ALMOST LAW, ONCE A JURY HAS FOUND INFRINGEMENT
11   IN A TRIAL, ANY FUTURE USE OF THE -- OF THE PATENT OR OF THE
12   INVENTION WOULD ALMOST -- I MEAN, AS A MATTER OF LAW BE
13   WILLFUL.  HOW COULD IT BE OTHERWISE?  YOU KNOW FOR AN ABSOLUTE
14   FACT THAT YOU'RE INFRINGING, AND YOU DO IT ANYWAY.
15              MR. ROBERTS:  MY VERY POINT.
16              THE COURT:  YOU'RE GOING TO STAND UP AND SAY NO,
17   IT'S NOT WILLFUL.  SO THAT WOULD APPLY IN EVERY CASE WHETHER
18   THE JURY FOUND WILLFULNESS IN THE PAST OR NOT.  AND I'VE NEVER
19   SEEN A CASE THAT SAID:  WELL, ALL FUTURE DAMAGES SHOULD ALWAYS
20   BE TREBLED BECAUSE THEY'RE ALWAYS WILLFUL.  I MEAN, THAT --
21   UNLESS YOU'VE GOT A CASE TO THAT EFFECT.
22              MR. ROBERTS:  WELL, I BELIEVE THERE ARE SOME
23   CASES IN THE BRIEF WHERE IT TALKED ABOUT IMPOSING DAMAGES FOR A
24   PERIOD DURING, SAY, A STAY OF AN INJUNCTION AND WHERE THE COURT
25   ENHANCED THOSE DAMAGES BY A FURTHER AMOUNT.  I THINK THAT THE
```

```
 1   FACTOR 50 PERCENT --
 2             THE COURT:  WELL, IF YOU'RE -- BECAUSE IT'S NOT
 3   EXACTLY A COMPULSORY LICENSE.  IT'S A SHORT PERIOD OF TIME
 4   WHERE THEY'RE SAYING THERE SHOULDN'T BE AN INJUNCTION, WE WANT
 5   TIME FOR A STAY AND SO ON AND SO FORTH.
 6             MR. ROBERTS:  AND DURING MR. NAPPER'S
 7   EXAMINATION, I WENT BACK AND CHECKED THE COURT'S COMMENTS ON
 8   THE LAST DAY OF TRIAL AFTER THE JURY VERDICT CAME BACK.  AND
 9   ONE OF THE COMMENTS THE COURT MADE WAS THAT THE PATENT HAS
10   NEVER BEEN USED AND THAT WE HAD UNCONVERTED TESTIMONY BY
11   DR. LEVINSON TO THAT EFFECT.  AND I WOULD JUST MERELY POINT OUT
12   THAT IT WAS THAT VERY ARGUMENT THAT THE SUPREME COURT REJECTED
13   IN EBAY AS PROVIDING A CATEGORICAL APPROACH FOR DENYING AN
14   INJUNCTION.  AND IN FACT, THERE IS -- THE CONTINENTAL PAPER BAG
15   DECISION BY THE U.S. SUPREME COURT STANDS FOR THAT VERY
16   PROPOSITION.  IT SAYS THE FEDERAL COURTS HAVE THE RIGHT TO
17   ENTER AN INJUNCTION, EVEN THOUGH THE PATENTEE -- AND I THINK
18   THE LANGUAGE IN THAT DECISION WAS -- UNREASONABLY FAILED TO
19   PRACTICE THE INVENTION.  THE PROBLEM THAT WE'RE REALLY
20   FACING --
21             THE COURT:  LET ME MAKE IT VERY CLEAR FOR THE
22   RECORD, YES, YOU'RE CORRECT.  BUT THAT'S ALWAYS BEEN THE LAW.
23   YOU CAN'T JUST PICK ONE OF THE FOUR FACTORS AND IMPOSE A
24   CATEGORICAL DECISION ON INJUNCTIONS AND NONINJUNCTION.  BUT
25   JUST BECAUSE YOU CAN'T, THAT DOESN'T MEAN YOU SHOULDN'T
```

```
 1   CONSIDER THAT FACTOR.

 2              MR. ROBERTS:  RIGHT.  AND I'M JUST -- MY POINT

 3   IS WHEN YOU CONSIDER THAT FACTOR, BY NECESSITY COMES OUT IN

 4   FAVOR OF FINISAR.  THE OTHER POINT THE COURT MADE IN THOSE

 5   COMMENTS WAS THAT THE DETRIMENT TO THE PUBLIC.  AND HERE, OF

 6   COURSE, WE'RE NOT OPPOSING SOME SORT OF A PHASE OUT PERIOD IN

 7   ORDER TO ENABLE DIRECTV TO INTEGRATE DESIGN ALTERNATIVES.  OF

 8   COURSE, AS I MENTIONED THERE'S ALWAYS THE POSSIBILITY OF THEM

 9   NEGOTIATING A LICENSE.  THEY HAVE NOT MADE A CASE FOR THE

10   CRITICAL PUBLIC INTEREST, WHICH IS REALLY WHAT IS REQUIRED

11   UNDER THIS FACTOR.

12              FINALLY, I WOULD NOTE THAT BECAUSE OF THE

13   SITUATION HERE WHERE WE'RE TRYING TO VALUE WHAT THIS INJUNCTION

14   WOULD BE WORTH, WE'RE TRYING TO VALUE DAMAGES ONGOING, WE HAVE

15   THE ADDITIONAL PROBLEM THAT THERE ARE ISSUES WHERE FINISAR

16   WOULD HAVE A RIGHT TO A JURY TRIAL.  JURY TRIAL FACT ISSUES

17   ABOUT DAMAGES ARE NECESSARILY GOING TO ARISE AND, IN FACT, I

18   BELIEVE THAT'S WHY JUDGE DAVIS IN THE Z4 CASE SEVERED POST

19   VERDICT DAMAGES.  AND SO AGAIN WE SEE THE DIFFICULTY OF ONGOING

20   LITIGATION ARISING BY FAILURE TO ENTER THE INJUNCTION.  THAT'S

21   ALL WE HAVE FOR NOW, YOUR HONOR.

22              THE COURT:  ALL RIGHT.

23              MR. SAVIKAS:  YOUR HONOR, WE'RE GOING TO PRESENT

24   THE TESTIMONY OF RICH DONALDSON AND THEN THOMAS MCGEORGE, AND

25   THEN MR. CASTANIAS IS GOING TO MAKE THE ARGUMENTS --
```

```
1              THE COURT:  ALL RIGHT.

2              MR. SAVIKAS:  -- IN RESPONSE TO FINISAR'S CASE.

3   SO I'D LIKE TO CALL MR. RICHARD DONALDSON TO THE STAND, PLEASE.

4                    RICHARD DONALDSON,

5   HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

6           I D I R E C T   E X A M I N A T I O N

7   BY MR. SAVIKAS:

8   Q.   WOULD YOU STATE YOUR NAME FOR THE RECORD AGAIN, SIR.

9   A.   RICHARD DONALDSON.

10  Q.   AND ARE YOU THE SAME RICHARD DONALDSON WHO TESTIFIED AT

11  TRIAL ON THE APPROPRIATE DAMAGE ANALYSIS?

12  A.   YES, I AM.

13  Q.   SINCE THE DATE OF YOUR TESTIMONY, HAS YOUR OPINION ON THE

14  CORRECT REASONABLE ROYALTY RATE CHANGED AT ALL?

15  A.   NO, IT HAS NOT.

16  Q.   AND WHY NOT?

17  A.   BECAUSE I HADN'T SEEN ANYTHING NEW THAT WOULD CHANGE THE

18  ROYALTY STRUCTURE AS FAR AS WHAT WE'VE CALLED THE CONSUMER

19  ELECTRONICS ROYALTY MODEL.

20  Q.   NOW, TO GIVE CREDENCE AND HONOR TO THE JURY VERDICT, DO

21  YOU HAVE AN OPINION AS TO THE APPROPRIATE WAY TO COMPUTE

22  DAMAGES FROM THE DATE OF TRIAL TO THE EXPIRATION OF THE 505

23  PATENT SHOULD THE COURT GRANT A COMPULSORY LICENSE?

24  A.    YES, I DO.  I THINK BASICALLY TWO THINGS:  FIRST, THE

25  ROYALTY STRUCTURE WHICH WE'VE TALKED ABOUT WHICH I TESTIFIED
```

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

53

1    ABOUT BEING THE CONSUMER ELECTRONICS MODEL, WHICH IS A FIXED

2    FEE PER SET TOP BOX BASICALLY, I THINK THAT IS THE MODEL.    IT

3    APPEARS TO BE THE MODEL MOST CLOSELY ALIGNED WITH WHAT THE JURY

4    LIKELY DID, PLUS IT REPRESENTS OR IS CONSISTENT WITH INDUSTRY

5    PRACTICE, WHICH I DISCUSSED IN MY PRIOR TESTIMONY.    SO THE

6    ROYALTY STRUCTURE IS ASSUMING THE ELECTRONICS MODEL IS CORRECT,

7    AND ALSO LOOKING AT THE AMOUNT OF DAMAGES OR WHAT THE JURY

8    DETERMINED TO BE A REASONABLE ROYALTY, I THINK IF YOU COMPUTE

9    THAT IT COMES OUT TO $1.32 PER SET TOP BOX.    AND I THINK IF

10   THAT WERE CONTINUED FORWARD, THAT WOULD GIVE RECOGNITION OF THE

11   MAGNITUDE OF A REASONABLE ROYALTY THAT THE JURY CONSIDERED.

12               THE COURT:  ALL RIGHT.    LET ME -- LET ME ASK A

13   COUPLE OF QUESTIONS HERE.    THERE SEEMS TO HAVE BEEN A

14   TREMENDOUS AMOUNT OF PROBLEM COMING UP WITH A TOTAL OF NUMBER

15   OF SET TOP BOXES.    IN FACT, YOU YOURSELF EVEN THOUGH YOU WERE

16   THEIR EXPERT WEREN'T GIVEN THE TOTAL NUMBER UNTIL JUST BEFORE

17   TRIAL.    PLAINTIFFS EVEN OBJECTED TO THE LAST MINUTE CHANGE

18   WHERE I THINK YOU ALMOST CLOSE TO DOUBLED YOUR ESTIMATE.    HOW

19   CAN I NOW ENTER SOME KIND OF A JUDGMENT SAYING -- IT DOESN'T

20   MATTER WHAT IT IS, A DOLLAR, $2, $5 PER SET TOP BOX WHEN THEY

21   CAN'T TELL ME OR TELL ANYBODY ELSE HOW MANY SET TOP BOXES THEY

22   HAVE OR ARE INSTALLING?

23               THE WITNESS:  YOUR HONOR, I THINK THE NEXT

24   WITNESS WILL GO INTO MORE DETAIL, BUT WHAT HAS HAPPENED IS --

25               THE COURT:  ALL RIGHT.    IS YOUR NEXT WITNESS THE

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
54

1    ONE THAT'S GOING TO KNOW --

2              MR. SAVIKAS:  HE'LL KNOW ABOUT THE FUTURE, BUT

3    MR. DONALDSON CAN EXPLAIN WHAT THE PROBLEM WAS IN THE

4    CALCULATION.

5              THE COURT:  WELL, I'M NOT WORRIED ABOUT THE PAST

6    RIGHT NOW.  THE JURY HAS DONE THAT.  I'M WONDERING ABOUT THE

7    FUTURE AND THIS PROBLEM WAS SUCH A BIG PROBLEM IN THE PAST,

8    WHAT CONFIDENCE CAN I HAVE IT WON'T BE A BIG PROBLEM IN THE

9    FUTURE.

10             MR. SAVIKAS:  ALL RIGHT.

11             THE COURT:  GO AHEAD.  AND IF YOU'VE GOT ANOTHER

12   WITNESS WHO REALLY KNOWS THAT, THERE'S NO POINT IN WASTING -- I

13   MEAN, THIS WITNESS'S TIME ON THAT.

14             THE WITNESS:  I CAN JUST COMMENT VERY BRIEFLY,

15   AND THE WITNESS CAN GO INTO MORE DETAIL IS THAT DIRECTV HAS

16   CHANGED THE WAY THAT IT PURCHASES SET TOP BOX.  IT HAS A DIRECT

17   RELATIONSHIP NOW WITH ALL THE SET TOP BOX MANUFACTURERS WHERE

18   IT BUYS THE COMPLETE OUTPUT FOR DIRECTV USE.  AND BECAUSE OF

19   THAT, THEY NOW HAVE COMPLETE CONTROL OVER THE SET TOP BOXES,

20   AND IT'S A VERY EASY STRAIGHTFORWARD CALCULATION.  THEY KEEP

21   TRACK OF THIS, AND THE NUMBERS ARE VERY READILY AVAILABLE.

22             THE COURT:  ALL RIGHT.

23   Q.  (BY MR. SAVIKAS)  THIS $1.32 PER SET TOP BOX, HOW DOES

24   THAT COMPARE WITH THE RANGE OF ROYALTIES THAT YOU TESTIFIED

25   ABOUT AT TRIAL?

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
55

1    A.    WELL, IT FALLS WITHIN A CLUSTER.  I CONSIDERED A NUMBER OF

2    THINGS LOOKING AT RELEVANT LICENSES AT OR ABOUT THE TIME OF THE

3    HYPOTHETICAL NEGOTIATIONS.  AND THEY RANGE FROM LIKE TEN CENTS

4    TO 12 CENTS PER SET TOP BOX PER UNIT UP TO, YOU KNOW, THE IMPEG

5    LICENSES WHICH WERE 2.50 TO $4.  AND THEY WERE $4 AND THEN THEY

6    DECREASED TO 2.50.  THEN SOME OF THE STARSIGHT LICENSES FOR SET

7    TOP BOXES WERE IN THE RANGE OF 3.50 TO 5.50.

8                   THE COURT:  HOLD ON.

9    A.    $1.32 --

10                  THE COURT:  HOLD ON.  HOLD ON.  YOU SAID

11   STARSIGHT?

12                  THE WITNESS:  STARSIGHT, YES.

13                  THE COURT:  AND REFRESH MY MEMORY HOW

14   STARSIGHT -- ISN'T THAT TECHNOLOGY LICENSED BY DIRECTV?

15                  THE WITNESS:  IT'S -- LICENSES WERE WITH HUGHES

16   NETWORK SYSTEM, ONE OF THE OTHER DEFENDANTS.

17                  THE COURT:  AND WHAT WAS THE RANGE OF THAT?

18                  THE WITNESS:  IT WENT FROM 3.50 TO 5.50 PER SET

19   TOP BOX; AND STARSIGHT HAD, I THINK, SEVEN PATENTS THAT RELATED

20   TO ELECTRONIC PROGRAM GUIDES.

21                  THE COURT:  ALL RIGHT.  GO AHEAD.

22   Q.    (BY MR. SAVIKAS)  ARE YOU AWARE OF ANY LICENSE IN THE

23   SATELLITE TELEVISION BUSINESS THAT IS BASED ON A PERCENTAGE OF

24   GROSS REVENUE?

25   A.    NO, SIR, I AM NOT.

1  Q.   AND AS A PARADIGM FOR GOING FORWARD, WOULD IT BE

2  REASONABLE TO HAVE THE COURT -- I'M NOT -- HAVE THE COMPULSORY

3  LICENSE BASED ON A PERCENTAGE OF GROSS REVENUE?

4  A.   NO, I DON'T THINK IT WOULD BE BECAUSE INDUSTRY PRACTICE

5  DOESN'T REFLECT THAT.  I MEAN, IT'S -- SO I THINK IT WOULD NOT

6  BE APPROPRIATE.

7  Q.   ARE YOU IN AGREEMENT WITH MR. NAPPER'S OPINION THAT IT

8  WOULD NOW BE PROPER TO HAVE THE COURT CONDUCT THE NEW

9  HYPOTHETICAL NEGOTIATION AS OF JUNE 2006?

10  A.   NO, I'M NOT.

11  Q.   WHY NOT?

12  A.   WELL, FOR -- FOR A NUMBER OF REASONS.  FIRST OF ALL, ALL

13  THE -- WHAT I THINK THE RELEVANT ISSUES WERE, IF YOU LOOK AT --

14  WERE CONSIDERED AT THE ORIGINAL, WERE CONSIDERED IN MY ANALYSIS

15  AND ALSO IN MR. NAPPER'S ANALYSIS, WILL YOU CONSIDER WERE THE

16  HYPOTHETICAL NEGOTIATIONS, THE PATENTS VALID, PATENTS

17  INFRINGED?  YOU LOOK AT WHETHER THE LICENSE IS EXCLUSIVE OR

18  NONEXCLUSIVE.  YOU LOOK AT THE LIFE OF THE PATENT.  YOU LOOK AT

19  THE IMPORTANCE OF THE TECHNOLOGY.  AND YOU LOOK AT ALL THESE

20  THINGS AND DETERMINE WHAT IS A REASONABLE ROYALTY FOR THE LIFE

21  OF THE PATENT IF THE PARTIES ACTUALLY SIT DOWN AND NEGOTIATED.

22  NONE OF THAT HAS CHANGED, SO I DON'T THINK YOU NEED -- I DON'T

23  SEE WHAT WOULD BE ADDED BY A NEW HYPOTHETICAL NEGOTIATIONS.

24  AND THE DIFFICULTY WITH NEW HYPOTHETICAL NEGOTIATIONS, IF YOU

25  DID IT IN 2006, YOU KNOW, ONE OF THE GROUND RULES FOR

```
 1   HYPOTHETICAL NEGOTIATIONS IS THAT BB4 INFRINGEMENT COMMENCES.

 2   THAT'S TO DO AWAY WITH THIS DISTORTION OF WHAT A FAIR VALUE FOR

 3   THE PATENT WOULD BE BECAUSE OF THE THREAT OF LITIGATION.  AND

 4   THAT'S EXACTLY WHAT WOULD HAPPEN IF YOU HAD NEW HYPOTHETICAL

 5   NEGOTIATIONS NOW.

 6   Q.   DO YOU AGREE THAT FINISAR'S ABILITY, AS THEY SAY IN THEIR

 7   BRIEF, TO GRANT EXCLUSIVE LICENSES WOULD BE DESTROYED IF THE

 8   COURT DOES NOT ORDER AN INJUNCTION?

 9   A.   NOT AT ALL.

10   Q.   AND WHY NOT, SIR?

11   A.   BECAUSE IT'S VERY COMMON IN LICENSING -- AND I'VE BEEN

12   ENGAGED IN A NUMBER OF LICENSES WHERE THERE IS A PREEXISTING

13   LICENSE AND A COMPANY NOW -- A PATENT OWNER NOW CHOOSES IT --

14   CHOOSES TO LICENSE IT AND WILL GRANT AN EXCLUSIVE LICENSE TO

15   SOMEONE ELSE SUBJECT TO THE EXISTING LICENSE.  SO, FOR EXAMPLE,

16   FINISAR COULD GRANT AN EXCLUSIVE LICENSE TO STARSIGHT SATELLITE

17   OR SIRIUS SATELLITE FOR RADIO SATELLITE BROADCASTING SUBJECT TO

18   WHATEVER RIGHTS DIRECTV MIGHT HAVE.  BUT IT DOESN'T -- THAT

19   DOES NOT DESTROY YOUR RIGHT TO GRANT SUBSEQUENT EXCLUSIVE

20   LICENSES.  IT JUST HAS TO SUBJECT TO.

21   Q.   HAVE YOU EVER BEEN INVOLVED IN A COURT CASE IN WHICH YOU

22   TESTIFIED AS TO A LUMP SUM ROYALTY FOR THE ENTIRE LIFE OF THE

23   PATENT WHICH WAS THEN ALLOCATED BY THE COURT?

24   A.   WELL, YES, THE -- UNDER APPROPRIATE CIRCUMSTANCES, YOU MAY

25   COME UP WITH A LUMP SUM.  IN A HYPOTHETICAL NEGOTIATION, YOU
```

 1  MAY DETERMINE THAT A REASONABLE ROYALTY IS A LUMP SUM FOR THE

 2  LIFE OF THE PATENT.  AND THEN TO -- IT IS NECESSARY TO ALLOCATE

 3  THAT LUMP SUM BACK TO THE DATE OF THE TRIAL.  AND I'VE DONE

 4  THAT ON MORE THAN ONE OCCASION, AND THAT WAS THE APPROPRIATE

 5  ANALYSIS.

 6  Q.    OKAY.  DO YOU AGREE WITH FINISAR'S POSITION AS STATED IN

 7  THEIR BRIEF THAT THEY WOULD NOT BE ABLE TO SELL ITS PATENT

 8  UNLESS THE COURT ORDERS AN INJUNCTION?

 9  A.    NO, I DON'T SEE HOW THAT CHANGES AT ALL.  THEY COULD --

10  THEY COULD SELL IT TO ANYONE WHO MIGHT HAVE WANT TO BUY IT.  IT

11  WOULD STILL BE SUBJECT TO WHATEVER ENCUMBRANCES THERE ARE,

12  WHICH MIGHT BE A LICENSE TO DIRECTV.  BUT THEY COULD STILL SELL

13  IT.

14  Q.    DO YOU AGREE THAT ANY COURT ORDERED ROYALTY WOULD HAVE AN

15  IMPACT ON FINISAR'S LICENSING EFFORTS?

16  A.    YES.  IT WILL HAVE AN EFFECT.  IT'S GOT TO HAVE AN EFFECT.

17  THE VERY FACT -- WHETHER THERE'S A COMPULSORY LICENSE OR NOT,

18  THE VERY FACT THAT THE JURY DECIDED WHAT A REASONABLE ROYALTY

19  WOULD BE, AND THAT'S PUBLIC INFORMATION, THAT'S GOING TO HAVE

20  AN EFFECT ON WHAT HAPPENS IN THE FUTURE.  I MEAN, THAT'S THE

21  WAY IT IS IN REAL LIFE.

22  Q.    YOU HEARD MR. NAPPER TESTIFY ABOUT THE GEM STAR LICENSE.

23  DOES THE GEM STAR LICENSE COMPORT WITH YOUR TESTIMONY ABOUT THE

24  INDUSTRY'S STANDARD IN THIS CASE?

25  A.    NOT REALLY.  I THINK GEM STAR IS SOMEWHAT OF AN ANOMALY



```
 1   FOR A NUMBER OF REASONS.

 2   Q.    WHAT ARE THE REASONS?

 3   A.    WELL, ONE THING, IT'S NOT A PATENT ONLY LICENSE.    THERE

 4   ARE OTHER -- OTHER RIGHTS THAT ARE INCLUDED IN THE GEM STAR,

 5   SOME SERVICES, SOME RIGHTS TO DATA, TRADEMARKS, THINGS OF THAT

 6   NATURE.   ANOTHER THING IS THE GEM STAR PATENT PORTFOLIO IS A

 7   COMBINATION OF THREE PATENT PORTFOLIOS.   YOU HAVE GEM STAR, YOU

 8   HAVE TV GUIDE, AND YOU HAVE STARSIGHT.   GEM STAR PURCHASED TV

 9   GUIDE AND STARSIGHT.   AND ALL OF THOSE PATENTS TOGETHER,

10   THERE'S OVER 200 PATENTS THAT DIRECTLY RELATE TO ELECTRONIC

11   PROGRAM GUIDES.   SO JUST A NUMBER OF PATENTS AND THE FACT THAT

12   THREE PATENT PORTFOLIOS WERE INVOLVED.   ALSO, AT THE TIME OF

13   THE GEM STAR LICENSE, YOU KNOW, GEM STAR AND DIRECTV WERE

14   BASICALLY SISTER COMPANIES.   NEWS CORP OWNED 80 PERCENT OF GEM

15   STAR AND THEN PURCHASED DIRECTV, SO THAT CERTAINLY FIGURED IN

16   THE OVERALL LICENSING STRUCTURE.

17   Q.    IS IT STILL YOUR OPINION THAT THE APPROPRIATE MODEL IN THE

18   SATELLITE INDUSTRY AND CONSUMER ELECTRONICS INDUSTRY IS A PER

19   SET TOP BOX MODEL?

20   A.    YES, SIR, IT IS.

21   Q.    DOES THE IMPEG ARRANGEMENT CONTINUE TO REPRESENT THE

22   INDUSTRY PRACTICE?

23   A.    YES, IT IS A VERY GOOD EXAMPLE.

24   Q.    AND IS YOUR ANALYSIS BASED ONLY THE IMPEG LICENSE?

25   A.    NO.    THERE ARE -- THERE ARE OTHER LICENSING ARRANGEMENTS
```

1   THAT, YOU KNOW, I THINK I DISCUSSED IN MY TESTIMONY.  LIKE

2   DOLBY, LIKE STARSIGHT, LIKE THOMPSON AND HNS, SET TOP BOX

3   LICENSE AGREEMENTS, THINGS OF THIS NATURE.

4   Q.   OKAY.  AND FINALLY WITH RESPECT TO YOUR DAMAGE REPORT

5   WHERE WE HAD SOME DIFFICULTY, WAS THAT DIFFICULTY CAUSED BY

6   TRYING TO ASCERTAIN HOW MANY SET TOP BOXES HAD BEEN ACTIVATED

7   IN THE PAST?

8   A.   YES.  THAT WAS THE -- THAT WAS THE DIFFICULTY.

9   Q.   OKAY.

10              MR. SAVIKAS:  NOTHING FURTHER.  THANK YOU.

11              THE COURT:  LET ME -- DO YOU RECALL THE RANGE

12   FOR THE DOLBY SET OF PATENTS?

13              THE WITNESS:  YES, SIR.  IT WENT FROM 12 CENTS

14   PER UNIT UP TO $1.65, AND IT WAS BASED ON VOLUME.  THE 12 CENTS

15   WAS -- I FORGET HOW MANY, MAYBE OVER THREE MILLION UNITS.  YOU

16   GOT A VOLUME DISCOUNT THEN, THAT WENT ALL THE WAY DOWN TO 12

17   CENTS.

18              THE COURT:  AND YOU SAID THE THOMPSON?

19              THE WITNESS:  THOMPSON, I BELIEVE, WAS $2.50 A

20   SET TOP BOX AT THAT TIME.

21              THE COURT:  GEM STAR, AS I UNDERSTAND, IS THAT

22   THE 20 CENTS PER SUBSCRIBER PER MONTH?

23              THE WITNESS:  THAT IS CORRECT; YES, SIR.

24              THE COURT:  ALL RIGHT.  THANK YOU.  DO YOU HAVE

25   ANY QUESTIONS?

1              MR. VEDERKA:  I DO, YOUR HONOR.

2              C R O S S    E X A M I N A T I O N

3    BY MR. VEVERKA:

4    Q.   GOOD AFTERNOON, MR. -- WELL, I GUESS IT'S STILL MORNING,

5    MR. DONALDSON.

6    A.   GOOD MORNING.

7    Q.   AGAIN, THIS IS C. J. VEVERKA ON BEHALF OF FINISAR.

8    MR. DONALDSON, IS IT YOUR UNDERSTANDING THAT DIRECTV HAS

9    SEVERAL NON-INFRINGING ALTERNATIVES IT COULD QUICKLY PUT INTO

10   PLACE IF IT WANTED TO OR NEEDED TO?

11   A.   MY ANALYSIS AT THE TIME OF HYPOTHETICAL NEGOTIATIONS IN

12   1995, AND IN 1995 THEY CERTAINLY DID.  I HAVE NOT ANALYZED WHAT

13   WOULD HAPPEN TODAY.

14   Q.   SO YOU -- YOU CAN'T TESTIFY ONE WAY OR THE OTHER IF THERE

15   EXISTS SUBSTANTIAL NON-INFRINGING ALTERNATIVES TO DIRECTV

16   TODAY?

17   A.   I HAVE NOT ANALYZED THAT; NO, SIR.

18   Q.   I BELIEVE YOU TESTIFIED THAT THE -- WELL, LET ME ASK YOU

19   THIS QUESTION:  YOU HAVE NOT CONTACTED ANYONE FROM THE JURY,

20   HAVE YOU?

21   A.   NO, SIR.

22   Q.   AND YOU'RE NOT AWARE OF ANYONE FROM DIRECTV OR DIRECTV'S

23   COUNSEL CONTACTING ANYONE FROM THE JURY?

24   A.   NO, SIR.

25   Q.   AND SO YOU REALLY DON'T KNOW WHAT METHODOLOGY THAT THE

```
 1   JURY USED IN DETERMINING ITS ROYALTY -- ITS DAMAGE AMOUNT,

 2   CORRECT?

 3   A.    I CANNOT KNOW PRECISELY.

 4   Q.    AND YOU ALSO DON'T KNOW THAT -- THAT MEANS YOU DON'T KNOW

 5   THAT THE JURY ADOPTED YOUR PER SET TOP BOX METHODOLOGY; ISN'T

 6   THAT ALSO CORRECT?

 7   A.    I DO NOT KNOW THAT FOR ABSOLUTE CERTAINTY; IT'S CERTAINLY

 8   LIKELY.

 9   Q.    YOU BELIEVE IT'S CERTAINLY LIKELY.  YOU'RE BASING THAT ON

10   YOUR SPECULATION, THOUGH, BECAUSE YOU DON'T KNOW WHAT HAPPENED

11   IN THIS JURY ROOM; IS THAT CORRECT?

12   A.    NO.  WHAT I'M BASING IT ON IS THE CLUSTER OF ROYALTY RATES

13   I TALKED ABOUT AND THE $1.32 FALLING RIGHT IN THE MIDDLE OF

14   THAT MAKES IT HIGHLY LIKELY THAT THEY USED THAT APPROACH.

15   Q.    YOU'RE SAYING YOU HAVE A GUESS, BUT IT'S EDUCATED?

16   A.    I THINK IT'S EDUCATED; YES, SIR.

17   Q.    BUT IT'S STILL A GUESS, ISN'T IT?

18   A.    I'M NOT GOING TO ARGUE ABOUT SEMANTICS.

19   Q.    NOW YOU ARGUED ABOUT A CLUSTER OF RANGES FOR SET TOP BOX

20   AGREEMENTS THAT YOU -- THAT YOU CONSIDERED OR TESTIFIED ABOUT.

21   I BELIEVE THAT YOU STATED THERE WAS A RANGE OF TEN CENTS TO

22   $2.50; IS THAT RIGHT?

23   A.    UP TO $5.50.

24   Q.    UP TO $5.50.  BUT IT WASN'T YOUR -- YOU TESTIFIED TO THE

25   JURY THAT THE APPROPRIATE AMOUNT WOULD BE 30 SOME CENTS PER SET
```

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

63

1    TOP BOX, DIDN'T YOU?

2    A.    THAT IS CORRECT; YES, SIR.

3    Q.    YOU DIDN'T TELL THE JURY I BELIEVE THAT YOU SHOULD

4    CONSIDER THIS RANGE OF TEN CENTS TO $5 PER SET TOP BOX AND

5    FIGURE OUT A CALCULATION OF DAMAGES WITHIN THAT RANGE ON YOUR

6    OWN, DID YOU?

7    A.    NO.  I TESTIFIED TO THE JURY THE DIFFERENT RATES AND SAID

8    IT WAS MY CONCLUSION IT SHOULD BE 30 CENTS.

9    Q.    RIGHT.  SO YOU DIDN'T GIVE THE JURY A RANGE OF SET TOP

10   BOX -- LUMP SUM PER SET TOP BOX AMOUNTS TO CHOOSE FROM; YOU

11   TOLD THEM WHAT YOU THOUGHT THE RANGE -- WHAT THE PRECISE NUMBER

12   SHOULD HAVE BEEN?

13   A.    YES.  BECAUSE IN THE RANGE THAT I LOOKED AT, YOU THEN HAVE

14   TO LOOK AT THE GEORGIA PACIFIC FACTORS, THE AVAILABILITY OF

15   NONINFRINGING ALTERNATIVES TO ADJUST THAT RANGE, AND I DID ALL

16   THAT ANALYSIS AND DETERMINED IT WOULD BE 30 CENTS.

17   Q.    I JUST WANT CLARIFY THAT YOU DIDN'T PROPOSE THAT RANGE TO

18   THE JURY FOR THEM TO USE THEMSELVES TO MAKE THEIR OWN

19   CALCULATION?

20   A.    NO.  I DID DISCUSS THE DIFFERENT ROYALTY RATES, HOWEVER.

21   Q.    NOW AT TRIAL, MR. DONALDSON, I BELIEVE YOU ACKNOWLEDGED

22   THAT SOME OF THE AGREEMENTS YOU CONSIDERED IN MAKING YOUR

23   CALCULATIONS WERE ENTERED INTO BY DIRECTV AND SOME OTHERS LIKE

24   HUGHES NETWORK SYSTEM; ISN'T THAT CORRECT?

25   A.    THAT IS CORRECT.

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

64

```
1    Q.    AND, FOR EXAMPLE, ONE OF THE AGREEMENTS ENTERED INTO BY

2    DIRECTV WAS THE MACROVISION AGREEMENT; ISN'T THAT ALSO CORRECT?

3    A.    THAT IS CORRECT.

4    Q.    AND THAT AGREEMENT WAS NOT ENTERED INTO BY HUGHES NETWORK

5    SYSTEMS?

6    A.    THAT IS ALSO CORRECT.

7    Q.    AND I BELIEVE THAT YOU ALSO CHARACTERIZED THE MACROVISION

8    AGREEMENT AS INCLUDING A RUNNING ROYALTY STRUCTURE; THAT'S

9    CORRECT, ISN'T IT?

10   A.    YES.  THAT'S CORRECT.

11   Q.    NOW, ANOTHER AGREEMENT THAT YOU HIGHLIGHTED WE'VE TALKED

12   ABOUT IT TODAY WAS THE IMPEG AGREEMENT.

13             THE COURT:  AND WHAT WAS THE MACROVISION RUNNING

14   ROYALTY AGREEMENT RATE?  I'M SURE YOU'RE GOING TO FOLLOW UP,

15   COUNSEL, BUT I'D LIKE TO WRITE IT DOWN NOW.

16             THE WITNESS:  IT'S -- THEY HAVE THREE DIFFERENT

17   RANGES DEPENDING UPON WHETHER ITS CONTENTS PROTECTION FOR PAY

18   PER VIEW AND IT WAS JUST BASIC, IT WAS 0.75 PERCENT OF WHAT

19   DIRECTV CHARGED TO A CUSTOMER FOR THAT PAY PER VIEW EVENT.

20   THEY WERE --

21             THE COURT:  ZERO WHAT?

22             THE WITNESS:  0.75 PERCENT, SO LESS THAN ONE

23   PERCENT.  SO, IF THEY PAID $3, IT WOULD BE LESS THAN ONE

24   PERCENT OF THE $3 WOULD BE THE ROYALTY RATE.  AND THEN THEY HAD

25   TWO OTHER -- THREE OTHER CATEGORIES, TWO OF THEM THE SAME.
```

1    THEY HAD AN EARLY VIEW WINDOW, SOMETHING TO THAT EFFECT, WHERE

2    YOU GOT AN EARLY RELEASE OF A MOVIE.  THEN THE RATE WOULD BE, I

3    BELIEVE, IT WAS ONE PERCENT OF WHAT THE CUSTOMER PAID OR THREE

4    PERCENT OF ROUGHLY THE GROSS PROFITS.  IT WAS WHAT THE CUSTOMER

5    PAID, SUBTRACT WHAT DIRECTV HAD TO PAY TO GET THAT PROGRAMMING.

6    AND THEN IT WOULD BE LIKE THREE PERCENT OF THAT; OR FOR REAL,

7    REAL EARLY REVIEW, IT WOULD BE FOUR PERCENT OF THAT BASICALLY

8    GROSS PROFIT.

9                    THE COURT:  I RECALL THE TESTIMONY NOW.  GO

10   AHEAD.

11   Q.   (BY MR. VEVERKA)  NOW WITH RESPECT TO THE IMPEG AGREEMENT,

12   THAT WAS ENTERED INTO BY HUGHES NETWORK SYSTEMS, CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   I BELIEVE YOU TESTIFIED THAT DIRECTV DID NOT ENTER INTO

15   THAT AGREEMENT?

16   A.   THAT IS CORRECT.

17   Q.   AND I BELIEVE THAT YOU WENT ON RECORD BOTH AT TRIAL AND IN

18   YOUR DAMAGE REPORT ARTICULATING THAT BOTH DIRECTV AND HUGHES

19   NETWORK SYSTEMS HAS ENTIRELY DIFFERENT BUSINESS MODELS?

20   A.   THEY HAD DIFFERENT BUSINESS MODELS.

21   Q.   HUGHES NETWORK SYSTEMS BEING A HARDWARE MANUFACTURER,

22   CORRECT?

23   A.   THAT WOULD BE ONE OF THE DIFFERENCES, YES.

24   Q.   MR. DONALDSON, YOU'RE FAMILIAR WITH THE 25 PERCENT RULE OR

25   THE RULE OF THUMB METHODOLOGY COMMONLY USED IN PATENT DAMAGES

```
 1   CALCULATIONS, AREN'T YOU?

 2   A.   I'M AWARE OF THE 25 PERCENT RULE.  HOW COMMONLY IT'S USED

 3   IS UP IN THE AIR.

 4   Q.   I BELIEVE IN YOUR EXPERT REPORT YOU DESCRIBED IT AS A RULE

 5   OR METHODOLOGY COMMONLY USED?

 6   A.   OKAY.

 7   Q.   YOU WOULD AGREE WITH THAT?  THAT'S FAIR?

 8   A.   THAT'S FAIR.

 9   Q.   OKAY.  AND YOU ALSO STATED IN YOUR EXPERT REPORT THAT THE

10   RULE OR METHODOLOGY IS MOST PROPERLY APPLIED TO PROFIT FROM

11   OPERATIONS, PARTICULARLY IN HIGH TECH INDUSTRIES, SUCH AS DBS;

12   IS THAT ALSO CORRECT?

13   A.   I BELIEVE SO.

14   Q.   AND WHEN YOU SAY PROFITS OF OPERATIONS, YOU MEAN

15   OPERATION -- THAT'S CALLED OPERATING PROFITS; IT'S ANOTHER WAY

16   OF SAYING OPERATING PROFITS, ISN'T IT?

17   A.   IT IS.

18   Q.   WHAT IS YOUR UNDERSTANDING THE DIFFERENCE BETWEEN

19   OPERATING PROFITS AND, SAY, OTHER TYPES OF PROFITS?

20   A.   WELL, THERE'S A NUMBER OF MEASURES.  THE MOST COMMON WOULD

21   BE GROSS PROFITS WHICH IS JUST REVENUES -- BASICALLY REVENUES

22   MINUS COST OF GOODS.  THEN YOU HAVE PROFIT FROM OPERATIONS,

23   WHICH DEDUCTS ADDITIONAL EXPENSES, OVERHEAD, R&D, THINGS OF

24   THAT NATURE.  THEN YOU HAVE NET PROFIT, WHICH IS STILL A

25   FURTHER -- YOU HAVE NET PROFIT BEFORE TAX, NET PROFIT AFTER
```

```
 1   TAX, SO THE VARIOUS MEASURES.
 2   Q.    OKAY.  AND UNDER THE -- UNDER THE 25 PERCENT RULE OR THE
 3   RULE OF THUMB, A LICENSEE PAYS 25 PERCENT OF ITS OPERATIONAL
 4   PROFITS TO THE PATENTEE, CORRECT?
 5   A.    WELL, THAT'S NOT WHAT THE 25 PERCENT RULE SAYS.  IT'S A
 6   TOOL THAT YOU MIGHT USE AS A STARTING POINT.  IT DOESN'T SAY
 7   DIRECTLY YOU APPLY THE 25 PERCENT RULE, AND THAT'S IT.  IT'S A
 8   STARTING POINT.  IT'S A TOOL.  BUT IT DOES RELATE TO PROFIT
 9   FROM OPERATIONS AS THE BEST MEASURE.
10   Q.    25 PERCENT AND OPERATIONAL PROFITS IS THE STARTING POINT
11   UNDER THAT RULE, CORRECT?
12   A.    THAT IS -- THAT'S THE MOST COMMONLY USED.
13   Q.    AND THAT -- AND THAT IS BASED ON REVENUE; THAT'S NOT ON A
14   LUMP SUM BASIS, CORRECT, WHEN YOU'RE TALKING IN TERMS OF
15   OPERATIONAL PROFIT?
16   A.    IT'S BASED UPON THE AMOUNT OF OPERATIONAL PROFIT.
17   Q.    OKAY.  ARE YOU AWARE THAT DIRECTV FORECASTS OPERATING
18   PROFIT FOR 2006 TO 2012 RANGING FROM 5.3 PERCENT TO 11.7
19   PERCENT?
20   A.    I THINK THAT MIGHT BE CORRECT IN ONE OF THE FORECASTS.
21   Q.    OKAY.
22               THE COURT:  WHAT WERE THOSE NUMBERS AGAIN?
23               MR. VEVERKA:   FROM 2006 TO 2012 OPERATING
24   PROFITS ARE FORECAST AS RANGING FROM 5.3 PERCENT TO 11.7
25   PERCENT.
```

```
 1              THANK YOU, MR. DONALDSON.  THAT'S ALL THE

 2   QUESTIONS I HAVE.

 3              MR. SAVIKAS:  JUST ONE OR TWO QUESTIONS, YOUR

 4   HONOR.

 5          R E D I R E C T   E X A M I N A T I O N

 6   BY MR. SAVIKAS:

 7   Q.   MR. DONALDSON, MR. VEVERKA ASKED YOU ABOUT THE

 8   IMPEG-DIRECTV RELATIONSHIP.  UNDER THIS NEW PARADIGM WHERE

 9   DIRECTV BUYS ALL OF THE OUTPUT FROM THE BOX MANUFACTURERS, HOW

10   IS THE LICENSING IN INTELLECTUAL PROPERTY HANDLED?

11   A.   DIRECTV SPECIFIES TO THE SET TOP MANUFACTURERS THOMPSON,

12   SONY, WHOMEVER THEY ARE, WHAT THAT SET TOP BOX HAS TO INCLUDE,

13   THE SPECIFICATION.  THEY ALSO SPECIFY THAT THEY WILL OBTAIN THE

14   LICENSES NECESSARY TO OPERATE, INCLUDING IMPEG, DOLBY, THINGS

15   OF THIS NATURE.  AND THOSE -- THE COST OF THOSE LICENSES ARE --

16   ARE PART OF THE BILL AND MATERIALS FOR THOSE SET TOP BOXES THAT

17   DIRECTV THEN PAYS FOR.  SO DIRECTV DIRECTS THEM TO OBTAIN THOSE

18   LICENSES ON THAT BEHALF OF DIRECTV, AND THEN THEY PAY THE SET

19   TOP BOX.  THEY REIMBURSE THEM FOR THEM BASICALLY.

20              MR. SAVIKAS:  ALL RIGHT.  THANK YOU, SIR.

21   NOTHING FURTHER.

22              THE COURT:  ANYTHING FURTHER?  ALL RIGHT.  YOU

23   MAY STEP DOWN.

24              THE WITNESS:  THANK YOU.

25              MR. SAVIKAS:  WE CALL THOMAS MCGEORGE.
```

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
69

1                          **THOMAS MCGEORGE,**

2    HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

3                 R E D I R E C T   E X A M I N A T I O N

4    BY MR. SAVIKAS:

5    Q.    WOULD YOU STATE YOUR FULL NAME FOR THE RECORD, SIR.

6    A.    MY NAME IS THOMAS MCGEORGE.

7    Q.    AND ARE YOU EMPLOYED BY DIRECTV, INC.?

8    A.    YES, I AM.

9    Q.    AND WHAT IS YOUR CURRENT TITLE?

10   A.    I'M CURRENTLY VICE PRESIDENT OF SUPPLY CHAIN MANAGEMENT

11   FOR DIRECTV.

12   Q.    AND WHAT ARE YOUR PRESENT RESPONSIBILITIES?

13   A.    MY PRESENT RESPONSIBILITY IS TO PLAN AND PURCHASE FOR

14   DIRECTV ALL THEIR EQUIPMENT NEEDS.

15   Q.    AS OF TODAY, WOULD YOU DESCRIBE HOW DIRECTV BUYS AND

16   DISTRIBUTES ITS SET TOP BOXES?

17   A.    SURE.  WE PURCHASE EQUIPMENT FROM SET TOP BOXES FROM SEVEN

18   TO EIGHT DIFFERENT MANUFACTURERS DIRECTLY.  THEY MANUFACTURE

19   AND SELL DIRECTV BRANDED BOXES TO US.  WE MOVE THOSE BOXES INTO

20   OUR WAREHOUSING SYSTEM.  AND THEN SUBSEQUENTLY WE REDISTRIBUTE

21   THOSE BOXES TO OUR INSTALLERS FOR CUSTOMER INSTALLATION.

22   Q.    DO THE MANUFACTURERS SELL THEIR DIRECTV BOXES TO ANYBODY

23   ELSE?

24   A.    NO, THEY DON'T.  THEY'RE EXCLUSIVE TO US.

25   Q.    IF I WERE TO GO TO BEST BUY OR CIRCUIT CITY AND BUY A

1  DIRECTV BOX, WHERE WOULD THAT BOX COME FROM?

2  A.    THAT BOX WOULD COME THROUGH THE SUPPLY CHAIN ORGANIZATION

3  AT DIRECTV.  WE WOULD DISTRIBUTE THAT BOX FROM OUR WAREHOUSE TO

4  A BEST BUY OR CIRCUIT CITY.

5  Q.    HOW MANY WAREHOUSES DO YOU HAVE?

6  A.    WE CURRENTLY HAVE THREE WAREHOUSES.

7  Q.    AND DO THE SET TOP BOX MANUFACTURERS EVER DROP SHIP ANY

8  DIRECTV BOXES?

9  A.    95 PERCENT OF THE BOXES THAT WE BUY COME THROUGH OUR

10 WAREHOUSING SYSTEM.  FIVE PERCENT -- ROUGHLY FIVE PERCENT OF

11 THE BOXES GO DIRECT FROM THE MANUFACTURER TO OUR CUSTOMER.

12 ELECTRONICALLY WE HANDLE THAT TRANSACTION THROUGH OUR

13 WAREHOUSE.  WE JUST DON'T PHYSICALLY HANDLE THE SET TOP BOX

14 MOVING THROUGH OUR WAREHOUSE.

15 Q.    NOW, HOW LONG HAS DIRECTV HAD IN PLACE THIS METHOD OF

16 PURCHASING ITS BOXES?

17 A.    WE TOOK OVER FULL FULFILLMENT, FULL ACQUISITION AND

18 DISTRIBUTION EARLY 2005.

19 Q.    AND BEFORE THAT DATE, HOW WERE THE SET TOP BOXES

20 DISTRIBUTED?

21 A.    ROUGHLY BEFORE 2005 ROUGHLY 20 TO 30 PERCENT OF THE SET

22 TOP BOXES WERE PURCHASED BY DIRECTV AND REDISTRIBUTED BY

23 DIRECTV.  THE OTHER 70 TO 80 PERCENT WERE MANUFACTURED BY THE

24 MANUFACTURERS, AND THEY HANDLED THE RELATIONSHIP WITH THE

25 CUSTOMER, BOTH FROM DISTRIBUTING THE EQUIPMENT AS WELL AS

1  TAKING CALLS IF THEY HAD A PIECE -- IF THEY HAD A PROBLEM WITH

2  THE EQUIPMENT.

3  Q.    AND THAT SYSTEM IS TOTALLY CHANGED TODAY?

4  A.    THAT'S CORRECT.

5  Q.    WHAT KIND OF MANAGEMENT OR INVENTORY SYSTEM DO YOU EMPLOY?

6  A.    WE USE A -- SAP SYSTEM, R3, THEY CALL IT.  IT'S AN

7  INVENTORY TRACKING SYSTEM.  WE USE THAT SYSTEM AS OUR INVENTORY

8  OF RECORD.

9  Q.    AND DOES IT KEEP TRACK OF ALL OF YOUR INVENTORY WHETHER IT

10 COMES DIRECTLY TO YOU OR IS DROP SHIPPED?

11 A.    ALL INVENTORY THAT WE MANAGE BOTH WITHIN OUR WAREHOUSE AS

12 WELL AS DROP SHIP IS MANAGED THROUGH OUR SAP R3 SYSTEM.

13 Q.    IF THE COURT WERE TO REQUIRE DIRECTV TO PROVIDE FINISAR

14 AND THIS COURT WITH MONTHLY OR QUARTERLY REPORTS OF ALL SET TOP

15 BOXES SHIPPED BY DIRECTV OR DROP SHIPPED BY MANUFACTURERS,

16 COULD YOU PROVIDE SUCH REPORTS?

17 A.    YES, WE COULD.

18 Q.    AND COULD YOU PROVIDE SUCH REPORTS QUICKLY?

19 A.    YES, WE COULD.

20 Q.    AND WOULD THOSE REPORTS BE ACCURATE?

21 A.    YES, THEY WOULD BE.

22 Q.    WHY DO YOU SAY THEY WOULD BE ACCURATE?

23 A.    WELL, WE TAKE A LOT OF -- WE PAY A LOT OF ATTENTION TO THE

24 INTEGRITY OF THE INFORMATION AND OUR INVENTORY SYSTEM.  WE

25 ACTUALLY COUNT PARTS EVERY DAY AND RECONCILE DAILY TO INSURE

1   THAT THE INTEGRITY OF THE INFORMATION IS ACCURATE.

2   Q.    AND UNDER OATH YOU COULD CONFIRM THE ACCURACY OF YOUR

3   INVENTORY SYSTEM?

4   A.    YES, I CAN.

5              MR. SAVIKAS:  THANK YOU.  NOTHING FURTHER, YOUR

6   HONOR.

7              C R O S S   E X A M I N A T I O N

8   BY MR. ROBERTS:

9   Q.    CHARLES ROBERTS FOR FINISAR.  MR. MCGEORGE, IS IT YOUR

10  UNDERSTANDING THAT WHEN A NEW SUBSCRIBER SIGNS UP WITH DIRECTV,

11  HE GETS A FREE DISH AND A NUMBER OF SET TOP BOXES?

12  A.    THAT'S MY UNDERSTANDING.

13  Q.    AND IS IT ALSO YOUR UNDERSTANDING THAT THOSE -- THE

14  CURRENT SET TOP BOXES ONLY PERMIT THE USE OF ONE TELEVISION?

15  A.    PER BOX PER TV.

16  Q.    AND DOES DIRECTV STILL SELL SET TOP BOXES THAT DO NOT HAVE

17  A DIGITAL VIDEO RECORDER IN THEM?

18  A.    YES.

19  Q.    SO IT'S POSSIBLE TO GET A DVR SET TOP BOX OR JUST A PLAIN

20  SET TOP BOX?

21  A.    THAT IS CORRECT.

22  Q.    AND IS IT YOUR UNDERSTANDING THAT CURRENT SET TOP BOXES

23  EACH HAVE ONLY ONE SMART CARD?

24  A.    THAT'S CORRECT.

25  Q.    AND YOU'RE AWARE THAT SOME CURRENT SET TOP BOXES ALLOW



1   SIMULTANEOUS RECORDING OF A SHOW AND ALLOW YOU TO WATCH ANOTHER

2   SHOW ON TELEVISION; IS THAT CORRECT?

3   A.    YEAH.   I'M -- THAT IS REALLY NOT PART OF MY

4   RESPONSIBILITY.   MY RESPONSIBILITY IS REALLY THE MANAGEMENT OF

5   INVENTORY, NOT, YOU KNOW, THE FUNCTIONALITY OF THE BOX IN THE

6   HOME, SO...

7   Q.    SO DO YOU KNOW WHETHER IT'S POSSIBLE IN A DIRECTV SET TOP

8   BOX THAT HAS A DIGITAL VIDEO RECORDER IN IT TO BE WATCHING ONE

9   TV SHOW WHILE SIMULTANEOUSLY RECORDING ANOTHER ONE?

10  A.    FROM PERSONAL EXPERIENCE, YES.

11  Q.    AND THAT'S BECAUSE THAT SET TOP BOX HAS NOT ONE, BUT TWO

12  TUNERS IN IT; IS THAT RIGHT?

13  A.    THAT'S CORRECT.

14          THE CLERK:   MR. ROBERTS, YOUR TIME IS UP.

15          THE COURT:   I'M GOING TO ALLOW YOU TWO MORE

16  MINUTES TO HANDLE THE QUESTIONING.   BUT, AS I STATED AT THE

17  CLOSE OF THE JURY PORTION OF THE TRIAL, I WAS GOING TO ALLOW

18  EACH SIDE AN HOUR, SO I'LL ALLOW YOU A FEW MORE MINUTES TO

19  FINISH YOUR QUESTIONING HERE.   GO AHEAD.

20          MR. ROBERTS:   THANK YOU, YOUR HONOR.

21  Q.    (BY MR. ROBERTS)   ARE YOU AWARE OF PLANS OF DIRECTV TO

22  ROLL OUT A HOME MEDIA CENTER SYSTEM COMPRISED OF A MAIN SERVER

23  AND SMALLER RECEIVER UNITS AT EACH TV?

24  A.    I'M AWARE OF IT, YES.

25  Q.    AND WOULD EACH OF THOSE SMALLER RECEIVER UNITS, IN YOUR



```
 1   OPINION, BE CONSIDERED TO BE A SET TOP BOX?

 2   A.   I'M NOT SURE I'M QUALIFIED TO ANSWER THAT.

 3   Q.   ARE YOU AWARE THAT SOME SET TOP BOXES -- DIRECTV SET TOP

 4   BOXES TODAY CAN BE EQUIPPED WITH A BROADCOM OR ST CHIP WHICH

 5   CAN PROVIDE OUTPUT OF TWO DIFFERENT PROGRAMS TO TWO DIFFERENT

 6   TELEVISIONS?

 7   A.   I'M NOT QUALIFIED TO ANSWER THAT AS WELL.

 8             MR. ROBERTS:   MAY I JUST APPROACH THE WITNESS,

 9   YOUR HONOR, WITH AN EXHIBIT?

10             THE COURT:   YOU MAY.

11   Q.   (BY MR. ROBERTS)   MR. MCGEORGE, I'LL ASK YOU, HAVE YOU

12   EVER SEEN THIS BROADCOM PRODUCT BRIEF BEFORE?

13   A.   NO, I HAVEN'T.

14   Q.   I NOTE ON HERE THAT THIS BRIEF SAYS THAT IT IS TALKING

15   ABOUT A SINGLE SHIP -- EXCUSE ME -- A SINGLE CHIP SATELLITE SET

16   TOP BOX DECODER.   AND IT INDICATES IN THE LEFT-HAND COLUMN

17   UNDER FEATURES THAT -- IT MAKES REFERENCE TO THE DVB/DIRECTV

18   DECODER.   DO YOU SEE THAT?

19   A.   YES, I DO.

20   Q.   AND IN THE RIGHT-HAND COLUMN UNDER THE SUMMARY OF BENEFITS

21   UNDER THE SECOND BULLET POINT IN THE SUBPARAGRAPH, IT

22   INDICATES:   "SIMULTANEOUSLY SUPPORTS TWO TVS WITH INDEPENDENT

23   PROGRAMMING AND ONSCREEN DISPLAYS."   DO YOU SEE THAT?

24   A.   I DO.

25   Q.   NOW MY QUESTION TO YOU IS:   IN A DIRECTV SET TOP BOX, IT'S
```

1   FIT WITH ONE OF THESE BROADCOM CHIPS WHERE YOU CAN ACTUALLY

2   DRIVE TWO TELEVISIONS OFF IT.  WOULD THAT, IN YOUR OPINION,

3   CONSTITUTE TWO SET TOP BOXES OR ONE?

4   A.    YOU KNOW, I'M NOT THE TECHNICAL PART OF DIRECTV HERE.  I

5   MANAGE THE MOVEMENT AND PURCHASING OF DIRECTV SET TOP BOXES, SO

6   I -- I REALLY CAN'T COMMENT ON IT.

7   Q.    DO YOU HAVE ANY IDEA HOW LONG IT WILL BE BEFORE SET TOP

8   BOXES ARE AVAILABLE THAT INCLUDE MULTIPLE TUNERS AND A LARGE

9   HARD DRIVE SO THAT A SUBSCRIBER ONLY NEEDS ONE BOX TO DRIVE ALL

10  THE TELEVISIONS IN THEIR HOME?

11  A.    I'M NOT AWARE OF WHEN IT WILL BE AVAILABLE, NO.

12            MR. ROBERTS:  THANK YOU.  NO QUESTIONS, YOUR

13  HONOR.

14            MR. SAVIKAS:  NOTHING FURTHER, YOUR HONOR.

15            THE COURT:  DO YOU HAVE ANY FORECAST ON HOW MANY

16  SET TOP BOXES YOU'RE PLANNING ON DISTRIBUTING DURING THIS

17  COMING YEAR?

18            THE WITNESS:  YES, WE DO.

19            THE COURT:  ALL RIGHT.  WHAT IS IT?

20            THE WITNESS:  I DON'T HAVE THE DOCUMENT WITH ME,

21  BUT I THINK THE NUMBER IS SOMEWHERE IN THE 15 MILLION RANGE FOR

22  2006.

23            THE COURT:  AS I UNDERSTAND IT, IN THE LAST --

24  WELL, SINCE 1999, IT WAS SOMETHING IN THE RANGE OF 59 MILLION

25  BOXES.  IS THAT THE NUMBER EVERYBODY WAS USING?  YEAH, WELL,



1  SOMEWHERE BETWEEN 55 MILLION AND 59 MILLION IS WHAT I THINK THE

2  NUMBERS CAME OUT TO BE.  BUT AT THE SAME TIME, AS I UNDERSTAND

3  IT, THE TOTAL NUMBER OF SUBSCRIBERS IS 15 MILLION; IS THAT

4  RIGHT?

5           THE WITNESS:  THAT'S CORRECT.

6           THE COURT:  SO THERE WAS SOME DISCUSSION AT

7  TRIAL INVOLVING WHAT THEY CALLED, I GUESS, CHURN AND SO FORTH.

8  WHY IF YOU HAVE 15 MILLION SUBSCRIBERS -- I GUESS THERE'S SOME

9  PEOPLE ADDING AND DROPPING -- IS THE TOTAL OF NUMBER OF BOXES

10 SO MUCH GREATER THAN THE TOTAL NUMBER OF SUBSCRIBERS?

11          THE WITNESS:  WELL, THERE'S A CERTAIN AMOUNT

12 OF -- YOU KNOW, EACH CUSTOMER CARRIES MORE THAN ONE BOX.



13          THE COURT:  OKAY.

14          THE WITNESS:  AND THERE IS A CERTAIN LEVEL OF

15 CUSTOMERS THAT CHURN OUT, THAT LEAVE DIRECTV.  AND TYPICALLY

16 THOSE BOXES STAY IN THE FIELD.  THEY'RE NOT ACTIVATED.  THEY'RE

17 DEACTIVATED, SO THEY'RE VIRTUALLY A DEAD BOX IN THE FIELD.

18          THE COURT:  ALL RIGHT.

19          THE WITNESS:  DOES THAT ANSWER YOUR QUESTION?

20          THE COURT:  YES.  ALL RIGHT.  YOU MAY STEP DOWN,

21 SIR.

22          MR. CASTANIAS:  THANK YOU, YOUR HONOR.  MAY IT

23 PLEASE THE COURT.  GREG CASTANIAS FOR THE DEFENDANTS.  I'LL TRY

24 TO BE BRIEF BECAUSE OUR BRIEFS THAT WE FILED ON JUNE 28TH AND

25 YESTERDAY SHOULD LAY OUT MOST OF THE POINTS.  AND I THINK THE

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06
77



```
 1   COURT APPRECIATES MANY OF THEM.  BUT I'LL ADDRESS -- I'M SORRY.

 2              THE COURT:  I THOUGHT YOU SAID THERE WAS A THIRD

 3   WITNESS, OR DID I ALREADY MISS HIM?

 4              MR. SAVIKAS:  NO.  THERE WAS ONLY TWO.

 5              THE COURT:  OKAY.  I'M SORRY.  I THOUGHT YOU

 6   GAVE ME THREE NAMES.  GO AHEAD.

 7              MR. CASTANIAS:  IN ANY EVENT, YOUR HONOR, I'LL

 8   BRIEFLY ADDRESS FIVE ISSUES:  ONE, THE ISSUE OF THE INJUNCTION

 9   AND WHY A COMPULSORY LICENSE DOES WORK HERE; TWO, THE

10   ENHANCEMENT ISSUE; THREE, ATTORNEY'S FEES; FOUR, PREJUDGMENT

11   INTEREST; AND FINALLY, FIVE, THE ISSUE OF COST.

12              LET ME FIRST TURN TO THE ISSUE OF THE

13   INJUNCTION.  OUR PAPERS HAVE LAID OUT OUR POSITION ON THIS

14   ISSUE.  THERE'S NOTHING CATEGORICAL ABOUT WHAT WE'RE SUGGESTING

15   TO THE COURT.  THIS IS EXACTLY THE CASE WHERE AN INJUNCTION

16   WOULD BE INAPPROPRIATE.  WITH REGARD TO IRREPARABLE INJURY,

17   FINISAR DOES NOT COMMERCIALIZE.  THE COURT NOTED THE TESTIMONY

18   OF DR. LEVINSON AND MR. RAWLS AFTER THE JURY RETURNED ITS

19   VERDICT.  FINISAR HAS NEVER ANSWERED THOSE POINTS.

20              WITH REGARD TO THE ADEQUACY OF MONEY DAMAGES TO

21   COMPENSATE BEARS REPEATING, THAT'S ALL FINISAR EVER WANTED.

22   THEIR TRIAL FEE WAS -- ALL WE WANTED WAS A LICENSE.  THOSE ARE

23   THE TWO POINTS ON WHICH THE COURT IDENTIFIED THAT THERE WAS

24   ALREADY STRONG EVIDENCE.

25              SO LET ME TURN TO THE OTHER TWO NOW.  HARM TO
```





1    THE PUBLIC.  WE PUT IN OUR BRIEF FILED YESTERDAY THE POINTS

2    ABOUT THE FCC'S AND THE DEPARTMENT OF JUSTICE ANTI-TRUST

3    DIVISION FINDINGS WITH RESPECT TO THE PUBLIC INTEREST.  THOSE

4    HAVE NOT BEEN ANSWERED BY FINISAR IN ITS ARGUMENTS TODAY.  THEY

5    WERE NOT MENTIONED IN THE BRIEF.  MR. NAPPER COULD NOT OPINE ON

6    THOSE, EVEN THOUGH THE DEPARTMENT OF JUSTICE'S PRESS RELEASE

7    WAS ATTACHED TO FINISAR'S VARIED COMPLAINT IN THIS CASE.

8            FINALLY, WITH RESPECT TO THE BALANCE OF HARMS,

9    WE POINTED THAT OUT IN OUR BRIEF YESTERDAY AS WELL.  DIRECTV

10   WOULD SUFFER GOVERNMENTAL AND OTHER PENALTIES, AS WELL AS

11   SERIOUS ECONOMIC HARM.  FINISAR WILL GET PAID.  THE BALANCE OF

12   HARMS IS WILDLY, WILDLY TIPPED AGAINST US.

13           THE COURT:  WAIT A MINUTE.  WHAT PENALTIES IS

14   DIRECTV GOING TO SUFFER IF I GRANT AN INJUNCTION?

15           MR. CASTANIAS:  DIRECTV, AS WE POINTED OUT IN

16   OUR BRIEF YESTERDAY, COULD SUFFER THE LOSS OF ALL OF ITS

17   BROADCASTING LICENSES THAT THE FCC HAS GRANTED IN THE PUBLIC

18   INTEREST HERE AS WELL.  THOSE ARE THE SORTS OF PENALTIES IN

19   ADDITION TO THE SERIOUS ECONOMIC --

20           THE COURT:  HOW LONG A PERIOD OF TIME DO THEY

21   HAVE TO BE SHUT DOWN BEFORE THAT HAPPENS?  I MEAN, OBVIOUSLY

22   HURRICANE COMES THROUGH AND WIPES EVERYTHING OUT, THEY DON'T

23   WITHDRAW YOUR LICENSES FOR A DAY OR A WEEK SHUTDOWN.

24           MR. CASTANIAS:  I THINK THAT WOULD BE UP TO THE

25   FCC.  IT IS A RISK.  I THINK THAT'S PROBABLY THE FAIREST WAY TO



1  PUT IT.

2          THE COURT:  YOU'VE GOT NO IDEA IN THE CODE OF

3  FEDERAL REGULATIONS OR IN THE LICENSE LANGUAGE ITSELF OR

4  ANYTHING ELSE, THAT WOULD GIVE AN INDICATION OF -- I MEAN,

5  OBVIOUSLY IT WOULDN'T BE A VOLUNTARILY.  IT WOULD BE ALMOST A

6  FORCE MEASURE, AND THE COURT'S NOT -- I'M NOT TRYING TO SAY I'M

7  AN ACT OF GOD, BUT IT'S SURELY OUTSIDE YOUR CONTROL.

8          MR. CASTANIAS:  YOUR HONOR, I THINK NO RESPONSE

9  TO THAT PART WOULD BE APPROPRIATE, BUT WITH REGARD TO --

10          THE COURT:  THE HIGHER COURTS MAYBE, BUT NOT ME.

11          MR. CASTANIAS:  WITH REGARD TO -- WITH REGARD TO

12  THE FCC, THE CODE OF FEDERAL REGULATIONS PROVISION -- AND I

13  HAVE TO MAKE SURE I GET THE TITLE CORRECT FOR YOU HERE -- IS --

14  IT IS IN THE COMMUNICATIONS TITLE, BUT I WISH I COULD TELL YOU

15  THAT I HAVE THAT MEMORIZED OFF THE TOP OF MY HEAD, 47 CFR, AND

16  IT'S SECTION 25.161, IN PARTICULAR 25.161 (C) DEALING WITH THE

17  AUTOMATIC TERMINATION OF STATION AUTHORIZATION.  AND WHETHER

18  THAT -- I MEAN, THAT IN AND OF ITSELF WOULD BE HARM TO DIRECTV.

19  EVEN IF, FOR EXAMPLE, THERE WAS A SHUTDOWN, THE FCC DECIDED TO

20  TERMINATE OUR LICENSE.  THAT MEANS THAT WE NOW HAVE A

21  GOVERNMENTAL POTENTIAL BARRIER TO ENTRY -- REENTRY INTO THE

22  MARKET EVEN IF WE COULD GET A NONINFRINGING ALTERNATIVE.

23          LET ME TURN TO FINISAR'S EXCLUSIVE LICENSE

24  THEORY.  AS WE POINTED OUT IN OUR BRIEF YESTERDAY, IT'S JUST

25  ANOTHER CREATIVE WAY OF ARGUING THAT THE PATENT'S RIGHT TO



FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

80

1   EXCLUDE IS ALWAYS IRREPARABLE HARM.  IT COULD NEVER BE REMEDIED

2   THROUGH MONEY.  AND TODAY WE HEARD THAT EBAY DIDN'T REALLY

3   CHANGE THE LAW.  I -- I MUST CONFESS THAT WE COMPLETELY

4   DISAGREE WITH THAT.  I THINK JUDGE DAVIS DISAGREED WITH IT IN

5   THE Z4 DECISION.  AND MORE TO THE POINT, I THINK IT'S WORTH

6   NOTING THAT THEY'VE GIVEN YOU TWO BRIEFS IN THIS CASE

7   SUGGESTING WHAT THE LAW IS.  WHAT THEY GAVE YOU WAS THE

8   SOLICITOR GENERAL'S BRIEF.  AND THEY LOST BECAUSE THE SOLICITOR

9   GENERAL WANTED AFFIRMANCE IN THE EBAY, AND THEY DIDN'T GET IT.

10  AND THEY GAVE YOU THE RESPONDENT'S BRIEF FILED BY MERCEXCHANGE

11  IN THE EBAY CASE.  AND, AGAIN, THAT WAS THE PARTY SEEKING

12  AFFIRMANCE.  AND IF YOU LOOK AT THE LAST LINE OF JUSTICE

13  THOMAS'S OPINION FOR THE MISSOURI, THE CASE WAS REVERSED.  IT

14  WAS REMANDED.  THE INJUNCTION WAS VACATED.

15          SO IF THE COURT NEEDS ANY ADDITIONAL EVIDENCE

16  THAT THE LAW HAS CHANGED, IT'S RIGHT ON THE FACE OF EBAY.  LET

17  ME RESPOND TO JUST THE --

18          THE COURT:  WELL, I GUESS ANOTHER WAY YOU CAN

19  LOOK AT IT IS THE SUPREME COURT HAS PUT THE LAW BACK TO WHERE

20  IT ALWAYS HAS BEEN IN INJUNCTIONS, AND IT'S JUST THE -- THEY'RE

21  IN EFFECT SAYING THAT THE FIFTH CIRCUIT GOT A LITTLE OFF TRACK.

22          MR. CASTANIAS:  THAT'S AN EXCELLENT WAY OF

23  PUTTING IT THERE, YOUR HONOR, BECAUSE THAT ANSWERS THE HEAVY

24  RELIANCE ON THE IN RE MAHURKAR DECISION FROM JUDGE EASTERBROOK,

25  A DISTINGUISHED JUDGE TO BE SURE, AN APPELLATE JUDGE SITTING AS