1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NOVOZYMES A/S, | |
| Plaintiff | |
| v. | C.A. No. 05-160-KAJ |
| GENENCOR INTERNATIONAL, INC., and | |
| ENZYME DEVELOPMENT CORPORATION | |
| Defendants | |

## NOVOZYMES A/S' RESPONSE TO
## DEFENDANTS' FIFTH SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff Novozymes A/S ("Novozymes") hereby responds to Defendants Genencor International, Inc. and Enzyme Development Corporation ("Genencor" and "EDC" and jointly "Defendants") Fifth Set of Interrogatories (the "Interrogatories").

## GENERAL OBJECTIONS

1.      Novozymes objects to the definitions and instructions incorporated into the Interrogatories from Defendants' First Set of Interrogatories and Defendants' First Request for the Production of Documents and Things to Plaintiff Novozymes A/S as set forth in its responses to those interrogatories and documents requests.

2.      Novozymes objects to the Interrogatories to the extent that they seek to impose duties over and above those required by the Federal Rules of Civil Procedure and the Local

Rules of this District. Novozymes' responses shall be made only in accordance with the applicable Rule(s).

3. Novozymes objects to the Interrogatories to the extent they seek production of information equally available to Genencor and EDC in the public domain or is already in the possession, custody or control of Genencor and EDC.

4. Novozymes objects to the Interrogatories to the extent they seek information that is in the possession of independent parties over whom Novozymes has no control.

5. Novozymes objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege that would protect the requested information from disclosure.

6. Novozymes objects to the Interrogatories to the extent they seek proprietary and/or confidential business information, which will be produced only subject to the terms of the Protective Order.

7. Novozymes objects to the Interrogatories to the extent they seek information irrelevant to *Plaintiff's Motion for Leave to Modify the Scheduling Order for the Purpose of Amending Its Complaint.*

8. The responses given herein and documents produced, if any, shall not be deemed to waive any claim of privilege or immunity Novozymes may have as to any response, document or thing, or any question or right of objection as to authenticity, competency, relevancy, materiality, admissibility, or any other objection Novozymes may have as to a demand for further response to these or other Interrogatories, or to any objection to the use of such information, documents or things in any other proceeding filed after the production of such information or documents.

- 2 -

9.     Nothing contained herein may be construed as an admission relative to the existence or non-existence of any document, and no response may be construed as an admission with respect to the relevancy or admissibility in evidence of any statement or characterization contained in the Interrogatories or respecting the authenticity, competency, relevancy, materiality or admissibility of any document or thing referenced by the Interrogatories.

10.     These General Objections are applicable to and are incorporated in each specific response herein without further reference.  The inclusion of specific objection(s) in response to any Interrogatory shall not be construed as a waiver of such objection.

## RESPONSES AND SPECIFIC OBJECTIONS

### INTERROGATORY NO. 25:

State all facts that support your contention that NZNA may be joined as a co-plaintiff.

### RESPONSE:

Pursuant to Fed. R. Civ. P. 33(d), Novozymes directs Defendants to its opening and reply briefs (D.I. ## 145, 152, 165, and 174) filed in support of *Plaintiff's Motion for Leave to Modify the Scheduling Order for the Purpose of Amending Its Complaint* and the accompanying declaration (D.I. ## 147 and 154) and appendices (D.I. ## 146, 153, 166, and 175) where the facts that support the addition of NZNA as a co-plaintiff are stated and discussed in great detail.

Such facts, include, but are not limited to, the following:

- o  NZNA is a wholly owned subsidiary of Novozymes A/S
- o  Novozymes A/S exercises complete strategic control over NZNA,
- o  Novozymes A/S' control over NZNA is formally evidenced by the structure of NZNA's five member board of directors, which is comprised of four Novozymes A/S executives
- o  Novozymes A/S controls the profits earned and cash received by NZNA

- 3 -

- o Novozymes A/S consolidates the profits and losses of all of its subsidiaries, NZNA included, into audited financial statements for the entire Novozymes group
- o Novozymes A/S stock is publicly traded based on the basis of these consolidated financial statements
- o Novozymes A/S competes in the U.S. fuel ethanol alpha amylase market by selling, *inter alia*, Liquozyme® SC, Liquozyme® DS, Liquozyme® NX, and Termamyl® SC through its U.S. subsidiary, NZNA
- o As a general company policy, Novozymes A/S does not license its core technology, including industrial enzymes, outside of its corporate family
- o NZNA has always been and continues to be is the sole licensee of the '031 Patent
- o Novozymes A/S has no intent to license the '031 Patent outside of its corporate family
- o NZNA has the implied exclusive right to produce, market, sell, and distribute products covered by the patent claims included in Novozymes' A/S patent portfolio in order to compete in the U.S. fuel ethanol alpha amylase market
- o NZNA produces, markets, sells, and distributes products covered by a Novozymes A/S patent closely related to the '031 Patent, falling within the same family of patents as the '031 Patent
- o NZNA has an implied exclusive license to the '031 Patent

## INTERROGATORY NO. 26:

State all facts that support your contention that "profits lost by NZNA are ultimately profits lost by NZDK."

## RESPONSE:

. Pursuant to Fed. R. Civ. P. 33(d), Novozymes directs Defendants to its opening and reply briefs (D.I. ## 145, 152, 165, and 174) filed in support of *Plaintiff's Motion for Leave to Modify the Scheduling Order for the Purpose of Amending Its Complaint* and the accompanying declaration (D.I. ## 147 and 154) and appendices (D.I. ## 146, 153, 166, and 175) where the facts that support the conclusion that profits lost by NZNA are ultimately profits lost by NZDK are stated and discussed in great detail.

Such facts, include, but are not limited to, the following:

- o NZNA is a wholly owned subsidiary of Novozymes A/S
- o Novozymes A/S exercises complete strategic control over NZNA,

- 4 -

- o Novozymes A/S' control over NZNA is formally evidenced by the structure of NZNA's five member board of directors, which is comprised of four Novozymes A/S executives
- o Novozymes A/S controls the profits earned and cash received by NZNA
- o Novozymes A/S consolidates the profits and losses of all of its subsidiaries, NZNA included, into audited financial statements for the entire Novozymes group
- o Novozymes A/S stock is publicly traded based on the basis of these consolidated financial statements

## INTERROGATORY NO. 27:

State all facts that support your contention that "NZDK ultimately collects the profits earned by NZNA."

## RESPONSE:

Pursuant to Fed. R. Civ. P. 33(d), Novozymes directs Defendants to its opening and reply briefs (D.I. ## 145, 152, 165, and 174) filed in support of *Plaintiff's Motion for Leave to Modify the Scheduling Order for the Purpose of Amending Its Complaint* and the accompanying declaration (D.I. ## 147 and 154) and appendices (D.I. ## 146, 153, 166, and 175) where the facts that support the conclusion that NZDK ultimately collects the profits earned by NZNA are stated and discussed in great detail.

Such facts, include, but are not limited to, the following:

- o NZNA is a wholly owned subsidiary of Novozymes A/S
- o Novozymes A/S exercises complete strategic control over NZNA,
- o Novozymes A/S' control over NZNA is formally evidenced by the structure of NZNA's five member board of director, which is comprised of four Novozymes A/S executives
- o Novozymes A/S controls the profits earned and cash received by NZNA
- o Novozymes A/S consolidates the profits and losses of all of its subsidiaries, NZNA included, into audited financial statements for the entire Novozymes group
- o Novozymes A/S stock is publicly traded based on the basis of these consolidated financial statements

- 5 -

**INTERROGATORY NO. 28:**

Identify each person who was involved in preparing and negotiating the following agreements: the January 1, 1996 Technology Licensing Agreement, the January 1, 2001 Framework Agreement for Services, and the January 1, 2005 Marketing Agreement.

**RESPONSE:**

Joan Schmidt was the person involved in preparing and negotiating the January 1, 1996 Technology Licensing Agreement.

Charles Shapiro was the person involved in preparing and negotiating the January 1, 2001 Framework Agreement for Services, and the January 1, 2005 Marketing Agreement.

**INTERROGATORY NO. 29:**

For each of the foregoing interrogatories, identify the Novozymes' personnel most knowledgeable about the subject matter and the answers thereto.

**RESPONSE:**

For Interrogatory No. 25, Henrik Myer, Jeff Faller, Benny Loft, and Rich Olofson are the Novozymes' personnel most knowledgeable about the subject matter and the answers thereto.

For Interrogatories Nos. 26 and 27, Benny Loft, and Rich Olofson are the Novozymes' personnel most knowledgeable about the subject matter and the answers thereto.

For Interrogatory No. 28, Charles Shapiro is the Novozymes' personnel most knowledgeable about the subject matter and the answers thereto.

**YOUNG CONAWAY STARGATT
& TAYLOR, LLP**

Dated:    September 28, 2006

*Karen C. Keller*
_____
Josy W. Ingersoll (No. 1088)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
kkeller@ycst.com

Joseph R. Robinson
David Tellekson
Robert C. Sullivan, Jr.
**DARBY & DARBY P.C.**
805 Third Avenue
New York, New York 10022
(212) 527-7700

*Attorneys for Plaintiff
Novozymes A/S*

- 7 -

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on September 28, 2006, I caused to be served a true

and correct copy of the foregoing document to the following counsel of record:

### BY ELECTRONIC MAIL AND HAND DELIVERY

Donald E. Reid, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE  19899-1347

### BY ELECTRONIC MAIL

Tharan Gregory Lanier, Esquire
Jane Froyd, Esquire
JONES DAY
2822 Sand Hill Road, Suite 240
Menlo Park, CA 94025

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*Karen E. Keller*

Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Novozymes A/S*

**2**

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------------------

NOVOZYMES A/S,

                    Plaintiff,

                              C.A. No. 05-160-KAJ

          - v -

GENENCOR INTERNATIONAL INC., and
ENZYME DEVELOPMENT CORPORATION,
                    Defendants.

---------------------------------------------------

                    11:30 a.m.
                    October 5, 2006

                    805 Third Avenue
                    New York, New York

              HIGHLY CONFIDENTIAL

          DEPOSITION of HENRIK MEYER, a Witness in
     the above entitled matter, taken pursuant to
     Notice, before Stephen J. Moore, a Registered
     Professional Reporter, Certified Realtime
     Reporter, and Notary Public of the State of New
     York.

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 2

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2
3    A P P E A R A N C E S:
4
5    DARBY & DARBY P.C.
6        Attorneys for Plaintiff
7        805 Third Avenue
8        New York, New York  10022
9
10   BY:   ROBERT C. SULLIVAN, JR., ESQ.
11
12   JONES DAY
13       Attorneys for Defendants
14       2822 Sand Hill Road, Suite 940
15       Menlo Park, California  94025
16
17   BY:   THARAN GREGORY LANIER, ESQ.
18
19
20
21
22
23
24
25

Page 3

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2    H E N R I K    M E Y E R, called as a
3        witness, having been first duly sworn by
4        the Notary Public, was examined and
5        testified as follows:
6
7    EXAMINATION BY MR. LANIER:
8
9        Q    Mr. Meyer, good morning.  We
10   have met before, but again for the record my
11   name is Greg Lanier, I'm one of the lawyers for
12   Genencor and EDC in this case.
13            Have you ever been deposed
14   before?
15       A    Never tried that.
16       Q    I'm not sure it's something
17   somebody tries, but hopefully it won't be too
18   bad.
19            I'm going to ask you a couple of
20   questions for record purposes, they are not
21   intended to offend so please don't get me
22   wrong.
23            Are you a native speaker of
24   English?
25       A    No, I'm not native speaker.

Page 4

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2        Q    Are you comfortable testifying
3    in English today?
4        A    Yes.
5        Q    Do you regularly use English,
6    both written and oral, for business purposes?
7        A    I do.
8        Q    If during the course of the day,
9    hopefully not too much of the day you don't
10   understand any of my questions for whatever
11   reason, either English issues or I have not
12   asked it well or I am going too fast or
13   anything else, please let me know.
14       A    Okay.
15       Q    I'm sure you've had some
16   instruction about your lawyers about how this
17   process works, let me just remind you about a
18   couple of the ground rules.
19            First one, do you understand,
20   sir, that the oath you just took is the same
21   oath with the same force and effect as if you
22   were testifying in a court of law?
23       A    I do understand that.
24       Q    Do you understand, sir, I don't
25   want you to guess or speculate to answer any of

Page 5

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2    my questions, but to give me your best
3    testimony, your best recollection as you sit
4    here today?
5        A    Absolutely.
6        Q    During the course of the day
7    your attorney may make some objections to the
8    questions that I ask you.
9            Do you understand, sir, that
10   unless he tells you specifically not to answer
11   the question, that you can go ahead and answer
12   my questions, if you understand them?
13       A    Yes.
14       Q    If any other questions about the
15   process come up, please either let me know or
16   let your counsel know, we will take a break
17   every once in a while.
18            Let's get started.
19            MR. SULLIVAN:  Before you get
20       started, I will again designate this
21       transcript as highly confidential.
22       Q    Including this top secret
23   question, what's your job?
24       A    I am responsible for marketing,
25   so I am a V.P. for marketing.

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 6

```
1        HENRIK MEYER - HIGHLY CONFIDENTIAL
2     Q    By what entity are you employed?
3     A    That's in Novozymes Denmark, so
4  the A/S.
5     Q    The A/S entity, is that what you
6  said?
7     A    Yes.
8     Q    During the course of the day I'm
9  going to refer to Novozymes A/S, I will also
10 refer occasionally to Novozymes North America
11 or NZNA.
12         Will you understand those latter
13 two entities are the same thing?
14    A    That Novozymes North America.
15    Q    Is NZNA?
16    A    NZNA, that's Novozymes North
17 America, yes.
18    Q    What term would you normally use
19 to refer to the North American entity?
20    A    NA.
21    Q    Then during the course of the
22 day I may just use that, it's shorter and I
23 will use that term.
24    A    Okay.
25    Q    If any of my questions, if I am
```

Page 7

```
1        HENRIK MEYER - HIGHLY CONFIDENTIAL
2  not clear about what Novozymes entity to which
3  I am referring, please let me know.
4         How long have you held your
5  current position at A/S?
6     A    My current position has changed
7  a little bit, but so -- but I was employed as
8  marketing V.P. in 2001.
9     Q    So is what you're saying since
10 2001 your position has changed a little bit?
11    A    A little bit, increased
12 responsibility, but basically within the same
13 function, marketing.
14    Q    Generally what are your
15 responsibilities today?
16    A    It's responsible for marketing
17 globally.
18    Q    I didn't mean to interrupt you,
19 if I ever interrupt you you'll tell me, are you
20 responsible for any particular products or
21 industry areas?
22    A    I'm responsible for all global
23 marketing for all of the different industries
24 and the industries, that's the segment of
25 business areas.
```

Page 8

```
1        HENRIK MEYER - HIGHLY CONFIDENTIAL
2     Q    So, you're responsible for all
3  products that any -- ultimately responsible for
4  all products that any Novozymes entity may sell
5  into any industry?
6     A    No, no, the enzyme products, and
7  there is some specific enzyme product where I'm
8  not responsible for the marketing, and that's
9  within the textile area.
10    Q    Are you responsible for fuel
11 ethanol enzyme products?
12    A    Yes.
13    Q    Are you specifically responsible
14 for marketing activities within the United
15 States?
16    A    What do you mean specifically
17 responsible?
18    Q    Is that part of your day-to-day
19 job, do you do things that relate directly to
20 marketing activities in the United States?
21    A    I do.
22    Q    Generally what are the types of
23 things you do with respect to marketing in the
24 United States in the fuel ethanol market?
25    A    I govern the business areas
```

Page 9

```
1        HENRIK MEYER - HIGHLY CONFIDENTIAL
2  including that, so it would be marketing
3  director who is responsible for the fuel
4  ethanol business is reporting to me and he's
5  also covering the North American business.
6     Q    Who is that person you just
7  mentioned?
8     A    That's Paul Rubin Andersen.
9     Q    Is he employed by Novozymes A/S
10 or by some other Novozymes entity?
11    A    By Novozymes A/S.
12    Q    I have had a chance to speak to
13 a gentlemen named Jeffrey Fowler, do you know
14 him?
15    A    Jeff Fowler, yes.
16    Q    Does he report to Mr. Rubin, was
17 that his name?
18    A    He's the Marketing Manager, I
19 think, but I'm not 100 percent sure. I think
20 he's a Marketing Manager, Jeff Fowler, hang on
21 a second, or is he the sales responsible --
22 actually I'm not sure.
23    Q    He's a marketing person, I will
24 tell that you?
25    A    He's a marketing person, then he
```

3 (Pages 6 to 9)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 10

1          HENRIK MEYER - HIGHLY CONFIDENTIAL
2    would be reporting to Paul Rubin.
3          Q      Directly or does he report
4    through anyone else?
5          A      No, he would then -- if he's the
6    regional Marketing Manager, then he will be
7    directly reporting to Paul Rubin.
8                 I wonder if Jeff is that now.  I
9    think so.
10         Q      You don't need to guess or
11   speculate, you know what you know and you don't
12   what you don't.
13                MR. SULLIVAN:  This will probably
14          work more smoothly if you wait for him
15          to answer the question.  Answer each
16          question then we will just go back and
17          forth.
18         Q      You've been in your current
19   position or something roughly similar since
20   2001?
21         A      Yes.
22         Q      Were you with Novozymes, any
23   Novozymes entity before 2001?
24         A      No, not Novozymes entity, no.
25         Q      Were you with Novo?

Page 11

1          HENRIK MEYER - HIGHLY CONFIDENTIAL
2          A      No.
3          Q      Where did you come from?
4          A      I came from American Cyanamid,
5    so a different business.
6          Q      Were you in marketing there,
7    too?
8          A      Yes, marketing and sales.
9          Q      Would you very briefly describe
10   for me, sir, your educational background
11   starting with college or university and any
12   subsequent degrees if you have any?
13         A      Agronomist, and that basically
14   is the degree I have.  University.
15         Q      Roughly when did you get your
16   degree?
17         A      Gee.
18         Q      That's a polite way for
19   attorneys to ask how old you are.
20         A      Well, I can tell you how old I
21   am, that might be easier.
22         Q      Why don't you tell me that.
23         A      I am 48, going to 49.
24         Q      So you got your degree sometime
25   in the '70s, I would think?

Page 12

1          HENRIK MEYER - HIGHLY CONFIDENTIAL
2          A      That's right.  I can't remember
3    the exact year.
4          Q      Are you familiar, do you
5    understand, sir, that we are here today in a
6    deposition in a case that relates to a
7    particular Novozymes patent?
8          A      Yes.
9          Q      Are you familiar with that
10   patent in any way?
11         A      When you say familiar, what do
12   you mean there?
13         Q      Let me ask a few different
14   aspects of familiarity.
15                Do you know which patent it is?
16         A      I cannot remember the number.
17         Q      Do you know the subject of the
18   patent?
19         A      Yes.
20         Q      What's your understanding of the
21   subject of the patent?
22         A      That it covers some important
23   alpha amylase products.
24         Q      Why do you say important?
25         A      Because they are valuable to the

Page 13

1          HENRIK MEYER - HIGHLY CONFIDENTIAL
2    company.
3          Q      Which products?
4          A      That's alpha amylase is within
5    the area of fuel ethanol.
6          Q      Are there any enzymes products
7    sold by, any enzymes entity that practice the
8    claims of the patent that brings us here
9    together today?
10                MR. SULLIVAN:  Objection, calls
11          for a legal conclusion.
12         A      Yeah, I wouldn't know that 100
13   percent.
14         Q      I will represent to you, sir,
15   two things, first that the patent we are
16   talking about today is often called the '031
17   patent, that's a label we lawyers have used for
18   it.
19         A      Um-hum.
20         Q      I will represent to you that at
21   various points in this case Novozymes has taken
22   the position that the Liquozyme and Termamyl
23   products do not practice the claims of that
24   '031 patent, that's a representation I'm making
25   to you.

4  (Pages 10 to 13)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 14

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2         If my representation is wrong,
3   not your fault, but I'm telling you that is a
4   fact.
5         Does that change your point of
6   view on whether the patent that's involved in
7   this case is important?
8      A    Not at all.
9      Q    Why not?
10     A    Because that's also is an area
11  that is important for the business that we are
12  in that is covering the exact same product
13  types that would cover the exact same use area
14  of the product that we sell.
15     Q    Do you have any understanding of
16  what it is about the thing that's claimed or
17  any specific aspect of the claims of the patent
18  in suit here today that gives it value in the
19  fuel ethanol industry?
20     A    I'm not sure I understand that.
21     Q    You mentioned that it covers
22  some important -- covers some important
23  products in the fuel ethanol industry?
24     A    Yeah.
25     Q    What, if anything, about the

Page 15

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   '031 patent makes it important to the fuel
3   ethanol industry specifically?
4      A    Because it covers, as I
5   understand it, products that you can make that
6   is very valuable and equal to the type of
7   product that we sell.
8      Q    Do you know any -- do you know
9   whether any Novozymes product currently or ever
10  have practiced the claims of the '031 patent?
11     A    I don't know that.
12     Q    If you wanted to find out the
13  answer to that question, what would you do?
14     A    I would ask our patent
15  department, or our business people.
16     Q    Let me show you -- I am going to
17  ask the court reporter to mark as an exhibit,
18  we are not going to look at too many today,
19  this is one we actually looked at at Mr. Loft's
20  deposition not too long ago.
21         For convenience we will mark it
22  separately for you here as Meyer number 1, and
23  it's the Novozymes' A/S's responses to
24  Defendant's fifth set of interrogatories.
25         (The above described document was

Page 16

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   marked Meyers Exhibit 1 for identification
3   as of this date.)
4      Q    Sir, with this and any other
5   document, I may show you the same general rule
6   applies, if you need to look at any part of it
7   or read through it or anything to answer my
8   questions, please tell me and do that.
9         But the first general question
10  for you, sir, is whether you recognize this
11  document?
12     A    Actually, I haven't read this
13  document.
14     Q    I will represent to you that
15  what this is is a pleading in this case, it's a
16  set of questions that we lawyers for the
17  Defendants have asked Novozymes and these are
18  the answers from Novozymes through their
19  lawyers, that's roughly what this document is.
20         I'm going to ask you about one
21  or two of the questions in there.
22     A    Okay.
23     Q    Let's turn specifically first to
24  interrogatory number 29, that's on Page 6.
25  Please read that interrogatories number 29 and

Page 17

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   the answer to yourself and tell me when you are
3   done.
4      A    So it's including the response?
5      Q    Yes, please.
6      A    Um-hum.
7      Q    I'm asking you that because I'm
8   going to -- I asked you to read that because
9   I'm going to ask you to turn to interrogatory
10  number 25, if you see this the first paragraph
11  there your name is associated with that one?
12     A    Yes.
13     Q    So please turn back to number 25
14  which is on Page 3, read it and the response to
15  yourself, it goes over to Page 4 then I will
16  ask you some questions about specific things in
17  that response.
18     A    Okay.
19     Q    Sir, I'm going to direct your
20  attention to a few of the specific bullet items
21  that are there, let's turn to one on Page 3,
22  the very first one, it reads, "NZNA is a wholly
23  owned subsidiary of Novozymes A/S," do you see
24  that, sir?
25     A    Yes.

5 (Pages 14 to 17)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 18

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2    Q    One thing I forgot to remind you
3    of, you need to say a yes or a no so that our
4    court reporter knows what to write down, as
5    opposed to um-hum or un-hum.  I forget that
6    often myself.
7    A    I will try to be specific.
8    Q    Thank you very much.
9         Are you aware generally, sir, of
10   the fact that Novozymes North America is
11   directly or indirectly a wholly owned
12   subsidiary of Novozymes A/S?
13   A    Yes.
14   Q    Are you personally familiar with
15   the corporate structure and the chain of
16   ownership that gives rise to that ultimate
17   ownership?
18   A    No, I don't know everything
19   about the corporate structure.
20   Q    Do you know, were you personally
21   involved in any of the decisions about how to
22   structure the ownership and incorporation of
23   Novozymes North America?
24   A    No, I was not.
25   Q    Let's ask about the fourth

Page 19

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2    bullet point on this page, Novozymes A/S
3    controls the profits earned and cash received
4    by NZNA, do you see that?
5    A    Um-hum.
6    Q    Is that a yes?
7    A    Yes.
8    Q    Thank you.
9         Even when the answer is obvious
10   to everyone sitting here, somebody may read
11   this on paper later and we have to go through
12   that, so I appreciate it, thank you, sir.
13   A    Yes, I see that.
14   Q    Are you personally familiar with
15   the way that Novozymes A/S accounts for monies
16   received by Novozymes North America and any
17   intracompany or intrafamily transactions
18   between those entities?
19   A    I don't know all the details
20   about that, no.
21   Q    Are you involved on a day-to-day
22   level in your job in any way in the accounting
23   for the flow of cash between the companies?
24   A    Not in the accounting, no.
25   Q    Do you have any involvement with

Page 20

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2    respect to the flow of cash between the
3    companies other than with respect to the
4    accounting?
5    A    So, could you give an example of
6    what that could be.
7    Q    I'll ask you about a few
8    specific things during the course of our time,
9    I will start with a few of them now.
10        Are you aware there is a
11   technology license agreement between Novozymes
12   North America and Novozymes A/S?
13   A    Yes.
14   Q    Were you involved in any way in
15   negotiating that license agreement?
16   A    No.
17   Q    Are you aware of the royalty
18   rate that is in that license agreement?
19   A    Yes.
20   Q    What is the rate as you know it?
21   A    It's 40 percent, as I know it.
22   Q    Were you involved in any way in
23   setting that royalty rate?
24   A    No.
25   Q    Are you aware that that royalty

Page 21

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2    rate, at least in part, resulted from
3    negotiations with the U.S. and Danish tax
4    authorities?
5    A    Yes.
6    Q    Were you involved directly or
7    indirectly in the discussions with the tax
8    authorities that gave rise to that rate?
9    A    I was not.
10   Q    Were you involved in any way in
11   Novozymes -- any Novozymes entity's
12   consideration of what that percentage rate
13   should be?
14   A    No.
15   Q    Does it matter to your job in
16   any way what that rate is?
17   A    No.
18   Q    Have you ever read the
19   technology licensing agreement?
20   A    Yes, I read -- I read it, but I
21   don't know of it in detail.
22   Q    Have you read it in the course
23   of your day-to-day job?
24   A    No.
25   Q    Did you review documents to

6  (Pages 18 to 21)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 22

1      HENRIK MEYER - HIGHLY CONFIDENTIAL
2    prepare for this deposition?
3      A    I read it, yes.
4      Q    Was this one of the documents
5    you looked at to prepare for this deposition?
6      A    That's correct.
7      Q    Before preparing for this
8    deposition had you seen the document before?
9      A    I'm not sure.
10     Q    Did any of the terms of the
11   technology licensing agreement, do any of them
12   matter to your day-to-day job?
13          MR. SULLIVAN:  Objection to the
14     form.
15     A    Definitely, as because this is a
16   license arrangement and of course license
17   arrangements matter to my job.
18     Q    How does that specific license
19   arrangement matter to your job?
20     A    This particular one does not
21   matter.
22     Q    How do license arrangements
23   generally matter to your job?
24     A    I review them, I sign license
25   arrangements, license agreement.

Page 23

1      HENRIK MEYER - HIGHLY CONFIDENTIAL
2      Q    So, over the course of the
3    years, has Novozymes granted licenses of its
4    technology to some -- Novozymes A/S, let me
5    backup and ask this question very precisely.
6          Over the time you've been with
7    the company, has Novozymes A/S granted licenses
8    of its technology to some entity besides
9    Novozymes A/S?
10     A    Yes.
11     Q    Have you been involved in
12   licenses that -- such licenses that have
13   anything to do with the fuel ethanol industry
14   in the United States?
15     A    No.
16     Q    What industries have been --
17   what industries have related to the licenses
18   that you recall having been involved in in some
19   way?
20     A    Detergent, in the detergent
21   areas.
22     Q    Any others?
23     A    Let me think.
24          Actually I can't recall any
25   others for the moment.

Page 24

1      HENRIK MEYER - HIGHLY CONFIDENTIAL
2      Q    Are you thinking of, with
3    respect to the detergent industry license or
4    licenses that you mentioned, do you have a
5    particular license or licenses in mind?
6      A    Yes, this is licenses between
7    Novozymes and our customers where we have
8    agreements.
9      Q    So, as part of dealing with its
10   customers, Novozymes may grant licenses to
11   those customers so they can use the technology?
12     A    In specific instances.
13     Q    Which specific customers are you
14   referring to?
15     A    P&G.
16     Q    Were you involved in negotiating
17   that license?
18     A    Yes.
19     Q    What was your role?
20     A    I think -- let me think about
21   it.  It was royalty rates.
22     Q    Now, were you personally
23   involved in negotiating the royalty rate with
24   P&G?
25     A    No.

Page 25

1      HENRIK MEYER - HIGHLY CONFIDENTIAL
2      Q    What was your involvement with
3    respect to royalty rates?
4      A    There was setting the direction
5    of the level, discussing the level.
6      Q    So, you were involved in
7    discussions within Novozymes about what royalty
8    rate should we agree or not, is that what you
9    are saying?
10     A    Yes.
11     Q    Is discussions of royalty rates
12   a part of your day-to-day job?
13     A    Yes.  Could be.
14     Q    Have you ever been involved in
15   any license negotiations, whether or not they
16   led to a completed license, with respect to the
17   fuel ethanol industry?
18     A    Not to my knowledge.
19     Q    Are you aware of any general
20   policy or parameters about royalty rates for
21   outlicenses of technology, any Novozymes
22   policies?
23     A    Yes, I mean our general policy
24   is that we don't license, we don't license out
25   our technology outside of our family.

7  (Pages 22 to 25)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 26

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      Q      Are there any general policies
3  about those circumstances if you are inclined
4  to grant a license what the license rates must
5  be, they must be at least X percent or anything
6  like that?
7           MR. SULLIVAN: Objection as to
8  form.
9      A      I also don't understand what you
10  mean there.
11      Q      Sure, I will try to ask the
12  question in a more articulate manner.
13           There obviously have been some
14  licenses that have been granted outside the
15  corporate family, correct?
16      A      That's right.
17      Q      Is there any Novozymes policy
18  with respect to what those license rates must
19  be, either defined by a range of rates or
20  particular minimum rates, anything like that?
21      A      No, I'm not aware of such
22  policies.
23      Q      Is there anything about the
24  detergent industry that would cause the royalty
25  rates or license agreements in that industry to

Page 27

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  be different from royalty rates or licenses
3  that might be granted in the fuel ethanol
4  industry?
5      A      So how do you mean that?
6      Q      The various -- I will try and
7  clarify my questions. There are various
8  licenses that Novozymes has granted in the
9  detergent industry, correct?
10      A      Yes.
11      Q      Is there anything about the
12  detergent industry that would have -- that
13  would make the license negotiations and the
14  royalty rates agreed there unique and special
15  to detergents as opposed to any other industry?
16      A      Yes, definitely in some of these
17  cases, yes.
18      Q      What are those factors that make
19  it unique?
20      A      It is detailed joint
21  collaboration on developing technology with a
22  customer.
23      Q      Is there a standard royalty rate
24  that Novozymes always insists on when it
25  licenses its technology?

Page 28

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      A      No, not to my knowledge.
3      Q      In your experience in dealing
4  with these situations, does Novozymes consider
5  the facts and circumstances of each
6  individual's circumstance in deciding what
7  license rate to agree to?
8      A      That's my understanding.
9      Q      I'll represent to you, sir, that
10  there are various agreements over time between
11  Genencor and Novozymes A/S, some called license
12  agreements, some with other names, are you
13  generally familiar with that?
14      A      Yes.
15      Q      Have you personally been
16  involved in the negotiation of any of those
17  agreements?
18      A      I have.
19      Q      Which ones?
20      A      Something to do with some
21  patents that -- some patents to some detergent
22  products, detergent enzymes that Genencor
23  wanted to have some rights to and some patents
24  and products that we would like to have some
25  rights to.

Page 29

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      Q      What was your involvement
3  specifically?
4      A      I was part of the negotiation
5  team.
6      Q      Were you also part of the team
7  that considered internally within Novozymes
8  what royalty rates or other economic terms to
9  agree to and/or propose?
10      A      Yes.
11      Q      To what industries did the
12  agreements between Genencor and Novozymes that
13  you are aware of relate?
14      A      Excuse me?
15      Q      Your aware that there is more
16  than one agreement between Novozymes and
17  Genencor, are you aware of that?
18      A      Yes, yes.
19      Q      Do they all relate to one
20  industry?
21      A      No.
22      Q      What industries are touched by
23  one or more of those agreements?
24      A      The baking industry also is one
25  industry, that I know of.

8  (Pages 26 to 29)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 30

HENRIK MEYER - HIGHLY CONFIDENTIAL
2    Q    Baking is one, any other
3  industries you are aware of that are touched in
4  some way?
5    A    Detergent is one.
6    Q    Any others?
7    A    I'm not 100 percent sure about
8  others for the moment.
9         I would be surprised if there
10  weren't others, but I can't remember.
11    Q    If there were to be a
12  negotiation between Genencor and Novozymes in
13  March of 2005 relating to the fuel ethanol
14  industry, in your job would you have been
15  involved in it?
16    A    I have to have that again.
17    Q    Sure.  In your job in March of
18  2005 as you recall your response back then
19  about a year and a half ago, if there were to
20  have been a negotiation between Novozymes and
21  Genencor about a patent license relating to the
22  fuel ethanol industry, would you have been
23  involved?
24    A    Not necessarily.  I could have
25  been, but it's not sure I would have been.

Page 31

HENRIK MEYER - HIGHLY CONFIDENTIAL
2    Q    If there were to be such a
3  negotiation today, would you be involved?
4    A    Again, most likely.
5    Q    What would your role be?
6    A    I would expect to be part of the
7  negotiation team to propose the commercial
8  conditions.
9    Q    By commercial conditions, do you
10  mean, among other things, including things like
11  the royalty rate for any licenses that might be
12  included?
13    A    And the -- yes.
14    Q    Any other economic terms like
15  that, is that what you mean?
16    A    Yes.
17    Q    Is whether or not the license is
18  exclusive or non-exclusive a commercial
19  condition in which you would have been involved
20  in negotiating?
21    A    Yes; it would also -- that would
22  also be part of it.
23    Q    Referring back, sir, to the
24  technology license agreement that we discussed
25  a few minutes ago, are you aware of whether or

Page 32

HENRIK MEYER - HIGHLY CONFIDENTIAL
2  not that is an exclusive or non-exclusive
3  license?
4    A    I'm aware that it's stated as a
5  non-exclusive license.
6    Q    You say that it's stated as a
7  non-exclusive license.  Do you think it's
8  something other than a non-exclusive license?
9    A    For all practical purposes it's
10  functioning as an exclusive license.
11    Q    Why do you say that?
12    A    Because that is the intent in
13  how we work as a family with our technology,
14  that our subsidiaries, they have in the area
15  where they operate exclusive rights to exercise
16  their job under these patents.
17    Q    How do you know -- I'm sorry, I
18  didn't mean to interrupt you, how do you know
19  that if you weren't involved in negotiating the
20  license?
21    A    Because that's how we operate
22  with all our technology, throughout the globe
23  with our subsidiaries.
24    Q    Then why doesn't it say it's an
25  exclusive license?

Page 33

HENRIK MEYER - HIGHLY CONFIDENTIAL
2    MR. SULLIVAN:  Objection,
3  foundation.  If you can answer you can
4  answer.
5    Q    Go ahead.
6    A    I cannot say exactly all the
7  reasons why, but I know that it would be
8  unpractical to have all the details stated in
9  such a document to make it an exclusive for
10  something -- for most of the technology it
11  could easily be an exclusive license, but
12  there -- it would be wrong to state it is an
13  exclusive license because there is something
14  that is outside of the -- that would not be
15  exclusive -- that could not be exclusive
16  because somebody else has the rights to it.
17    Q    As you understand the agreement,
18  does Novozymes A/S retain the right to license
19  the technology covered by that agreement to
20  some entity other than Novozymes North America?
21    A    I need to have that again.
22    Q    Sure, as you understand the
23  agreement, does Novozymes A/S retain the right
24  to license technology covered by that agreement
25  to some entity other than Novozymes North

9  (Pages 30 to 33)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 34

HENRIK MEYER - HIGHLY CONFIDENTIAL
1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2    America?
3        A    Yes.  We have the rights.
4        Q    Does Novozymes A/S retain the
5    right to license the technology covered by that
6    agreement to some entity outside the Novozymes
7    family if it were to choose to do that?
8        A    Yes.
9        Q    If I asked you this before I
10   apologize.  In fact, I remember I did, I
11   remember your answer, so I won't ask you again.
12            Let's turn back to interrogatory
13   number 25 that led us in part to this
14   discussion, let's turn to Page 4, some of the
15   specific bullet points that we are talking
16   about here.
17            On Page 4, the third bullet
18   point down says, "Novozymes A/S competes in the
19   U.S. fuel ethanol alpha amylase market by
20   selling, inter alia, Liquozyme SC," then it
21   lists a lot of products, "through its U.S.
22   subsidiary NZNA;" do you see that, sir?
23       A    Yes.
24       Q    A couple of questions about this
25   bullet point.

Page 35

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2            First, fuel ethanol alpha
3    amylase market.
4        A    Yes.
5        Q    Would you define for me the
6    parameters of the U.S. fuel ethanol alpha
7    amylase market?
8        A    I can define for you what I
9    understand it is.
10       Q    Sure.
11       A    Which is the market where the
12   fuel ethanol alpha amylases are being used in
13   the process of making ethanol, and that is a
14   specific group of enzymes that is being used
15   for that, that's called alpha amylases and in
16   that market there are certain products that are
17   alpha amylases.
18       Q    What products -- let me backup a
19   second and ask this question.
20            What companies currently compete
21   in the U.S. fuel ethanol alpha amylase market
22   as you understand it?
23       A    At least the important ones is
24   Novozymes and Genencor.
25       Q    Are you aware of any other

Page 36

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2    companies?
3        A    Not off the top of my head.
4        Q    Have you ever heard of a company
5    called Valley Research?
6        A    Yes.
7        Q    Are they in the U.S. fuel
8    ethanol alpha amylase market?
9        A    I don't know for sure.
10       Q    If you wanted to know the answer
11   it that, who would you ask?
12       A    I would ask our marketing
13   director.
14       Q    Are the sales and the
15   competition relating to glucoamylase products
16   related to the U.S. fuel ethanol?
17       A    I have to have that again.
18       Q    Are sales and competition with
19   respect to glucoamylase products part of the
20   alpha amylase market?
21       A    They are linked, but they are
22   not necessarily the same.
23       Q    In what way are they linked?
24       A    They do talk to the same
25   customers.

Page 37

1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2        Q    So many customers that would be
3    interested in buying one product might be
4    interested in buying the other, correct?
5        A    Correct.
6        Q    Does every Novozymes customer
7    that buys its alpha amylases also by its
8    glucoamylase?
9        A    I don't know that for a fact.
10       Q    Do you have any understanding of
11   it based on your day-to-day work?
12       A    I have the understanding that
13   that would be our intent.  If you sell one you
14   want to sell the other.
15       Q    Certainly.
16            But moving past intent to
17   actuality, does every Novozymes customer that
18   buys its alpha amylase products buy its
19   glucoamylase products?
20       A    I don't know that.
21       Q    If you wanted to know about
22   that, who would you ask?
23       A    I would ask the American
24   business organization or my marketing director.
25       Q    You say my marketing director,

10  (Pages 34 to 37)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 38

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  do you mean Paul Rubin?
3      A    Paul Rubin and then he would
4  find out.
5      Q    And you may have mentioned it,
6  but what's his title precisely, Mr. Rubin?
7      A    He is a marketing director for
8  the biofuel and starch business.
9      Q    Does he have worldwide
10 responsibility?
11     A    He has worldwide responsibility.
12     Q    I take it the biofuel and starch
13 business would include the U.S. fuel ethanol
14 market, correct?
15     A    That's correct.
16     Q    Does Novozymes, either North
17 America or A/S, track the percentage of its
18 customers that buy an alpha amylase product
19 that also buy its glucoamylase products?
20     A    Yes, we would know that, I don't
21 know exactly what you mean we would track, but
22 we would certainly know whether they also buy
23 that normally.
24     Q    Are you personally aware of what
25 the relationship is between purchases, whether

Page 39

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  expressed in percentages or raw numbers, any
3  units, purchases by customers of your alpha
4  amylase products and of your glucoamylase
5  products?
6      A    No, I don't know those details.
7      Q    Do you know whether those
8  percentages have changed over time?
9      A    I don't know the details.
10     Q    I will ask one more, I can guess
11 your answer, but I will ask one more specific
12 question, do you know whether the percentage of
13 Novozymes' alpha amylase's customers that also
14 bought its glucoamylase has gone up or down
15 over time?
16     A    Could I have the question again?
17     Q    Sure. Do you know whether the
18 percentage of Novozymes' alpha amylase
19 customers that have also bought Novozymes'
20 glucoamylase products has that gone up or down
21 over time?
22     A    No, I don't want to speculate.
23     Q    So, your answer is you don't
24 know?
25     A    I don't know for sure.

Page 40

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      Q    Do you know whether the entry of
3  Spezyme Ethyl on the market for U.S. fuel
4  ethanol products changed the relationship
5  between the sales of alpha amylase and
6  glucoamylase by Novozymes?
7      A    It did.
8      Q    And how did it do so?
9      A    We lost market share in the
10 alpha amylase market.
11     Q    How did that affect the sale of
12 glucoamylase?
13     A    I mean the relative share then
14 have to change, if you lose market share in
15 one.
16     Q    So, if you lose market share in
17 glucoamylase, is it also the case that you lose
18 market share in glucoamylase?
19         MR. SULLIVAN:  Objection to the
20     form.
21     A    I don't understand the question.
22     Q    I may have misunderstood you, so
23 I'm not trying to confuse you, I just want to
24 make sure.
25         MR. SULLIVAN:  I think you

Page 41

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  basically misstated what you meant to
3  say there.
4          MR. LANIER:  That could well be,
5      thank you.
6      Q    As I understand your testimony,
7  the entry of Spezyme Ethyl into the market
8  reduced Novozymes or Novozymes North America's
9  market share in the U.S. fuel ethanol market,
10 correct?
11     A    I don't know that for sure.
12     Q    Did the entry of Spezyme Ethyl
13 on to the market -- on to the alpha amylase
14 market change Novozymes' or Novozymes North
15 America's market share for glucoamylase
16 products?
17     A    I don't know that for sure.
18     Q    I guess I know the answer, if
19 you wanted to know what would you do?
20     A    I would ask my marketing
21 director. I will ask the North American
22 business people.
23     Q    Let's jump forward in time.
24         Are you aware of a product known
25 as Spezyme Extra?

11  (Pages 38 to 41)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 42

HENRIK MEYER - HIGHLY CONFIDENTIAL
2  A    Yes, I have heard about it.
3  Q    When did you first hear about
4  it?
5  A    I have heard about it from, I
6  don't know, probably only some years -- some
7  months ago when I really started to be looking
8  at this business in detail.
9  Q    When you really started, is that
10 what you said?
11 A    When I personally started to
12 look at this business in detail.
13 Q    What caused you over the last
14 month or so to really start to look at this
15 business in detail?
16 A    That my responsibility have
17 increased to cover this area since the autumn
18 last year.
19 Q    How did your responsibilities
20 change?
21 A    I have the total marketing
22 responsibility for the whole area.
23 Q    What did you have before that
24 change?
25 A    It did not cover the -- all the

Page 43

HENRIK MEYER - HIGHLY CONFIDENTIAL
2  industries, it only covered part of the
3  industries at the time.
4  Q    Which were the industries that
5  were newly added?
6  A    This was -- this was the biofuel
7  area and several other areas.
8  Q    And fuel ethanol is included in
9  biofuel?
10 A    That's correct.
11 Q    Thank you.  When did you acquire
12 this new responsibility for biofuels?
13 A    I'm thinking about that.  Autumn
14 last year.
15 Q    Are you in a position as you sit
16 here today to tell me about competition and
17 pricing trends and everything else in the U.S.
18 fuel ethanol market for the period before you
19 acquired this responsibility?
20 A    I need to understand the
21 question in more detail.
22 Q    Sure.
23     If I were to ask you -- well, I
24 will ask you a question, we will see if you
25 know.

Page 44

HENRIK MEYER - HIGHLY CONFIDENTIAL
2     What has been the pricing trends
3  for Liquozyme products generally, all the
4  products with that name, since they were first
5  introduced into the market?
6  A    I would know of the -- I know of
7  the trend.
8  Q    What is the trend?
9  A    That has been going down.
10 Q    And that's since the
11 introduction of the product?
12 A    Not -- yes, since the
13 introduction of the product, yes.
14 Q    Can you give me a percentage
15 change for any particular year?
16 A    No, I don't know the details.  I
17 mean I know of the price has gone down.
18 Q    You would speak to Mr. Rubin or
19 somebody in the U.S. if you wanted details for
20 the U.S. market?
21 A    That's correct.
22 Q    Let's go back to Spezyme Extra,
23 if we could.
24     Have any U.S. customers of
25 Liquozyme products switched to Spezyme Extra,

Page 45

HENRIK MEYER - HIGHLY CONFIDENTIAL
2  of which you are aware?
3  A    I don't know.
4     MR. SULLIVAN:  Objection as to
5  form.
6  Q    Are you aware of what current
7  Genencor customers, how many, if any of them
8  have switched from whatever product they may be
9  using to Spezyme Extra?
10 A    I don't know that.
11 Q    Do you know whether Novozymes'
12 market share in the U.S. fuel ethanol market
13 has gone up or down since the announcement of
14 the court's decision finding infringement and
15 other things relating to the '031 patent?
16 A    I have not looked at those
17 details.
18 Q    Let's turn back to this
19 document, if we could.  Go back to the next
20 bullet point, "As a general company policy
21 Novozymes A/S does not license its core
22 technology, including industrial enzymes
23 outside of its corporate family."
24     Do you see that?
25 A    Yes.

12  (Pages 42 to 45)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 46

```
 1        HENRIK MEYER - HIGHLY CONFIDENTIAL
 2       Q    Is the '031 patent that brings
 3  us here together today core technology?
 4       A    It is, indeed.
 5       Q    How do you know?
 6       A    Because it covers an area that's
 7  very important for us.
 8       Q    What does it cover?
 9       A    It covers the alpha amylase area
10  in fuel.
11       Q    What do you mean by cover?
12       A    It is -- it covers products that
13  can be used in that area.
14       Q    What products?
15       A    Well, it covers the type of
16  product that is exemplified with the Spezyme
17  Ethyl product.
18       Q    Any other products?
19       A    Not to my knowledge.
20       Q    The licenses we discussed a
21  little earlier today, there were some in the
22  detergent, potentially the baking field we
23  discussed generally, do any of those relate to
24  core technology?
25       A    I need to have that again.
```

Page 47

```
 1        HENRIK MEYER - HIGHLY CONFIDENTIAL
 2       A    Sure.  You recall that earlier
 3  in our conversation this morning we discussed
 4  various licenses, some with Proctor & Gamble,
 5  some with customers, some with Genencor,
 6  generally did any of those relate to core
 7  technology?
 8       A    Some did.
 9       Q    Which ones?
10       A    Some in the detergent area.
11       Q    Who were the other parties to
12  those licenses that were in the detergent area
13  that were core technology?
14       A    I need to understand the
15  question again.
16       Q    I will try and ask it better.
17       A    Okay.
18       Q    I will break it up into a couple
19  of pieces.
20            If I understand you correctly,
21  and please tell me if I'm wrong, some of the
22  licenses in the detergent area that we were
23  discussing generally before related to
24  Novozymes' core technology, is that right?
25       A    Yes.
```

Page 48

```
 1        HENRIK MEYER - HIGHLY CONFIDENTIAL
 2       Q    Identify for me any specific
 3  licenses, either by the name of the license or
 4  the other party that you can that are in that
 5  category that we just mentioned?
 6       A    Okay, an example would be a
 7  discussion with Genencor of the, as I recall
 8  the name the FN 4 license that would be within
 9  the protease area, which is an area of core
10  technology.
11       Q    Any other examples that you can
12  think of?
13       A    That's the one that comes to
14  mind.
15       Q    Why did Novozymes grant a
16  license to core technology in that
17  circumstance?
18       A    There was a business decision
19  where there was technology discussion on both
20  sides, so it was a settlement agreement, I
21  don't know if you call it a settlement
22  agreement, but there was an agreement on
23  technology between Genencor and Novozymes at
24  the time that, among others, included this
25  particular license.
```

Page 49

```
 1        HENRIK MEYER - HIGHLY CONFIDENTIAL
 2            It was a good business decision
 3  to make that.
 4       Q    Could Novozymes A/S sell
 5  Novozymes North America if it wanted to?
 6            MR. SULLIVAN:  Objection,
 7  foundation.
 8       A    I don't know.
 9       Q    Let's turn back to this
10  document, look at another bullet point, it is
11  the sixth one down.
12       A    Yes.
13       Q    Novozymes A/S has no intent to
14  license the '031 patent outside of its
15  corporate family.  Do you see that?
16       A    Um-hum.
17       Q    Is that a yes?
18       A    I see that.
19       Q    Thank you very much.
20            Ultimately who would decide if
21  Novozymes A/S were going to license the '031
22  patent outside of its corporate family, if that
23  were to happen today, whose job would it be to
24  make that decision?
25       A    I would definitely be involved,
```

13  (Pages 46 to 49)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 50

HENRIK MEYER - HIGHLY CONFIDENTIAL
1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2  but such important decisions on core technology
3  would rise most likely to our executive
4  management level.
5      Q    I forgot to ask you earlier, to
6  whom do you report?
7      A    I report it our EVP business
8  operations.
9      Q    To whom does the EVP report?
10     A    To our CEO.
11     Q    So your -- is the EVP, is that
12 person executive management?
13     A    He is one of the whatever, I
14 don't know how many, he has that arrangement.
15     Q    What's that person's name?
16     A    That's Peter Hock Nelson.
17     Q    Let's go to the next bullet
18 point, "NZNA has the implied exclusive right to
19 produce, market, sell and distribute products
20 covered by the patent claims included in
21 Novozymes' A/S patent portfolio in order to
22 compete in the U.S. fuel ethanol alpha amylase
23 market;" do you see that?
24     A    I see that.
25     Q    Are the patent claims of the

Page 51

HENRIK MEYER - HIGHLY CONFIDENTIAL
1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2  '031 patent necessary in any way to produce,
3  market, sell or distribute any Novozymes A/S or
4  NZNA products in the U.S. fuel ethanol alpha
5  amylase market?
6      A    Not to my knowledge.
7      Q    Next bullet point, turn our
8  attention to that one, "NZNA produces, markets,
9  sells and distributes products covered by a
10 Novozymes A/S patent closely related to the
11 '031 patent falling within the same family of
12 patents as the '031 patent."
13     Do you know what that other
14 patent is?
15     A    I can't remember the number, but
16 I think I know what patent is referred to.
17     Q    Describe it as best you can,
18 name, technology, whatever?
19     A    That would be the patent that
20 then covers the Liquozyme product.
21     Q    Do you know what patent it is,
22 can you give me a title or anything like that?
23     A    I forgot that.
24     Q    You don't have all the patents
25 memorized?

Page 52

HENRIK MEYER - HIGHLY CONFIDENTIAL
1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2      Next bullet point, the last one
3  in this response says, "NZNA has an implied
4  exclusive license to the '031 patent."
5      Do you see that?
6      A    Yes.
7      Q    Do you have an understanding of
8  the term implied exclusive license?
9      A    Yes.
10     Q    What's your understanding?
11     A    My understanding is that for all
12 practical purposes they could exercise -- they
13 have the rights to sell product under that
14 patent if they wanted to and had a product they
15 wanted to sell under that patent.
16     Q    As you understand it, I'm
17 sorry --
18     A    And nobody else in the U.S.
19 would have that right.
20     Q    Thank you, I didn't mean to
21 interrupt you.
22     As you understand it, does
23 Novozymes North America have the right to
24 sublicense the patent, the '031 patent to
25 anyone else?

Page 53

HENRIK MEYER - HIGHLY CONFIDENTIAL
1    HENRIK MEYER - HIGHLY CONFIDENTIAL
2      A    Could I hear the question again?
3      Q    Certainly.  As you understand it
4  does Novozymes North America have the right to
5  sublicense the '031 patent to anybody?
6      A    My understanding is that the
7  approval for such a license would always be by
8  the Novozymes Denmark -- by A/S.
9      Q    One more nomenclature thing,
10 occasionally I don't know if you have done it
11 before, you said Novozymes Denmark, is that
12 Novozymes A/S?
13     A    Yes.
14     Q    Just so if you happen to say
15 that, we don't need to keep clarifying it, now
16 we know?
17     A    Novozymes Denmark or A/S, same
18 thing.
19     Q    Thank you.  Thank you for
20 clarifying that.
21     What you say was Novozymes
22 Denmark would have to give approval for such a
23 license, but as you understand it, again your
24 understanding, could Novozymes North America
25 actually grant a sublicense to the '031 patent?

14  (Pages 50 to 53)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER     October 5, 2006
HIGHLY CONFIDENTIAL

Page 54

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2     A     I would think not.
3     Q     Why would you think not?
4     A     Because all such licenses is
5 done very centralized in our organization.
6     Q     And who ultimately runs that
7 centralized function?
8     A     Well, I mean I would be one that
9 would approve it, that would be at our level
10 that -- the V.P. level for approval.
11     Q     Do you know a person in the
12 Novozymes A/S organization Maryanne Nanbo?
13     A     Um-hum.
14     Q     That's yes?
15     A     That is correct, yes, I know
16 her.
17     Q     What's your understanding of her
18 job?
19     A     She's responsible for our
20 licensing department.
21     Q     Does she report up to you?
22     A     No.
23     Q     Would she be involved in a
24 decision with respect to whether or not to give
25 a license to a Novozymes patent in the U.S.

Page 55

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2 fuel ethanol industry?
3     A     She would know that.
4     Q     As you understand the license
5 agreement, could Novozymes North America grant
6 a sublicense of the '031 patent to another
7 entity within the Novozymes family?
8     A     There is some ambiguity in the
9 question, and let me explain why; because I
10 don't know exactly what you mean. So whether
11 they can grant a license or give them -- or can
12 somebody else use it.
13     Q     I was asking the former, could
14 Novozymes -- as you understand the license,
15 could Novozymes North America actually formally
16 grant a sublicense of the '031 patent to some
17 other Novozymes entity?
18     A     In North America?
19     Q     Anywhere; doesn't matter to me.
20     A     No, and there would be no need
21 to do so.
22     Q     Could it do --
23     A     That's how I understand it.
24     Q     If there were a need, or putting
25 aside whether or not there was a need, as you

Page 56

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2 understand the license, is that something
3 Novozymes North America could do?
4     A     I would expect not.
5     Q     Can Novozymes, as you understand
6 the license, can Novozymes North America sell
7 or assign its rights to the '031 patent to
8 anyone?
9         MR. SULLIVAN:  Objection,
10     foundation.
11     A     Yeah, I don't understand that
12 particular question.  It doesn't make any
13 meaning for them to do that.
14         My expectation is they don't
15 have the rights.
16     Q     Do you have a general
17 familiarity with Novozymes' North America's
18 marketing strategy for alpha amylase products
19 in the fuel ethanol market in the United
20 States?
21     A     I need to hear that again.
22     Q     Sure.  Do you have a general
23 familiarity with Novozymes' North America's
24 marking strategy for alpha amylase products in
25 the U.S. fuel ethanol market?

Page 57

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2     A     A general familiarity, yes.
3     Q     Has that strategy changed since
4 the entry of Spezyme Extra?
5     A     I don't know that for a fact.
6     Q     And you would go ask the same
7 people we have been talking about, is that
8 right?
9     A     That's right.
10         MR. LANIER:  Let me ask the court
11     reporter to mark as Exhibit 2 another
12     document that's been marked at previous
13     depositions, it's probably a trial
14     exhibit, you don't remember the numbers
15     offhand, you don't need to worry about
16     any of that, for you it's Exhibit 2 it
17     bears the production numbers NV-D
18     0126375 through 396, it's an e-mail from
19     Jeff Fowler to various folks that also
20     attaches a Power Point.
21         (The above described document was
22     marked Meyer Exhibit 2 for identification
23     as of this date.)
24     Q     First general question for you,
25 sir, is whether you've ever seen before this

15  (Pages 54 to 57)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 58

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  document including the Power Point attached?
3      A    No. I've never seen it.
4      Q    There is on the first page the
5  e-mail there, there is an e-mail alias listed
6  NZNA fuel industry group, do you see that?
7      A    Yes, um-hum.
8      Q    Is that yes?
9      A    Yes.
10      Q    Are you aware generally of the
11  use of group names to send e-mails to a large
12  category or class of people?
13      A    Yes.
14      Q    Are you a member of that group?
15      A    I don't know.  I can't remember.
16      Q    There has been some testimony
17  that this document, the Power Point that's
18  attached, came out of a brainstorming session
19  some time before the document earlier in this
20  year about how to sell against various alpha
21  amylase products in the U.S.?
22      A    Yes.
23      Q    Were you part of that
24  brainstorming session?
25      A    No.

Page 59

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      Q    In the ordinary course of your
3  job would you be?
4      A    Not necessarily, no.
5      Q    Are you aware of what products
6  have competed with Novozymes North America's
7  Liquozyme and Termamyl products over time
8  before you got your added responsibilities for
9  biofuels?
10      A    I have heard about it.
11      Q    As you understand it, based on
12  what knowledge you have, what products have
13  competed with Novozymes' North America's
14  Liquozyme and Termamyl products since those
15  products, the Termamyl and Liquozyme products
16  have been on the market?
17      A    Well, Spezyme Ethyl in the alpha
18  amylase market is the main one, then
19  glucoamylases in the other.
20      Q    Are you familiar with a Genencor
21  products known as Spezyme Fred and Spezyme Fred
22  L and Spezyme HPA?
23      A    I heard of them, yes.
24      Q    Do you know anything about their
25  market share over time?

Page 60

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      A    I can't recall the exact market
3  share.
4      Q    Do you know anything about
5  whether their market shares over time have gone
6  up or down or anything like that?
7      A    I can't remember.
8      Q    That's again something we talked
9  to the various other people.
10      A    I will talk to my specialist
11  about those things, yes.
12          MR. LANIER:  Why don't we take a
13  five minute break now.
14          (At this point in the proceedings
15      there was a recess, after which the
16      deposition continued as follows:)
17          MR. LANIER:  Let's go back on the
18      record.
19      Q    Mr. Meyer, as a result of the
20  break or if for any other reason if you can
21  think of any of your previous answers you need
22  to amend or change or anything like that?
23      A    No.
24      Q    A couple of general questions
25  for you, then we will plunge back in a few more

Page 61

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  specific topics for what I guess will be an
3  hour or less together today remaining.
4          I spoke at length this morning
5  with Mr. Loft about the APA or advance pricing
6  agreement that was reached with the U.S. and
7  Danish tax authorities and Novozymes North
8  America.
9          First of all, are you generally
10  familiar with that agreement?
11      A    No, I'm not.
12      Q    As between you and Mr. Loft, who
13  knows more about that agreement?
14      A    That is Benny Loft who knows all
15  about that.  Something about that, at least.
16      Q    I won't bug you any more about
17  that one.
18          Prior to coming to Novozymes,
19  had you any direct experiences with the fuel
20  ethanol industry in the U.S. or elsewhere?
21      A    Prior to?
22      Q    Yes, prior to.
23      A    I need to have the question
24  again.
25      Q    Before you came to Novozymes,

16  (Pages 58 to 61)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER   October 5, 2006
HIGHLY CONFIDENTIAL

Page 62

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  had you had any business experience with the
3  fuel ethanol industry?
4      A    No.
5      Q    Very generally what were the
6  industries that you dealt with at American
7  Cyanamid?
8      A    That was the agricultural
9  business.
10     Q    Before coming to Novozymes, had
11 you had any direct business experience with
12 alpha amylase products?
13     A    No.
14     Q    Before coming to Novozymes, had
15 you had any direct business experience with
16 glucoamylase products?
17     A    No.
18     MR. LANIER: I ask the court
19     reporter to mark as Exhibit 3 an
20     agreement I think we have been talking
21     about for a while, let's just make sure,
22     called the technology license agreement.
23     (The above described document was
24     marked Meyer Exhibit 3 for identification
25     as of this date.)

Page 63

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      Q    A general question or two before
3  we plunge directly into this. You recall that
4  we have spoken about this morning about a
5  technology license agreement between Novozymes
6  North America and Novozymes A/S, do you recall
7  that generally?
8      A    I recall that.
9      Q    The question for you, sir, and
10 review this to the extent you need to, is
11 whether Exhibit 3 is the technology license
12 agreement that we had been discussing?
13     A    Yes, I think that's the
14 agreement we have been discussing.
15     Q    Would Novozymes A/S ever sue
16 Novozymes North America for patent
17 infringement?
18     MR. SULLIVAN: I'm sorry, I
19     missed the first word.
20     Q    Would Novozymes A/S ever sue
21 Novozymes North America for patent
22 infringement?
23     MR. SULLIVAN: Objection, calls
24     for a legal conclusion, calls for
25     speculation.

Page 64

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2      A    Yes, I don't know what to answer
3  to that question.
4      Q    It's a serious question for
5  reasons that will become apparent, can you
6  conceive of any circumstance under which
7  Novozymes A/S would sue Novozymes North America
8  for patent infringement?
9      A    I cannot.
10     Q    Then why have a formal license
11 agreement?
12     A    To my understanding the reason
13 for a license agreement is that -- that you
14 need that for legal purposes to exercise your
15 right as a legal entity.
16     Also -- and then the form also
17 is important with regard to taxation in North
18 America and taxation in Denmark.
19     Q    So, if the form is important and
20 you need it for legal purposes, why isn't
21 everything about the license relationship
22 included in this agreement?
23     A    I don't understand that
24 question.
25     Q    You told me earlier today that

Page 65

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2  for all practical purposes it operates like an
3  exclusive, et cetera, et cetera.
4      Is that in this agreement?
5      MR. SULLIVAN: Objection to the
6     form.
7      A    I don't understand exactly where
8  you are heading with this.
9      Q    I will try and break my
10 questions down, they know where I'm headed but
11 you don't have to know, necessarily.
12     A    As long as I know what you want
13 me to answer.
14     Q    Well, you have to decide what
15 you answer.
16     This technology license
17 agreement, Exhibit 3 to your deposition?
18     A    Yes.
19     Q    Is there any other written
20 agreement you are aware of that relates to the
21 scope of the license between Novozymes A/S and
22 Novozymes North America?
23     A    I don't know that.
24     Q    Are you aware of any other
25 agreement that in any way affects the rights of

17 (Pages 62 to 65)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

Page 66

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   Novozymes North America with respect to the
3   '031 patent besides this technology license
4   agreement?
5       A    I'm not aware of that.
6       Q    Do you know about whether the
7   exclusivity or non-exclusivity of the license
8   granted in this technology license agreement
9   had any bearing on the negotiation of the
10  royalty rate with the U.S. and Danish tax
11  authorities?
12      A    I don't understand the word
13  bearing, so maybe you can rephrase it.
14      Q    Is it related in any way to that
15  negotiation?
16      A    To the -- could you maybe repeat
17  in small fractions so I answer the right thing?
18      Q    No problem.
19          There is a license -- there is a
20  royalty rate in this license agreement, you
21  recall that generally?
22      A    Yes.
23      Q    And as you testified earlier,
24  that royalty rate resulted, at least in part,
25  from negotiations with the U.S. and Danish tax

Page 67

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   authorities, correct?
3       A    And Novozymes, yes.
4       Q    Did the exclusivity or
5   non-exclusivity, whatever it is of the license
6   that is conferred on Novozymes North America,
7   affect the negotiations with the U.S. and
8   Danish tax authorities that ultimately led to
9   that royalty rate?
10      A    I don't know that.
11      Q    As you understand the license
12  agreement, were Novozymes N.A. to be sold in
13  whole or in part to someone else, would it
14  still have its rights under the technology
15  license agreement?
16          MR. SULLIVAN: Objection,
17  foundation.
18      A    I don't know that.
19      Q    You can put this license
20  agreement away now. I'm done asking you
21  questions about it.
22          Let's turn to a related topic,
23  though, this notion of core technology we
24  discussed. Do you recall that generally?
25      A    Yes.

Page 68

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2       Q    Over time does technology that
3   was at one point core technology ever become
4   non-core technology, or more precisely cease to
5   be core technology?
6       A    That's a very general question.
7   That can, of course happen.
8       Q    Is there anything that you are
9   aware of that prevents Novozymes from licensing
10  it's core technology if it chose to do so?
11      A    No.
12          MR. LANIER: Let's look at one
13      other thing, sir.
14          (The above described document was
15      marked Meyer Exhibit 4 for identification
16      as of this date.)
17          MR. LANIER: I am going to ask
18      the court reporter to mark one other
19      agreement called the framework agreement
20      for services.
21      Q    First question, sir, is whether
22  you recognize this agreement?
23      A    I can't remember. I might have
24  read it, but I can't remember.
25      Q    Let me draw your attention, sir,

Page 69

HENRIK MEYER - HIGHLY CONFIDENTIAL
1
2   to the appendix, which is the last page.
3          Under the first grouping it
4   says, "services provided by NZNA to NZAS," then
5   it lists a variety of services; do you see
6   that?
7       A    Yes.
8       Q    One of them is, "contract
9   drafting and negotiation in connection with
10  licensing agreements and other contractual
11  arrangements involving intellectual property;"
12  do you see that?
13      A    Yes.
14      Q    Have you in your involvement in
15  licenses ever called on NZNA to provide such a
16  service?
17      A    Yes, I think so.
18      Q    As you understand, putting this
19  specific agreement aside, as you understand the
20  relationship between the entities, are you
21  required to call on NZNA for any contract
22  drafting and negotiation with respect to any
23  license agreements?
24      A    I would not be required, if I
25  had other options to do it, but if there is a

18  (Pages 66 to 69)

1e0e0de1-0015-4a95-9c82-29cca0148065

HENRIK MEYER    October 5, 2006
HIGHLY CONFIDENTIAL

---

Page 70

1     HENRIK MEYER - HIGHLY CONFIDENTIAL
2  way to do it through the U.S. capable people, I
3  would be able to use them, as any other part of
4  the Novozymes family of companies and
5  expertise.
6         MR. LANIER:  On that happy note,
7  sir, I have no more questions for you.
8         MR. SULLIVAN:  I have no
9  questions.
10
11  _____
          HENRIK MEYER
12  Subscribed and sworn
13  to before me this _____
14  day of _____, 2006.
15
16  _____
17     Notary Public
18
19
20
21
22
23
24
25

---

Page 71

1      HENRIK MEYER - HIGHLY CONFIDENTIAL
2          E X H I B I T S
3
4  MEYER              PAGE
5
6  1   Novozymes' A/S's responses to   15
        Defendant's fifth set of
7       interrogatories
    2   E-mail from Jeff Fowler to    57
8       various people that also
        attaches a Power Point
9  3    Technology license agreement.   62
    4   Framework agreement for    68
10      services
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 72

1     HENRIK MEYER - HIGHLY CONFIDENTIAL
2
3        C E R T I F I C A T E
4
5      I, STEPHEN J. MOORE, a Shorthand
6  Reporter and Notary Public of the State of New
7  York, do hereby certify:
8
9        That, HENRIK MEYER, the witness
10  whose deposition is hereinbefore set forth was
11  duly sworn, and that such deposition is a true
12  record of the testimony given by such witness.
13
14        I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage; and that I am in no way
17  interested in the outcome of this matter.
18
19
20  _____
       Stephen J. Moore, RPR,
21     CRR.
22
23
24
25

---

Page 73

1     HENRIK MEYER - HIGHLY CONFIDENTIAL
2          ERRATA SHEET
3
4  PAGE/LINE   CHANGE FROM   CHANGE TO
5  _____   _____   _____
6  _____   _____   _____
7  _____   _____   _____
8  _____   _____   _____
9  _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  _____   _____   _____
23  _____   _____   _____
24  _____   _____   _____
25  _____   _____   _____

19  (Pages 70 to 73)

1e0e0de1-0015-4a95-9c82-29cca0148065