**3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,

                Plaintiff

    v.

GENENCOR INTERNATIONAL, INC., and

ENZYME DEVELOPMENT CORPORATION

                Defendants

C.A. No. 05-160-KAJ

## NOVOZYMES A/S' RESPONSES TO
## DEFENDANTS' FIRST REQUEST FOR ADMISSIONS (NOS. 1-26)

        Pursuant to Rule 36 of the Federal Rules of Civil Procedure, the Local Rules of

the United States District Court for the District of Delaware, and the Orders of the Court,

Plaintiff Novozymes A/S ("Novozymes"), by its attorneys, responds and objects to the first

requests for admission (the "Requests") by defendants Genencor International, Inc. and Enzyme

Development Corporation (collectively, "Defendants").

## GENERAL OBJECTIONS

    1.      Novozymes objects to the definitions incorporated into the Requests from

Defendants' First Set of Interrogatories and to Defendants' First Request for the Production of

Documents and Things to Plaintiff Novozymes A/S as set forth in its response to those

interrogatories and documents requests.

    2.      Novozymes objects to the Requests to the extent that they seek to impose duties

over and above those required by the Federal Rules of Civil Procedure, the Local Rules of this

District, and this Court's orders. Novozymes' responses shall be made only in accordance with the applicable Rule(s).

3.    Novozymes objects to the Requests to the extent that they relate to issues irrelevant to Novozymes' Motion for Leave to Amend the Complaint for the Purpose of Joining Novozymes of North America, Inc. ("NZNA") as a Co-Plaintiff.

4.    Novozymes objects to the Requests to the extent they seek information protected by the attorney-client privilege, the attorney work-product privilege, or any other privilege that would protect such information from disclosure.

5.    Novozymes objects to the Requests to the extent they seek proprietary and/or confidential business information, which will be produced only subject to the terms of the Protective Order.

6.    The responses given herein shall not be deemed to waive any claim of privilege or immunity Novozymes may have as to any response, document or thing, or any question or right of objection as to authenticity, competency, relevancy, materiality, admissibility, or any other objection Novozymes may have as to a demand for further response to these or other Requests, or to any objection to the use of such information, documents or things in any other proceeding filed after the production of such information or documents.

7.    These General Objections are applicable to and are incorporated in each specific response herein without further reference. The inclusion of specific objection(s) in response to any Requests shall not be construed as a waiver of such objection.

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that on July 18, 2006, counsel for Novozymes A/S raised for the first time the issue of joining NZNA as a co-plaintiff.

### RESPONSE TO REQUEST NO. 1:

Admitted.

### REQUEST FOR ADMISSION NO. 2:

Admit that Novozymes A/S did not produce the January 1, 1996 Technology License Agreement and the January 1, 2005 Marketing Agreement to Defendants until July 19, 2006.

### RESPONSE TO REQUEST NO. 2:

Plaintiff admits that Novozymes produced the January 1, 1996 Technology License Agreement and the January 1, 2005 Marketing Agreement to Defendants on July 19, 2006.

### REQUEST FOR ADMISSION NO. 3:

Admit that Novozymes A/S did not produce the January 1, 2001 Framework Agreement for Services to Defendants until July 20, 2006.

### RESPONSE TO REQUEST NO. 3:

Plaintiff admits that Novozymes produced the January 1, 2001 Framework Agreement for Services to Defendants on July 20, 2006.

### REQUEST FOR ADMISSION NO. 4:

Admit that Novozymes A/S voluntarily structured its relationship with NZNA for business purposes.

**RESPONSE TO REQUEST NO. 4:**

Novozymes objects to the term "voluntarily structured" as vague and ambiguous. Novozymes admits that its relationship with all of its subsidiaries, NZNA included, is structured to comply with applicable laws and regulations while serving the best interests of its shareholders.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the business purposes for which Novozymes A/S structured its relationship with NZNA were not specifically related to the '031 patent or practice thereof.

**RESPONSE TO REQUEST NO. 5:**

Novozymes admits that its relationship with NZNA was structured to comply with applicable laws and regulations while serving the best interests of its shareholders; otherwise denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that NZNA was not created for the purpose of manufacturing and/or selling products that practice the '031 patent.

**RESPONSE TO REQUEST NO. 6:**

Novozymes admits that NZNA was not created for the sole purpose of manufacturing and/or selling products that practice the '031 patent; otherwise denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that NZNA is separately incorporated from Novozymes A/S.

**RESPONSE TO REQUEST NO. 7:**

Novoyzmes objects to the term "separately incorporated" as vague and ambiguous. Novozymes admits that NZNA is a U.S. corporation and Novozymes A/S is a Danish corporation.

**REQUEST FOR ADMISSION NO. 8:**

Admit that NZNA pays its employees out of its own payroll.

- 4 -

**RESPONSE TO REQUEST NO. 8:**

Novozymes objects to the phrase "out of its own payroll" as vague and ambiguous. Novozymes admits that NZNA pays the majority of its employees from an NZNA bank account.

**REQUEST FOR ADMISSION NO. 9:**

Admit that NZNA pays its own state and U.S. taxes.

**RESPONSE TO REQUEST NO. 9:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that NZNA has its own board of directors.

**RESPONSE TO REQUEST NO. 10:**

Novozymes admits that NZNA has a board of directors consisting of five members, four of whom are executive employees of Novozymes A/S.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Novozymes A/S and NZNA provide services and/or technology that one entity provides to the other pursuant to contractual agreements.

**RESPONSE TO REQUEST NO. 11:**

Admitted.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Novozymes A/S and NZNA charge each other expenses pursuant to contractual agreements.

**RESPONSE TO REQUEST NO. 12:**

Admitted.

- 5 -

**REQUEST FOR ADMISSION NO. 13:**

Admit that Novozymes A/S and NZNA purchase products from each other pursuant to contractual agreements.

**RESPONSE TO REQUEST NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the '031 patent is not specifically mentioned in the January 1, 1996 Technology License Agreement.

**RESPONSE TO REQUEST NO. 14:**

Novozymes admits that the '031 patent is not specifically referenced by title or number in the January 1 1996 Technology License Agreement.

**REQUEST FOR ADMISSION NO. 15:**

Admit that the January 1, 1996 Technology License Agreement does not explicitly transfer to NZNA any proprietary rights to any Novozymes A/S patent.

**RESPONSE TO REQUEST NO. 15:**

Novozymes objects to this request as vague and ambiguous. Novozymes admits that the January 1, 1996 Technology License Agreement does not expressly refer to any specific patents by title or number. Novozymes also admits that the January 1, 1996 Technology License Agreement does not convey ownership of any patents to NZNA. Novozymes also admits that the January 1, 1996 Technology License Agreement does not expressly convey any exclusive rights to any patents to NZNA; otherwise denied.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the '031 patent is not specifically mentioned in the January 1, 2001 Framework Agreement for Services.

- 6 -

**RESPONSE TO REQUEST NO. 16:**

Novozymes admits that the '031 patent is not specifically referenced by title or number in the January 1, 2001 Framework Agreement for Services.

**REQUEST FOR ADMISSION NO. 17:**

Admit that the January 1, 2001 Framework Agreement for Services does not explicitly transfer to NZNA any proprietary rights to any Novozymes A/S patent.

**RESPONSE TO REQUEST NO. 17:**

Novozymes objects to this request as vague and ambiguous. Novozymes admits that the January 1, 2001 Framework Agreement for Services does not expressly refer to any specific patents by title or number. Novozymes also admits that the January 1, 2001 Framework Agreement for Services does not convey ownership of any patents to NZNA. Otherwise, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the '031 patent is not specifically mentioned in the January 1, 2005 Marketing Agreement.

**RESPONSE TO REQUEST NO. 18:**

Novozymes admits that the '031 patent is not specifically referenced by title or number in the January 1, 2005 Marketing Agreement.

**REQUEST FOR ADMISSION NO. 19:**

Admit that January 1, 2005 Marketing Agreement does not explicitly transfer to NZNA any proprietary rights to any Novozymes A/S patent.

**RESPONSE TO REQUEST NO. 19:**

Novozymes objects to this request as vague and ambiguous. Novozymes admits that the January 1, 2005 Marketing Agreement does not expressly refer to any specific patents by title or number. Novozymes also admits that the January 1, 2005 Marketing Agreement does not convey ownership of any patents to NZNA. Otherwise, denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Novozymes A/S does not manufacture or sell any products that practice the '031 Patent.

### RESPONSE TO REQUEST NO. 20:

Novozymes objects to the term "practice" as vague and ambiguous. Novozymes admits that Novozymes A/S does not manufacture or sell any products that would be encompassed by any of the claims of the '031 patent.

**REQUEST FOR ADMISSION NO. 21:**

Admit that NZNA does not manufacture or sell any products that practice the '031 Patent.

### RESPONSE TO REQUEST NO. 21:

Novozymes objects to the term "practice" as vague and ambiguous. Novozymes admits that NZNA does not manufacture or sell any products that would be encompassed by any of the claims of the '031 patent.

**REQUEST FOR ADMISSION NO. 22:**

Admit that Novozymes A/S does not itself manufacture products that compete with Spezyme[®] Ethyl in the United States.

### RESPONSE TO REQUEST NO. 22:

Novozymes admits that Novozymes A/S manufactures products that compete with Spezyme[®] Ethyl in the United States through its United States subsidiary, NZNA; otherwise denied.

**REQUEST FOR ADMISSION NO. 23:**

Admit that Novozymes A/S does not itself sell products that compete with Spezyme[®] Ethyl in the United States.

### RESPONSE TO REQUEST NO. 23:

Novozymes admits that Novozymes A/S sells products that compete with Spezyme[®] Ethyl in the United States through its United States subsidiary, NZNA; otherwise denied.

- 8 -

**REQUEST FOR ADMISSION NO. 24:**

Admit that Novozymes A/S has not licensed the '031 patent for profit.

**RESPONSE TO REQUEST NO. 24:**

Novozymes admits that Novozymes A/S has not licensed the '031 patent to any entity or individual outside of the Novozymes family of companies.

**REQUEST FOR ADMISSION NO. 25:**

Admit that NZNA is not an implied exclusive licensee of the '031 Patent.

**RESPONSE TO REQUEST NO. 25:**

Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that the January 1, 1996 Technology License Agreement coveys a non-exclusive, nontransferable right and license to use the Technology described in the agreement.

**RESPONSE TO REQUEST NO. 26:**

Novozymes admits that among other transfers of rights, the January 1, 1996 Technology License Agreement coveys a non-exclusive, nontransferable right and license to use the Technology described in the agreement.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Dated:    September 28, 2006

Josy W. Ingersoll (No. 1088)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
kkeller@ycst.com

Joseph R. Robinson
David Tellekson
Robert C. Sullivan, Jr.
**DARBY & DARBY P.C.**
805 Third Avenue
New York, New York 10022
(212) 527-7700

Attorneys for Plaintiff
Novozymes A/S

- 10 -

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on September 28, 2006, I caused to be served a true

and correct copy of the foregoing document to the following counsel of record:

**BY ELECTRONIC MAIL AND HAND DELIVERY**

Donald E. Reid, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

**BY ELECTRONIC MAIL**

Tharan Gregory Lanier, Esquire
Jane Froyd, Esquire
JONES DAY
2822 Sand Hill Road, Suite 240
Menlo Park, CA 94025

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*Karen E. Keller*

Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Novozymes A/S*

**4**

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------------------

NOVOZYMES A/S,

                    Plaintiff,

                              C.A. No. 05-160-KAJ

          -  v -


GENENCOR INTERNATIONAL INC., and
ENZYME DEVELOPMENT CORPORATION,
                    Defendants.

----------------------------------------------------

                    8:30 a.m.
                    October 5, 2006

                    805 Third Avenue
                    New York, New York

          HIGHLY CONFIDENTIAL

          DEPOSITION of BENNY LOFT, a Witness in the
     above entitled matter, taken pursuant to
     Notice, before Stephen J. Moore, a Registered
     Professional Reporter, Certified Realtime
     Reporter, and Notary Public of the State of New
     York.

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 2

BENNY LOFT - HIGHLY CONFIDENTIAL

A P P E A R A N C E S:

DARBY & DARBY P.C.
    Attorneys for Plaintiff
    805 Third Avenue
    New York, New York 10022

BY:  ROBERT C. SULLIVAN, JR., ESQ.

JONES DAY
    Attorneys for Defendants
    2822 Sand Hill Road, Suite 940
    Menlo Park, California 94025

BY:  THARAN GREGORY LANIER, ESQ.

Page 3

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2  B E N N Y   D A L G A A R D   L O F T, called as
3    a witness, having been first duly sworn by
4    the Notary Public, was examined and
5    testified as follows:
6
7  EXAMINATION BY MR. LANIER:
8
9    Q    Good morning, sir.  We met
10 briefly before the deposition, but my name is
11 Greg Lanier, I am one the attorneys for
12 Genencor and EDC in this case.
13       Would you state your full name
14 for the record, please?
15    A    It's Benny Dalgaard Loft.
16    Q    Mr. Loft, I'm going to ask you a
17 couple of questions that are for the record not
18 intended to offend or anything like that, but
19 the first is are you a native speaker of
20 English?
21    A    No, I'm not a native speaker of
22 English.
23    Q    Are you comfortable testifying
24 today in English?
25    A    Yes.

Page 4

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    Q    Do you regularly use English for
3  business purposes both reading and writing and
4  speaking English?
5    A    Yes.
6    Q    During the course of the day if
7  any of my questions, sometimes I'll get rolling
8  along or I will speak too fast, if for whatever
9  reason you don't understand any of my
10 questions, do you understand that you can ask
11 me to stop, repeat, clarify my question; do you
12 understand that?
13    A    Yes.
14    Q    I am sure you had counsel giving
15 you some guidance about the processes and rules
16 for depositions.  Let me just remind you of a
17 couple of the other ground rules and ask you
18 some questions about your understanding.
19       First, do you understand that
20 the oath you just took is the same oath with
21 the same force and effect as if you were
22 testifying in court in front of a judge?
23    A    Yes.
24    Q    Do you understand that I don't
25 want you to guess or speculate in answer to any

Page 5

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2  of my questions but to give me your best answer
3  based on your recollection as you sit here
4  today?
5    A    Um-hum.
6    Q    That gets to our next one, do
7  you understand that you need to give a response
8  the reporter can transcribe, a yes or a no or
9  other words?
10    A    Yes.
11    Q    You will forget during the day,
12 I will remind you or your counsel will remind
13 you, it happens all the time.
14       We will go for a few hours
15 today, I don't think any more than three or so
16 we will take breaks periodically.
17       If you need to take a break at
18 some point, please let me know.  Typically we
19 don't take breaks between when I have asked you
20 a question and when you have answered it, but
21 your counsel knows the rules about when that's
22 all permitted and we will all stay together on
23 that.
24       Do you understand all that?
25    A    Yes, I do.

2 (Pages 2 to 5)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 6

```
1        BENNY LOFT - HIGHLY CONFIDENTIAL
2      Q    Is there any reason why you feel
3  you are not able to testify competently today
4  or you're feeling ill, you are not on
5  medication or anything like that?
6      A    No.
7      Q    What's your current employer?
8      A    Novozymes A/S.
9      Q    What's your position?
10     A    I am Vice President of Finance
11 and heading up IT also.
12     Q    Information Technology?
13     A    Yes.
14     Q    Thank you.
15          How long have you been in that
16 position?
17     A    Which one of them?
18     Q    Vice President of Finance?
19     A    I've been there for six years.
20     Q    Were you employed at Novozymes
21 before being Vice President of Finance?
22     A    Ask again, please.
23     Q    Were you employed by Novozymes
24 before you were Vice President of Finance?
25     A    I was employed by Novo Nordisk,
```

Page 7

```
1        BENNY LOFT - HIGHLY CONFIDENTIAL
2  which was the company which was formed into two
3  companies, Novo Nordisk was a company which was
4  demerged into two companies, Novozymes being
5  one of them, and I was becoming Vice President
6  at the demerger time six years ago.
7      Q    So you have held that Vice
8  President of Finance position the entire time
9  that you have been at Novozymes A/S since the
10 demerger, correct?
11     A    That's correct.
12     Q    How long have you had the IT
13 position?
14     A    Since May this year.
15     Q    Before the demerger what was
16 your position with Novo Nordisk?
17     A    Director of consolidation and
18 external reporting and production and inventory
19 and accounting and taxes.
20     Q    I want you to spend a minute or
21 two to get some nomenclature, some terms
22 straight between us so we are not confused as
23 we talk to each other today.
24          During the course the day I may
25 say Novozymes A/S or NZAS, do you recognize
```

Page 8

```
1        BENNY LOFT - HIGHLY CONFIDENTIAL
2  them to be -- I will use those terms to refer
3  to the same entity?
4      A    I prefer if you could say
5  Novozymes A/S and Novozymes North America.
6      Q    That's fine, I will do that
7  then.  If I forget and as a result of that if
8  any of my questions are confusing, please tell
9  me, I will use the full name so we are very
10 clear on the record here.
11          Would you describe generally
12 what your responsibilities are in your
13 concurrent position?
14     A    Heading up finance is, of
15 course, heading up a lot of stuff related to
16 finance, being tax, treasury, consolidation,
17 but -- yeah.
18          And within IT it's responsible
19 for information technology at Novozymes, in
20 both jobs it's -- I'm the manager -- I'm the
21 leader of these two functions.
22     Q    I met a few weeks ago a fellow
23 named Richard Olofson; do you know him?
24     A    Yes.
25     Q    Does he report to you?
```

Page 9

```
1        BENNY LOFT - HIGHLY CONFIDENTIAL
2      A    No.
3      Q    Does he report to someone that
4  reports to you?
5      A    No.
6      Q    Does Mr. Olofson report to you
7  indirectly?
8      A    Yes.
9      Q    How does that chain work?
10     A    It works the way that I, as I
11 said, have a leadership responsibility, I
12 manage people in Denmark and these people are
13 managed in Denmark, they receive information on
14 a monthly basis from individuals.
15     Q    So how many layers or levels of
16 people are between you and Mr. Olofson?
17     A    Two.
18     Q    What are the positions of those
19 names and positions, if you remember them, of
20 the two layers of people between you and
21 Mr. Olofson?
22     A    The position I have is Vice
23 President and then the next lower position
24 would be director and beneath that will be
25 manager.
```

3 (Pages 6 to 9)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 10

BENNY LOFT - HIGHLY CONFIDENTIAL
2  Q    So, who's the relevant director
3 that's between you and Mr. Olofson?
4  A    It's the finance director of
5 Novozymes North America.
6  Q    What's that person's name?
7  A    It's Mike Pocanan.
8  Q    Then who's the relevant manager
9 that fits in there?
10  A    I don't understand your
11 question.
12  Q    You had mentioned that there was
13 a director position between you and Mr. Olofson
14 and then a manager position between the
15 director and Mr. Olofson; did I get that right?
16  A    I don't think so, but try again.
17  Q    Does Mr. Olofson report to that
18 director that you just mentioned?
19  A    Yes.
20  Q    Thank you, now I've got it.
21     Do you have any, you personally
22 have any day-to-day responsibilities in your
23 finance role that have anything to do
24 specifically with Novozymes North America?
25  A    I think you have to -- I really

Page 11

BENNY LOFT - HIGHLY CONFIDENTIAL
2 don't understand what you mean by direct or, if
3 you could rephrase it a little bit.
4  Q    In doing your day-to-day job, do
5 any of the things that you do every day relate
6 directly to the business and financial
7 information of Novozymes North America,
8 specifically that entity?
9  A    No.
10  Q    Do you have an understanding of
11 the structure by which Novozymes A/S ultimately
12 owns Novozymes North America?
13  A    I know the structure.
14  Q    What is the structure?
15  A    Novozymes A/S owns a holding
16 company in the U.S. which holds 100 percent
17 shares in Novozymes North America.
18  Q    Was that structure in place,
19 that basic structure in place before the
20 demerger?
21  A    For good reason it couldn't be.
22  Q    What was the good reason?
23  A    Novozymes did not exist,
24 Novozymes A/S did not exist.
25  Q    Novo Nordisk owned an entity or

Page 12

BENNY LOFT - HIGHLY CONFIDENTIAL
2 one or more entities in the United States
3 before the demerger, correct?
4  A    I don't remember the old
5 structure of Novo Nordisk.
6  Q    Do you remember when the entity
7 that is currently Novozymes North America was
8 formed?
9  A    When it was formed?
10  Q    Yes.
11  A    I don't remember exactly when.
12  Q    Was there -- the entity that is
13 now Novozymes North America, was there a
14 similar -- was there an entity in the Novo
15 Nordisk structure that became Novozymes North
16 America as part of the overall demerger
17 process?
18  A    As far as I remember, yes.
19  Q    Were you involved in any of the
20 decision-making about the creation and founding
21 of that North American entity that ultimately
22 became Novozymes North America?
23  A    I was part of the decision.
24  Q    What was the purpose for
25 creating that entity?

Page 13

BENNY LOFT - HIGHLY CONFIDENTIAL
2  A    I don't remember.
3  Q    Do you remember when the
4 decision was made?
5  A    You have asked me that question
6 before, no.
7  Q    When Novozymes -- when the
8 demerger transaction happened, was there any
9 thought given to changing the structure, other
10 than simply transitioning ownership to what
11 became the Novozymes A/S entity, was there any
12 thought to changing the structure by which the
13 ultimate Danish parent company owned the United
14 States entity that is now Novozymes North
15 America?
16     MR. SULLIVAN:  Objection,
17 foundation.
18  A    I understand why you did that.
19 I have answered that question before.  I don't
20 remember all the details behind it.
21  Q    In your current position do you
22 have any job responsibilities that relate
23 specifically to the fuel ethanol industry?
24  A    Try to ask that question again,
25 please?

4  (Pages 10 to 13)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 14

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    Q    Sure.  Doing your job
3    day-to-day, do any of your job day-to-day tasks
4    involve decisions or matters specifically
5    relating to the fuel ethanol market?
6    A    I think I need to understand
7    what you mean by day-to-day work.
8    Q    I meant it in a very pedestrian
9    sense, you walk into your office one morning
10    and do the job that you do and on a regular
11    basis there are probably tasks that you do more
12    than once, I don't know what they are, in the
13    ordinary course you walk into your office or do
14    your job, do the things that you do regularly
15    relate specifically, any of them, relate
16    specifically to the fuel ethanol industry?
17    A    On a recurring basis, no.
18    Q    What did you mean by on a
19    recurring basis?
20    A    Meaning that the way that I work
21    would be that I manage other people and from
22    time to time there could turn out to be
23    questions in respect of the bio-enzyme
24    business.
25    Q    Do you have any personal

Page 15

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    knowledge or familiarity with a competition
3    between Novozymes North America and Genencor in
4    the United States fuel ethanol markets?
5    A    If I -- try to ask that question
6    again, please.
7    Q    Sure.  Do you personally know
8    anything about the competition, the competition
9    in the day-to-day marketplace between Novozymes
10    North America and Genencor specifically in the
11    field of fuel ethanol, specifically in the
12    United States?
13    A    No detailed knowledge.
14    Q    Do you know anything personally
15    about the products that Genencor sells in that
16    market?
17    A    No.
18    Q    Do you know anything personally
19    about the products that Novozymes North America
20    sells in that market?
21    A    If I know the name of the
22    product, or what is the question?
23    Q    Beyond knowing the name of the
24    product.
25    A    No.

Page 16

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    Q    Do you know anything about how
3    Novozymes North America's sales of Liquozyme
4    have changed over time, gone up, gone down?
5    A    No.
6    Q    The answer was no?
7    A    No.
8    Q    One caution I need to give you
9    is occasionally my questions will trail off and
10    I will add a qualifier or another clause, so
11    I'll need to finish my whole question, that's
12    why I may occasionally ask you to reanswer it
13    once I get my whole question out.
14    By that same token, if I have
15    interrupted any of your answers, please tell me
16    and it's my job to make sure you get to answer
17    the question completely; do you understand all
18    that?
19    A    Yes.
20    Q    Thank you, sir.
21    I am going to show you a
22    document that has been marked as Exhibit 1 to
23    your deposition.
24    MR. LANIER:  Rob, on a logistical
25    note, I am just going to, for today's

Page 17

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    two depositions, we are going to mark
3    them Loft 1 through whatever and Meyer 1
4    through whatever rather than try to keep
5    in any sequence.
6    MR. SULLIVAN:  That's fine.  Let
7    me just mention again that we would like
8    to designate this entire transcript,
9    including your exhibits, as
10    confidential, highly confidential.
11    MR. LANIER:  Well, this first one
12    hasn't been marked that, I get the
13    general designation point and we will
14    deal with that as we get closer to
15    trial, which is not very far away.
16    (The above described document was
17    marked Loft Exhibit 1 for identification,
18    as of this date.)
19    Q    Loft 1, let me shoot that across
20    to you, is Novozymes A/S's responses to
21    interrogatories, those are questions that we
22    lawyers put to Novozymes A/S in this
23    litigation.
24    My first question for you, sir,
25    is whether you recognize this document, have

5  (Pages 14 to 17)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT   October 5, 2006
HIGHLY CONFIDENTIAL

Page 18

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  you ever seen it before?
3      A    No.
4      Q    I'm going to draw your attention
5  to some specific questions in this, give you
6  the opportunity to read the question and answer
7  first then ask you a little about them, so if
8  you would turn first to Page 6 of the document.
9          It's interrogatory number 29.
10 Please read that to us, the question and the
11 answer, please.
12     A    Hold on, I'm getting it.
13     Q    No problem.
14         Please read number 29 to
15 yourself, the question and the answer and tell
16 me when you are done.
17     A    And that will be this, correct?
18         MR. SULLIVAN: Yes.
19     Q    Yes.
20     A    Yes, I have read it, I might be
21 asking to read it again.
22     Q    Of course, if you need to --
23 during the course of your time together, if you
24 need to read or reread anything I've given you
25 so you can properly answer my questions or

Page 19

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  understand them, tell us and we will let you do
3  it.
4      A    I will do that.
5      Q    Do you note, sir, in the first
6  paragraph of the response a reference to
7  interrogatory number 25 and your name follows a
8  few names after that?
9      A    Um-hum.
10     Q    Was that a yes?
11     A    What is your question?
12     Q    You need to say yes or no.  Did
13 you notice that?
14     A    To which question?
15     Q    Do you see your name there, sir?
16     A    I can see my name.
17     Q    Thank you.
18         Let's turn to interrogatory
19 number 25. Take a moment, read the question
20 and answer, it starts on Page 3 and it goes to
21 about the middle of Page 4. Please tell me
22 when you are done.
23     A    I have read it.
24     Q    Thank you, sir.  I want to ask
25 you about a couple of specific things that are

Page 20

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  in this response, if you will turn to Page 4,
3  there is that list of items that follow open
4  bullet points, continues on to Page 4?
5      A    Um-hum.  Yes.
6      Q    Three bullet points down there
7  is one that says "Novozymes A/S competes in the
8  U.S. fuel ethanol alpha amylase market by
9  selling, inter alia, Liquozyme SC, Liquozyme
10 DS, Liquozyme NX and Termamyl SC through its US
11 subsidiary NZNA;" do you see it?
12     A    I see it. Does Novozymes A/S
13 directly make sales of those products in the
14 United States?
15         MR. SULLIVAN: Objection to
16 foundation.
17     Q    If you know the answer to the
18 question you may answer it.
19     A    I would not answer.
20         MR. SULLIVAN: I'm just objecting
21     to the form of the question.  If you
22     understand the question, you can answer
23     it, if you can.
24     A    But I don't know the answer to
25 the question.

Page 21

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2      Q    And that, to be fair, as I am
3  sure your lawyer has told you, if your answer
4  is that you don't know the answer then that's
5  an answer to the question and that's fine.
6          So I will ask you questions,
7  your attorney may make objections during the
8  day, if he tells you not to answer, and he will
9  explain this to you if he needs to, then you
10 don't need to answer.  If he objects for the
11 record, which sometimes we lawyers do, you
12 still need to answer.
13         If it turns out you don't know
14 an answer, so be it, that's your answer and
15 that's fine.
16         So, if you don't know the answer
17 to that question, fair enough.
18         Let's look at the next bullet
19 point, the fourth one down says, "As a general
20 company policy Novozymes A/S does not license
21 its core technology, including industrial
22 enzymes, outside of its corporate family."
23         Do you see that?
24     A    Yes.
25     Q    Do you know what is meant by

6  (Pages 18 to 21)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 22

BENNY LOFT - HIGHLY CONFIDENTIAL
2  core technology?
3      A    No.
4      Q    Have you ever been involved in
5  discussions within Novozymes about whether the
6  patent that's at issue in this lawsuit that
7  brings us together, the '031 patent is core
8  technology?
9      A    Ask again, please?
10     Q    Sure.  Have you ever been
11  involved in any discussions within Novozymes
12  about whether the patent that's involved in the
13  lawsuit that's the reason you and I are here
14  together today, whether that specific patent is
15  core technology as referenced in this bullet
16  point we just read?
17     A    I have to ask you to ask the
18  question again, please.
19     Q    Sure.
20         Let me break it down into some
21  smaller parts and see if that helps us.
22         You are aware, sir, are you not,
23  that we are here together because of a lawsuit,
24  is that correct?
25     A    That's correct.

Page 23

BENNY LOFT - HIGHLY CONFIDENTIAL
2      Q    Are you aware that the lawsuit
3  relates to Novozymes A/S asserting that
4  Genencor and EDC infringe a patent owned by
5  Novozymes A/S?
6      A    That's correct; I know that.
7      Q    During the course our time
8  together I may refer to that patent by a
9  number, the shorthand we lawyers use in this
10  case is the '031 patent; are you familiar at
11  all with the '031 patent itself?
12     A    No.
13     Q    Do you know anything about what
14  technology it covers or the claims or anything
15  like that?
16     A    No.
17     Q    Have you ever been involved in
18  any discussions within the company about what
19  is Novozymes A/S' core technology?
20     A    What do you mean by discussion?
21     Q    Conversation?
22     A    I would have overheard a
23  conversation about core technology, but I don't
24  recall it in this connection.
25     Q    In connection with the '031

Page 24

BENNY LOFT - HIGHLY CONFIDENTIAL
2  patent?
3      A    No.
4      Q    Are you, yourself, involved in
5  any of Novozymes A/S's licensing of
6  intellectual property, either licensing out or
7  licensing in?
8      A    No.
9         Can I, just to make sure that I
10  am answering, what do you mean by involved in?
11     Q    Let me ask you about a few
12  specific ways, you might be involved and we
13  will find out.
14         Do you personally ever get
15  involved in decisions should Novozymes grant a
16  particular license of its technology?
17     A    What do you mean by involved in?
18     Q    Be a participant in the
19  decision-making process, be a part of a
20  discussion, written or oral, about should we
21  grant this particular license, for example?
22     A    If there is any economic stuff
23  involved, I might be asked about the economic
24  impact.
25     Q    Like how much money might we

Page 25

BENNY LOFT - HIGHLY CONFIDENTIAL
2  make if we got this license, is that what you
3  mean?
4      A    Yes.
5      Q    Do you or does someone in your
6  group keep track of the license rates that
7  Novozymes charges when it licenses its
8  technology?
9         MR. SULLIVAN:  Objection,
10  foundation.
11     A    If we keep track of our
12  licenses, yes.
13     Q    Do you, yourself, know anything
14  about the percentage royalty rates?
15     A    No, I don't.
16     Q    Do you know whether Novozymes
17  A/S has a policy about what percentage royalty
18  rates it will charge, never less than this
19  never more than this, something like that?
20         MR. SULLIVAN:  Objection to
21  foundation.
22     A    I'm not aware of any policy.
23     Q    Other than the discussion of the
24  potential economic consequences of granting a
25  license, are you ever involved in other

7 (Pages 22 to 25)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 26

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  conversations or decision-making about whether
3  to grant a license?
4      A    Please ask again.
5      Q    Sure.
6          Occasionally there may be
7  discussions about should we grant a license to,
8  say, Genencor, for example, because they are a
9  competitor of ours and how does that affect
10 whether we want to give them a license, are you
11 involved in discussions like that about
12 Novozymes' licenses?
13     A    To be honest, I don't really
14 understand your question.
15     Q    Let me try it a little
16 differently then to make sure I am asking it
17 properly.
18         You are aware, sir, are you not,
19 that over time Novozymes A/S has granted
20 certain licenses to its technology to other
21 companies?
22     A    Yes.
23     Q    You are generally aware of that,
24 correct?
25     A    Yes.

Page 27

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2      Q    Do you recall, putting aside the
3  specific circumstance for a minute, do you
4  recall ever being involved in a specific
5  decision we should grant or not grant this
6  particular license?
7      A    I don't recall any.
8      Q    Have you ever been involved,
9  without telling me anything that you may recall
10 about it first, have you ever been involved in
11 discussions about whether to grant a license to
12 Genencor for any particular technology?
13     A    Again, what do you mean by
14 involved in?
15     Q    A speaking or writing
16 participant in some sort of communication?
17     A    No.
18     Q    So, you are aware discussions
19 may take place, but you yourself are not a
20 participant, is that correct?
21     A    That's correct.
22     Q    If you wanted to know, if you
23 got back to Denmark and you wanted to know the
24 answer to what are the royalty rates that
25 Novozymes has had in its various license

Page 28

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  agreements over time, what would you do?
3      A    I would go to our legal
4  department in Kopenhavn and ask.
5      Q    Have we granted any licenses?
6      A    Yes.
7      Q    Let's look at the next bullet
8  point, it's the fifth one down, it says, "NZNA
9  has always been and continues to be, is the
10 sole licensee of the '031 patent."
11         Do you see that?
12     A    Yes.
13     Q    Do you know whether that is true
14 or not?
15     A    No.
16     Q    The next bullet point down,
17 "Novozymes A/S has no intent to license the
18 '031 patent outside of its corporate family."
19         Do you know whether that is true
20 or not?
21     A    No.
22     Q    The next bullet point, I won't
23 read the whole thing in there, it's the seventh
24 one down, it refers to an implied exclusive
25 right.

Page 29

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2      Do you see that?
3      A    Yes.
4      Q    Do you know what's meant by
5  implied exclusive right there?
6      A    No.
7      Q    Further down it reads -- I will
8  read the whole one in because I need to ask you
9  about something later on in, "NZNA has the
10 implied exclusive right to produce, market,
11 sell and distribute products covered by the
12 patent claims in Novozymes A/S' patent
13 portfolio in order to compete in the U.S. fuel
14 ethanol alpha amylase market."
15         I'm asking you about the in
16 order to compete part.
17         Do you know anything about
18 whether the coverage under the '031 patent is
19 in any way necessary for NZNA to compete in the
20 fuel ethanol amylase market?
21     A    As I stated, I have no knowledge
22 about the '031 patent, so I would not be able
23 to answer that question either.
24     Q    Let me backup and ask the
25 question this way.  If you wanted to know

8  (Pages 26 to 29)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 30

BENNY LOFT - HIGHLY CONFIDENTIAL
1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    whether a particular Novozymes product, let's
3    say the NZNA product Liquozyme was covered by a
4    particular patent of Novozymes, say the '031
5    patent, what would you do to find out the
6    answer to that question?
7        A    Ask again, please.
8        Q    Sure. Referring to the patent
9    that's at issue in this case, the '031 patent,
10   if you, yourself, wanted to know the answer to
11   the question, does the '031 patent cover the
12   Liquozyme product?
13       A    Yes.
14       Q    What would you do to get that
15   answer?
16       A    I would go to our legal
17   department in Kopenhavn.
18       Q    Next bullet point down,
19   "Novozymes produces, markets and sells products
20   covered by a Novozymes A/S patent closely
21   related to the '031 patent falling within the
22   same family of patents as the '031 patent."
23           Do you know what patent is
24   referred to there?
25       A    No.

Page 31

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2        Q    Next bullet point down, and the
3    last one in this section, "NZNA has an implied
4    exclusive license to the '031 patent."
5            Do you know what's meant by
6    implied exclusive license?
7        A    Still no.
8        Q    Let's turn to interrogatory
9    number 26. If you want to check, interrogatory
10   number 29, this is one of the interrogatories
11   where you were said to be someone who knew
12   something about it, please read interrogatory
13   number 26 and the response that goes over to
14   Page 5 and tell me when you are done.
15       A    I have read it. Part of the
16   sentence I do not understand, all the
17   references and stuff.
18       Q    I will direct you to a few
19   specific things, if there is something you
20   don't understand about those, please let me
21   know.
22       A    Yes.
23       Q    I would like to turn to Page 5
24   again, I am going to ask you about one or two
25   of the bullet points in the answer to this one.

Page 32

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2        So in the carryover bullet
3    points on Page 5, the second one down,
4    "Novozymes A/S controls the profits earned and
5    cash received by NZNA;" do you see that, sir?
6        A    Yes.
7        Q    When NZNA, Novozymes North
8    America receives cash, does it account for it
9    separately from cash received by other
10   Novozymes A/S entities?
11       A    What do you mean by if Novozymes
12   North America receives cash?
13       Q    Sure.
14           Novozymes North America sells
15   products, does it not?
16       A    Yes.
17       Q    So, at some point in that
18   process hopefully Novozymes North America is
19   paid cash, correct?
20       A    Yes.
21       Q    Other Novozymes A/S entities may
22   also sell products and receive cash, correct?
23       A    Um-hum.
24       Q    Is that a yes?
25       A    Yes, that's a yes.

Page 33

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2        Q    When that cash is received, some
3    cash is received by Novozymes North America,
4    some cash is received by some other Novozymes
5    A/S entity.
6            Is that cash put into -- when it
7    comes in the door is it put into the same bank
8    account?
9        A    It's control of Novozymes A/S
10   and they are -- all affiliates in the group is
11   required to put the receipts to a Novozymes A/S
12   controlled account.
13       Q    Let me be -- I understand that,
14   let me focus on some more specific details
15   here.
16           They are required to put it in a
17   controlled account. Does each Novozymes entity
18   have its own account or accounts that
19   ultimately are controlled by A/S?
20       A    I say it's to a controlled
21   account, they basically have to place the money
22   at Novozymes A/S and then we will define what
23   to do with the money.
24       Q    I will ask you some really
25   granular, specific questions. Somebody in

9  (Pages 30 to 33)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 34

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  Nebraska writes a check for some Liquozyme, you
3  write a check and they mail it to Novozymes
4  North America to pay for this Liquozyme that
5  they bought.
6          What does Novozymes North
7  America do with that check?
8      A    Put it into the bank account.
9      Q    And where is that bank account?
10     A    I don't know.
11     Q    Ultimately some or all of the
12  cash that Novozymes North America gets is put
13  into bank accounts controlled by Novozymes A/S,
14  correct?
15     A    I think, just to be clear, the
16  cash surplus that exists in North America,
17  Novozymes North America, the cash surplus, that
18  could consist of different bank accounts
19  locally in North Carolina, but the cash surplus
20  they are required to place at Novozymes A/S.
21     Q    What did you mean by cash
22  surplus?
23     A    It means that they, of course,
24  also have a drawing right, might be, I don't
25  know, but it could be, so it's just in, general

Page 35

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  speaking, it's you owe money, but it's do you
3  have money in your account or don't you, on a
4  net basis.
5      Q    So many of the expenses, the
6  operating expenses of Novozymes North America
7  are paid from bank accounts in the United
8  States, correct?
9          MR. SULLIVAN:  Objection to form.
10     A    I would assume so.
11     Q    Novozymes North America
12  employees, where do they get their paychecks?
13         MR. SULLIVAN:  Objection as to
14  form.
15     A    What do you mean by that
16  question?
17     Q    Novozymes North America employee
18  gets paid a check once or twice a month, I
19  don't know how you do it, what bank is on
20  there, is it a bank in the United States, a
21  bank in Denmark?
22     A    It's a bank in the United
23  States.
24     Q    When the surplus cash that you
25  mentioned is sent up to Novozymes A/S, does

Page 36

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  Novozymes A/S keep track of which of its
3  various family entities sent surplus cash and
4  how much?
5          MR. SULLIVAN:  Objection as to
6  form.
7      A    Well, of course we do.
8      Q    What's the purpose for doing
9  that?
10     A    We have to.
11     Q    Why?
12     A    Because it's -- we have to be
13  able to trace where the money is coming from.
14     Q    Why?
15     A    Because in the end it is the
16  legal -- the legal company, Novozymes North
17  America is the one having these -- it's their
18  money until we decide differently.
19     Q    Who makes the decision about
20  what to do with the surplus cash?
21     A    Novozymes A/S.
22     Q    When Novozymes A/S, or excuse
23  me, Novozymes North America is paid let's say
24  $100, just take a nice round number to make it
25  easy, $100 U.S. for some Liquozyme, does

Page 37

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  Novozymes A/S automatically, immediately get
3  $100 U.S.?
4          MR. SULLIVAN:  Objection as to
5  form.
6      A    I don't know.
7      Q    Before -- you mentioned surplus
8  cash, let's -- again, let's use $100 because
9  it's a nice even round number, I don't know
10  what the numbers are and I'm not telling you
11  that's exactly any number, it's an easy
12  example.
13         Novozymes North America earns
14  $100 one year. Out of that $100 does Novozymes
15  North America pay taxes in the United States
16  and potentially North Carolina and maybe the
17  City of Franklinton?
18         MR. SULLIVAN:  Objection to the
19  form.
20     A    They pay taxes, I don't know
21  where they pay the taxes.
22     Q    Do they pay other operating
23  expenses, such as employee salaries and rent
24  and supplies and things?
25     A    I do not understand what you are

10  (Pages 34 to 37)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 38

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  getting, where you want to get at, because you
3  were talking about they make an earning of
4  $100, right?
5      Q    Revenues; receive $100 for sales
6  of Liquozyme, so I'm sorry if I wasn't clear.
7          So Novozymes gets $100 of
8  revenue, top line, are you with me so far?
9      A    Yes.
10     Q    Out of that does Novozymes A/S
11  get $100 of surplus cash when Novozymes North
12  America gets $100 of revenue?
13     A    Yes, that could be the case.
14     Q    If there were no expenses,
15  right?
16     A    If they have the revenue of $100
17  and that goes directly into our books which is
18  what we do, it will also go back to Novozymes
19  A/S, the $100.
20     Q    As surplus cash?
21     A    If we invoice $100 we will
22  receive $100, and that amount will go directly
23  to the cash, so that will also be directed back
24  to Denmark, the $100.
25     Q    Is that it, it goes directly to

Page 39

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  cash, is it surplus cash?
3      A    If they are in the position
4  where they have surplus cash and then you add
5  $100 we will get the additional $100.
6      Q    And by surplus cash you are
7  talking about cash after expenses, correct?
8      A    Yes. Yes.
9      Q    Are the profits and losses, if
10  there any, again I'm not assuming whether
11  there are profits or losses, but generally,
12  profits or losses of Novozymes North America,
13  ever separately calculated?
14     A    Ask again please?
15     Q    Sure.
16          Does Novozymes A/S ever, or
17  anybody, ever calculate the profits and losses
18  of Novozymes North America, that entity
19  specifically?
20     A    Novozymes A/S?
21     Q    Yes.
22     A    No.
23     Q    Does Novozymes North America do
24  that?
25     A    I would assume they have to.

Page 40

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2      Q    Isn't it necessary for Novozymes
3  North America to know its profits or loss so it
4  can figure out taxes, for example?
5      A    That's why I say yeah, I think
6  they have to.
7      Q    Interrogatory number 27 is the
8  next one on this page, it is the remainder of
9  Page 5. Please take a moment and read that to
10  yourself and tell me when you are done.
11     A    Yes, I have read it.
12     Q    Thank you, sir, I'm going to ask
13  you about something in one of the bullet points
14  here, there is a reference in the fifth bullet
15  point down to audited financial statements.
16          Do you see that reference, sir?
17     A    Um-hum.
18     Q    Is that a yes?
19     A    Yes, I see it.
20     Q    Thank you.
21          Who does -- who's the auditor
22  for Novozymes A/S?
23     A    PricewaterhouseCoopers.
24     Q    Are the financial statements of
25  Novozymes North America separately audited?

Page 41

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2      A    Yes.
3      Q    Is that also by
4  PricewaterhouseCoopers?
5      A    Yes.
6      Q    Why are the financials of
7  Novozymes North America separately audited?
8      A    It's required.
9      Q    What requirement are you
10  referring to?
11     A    Novozymes being listed on the
12  Stock Exchange in Copenhagen, we are required
13  to follow international accounting standards,
14  and it's required that these financial
15  statements are audited.
16     Q    By these financial statements,
17  are you referring to Novozymes A/S or Novozymes
18  North America?
19     A    I'm referring to that -- both
20  Novozymes A/S and the Novozymes group financial
21  statements is audited.
22     Q    I need to make sure I got an
23  answer to this very specific question, so I
24  apologize if it feels like I have asked it to
25  you before.

11 (Pages 38 to 41)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 42

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    A    That's fine.
3    Q    Are the financial statements of
4  Novozymes North America itself, are they
5  separate -- are they audited specifically
6  separately?
7    A    Yes.
8        MR. LANIER: I am done with
9    Exhibit number 1, you may, if you would,
10   put it back together and hand it over to
11   the court reporter there, I would
12   appreciate it.
13       Thank you, sir.
14       Let's take a five minute break.
15       (At this point in the proceedings
16   there was a recess, after which the
17   deposition continued as follows:)
18       MR. LANIER: Let's go back on the
19   record.
20   Q    Mr. Loft, our little chat off
21  the record about the fact I am a philosophy
22  major reminds me I forgot to ask you would you
23  briefly describe your educational background,
24  sir?
25   A    I will.

Page 43

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    Q    College and any subsequent
3  degrees.
4    A    To be frank, I don't know all
5  the English words, in Denmark we have more
6  European thing also, I think, my title, my
7  educational title today is state authorized
8  public accountant.
9        It's an education where you are
10  trained in auditing, accounting, taxes and
11  similar stuff, legal stuff also.
12       It's a long education, basically
13  the longest you can get in Denmark.
14   Q    Do you have any scientific or
15  technical training?
16   A    Meaning what?
17   Q    As opposed to training
18  specifically in accounting and finance and
19  business, do you have any training, for example
20  in genetic engineering or alpha amylases or
21  anything like that?
22   A    No.
23   Q    I was raised, I guess I am still
24  being raised by a certified public accountant,
25  so I have some sense of that.

Page 44

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2        (The above described document was
3    marked Loft Exhibit 2 for identification,
4    as of this date.)
5    Q    Sir, I will show you what has
6  been marked as Exhibit 2 to your deposition,
7  it's a document that bears the production
8  number NV-D 0174787, it's a document that was
9  given to us by Novozymes' lawyers at the
10  deposition of Mr. Olofson, actually.
11       The first question to you, sir,
12  is whether you recognize this?
13   A    No.
14   Q    The first line item there is
15  royalty, do you see that line item?
16   A    Yes.
17   Q    I will represent to you that's a
18  lawyers way of saying I will tell you and if my
19  subsequent questions based on that
20  representation are crazy, it's not your fault,
21  but I will represent to you that that royalty
22  item refers to royalty payments attributed to
23  Novozymes North America and owing to Novozymes
24  A/S relating to a technology license agreement.
25       Are you familiar at all directly

Page 45

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  with royalty payments owing by Novozymes North
3  America to Novozymes A/S?
4    A    I am aware of a technology
5  license between Novozymes North America and
6  Novozymes A/S.
7    Q    Are you aware specifically of
8  the fact of royalty payments being accounted
9  for between the companies?
10   A    What do you mean by the fact of?
11   Q    You may not know the specific
12  number paid in a specific quarter, but are you
13  aware that that happens?
14   A    Yes.
15   Q    Is cash always paid every
16  quarter from Novozymes North America to
17  Novozymes A/S as a result of that licensing
18  agreement?
19   A    Again, the cash position, the
20  net cash position is an important number and it
21  really depends also about will this change, the
22  invoice of the royalty, will that change the
23  cash position, so it's -- I will not be able to
24  answer your question because there are a lot of
25  fundamentals that have to be -- I have to know

12  (Pages 42 to 45)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 46

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  before I will be able to answer.
3      Q    Bear with me a moment, I am
4  trying to think a little to make our time more
5  efficient so I can ask you about things you
6  know. I will just think for a second here.
7          Keep this document around, but I
8  am going to jump ahead an exhibit or two to
9  Exhibit number 4 which is the technology
10 license agreement.
11         (The above described document was
12     marked Loft Exhibit 4 for identification,
13     as of this date.)
14     MR. LANIER: It may help us a
15 little bit. Here is that for you, sir.
16     For the record, it's got Bates
17 numbers on it that have been read into the
18 record more than once, it will end up
19 being a trial exhibit for our purposes,
20 it's Loft number 4.
21     MR. SULLIVAN: Sorry, you are
22 skipping over 3?
23     MR. LANIER: I will get to 3
24 eventually. I had planned to get to it
25 later, but given his answers I figure we

Page 47

1  BENNY LOFT - HIGHLY CONFIDENTIAL
2  might as well just jump to this now, so
3  it has already been marked as number 4.
4      Q    So, do you recognize this
5  technology license agreement, sir?
6      A    I don't know the detail, I know
7  about the technology license agreement, but not
8  all the detailed stuff which is in it.
9      Q    So, you are aware there is an
10 agreement called a technology license agreement
11 between Novozymes North America and Novozymes
12 A/S, correct?
13     A    Yes.
14     Q    But you -- I take it you've
15 never read this agreement?
16     A    I don't remember that I have
17 read it.
18     Q    Were you involved, personally
19 involved in negotiating the agreement at all?
20     A    No.
21     Q    Do you know what the royalty
22 rate is currently?
23     A    I think I will -- I need you to
24 rephrase the question. Also bear in mind that
25 I do not know the details of this technology

Page 48

1  BENNY LOFT - HIGHLY CONFIDENTIAL
2  license agreement, but I'm aware of
3  negotiations taking place between the tax
4  negotiations in Denmark and the U.S. that might
5  have a direct impact on what is in here, so I
6  might know the percentage in here, but it's
7  because I know the other stuff.
8      Q    Understood, and I will ask you a
9  little bit about that shortly, those tax
10 negotiations. I'm not trying to trick you or
11 anything else, I just asked if you knew, but
12 let me draw your attention to the very last
13 page of this document.
14     A    Yes.
15     Q    It's an amendment number 1 to
16 technology license agreement, tell me when you
17 get there, and if you see in 5A.
18     A    Yes.
19     Q    A second sentence in says, "The
20 royalty rate shall be 40 percent of net sales,"
21 do you see that?
22     A    Yes.
23     Q    Are you aware that that royalty
24 rate is a changed from the royalty rate in the
25 original agreement?

Page 49

1  BENNY LOFT - HIGHLY CONFIDENTIAL
2      A    What is the original agreement?
3      Q    I will represent to you, sir,
4  that there was a royalty rate of 20 percent
5  that was changed to 40 percent.
6          Is that something you knew? Did
7  you know that?
8          MR. SULLIVAN: I think he was
9  also asking which was the original
10 agreement.
11     Q    I'm sorry, the first several
12 pages of this document are the original
13 agreement, the last --
14     A    Okay.
15     Q    The last page is the amendment.
16 I'm sorry, I misunderstood your question.
17 Thank you, Mr. Sullivan.
18         So the original agreement --
19     A    Is this one.
20     Q    Is the first several pages.
21     A    Okay, I thought there was also
22 another agreement.
23     Q    No, I'm sorry, I didn't mean to
24 mislead you. This amendment page we have just
25 all included it together.

13 (Pages 46 to 49)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 50

BENNY LOFT - HIGHLY CONFIDENTIAL

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2        A    I do not remember the 20
3    percent.
4        Q    Even if you don't remember that
5    percent number, do you remember that the 40
6    percent number was a change from some other
7    previous number?
8        A    No.
9        Q    You mentioned that -- do you
10    know anything about how -- seeing that 40
11    percent number there, does that refresh your
12    recollection, help you remember that that is
13    the royalty rate?
14        A    If it's -- yes, if it's the same
15    which has been agreed between authorities in
16    U.S. and the authorities in Denmark then I do
17    know.
18        Q    Do you know anything about how
19    that 40 percent -- that royalty rate, whatever
20    it is, do you know why that rate was chosen?
21        A    Yes.
22        Q    Why?
23        A    It was chosen because in Denmark
24    we -- the production -- the Executive Vice
25    President of Production is setting up the whole

Page 51

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    production process for the Novozymes group.
3        We also have R & D and the head
4    of R & D, the Executive Vice President of R & D
5    is also in Denmark and these two people are
6    responsible for our technology, the improvement
7    of our technology.
8        And the reason that the 40
9    percent is there is that Novozymes North
10    America is using our technology and the
11    specific number, 40 percent, is a negotiation
12    between the Danish tax authorities and the U.S.
13    tax authorities and they have agreed that the
14    40 percent is a fair charge for Novozymes North
15    America using our technology.
16        Q    Have you personally been
17    involved in that negotiation and that agreement
18    with the tax authorities?
19        A    There is a person involved in --
20    I don't know exactly what you mean by the
21    personal involved in.
22        What I am involved in is, and
23    have been involved in, is that we need to make
24    sure that we are paying taxes wherever we do
25    operations, the right level of taxes and if

Page 52

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    we -- for some reason it's difficult to get to
3    a level of taxes that we should pay, I will be
4    involved.
5        So directly I have not spoken to
6    the authorities in the U.S., for example, but
7    if anything turns out that we will not be able
8    to make a fair payment of taxes in the U.S., I
9    would have been involved.
10        Q    Who, if you know, if you don't
11    know, you don't know, so let me ask it this
12    way, do you know who actually sat down with or
13    got on the telephone with the U.S. tax
14    authorities and had the negotiation that
15    ultimately resulted in that 40 percent?
16        A    Are you asking about one single
17    person?
18        Q    Or a group of people.
19        A    There would be a lot of people
20    involved in a process like this, and there is a
21    head of tax in Denmark which would be
22    definitely involved in this process, and there
23    will be a person in North America also being
24    part of this.
25        As some kind of project legal,

Page 53

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    but in the end it's the authorities which have
3    decided on the percentage.
4        Q    You mentioned a head of tax in
5    Denmark, who is that person?
6        A    It's -- on a daily basis its
7    Birthe Brouer Viggaard. The overall
8    responsibility would remain at me.
9        Q    Who is the U.S. person that was
10    directly involved in the dealings with the
11    authorities?
12        A    As far as I remember it was Rich
13    Olofson.
14        Q    Let me draw your attention back
15    to the first page of this technology license
16    agreement.
17        I am going to guess, I know a
18    few of your answers, but I need to find out
19    what you know and what you don't know that's
20    part of this exercise here.
21        There is a reference in 1A to
22    the technology, Paragraph 1A and I won't read
23    it all in there.
24        A    Yes.
25        Q    Do you personally know whether

14  (Pages 50 to 53)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 54

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2   or not the '031 patent that's at issue in this
3   case is covered by the definition of technology
4   in that section?
5       A    As I haven't read these, I would
6   not be able to answer that question.
7       Q    Do you know anything about
8   the -- I know you haven't read it, but from
9   your conversations and understanding of this
10  agreement, do you know anything about the
11  nature of the license that is granted to
12  Novozymes North America?
13          Specifically whether the license
14  is exclusive or non-exclusive?
15          MR. SULLIVAN: Objection, it
16  calls for a legal conclusion.
17  Q    Go ahead.
18  A    But I have to answer?
19          MR. SULLIVAN: If you can answer,
20  you can answer.
21      A    I haven't read the agreement, so
22  I will not be able to make the -- what is the
23  exclusive and non-exclusive, not even the
24  understanding of these two different.
25      Q    Do you have -- personally do you

Page 55

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2   have any understanding about whether Novozymes
3   A/S could choose if it wanted to to license the
4   '031 patent to some entity other than Novozymes
5   North America?
6       A    I have no knowledge.
7       Q    You had mentioned, you had
8   talked about the discussions what you heard
9   about the discussions with the tax authorities
10  about whether it was a fair charge I think was
11  your phrase for the use by Novozymes North
12  America of Novozymes A/S's technology, do you
13  recall generally that subject?
14      A    If I what?
15      Q    Do you recall generally
16  testifying about that issue?
17      A    Yes.
18      Q    I am just reminding you of the
19  issue to take you back there with my next
20  couple of questions.
21          Who made the ultimate decision
22  within Novozymes, whatever entity of the
23  Novozymes family that yes, we will agree with
24  the tax authorities to that percentage rate?
25      A    Novozymes A/S.

Page 56

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2       Q    I wasn't clear enough, which
3   person or persons?
4       A    That, again, would be a group of
5   persons, but in the end it would be executive
6   management.
7           Yeah.
8       Q    Were you part of the executive
9   management that made that decision with respect
10  to the specific royalty rate we are talking
11  about here?
12      A    When I say executive management
13  I mean what we internally define as the
14  executive management that would be five people,
15  I have been personally involved in making the
16  suggestion, yes, to the executive management of
17  going for this agreement.
18      Q    So you're not part of executive
19  management?
20      A    No.
21      Q    As you use that term?
22      A    No.
23      Q    Which reminds me to ask you, who
24  do you report to?
25      A    I report to the CFO in

Page 57

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2   Novozymes.
3       Q    Is that CFO part of what you
4   called executive management?
5       A    Yes.
6       Q    So you made a recommendation
7   yes, we should agree to this royalty rate,
8   correct?
9       A    That's correct.
10      Q    What was the basis for your
11  recommendation?
12      A    It's very important for us to
13  make sure that we pay taxes wherever we
14  operate, the right level of taxes, and in this
15  particular case we decided because North
16  America is -- Novozymes North America is a big
17  entity they would like to have certainty about
18  taxes also, so the certainty about the tax
19  level and also to make sure to pay the taxes,
20  that's some of the -- as I recall it, some of
21  the main reasons for choosing this.
22      Q    And by certainty you mean, do
23  you not, that it's good to at least know that
24  the government agrees with our 40 percent
25  royalty rate, correct?

15  (Pages 54 to 57)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 58

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    A    Yeah.
3    Q    Because if you didn't -- if you
4 hadn't had that agreement with the tax
5 authorities, then there might be uncertainty
6 about whether the U.S. Government, for one,
7 would agree with the transfer pricing, correct?
8    A    That's correct.
9    Q    And that would create some risk
10 or uncertainty about your tax calculations with
11 respect to the North American entity, is that
12 correct?
13    A    That would create a risk when we
14 are reporting to the stock market in Copenhagen
15 that the taxes of Novozymes group can change.
16    Q    Do you know anything about the
17 positions the U.S. Government took about here
18 is why we think it should be 40 percent?
19    A    I haven't been speaking myself
20 to the IRS, but the material that we have
21 helped and produced in this respect was a
22 benchmark where we compared Novozymes North
23 America with other similar companies in the
24 U.S. and to see what kind of -- what level of
25 earnings these benchmark companies have.

Page 59

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2        And based on that, what kind of
3 percentages do we need to make sure that we
4 make the same earnings in Novozymes North
5 America than peers, other companies within the
6 U.S. make, so that's the way the 40 percent
7 arises.
8    Q    I think I am done with number 4
9 which is this technology license agreement, so
10 you may toss that over to the court reporter.
11        Let's turn back to number 2, if
12 we could, that got us down this path.
13        I will represent to you, sir,
14 that one of the things we were told about this
15 document, number 2 when it was given to us was
16 this was an effort to represent accounting for
17 transactions and payments owing between
18 Novozymes North America and Novozymes A/S.
19        You don't have to agree with
20 these numbers or anything, I'm telling you
21 that's what we were told about it.
22        Do you have a question, or you
23 understand?
24    A    You say it's covering all
25 transactions?

Page 60

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    Q    That's what I was about to start
3 asking you.
4    A    Okay.
5    Q    I'm told this was an effort to
6 represent some, I don't know if it was all or
7 not, so let me ask you a couple of questions.
8        MR. SULLIVAN:  Let me just
9    interject one comment.  As I understand
10    it this was calculated based upon the
11    various agreements that are identified
12    in the left-hand side here, these
13    categories of payments with respect to
14    certain agreements that were discussed
15    and this was an attempt to talk about
16    the dollars flowing back and forth with
17    respect to these categories that are
18    listed here.
19        THE WITNESS:  Right.
20    A    It's not the trading part, it's
21 not -- if Novozymes North America is buying
22 directly goods produced in Denmark, in China,
23 wherever we decide to produce it, I cannot see
24 that being part of that, so --
25    Q    And I think what Mr. Sullivan

Page 61

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2 said is consistent with what I remember, and
3 what you just said is consistent with what I
4 remember, so let me just ask you a couple of
5 questions to follow-up to make sure I
6 understand it completely.
7        So, for example, Novozymes North
8 America sells products in the United States
9 that may be manufactured by some other
10 Novozymes entity outside of the United States,
11 correct?
12    A    That can easily happen.
13    Q    In those cases the sales,
14 Novozymes North America technically buys those
15 products from some other Novozymes entity,
16 correct?
17    A    Yes.
18    Q    And it's treated as a purchase
19 by one entity and a sale by the other, correct?
20    A    That's correct.
21    Q    This chart number, it doesn't
22 show that activity, does it, I'm not
23 criticizing the chart, I'm just making sure we
24 understand it doesn't show that, correct?
25    A    I cannot see that.

16  (Pages 58 to 61)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 62

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    Q    Is it possible if you walked
3   back into your office and could get your staff
4   working on it right away, is it possible to
5   say, to get a report that says I want to see
6   all the transactions between Novozymes North
7   America and Novozymes A/S, for example?
8    A    It is possible to see.
9    Q    For 2005, could you generate a
10  report like that?
11   A    When you say generate a report,
12  what do you mean, all transactions or what?
13   Q    Or a top line summary of
14  transactions, will you let me -- you shouldn't
15  have to guess at what I want, so let me try to
16  ask you some more specific questions.
17        If you wanted to know all
18  purchases and sales, for example, between
19  Novozymes North America and Novozymes A/S,
20  either direction, could you get that
21  information in your office?
22   A    It's a legal requirement that we
23  are able to trace all transactions so yes.
24   Q    Is a report of those
25  transactions regularly generated?

Page 63

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2        Like every month, every quarter,
3   every year there is a report, here is the
4   transaction report?
5    A    I'm not aware of that kind of
6   report.
7    Q    Are you aware of which Novozymes
8   entity is paying the legal fees in connection
9   with this case, the one that brings us, you and
10  I here together today?
11   A    I'm aware that we do have
12  service agreements between Novozymes A/S and
13  different affiliates, and if they perform work
14  for Novozymes A/S, which I would assume this
15  is, I would also assume that we are paying for
16  these services.
17   Q    Do you know anything about the
18  specific service agreement that may apply to
19  this situation?
20   A    I would not -- if you show it to
21  me, I will not be able to say this is the
22  agreement.
23   Q    So, you assume or believe there
24  is some agreement, but you couldn't pick it out
25  of a lineup?

Page 64

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2    A    I know there is an agreement,
3   but I haven't seen it.
4    Q    Is there someone in your
5   organization who's responsible for keeping
6   track of performance of service agreements like
7   that, is each party to that agreement doing the
8   jobs and appropriately paying or charging for
9   services provided?
10   A    There are several people, both
11  in Novozymes A/S and in the affiliates which is
12  responsible for making sure that we are in
13  compliance with the legal documents that we
14  have agreed upon.
15   Q    Who is the person that would be
16  responsible within Novozymes North America for
17  that compliance?
18   A    It would not be one person, it
19  would be more than one person.
20   Q    Who's the senior-most or person
21  in charge of that group of people at Novozymes
22  North America?
23   A    It could easily be two kinds,
24  two persons, just to explain there will be a
25  person responsible for taxes and she'll monitor

Page 65

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2   most of these agreements, but all the more
3   bookkeeping part and trying to trace cost and
4   so forth, that will be a different person.
5    Q    What are the names of those
6   people at Novozymes North America today, if you
7   know?
8    A    I don't know.
9        MR. LANIER: I am done with
10       number 2, you can give that back to the
11       court reporter.
12   Q    I am going to jump to number 5
13  real, quickly and I think I know the answer to
14  some of these questions, but I have to ask you
15  anyway.
16        This is called framework
17  agreement for services, it's Loft Exhibit
18  number 5.
19        (The above described document was
20       marked Loft Exhibit 5 for identification,
21       as of this date.)
22   Q    I will represent, I will tell
23  you this is a document that was given to us by
24  Novozymes' lawyers out of the files of
25  Novozymes and it was represented to be service

17 (Pages 62 to 65)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

---

Page 66

BENNY LOFT - HIGHLY CONFIDENTIAL
1  agreement that potentially is relevant to this
2  case.
3        Do you recognize this agreement
4  at all, specifically this agreement?
5     A    No.
6     Q    If you were to read it, would
7  you able to tell me, to confirm or deny for
8  sure that this is the agreement that relates to
9  the circumstances of this case?
10    A    Not having read it, it will be
11 quite difficult for me to answer your question.
12    Q    I will represent to you, sir,
13 that there has been testimony in this case that
14 this is, in fact, the service agreement that
15 relates in part to patent -- this litigation
16 that brings us together.
17    A    Yes.
18    Q    Do you have any reason to doubt
19 that?
20    A    No.
21    Q    Were you involved in the
22 negotiation of this specific agreement?
23    A    No.
24    Q    Do you know who did negotiate

---

Page 67

BENNY LOFT - HIGHLY CONFIDENTIAL
1  it?
2     A    I don't know as a fact who was
3  participating in the negotiation.
4     Q    Given the time frame, it's dated
5  January 1, 2001, it's between Novozymes A/S and
6  Novozymes North America.
7        Do you have any belief about who
8  it was likely was involved in that negotiation,
9  if anyone?
10    A    Again, depending on what's in
11 here, if it's also to adjust and make sure that
12 we are on an arms length basis between
13 companies in the group, I would assume that our
14 Tax Department in Denmark would have been part
15 of this.
16       I would also, of course, assume
17 that the legal department would be part of this
18 agreement as well.
19    Q    You used the phrase arms length,
20 what did you mean by that?
21    A    That's a general term used where
22 you basically try to make sure that whatever
23 you do in the Novozymes group, that we aim at
24 making sure that all transactions between group

---

Page 68

BENNY LOFT - HIGHLY CONFIDENTIAL
1  companies is on an arms length basis, and arms
2  length being you could have done the same deal
3  with a third-party.
4     Q    Is that for tax purposes?
5     A    Yeah, that's for tax purposes.
6     Q    Thank you.
7     A    I would correct it a little bit,
8  I would say mainly for tax purposes, there
9  would be other, I would not be able to tell if
10 there are other reasons as well.
11    Q    You are aware of tax purposes,
12 there might be others?
13    A    Yes.
14    Q    Thank you.  I won't bother you
15 more about this one, I have asked other people
16 questions about it, so I won't bug you.
17       MR. LANIER:  We are going to get
18 back to Loft Exhibit 3 at some time, I
19 promise, Mr. Sullivan.
20       MR. SULLIVAN:  I can hardly wait.
21    Q    Let's go to Loft Exhibit number
22 6.  I promise you I will not ask you about all
23 the pages in here, it's a thick document.
24       This is -- it's also -- for the

---

Page 69

BENNY LOFT - HIGHLY CONFIDENTIAL
1  record I will note it's been Defendant's trial
2  Exhibit 740, you don't need to worry about
3  that, Mr. Loft, that's more for the record.
4        This is, as you will see on the
5  reference in the cover page, it's an advance
6  pricing agreement, the cover of this document
7  bears the date of August 29, 2003.
8        I am not going to ask you too
9  much about specific pieces.  If you need to
10 skim through this to answer my question please
11 let me know, but do you recognize this?
12    A    I am aware that we have an
13 advance pricing agreement.
14    Q    You and I had talked earlier in
15 the day about an agreement with the tax
16 authorities.
17    A    Yes.
18    Q    Is that the advance pricing
19 agreement to which you are referring?
20    A    Yes.
21    Q    Have you ever read the advance
22 pricing agreement?
23    A    I don't remember.
24    Q    Take a minute.  I'm not asking

---

18  (Pages 66 to 69)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 70

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  you to read the whole thing, but glance through
3  the first few pages and tell me if that
4  refreshes your recollection about whether
5  you've ever read it before or not?
6       A    I will not be able to remember
7  the detailed content of this, so I don't need
8  to.
9       Q    All right, very well.
10          MR. SULLIVAN: I'm sorry, just so
11      we are clear, you may have said this
12      already, is this a partial copy of the
13      entire agreement, perhaps excluding some
14      of the exhibits?
15          MR. LANIER: It's got exhibits
16      and things like this. This was given to
17      us in response to our request for the
18      advance pricing agreement.
19          This is the document that was
20      provided to us as it was provided to us.
21          MR. SULLIVAN: Okay.
22          Beyond that I can say no more, but
23      I can only say what we were told.
24       Q    Are you aware of whether there
25  are negotiations going on now concerning the

Page 71

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  terms of the -- concerning a new advance
3  pricing agreement?
4       A    Yeah, we have in -- Novozymes
5  have decided to pursue a new advance pricing
6  agreement.
7       Q    Will that new advance pricing
8  agreement potentially involve a change to the
9  royalty rate under the technology license
10  agreement we have discussed?
11       A    If it turns out that the profit
12  in Novozymes North America is increasing, and
13  is going beyond the benchmark companies that we
14  were including in our analysis, then it
15  certainly is our expectation that the
16  percentage has to be looked at again.
17       Q    In that scenario, if the profit
18  of Novozymes North America is increasing
19  relative to the benchmark companies, what
20  Novozymes A/S would want to do is increase the
21  royalty rate, is that correct?
22       A    That's correct.
23       Q    Has any conclusion been reached
24  within Novozymes North America as to what new
25  royalty rate, if any, to propose to the U.S.

Page 72

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2  tax authorities?
3       A    No conclusion.
4       Q    Is there a time frame by which
5  this advance -- this new advance pricing
6  agreement is expected to be concluded?
7       A    No.
8       Q    Is there any deadline?
9       A    Not as far as I know.
10       Q    Understood, sir. Thank you for
11  clarifying that.
12          Is there any deadline by which
13  it must be concluded?
14       A    I don't remember.
15       Q    Is the agreement that's in front
16  of us here the one that has the date on the
17  cover August 29, 2003, is it still in effect?
18       A    No.
19       Q    When did it expire?
20       A    As far as I remember, end of
21  2004.
22       Q    Have there been any other
23  advance pricing agreements between the expiry
24  at the end of 2004 and the current date?
25       A    What do you mean?

Page 73

BENNY LOFT - HIGHLY CONFIDENTIAL
1
2       Q    If the agreement expired at the
3  end of 2004, there are negotiations going on
4  now or consideration going on now toward a new
5  one, in the interim have there been any other
6  agreements that have also expired?
7       A    I don't know.
8       Q    Occasionally I will drift off in
9  thought like this, but in the end trust me,
10  it's intended to make our time together more
11  efficient, so bear with me.
12          Would you turn, sir, I know you
13  said you haven't read this before, I'm going to
14  draw your attention --
15       A    That I didn't say, I said I
16  didn't remember.
17       Q    Thank you for clarifying. I
18  didn't mean to misrepresent what you said. I
19  want to draw your attention to a couple of
20  specific things to see whether that refreshes
21  your recollection about anything, and it may
22  help me ask some questions.
23          So, turn to Page -- it's the
24  fourth page of the document, it's Page 2 of the
25  actual advance pricing agreement on the bottom

19  (Pages 70 to 73)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 74

BENNY LOFT - HIGHLY CONFIDENTIAL
1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    it bears production number NV-D-0 --
3        A    Is that the.
4        Q    It bears this production number
5    right here and for the record I will say it is
6    NV-D-0174801.
7            Are you on this page, sir?
8        A    Yes.
9        Q    Section 5D says that, "The IRS
10   will determine whether taxpayer has complied
11   with this APA based on," and it goes on to say
12   things, do you see that?
13           Section 5D, it's at the very
14   bottom of the page?
15       A    Yes. I see that.
16       Q    Do you know whether the IRS has
17   communicated to any Novozymes entity any
18   conclusion it's reached about compliance with
19   the APA?
20       A    I have not heard that we should
21   not be in compliance.
22       Q    You see a reference there to
23   taxpayer in that same paragraph?
24       A    Yes.
25       Q    What's your understanding of who

Page 75

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    is the taxpayer under this agreement?
3        A    I would think it's Novozymes
4    North America.
5        Q    What's your understanding, if
6    any, of the consequences if the IRS were to
7    determine that there has not been compliance
8    with this agreement?
9        A    The consequences?
10       Q    Yes.
11       A    That our tax payment according
12   to IRS should be changed, or potentially could
13   be changed.
14       Q    Does every dollar of profit made
15   by Novozymes North America turn into a dollar
16   of profit for Novozymes A/S?
17           MR. SULLIVAN:  Objection as to
18   form.
19       A    Yes.
20       Q    Is that pretax or post tax?
21       A    Both.
22       Q    So, every dollar -- let me break
23   it down then.
24           Novozymes North America, let's
25   say it's made, and taking an easy number, $100

Page 76

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    in profit, I'm not representing that's actually
3    the number, let's say for 2005 Novozymes North
4    America made $100 of profit before taxes.
5            You have heard the phrase
6    EBITDA, in fact let's focus on that.
7            Do you know what I mean by that,
8    EBITDA, earnings before depreciation, interest
9    and taxes?
10       A    Yes, but it -- yes, the two
11   phrases you are using is not the same, but --
12       Q    I understand.  So let's focus on
13   the second one.
14           Novozymes has $100 EBITDA. Does
15   Novozymes A/S get all of that $100 as net
16   profit at the end of the year on the
17   consolidated return?
18       A    You need to be more precise.
19           If this is some kind of a local
20   produced EBDA or it's the group reporting.
21           Novozymes North America has to
22   come to some conclusion about its profits or
23   losses in order to calculate U.S. taxes that
24   must be paid, correct?
25       A    Yes.

Page 77

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2        Q    So Novozymes North America comes
3    to a conclusion, again, let's take my made up
4    number, $100, we have made $100, based on that
5    we now can figure out how much taxes need to be
6    paid; is that how it works?
7        A    If it's an EBIT, after financial
8    items then after that you have to decide what
9    kind of taxes you have to pay, yes.
10       Q    So there is an amount of profit
11   that exists that are calculated before the
12   payment of taxes, correct?
13       A    Yes.
14       Q    And then after the payment of
15   taxes there is a different amount of profit
16   that remains, correct?
17       A    I think you have -- I need you
18   to ask the questions again so I understand
19   really which kind of numbers you are alluding
20   to.
21       Q    You used the phrase EBIT, let's
22   talk about that.
23       A    Yes.
24       Q    Novozymes North America
25   calculates EBIT, right, earnings before

20  (Pages 74 to 77)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 78

BENNY LOFT - HIGHLY CONFIDENTIAL
1 BENNY LOFT - HIGHLY CONFIDENTIAL
2 interest and taxes, right?
3    A    Yes.
4    Q    Let's say it's $100?
5    A    Yes.
6    Q    Out of that $100, some amount is
7 then taken out in order to pay taxes, correct?
8    A    If the EBIT is for tax purposes,
9 if that phrase exists for tax purposes, yes.
10    Q    Novozymes A/S, the way you
11 described it earlier, gets the cash that's left
12 over after the payment of taxes, correct?
13    A    That's correct.
14    Q    Thank you for bearing with me on
15 that, I don't have your background in these
16 things, but I think I've got it.
17        I think for the moment I am done
18 with number 6, the APA, I may toward the end of
19 our very last break come back and ask you some
20 questions about it, but I will throw it away
21 for now.
22        Give it to the court reporter.
23        Now, Mr. Sullivan has been
24 waiting for me to get to Exhibit number 3.
25    A    All right.

Page 79

1 BENNY LOFT - HIGHLY CONFIDENTIAL
2        (The above described document was
3        marked Loft Exhibit 3 for identification,
4        as of this date.)
5    Q    I guess I know the answer to
6 this question, do you recognize this document,
7 sir?
8    A    No. Have I seen that before?
9 It's not the same?
10    Q    It is not the same.
11    A    I just saw -- the heading seems
12 to be the same on these.
13    Q    You've correctly noted it's a
14 similar looking document.
15    A    I just want to make sure that
16 it's not the same.
17    Q    For our record these are
18 responses to requests for admissions. These
19 are I will tell you these are a different way
20 of asking questions to Novozymes and these are
21 the answers to those questions.
22    A    Yes.
23    Q    I am going to ask you about a
24 couple of specific things in here, I will draw
25 your attention to them specifically.

Page 80

1 BENNY LOFT - HIGHLY CONFIDENTIAL
2        If you need to read any other
3 part of this agreement to answer my questions
4 you will let me know.
5        Please turn to Page 4 of the
6 document, request for admission number 7 and
7 the response, read that to yourself, tell me
8 when you are done.
9    A    I have read it, I just want to
10 make sure that I understand the word ambiguous,
11 I understand the word vague, is that just
12 another way of saying it?
13    Q    Well, very strictly speaking
14 vague means that you don't know the meaning of
15 the term, the meaning is uncertain, and
16 ambiguous means that a term could have two or
17 more meanings.
18        We lawyers tend to lump them
19 together, but we philosophy majors know they
20 have different meanings.
21    A    So I read it, I'm not sure I
22 totally understand what it says.
23    Q    I want to ask you about this,
24 the lawyers, we ask our questions, the lawyers
25 make certain objections back, I'm going to ask

Page 81

1 BENNY LOFT - HIGHLY CONFIDENTIAL
2 you about the last sentence of the response.
3        It says, "Novozymes admits that
4 NZNA is a U.S. corporation and Novozymes A/S is
5 a Danish corporation."
6        Do you see that?
7    A    Yes.
8    Q    The formal legal act of
9 incorporating Novozymes North America, that's a
10 different set of formal legal acts than that
11 which resulted in the incorporation of
12 Novozymes A/S, correct?
13    A    I would assume so.
14    Q    Your understanding is -- is it
15 your understanding that, in fact, Novozymes
16 North America is a corporation that while it
17 may be related to Novozymes A/S, is a different
18 corporation than Novozymes A/S, is that
19 correct?
20    A    The word related, we own them
21 100 percent, so that's the relationship.
22    Q    I understand, I'm not trying to
23 change that, is Novozymes A/S a different
24 corporation than Novozymes North America?
25    A    It is.

21 (Pages 78 to 81)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT    October 5, 2006
HIGHLY CONFIDENTIAL

Page 82

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    Q    Would you read to yourself, turn
3  back to the document, request for admission
4  number 8 starts at the bottom of Page 4 and it
5  goes to the top of Page 5 the answer, please
6  read that and tell me when you are done.
7    A    Yes.
8    Q    Again, I am going to ask you
9  about the second sentence and the response, it
10 says, "Novozymes admits that NZNA," that's
11 Novozymes North America, "pays the majority of
12 its employees from an NZNA bank account."
13    Do you see that sentence, sir?
14    A    Um-hum.
15    Q    Is that a yes?
16    A    Yes, I see it.
17    Q    Do you know whether there are
18 Novozymes North America employees that are paid
19 other than from Novozymes North America bank
20 accounts?
21    A    I don't know.
22    Q    Is there any reason why
23 Novozymes North America employees would be paid
24 by some other way than from a Novozymes North
25 America bank account?

Page 83

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    A    Going back to me not knowing all
3  the details of the service agreement, if they
4  are doing services for Novozymes people in
5  North America, Novozymes North America directly
6  paid by the legal entity Novozymes North
7  America, but indirectly we might be paying for
8  the services that they provide to us.
9    Q    So let's say there is an
10 employee at Novozymes North America that's
11 doing something covered by the service
12 agreement, is it the case that Novozymes North
13 America would then charge Novozymes A/S and
14 Novozymes A/S would strictly speaking pay
15 Novozymes North America back for that?
16    A    I would assume that would be the
17 transaction, yeah.
18    Q    Almost done with this document,
19 sir.
20    In fact, I am done with number
21 3. You may give it back to the court reporter.
22    MR. LANIER:  Frankly, I think I
23 am getting close to being done with my
24 questions for Loft. Let me propose we
25 take a five minute break, I will look at

Page 84

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2  my notes, we will think about it I will
3  walk down the hall, we will come back
4  and get you out of here.
5    (At this point in the proceedings
6    there was a recess, after which the
7    deposition continued as follows:)
8    MR. LANIER:  Let's go back on the
9    record.
10    Q    Mr. Loft, would you get back
11 Exhibit number 1, it is the interrogatory
12 responses, I think it's the one that's closes
13 to me there.
14    I am going to draw your
15 attention to one of the bullet points that's in
16 the response to number 26, specifically on Page
17 5, top of the page.
18    Second bullet point at the top
19 of the page says Novozymes A/S controls the
20 profits earned and cash received by NZNA, do
21 you see that?
22    A    I see that.
23    Q    Does the U.S., other states and
24 local tax rates paid by NZNA affect the profits
25 earned by NZNA?

Page 85

1    BENNY LOFT - HIGHLY CONFIDENTIAL
2    A    Ask again.
3    Q    Sure.
4    Does a change in the tax rates
5  applicable to Novozymes North America affect
6  the profits earned by Novozymes North America?
7    A    Yeah.
8    Q    Your tax rate goes higher, you
9  earn less profits, right?
10    A    Yes.
11    Q    Does Novozymes North America
12 control the tax rates paid by Novozymes -- does
13 Novozymes A/S control the tax rates paid by
14 Novozymes North America?
15    A    No, we don't.
16    Q    Thank you, sir.
17    We have taken a couple of breaks
18 during the day, during any of those breaks has
19 anything, have you thought of anything that you
20 need to change or correct or modify about your
21 answers to this point?
22    A    No.
23    Q    Sir, I thank you for your time.
24    A    You are welcome.
25    MR. LANIER:  I have no more

22  (Pages 82 to 85)

c31a9196-4b29-491a-be0d-b5bc831ab2d9

BENNY LOFT   October 5, 2006
HIGHLY CONFIDENTIAL

---

Page 86

```
 1            BENNY LOFT - HIGHLY CONFIDENTIAL
 2       questions.
 3              MR. SULLIVAN:  I have no
 4       questions either.
 5              MR. LANIER:  Thank you.
 6       _____
 7              BENNY DALGAARD LOFT
 8       Subscribed and sworn
 9       to before me this _____
10       day of _____, 2006.
11
12       _____
13              Notary Public
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 88

```
 1       BENNY LOFT - HIGHLY CONFIDENTIAL
 2
 3           C E R T I F I C A T E
 4
 5           I, STEPHEN J. MOORE, a Shorthand
 6       Reporter and Notary Public of the State of New
 7       York, do hereby certify:
 8
 9           That, BENNY ALGAARD LOFT, the
10       witness whose deposition is hereinbefore set
11       forth was duly sworn, and that such deposition
12       is a true record of the testimony given by such
13       witness.
14
15           I further certify that I am not
16       related to any of the parties to this action by
17       blood or marriage; and that I am in no way
18       interested in the outcome of this matter.
19
20
21       _____
22       Stephen J. Moore, RPR,
23       CRR.
24
25
```

Page 87

```
 1         BENNY LOFT - HIGHLY CONFIDENTIAL
 2             E X H I B I T S
 3
 4       LOFT                    PAGE
 5
 6    1    Novozymes A/S's responses to    17
         interrogatories
 7    2    Document bearing production     44
         number NV-D 0174787
 8    4    Technology license agreement    46
      5    Framework agreement for         65
         services,
 9
      3    Responses to requests for       79
         admissions
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 89

```
 1       BENNY LOFT - HIGHLY CONFIDENTIAL
 2             ERRATA SHEET
 3
 4    PAGE/LINE    CHANGE FROM    CHANGE TO
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

23 (Pages 86 to 89)

c31a9196-4b29-491a-be0d-b5bc831ab2d9