# EXHIBIT K

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Marshall
Division.
PAICE LLC, Plaintiff,
v.
TOYOTA MOTOR CORP., et al., Defendants.
No. 2:04-CV-211-DF.

Aug. 16, 2006.

Samuel Franklin Baxter, Attorney at Law, Marshall,
TX, Ahmed J. Davis, Ahmed J. Davis, Ruffin B.
Cordell, Fish & Richardson, Washington, DC, for
Plaintiff.
Fred Grasso, Jeffrey Gerchick, T. CY Walker, Kenyon
& Kenyon, Washington, DC, Nicholas H. Patton,
Justin Kurt Truelove, Patton & Tidwell, Texarkana,
TX, Thomas R. Makin, George E. Badenoch, John
Flock, Kenyon & Kenyon, New York, NY, for
Defendants.

### ORDER
DAVID FOLSOM, District Judge.
*1 Before the Court is Plaintiff Paice LLC's ("Paice")
Motion for Entry of an Injunction. Dkt. No. 207. Also
before the Court is Defendants' Combined (1)
Opposition to Paice LLC's Motion for Entry of an
Injunction and (2) In the Alternative, Motion for a
Stay of Any Injunction Entered and Plaintiff's
Combined Response to Toyota's Motion for Stay and
Reply in Support of Its Motion for Injunction. Dkt.
Nos. 212 and 219, respectively. On April 25, 2006 the
Court heard the parties on these motions. Subsequent
to the hearing, the parties submitted letter briefing to
the Court. 6/23/06 Letter from G. Badenoch, 6/30/06
Letter from R. Cordell, and 7/13/06 Letter from G.
Badenoch. Having considered the motions, all other
relevant briefing, and the applicable law, the Court
finds that Plaintiff's Motion for Injunction should be
DENIED.

### I. BACKGROUND

In this patent infringement action, Plaintiff claimed
three of Defendants' hybrid vehicles infringe three of
Plaintiff's patents, U .S. Patent Nos. 5,343,970 ("the
970 patent"), 6,209,672 ("the 672 patent"), and

6,554,088 ("the 088 patent") (collectively, the
"patents-in-suit"). [FN1] Plaintiff alleged that nine claims
among three patents were literally infringed by
Defendants' accused vehicles and that ten claims were
infringed under the doctrine of equivalents. Plaintiff
also argued that Defendants' alleged infringement was
willful.

FN1. A detailed explanation of each of the
asserted patents and the underlying
technology can be found in the Court's Claim
Construction Order. Dkt. No. 91. The present
Order assumes familiarity with the
patents-in-suit.

In December 2005, the case was tried to a jury. The
jury found that Defendants' accused vehicles infringed
claims 11 and 39 of the 970 patent under the doctrine
of equivalents, but found no further infringement. The
jury did not find Defendants' infringement was willful.

Plaintiff now moves for entry of a permanent
injunction.

### II. LEGAL PRINCIPLES
051 Extra cent-Y found within cent-Y markup.
Recently the Supreme Court revisited the propriety of
issuing permanent injunctions as a matter of course
after a finding of infringement in patent cases. eBay
Inc. v. MercExchange, L.L.C., 126 S.Ct. 1837,
1839-1841 (U.S.2006) (hereinafter "eBay").
Observing the existence of a " 'general rule,' unique to
patent disputes" that mandated the issuance of a
permanent injunction once infringement and validity
were decided, the Supreme Court explored the origins
of this general rule and compared it to other instances
in which courts are faced with deciding whether or not
to issue equitable relief. Id. The Supreme Court
determined that equitable relief is not mandatory in
patent cases, but instead should be decided in
accordance with traditional equitable considerations.
Id.

To this end, a plaintiff seeking a permanent injunction
must satisfy a four-factor test before a court may grant
such relief:
A plaintiff must demonstrate: (1) that it has suffered
an irreparable injury; (2) that remedies available at law,
such as monetary damages, are inadequate to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

**\*2** *Id.* Further, the Supreme Court held that:[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.

*Id.* It is clear that the Supreme Court by its decision did not intend to part with long-standing decisions in equity. As noted by Chief Justice Roberts, "there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate." *Id.* at 1841 (Roberts, C.J.concurring). And, as Justice Kennedy notes in his concurrence, "the existence of a right to exclude does not dictate the remedy for a violation of that right," which aligns equitable decisions in patent cases with other cases. *Id.* at 1842 (Kennedy, J. concurring).

### III. THE PARTIES' POSITIONS

Plaintiff, seeking entry of a permanent injunction, principally argued that it is entitled to an injunction pursuant to 35 U.S.C. § 283 because the Defendants are adjudged infringers of its valid patent claims. Dkt. No. 207 at 2. Plaintiff additionally argued that no exceptional circumstances exist for which an injunction should be denied. *Id.* Defendants responded in opposition to Plaintiff's motion but spent the majority of their pre-hearing brief arguing that any injunction that issues should be stayed pending the outcome of an appeal or the issuance of a decision in *eBay.* Dkt. No. 212. Less than a month after the hearing, the *eBay* opinion issued.

Following the traditional four-factor test for equitable relief, Defendants argue no injunction should issue as Plaintiff cannot meet its burden of demonstrating each of the factors, let alone any of the factors. Dkt. No. 222. According to Defendants, Plaintiff failed to demonstrate irreparable harm. *Id.* at 3. Defendants argue that, following from the Supreme Court's decision, irreparable harm cannot be presumed. Further, citing a decision in *z4 Technologies, Inc. v. Microsoft Corporation,* Defendants argue that the inability to license Plaintiff's patents to others without an injunction in hand is not a viable reason for issuing

an injunction. Dkt. No. 222 at 3, *citing z4 Technologies, Inc. v. Microsoft Corp.,* 6:06-cv-142, Dkt. No. 394 (E.D. Tex. June 14, 2006). Defendants also point to evidence demonstrating that there are reasons unrelated to Defendants' conduct that explain why Plaintiff's efforts to license its patents have been refused. *Id.* citing evidence at Dkt. No. 212, 5-6. Defendants argue there is no evidence supporting Plaintiff's contention that Defendants' sales of the accused vehicles have resulted in the harm Plaintiff alleges as Plaintiff does not sell vehicles. Dkt. No. 222 at 3-4.

Defendants argue that monetary damages are sufficient to compensate Plaintiff. Because Plaintiff does not manufacture competing vehicles, but rather is geared toward licensing its technology, Defendants argue that there is "no question" that monetary damages are sufficient. Dkt. No. 222 at 4. Defendants further argue that the claims found to be infringed make up only a "small component" of the overall accused vehicles. *Id.*
**\*3** The two claims found to be infringed by equivalents are not to the entirety of the hybrid transmission, let alone the entire car. For there to be an entire working vehicle that meets [Defendants'] standards, there are many tens of thousands of separate parts that make up the various essential parts of the car ... Any contribution of [Plaintiff's] technology to the accused vehicles is relatively minor when compared to the value of the overall vehicles sought to be enjoined....

Dkt. No. 222 at 4. Defendants further cite the jury's reasonable royalty verdict as demonstrative of the relatively small contribution of that Plaintiff's invention to the accused vehicles as a whole:Any contribution of [Plaintiff's] technology to the accused vehicles is relatively minor when compared to the value of the overall vehicle sought to be enjoined, as confirmed by the jury's verdict awarding reasonable royalty damages of only $25 per vehicle-or 1/8th of one percent of the $20,000 price of a Prius and even less of a percentage of the price of the Highlander ($33,000) and the RX400h ($42,000).

*Id.*

Defendants argue that the third and fourth factors weigh against issuing a permanent injunction. According to Defendants, implementation of an injunction would cause substantial economic injury to it, its dealers, and its suppliers. An injunction would also severely damages its "reputation as the industry leader in bringing hybrid and other vehicles to

Slip Copy                                                                                                                        Page 3
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
(Cite as: Slip Copy)

market," argue Defendants. *Id.* at 4. And, Defendants argue, significant time and money have been invested in designing the accused devices while a redesign would be "extraordinarily expensive and a great hardship." *Id.* Defendants argue that there is "no discernable hardship" to Plaintiff in the absence of an injunction because Plaintiff seeks only licensing fees for the use of its patents. *Id.* Defendants also argue that an injunction would be contrary to the public interest as hybrid vehicles play an important role in "reducing harmful automobile emissions and American reliance on foreign oil." *Id.*

Lastly, Defendants remind the Court that, although accused, the jury did not find that Defendants' infringement was willful. Nor were they found to literally infringe Plaintiff's patents-only two of ten asserted claims from one of three patents were found infringed under the doctrine of equivalents. Defendants argue that these facts should also be considered in determining whether an injunction should issue. Dkt. No. 222 at 4-5.

In response, Plaintiff argues that, even under the traditional four-factor test for equitable relief, they are entitled to a permanent injunction. Plaintiff argues it has proved it will suffer irreparable harm because, unless Defendants are enjoined from selling the infringing vehicles, it cannot succeed in its efforts to license its technology. Dkt. No. 223 at 2. Plaintiff argues that Defendants' infringement has had a "devastating effect" on its business resulting in great harm. Dkt. No. 207 at 6. During the hearing on this motion, Plaintiff's counsel related that Plaintiff was recently "sidelined" as potential parties to a joint venture chose to put the deal on hold while they await the outcome of this motion. 4/25/06 Hr. Tr. at 99. Plaintiff also cites testimony from Dr. Severinsky, the inventor of the 970 patent and Paice employee, that potential licensees have refused to license Plaintiff's patents pending the outcome of this case. *Id.* at 2-3. Plaintiff argues that even if potential licensees refused licenses in the past for reasons unrelated to the current lawsuit, they are today refusing to license as they await the outcome of this suit. *Id.* at 3. Thus, Plaintiff argues, it is suffering harm from what amounts to a *de facto* stop work injunction. 4/25/06 Hr. Tr. at 106.

*4 Addressing the second factor, Plaintiff argues that although it does not manufacture products utilizing the patented invention, this alone does not end the inquiry as to whether there is an adequate remedy at law for Defendants' infringement. Dkt. No. 223 at 3. Instead, Plaintiff argues, because it suffers irreparable harm, there is no adequate remedy at law. According to

Plaintiff, without an injunction, Plaintiff will continue to loose licensing opportunities to other potential licensees. Dkt. No. 223 at 3. Further, regarding the relative import of the infringed claims to the accused vehicles, Plaintiff argues that the infringed claims "cover ... the heart of what the Prius is all about." 4/25/06 Hr. Tr. at 105; *see also* Dkt. No. 223 at 4.

Plaintiff argues that the balance of hardships tips in favor of an injunction. According to Plaintiff, the infringing products that would be enjoined can be sold in other parts of the world. Further, Plaintiff argues, the infringing vehicles account for less than 2% of Defendants' worldwide revenue. *Id.; see also* 4/25/06 Hr. Tr. at 108. On the other hand, without an injunction, Plaintiff argues that it faces extinction. Dkt. No. 223 at 4.

Regarding the public interest, Plaintiff argues the that public interest in strong patent rights is better served by enforcing those rights through an injunction, particularly where a small company's patents are infringed. 4/25/06 Hr. Tr. at 111; Dkt. No. 223 at 5. Plaintiff also argues that enjoining sales of the accused vehicles would not leave the public without options-in fact, there are other hybrid alternatives on the market as well as vehicles that are more fuel efficient than the accused vehicles. 4/25/06 Hr. Tr. at 110.

## IV. DISCUSSION

Following the traditional four-factor test for equitable relief, the Court concludes that no injunction is warranted in this case.[FN2]

> FN2. As Plaintiff's motion for an injunction is denied, Defendant's cross-motion for a stay is moot and will not be addressed herein.

Plaintiff fails to establish that it will be irreparably harmed absent an injunction. The *eBay* decision demonstrates that no presumption of irreparable harm should automatically follow from a finding of infringement. *See, e.g.,* 126 S.Ct. at 1840; *see also* 6:06-CV-142, Docket No. 394, at 4. Plaintiff argues that, because no injunction has issued, it has been unsuccessful in its efforts to license its technology. Plaintiff's evidence, however, does not prove that the current litigation or the absence of an injunction have resulted in its inability to successfully license its technology.

Dr. Severinsky's testimony, cited by Plaintiff,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
**(Cite as: Slip Copy)**

Page 4

addressed only his belief as to why potential licensees were reluctant to take licensees. Plaintiff's counsel's statements that the company was "sidelined" pending the outcome of this litigation are not evidence. There is evidence in the record, however, that potential licensees may have declined business deals because of Plaintiff's misrepresentations and improper business tactics. *See* 12/7/05 PM Trial Tr. at 46:25-49:1; DTX 745.

**\*5** Irreparable harm lies only where injury cannot be undone by monetary damages. *See Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981). Plaintiff's losses from Defendant's sales of infringing products can be remedied via monetary damages in accordance with the reasonable royalty set by the jury. As for Plaintiff's allegations of irreparable harm in the form of a failed licensing program, Plaintiff has not demonstrated Defendants' infringement is to blame for this failure. As the evidence demonstrates, there were other reasons Plaintiff may not have succeeded in licensing its technology.

Additionally, Plaintiff has not demonstrated that monetary relief will not aid its licensing efforts. As is discussed below, the entry of a judgment for monetary relief in conjunction with the jury's infringement and validity findings will affirm Plaintiff's patent rights, as would the issuance of an injunction. Although potential licensees will likely consider the outcome of this case in their licensing decisions, Plaintiff has not been prevented from continuing its licensing efforts. It is should also be noted that because Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name recognition and market share similarly are not implicated.

For these reasons, Plaintiff has not demonstrated that it will suffer irreparable harm in the absence of an injunction.

Second, Plaintiff has not demonstrated that monetary damages are inadequate. According to Plaintiff, monetary damages paid by Defendants will not prevent further lost opportunities to license its technology to potential licensees. Plaintiff further argues that the infringed claims form the "heart" of the accused products. Infringing one's right to exclude alone, however, is insufficient to warrant injunctive relief. 126 S.Ct. at 1840. Plaintiff does not demonstrate why other potential licensees would be less likely to take a license if this case ends with monetary damages instead of equitable relief. [FN3] In either case, the Plaintiff's patent rights are vindicated.

The appropriateness of an injunction is determined after considering the traditional four factors addressed here.

> FN3. The Court notes that monetary relief could result in lower licensing rates than Plaintiff would desire. The Court also recognizes that, if an injunction were to issue, Plaintiff would have a more impressive bargaining tool. This consideration, however, doe not replace the four-factor test that must be satisfied for equitable relief.

Further, the Court disagrees with Plaintiff regarding the import of the two claims found infringed to the accused vehicles as a whole. The infringed claims relate to the hybrid transmissions of the accused vehicles, but form only a small aspect of the overall vehicles. The jury's damages award also indicates that the infringed claims constitute a very small part of the value of the overall vehicles. The jury, based on the entire record, determined an appropriate reasonable royalty rate that can be easily calculated on future sales of the accused devices thereby removing uncertainty from future damages calculations.

It is also of note that Plaintiff, throughout post-trial motions, has extended Defendants an offer to license its technology. 4/25/06 Hr. Tr. at 108. This offer further demonstrates the adequacy of monetary relief from Plaintiff's point of view. Thus, the Court finds that Plaintiff has not demonstrated monetary damages are an inadequate remedy to compensate for Defendants' infringement.

**\*6** Third, the Court finds that the hardships balance against enjoining Defendants. Plaintiff again argues that this factor tips in its favor because it faces extinction absent an injunction while Defendants will experience only minor economic losses. This ignores the reality that two of the accused vehicles were introduced to the market during the 2006 model year and enjoining their sales will likely interrupt not only Defendants' business but that of related businesses, such as dealers and suppliers. The burgeoning hybrid market could also be stifled as the research and expense of bringing its product line to market would be frustrated. And the Court finds that enjoining Defendants will damage their reputation. Defendants face significant hardships if enjoined. Plaintiff's argument that it may go out of business unless Defendants are enjoined is again premised upon their contention that only injunctive relief will lead to a successful licensing program. As discussed above, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 5
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
**(Cite as: Slip Copy)**

Court does not agree with this contention. Thus, the balance of hardships tips decidedly in favor of Defendants.

Lastly, the Court concludes that the public interest does not weigh heavily in either party's favor. As Plaintiff argues, there is a long recognized public interest in enforcing patent rights. The grant of injunctive relief for such enforcement, as the *eBay* case directs, should be determined using the traditional four-factor test. Relief in non-injunctive form also serves this public interest. Insofar as Defendants argue that an injunction would be contrary to the public interest in reducing dependence of foreign oil, the Court finds this argument unavailing. Defendants' hybrid vehicles are not the only hybrid alternatives on the market, and there has been no evidence demonstrating the demand for hybrid vehicles could not be met by such alternatives. Thus, Defendants have not demonstrated that enjoining the sale of their hybrid vehicles will disserve the public interest.

Having found that Plaintiff has failed to demonstrate that injunctive relief is warranted under any of the four relevant factors, the Court will deny Plaintiff's request.

### V. CONCLUSION

For all the above reasons, Plaintiff's Motion for Entry of an Injunction, Dkt. No. 207, is hereby **DENIED** and Defendants' Motion for a Stay of Any Injunction Entered, Dkt. No. 212, is **DENIED** as moot.

E.D.Tex.,2006.
Paice LLC v. Toyota Motor Corp.
Slip Copy, 2006 WL 2385139 (E.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 813675 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Reply Brief in Support of its Motion for Judgment as a Matter of Law Or, in The Alternative, for a New Trial (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 813676 (Trial Motion, Memorandum and Affidavit) Toyota's Reply Memorandum in Support of its Motion for Judgment as a Matter of Law and, in the Alternative, for a New Trial (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 813677 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Combined Response to Toyota's Motion for Stay and Reply in Support of its Motion for injunction (Feb. 15, 2006) Original

Image of this Document (PDF)
• 2006 WL 813672 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Memorandum in Opposition to Toyota's Motion for Judgment as a Matter of Law and, in The Alternative, for a New Trial (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 813673 (Trial Motion, Memorandum and Affidavit) Toyota's Combined (1) Opposition to Paice LLC's Motion for Entry of an Injunction and (2) in The Alternative, Motion for a Stay of any Injunction Entered (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 813674 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Motion for Judgment as a matter of Law Or, in The Alternative, for a New Trial (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 502267 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Motion for Entry of an Injunction (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 502268 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for Judgment as a Matter of Law and, in the Alternative, for a New Trial (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 502269 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (Jan. 20, 2006) Original Image of this Document (PDF)
• 2005 WL 4656513 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for a Directed Verdict of no Infringement Under the Doctrine of Equivalents (Dec. 16, 2005)
• 2005 WL 4656511 (Trial Motion, Memorandum and Affidavit) Defendant Toyota's Opposition to Plaintiff Paice LLC'S Renewed Motion to Preclude or Limit Introduction of Evidence of Toyota Patents (Dec. 9, 2005)
• 2005 WL 4656512 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Renewed Motion to Preclude Or Limit Introduction of Evidence of Toyota Patents (Dec. 8, 2005)
• 2005 WL 4656510 (Trial Motion, Memorandum and Affidavit) Paice LLC's Opposition to the Toyota Defendants' Motion for Reconsideration and/or Clarification of Claim Term Definitions (Dec. 1, 2005)
• 2005 WL 3337409 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice Llc's Motion to Strike George Gelb from the Witness List of Defendants (Oct. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3337408 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice Llc's Motion to Strike

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
(Cite as: Slip Copy)

George Gelb from the Witness List of Defendants (Oct. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2666726 (Trial Motion, Memorandum and Affidavit) Toyota's Motion in Limine No. 1 to Limit the Scope of the Trial Testimony of Dr. Steven Nichols (Sep. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 2667128 (Trial Motion, Memorandum and Affidavit) Toyota's Motion in Limine No. 3 to Preclude Paice from Presenting at Trial Evidence of Conception of the Claimed Inventions Before the Respective Filing Dates of the Patents-In-Suit (Sep. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 2667127 (Trial Motion, Memorandum and Affidavit) Toyota's Reply Memorandum in Support of Its Motion to Adjourn the Trial and to Reopen and Compel Discovery on Paice's Experimental Testing (Aug. 31, 2005) Original Image of this Document (PDF)
• 2005 WL 2666724 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Opposition to the Toyota Defendants' Motion to Adjourn The Trial and to Reopen and Compel Discovery on Paice's Experimental Testing (Aug. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2667126 (Trial Motion, Memorandum and Affidavit) Toyota's Reply Memorandum in Support of Its Motion for Summary Judgment of Non-Infringement (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 2299500 (Trial Motion, Memorandum and Affidavit) Toyota's Motion to Adjourn the Trial and to Reopen and Compel Discovery on Paice's Experimental Testing (Aug. 10, 2005) Original Image of this Document (PDF)
• 2005 WL 2299566 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Second Motion to Compel (Aug. 4, 2005) Original Image of this Document (PDF)
• 2005 WL 4656522 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Second Motion to Compel (Aug. 4, 2005)
• 2005 WL 2299563 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for Summary Judgment of Non-Infringement and Substitute Memorandum in Support Thereof (Aug. 2, 2005) Original Image of this Document (PDF)
• 2005 WL 4656521 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for Summary Judgment of Non-Infringement and Substitute Memorandum in Support Thereof (Aug. 2, 2005)
• 2005 WL 1924120 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for Summary Judgment of Non-Infringement and Memorandumin Support Thereof (Jul. 15, 2005) Original Image of this

Document (PDF)
• 2005 WL 4656520 (Trial Motion, Memorandum and Affidavit) Toyota's Motion for Summary Judgment of Non-Infringement and Memorandum in Support Thereof (Jul. 15, 2005)
• 2005 WL 1365999 (Trial Motion, Memorandum and Affidavit) Paice LLC's Reply Brief in Support of Its Motion to Compel (Apr. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 4656519 (Trial Motion, Memorandum and Affidavit) Paice LLC's Reply Brief in Support of Its Motion to Compel (Apr. 8, 2005)
• 2005 WL 1365994 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Motion to Compel (Apr. 5, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 4656518 (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Motion to Compel (Apr. 5, 2005)
• 2005 WL 1365985 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice Llc's Claim Construction Reply Brief (Mar. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 1365990 (Trial Motion, Memorandum and Affidavit) Toyota's Response to Plaintiff Paice LLC's Claim Construction Brief (Mar. 29, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 4656516 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC'S Claim Construction Reply Brief (Mar. 29, 2005)
• 2005 WL 4656517 (Trial Motion, Memorandum and Affidavit) Toyota's Response to Plaintiff Paice LLC's Claim Construction Brief (Mar. 29, 2005)
• 2005 WL 1365969 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice Llc's Claim Construction Brief (Mar. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 1365976 (Trial Motion, Memorandum and Affidavit) Opening Memorandum in Support of Defendants' Proposed Claim construction (Mar. 8, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 4656514 (Trial Motion, Memorandum and Affidavit) Plaintiff Paice LLC's Claim Construction Brief (Mar. 8, 2005)
• 2005 WL 4656515 (Trial Motion, Memorandum and Affidavit) Opening Memorandum in Support of Defendants' Proposed Claim Construction (Mar. 8, 2005)
• 2004 WL 3358538 (Trial Pleading) Paice Llc's Answer to Defendants' Counterclaims (Aug. 19, 2004) Original Image of this Document (PDF)
• 2004 WL 3361597 (Trial Pleading) Toyota's Answer, Affirmative Defenses, and Counterclaims (Jul. 30, 2004) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 7
Slip Copy, 2006 WL 2385139 (E.D.Tex.)
**(Cite as: Slip Copy)**

• <u>2004 WL 4908846</u> (Trial Pleading) Toyota's Answer, Affirmative Defenses, and Counterclaims (Jul. 30, 2004)

• <u>2004 WL 3358536</u> (Trial Pleading) Complaint (Jun. 8, 2004) Original Image of this Document (PDF)

• <u>2004 WL 4908845</u> (Trial Pleading) Complaint (Jun. 8, 2004)

• <u>2:04cv00211</u> (Docket) (Jun. 8, 2004)

• <u>2002 WL 33928484</u> (Trial Motion, Memorandum and Affidavit) Toyota's Opposition to Plaintiff Paice LLC's Motion to Preclude USE of Certain of Defendant and Counter-Claim Plaintiff' Designations of Deposition Testimony at Trial (Dec. 13, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
(Cite as: Slip Copy)

H

Briefs and Other Related Documents

Rosco, Inc. v. Mirros Lite Co.E.D.N.Y.,2006.Only the Westlaw citation is currently available.

United States District Court,E.D. New York.

ROSCO, INC., Plaintiff,

v.

MIRROR LITE COMPANY, Defendants.

No. CV-96-5658 (CPS).

Sept. 29, 2006.

Max Moskowitz, Ostrolenk, Faber, Gerb & Soffen, L.L.P., New York, NY, for Plaintiff.
John S. Artz, Artz & Artz, Southfield, Ml, Thomas M. Furth, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER
SIFTON, Senior Judge.
*1 In 1996, Rosco, Inc., brought this action against Mirror Lite asserting claims of design patent infringement, trade dress infringement, false designation of origin, tortious interference with business relationships, misrepresentation in violation of 15 U.S.C. § 1125(a), and common law trademark infringement. In addition to damages, the complaint sought declaratory and injunctive relief pursuant to 29 U.S.C. § § 2201 and 2202. Mirror Lite asserted a counterclaim of patent infringement in violation of 15 U.S.C. § 1125(a).

The matter was tried before the undersigned sitting without a jury between March 6 and March 10, 2000. After appeal to the Federal Circuit and remand for determination of infringement, I found that Rosco had infringed Mirror Lite's 984 patent. Now before this Court is (1) Mirror Lite's motion for a permanent injunction pursuant to 35 U.S.C § 283; and (2)Rosco's request for limitations on the scope of post-trial damages discovery and correction of factual finding # 16 of my August 26, 2005 opinion, that Rosco sold "in excess of 150,000 Hawk Eye mirrors."

BACKGROUND

Procedural History

The facts of this case have already been stated several

times in the prior opinions in this case. Rosco v. Miller Lite, 139 F.Supp.2d 287 (E.D.N.Y 2001); Rosco v. Miller Lite, 304 F.3d 1373 (2d Cir.2002). It is unnecessary to repeat them fully again here. A procedural history is offered below.

Rosco's 357 design patent relates to an oval, highly convex cross-view mirror with a black, flat metal backing. Rosco applied for this patent in April of 1992, and the patent issued in April of 1994. Mirror Lite's 984 utility patent relates to an oval cross-view mirror with a varying radius of curvature along the major axis of the convex ellipsoid mirror lens. Mirror Lite applied for this patent in September of 1992, and the patent issued in December of 1996.

In its complaint, Rosco sought a declaratory judgment that all claims of Mirror Lite's 984 patent were invalid and unenforceable due to Mirror Lite's inequitable conduct in procuring the patent and a finding that Mirror Lite infringed its 357 patent. Mirror Lite filed a counterclaim alleging that Rosco infringed the 984 patent. At trial, Mirror Lite contended that Rosco's patent was invalid as functional and therefore not infringed.

After a bench trial, I held in relevant part that Rosco's 357 patent was invalid as functional and obvious pursuant to 35 U.S.C. § 103.[FN1] I also found Mirror Lite's patent invalid under 35 U.S.C. § 102(e) [FN2] and (g).[FN3] Accordingly, I did not reach the merits of Mirror Lite's patent infringement claim.

FN1. 35 U.S.C. § 103 limits patentability if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

FN2. 35 U.S.C. § 102(e) provides that person is entitled to a patent unless the invention was the subject of a previously issued patent.

FN3. 35 U.S.C. § 102(g) provides that person is entitled to a patent unless "before such person's invention thereof, the invention was made in this country by another inventor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 2
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
**(Cite as: Slip Copy)**

who had not abandoned, suppressed, or concealed it."

The Federal Circuit reversed the holdings that both Rosco and Mirror Lite's patents were invalid. The Court remanded in relevant part for consideration of: 1) whether Mirror Lite had proven by clear and convincing evidence that Rosco's patent was invalid under 35 U.S.C. § 103; 2) whether Mirror Lite had infringed Rosco's patent; 3) whether Mirror Lite's patent was invalid under 35 U.S.C. §§ 102(a), [FN4] (f), and 103; 4) whether Mirror Lite's patent was unenforceable due to inequitable conduct; and 5) whether Rosco had infringed on Mirror Lite's patent.

> FN4. 35 U.S.C. § 102(a) provides in part that a person is not entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."

**\*2** On remand, Mirror Lite conceded that Rosco's patent was valid, while Rosco argued that Mirror Lite's 984 patent was invalid. Rosco contended that prior to the date of Mirror Lite's invention, Rosco had conceived, reduced to practice, and sold mirrors containing all the elements of claims 1, 2, 3, 6, 7, and 8 of the 984 patent, thus rendering it invalid under 35 U.S.C. § 102(a). Benjamin Englander, one of Rosco's owners, testified to that effect. Rosco introduced this mirror as Exhibit 110, called a "Hawk Eye Mirror" based on the 357 patent. Mirror Lite responded that: 1) Rosco failed to show that its previous mirror had decreasing radii of curvature along its major and minor axes and did not contain a reflective outer surface and a non-reflective inner surface; or in the alternative, 2) that Rosco could not show that it appreciated these aspects of its mirror; and 3) that Rosco could not prove that it had used this mirror publicly before the priority date of the 984 patent.

I found that Exhibit 110 did have these qualities, that Rosco had used the mirror publicly, and that Rosco had anticipated Mirror Lite's patent under 35 U.S.C. § 102. I also held that Mirror Lite's 984 patent was unenforceable due to Mirror Lite's inequitable conduct in procuring the patent. Specifically, I held that Mirror Lite had intended to mislead the examiner by failing to disclose prior art.

I also held that Rosco failed to prove its claim of infringement. In particular, Rosco sought to prove that

four of Mirror Lite's mirrors infringed on Rosco's 357 patent, but Rosco had not proven that the four allegedly infringing mirrors appropriated the novelties that distinguished Rosco's 357 patent from prior art.

On appeal for the second time, the Federal Circuit reversed this Court's holding that Exhibit 110 anticipated Mirror Lite's 984 patent. Specifically, the Federal Circuit held that Rosco failed to prove by clear and convincing evidence that Exhibit 110 disclosed every claim limitation of the 984 patent because "[t]estimonial evidence of invalidity must be corroborated." *Rosco, Inc. v. Mirror Lite, Co.,* 03-1562, 120 Fed.Appx. 832 (Fed.Cir. Jan. 19, 2005) (unpublished). Rosco presented the testimonial evidence of Benjamin Englander to the effect that he had designed Exhibit 110 and that it contained every element of claims 1, 2, 3, 6, 7, and 8 of Mirror Lite's 984 patent. Exhibit 110 itself, the Federal Circuit held, was insufficient to corroborate this testimony. Nor did the testimony of Rosco's expert witness, Harvey Manbeck, suffice because he based his testimony on Benjamin Englander's representations. With regard to my finding of inequitable conduct by Mirror Lite for failing to disclose prior art, the Federal Circuit held that there was insufficient evidence of Mirror Lite's intent to deceive. The Federal Circuit remanded "for further proceedings solely on the issue of infringement, the determination of which should be made on the existing trial record."

**\*3** I thereafter determined that Mirror Lite had proven that Rosco infringed Mirror Lite's 984 patent. I also ordered limited additional discovery on two issues: (1) whether and to what extent Rosco continued to sell Hawk Eye and Mini Hawk Eye mirrors post-trial; and (2) post-trial revenue, costs, and profits Rosco has earned or incurred through sale or manufacture of Hawk Eye and Mini Hawk Eye mirrors.

*Recent Factual History*

Rosco now asserts, through the declaration of Benjamin Englander, that Rosco holds patents for constant curvature oval cross-view mirrors [FN5] and has manufactured such mirrors since March 2000, under the Hawk Eye and Mini Hawk Eye registered trademark. [FN6] Englander further asserts that Ed Swain, Bob West, and Jed Routh, three employees of Thomas Buses Built Buses Inc. ("Thomas Buses"), a Rosco customer, informed Englander that Daniel Swain, Vice President of Sales for Mirror Lite, and another unidentified employee of Mirror Lite told the Thomas Buses employees that Mirror Lite had won the case

Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
**(Cite as: Slip Copy)**

against Rosco, that "Rosco is locked out from the cross-view mirror business," that Thomas Buses would no longer be able to buy any Rosco oval cross-view mirrors, and that Rosco's supply agreement with Thomas Buses for oval mirrors would be null and void.

> FN5. The three patents are U.S. patent numbers 6,328,450, 6,282,771 and 6,227,674 and are attached to the Englander Declaration as Exhibit A.

> FN6. If this statement is true then these mirrors would not infringe the 984 patent because they have a constant curvature.

In contrast, defendant submits the declaration of Daniel Swain who states that he never told employees at Thomas Buses that Rosco was "locked out from the cross-view mirror business," that Thomas Buses could no longer buy any oval view mirrors from Rosco, or that Rosco's supply agreement with Thomas Buses for oval mirrors would be null and void. Swain further states that neither he nor anyone else at Mirror Lite ever made a statement to Thomas Buses or anyone else in the industry that Rosco cannot sell cross-view mirrors with a constant radius of curvature.

### DISCUSSION

*Permanent Injunction*

*Should an Injunction be Issued at All?*

35 U.S.C. § 283 grants courts the power to issue permanent injunctions. ("The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.") The Supreme Court has recently held that [a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction.

*eBay Inc. v. Mercexchange, LLC,* 126 S.Ct. 1837, 1839 (2006). Whether to grant or deny a permanent injunction is within the district court's equitable discretion. *Id.*

**\*4** Rosco first urges that the injunction should be denied because it has ceased to manufacture and sell the infringing products. Cessation of production and sales is not in and of itself sufficient "sound reason" to deny a permanent injunction. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1282 (Fed .Cir.1988)("The mere fact that [infringer] was no longer making or selling the infringing filament and packing products is not a sufficient ground for denying an injunction against future infringement.") Rather, the request for an injunction should be denied only when "the evidence is very persuasive that further infringement will not take place." *Id.* For example, where the infringer no longer had the manufacturing capacity to produce the infringing item, a permanent injunction was not appropriate. *Id.* In this case, the only evidence of Rosco's cessation of infringement is its own statement that it has done so. If this sufficed for the "very persuasive" evidence that infringement had permanently ceased, few permanent injunctions would issue. As explained in *General Electric Co. v. New England Electric Mfg. Co.,* "The argument in such circumstances is very simple. If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest, the court should place a strong hand upon him...." 128 F. 738, 740 (2d Cir.1904).

Rosco next argues that equitable considerations require that an injunction not be granted against it. Rosco submits the declaration of Benjamin Englander, who states that Mirror Lite's Vice President of Sales, Daniel Swain, and another Mirror Lite employee have approached employees of Rosco customer Thomas Buses and informed it that Mirror Lite had won the case against Rosco, that "Rosco is locked out from the cross-view mirror business," that the customer will no longer be able to buy any Rosco oval cross-view mirrors, and that Rosco's supply agreement with the customer for oval mirrors will be null and void. [FN7] Englander Declaration ¶ 8. Rosco asserts that it produces oval mirrors with constant radii of curvature which are not covered by the Mirror Lite Patent 984. As a result, Rosco claims that Mirror Lite's statements to Thomas Buses employees falsely represent my prior decision and attempt to parlay one patent ruling in its favor into industry domination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 4

FN7. As explained in the facts section above, in his declaration Swain states that he never made any of these statements to personnel at Thomas Buses.

In support of the argument that equitable considerations may prevent the issuance of a permanent injunction, Rosco relies on *Foster v. American Machinery & Foundry Co.,* 492 F.2d 1317, 1324 (2d Cir.1977), holding that, "an injunction to protect a patent against infringement, like any other injunction, is an equitable remedy to be determined by the circumstances. It is not intended as a club to be wielded by a patentee to enhance his negotiating stance ." Rosco also points to *Nerrney v. New York, N.Y. & H.R. Co.,* 83 F.2d 409, 411 (2d Cir.1936) holding that, where "it is recognized that the only real advantage to a plaintiff in granting the injunction would be to strengthen its position ... an injunction should not issue."

**\*5** Even assuming that the only purpose of the permanent injunction were for Mirror Lite to strengthen its position, a permanent injunction would still issue because *Foster* and *Nerrney* are distinguishable from this case. In *Foster* the patent owner did not actually manufacture any products covered by the patent. Granting a permanent injunction would have given the patent owner a negotiating advantage in negotiations to license the infringer's use of the patent. Instead the court decided it was more equitable to grant mandatory royalties under a licensing scheme. In this case it is undisputed that Mirror Lite manufactures mirrors covered by the 984 patent. Thus, this is not a case where a mandatory licensing scheme could adequately compensate the patent owner.

In *Nerrney* the requested permanent injunction would have given the patent owner very little benefit, would have huge costs for the railroad infringer, and would have caused a great inconvenience to the public because compliance would necessarily slow down train schedules. In this case, the permanent injunction would not disproportionately burden Rosco. To the extent an oval mirror with a varying radius of curvature is a superior bus mirror, a permanent injunction may be of significant value to Mirror Lite. Further, in *Nerrney* one factor for consideration was that the permanent injunction would inconvenience the public. Here that is not the case, since to the extent the public is interested in purchasing varying radii mirrors or riding on buses equipped such mirrors, such mirrors may be obtained from Mirror Lite. Finally,

even accepting Rosco's portrayal of Mirror Lite's conduct as true, its efforts at self-help are not so egregious as to forfeit its right to the legal protections of an injunction.

### *What Should the Scope of the Injunction Be?*

Rosco argues that to the extent Mirror Lite is entitled to an injunction, the proposed injunction submitted by Mirror Lite is overbroad because it: (1) prohibits Rosco from infringing "any claims of the 984 patent" including non-asserted claims 4, 5, and 9 and (2) it prohibits any sale of "Rosco's Hawk Eye and Mini Hawk Eye mirror products despite the fact that, according to Rosco, it uses the "Hawk Eye" mark for mirrors with a constant radius of curvature.

Section 283 requires that the purpose behind an injunction be "to prevent the violation of any right secured by patent." 35 U.S.C. § 283. See also *Eli Lilly and Co. v. Medtronic, Inc.,* 915 F.2d 670, 674 (Fed.Cir.1990) ("an injunction is only proper to the extent it is 'to prevent the violation of any right secured by patent.' "). Therefore, "injunctive relief should be narrowly tailored to fit the specific legal violations." *Gemveto Jewelry Co. v. Jeff Cooper Inc.,* 800 F.2d 256, 259 (Fed.Cir.1986). This is because "judicial restraint of lawful competitive activities ... must be avoided." *Joy Technologies, Inc. v. Flackt, Inc.,* 6 F.3d 770, 777 (Fed.Cir.1993).

**\*6** Recognizing that this is the law, in its Reply Mirror Lite submits an amended proposed permanent injunction which prevents infringement only of "claims 1-3 and 6-8 of the 984 patent" and the sale of Hawk Eye and Mini Hawk Eye mirror products only to the extent they have "an oval lens with a varying radius of curvature along the major axis." Amended Proposed Permanent Injunction ¶ 2(b). These changes partially address Rosco's concerns.

The amended permanent injunction also prevents the sale of mirrors with a list of characteristics including "a lens with a varying radius of curvature along the major axis and with such radius decreasing from the intersection with the minor axis to the perimetral edge." Amended Proposed Permanent Injunction 2(c)(7). As this is a characteristic of the infringing Hawk Eye and Mini Hawk Eye mirrors, ¶ 2(c)(7) covers the infringing Hawk Eye and Mini Hawk Eye mirrors. Without resolving the question of whether Mirror Lite has improperly suggested to customers that Rosco is totally out of the business and that all of its Hawk Eye and Mini Hawk Eye mirrors infringe, ¶

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 5
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
**(Cite as: Slip Copy)**

2(b) of the amended proposed permanent injunction, specifically referring to certain Hawk Eye and Mini Hawk Eye mirrors, should also be struck in order to avoid potential misunderstanding on the part of consumers. Specifically naming the Hawk Eye and Mini Hawk Eye models might mislead consumers into thinking that all Hawk Eye and Mini Hawk Eye mirrors are enjoined. It is sufficient to list the characteristics of infringing mirrors, which would preclude the sale of infringing Hawk Eye and Mini Hawk Eye mirrors, but not all mirrors marketed under those names.[FN8]

> FN8. Although Mirror Lite's requested injunction will issue, modified as described above, such injunction will not issue until after the damages are resolved. At oral arguments I raised the issue of whether there was just reason for delay. *see* Fed.R.Civ.P. 54. Although the liability issue in this case is closed, the amount of damages is as yet undetermined. This would leave the more hotly contested damages issue to be appealed at a later date. It the interest of conservation of judicial resources, the injunction will be issued when the damages issue is decided so that both issues may be appealed together.

*Damages Issues*

The measure of damages in an infringement case is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 507 (1964)*. There must be adequate evidence in the record to recover lost profits. This requires evidence of "a causal relation between the infringement and its loss of profits." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed.Cir.2001)*. Where the evidence is inadequate to establish lost profits, a Court must determine a "reasonable royalty rate." 35 U.S.C. § 284; *Lindemann Mashinenfabrik GmbH v. American Hoist & Derrick Co., 895 F.2d 1403 (Fed.Cir.1990)*.[FN9] Under either a lost profit or reasonable royalty measure, the patent holder must "reconstruct the market to project economic results" of what would have occurred had the market developed absent the infringing product or what agreement would have resulted had a hypothetical negotiation over royalty rates occurred. *Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed.Cir.2003); Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302,*

1311 (Fed.Cir.2002).

> FN9. In determining a reasonable royalty rate, the Court is to consider, to the extent there is evidence on the record, the factors listed in *Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). See Dow Chemical Co. v. Mee Indus., Inc., 341 F.3d 1370, 1381-82 (Fed.Cir.2003); Lindemann Mashinenfabrik GmbH v. American Hoist & Derrick Co., 895 F.2d 1403 (Fed.Cir.1990); Devex Corp. v. Gen. Motors Corp., 667 F.2d 341 (Fed.Cir.1981); National Presto Indus. v. Black & Decker (U.S.), Inc., 760 F.Supp. 699, 701 (N.D.Ill.1991).*

*Pre-Trial Damages-Correction of Factual Finding of Number of Units Sold*

**\*7** In the August Opinion, Fact Finding number 16, I found that, "Between February 13, 1997, and February 23, 2000, Rosco has sold in excess of 150,000 Hawk Eye mirrors." In making this finding I explicitly relied on Rosco's Revised Findings of Fact 5. Rosco now argues that the proposed Finding of Facts submitted by Rosco counsel never became part of the pre-trial order,[FN10] and argues that the 150,000 number was a typographical error. Rosco requests that I reconsider this factual finding as the only evidence submitted at trial concerning the number of mirrors sold was testimony by Rosco Owner and Vice President of Finance, Daniel Englander, that 90,000 mirrors were sold. Trial Tr. 479, March 9, 2000. This evidence was undisputed at trial and in fact was relied on by Mirror Lite in the "lost profits" section of its Post Trial Brief on Remaining Issues. As there was no evidence in the record to support the fact that 150,000 Hawk Eye Mirrors were sold, it was a mistake to so find. As the trial evidence is uncontroverted that only 90,000 mirrors were sold, I now find that 90,000 mirrors were sold and that such number should be used in the determination of damages.

> FN10. "Rule 16 (of the Federal Rules of Civil Procedure) indicates that only admissions made at a pre-trial conference and incorporated in a pre-trial order are binding." Fed.R.Civ.P. Rule 16; *Taylor v. Allis-Chalmers Mfg. Co., 320 F.Supp. 1381, 1384 (E.D.Pa.1969), affirmed, 436 F.2d 416 (3rd Cir.1970)*. "Proposed findings submitted by counsel are no more than informal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suggestions for the sole purpose of assisting the court." 7 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2578; *American Elastics v. U.S.,* 84 F.Supp. 198, 199 (S.D.N.Y.1949). Thus, the proposed findings of fact have no evidentiary significance. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 538 F.Supp 1257,1280 (N.D.Ohio 1980) (the plaintiff has utterly failed to direct the Court's attention to any legal authority which would support [its] rather novel contention that proposed findings of fact ... may properly serve as evidentiary admissions").

*Pre-Trial Damages: Reopening Discovery*

Mirror Lite filed a sur-reply arguing that my consolidation of the 1996 and 1999 cases "did not allow time for either party to make any discovery or retain any experts concerning the damages issue prior to the start of the trial on March 6, 2000" and that accordingly Mirror Lite believed that the damages issue would be heard and tried later and after full discovery. Mirror Lite thus requests that both it and Rosco now be allowed to conduct full discovery on damages, if any, occurring both before and after trial.

However, Mirror Lite never moved to bifurcate the issue of damages. It did not complain that it had inadequate time to conduct discovery on the damages issue. It presented a witness on the issue of damages and briefed the issue in its post-trial submissions. Mirror Lite did not appeal my consolidation order or its obligation to try damages. Accordingly, Mirror Lite will not be permitted to reopen the damages issue at this late date.

*Post-Trial Damages: Scope of Discovery*

This Court's August 26, 2005 Memorandum and Order allowed Mirror Lite to conduct discovery on post-trial damages issues:
Mirror Lite may, however, take additional discovery concerning: (1) whether and to what extent Rosco continued to sell Hawk Eye and Mini Hawk Eye mirrors after the trial; and (2) post-trial revenue, costs, and profits Rosco has earned or incurred through sale or manufacture of Hawk Eye and Mini Hawk Eye mirrors.

While Mirror Lite has been permitted to conduct discovery on post-trial revenue, costs, and profits Rosco has earned or incurred through sale or

manufacture of Hawk Eye and Mini Hawk Eye Mirrors, this discovery is not intended to supplement evidence of Mirror Lite's pre-trial damages. As already stated in the August Opinion, "to the extent that Mirror Lite failed to meet this burden at trial, it will not be permitted to supplement the record to close any evidentiary gaps."

*8 Each of Mirror Lite's interrogatories and document production requests ask for information and documents for "the period of December 31, 1996 to March 6, 2000" and "the period of March 7, 2000 to the present." The period of December 31, 1996 to March 6, 2000 is the pre-trial period. Discovery on these issues is closed and Mirror Lite will not be permitted to use discovery on post-trial damages to supplement the evidence it has already presented on pre-trial damages.

Interrogatories 1-3 and Requests for Production 1-4 request information on "mirrors" generally or on "all mirrors" without limiting their scope to Hawk Eye and Mini Hawk Eye mirrors. The discovery order specifically limited discover to issues of "post-trial revenue, costs, and profits Rosco has earned or incurred through sale or manufacture of oval Hawk Eye and Mini Hawk Eye mirrors." Thus, interrogatories and requests for production on Rosco's production, manufacture and sales of mirrors generally is beyond the scope of permissible discovery.

Rosco further argues that as some Hawk Eye and Mini Hawk Eye Mirrors have a constant radius of curvature and are thus not infringing, Mirror Lite should not be allowed any discovery as to these mirrors. In order to facilitate discovery Rosco suggests that the magistrate judge appoint an independent accountant to audit all of Rosco's books and records and provide an accounting report concerning information only on post-trial varying radii of curvature mirrors.

This solution is inadequate. Rosco is only now contending that some Hawk Eye and Mini Hawk Eye mirrors do not infringe. This may very well be the case. However, Mirror Lite is entitled to determine for itself whether or not some Hawk Eye and Mini Hawk Eye mirrors have a constant radius of curvature and thus do not infringe. An independent accountant is not qualified to investigate the mirrors and make such a determination. Thus, Mirror Lite will be permitted to conduct its own discovery and will not be limited only to a report by an independent accountant. However, discovery of revenues and costs may be limited to those mirrors which are *prima facie* infringing.

Slip Copy
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 7

Finally, Rosco objects that Mirror Lite's interrogatories and production requests ask for information about hardware that is nowhere recited in the claims found to be infringed such as supplier names and cost of "tripod mounting brackets" "mounting bases," "cross view arms," "mirror arms," "trigger grip bases," "goosenecks," "twist arms," and "bracket kits." <u>FN11</u> Rosco is correct that these components are not themselves alleged to have infringed. However, to the extent Mirror Lite will attempt to establish a "reasonable royalty rate" it may be relevant to know the full construction cost of the infringing mirrors, not just the cost of the infringing components. This will assist Mirror Lite in determining the value of the infringing components to Rosco and what part of Rosco's profit may be attributed to the infringing components. *Austral Sales Corp. v. Jamestown Metal Equipment Co.*, 45 F. Supp 360 (W.D.N.Y 1942) (calculating a reasonable royalty based on the infringer's profits). Thus, discovery on this issue is permitted.

FN11. Interrogatories 10 and 11; Requests for Production 12 and 13.

**CONCLUSION**

*\*9* For the reasons set forth above, Mirror Lite's request for a permanent injunction is granted and its amended proposed permanent injunction, excepting ¶ 2(b) will be entered upon resolution of the remaining damages issues. The pre-trial sale figure of 90,000 infringing mirrors is adopted. Discovery is precluded as to inquiries concerning the December 31, 1996 to March 6, 2000 period and to the extent it requests information on "all mirrors" or on "mirrors" generally.

The Clerk is directed to furnish a filed copy of the within to all parties and to the Magistrate Judge.

SO ORDERED.

E.D.N.Y.,2006.
Rosco, Inc. v. Mirror Lite Co.
Slip Copy, 2006 WL 2844400 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2929272 () Declaration of Benjamin Englander (Sep. 12, 2006) Original Image of this Document with Appendix (PDF)
• 2006 WL 2929273 () Declaration of Peter Sinclair (Sep. 12, 2006) Original Image of this Document

(PDF)
• 2005 WL 2892752 (Trial Motion, Memorandum and Affidavit) Rosco's Reply to Mirror Lite's Opposition to Rosco's Request for Reconsideration Concerning the Post-Trial Discovery (Sep. 30, 2005)
• 2005 WL 2892749 (Trial Motion, Memorandum and Affidavit) Rosco's Memorandum of Law in Opposition to Mirror Lite's Motion for a Permanent Injunction (Sep. 21, 2005)
• 2005 WL 2892745 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Permanent Injunction Following Judgment of Infringement (2005)
• 2001 WL 34764439 (Trial Motion, Memorandum and Affidavit) Affidavit of William P. Schmidt (2001)
• 2001 WL 34764440 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendant's Motion for Summary Judgment (2001)
• 2000 WL 34498426 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Supporting Motion to Strike New Defense Grounds 35 U.S.C. || 102(e) and 103 (Mar. 8, 2000)
• 2000 WL 34498421 (Trial Motion, Memorandum and Affidavit) Plaintiffs Trial Memorandum (Jan. 10, 2000)
• 1999 WL 33929954 (Trial Pleading) Request for Reconsideration of Grant of Summary Judgment on Count V of the First Amended Complaint (Jun. 14, 1999)
• 1998 WL 34321460 (Trial Pleading) Defendant's Responses to Plaintiff's First Set of Requests for Admissions (Jan. 20, 1998)
• 1997 WL 33789612 (Trial Pleading) Second Amended Complaint (Jul. 1997)
• 1997 WL 33789613 (Trial Pleading) Defendant's Answer to First Amended Complaint (Mar. 4, 1997)
• 1:96cv05658 (Docket) (Nov. 19, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M

Dbt f !3;13.dw 13984.TI  N.t ub!!!!!Epdvn f ou3: 5!!!!!Gjrhe!1: 03903117!!!!!Qbhf !2!pg25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 02-2873 Ma/A |
| SYNTHES (U.S.A.) and SYNTHES-STRATEC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## ORDER GRANTING PLAINTIFF'S PRAYER FOR ENTRY OF A PERMANENT INJUNCTION

---

On November 13, 2002, Plaintiff Smith & Nephew, Inc. ("Smith & Nephew") sued Defendants Synthes (U.S.A.) and Synthes-Stratec, Inc. (collectively, "Synthes") for infringement of two patents, U.S. Patent No. 5,167,663 ("the '663 patent") and U.S. Patent No. 5,312,406 ("the '406 patent"). The patents relate to intramedullary nails and the methods used in the treatment of intertrochanteric femoral fractures using interfragmentary compression. On May 14, 2004, the court held a patent construction hearing under Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996), and entered an order construing the disputed patent terms on August 26, 2004. The case was tried discontinuously without a jury,

1

beginning December 6, 2004, and ending March 4, 2005. On August 26, 2005, this court issued its findings of fact and conclusions of law ("the Memorandum Opinion"). The court found that certain versions of Synthes' Trochanteric Fixation Nail ("TFN") and Proximal Femoral Nail ("PFN") infringed the '663 patent and the '406 patent.

In its complaint, Smith & Nephew prayed for relief in the form of a permanent injunction as well as damages. The court did not address the issue of a permanent injunction in its Memorandum Opinion. Both parties have had an opportunity to brief the court further on that issue, and the issue is now ready for decision. For the following reasons, Plaintiff's request for permanent injunction is GRANTED.

## I.  Background

Synthes argues principally that (i) Smith & Nephew will not be irreparably harmed because of the limited competition between the primary Smith & Nephew product covered by the '663 and '406 patents and the infringing TFN nails, (ii) Smith & Nephew has shown a willingness to be compensated fully for its patents by money damages because in the past it has licensed the patents to its competitors and has extended several licensing offers to Synthes while this case has been pending, (iii) the overall balance of hardships favors Synthes because Smith & Nephew's business will not be significantly affected by continued sales of

the infringing products, and (iv) the public health interest in having Synthes' allegedly safer and more effective TFN product available to treat femoral fractures is substantial. (Def.'s Mem. in Opp'n to Pl.'s Req. for Entry of Permanent Inj., October 3, 2005; Def.'s Resp. to Pl.'s Suppl. Br. Regarding the S. Ct.'s eBay, Inc. v. MercExchange, L.L.C. Op. at 2, May 17, 2006.)

Smith & Nephew argues that (i) irreparable harm to the sales of its patented femoral nails has been shown, together with the loss of market momentum and the ability to form customer relationships, (ii) money damages would not be adequate compensation, and (iii) the public health interest would not be adversely affected by a permanent injunction because substitute products and methods of treatment are available to the public through Plaintiff and its selected licensees. Smith & Nephew argues that it is substantially smaller than Synthes in the field of manufacturing trauma products, and, therefore, that an injunction would give Smith & Nephew the competitive support it needs to expand its customer base, increasing market competition. (Smith & Nephew's Supplemental Br. Regarding the S. Ct.'s eBay, Inc. v. MercExchange, L.L.C. Op. at 2-3, May 16, 2006; Pl.'s Second Suppl. Post-Trial Mem. Supporting Permanent Inj. (with Revised Proposed Order), October 20, 2005.)

## II.  Applicable Legal Standard

A plaintiff seeking permanent injunctive relief in a patent

Dbt f !3;13.dw.13984.TI N.t ub!!!!!Epdvn f ou3: 5!!!!!Gme!1: 0903117!!!!!Qbhf !5!pg25

infringement dispute must show:

> (1) that it has suffered an irreparable injury; (2)
> that remedies available at law, such as monetary
> damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between
> the plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not
> be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839 , 547

U.S. ___ (2006).

The Court in eBay held that "the decision whether to grant

or deny injunctive relief rests within the equitable discretion

of the district courts, and that such discretion must be

exercised consistent with the traditional principles of equity,

in patent disputes no less than in other cases governed by such

standards." Id. at 1841.  The Court thus rejected the

traditional rebuttable presumption that a permanent injunction is

to be automatically awarded to the plaintiff upon a showing of

the validity and infringement of the patent.  Christiana Indus.

v. Empire Elecs., 2006 U.S. Dist. LEXIS 54210, at *5 (E.D. Mich.

July 25, 2006).  The four-factor eBay test is a balancing test

under which the plaintiff must demonstrate that the totality of

circumstances weighs in its favor.  Canadian Lumber Trade

Alliance et al. v. United States et al., 2006 Ct. Intl. Trade

LEXIS 103, at *11, slip op. 2006-104 (Ct. Int'l Trade July 14,

2006).

**III.  Analysis**

4

Dbt f !3;13.dw 13984.TI N.t ub!!!!!Epdvn f ou3: 5!!!!!Gjmf !1: 0890311117!!!!!Qbhf !6!pg25

## A. Irreparable Harm Suffered by Smith & Nephew

Smith & Nephew has presented evidence that it has
suffered irreparable injury to its business because of Synthes'
infringement of the '663 and the '406 patents.

Irreparable harm is "'often suffered when the injury can[not] be
adequately atoned for in money . . . or when the district court
cannot remedy [the injury] following a final determination on the
merits,'" as when the plaintiff loses market share or its
reputation for innovation. Wald et al. v. Mudhopper Oilfield
Svcs., Inc. et al., 2006 U.S. Dist. LEXIS 51669, at *16 (W.D.
Okla. July 27, 2006) (quoting Prairie Band of Potawatomi Indians
v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001)). Although
stated as two separate factors under eBay, the irreparable harm
requirement contemplates the inadequacy of alternate remedies
available to the plaintiff. Canadian Lumber, 2006 Ct. Intl.
Trade LEXIS 103, at *12. Under the principles of equity to which
the Court referred throughout its opinion in eBay, irreparable
harm means "'that unless an injunction is granted, the plaintiff
will suffer harm which cannot be repaired.'" Id. at *12 (quoting
Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966)).

When it introduced its patented devices to the market, Smith
& Nephew filled a market gap. (Trial Tr. 876:23-877:6; Trial Tr.
876:17-22 (Hall)(C).) Smith & Nephew has demonstrated flattening
sale growth, starting in 2002, in the market for the infringing

5

Dbt f !3;13. dw 13984. TI N. t ub!!!!!Epdvn f ou3: 5!!!!!Gjrfhe!1: 0890B117!!!!!Qbhf !7!pg25

devices, attributable to a decreased ability to compete in the
market. (Trial Tr. 905:5-910:9.) Synthes' expert admitted that
if the infringing products had not been available, he would have
used Smith & Nephew products instead. (Trial Tr. 1379:4-19.)

Synthes had stagnant growth in its compression hip screw
line before it started producing the infringing products because
surgeons chose to treat intertrochanteric fractures with
intramedullary devices instead of devices Synthes was producing
at that time. (Trial Tr. 876:23-877:17 (Hall)(C); Trial Tr.
908:25-909:14 (James)(D).) Since bringing the infringing
products to market, Synthes has enjoyed significant sales in both
TFN and PFN products and has identified TFN as one of the two
products most important to its growth. (Trial Tr. 908:15-24
(James)(D).)

Synthes admits that competition exists between Smith &
Nephew's products and the infringing devices. (Def.'s Mem. in
Opp. at 5.) (See also Trial Tr. 908:15-25.) Smith & Nephew has
shown that direct competition exists between the infringing
products and Smith & Nephew's own products. (Trial Tr. 873:11-
874:15 (Hall)(C).) Synthes' TFN and PFN products have had a
direct negative impact on sales of Smith & Nephew products
protected by the '663 patent, as well as on other Smith & Nephew
orthopaedic products. (Trial Tr. 907:24-909:14 (James)(D).)
This competition has been shown to reduce Smith & Nephew's

ability to create customer relationships. (Trial Tr. 909:15-910:8.) The loss of sales due to the competition not only affects Smith & Nephew monetarily, but also inhibits the company's ability to develop new products because it interferes with the relationships Smith & Nephew is able to form with surgeons. (Trial Tr. 902:10-903:1 (James)(D); Trial Tr. 909:15-910:9 (James)(D).)

The loss of market share and the resulting lost profits and loss of brand name recognition which Smith & Nephew suffered because of Synthes' continued sale of the infringing products constitute injuries that are both incalculable and irreparable. The court finds no support for Synthes' assertions that Smith & Nephew has not been irreparably harmed because of the limited competition between the primary Smith & Nephew product covered by the '663 and the '406 patents and the infringing products made by Synthes.

Smith & Nephew has not been willing to accept royalty-type damages in lieu of the market exclusivity that it intended to secure by obtaining the '663 and the '406 patents. Even if it were, "a plaintiff's willingness to license its patent" is not "sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue." eBay, 126 S. Ct. at 1841 (citing the district court decision, 275 F. Supp. 2d at 712 (E.D. Virginia. 2003)).

7

Dbtf !3;13.dw13984.TI N .t ub!!!!!Epdvn f ou3: 5!!!!!Gjrhe!1: 0B9B117!!!!!Qbhf !9!pg25

## B.  Adequacy of Remedies Available at Law

A violation of the right to exclude does not compel the conclusion that a patent holder cannot be adequately compensated by remedies at law, such as monetary damages.  However, by competing in the market for the patented invention with the infringing products and by damaging Smith & Nephew's goodwill and brand name recognition, as shown above, Synthes has violated Plaintiff's exclusionary right in a manner that cannot be compensated adequately through pecuniary damages.  "To recover lost profits, a patent owner must . . .  show 'a reasonable probability that "but for" the infringing activity, the patentee would have made the infringer's sales, . . . a showing [that] necessarily entails a "reconstruct[ion] of the applicable market through sound economic proof." KEG Techs., Inc. et al. v. Reinhart Laimer, Sewer Equip. Corp. et al., 436 F. Supp. 2d 1364 (N.D. Ga. June 8, 2006) (quoting Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed Cir. 2003)).  Such a showing, speculative at best, is more challenging to make in this case because of the presence of other suppliers in this highly competitive industry and the extensive time during which Synthes has been infringing Smith & Nephew's patents.  Damages due to lost sales might theoretically be proven with lesser or greater degree of certainty, but intangible losses, such as the loss of goodwill, can never be ascertained accurately.

8

Even if monetary damages were provable for some tangible components of Smith & Nephew's demand for damages, that relief would not necessarily be equitable.  "'It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'" Canadian Lumber, 2006 Ct. Intl. Trade LEXIS 103, at *18 (quoting Boyce's Ex'rs v. Grundy, 28 U.S. (3 Pet.) 210, 214 (1830)). Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue.  Monetary damages generally are not an adequate remedy against future infringement because the central value of holding a patent is the right to exclude others from using the patented product.  Telequip Corp. v. The Change Exchange et al., 2006 U.S. Dist. LEXIS 61469, at *4 (N.D.N.Y., Aug. 15, 2006)(citing Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 397 F. Supp. 2d 537, 546 (D. Del. 2005)).  Even if Synthes were to terminate its sales of the infringing products voluntarily, it would be free to return to its offending conduct, thereby further imposing monetary and intangible losses on Smith & Nephew.  It is "[t]he purpose of an injunction ... to prevent future violations." Swift & Co. v. United States, 276 U.S. 311, 326 (1928).  Indeed, "the entire purpose of an injunction is to take away defendant's discretion not to obey the law." Canadian

9

Lumber, 2006 Ct. Intl. Trade LEXIS 103, at *19.

### C.   The Balance of Hardships

   Patent infringement is a continuing threat to Smith &
Nephew.  The hardship to Synthes of permanently enjoining its
infringing conduct is limited to the injury ordinarily expected
when an injunction is imposed.  "Only 'hardship to the defendant
[that] is not an inseparable part of the plaintiff's right' is
cognizable."  Canadian Lumber, 2006 Ct. Intl. Trade LEXIS 103, at
*20 (quoting Dan B. Dobbs, Law of Remedies 80 (2d ed. 1993)).
Mere hardship incurred in the process of ceasing operations,
however, is not sufficient.  Id.  Although Synthes' effort, time
and expense in redesigning the nail product used for
intertrochanteric fractures might be significant, that is the
consequence of a patent infringement.

  No considerable hardship will be imposed on physicians or
patients when the injunction is imposed because other competing
products would fill any temporary void created by the injunction.

### D.   The Public Interest

  As a general matter, the public maintains an interest in
protecting the rights of patent holders, and injunctions serve
that interest.  Here, a permanent injunction will further
consumer access to more competitive, and thus, presumably better,
products by allowing Smith & Nephew the benefit of its patents
and the ability to gain greater brand recognition.

Dbt f !3;13.dw 13984.TI N.t ub!!!!!Epdvn f ou3: 5!!!!!Grfne!1: 0B9C3117!!!!!Qbhf !22!pg25

Any minor disruption to the distribution of the infringing products will not negatively affect the public or those involved in the chain of distribution because none of the data on the record establishes undisputed and enormous public reliance on Synthes' products and because other, similar products are available in the market.

## IV.  Conclusion

The balance of equities warrants injunctive relief.  Smith & Nephew has demonstrated that it will suffer irreparable harm in the absence of a permanent injunction, harm that cannot be remedied adequately through the recovery of monetary damages. Both the balance of the hardships and the impact on the public interest, although speculative, weigh in favor of Smith & Nephew. For the foregoing reasons, Plaintiff's request for permanent injunction is GRANTED.

**IT IS THEREFORE ORDERED THAT** Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are hereby ENJOINED (i) for the life of the '663 patent, from infringing, inducing the infringement of, and contributorily infringing through the manufacturing, selling, using, offering for sale, importing, distributing or promoting in the United States (A) any version of

11

the Trochanteric Fixation Nail products and colorable variations
thereof (*except* (1) fluted versions and (2) versions that have an
11 mm or a 12 mm diameter) (hereinafter, the "TFN products") and
(B) any version of the Proximal Femoral Nail products and
colorable variations thereof (*except* (1) versions that are solid
and non-cannulated and (2) fluted versions) (hereinafter, the
"PFN products"), as used for the treatment of intertrochanteric
fractures, and from otherwise infringing or inducing others to
infringe the '663 patent;

(ii) for the life of the '406 patent, from infringing through the
use, selling or offering to sell (A) any version of the TFN
products and (B) any version of the PFN products, indicated for
use in the treatment of intertrochanteric fractures, and from
otherwise infringing or inducing others to infringe the '406
patent; and

(iii) for the life of the '406 patent, from further publication
or distribution of any product manual, sales literature,
instrumentation, videos or other instructional or promotional
materials distributed in the United States that describe or
depict how (A) any version of the TFN products or (B) any version
of the PFN products, designed, manufactured, sold or offered for
sale by the Defendants, their officers, agents, employees,
successors or assigns, may be used to treat intertrochanteric
fractures (collectively, "instructional materials"), and are

12

further enjoined from communicating in any manner to any
potential or actual purchaser or user of (A) any version of the
TFN products or (B) any version of the PFN products that such
products may be used to treat intertrochanteric fractures.

**IT IS FURTHER ORDERED** that Defendants, within thirty days of the
issuance of this Order, sequester all instructional materials,
all surgical instrumentation within Defendants' possession,
title, custody or control especially designed and adapted for
using (A) any version of the TFN products or (B) any version of
the PFN products, in a method treating intertrochanteric
fractures, and revise instructional materials to eliminate any
reference to the use of (A) any version of the TFN products or
(B) any version of the PFN products, for treatment of
intertrochanteric fractures.

Defendants are **FURTHER ORDERED** to provide notice of this Order to
their officers, directors, agents, servants, representatives,
attorneys, employees, subsidiaries and affiliates, and those
persons in active concert or participation with them, including
any manufacturers, distributors, retailers, and health care
providers who have been involved in the making, using, selling,
offering for sale or importing of (A) any version of the TFN
products or (B) any version of the PFN products, used to treat

13

Dbt f !3;13.dw.13984.TI N .t ub!!!!!Epdvn f ou3: 5!!!!!Gjmhe!1: 0893117!!!!!Qbhf !25!pg25

intertrochanteric fractures, and to all other persons or entities involved in any way with the making, using, selling, offering for sale or importing of (A) any version of the TFN products or (B) any version of the PFN products, used to treat intertrochanteric fractures, and to notify all persons or entities known by Defendants to lease, own or control surgical instrumentation provided by Defendants for use in inserting into a patient TFN products or PFN products that such instrumentation may not be used to insert into a patient (A) any version of the TFN products, or (B) any version of the PFN products, to treat intertrochanteric fractures. Defendants shall take whatever means are necessary or appropriate to ensure proper compliance with this Order.

All relief not specifically granted herein is denied. This is a Final Judgment and is appealable.

So ordered this 28th day of September 2006.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

14

# EXHIBIT N

NOTE: Pursuant to Fed. Cir. R. 47.6, this order
is not citable as precedent. It is a public order.

# United States Court of Appeals for the Federal Circuit

2006-1574

TIVO, INC.,

Plaintiff-Appellee,

v.

ECHOSTAR COMMUNICATIONS CORPORATION, ECHOSTAR DBS
CORPORATION, ECHOSTAR TECHNOLOGIES CORPORATION, ECHOSTAR
LIMITED LIABILITY COMPANY, and ECHOSTAR SATELLITE LLC,

Defendants-Appellants.

ON MOTION

Before LOURIE, Circuit Judge, CLEVENGER, Senior Circuit Judge, and BRYSON,
Circuit Judge.

BRYSON, Circuit Judge.

## O R D E R

EchoStar Communications Corporation et al. (EchoStar) move for a stay,
pending appeal, of the permanent injunction entered by the United States District Court
for the Eastern District of Texas. TiVo, Inc. opposes. EchoStar replies. TiVo moves to
strike a portion of EchoStar's reply or, in the alternative, for leave to file a surreply.
EchoStar moves for leave to respond to TiVo's motion. TiVo replies.

TiVo sued EchoStar for infringement of its patent related to hardware and
software components of a digital video recorder (DVR). After a jury verdict of

infringement of the hardware and software claims, the district court entered a judgment and issued a permanent injunction. EchoStar appeals and moves for a stay, pending appeal, of the injunction.

To obtain a stay, pending appeal, a movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor. Hilton v. Braunskill, 481 U.S. 770, 778 (1987). In deciding whether to grant a stay, pending appeal, this court "assesses the movant's chances of success on the merits and weighs the equities as they affect the parties and the public." E. I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987). See also Standard Havens Prods. v. Gencor Indus., 897 F.2d 511 (Fed. Cir. 1990).

Because EchoStar's DVR was found to infringe both the hardware and software claims, to obtain a stay of the injunction, EchoStar must show that it is likely to prevail on its arguments concerning both sets of claims. Based upon our review of the motions papers, and without prejudicing the ultimate determination of this case by the merits panel, EchoStar has met its burden of showing that there is a substantial case on the merits and that the harm factors militate in its favor. Thus, the motion for a stay is granted. Hilton, 481 U.S. at 778.

Accordingly,

IT IS ORDERED THAT:

(1)     EchoStar's motion for a stay is granted.

(2)     TiVo's motion to strike is denied. TiVo's motion for leave to file a surreply is granted.

2006-1574                                    - 2 -

(3)    EchoStar's motion for leave to file a response is granted.

FOR THE COURT

OCT – 3 2006
_____
Date

William C. Bryson
Circuit Judge

cc:    Morgan Chu, Esq.
       Donald R. Dunner, Esq.

s8

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

OCT – 3 2006

JAN HORBALY
CLERK

2006-1574                    - 3 -

# EXHIBIT O

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Oklahoma.
Jan K. VODA, M.D., Plaintiff and Counterclaim
Defendant,
v.
CORDIS CORPORATION, Defendant and
Counterclaim Plaintiff.
**No. CIV-03-1512-L.**

Sept. 5, 2006.

Jonathan Keith Waldrop, Mitchell G. Stockwell,
Kilpatrick Stockton LLP, Atlanta, GA, John A.
Kenney, Spencer F. Smith, McAfee & Taft, Oklahoma
City, OK, for Plaintiff and Counterclaim Defendant.
Adam R. Steinert, Diane C. Ragosa, John M. Dimatteo,
Kelsey I. Nix, Willkie Farr & Gallagher LLP, New
York, NY, Amanda Leigh Maxfield, Clyde A.
Muchmore, Crowe & Dunlevy, Mahaffey & Gore PC,
John A. Kenney, Spencer F. Smith, McAfee & Taft,
Oklahoma City, OK, Mitchell G. Stockwell, Jonathan
Keith Waldrop, Kilpatrick Stockton LLP, Atlanta, GA,
for Defendant and Counterclaim Plaintiff.

*ORDER*
TIM LEONARD, District Judge.
**\*1** This action concerns three patents that were issued
by the United States Patent and Trademark Office to
plaintiff, Dr. Jan K. Voda. All of the patents concern
an angioplasty guide catheter. Patent No. 5,445,625
("the 625 patent") reflects the catheter "in a relaxed
state prior to insertion in the cardiovascular system."
The two remaining patents (the 213 and the 195
patents) cover plaintiff's inventive technique for using
the catheter to perform angioplasty. In addition to
method claims, the 195 patent also includes claims
that focus on the catheter as it appears in the aorta.
Plaintiff filed this action on October 30, 2003, seeking
damages for alleged infringement of the three patents
by defendant, Cordis Corporation. Beginning May 15,
2006, the case was tried to a jury, which returned a
verdict in favor of plaintiff on May 25, 2006. The jury
specifically held defendant infringed each of the
patents in suit and that claims 1, 2, and 3 of the 213
patent were not invalid due to anticipation or
obviousness.[FN1] Verdict Form at 1-7. The jury
determined that plaintiff was entitled to a reasonable
royalty of 7.5% of defendant's gross sales of the

infringing catheters. *Id.* at 8. In addition, the jury
found defendant's infringement was willful. *Id.* at 3.

> FN1. At the conclusion of the trial, defendant
> conceded it was no longer seeking a
> declaration as to the validity of the '625
> patent, the '195 patent, or claims 4 and 5 of
> the '213 patent ("the apparatus claims"). The
> court thus granted judgment as a matter of
> law in favor of plaintiff on that portion of
> defendant's counterclaim.

Although the parties were able to stipulate to the
amount of compensatory damages based on the jury's
verdict,[FN2] they were unable to agree on whether
plaintiff should be awarded prejudgment interest and,
if so, the rate of interest. Likewise, the parties dispute
whether plaintiff is entitled to enhanced damages
based on the jury's willfulness finding. In addition, the
court must decide whether plaintiff is entitled to
injunctive relief and attorney's fees.

> FN2. Joint Stipulation Regarding
> Compensatory Damages (Doc. No. 341).

*Prejudgment Interest*

As a general rule, prejudgment interest should
ordinarily be awarded in patent infringement actions.
*General Motors Corp. v. Devex Corp.,* 461 U.S. 648,
655 (1983).
> In the typical case an award of prejudgment interest is
> necessary to ensure that the patent owner is placed in
> as good a position as he would have been in had the
> infringer entered into a reasonable royalty agreement.
> An award of interest from the time that the royalty
> payments would have been received merely serves to
> make the patent owner whole, since his damages
> consist not only of the value of the royalty payments
> but also of the forgone use of the money between the
> time of infringement and the date of the judgment.

*Id.* at 655-56 (footnote omitted). Although defendant
recognizes this general rule, it argues prejudgment
interest should be denied "[d]ue to Dr. Voda's
eight-year delay in bringing suit, and the resultant
prejudice". Cord is' Opposition to Dr. Voda' Motions
for (1) a Permanent Injunction, (2) Enhanced
Damages and (3) Prejudgment Interest at 19 (Doc. No.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

Page 2

362). In support of this contention, defendant identifies the same economic and evidentiary prejudice the court found to be insufficient to support its laches defense. [FN3] The court likewise finds the prejudice identified by defendant insufficient to warrant deviating from the general rule regarding prejudgment interest. Plaintiff's request for prejudgment interest is therefore granted.

> FN3. Cord is' Post-Trial Brief Regarding Injunctive Relief, Enhanced Damages and Prejudgment Interest at 23. *See also* Order at 4-5 (Doc. No. 339).

**\*2** The rate of interest and whether to compound it are matters for the court's discretion. *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 969 (Fed.Ci.1986), cert. denied, 482 U.S. 915 (1987).* Plaintiff contends the appropriate rate is the prime rate plus two percent, compounded annually. In contrast, defendant proposes using the three-month or one-year United States Treasury Bill rate. *See* Declaration of Kathleen M. Kedrowski at ¶ 5, Exhibit 30 to Declaration of Kelsey I. Nix in Support of Cord is' Opposition to Dr. Voda's Motions (Doc. No. 359). Defendant argues this rate "is the proper rate ... because the damage award is not subject to any investment risk during the waiting period." *Id.* Defendant's argument is based on a misapprehension of the economic policy for prejudgment interest. It is not, as defendant argues, to compensate plaintiff for the risk of default by defendant; rather, the purpose of prejudgment interest is to make plaintiff whole by compensating him for the loss of use of the money owed him. *Bio-Rad Laboratories, Inc., 807 F.2d at 969.* The court finds that neither rate suggested by the parties fulfills this purpose; plaintiff's suggested rate is too high and defendant's too low. The court concludes the appropriate rate is the prime rate, compounded annually. This results in a total prejudgment interest award of $489,375.[FN4]

> FN4. This represents the total prejudgment interest for the '213 patent for the period July 4, 2000 through May 15, 2006. The court's calculation of the yearly totals for the '213 patent are: 2000-0; 2001-$19,388.29; 2002-$35,865.66; 2003-$55,085.63; 2004-$89,068.63; 2005-$176,334.73; 2006-$113,631.94. The total prejudgment interest for the '625 patent is $185,323.91 (2002-0; 2003-$11,988.58; 2004-$32,459.54; 2005-$82,440.35; 2006-$58,435.44). The

total prejudgment interest for the '195 patent is $80,477.98 (2003-0; 2004-$3,302.96; 2005-$39,844.47; 2006-$37,330.55).

*Enhanced Damages*

The Patent Act permits the court to award enhanced damages of "up to three times the amount found or assessed." *35 U.S.C. § 284.* Whether to award such damages is two-step process. "First, the fact-finder must determine whether an infringer is guilty of conduct upon which increased damages may be based. If so, the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." *Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed.Cir.1996).* The jury's determination that defendant's infringement was willful satisfies the first requirement. A finding that infringement was willful does not, however, mandate an award of enhanced damages. *Id.* at 1573. Whether to increase damages, and to what extent, is left to the sound discretion of the court. In exercising that discretion, the court is guided by the factors enunciated by the Federal Circuit in *Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed.Cir.1992).*

Courts consider several factors when determining whether an infringer has acted in bad faith and whether damages should be increased. They include: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; ... (3) the infringer's behavior as a party to the litigation;" (4) "defendant's size and financial condition;" (5) "closeness of the case;" (6) "duration of defendant's misconduct;" (7) "remedial action by the defendant;" (8) "defendant's motivation for harm;" and (9) "whether defendant attempted to conceal its misconduct."

**\*3** *Liquid Dynamics Corp. v. Vaughan Co., Inc., 449 F.3d 1209, 1225 (Fed.Cir.2006)* (quoting *Read Corp., 970 F.2d at 826-27).*

Based on the totality of the circumstances, the court concludes plaintiff's damages should be increased, but not trebled. In reaching this conclusion, the court finds factors 1, 2, 4, and 7 weigh in favor of increasing damages. First, plaintiff presented evidence that defendant consciously copied his design and ideas. Although defendant vigorously disputed this notion, a finding of conscious copying is inherent in the jury's finding of willfulness. At trial the jury was specifically

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 3
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

instructed:

Other factors you may consider in determining wilfulness are whether, in designing the product accused of infringement, Cordis copies the disclosures of Dr. Voda's patents, or whether Cordis instead tried to "design around" the patents by designing a product that Cordis believed did not infringe the patent claims. Evidence of copying a patent is evidence of willful infringement. On the other hand, evidence that Cordis attempted to avoid infringement by designing around the patent claims, even if that attempt was unsuccessful, is evidence that the infringement was not willful.

Court's Instructions to the Jury at 47 (Doc. No. 335). Also implicit in this finding is a rejection of defendant's argument that it attempted to design around plaintiff's claims. Thus, the court finds defendant did not take any remedial actions; moreover, defendant has indicated it will continue to produce and market the infringing devices without change even after the jury verdict. [FN5] Likewise, in making its willfulness finding, the jury rejected defendant's advice of counsel defense. At trial, defendant presented evidence that it sought and obtained opinion letters from both in-house and outside counsel with respect to the patents-in-suit. Plaintiff countered this evidence by questioning the timing of the requests, the thoroughness of the information defendant provided to counsel, and the independence of counsel. The jury was then instructed:

> FN5. *See* Exhibit PX400 to Consolidated Appendix in Support of Dr. Voda's (1) Brief in Support of Plaintiff's Motion for Enhanced Damages (2) Brief in Support of Plaintiff's Request for Permanent Injunction (3) Brief in Support of Plaintiff's Request for Prejudgment Interest.

In evaluating Cordis' reliance on the advice of a lawyer, you should consider when Cordis obtained the advice, the quality of the information Cordis provided to the lawyer, the competence of the lawyer's opinion, and whether Cordis relied upon the advice. Advice is competent if it was based upon a reasonable examination of the facts and law relating to validity, enforceability and/or infringement issues, consistent with the standards and practices generally followed by competent lawyers.

*Id.* Defendant's lengthy post-trial argument that it did in fact rely on competent legal advice is misplaced, as it asks the court to reweigh an issue decided by the jury. The court, however, does not have discretion to

do so at this time; it may not disregard the jury's wilfulness finding and the findings implicit therein. *See Jurgens,* 80 F.3d at 1572. Finally, the fact that defendant is "a large company with extensive financial means" [FN6] is another factor that justifies increasing the damages award.

> FN6. *Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings,* 370 F.3d 1354, 1371 (Fed.Cir.2004).

**\*4** On the other hand, the other *Read* factors are either neutral or do not support an award of enhanced damages. For example, factor 6, the duration of defendant's misconduct, cuts both ways. Although defendant has been manufacturing infringing devices for years, plaintiff also waited years to challenge defendant's infringement. While the court found plaintiff's delay was not sufficient to establish laches or to prevent plaintiff from receiving prejudgment interest, it is a factor the court considers in determining the amount any enhancement. Factor 5 also is neutral. Although the jury's relatively quick deliberation might indicate the issues that remained for decision were not close, other issues-including literal infringement-were decided adversely to plaintiff prior to trial. Contrary to plaintiff's assertions, factors 3, 8, and 9 do not support enhancement. The court finds there is no evidence of litigation misconduct by defendant, nor has plaintiff demonstrated any intent by defendant to harm him. Hyperbole in marketing documents does not indicate intent to harm; moreover, any harm would have been directed at plaintiff's licensee, Scimed, not plaintiff. Also, there is no evidence defendant sought to conceal its activities. These factors, however, do not outweigh defendant's conscious copying, lack of good-faith belief that it was not infringing, and failure to take remedial action.

Based on the totality of the circumstances, the court finds trebling plaintiff's damages is not warranted. The court, however, exercises its discretion to double the infringement damages. Plaintiff is thus awarded compensatory damages of $3,803,094 through May 15, 2006[FN7] together with prejudgment interest in the amount of $489,375, and enhanced damages of $3,803,094, for a total award of $8,095,563.

> FN7. *See* Joint Stipulation Regarding Compensatory Damages at 1.

*Attorney's Fees*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
(Cite as: Slip Copy)

Section 285 provides the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. As with enhanced damages, the decision to award attorney's fees involves two steps. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1460 (Fed.Cir.1998). First, the court must determine whether the action constitutes an exceptional case. "As a general rule, attorneys fees under section 285 may be justified by any valid basis for awarding increased damages under section 284." Jurgens, 80 F.3d at 1573 n. 4. Based on the analysis enunciated above, the court finds this is an exceptional case warranting an award of attorney's fees. Specifically, the jury's implicit findings that defendant consciously copied plaintiff's design and did not have a good faith belief as to infringement and validity provide the requisite degree of bad faith necessary to support finding this case exceptional.[FN8]

> FN8. "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement...." Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc., 393 F.3d 1378, 1381 (Fed.Cir.2005).

Having concluded the case is exceptional, the court also determines that an award of fees is appropriate. Defendant does not dispute the hours expended by plaintiff's attorneys or the reasonableness of the rates charged by plaintiff's attorneys. Defendant does, however, ask the court to impose two limits on any fee award. First, it argues plaintiff's contingent fee contract with his attorneys "sets the maximum amount the court can award." Cordis' Opposition to Voda's Motion for Attorneys' Fees at 15 (Doc. No. 380). Second, it contends local attorney billing rates should be used to calculate the lodestar figure. Id. at 17-18.

*5 Defendant's first argument is not only without merit, given the court's award of enhanced damages, it is moot.[FN9] The cases cited by defendant in support of this contention are inapposite as they concern fees sought pursuant to Florida's fee-shifting statute. The court also rejects defendant's second argument. Although local hourly rates should be used to calculate fees in the normal case, patent litigation is a specialized practice with a national bar. Defendant does not contest that "the rates usually charged by Voda's national counsel may be reasonable for the Atlanta market". Cord is' Opposition to Voda's Motion for Attorneys' Fees at 17. The court's independent examination of those rates confirms they are objectively reasonable for the national patent bar. Therefore, the court calculates the lodestar figure by multiplying the rates normally charged by plaintiff's Atlanta and Oklahoma City attorneys by the hours expended. This results in an attorney's fee award of $2,133,086.25.[FN10] The court finds no reason to increase this award based on any of the factors enunciated in Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983). As defendant does not contest plaintiff's request for litigation expenses, the court awards plaintiff litigation expenses of $68,053.21, making the total fee award $2,201,139.46.

> FN9. In response to Cordis' Motion to Compel Dr. Voda to Produce his Contingency Fee Agreement (Doc. No. 367), plaintiff provided a copy of the contingency fee contract for the court to review in camera. The court denied defendant's motion to compel, finding the contract was not relevant since defendant did not challenge the reasonableness of either the rates charged by plaintiff's attorneys or the hours expended. Order at 2 (Doc. No. 377). Nonetheless, in the interest of full disclosure, the court notes plaintiff's contingent fee contract provided plaintiff would pay 45 percent of the recovery received after trial or after the filing of a notice of appeal. Forty-five percent of the damages awarded by the court, including prejudgment interest, equals $3,643,003.35, a sum that is significantly larger than the amount sought by plaintiff in his Motion for Attorneys' Fees.

> FN10. Plaintiff's motion sought an award of $2,133,086.20. The supporting documentation, however, reflects a fee request of $2,133,086.25 ($1,708,842.25 + $424,244.00). Exhibits PX 427 and PX 428 to Supplemental Appendix to Dr. Voda's (1) Brief in Support of Plaintiff's Motion for Enhanced Damages (2) Brief in Support of Plaintiff's Request for Permanent Injunction (3) Brief in Support of Plaintiff's Request for Prejudgment Interest (4) Plaintiff's Motion for Attorneys' Fees (Doc. No. 366).

*Injunctive Relief*

Plaintiff requests a permanent injunction barring defendant, "its officers, agents servants, directors, employees and all those in active concert or

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

participation with them ... from infringing, inducing the infringement of, and contributorily infringing any one or more claims" of the patents-in-suit. Attachment to Brief in Support of Plaintiff's Request for Permanent Injunction at 1 (Doc. No. 350). The Patent Act permits the court to "grant injunctions in accordance with principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The United States Supreme Court recently confirmed that permanent injunctions in patent cases should not automatically follow a finding of infringement; rather, requests for permanent injunctions in such cases are governed by the same four-factor test that applies to injunctive relief in general. *eBay Inc. v. MercExchange, L.L.C.,* 126 S.Ct. 1837, 1839-40 (2006).

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 1839.

As plaintiff has failed to demonstrate either irreparable injury or that monetary damages are inadequate, the court denies his request for a permanent injunction.[FN11] Plaintiff argues irreparable harm is presumed whenever validity and continuing infringement have been established. Brief in Support of Plaintiff's Request for Permanent Injunction at 5 (Doc. No. 350). This argument, however, runs afoul of the court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief. *eBay Inc.,* 126 S.Ct. at 1840. Moreover, other than the presumption of irreparable harm, plaintiff identifies no harm to himself; rather, he relies on alleged harm to a non-party, Scimed.[FN12] *See* Brief in Support of Plaintiff's Request for Permanent Injunction at 6-12. The court concurs with defendant that such harm is irrelevant because Scimed elected not to sue to enforce the patent rights. As patents have "the attributes of personal property"[FN13], the person seeking a permanent injunction must demonstrate harm from infringement of those rights that is personal as well.

[FN11.] The court therefore need not address defendant's assertions that plaintiff did not timely seek injunctive relief or that the relief requested is not sufficiently limited or specific to comply with Fed.R.Civ.P. 65(d).

[FN12.] Cordis' Motion to Strike the Lundeen Declaration and Dr. Voda's Arguments Relying on that Declaration in his Post-trial Brief (Doc. No. 363) is denied. In accordance with defendant's request, the court reserved the issue of injunctive relief until after the jury returned its verdict. Order at 3 (Doc. No. 311). Plaintiff's post-trial submission of the Lundeen Declaration is in accord with that ruling.

[FN13.] *eBay Inc.,* 126 S.Ct. at 1840.

**\*6** The court also finds plaintiff has not established that monetary damages are inadequate to compensate him. Plaintiff argues he granted Scimed an exclusive license to his patented inventions and defendant's continuing infringement will damage his relationship with Scimed. This argument, however, is simply the other side of the right-to-exclude coin and is not sufficient to justify granting injunctive relief. Plaintiff's request for a permanent injunction is therefore denied.

*Post-Verdict Infringement*

As the court has declined to issue a permanent injunction and defendant has indicated it will continue to infringe the patents-in-suit, the court must fashion a remedy for the continuing harm to plaintiff. Plaintiff suggests severing his action for monetary damages for post-verdict infringement. In addition, plaintiff asks the court to order defendant to file quarterly reports of sales and to establish an interest-bearing escrow account into which defendant would pay the royalty rate assessed by the jury. The court sees no reason for severance of a cause of action for the post-verdict damages as there would be no issues for decision except simple mathematical calculations based on defendant's sales. The court therefore denies plaintiff's motion for severance. The court, however, concludes that quarterly reporting by defendant is reasonable. The reports shall be filed beginning September 15, 2006 and every three months thereafter until final resolution of this action. Defendant may file the reports under seal without seeking leave of court to do so. Given defendant's size and financial stability, the court will not order defendant to pay the royalty funds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

Page 6

into an interest-bearing escrow account. Defendant is cautioned, however, that absent establishment of an escrow account, prejudgment interest will accrue on any post-verdict infringement damages.

*Conclusion*

In sum, plaintiff's requests for prejudgment interest and enhanced damages are GRANTED to the extent noted above. Plaintiff's request for a permanent injunction is DENIED. Plaintiff's Motion for Entry of Judgment, Severance of Continuing Causes of Action for Post-Verdict Infringement, and Establishment of Reporting and Escrow Requirement (Doc. No. 353) is GRANTED in part and DENIED in part. Cordis' Motion to Strike the Lundeen Declaration and Dr. Voda's Arguments Relying on that Declaration in his Post-trial Briefs (Doc. No. 363) is DENIED. Plaintiff's Motion for Attorneys' Fees (Doc. No. 365) is GRANTED. Judgment in accordance with this Order, the parties' stipulation, and the jury's verdict will issue according.

It is so ordered this 5th day of September, 2006.

W.D.Okla.,2006.
Voda v. Cordis Corp.
Slip Copy, 2006 WL 2570614 (W.D.Okla.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1749477 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Motion for Judgment As a Matter of Law Regarding the Doctrine of Laches (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 1749478 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response in Opposition to Cordis' Motion for Judgment as a Matter of Law Regarding Non-Infringement Under the Doctrine of Equivalents (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 1749475 (Trial Motion, Memorandum and Affidavit) Cordis' Motion for Judgment as a Matter of Law Regarding the Doctrine of Laches, and Memorandum of Law in Support Thereof (May 22, 2006) Original Image of this Document (PDF)
• 2006 WL 1749476 (Trial Motion, Memorandum and Affidavit) Cordis' Motion for Judgment as a Matter of Law Regarding Non-Infringement Under the Doctrine of Equivalents (May 22, 2006) Original Image of this Document (PDF)
• 2006 WL 1749474 (Trial Motion, Memorandum and Affidavit) Cordis' Opposition to Plaintiff's Motion in

Limine to Preclude the Testimony of George Gerstman, Esq. (May 21, 2006) Original Image of this Document (PDF)
• 2006 WL 1749473 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion in Limine to Preclude the Testimony of George Gerstman, Esq. and Brief in Support (May 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1880019 () (Partial Testimony) (May 11, 2006) Original Image of this Document (PDF)
• 2006 WL 1749466 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Cordis' Motion in limine to Preclude Dr. Voda from Referring to the Presumption of Validity in the Presence of the Jury (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1749467 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Cordis' Motion Inlimine to Preclude Dr. Voda from Calling William Kingston, Marty Lundeen, Tracy Rosecrans, Dale Spencer or Henry Pepin as Trial Witnesses (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1749468 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Cordis' Motion in Limine to Preclude Dr. Voda from Referring to His Counterpart Patents or to Injunctive Relief During the Trial (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1749463 (Trial Motion, Memorandum and Affidavit) Cordis' Trial Brief (May 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1749464 (Trial Motion, Memorandum and Affidavit) Plaintiff's Trial Brief (May 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1494919 (Trial Motion, Memorandum and Affidavit) Cordis' Opposition to Plaintiff's Motion to Enforce 35 U.S.C. s 282 and to Exclude Cordis' ""Undisclosed Alleged Prior Art" (Apr. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 1494916 (Trial Motion, Memorandum and Affidavit) Cordis' Motion in Limine to (1) Set the Order of Proofs at Trial and (2) Bifurcate the Willful Infringement Issue, and Brief in Support of its Motion (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1494917 (Trial Motion, Memorandum and Affidavit) Cordis' Motion in Limine to Preclude Dr. Voda from Referring to the Presumption of Validity in the Presence of the Jury, and Brief in Support of its Motion (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1494918 (Trial Motion, Memorandum and Affidavit) Cordis' Motion in Limine to Preclude Dr. Voda from Calling William Kingston, Marty Lundeen, Tracy Rosecrans, Dale Spencer or Henry Pepin as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Trial Witnesses, and Brief in Support of its Motion (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1749459 (Trial Motion, Memorandum and Affidavit) Cordis' Motion in Limine to (1) Set the Order of Proofs at Trial and (2) Bifurcate the Willful Infringement Issue, and Brief in Support of its Motion (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1749458 (Trial Motion, Memorandum and Affidavit) Dr. Voda's Opposition to Cordis' Motion to Strike and Motion in Limine Concerning Voda's Exhibits 66 67 and 68 (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 814387 (Trial Motion, Memorandum and Affidavit) Consolidated Reply in Support of Dr. Voda's (1) Daubert Motion and (2) Motion for Partial Summary Judgment (Feb. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 814386 (Trial Motion, Memorandum and Affidavit) Dr. Voda's Opposition to Cordis' Motion to Exclude and Strike Voda Production Nos. 1402-1403, 1427-1444 (Feb. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 497441 (Trial Motion, Memorandum and Affidavit) Brief in Support of Plaintiff's Motion to Strike and Motion in Limine Concerning Defendant's Exhibits 12, 23, 24, 27 and 29 Submitted in Support of Defendant's Motion for Summary Judgment (Jan. 31, 2006) Original Image of this Document (PDF)
• 2005 WL 2897736 (Trial Motion, Memorandum and Affidavit) Plaintiff's Supplemental Claim Construction Brief (Aug. 23, 2005) Original Image of this Document (PDF)
• 2005 WL 2897737 (Trial Motion, Memorandum and Affidavit) Update to Cordis' Markman Brief (Aug. 23, 2005) Original Image of this Document (PDF)
• 2004 WL 3138567 (Trial Motion, Memorandum and Affidavit) Cordis' Responsive Markman Brief (Dec. 13, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3138722 (Trial Motion, Memorandum and Affidavit) Cordis' Responsive Markman Brief (Dec. 13, 2004)
• 2004 WL 3138548 (Trial Motion, Memorandum and Affidavit) Cordis' Reply Brief in Support of its Motion to Preclude Dr. Voda from Continuing to Contact Current and Former Employees of Cordis (Dec. 8, 2004) Original Image of this Document (PDF)
• 2004 WL 3138707 (Trial Motion, Memorandum and Affidavit) Cordis' Reply Brief in Support of its Motion to Preclude Dr. Voda from Continuing to Contact Current and Former Employees of Cordis (Dec. 8, 2004)
• 2004 WL 3138574 (Trial Motion, Memorandum and

Affidavit) Cordis' Opening Markman Brief (Nov. 16, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 4025336 (Trial Motion, Memorandum and Affidavit) Cordis' Motion for Protective Order to Preclude Dr. Voda from Continuing to Contact Current and Former Employees of Cordis (Nov. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 3138529 (Trial Motion, Memorandum and Affidavit) Surreply Brief in Opposition to Dr. Voda's Motion to Compel (Sep. 21, 2004) Original Image of this Document (PDF)
• 2004 WL 3138692 (Trial Motion, Memorandum and Affidavit) Surreply Brief in Opposition to Dr. Voda's Motion to Compel (Sep. 21, 2004)
• 2004 WL 3138513 (Trial Motion, Memorandum and Affidavit) Cordis' Opposition to Dr. Voda's Motion to Compel Discovery Materials (Aug. 24, 2004) Original Image of this Document (PDF)
• 2004 WL 3138681 (Trial Motion, Memorandum and Affidavit) Cordis' Opposition to Dr. Voda's Motion to Compel Discovery Materials (Aug. 24, 2004)
• 2004 WL 3138491 (Trial Motion, Memorandum and Affidavit) Reply to Defendant Cordis Corporation's Counterclaim (Jan. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 3138669 (Trial Motion, Memorandum and Affidavit) Reply to Defendant Cordis Corporation's Counterclaim (Jan. 22, 2004)
• 2003 WL 23996744 (Trial Pleading) Complaint (Oct. 30, 2003) Original Image of this Document (PDF)
• 2003 WL 23996782 (Trial Pleading) Complaint (Oct. 30, 2003)
• 5:03cv01512 (Docket) (Oct. 30, 2003)
• 2003 WL 23996752 (Trial Pleading) Answer and Counterclaim for Declaratory Relief (2003) Original Image of this Document (PDF)
• 2003 WL 23996758 (Trial Motion, Memorandum and Affidavit) Demand for Jury Trial (2003) Original Image of this Document (PDF)
• 2003 WL 23996760 (Trial Pleading) First Amended Complaint (2003) Original Image of this Document (PDF)
• 2003 WL 23996762 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opening Claim Construction Bref (2003) Original Image of this Document (PDF)
• 2003 WL 23996765 (Trial Motion, Memorandum and Affidavit) Demand for Jury Trial (2003) Original Image of this Document (PDF)
• 2003 WL 23996769 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Response to Defendant's Opening Markman Brief (2003) Original Image of this Document (PDF)
• 2003 WL 23996773 (Trial Motion, Memorandum and Affidavit) Surreply of Jan K. Voda, M.D. in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 8
Slip Copy, 2006 WL 2570614 (W.D.Okla.)
**(Cite as: Slip Copy)**

Opposition to Cordis' Motion for Protective Order
(2003) Original Image of this Document (PDF)
• 2003 WL 23996867 (Trial Motion, Memorandum
and Affidavit) Reply Brief in Support of Plaintiff's
Motion to Compel Discovery Materials (2003)
Original Image of this Document (PDF)
• 2003 WL 23996870 (Trial Motion, Memorandum
and Affidavit) Memorandum in Support of Plaintiff's
Motion for Sanctions (2003) Original Image of this
Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P

Westlaw.

198 U.S.P.Q. 353                                                   Page 1
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
**(Cite as: 198 U.S.P.Q. 353)**

◫

W. L. Gore & Associates, Inc.
v.
Carlisle Corporation

District Court, D. Delaware

No. 4160

Decided May 17, 1978
United States Patents Quarterly Headnotes

**PATENTS**
**[1] Accounting -- Damages -- In general (§ 11.251)**
**Accounting -- Profits (§ 11.60)**
**Accounting -- Reasonable or established royalty (§ 11.65)**
  Patent owner's damage award is governed by 35 U.S.C. 284 in patent infringement action; this section represented departure from previous law; traditionally, constructive trust was placed around infringer's profits in infringement suit in equity, which, together with patentee's damages, was measure of patentee's recovery; now, statutory mandate is for compensatory damages to extent that they exceed reasonable royalty; actual royalty rate that was fixed by patent owner in prior licensing arrangements involving patent in suit is best measure of compensatory damages due to infringement; however, court must look to other evidence to determine difference between patentee's pecuniary condition after infringement and that which it would have been but for infringement, when no royalty rate has been fixed.

**PATENTS**
**[2] Accounting -- Damages -- In general (§ 11.251)**
  Proponent is under no obligation to negate all possibilities that purchasers would not have bought different product or to convince beyond reasonable doubt.

**PATENTS**
**[3] Accounting -- Damages -- In general (§ 11.251)**
  Amount that patent owner would have netted in reasonable probability from sales that were denied it but that in all reasonable probability it would have made, is measure of loss, although each case applying "in all reasonable probability" standard must stand on

its own record.

**PATENTS**
**[4] Accounting -- Damages -- In general (§ 11.251)**
  Patent owner's failure to solicit sale specifically of goods meeting purchaser's additional specification is not fatal to demand for lost profits.

**PATENTS**
**[5] Accounting -- Damages -- In general (§ 11.251)**
  Patentee-producer need not have current capacity to satisfy orders filled by infringer, to prove damages based on lost profits; patentee-producer that has proven that technology was common and cost of adaptation was low, has carried his burden and did not have to build plant that would not have been fully utilized due to infringer's conduct, in order to demonstrate loss in situation in which there was nothing unique about equipment required for plant expansion to meet increased demand and no indication that had infringer not been poaching, licensee would not have been able to build or acquire needed facilities.

**PATENTS**
**[6] Accounting -- Burden of proof (§ 11.20)**
  Higher standard than "reasonable probability" is not applicable to patent infringement damage calculation; Congress did not intend to abrogate common law standard of proof of damages for patent infringement of Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, in favor of stricter standard of proof by amending Patent Act in 1946 to guarantee minimum recovery of "reasonable royalty."

**PATENTS**
**[7] Accounting -- Apportionment (§ 11.15)**
  There is no occasion for application of apportionment once fact that sales have been lost has been proven.

**PATENTS**
**[8] Accounting -- Apportionment (§ 11.15)**
**Accounting -- Burden of proof (§ 11.20)**
  Doctrine of apportionment is inapplicable in assessing damages once quantity of sales lost, or sales

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
**(Cite as: 198 U.S.P.Q. 353)**

at eroded prices, has been determined; patent owner alleging damages from infringement has burden to prove only that infringed product was so differentiated commercially as to allow no noninfringing substitute product and that he was in position to make sales but for infringer's conduct.

**PATENTS**
**[9] Accounting -- Burden of proof (§ 11.20)**
**Accounting -- Damages -- In general (§ 11.251)**
  Whether or not article would have same commercial usefulness without patented feature is irrelevant where it is clear that patentee would have made sale of article had not infringer infringed; burden of proving that infringer's conduct was direct cause of loss of sales may be great, especially in case of improvement patents on already patentable devices or of patents on components of systems otherwise marketable.

**PATENTS**
**[10] Accounting -- Damages -- In general (§ 11.251)**
**Accounting -- Profits (§ 11.60)**
  Action for both infringer's profits and patentee's damages was available prior to 1946; action for profits was akin to equitable action for constructive trust; those profits of infringer properly attributable to patented invention justly belonged to patentee; express provision for recovery of infringer's profits was deleted in 1946 Amendment.

**PATENTS**
**[11] Accounting -- Burden of proof (§ 11.20)**
  Fact of loss of sales due to infringement is not to be presumed, especially in case of patent for improvement of device already being sold in same market; however, this relates to market differentiation and not apportionment.

**PATENTS**
**[12] Accounting -- Deductions (§ 11.30)**
**Accounting -- Profits (§ 11.60)**
  Only costs that vary with production activity may be excluded in calculation of lost profits.

**PATENTS**
**[13] Accounting -- Burden of proof (§ 11.20)**
**Accounting -- Deductions (§ 11.30)**
  Law in Third Circuit is that fixed overhead is not to be charged against patentee's damages; threshold

question is whether or not patent owner's overhead or fixed expenses would have been affected by manufacturing and selling product infringer sold; burden of proof that acknowledged costs are fixed, rather than variable, assumedly, rests upon patentee.

**PATENTS**
**[14] Accounting -- Damages -- In general (§ 11.251)**
**Accounting -- Reasonable or established royalty (§ 11.65)**
  Award of infringement damages to patentee can include portion representing provable lost profits and non-duplicative portion representing reasonable royalties on those infringing sales for which greater damages cannot be proven; such reasonable royalty is to be based upon nature, utility, and extent of use of invention.

**PATENTS**
**[15] Accounting -- Reasonable or established royalty (§ 11.65)**
  Reasonable royalty rate is hypothetical in nature; ideally, it is that rate to which "willing buyer and willing seller" would agree in arms-length negotiation; further, it must be such as to leave infringer with "reasonable profit"; it must be determined solely on basis of submitted evidence and upon evaluation of factors that could affect reasonable royalty, and not upon mere conjecture.

**PATENTS**
**[16] Accounting -- Increased or treble damages or profits (§ 11.35)**
**Accounting -- Interest on recovery (§ 11.40)**
  Compensatory interest was not to be awarded in legal action for infringement damages, prior to 1946; rather, only punitive interest was involved and then only under "exceptional circumstances."

**PATENTS**
**[17] Accounting -- Interest on recovery (§ 11.40)**
  New statutory language in 1946 Amendment emerged providing for "interest * * * as fixed by court"; this language was outgrowth of language in both House and Senate reports on 35 U.S.C. 284, providing for "interest from the time infringement occurred."

**PATENTS**

COPR. © 2006 The Bureau of National Affairs, Inc.

**[18] Accounting -- Interest on recovery (§ 11.40)**
  Majority rule with regard to interest on reasonable royalty awards is that Duplate Corp. v. Triplex Safety Glass Co., 29 USPQ 306, was vitiated by 1946 Amendment to Section 284; assessment of interest is to be governed by conventional equity, rather than by Duplate's "hoary" rules.

**PATENTS**
**[19] Accounting -- Interest on recovery (§ 11.40)**
  Recent dramatic liberalization of law of interest on reasonable royalty awards has come in Seventh Circuit; only Sixth Circuit has continued to follow Duplate Corp. v. Triplex Safety Glass Co., 29 USPQ 306, in last decade.

**PATENTS**
**[20] Accounting -- Interest on recovery (§ 11.40)**
  Although law now favors assessment of compensatory interest on reasonable royalty awards where necessary to make injured patentee whole, there is no analogous shift in law of interest on lost profit awards; general rule has been that such damages in patent suit are considered unliquidated until assessment by master or court; traditional rule at law has been that compensatory interest is not to be awarded on unliquidated claims.

**PATENTS**
**[21] Accounting -- Damages -- In general (§ 11.251)**
**Accounting -- Interest on recovery (§ 11.40)**
**Accounting -- Profits (§ 11.60)**
**Accounting -- Reasonable or established royalty (§ 11.65)**
  There is substantial distinction between interest award on reasonable royalties and on lost profits; reasonable royalty is approximation of actual royalty that would have been paid had infringer negotiated with patentee and not of patentee's lost profits; rule is that moratory interest on actual royalties illegally withheld is appropriate; infringer, in contemplation of law, is on notice that periodic payment is expected for use of patent; patentee reasonably may expect to have use of that money; however, actual replacement damages that are proven are exacted not as payment for use, but as compensation for monies otherwise to be received from third-party customers; this measure of infringer's liability depends upon his own conduct and upon possibly unforeseen conduct of patentee; generally, patentee, who is seller, has no legally protected expectation of definite profit.

**PATENTS**
**[22] Accounting -- Interest on recovery (§ 11.40)**
  Important consideration in denying interest on unliquidated claims is difficulty of making such awards without undue speculation.

**PATENTS**
**[23] Accounting -- Interest on recovery (§ 11.40)**
  Interest award is correctly denied on damage award that is based solely upon lost profits.

  **\*356** Action by W. L. Gore & Associates, Inc., against Carlisle Corporation, for patent infringement, in which defendant counterclaims for violation of antitrust laws. Accounting settled.

  See also 183 USPQ 459 and 189 USPQ 129.

  C. Walter Mortenson, Wilmington, Del. (Marcus B. Finnegan, Brian G. Brunsvold, Bruce C. Zotter, and Finnegan, Henderson, Farabow & Garrett, all of Washington, D.C., of counsel) for plaintiff.

  William Poole, and Potter, Anderson & Corroon, both of Wilmington, Del. (Henry W. Foulds, Brooks, Haidt, Haffner & Delahunty, William Lee Kinnally, Jr., and Parker, Duryee, Zunino, Malone & Carter, all of New York, N.Y., of counsel) for defendant.

  Wright, Senior Judge.

  Having determined that the defendant (Carlisle) had infringed a patent owned by the plaintiff (Gore), as assignee of the inventor Robert W. Gore, [FN1] this Court referred the matter of an accounting of damages to a Special Master. [FN2] The Special Master, Henry N. Herndon, Jr., filed his report on January 26, 1978. Pursuant to Rule 53(e)(2) of the Federal Rules of Civil Procedure, each party has filed objections. This Court has considered the Master's Report and the objections, and has determined that the Report is to be adopted with certain modifications.

### I. Introduction

*A. Prior Findings*
  In an earlier opinion, this Court has set forth a detailed description of Gore's invention, and of Carlisle's subsequent infringement. To place the Master's Report in context, only a brief summary need be given here.

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
**(Cite as: 198 U.S.P.Q. 353)**

Originally, two United States Patents were in suit: Patent No. 3,082,292 (herein '292, or "Multi-Tet", Patent); and Patent No. 3,540,956 (herein ' 956, or "Precise Conductor", Patent). Both patents involve processes and products used in the manufacture of flat multi-conductor ribbon cable insulated with polytetrafluoroethylene (PTFE). This product is especially useful as transmission cable in computer applications, where the ability to handle "fast" signals (those with short rise times) is essential. Because of the extremely low dielectric constant of polytetrafluoroethylene, such fast signals experience little distortion even when transmitted along extremely closely spaced conductors insulated by PTFE. This is in sharp contrast to the signal handling characteristics of conductors insulated by hydrocarbon materials such as polyethylene.

The '292 patent, issued on March 19, 1963 to R.W. Gore, teaches a process for coating an article (such as a network of conductors) in PTFE. For example, in the manufacture of cables the conductor wires are to be inserted between two sheets of unsintered PTFE, the sandwich then to be pressed tightly together between two unheated pressure rollers. Subsequently, the assembly is sintered, forming a secure bond. An important aspect of the invention was the discovery that the pressed sandwich, even before sintering, holds together**357** sufficiently well to allow handling. Prior to this invention, it had not been possible to laminate multi-conductor cables uniformly in polytetrafluoroethylene.

In order to be useful for the transmission of fast signals, the conductors in a flat cable must be precisely positioned so that the distance between adjacent conductors is constant along the length of the cable. A slight deviation in this separation can introduce echoes and distortion into the signal. Patent '956, issued to H.W.Arnold and W.L.Gore on November 17, 1970, is an improvement patent addressing this problem. Specifically, it provides a process for achieving a precise alignment of conductor wires within a PTFE insulated cable. An additional ridged roller is to be used, forming grooves in one of the two sheets of unsintered PTFE: this provides a guide within which the conductor wires are placed prior to the compression of the two sheets. The '956 patent was based upon the discovery that during the compression process little lateral stress is propagated across the grooved sheet. Consequently, there is no tendency for the conductors to move.

Plaintiff's amended complaint alleged infringement of each the '292 and the '956 patents. This Court found,

however, that the '956 patent was invalid in view of the prior art. [FN3] For this reason, the Special Master was obliged to limit his accounting to damages caused by infringement of only the '292 patent.

*B. Standard of Review*

In reviewing the Report of the Special Master in this non-jury case, the Court is bound by Rule 53(e)(2):

In an action to be tried without a jury the court shall accept the Master's findings of fact unless clearly erroneous.

This standard of review is indistinguishable from that used by an appellate court in its review of the factual findings of a trial court. In re Kellett Aircraft Corp., 186 F.2d 197 (3d Cir. 1950).

Of course, the Master's findings are not binding on this Court unless those findings are supported by substantial evidence. The finding must be based upon more than mere intuition: "the requirement is for probative facts capable of supporting, with reason, the conclusions expressed in the verdict." In re Lueders' Estate, 164 F.2d 128, 133 (3d Cir. 1947). See, In re Leighter, 197 F.2d 955 (3d Cir. 1952), cert.denied, sub.nom., Dworsky v. Leichter, 344 U.S. 914 (1953); In re Continental Vending Machine Corp., 543 F.2d 986, 995 (2d Cir. 1976); United States v. 15.3 Acres of Land, etc., 154 F.Supp. 770, 775 (M.D. Pa. 1957), rev'd. on other grounds and remanded, sub.nom., United States v. Delaware, Lackawanna & Western Rr. Co., 264 F.2d 112 (3d Cir. 1959).

Even where there is some substantial evidence to support the Master's findings, this is not an invitation for the Court to abdicate its role as reviewer of the findings. Locklin v. Day-Glo Color Corp., 429 F.2d 873, 166 USPQ 164 (7th Cir. 1970), cert.denied, 400 U.S. 1020, 152 USPQ 844 (1971). Rather, this Court must apply the Gypsum rule:

A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 76 USPQ 430, 442-443 (1948).

See, United States v. International Business Machines Corp., 66 F.R.D. 154 (S.D.N.Y. 1974).

Rule 53(e)(2) is based upon the principle that where issues of credibility are involved, the finding of a

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

Special Master is entitled to great weight. In re
American Coils Co., 187 F.2d 384, 386 (3d Cir. 1951).
The Master took four days of testimony, accumulating
a record consisting of over 700 pages of transcript and
a large number of documentary exhibits. [FN4] He
had an opportunity to observe the demeanor of the
witnesses and to evaluate their credibility. Where his
findings involve the resolution of conflicting evidence
involving questions of credibility, this Court will not
disturb those findings unless they are manifestly
unsupported. In re Riddlesburg Mining Co., 122
F.Supp. 560 (W.D.Pa. 1954), modified and aff'd., 224
F.2d 834 (3d Cir. 1955); In re American Coils Co.,
supra, 187 F.2d 384, 386. However, this principle has
no application insofar as the Master's findings are
based *358 upon legal conclusions or inferences from
undisputed facts. In re Kellett Aircraft Corp., supra.
See, generally, 5A J.Moore, Federal Practice P53.12[5]
(2d ed. 1974).

**II. Findings of the Special Master**
[1] The Special Master correctly observed that in a
patent infringement action, the plaintiff's damage
award is to be governed by 35 U.S.C. § 284:

Upon finding for the claimant, the court shall
award the claimant damages adequate to
compensate for the infringement, but in no event
less than a reasonable royalty for the use made of
the invention by the infringer, together with
interest and costs as fixed by the court.

When the damages are not found by a jury, the
court shall assess them. In either event, the court
may increase the damages up to three times the
amount found or assessed.

The court may receive expert testimony as an aid
to the determination of damages or of what
royalty would be reasonable under the
circumstances.

This section, enacted in the 1946 revision of the
Patent Act, represented a departure from the previous
law. Traditionally, in an infringement suit in equity, a
constructive trust was placed around Infringer's profits:
this, together with Patentee's damages, was the
measure of recovery of Patentee. Now, however, the
statutory mandate is for compensatory damages to the
extent that they exceed a reasonable royalty.
H.K.Porter Co. v. Goodyear Tire & Rubber Co., 536
F.2d 1115, 191 USPQ 486 (6th Cir. 1976). Where an
actual royalty rate has been fixed by the plaintiff in
prior licensing arrangements involving the patent at
suit, this is the best measure of compensatory damages

due to an infringement. Marvel Specialty Co. v. Bell
Hosiery Mills, Inc., 386 F.2d 287, 155 USPQ 545 (4th
Cir. 1967), cert. denied 390 U.S. 1030, 157 USPQ 720
(1968). However, when no royalty rate has been fixed,
the Court must look to other evidence to determine the
difference between Patentee's pecuniary condition
after the infringement and that which it would have
been but for the infringement. Aro Manufacturing Co.
v. Convertible Top Replacement Co., 377 U.S. 476,
141 USPQ 681 (1964).

In the present case, the parties stipulated that the
relevant accounting period for which Defendant was
liable extended from November 10, 1970 through
October 21, 1974. The Special Master found that
during that period substantially all of the flat
laminated polytetrafluoroethylene cable manufactured
in the United States was produced by the two parties.
Defendant's net sales of infringing material amount to
$607,976.51. Since Plaintiff has never licensed the
patent at issue, no actual royalty rate could be
determined. Consequently, the Special Master looked
to Plaintiff's damages in the form of profits lost both
from sales which he would have made but for
Defendant's infringement, and also from sales actually
made by Plaintiff but at prices eroded due to the
infringement.

*A. Damages Due To Price Erosion*
The parties have not challenged the Special Master's
calculation of damages due to price erosion. During
the accounting period, Plaintiff sold cable to Comten,
Honeywell and Univac at prices substantially lower
than those set in the pre-infringement period. In
calculating the loss due to the eroded price, the Special
Master implicitly assumed that but for the unlawful
competition, Gore's price would have remained
constant; i.e., he assumed an infinite price elasticity of
demand. This is not unreasonable in light of the
pricing system used by Gore [FN5] and the specialized
nature of the market. [FN6] In the absence of evidence
to the contrary, and in the absence of dispute, this
Court also will adopt the elasticity assumption. The
damage due to the price erosion, then, is the aggregate
of the volume of each of Gore's sales during the
infringement period, multiplied by the difference
between the pre-infringement price and the actual sale
price. This Court adopts the Special Master's finding
that this damage amounted to $147,288.00.

*B. Finding That Gore Lost Sales To Carlisle*
Aside from the damage due to price erosion, the
Special Master also found damage due to infringing
sales made by Carlisle. In so finding, he had to make
two determinations: (1) which of those sales by

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

Carlisle otherwise would have been made *359 by Gore: and (2) with respect to those sales, what would have been the profits to Gore.

During the accounting period, Carlisle made infringing sales to a number of customers: A.P. Products, Inc.; RCA; Honeywell; Foxboro; Comten; John Beal; Sperry Rand (Univac); Standard Memories; Xerox; Fairfield; Memory; Elscint Limited (Israel); Circuit Assembly Corp.; Burndy Corp.; Thor Electronics of California; Harris Communications Systems, Inc.; Burroughs; Miles Roystone Limited (England); and Carlisle/Belgium, Europe, S.A. The Special Master found that prior to, or during the accounting period, Plaintiff had made sales calls to each of these customers except: Fairfield; Elscint; Miles Roystone; and Carlisle/Belgium. [FN7] Damage from sales to these latter customers will be considered, infra. However, as to those customers with whom Gore had dealt, the Special Master found that throughout the accounting period Gore possessed the capability to manufacture the infringing products sold by Defendant. [FN8]

The Special Master also found that the market served by Plaintiff's and Defendant's transmission cable was a highly differentiated one. The computer market, the primary market for PTFE flat laminated cable, required products meeting complicated specifications. For fast signal applications, the only other cable having suitable electrical characteristics was "FEP". This cable was developed during the accounting period by IBM, which supplied the cable solely for its own use but did not market it. Further, acceptable FEP transmission cable was a more expensive product than PTFE cable. [FN9] All other electrically acceptable flat cable constructions required the use of bulkier configurations, which would not meet the specifications necessary for computer applications. [FN10] From this, the Master concluded that Defendant and Plaintiff were the sole sources of supply for the relevant market. [FN11] Thus, having found that the parties participated in a two-supplier market, that Plaintiff had the sales contacts with Defendant's customers, and that Plaintiff had the manufacturing capacity to satisfy those orders which had been filled by Defendant, the Special Master concluded that in the absence of the infringement, Plaintiff would have made all of these sales.

*C. Calculation of Damages Due to Those Lost Sales*
In light of Defendant's objections, the Court here discusses in some detail the Special Master's calculations of the damages due to the lost sales discussed above. During the accounting period, Gore

Associates did not maintain a detailed cost accounting system. This was due, in part, to Gore's corporate policy of decentralized decision making. For that reason, the Special Master had to rely upon extrapolations of estimated costs and profitabilities with respect to the individual product lines. Only in this manner was he able to determine what the profit would have been to Gore had it been allowed to make Defendant's sales.

In this computation, for each infringing product sold by the Infringer, the incremental costs Gore would have incurred in its manufacture and sale of the product were subtracted from Patentee's pre-infringement sale price. The Master found that these incremental costs included: the costs of the raw materials, the direct cost of labor, the packaging costs, and additional selling, administrative and general expenses. [FN12] The Master recognized that Patentee's fixed expenses were not a proper element of costs to be considered in making this computation. Vitex Manufacturing Corp. v. Caribtex Corp., 377 F.2d 795 (3d Cir. 1967).

To establish the incremental costs of raw materials, Plaintiff's witness, Mr. Mehta, took advantage of a study made by a Gore employee, Truman McClearly. Performed in the summer of 1974, this study ascertained the amount of raw material required to produce a typical unit of cable. It found that in processing the raw materials required, 15% of the conductor, and 30% *360 of the PTFE were lost to scrap. From this, then, the amount of raw material which would be required to fill an order was calculated. To determine the cost of that raw material, Mehta made a statistical study of the costs of the materials, based upon invoices from the accounting period.

The calculations of direct labor costs involved a similar approach. Studying the 1974-75 period, Mr. Mehta had analyzed the labor costs, at the current average wage rate, of each step in the production of cable. He then extrapolated this cost back to the 1970-74 accounting period on the basis of the average production line wage rates for the relevant years.

The incremental packaging cost was minimal compared to the costs described above. Recognizing the general inflationary trend, Mr. Mehta simply took the cost determined in a study performed in 1975-76, and applied that as a conservative value for the period 1970-74. The Master found that this cost was 1.5% of the incremental material costs. [FN13]

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

The Special Master accepted the calculations referred to above as sufficient evidence of the material and direct labor costs to be assessed against Plaintiff. [FN14] However, against Plaintiff's assertion that there would be no additional selling, administrative or general expenses due to the additional sales, the Special Master accepted the testimony of Defendant's expert witness, Robert Stautberg. Mr. Stautberg, a partner in Defendant's outside accounting firm, reviewed Gore's financial statements for the period 1968-74. He noted that the selling expenses reflected therein seemed to be correlated with the gross sales revenues. Thus, as the sales increased, selling expenses averaged around 12% of sales revenues. Similarly, general and administrative expenses, on the average, also were 12% of the gross revenues. Based only upon that evidence, Mr. Stautberg concluded that the selling, administrative and general expenses were variable costs, and amounted to 24% of the incremental gross sales. The Special Master rejected Plaintiff's explanation of this apparent correlation on the basis of marketing, and expanded research and development work on other PTFE products. [FN15] For that reason, the Master reduced Gore's lost gross revenues by 24%. From these calculations of incremental material and labor costs, and selling, general and administrative expenses, the Special Master determined that Patentee's damages due to lost sales were $455,823.00.

In conclusion, then, the Master recommended that Gore be allowed the following:

Damages due to lost sales, $455,823.00;

Damages due to price erosion on Comten, Honeywell and Univac sales, $147,288.00.

This amounts to $603,111.00. No damages were assessed against Carlisle for its infringing sales to Fairfield, Elscint, Mills Roystone or Carlisle/Belgium. [FN16]

### III. Defendant's Objections

Infringer, Carlisle, has presented sixteen specific objections to the findings and conclusions of the Master. These may be classified generically as:

(1) Those going to whether Gore can recover profits lost due to Carlisle's sales of PVC jacketed PTFE cable to A.P. Products;

(2) Those going to whether Gore's calculations of profits from sales proven lost to Carlisle lacked a sufficient basis in fact;

(3) That going to whether the Master should have apportioned Gore's lost profits between those arising out of the '292 patent and those arising out of the '956 patent.

The Court has considered each of these objections, as well as the briefs filed with the Master by each party after the damages trial. The Court finds that the objections are without merit and overrules them.

*A. Profits From A.P. Products Lost To Carlisle*

The Master found that a substantial portion of the infringing sales made by Carlisle during the accounting period were to A.P. Products, Inc. [FN17] He found also that but for Infringer's conduct, those sales would have accrued to Gore's own profit. [FN18] Carlisle has objected to this finding, arguing that during the relevant period Gore neither possessed the production capability to make those sales nor solicited those sales from A.P. Products.

**\*361** In support of these contentions, Carlisle emphasizes that the specifications under which it made the infringing sales called for the PTFE cable to be jacketed in polyvinylchloride (PVC). The finding that Gore made sales calls on A.P. Products prior to the end of the accounting period apparently is not disputed. [FN19] However, Carlisle asserts as clearly erroneous the finding that:

> Gore had at all times since at least 1967 possessed the capabilities to jacket the cable using either an extrusion or a lamination process. * * * [FN20]

Further, Carlisle asserts that since Gore did not solicit sales specifically for jacketed cable, it is barred from recovery of profits lost on sales of such cable.

To put this in perspective, the only function of jacketing PTFE cable is to protect it from mechanical wear. The vast bulk of PTFE high-speed signal transmission cable sold to the computer industry is for use within closed cabinets. This cable must meet strict size limitations, and since it is protected from without by the cabinet, it typically is not jacketed. However, cable running between cabinets, often laid upon the floor, may need the protection of a jacket. The cable may be manufactured with a jacket, e.g. of PVC, either extruded onto or laminated about the cable. Alternatively, a jacket may be slipped over the cable at the computer site. [FN21] The important aspect, here, is that the jacketing can be performed using standard techniques and machinery available to Gore, and does not affect the electric signal handling characteristics of

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

the PTFE flat laminated cable. [FN22]

The issue before the Court, then, is whether there is sufficient evidence upon which the Master could conclude that, but for Carlisle's infringement, Gore would have made the sales to A.P. Products. The parties and Master apparently have assumed that such sales, if made, would have been of jacketed cable and that A.P. Products would not have altered its specifications. The Court will accept, arguendo, that assumption.

[2] When confronted by a hypothesis such as this, the Court cannot expect "absolute" proof of the affirmative. The proponent is under no obligation to "negate *all possibilities* that the purchasers would not have bought a different product or [to convince] beyond a reasonable doubt." Broadview Chemical Corp. v. Loctite Corp., 311 F.Supp. 447, 451, 164 USPQ 419, 422 (D.Conn. 1970).

[3] Rather, this Court adopts the oftcited standard enunciated twenty years ago by the Fifth Circuit:

If in all reasonable probability, the Patent Owner would have made the sales which Infringer has made, what the Patent Owner in reasonable probability would have netted from the sales denied to him is the measure of his loss. * * * Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 471, 116 USPQ 167, 169 (5th Cir. 1958).

While the issue in Livesay went to the degree of accuracy required in the calculation of lost profits (discussed infra), the test set out in the predicate of the above quotation is apposite: would, "in all reasonable probability", Gore have made the sales to A.P. Products?

When using a standard of proof such as this, each case must stand upon its own record. Nevertheless, the Court finds of relevance two Second Circuit decisions on this issue. Electric Pipe Line, Inc. v. Fluid Systems, Inc., 250 F.2d 697, 116 USPQ 25 (2d Cir. 1957); American Safety Table Co. v. Schreiber, 415 F.2d 373, 163 USPQ 129 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 164 USPQ 225 (1970).

In Electric Pipe Line, Defendant-Patentee and Plaintiff-Infringer were the only producers of the subject heavy fuel oil circulation system. Patentee alleged infringement on thirty-seven sales by Infringer; yet, because of "carefully drawn specifications inspired by [Infringer]," Patentee was able to bid on

only twenty-two. Nevertheless, in light of the Master's findings that the parties were the sole participants in the market, and that the cost of the circulation system was but a minor part of the purchaser's building construction costs, the Appellate Court found justified the conclusion that but for Infringer's conduct, Fluid Systems would have made all of the sales.

American Safety Table, a more recent case, has implications far broader than required to decide this case. The trial court had found Plaintiff's patent for a shirt collar pressing machine to have been infringed by Defendant's sales of each of two types of machine, nominated "A" and "B". By substitution of die assemblies, each of these machines could press either a *362 quarter-collar or a half-collar. Although Patentee produced only type "A" machines, with quarter-collar dies, the Court affirmed the award of lost profits arising out of Infringer's sales of both "A" and "B" machines with either one quarter- or one half-collar dies. It cited the two-supplier market and the common function performed by each machine, through the use of the invention, as support for the trial court's conclusion.

[4] Based upon the reasoning of Electric Pipe Line and American Safety Table, the Court concludes that Gore's failure to solicit a sale specifically of jacketed cable from A.P. Products is not fatal to its demand for lost profits. The pre-existing business relationship between Gore and A.P. Products, and the capacity of Gore (discussed, infra) to produce the jacketed cable are substantial support for the Master's finding. In all reasonable probability, but for Infringer's conduct, Gore would have made the sales to A.P. Products. [FN23]

Defendant also argues that the Master's finding that Gore had the capacity to produce jacketed cable is clearly erroneous. In support of this, Carlisle cites testimony by Gore's Manager of Product and Market Development, referred to in a footnote of the Master's Report. [FN24] Upon careful consideration of the record, the Court finds the Master's interpretation of the testimony not only to be supported but to be in agreement with the Court's own interpretation. [FN25]

[5] Further, this Court is unable to agree with Defendant that a Patentee-Producer must have the current capacity to satisfy the orders filled by an Infringer. Having proven that the technology was common and that the cost of adaptation was low, [FN26] he has carried his burden. This Court agrees with Judge Brown writing for an unanimous court:

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

Nor does the Infringers' attack on Licensee's physical productive capability undermine this award. * * * Certainly there was nothing unique about the equipment required for plant expansion to meet increased demand. Nor was there any indication that had not the Infringer been poaching, the Licensee would not have been able to build or acquire the needed facilities. With all of the grief that the Patent Holder and Licensee have had, they did not, in order to demonstrate a loss, have to build a plant which, because of the Infringer's conduct, would not have been fully utilized. Livesay Window Co., supra, at 473, 116 USPQ at 170.

The Court having found adequate support for the Master's award of profits lost to sales to A.P. Products, Defendant's Specific Objections Numbers 1-10 are overruled.

*B. Sufficiency Of Proof of Amount Of Lost Profits*
The method by which the Master calculated profits lost to Gore by virtue of Carlisle's infringing sales has been described, supra. Defendant objects to this as being too speculative in that it uses Mr. Mehta's extrapolation of material and labor cost data from the post-infringement period back into the accounting period, and also his statistical sampling for the determination of the extrapolation parameters.

In rebuttal to Mr. Mehta, Defendant offered its expert witness, Robert E. Stautberg. [FN27] Mr. Stautberg's criticism of Mr. *363 Mehta's calculation of the costs Gore would have endured were it to have made Carlisle's sales went both to the material and to the labor cost estimates. In calculating material costs, Mr. Mehta needed to know: the amount of PTFE and of conductor in each cable; the scrap rate for each of these materials; and the cost, at the time of Infringer's sales, of PTFE and conductor wire. To obtain these data, Mr. Mehta weighed one-foot samples of the various cables still in stock; used a 1974 yield (scrap rate) analysis performed by following the production of a typical style of cable; [FN28] and then referred to a sample of material invoices - one from each quarter year - to determine costs. [FN29]

Mr. Stautberg argued, first, that although multi-one-foot samples were taken for many cable specifications, in each instance these were from the same run and might not show systematic long-term variations. However, this Court finds that there is adequate evidence upon which the Master could find that the specifications for each cable style were sufficiently narrow to eliminate such fluctuations.

[FN30] Mr. Stautberg also argued that the use of the 1974 yield analysis was improper, both because it involved only one cable type and because it did not take into account improvements in productivity with time. Once again, this Court finds substantial evidence upon which the Master could conclude that the cable used was typical. There was evidence that nearly 40% of the infringing sales were of an equivalent cable. [FN31] Further, there was testimony upon which the Master could conclude that no significant change in productivity had occurred: the Honeywell-type cable (used in the yield analysis) had been in active production prior to the infringement period, and the techniques for producing that cable had not changed between the commencement of the infringement period and 1974. [FN32] Finally, Mr. Stautberg criticized the use of a single material invoice from each quarter year of the infringement period for each PTFE and conductor. Without digressing into the discussion of Basian statistics given by Mr. Mehta, suffice it to say that there was sufficient evidence to conclude that variations in price from one quarter to the succeeding quarter were so small as to be insignificant here. [FN33]

Mr. Stautberg also criticized Mehta's computation of the incremental labor costs in producing the hypothetical goods which Gore would have sold but for the infringement. As mentioned previously, these costs were determined in 1974- 75 by studying the current costs of labor for each principal stage of production. These costs were then extrapolated to the accounting period using the relative average production line wage rates. Mr. Stautberg's criticism centered around: the use of a wage rate averaged over all hourly production workers; and the failure to account for changes in productivity or methods of operation. The latter criticism already has been addressed, supra. Further, there was substantial evidence upon which the Master could conclude that the overall average production line wage rate was higher than that for the transmission line production operations, resulting in a conservative damage calculation. [FN34]

Both parties agree that the traditional standard of proof in patent infringement cases was borrowed from the anti-trust law:

The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. * * *

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931).

However, Infringer here raises the ingenious argument that, by amending the Patent Act in 1946, to guarantee a minimum recovery of a "reasonable royalty", Congress intended to abrogate this common law standard in favor of a stricter standard of proof. In support of this argument, Defendant notes that the Amendment has been interpreted as shifting the relevant inquiry from the Infringer's profits over to the Patentee's lost profit. Aro Manufacturing *364 Co., Inc., supra. With this shift, Carlisle argues, went a shift of the standard of proof.

[6] This Court finds no support whatever for the assertion that a higher standard than "reasonable probability" is applicable to this damage calculation.

Of persuasive force to the contrary is a recent Sixth Circuit decision. H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 191 USPQ 486 (1976), aff'g., 183 USPQ 794 (N.D. Ohio 1974). Goodyear there objected to the trial court determination of lost profits based not upon sales records (which were unavailable) but upon management reports of sales and gross margins for major product line groups which included the infringed product. As the trial court had noted:

Defendant further challenges plaintiff's estimate of damages from loss of profits because, admittedly, it is based upon assumptions, approximations and, on occasion, reconstruction of missing data. Defendant points out that none of the accountants testifying would certify as to the accuracy of the conclusions to be derived from the data available. A certified statement is not required. It is settled that mathematical exactitude in the ascertainment of damages cannot be expected and a reasonable approximation is all that is required once the wrong has been established. 183 USPQ at 798.

In affirming this lower court decision, the Sixth Circuit pointed out that:

Lost profits cannot be computed with certainty; they are hypothetical by definition. The

"reasonable certainly" test suggested by Goodyear is no more than a test of probability, as it must be in dealing with a hypothetical situation. 536 F.2d at 1122, 191 USPQ at 491. [FN35]

The injury here is one for which exact damages inherently cannot be proven. No standard of proof higher than that of Story, Livesay and H. K. Porter is mandated. To a level of "reasonable probability", there is adequate evidence in the record to support the Master's determination of damages. Defendant's Objections Numbers 11-15 are overruled.

C. Apportionment

[7] Infringer, Carlisle, also has objected to the failure of the Master to apportion Gore's lost profit between that attributable to the '292 patent and that attributable to the precise alignment process described in the invalidated '956 patent. Carlisle notes that but for the precise alignment of the conductors, the PTFE flat laminated cable was of no commercial value as a high speed signal transmission cable. That being the case, Carlisle argues that the Master erroneously applied the "entire market rule" to award Gore its entire damages. This Court finds that the Master correctly construed the law. Once the fact that sales have been lost has been proven, there is no occasion for the application of apportionment. Further, even if applicable to some damage calculations, the facts of this case do not justify application of apportionment here.

[8] Although neither the Supreme Court nor the Third Circuit has addressed this issue, it seems clear to the Court that the doctrine of apportionment is inapplicable in assessing damages once the quantity of sales lost (or of sales at eroded prices) has been determined. Gore had the burden to prove only the facts, previously found, that:

(1) The infringed product was so differentiated commercially as to allow no non-infringing substitute product; and

(2) Gore was in a position to make the sales but for Carlisle's conduct.

The Second Circuit has used this reasoning in awarding damages due to lost profits. Electric Pipe Line, supra. The trial court there had awarded not only the profits lost in the sale of the patented heated pipe circulation system, but also the profit lost in the sale of complete installations. Those installations included non-patented components. In affirming that award, the

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

Page 11

Court applied alternatively the "entire marketable value" rule and also the proven lost sales rule, adopted by this Court. In its application of the former rule, the Circuit Court focused upon the effect of the patented, rather than the unpatented, components:

> The patent here involved gave value to the components which otherwise would have been useless for the purposes involved and would not have been sold by *365 [Infringer] or anyone else. 250 F.2d 697, 700, 116 USPQ 25, 27.

The Court then stated the later rule:

> [T]he inclusion of profits from the sale of all the components seems proper, because [Patentee's] revenues would have reflected these sales had it not been for [the] infringement. ld.

See, also, American Safety Table Co., supra, 415 F.2d 373, 377, 163 USPQ 129, 131.

[9] Most recently, the Fifth Circuit stated, in dictum, the reasoning which this Court adopts:

> Whether or not the article would have some commercial usefulness without the patented feature is irrelevant where it is clear that the patentee would have made the sale of the article had not the defendant infringed. Hughes Tool Co., supra, 491 F.2d 923, 928, 180 USPQ 353, 357.

The relevant issue, then, becomes not apportionment, but rather loss of sales. [FN36]

[10] Arguing that Patentee has a burden of apportioning damages, Carlisle has referred the Court to several pre-1946 cases. [FN37] When considering this early case law, the Court recalls that, prior to 1946, action for both the infringer's profits and the patentee's damages was available. [FN38] The action for profits was akin to the equitable action for a constructive trust. Those profits of the infringer properly attributable to the patented invention justly belonged to the Patentee. In the 1946 Amendment, express provision for the recovery of an infringer's profits was deleted.

[11] None of these early cases is apposite. Each rests upon the apportionment of an infringer's profits rather than a patentee's damages. Indeed, each case was marked by the absence of sufficient evidence of damage. In Garretson, for example, the owner of an improvement patent for a mop-head clamp produced only evidence to show the cost of

the mop and its sale price. No evidence relating to the loss of sales due to infringement was offered. This fact is not to be presumed, especially in the case of a patent for the improvement of a device already being sold in the same market. However, this relates not to apportionment but rather to market differentiation.

Dowagiac Manufacturing, again involving the infringement of an improvement patent on an already commercial machine, supports this analysis. The Court, in denying recovery, expressly relied upon Patentee's failure to prove apportionment to bar recovery of Infringer's profits; however, it relied not upon apportionment, but rather upon the failure of Patentee to prove both the amount of sales lost (in view of the multi-supplier market) and also his production capacity to bar recovery of Patentee's damages.

In the present case, Gore has proven the fact of lost sales, and has proven the profit it would have made on those sales. It is entitled, under the theory discussed above, to an award of those damages.

However, even were the doctrine of apportionment applicable to damages, apportionment is not warranted here. For one cannot consider apportionment between the '292 and the '956 patents without asking: "Why not apportion part of the damages to the fabrication of the unsintered tape"; or "Why not apportion part to the sintering process?" For, as this Court found in its previous opinion, the "precision alignment" was a routine operation, no more essential to the commerical value of the finished product than were the sintering or fabrication steps.

The point, then, is not the application of an "entire marketable value" rule; rather, it is the recognition that each step of the instant process was essential to a single final product not otherwise saleable within the relevant market. This distinguishes the present case from the improvement patent situation and also from the component system situation where only a separable component is protected.

For either of the two reasons discussed above, this Court concludes that the Master correctly interpreted the law and that his findings are supported. Infringer's Objection on apportionment is without merit, *366 and his specific Objection Number 16 is overruled.

### IV. Plaintiff's Objections

Patentee, Gore, also has filed objections to the Report of the Special Master. These objections may be

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

classified generically as those going to:

> (1) The Master's finding that sales and general and administrative charges were incremental costs to be included in the calculation of lost profits;

> (2) The Master's failure to include, as lost sales, the infringing sales by Infringer to Carlisle/Belgium;

> (3) The Master's failure to award at least reasonable royalties on certain infringing sales;

> (4) The Master's refusal to award interest, compounded from the dates of infringement.

The Court finds merit in the first of these objections, and sustains it. The remaining objections are overruled.

### A. Allocation of Costs

[12] In calculating Gore's damages due to lost sales, the Master deducted, from lost gross revenues, the additional costs which Gore would have encountered had it made the sales. While it is not disputed that the direct incremental costs of raw materials and labor properly were deducted, Gore has objected to the allocation of certain sales and general and administrative costs. Arguing that only costs which vary with production activity properly may be excluded, Gore asserts that the finding of the Master that these particular expenses are of a variable, rather than substantially fixed, nature is clearly erroneous. This Court agrees.

[13] The law of this Circuit is that fixed overhead is not to be charged against Plaintiff's damages:

> Since overhead is fixed and non-performance of the contract produced no overhead costs savings, no deductions from profits should result. Vitex Manufacturing Corp. v. Caribtex Corp., 377 F.2d 795, 798 (3d Cir. 1967).

As the Master correctly pointed out:

> The threshold question is whether or not plaintiff's overhead or fixed expenses would have been affected by manufacturing and selling the product which the defendant sold. [FN39]

Although one could find support for the contrary, [FN40] the Court will assume that the burden of proof that acknowledged costs are fixed, rather than variable,

rests upon Patentee.

With regard to the sales expenses, it is important to bear in mind that lost profit, as measure of damage, here is being applied only where Gore had adequate sales contacts to allow the Court to conclude that, but for the infringing conduct, Patentee would have made a sale. In those cases (except as to the jacketing of cable for A.P. Products, discussed supra), the expense of drawing complex specifications for the cable already had been incurred. Further, Gore's witness, George Hansell, testified that Gore not only expended its sales efforts to obtain for itself the purloined orders, but in fact suffered an *increase* in its sales expenses due to Infringer's activity. [FN41] This Court finds that Gore carried the burden of proving, prima facie, that there was no net selling expense saved by virtue of its sales lost to Carlisle.

Carlisle's witness, Robert Stautberg, testified, and on this basis the Master found, that the profits calculated by Gore should be reduced by 24% representing variable sales and administrative expenses. This testimony was based upon a summary of Gore's financial statements for the years 1968-74. [FN42] These showed that the ratio of total selling expenses to net sales and of general and administrative costs to net sales each averaged 12%. Because of the roughly constant ratios over the years, as net sales varied, Stautberg concluded that these expenses were correlated with the amount of sales. [FN43]

This Court finds clearly erroneous the Master's finding that Stautberg's inference was substantial rebuttal of Hansell's specific testimony. Indeed, the Court has difficulty finding any probative value in it. In the context of this case, there is no basis upon which one can infer that the apparent correlation of total costs with net sales is more than coincidence. Beyond this, on rebuttal, Gore's accountant (Mr. Mehta) offered a specific explanation for the apparent correlations. During the relevant *367 period, Gore was engaged in expanding its lines of products other than transmission cables. This, he explained, involved increased expenditure in marketing, reflected as increased sales costs, as well as in research and development, reflected as increased general expenses. [FN44] Infringer made no attempt to rebut this explanation.

Stautberg's testimony is not unlike that rejected by the Master in Electric Pipe Line, supra:

> Over the period in question, [Patentee's] general overhead increased coincidentally with gross

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

sales. [Infringer] maintains that this experience proves that [Patentee] would have incurred increased overhead expenses had it taken on the installations in question. The Master found, however, that substantially all of the increase in overhead was occasioned by increases in salaries and the establishment of offices in New York and Chicago. Therefore, although the general overhead and gross sales figures increased coincidentally, the increases were not related and the Master's conclusion appears justified. 250 F.2d 697, 699, 116 USPQ 25, 27.

In the present case, Carlisle has not, over Gore's proof, shown that the selling or general and administrative costs were variable with so direct a dependence upon sales volume as properly to be considered costs in computing lost profits. Vitex Manufacturing Corp., supra, 377 F.2d 795, 799. Gore's specific Objections Numbers 1-2 are sustained. [FN45]

*B. Sales to Carlisle/Belgium*

In his determination that only some of Infringer's sales probably would have been made by Gore, the Master excluded a sale to Carlisle/Belgium. Patentee objects to this, arguing that Carlisle/Belgium was a captive importing company supplying Honeywell-Europe. The latter was recognized as a customer of Gore by the Master. Therefore, Gore argues, the sale by Carlisle to Carlisle/Belgium otherwise would have been made by Gore to Honeywell-Europe.

This Court disagrees. The evidence does show that Carlisle/Belgium was a division of Carlisle, and that while Tensolite (Carlisle's cable production division) occasionally dealt directly with Honeywell-Europe, it normally dealt with them through Carlisle/Belgium. [FN46] Further, the Master relied upon Exhibit PDX-96, a tabulation of Carlisle's infringing sales, for his findings of other sales lost. Since this table shows sales to Honeywell-Europe, the Court can infer that the Master found that Gore had established sales contacts with Honeywell-Europe. Finally, the evidence shows that the cable involved in the sale to Carlisle/Belgium was of the type commonly used by Honeywell-Europe.

However, there is no evidence that Honeywell-Europe was the *sole* purchaser of this cable from Carlisle/Belgium. In the absence of such evidence, the Court cannot conclude that the particular sale by Carlisle to Carlisle/Belgium was but a step of a single integrable sales transaction with Honeywell-Europe. Certainly the Master's refusal to award lost profits for that sale is not clearly erroneous. Plaintiff's specific Objection Number 3, therefore, is overruled.

*C. Reasonable Royalties on Other Infringing Sales*

As the Court already has mentioned, the Master failed to award Gore any damages on sales by Infringer to four customers: Carlisle/Belgium; Elscint, Ltd.; Fairfield; and Miles Roystone, Ltd. The Master based this upon a failure of proof that Gore had established sales contacts with these companies. Patentee now argues that it is entitled to at least a reasonable royalty on those sales. [FN47]

[14] There is no question that an award of infringement damages to a patentee can include a portion representing provable lost profits and a non-duplicative portion representing reasonable royalties on those infringing sales for which greater damages cannot be proven. H.K. Porter Co. v. Goodyear Tire & Rubber Co., supra, 183 USPQ 794 (N.D. Ohio 1974); Broadview Chemical Corp. v. Loctite Corp., supra, 311 F.Supp. 447, 164 USPQ 419 (D.Conn. 1970). Such a reasonable royalty is to be based upon the nature, utility and extent of use of the invention. *368Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., supra, 235 U.S. 641, 648 (1915). See, Randolph Laboratories, Inc. v. Specialties Development Corp., 213 F.2d 873, 102 USPQ 40 (3d Cir. 1954), cert. denied, 348 U.S. 861, 103 USPQ 424 (1954).

Hence an element of recovery for Gore is the reasonable royalty on those sales. Nevertheless, prior to and throughout the damages trial, Gore consistently demanded lost profits as its measure of damages. Indeed, the Master seems to have found that Gore abandoned any claim to reasonable royalties as an alternative measure. [FN48] This Court finds it unnecessary to determine whether Gore effectively did waive its statutorily mandated minimum recovery for the Court finds a complete lack of evidence upon which such an award could be based.

[15] A reasonable royalty rate is, of course, hypothetical in nature. Ideally, it is that rate to which a "willing buyer and willing seller" would agree in an arms-length negotiation. Horvath v. McCord Radiator & Manufacturing Co., 100 F.2d 326, 40 USPQ 324 (6th Cir. 1938), cert. denied, sub.nom., Carrier Engineering Corp. v. Horvath, 308 U.S. 581, 43 USPQ 520 (1939). Further, the reasonable royalty must be such as to leave Infringer with a "reasonable profit". Georgia-Pacific

Corp. v. United States Plywood-Champion Papers, Inc., 446 F.2d 295, 170 USPQ 369 (2d Cir. 1971), cert. denied, 404 U.S. 870, 171 USPQ 322 (1971), modifying 318 F.Supp. 1116, 166 USPQ 235 (S.D.N.Y. 1970); Jenn-Air Corp. v. Penn Ventilator Co., 394 F.Supp. 665, 185 USPQ 410 (E.D. Pa. 1975). But hypothetical though it may be, nevertheless:

[It must] be determined solely on the basis of the submitted evidence and upon an evaluation of the factors that could affect the reasonable royalty, not upon mere conjecture. Trio Process Corp. v. L. Goldstein's Sons, Inc., 533 F.2d 126, 130, 189 USPQ 561, 564 (3d Cir. 1976).

What little evidence there is relating to a reasonable royalty rate was offered by the infringer, Carlisle. This evidence was of three types:

(1) That going to show that Gore's profit on transmission lines was only 11-13% of sales;

(2) That going to prove that Gore itself had valued the '292 patent at a royalty of 5-10% of sales;

(3) That going to prove that comparable patent licenses were negotiated at royalties of 1-5% of sales.

From this, Carlisle argues that a reasonable royalty rate could not exceed 5%.

To prove that Gore's profit on the transmission line was only 11-13% of sales, Carlisle introduced two internal memoranda prepared for Gore management. The first, DDX-44, dated October 2, 1974, is a study by Mehta forecasting the profitabilities of each product line. For the transmission cables, this estimate was 10.9% of forecast sales for the period 1974-75. Mehta testified that this study was Patentee's first attempt at product line profitability analysis, and was based on conservative estimates by product managers. [FN49] He emphasized also that the profit estimate was after allocation of all fixed, as well as variable, costs. The second report, DDX-36, by Murray and Mehta on October 17, 1974, estimated the direct cost of manufacturing transmission lines at 62% of sale price. Mr. Stautberg, Carlisle's accountant, testified that by subtracting 25% for selling and general and administrative costs from this 38 rofit, he found a net profitability of 13%. [FN50] However, the Court notes that Exhibit DDX-36 apparently was based upon the same information upon which Exhibit DDX-44 was based: it is not independent evidence.

By accepting the lost profits calculations of Gore, the Master implicitly rejected these reports. In discussing the findings of the Master, this Court already has pointed to the substantial basis for them. For comparable cable, the profitability reports lead to substantially different cost estimates than do the labor and material cost studies underlying the damage calculation, supra. For example, materials and direct labor costs for the transmission lines were estimated at 53% of sales revenue in DDX-44, while it already has been determined that these costs were only 19% of revenue. [FN51]

The probative weight of this first profitability study, on which DDX-44 and DDX-36 were based, is further diminished by the fact that all subsequent profitability *369 studies were based on actual historical, rather than projected, cost data. [FN52] The Court infers from this that Gore's management, too, had little confidence in the original reports.

Further, the Court already has found that Gore's overhead, selling and general and administrative costs were insensitive to small changes in the volume of sales. Since only small changes in volume would be anticipated under the limited license, this Court concludes that the negotiating posture of Gore would have ignored such costs. In conclusion, then, the 11-13% profitability rate urged by Carlisle has been neither proven reliable nor shown relevant. Rather, the Court will continue to use the profitability rate of 81%.

Even with the proven profitability, for Gore, of the transmission cable, Carlisle argues that Gore valued the '292 patent at only 5-10% of sales. To prove this, Carlisle introduced a license offer which had been made to it by Gore during this litigation. The offer was for an exclusive license of both the '292 and the '956 patents at a royalty of 30%, to be reduced to 20-25% upon the expiration of the '292 patent. [FN53] From this, Carlisle argues that Gore had assessed a royalty on the '956 patent of 20-25% and on the '292 patent of 5-10%. Gore rebutted this through the testimony of its President [FN54] and of its patent agent, Ernest Uebler. [FN55] Each testified that the reduction of the royalty rate was based not upon relative assessments of value, but rather upon counsel that this was necessary to avoid a charge of patent misuse. The Court finds that the license offer does not manifest an intention to assess the relative values. However, Gore goes beyond this to argue that the offer represents the royalty rate (30%) for which it would have bargained. [FN56] This argument overlooks the fact that the offer

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
**(Cite as: 198 U.S.P.Q. 353)**

was for an exclusive license, rather than for the limited license in the hypothetical negotiation here considered. Further, it cannot be overlooked that the offer was made during this litigation, as a settlement offer rather than simply as a license offer. The Court finds the license offer of no probative value here either as to Gore's assessment of the '292 patent or as to its likely bargaining stance.

Finally, Carlisle put into evidence the royalty rate actually paid by it on two other patents: the "Chesnut" patent (owned by Johnson & Johnson), and the "Alexander" patent (owned by ITT). However, neither patent was for a product in this or any comparable market. The Chesnut patent dealt with the use of PTFE tape as a sealant for plumbing joints. Only the joint, qua se, was patented: PTFE tape was not protected. That a royalty of 1% was paid by Carlisle on the sale of the tape for this specific purpose is irrelevant. The Alexander patent, describing a process for insulating a single conductor in multiple layers of PTFE, similarly is irrelevant in the absence of further evidence. The wire cannot be used in the high speed signal transmission market; nor is there any evidence regarding the availability of substitute products for the Alexander wire. In short, there is no evidence that the economic considerations which went into setting a one percent royalty on the Chesnut patent or a five percent royalty on the Alexander patent are even remotely similar to those present here. [FN57]

The Court notes that there was no evidence of Carlisle's anticipated or actual profit from the manufacture and sale of the PTFE transmission cable. In the absence of such evidence, there is no way of determining what the bargaining posture of Carlisle would be in the contemplated hypothetical negotiations. [FN58] Even were the Court to assume that the material and labor costs to Carlisle would be expected to be comparable to Gore's, there is no evidence of the variability to be expected in Carlisle's general or selling costs. Finally, there is no evidence going to the minimum "reasonable profit" which Carlisle could accept in light of their other investment options. Both that base figure and the expected profitability of the PTFE transmission cable line are necessary, for it is the difference which represents the maximum royalty Carlisle would pay. Cf., *370Georgia- Pacific, supra, 446 F.2d 295, 299-300, 170 USPQ 369, 371-373.

There is no substantial evidence, such as profits to each party from sales anticipated in the non-exclusive limited license, which would justify a conclusion as to the minimum royalty to which Gore, or the maximum

royalty to which Carlisle, could agree. Even were there such evidence, there is no expert testimony, or evidence of royalties in comparable patent licenses, which would allow the Court to choose a specific royalty within that bargaining range. Upon the evidence presented here, such a choice only could be "mere conjecture". Trio Process Corp., supra.

Carlisle cannot be held to blame for this deficiency of proof. Liberal discovery was available to Gore, but Gore showed no interest in pursuing evidence relevant to reasonable royalties. In the substantial absence of relevant evidence, or even of evidence on which to base a *minimum* royalty, the Court must deny any award of reasonable royalties to Gore. Gore's Specific Objection No. 4 is overruled.

*D. Interest*

The Special Master declined to award interest as a form of compensatory delay damages. This denial was based upon the lack of any "exceptional circumstances", aside from the possible willfulness of Infringer's conduct (to be considered by this Court at a later date). Patentee has objected to this, arguing that the Master's interpretation of the law to require "exceptional circumstances" is erroneous. Based upon its study of the law, the Court is led to conclude that in the instant case, denial of moratory interest is correct.

[16] The law on this issue has evolved rapidly in the recent past. Prior to 1946, it seems to have been clear that compensatory interest was not to be awarded in a legal action for infringement damages. Rather, only punitive interest was allowed, and then only under "exceptional circumstances". Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 459, 29 USPQ 306, 311 (1936).

[17] In the 1946 Amendment, new statutory language emerged providing for "interest * * * as fixed by the court". 35 U.S.C.A. § 284. This language was the outgrowth of language in both the House and Senate reports on § 284, providing for "interest from the time infringement occurred". See, Aro Manufacturing Co., supra, 377 U.S. 476, 141 USPQ 681 (1964).

Our Circuit, at first, seemed to assume the continued viability of the Duplate rule:

It is settled that interest on an unliquidated claim for damages in a patent infringement suit is allowable from the time of infringement only under special circumstances and in the discretion of the court. [Duplate Corp., supra.] This is true

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

even though the damages are computed on the basis of a reasonable royalty. Randolph Laboratories, supra, 213 F.2d 873, 875, 102 USPQ 140, 142.

Shortly thereafter, however, Judge Leahy of this Court assessed interest on an award based on reasonable royalties:

> While defendant argues the circumstances of this case are such that there should be a refusal to award any interest, I do not pause to discuss the allowance of interest in light of the infringement that has occurred in this instant case as viewed by this Court and the Court of Appeals under the circumstances of defendant's tortious conduct. The award of interest, here, is, however, not a punitive device. Allowed interest in this case represents damages for delay in payment and compensation for use of plaintiff's money that should have been included in withheld annual royalty statements which, of course, were never rendered by the infringer. In short, it is moratory interest and not contract or punitive interest. Hartford National Bank & Trust Co. v. E. F. Drew & Co., 188 F.Supp. 347, 349, 127 USPQ 243, 244 (D.Del. 1960), aff'd., 290 F.2d 589, 129 USPQ 204 (3d Cir. 1961), cert. denied, 368 U.S. 825, 131 USPQ 498 (1961).

Further, Judge Leahy considered the money market in detail, and concluded that 4% was an appropriate rate for delay damages, rather than the 6% statutory interest rate. This award was affirmed without further comment.

[18] Although subsequently no court in our Circuit has spoken to this issue, it is now the majority rule that with regard to interest on reasonable royalty awards, Duplate was vitiated by the Amendment. Rather than being governed by Duplate's "hoary" rules, assessment of interest is to be governed by conventional equity. Georgia-Pacific, supra, 446 F.2d 295, 300-302, 170 USPQ 369, 372-374 (2d Cir. 1971). See, e.g., Foster v. American Machine & Foundry Co., 492 F.2d 1317, 182 USPQ 1 (2d Cir.), cert. denied, 419 U.S. 833, 183 USPQ 321 (1974); *371 Maloney-Crawford Tank Corp. v. Sauder Tank Co., Inc., 511 F.2d 10, 185 USPQ 80 (10th Cir. 1975); Tights, Inc. v. Kayser-Roth Corp., 196 USPQ 750 (M.D. N.C. 1977); Vanity Fair Mills, Inc. v. Olga Co., 369 F.Supp. 1233, 181 USPQ 699 (S.D.N.Y. 1974) rev'd on other grounds, 510 F.2d 336, 184 USPQ 643 (2d Cir. 1975).

[19] A recent dramatic liberalization of this law has come in the Seventh Circuit. Compare, Wahl v. Carrier Manufacturing Co., 511 F.2d 209, 214, 184 USPQ 516, 519 (7th Cir. 1975), and Union Carbide Corp. v. Graver Tank & Mfg. Co., 282 F.2d 653, 677, 127 USPQ 3, 21-22 (7th Cir. 1960), cert. denied, 365 U.S. 812, 128 USPQ 557 (1961), (interest only under exceptional circumstances), with Columbia Broadcasting System, Inc. v. Zenith Radio Corp., 537 F.2d 896, 898, 192 USPQ 68, 70 (7th Cir. 1976), (interest whereever commercial considerations mandate award to make Patentee whole). In the last decade, only the Sixth Circuit has continued to follow Duplate. H.K.Porter Co., supra, 536 F.2d 1115, 191 USPQ 486. [FN59]

[20] Although the law now seems to favor the assessment of compensatory interest on reasonable royalty awards, where necessary to make whole an injured patentee, this Court has not found an analogous shift in the law of interest on lost profit awards. In the dictum of Randolph Laboratories, supra, the general rule has been that such damages in a patent suit are considered unliquidated until assessment by a Master or Court. The traditional rule at law has been that compensatory interest is not to be awarded on unliquidated claims. General Electric Co. v. Sciaky Bros, Inc., 415 F.2d 1068, 1076, 163 USPQ 257, 262-263 (6th Cir. 1969). Research has disclosed only one case clearly holding to the contrary. Abbott v. Barrentine Manufacturing Co., 160 USPQ 524 (N.D. Miss. 1968).

[21] This Court finds a substantial distinction between an interest award on reasonable royalties and one on lost profits. The reasonable royalty is an approximation not to Patentee's lost profits, but rather to the actual royalty which would have been paid had Infringer negotiated with Patentee. The clear rule has been that moratory interest on actual royalties illegally withheld is appropriate. Marvel Specialty Co., supra, 386 F.2d 287, 290; 155 USPQ 545, 547 Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383, 416, 136 USPQ 348, 374 (D. Md. 1963). In the contemplation of the law, an infringer is on notice that a periodic payment is expected for his use of the patent. Patentee reasonably may expect to have the use of that money. However, where actual replacement damages are proven, they are exacted not as payment for use, but as compensation for monies otherwise to be received from third party customers. This measure of Infringer's liability depends not only upon his own conduct, but also upon the

COPR. © 2006 The Bureau of National Affairs, Inc.

198 U.S.P.Q. 353
1978 WL 21430 (D.Del.), 198 U.S.P.Q. 353
(Cite as: 198 U.S.P.Q. 353)

possibly unforeseen conduct of Patentee. Further, generally Patentee - himself a seller - has no legally protected expectation of a definite profit.

[22] An important consideration in denying interest on unliquidated claims, generally, is the difficulty of making such awards without undue speculation. In the present case, for example, no evidence has been adduced proving the dates upon which Gore would have made the sales lost to Carlisle. Beyond that, there is no evidence going to the likely dates of collection of the accounts receivable on those sales. While evidence may exist from which such dates reasonably could be inferred with respect at least to the profits lost from sales at eroded prices to customers with whom Gore had regular dealings, not even that evidence has been presented.

[23] For these reasons, this Court holds that, in the instant case, moratory interest on Gore's lost profits is not to be assessed against Carlisle. Since the damage award in this instance is based solely upon lost profits, the Master correctly denied interest. Patentee's Objections Numbers 5 and 6, therefore, are denied.

### V. Conclusion

Having reviewed the record presented to the Master, and the briefs of the parties, the Court adopts the Report of the Special Master as modified herein. Each specific Objection of Defendant, Carlisle, is denied for the reasons given above. Similarly, except as to the allocation of sales and general and administrative costs, the Objections of Plaintiff, Gore, are denied.

However, the Master's finding, with respect to the sales lost to the Infringer, that Gore's sales and general and administrative costs were variable is without substantial support. To the contrary, there is substantial evidence that those costs were *372 fixed. For that reason, the Court sustains Plaintiff's Objections Numbers 1 and 2.

As modified to include those sales ($96,574) and general and administrative ($96,574) costs erroneously deducted, the award of the Master ($603,111) is adopted. The Court assesses Carlisle, in favor of Gore, compensatory damages of $796,259.

[Appendixes omitted].

FN1 W.L.Gore & Associates, Inc. v. Carlisle Corp., 381 F.Supp. 680, 183 USPQ 459 (D.Del. 1974), aff'd. in part, reversed in part and remanded, 529 F.2d 614, 189 USPQ 129

(3d Cir. 1976).

FN2 Order of Reference of Accounting, April 30, 1976.

FN3 W.L.Gore & Associates, supra, 381 F.Supp. 680, 697, 183 USPQ 459, 470.

FN4 The four volumes of transcript from the four days of hearings have been labeled "A"-"D". Subsequent citations to that record will conform to that designation. References to the Master's Report shall be prefaced with an "R".

FN5 Rather than basing its price upon demand considerations, Gore used a "value pricing" system. Value was determined by comparison with other products serving the market. See, e.g., R-13; A-123; A-155; BG-7.

FN6 R-13-14. PTFE cable was uniquely suited, among commercially available cables, for high speed signal transmission applications. See, e.g., A-108.

FN7 R-8.

FN8 R-10. Defendant has objected to the specific finding that Gore had the capability to manufacture jacketed cable for sale to A.P. Products. This objection is considered in detail in Section III. A., infra.

FN9 Report of the Special Master, Appendix II, Additional Findings of Fact No. 16. [Hereinafter, "Add.Finding # 16"].

FN10 Add.Findings 15-17.

FN11 R-6.

FN12 Add.Findings 3-5. Plaintiff has objected to the specific findings that sales and general and administrative costs were incremental, rather than fixed, with volume. This objection is considered in detail in Section IV. A., infra.

FN13 R-29.

FN14 R-29.

FN15 R-32.

COPR. © 2006 The Bureau of National Affairs, Inc.

FN16 R-33, n-72.

FN17 Of the $607,976.51 of infringing sales by Carlisle, more than $140,000 were to A.P. Products. R-7-8.

FN18 R-11.

FN19 R-10.

FN20 R-9.

FN21 A-130-133.

FN22 A-131; B-46-47; Add.Finding # 20.

FN23 Hughes Tool Co. v. G.W. Murphy Industries, Inc., 491 F.2d 923, 180 USPQ 353 (5th Cir. 1973), relied upon by Carlisle, is inapposite. That Court does mention the problem of proving lost sales in a multi-supplier market situation. However, in denying lost profits, the Court relied not upon that, but rather upon the fact that Infringer sold the original (non-infringing) product as well as the improved (infringing) product in the same market. This market differentiation issue has not been contested to this Court in the instant case.

FN24 R-9, n.17.

FN25 Carlisle also argues that Gore could not have sold the jacketed cable because it lacked the approval of Underwriters Laboratories. However, there was substantial testimony to the contrary. A-178-180; B-51-52.

FN26 B-52-53.

FN27 The Master here had to determine the relative weight to be given each witness' testimony. Reference already has been made to Plaintiff's witness, Shantekumar Mehta. A specialist in the application of statistical techniques to quality control and production, Mr. Mehta testified to his teaching and professional experience in the field. (B-59-63). In his background testimony, Mr. Mehta stated that when he joined Gore (in 1971) great emphasis already was placed upon statistical methods of accounting in Gore's decision-making process.

(B-64-65).Mr. Stautberg, a Certified Public Accountant, is a member of Defendant's outside accounting firm, Pete, Marwick and Mitchell. Although he had no personal involvement with the cable production unit (Tensolite Division), he was the partner in charge of the Carlisle account. (C-52-53). Mr. Stautberg had taken several courses offered by his firm in statistics. (C-10).

FN28 PDX-95, p.600600; B-73.

FN29 PDX-95; B-75-77.

FN30 See, e.g., C-58-66 (Cross-examination of R.E. Stautberg).

FN31 PDX-96.

FN32 D-50-54.

FN33 D-105-107; C-56-58.

FN34 D-116-117.

FN35 Carlisle relies heavily upon Georgia-Pacific Corp. v. United States Plywood Corp., 243 F.Supp. 500, 146 USPQ 228 (S.D.N.Y. 1965). However, there Patentee had failed completely to adduce any evidence indicating that he would have made additional sales but for the infringement. Rather, the evidence indicated a competitive multi-supplier market involving substitutable goods. The issue of how much evidence a patentee must bring forth concerning his own profit margin was not addressed.

FN36 Of course, the burden of proving that Infringer's conduct was the direct cause of a loss of sales may be great, especially in the case of improvement patents on already profitable devices, or of patents on components of systems otherwise marketable. Hughes Tool Co., supra; Allen v. W.H.O. Alfalfa Milling Co., 272 F.2d 98, 123 USPQ 473 (10th Cir. 1959).

FN37 Garretson v. Clark, 111 U.S. 120 (1884); Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604 (1912); Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641 (1915); National Carbon Co. v. Richards & Co., 85 F.2d 490, 30 USPQ 327 (2d Cir. 1936).

COPR. © 2006 The Bureau of National Affairs, Inc.

FN38 See, e.g., Act of February 18, 1922, C-58, § 8, 42 Stat. 392 (1922).

FN39 R-30.

FN40 Henry Hanger & Display Fixture Corp. v. Sel-O-Rak Corp., 270 F.2d 635, 123 USPQ 3 (5th Cir. 1959), (burden on defendant where using defendant's profits as a measure of plaintiff's damages).

FN41 A-151.

FN42 DDX-33-A.

FN43 C-43-46.

FN44 D-117-118.

FN45 The Master deducted $193,148, for selling and general and administrative expenses from his award of damages due to lost sales. Under the ruling of this Court, the damages assessed to Carlisle now will be increased by that amount.

FN46 C-175-176; A-145.

FN47 Patentee claims a 15% reasonable royalty rate. If adopted, that would result in an award of $1346.00, to be added to the $796,259 already awarded.

FN48 R-4, n.4.

FN49 B-129-30.

FN50 C-44-46.

FN51 This latter value is obtained using the Master's findings, R-33: Variable Costs/Recognized Sales = $155,795/$804,766.

FN52 B-131.

FN53 DDX-204

FN54 A-59-62 (Cross-Examination of W.L. Gore).

FN55 D-99-101 (Testimony of E. A. Uebler).

FN56 Plaintiff's Objection No. 4.

FN57 The testimony regarding these two patents was against their relevancy. A-48-51 (testimony of W.L. Gore); D-28-42 (testimony of J.Fay, Infringer's expert).

FN58 Further, there is no evidence of the profitabilities of the Chesnut or Alexander patents, either inter sese or relative to the '292 patent. Reference already has been made to the lack of evidence supporting their relevancy.

FN59 The Court, in Porter, may have been influenced by the presence of a substantial award for lost profits in addition to an award of reasonable royalties.

D.Del.

198 U.S.P.Q. 353

END OF DOCUMENT

COPR. © 2006 The Bureau of National Affairs, Inc.

# EXHIBIT Q

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Oklahoma.
H. Lester WALD, et al., Plaintiffs,
v.
MUDHOPPER OILFIELD SERVICES, INC., et al.,
Defendants.
**No. CIV-04-1693-C.**

July 27, 2006.

Gary S. Peterson, Oklahoma City, OK, for Plaintiffs.
Julia C. Rieman, Gungoll Jackson Collins Box &
Devoll, Enid, OK, for Defendants.

### *MEMORANDUM OPINION & ORDER*
ROBIN J. CAUTHRON, District Judge.
**\*1** On April 12, 2006, the jury in this case returned a
verdict that Defendants infringed Plaintiffs' patent (the
Wald patent) based on Defendants' sales of Poly Drill
Sticks and awarded Plaintiffs damages based on those
sales and Defendants' sales of another product, Hole
Sweep Sticks, which the parties stipulated infringed
the Wald patent. (Dkt. No. 70.) The jury also found,
by special interrogatory, that there was clear and
convincing evidence that Defendants' infringement
was willful. (Dkt. No. 69.) At the close of evidence,
Defendants' counsel moved for judgment as a matter
of law (JMOL) on the issue of infringement under the
doctrine of equivalents because "no reasonable jury
would find that the equivalent container is present [in
the Poly Drill Sticks]." (Tr. at 276.) After the verdict
was announced, Defendants again moved for
"judgment notwithstanding the verdict as being
unsupported by the evidence." (Tr. at 304.)
Defendants were instructed to file that motion in
writing. (*Id.*)

Defendants have since filed their written post-verdict
motion for JMOL, which is presently before the Court.
Plaintiffs have responded, and Defendants have filed a
reply. For the reasons explained below, Defendants'
motion is denied.

### STANDARD

Federal Rule of Civil Procedure 50(a) allows motions
for JMOL to be made "[I]f during a trial by jury a

party has been fully heard on an issue and there is no
legally sufficient evidentiary basis for a reasonable
jury to find for that party on that issue" and at any time
before submission of the case to the jury. A Rule 50(a)
motion must "specify the judgment sought and the law
and the facts on which the moving party is entitled to
the judgment." According to Rule 50(b), "[i]f, for any
reason, the court does not grant a motion for [JMOL]
made at the close of all the evidence, the court is
considered to have submitted the action to the jury
subject to the court's later deciding the legal questions
raised by the motion." The movants may renew their
pre-verdict motion no later than ten days after the
entry of judgment. *Id.*

JMOL is appropriate "only 'if the jury's factual
findings are not supported by substantial evidence or if
the legal conclusions implied from the jury's verdict
cannot in law be supported by those findings.'
" *Junker v. Eddings, 396 F.3d 1359, 1364
(Fed.Cir.2005), cert. denied, --- U.S. ----, 125 S.Ct.
2937 (2005) (quoting Cybor Corp. v. FAS Techs., Inc.,
138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc)). Thus,
the Court must first "determine what facts are
supported by substantial evidence" and second
"determine whether those facts support the legal
conclusion necessarily drawn by the jury en route to
its verdict." Railroad Dynamics, Inc. v. A. Stucki Co.,
727 F.2d 1506, 1513 (Fed.Cir.1984).*

The Federal Circuit reviews the decision on a motion
for JMOL de novo, applying the standard applicable in
the regional circuit where the district court sits. *Old
Town Canoe Co. v. Confluence Holdings Corp., 448
F.3d 1309, 1314 (Fed.Cir.2006); Markman v.
Westview Instruments, Inc., 52 F.3d 967, 975
(Fed.Cir.1995).* Law in the Tenth Circuit requires this
Court to make all reasonable inferences in favor of the
non-moving party and to refrain from weighing the
evidence or making credibility determinations.
*Loughridge v. Chiles Power Supply Co., Inc., 431
F.3d 1268, 1280 (10th Cir.2005).* The Court will grant
such a motion for JMOL " 'only if the evidence points
but one way and is susceptible to no reasonable
inferences which may support the opposing party's
position.' " *Id. (quoting Finley v. United States, 82
F.3d 966, 968 (10th Cir.1996)).*

### DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
(Cite as: Slip Copy)

Page 2

*2 Defendants argue that the Court should enter JMOL in their favor because: (1) no reasonable jury could have found that the Poly Drill Stick satisfied the function/way/result test to infringe the Wald patent under the doctrine of equivalents; (2) the infringement verdict violates the "all limitations" rule; and (3) the infringement verdict impermissibly allowed Plaintiffs to exclude a product that was obvious, based on prior art, at the time the Wald patent issued. Alternatively, Defendants contend that they are entitled to JMOL with respect to the finding of willfulness, which they contend was against the substantial weight of evidence presented at trial. These arguments are addressed below.

1. Infringement Under the Doctrine of Equivalents

The jury was instructed that if they found that the Poly Drill Stick includes the equivalent of a "container" under the doctrine of equivalents, then Defendants would be liable for infringing the Wald patent based on their sales activities relating to the Poly Drill Sticks. (Dkt. No. 68, Jury Instruction No. 6.) The jury was further instructed:
The Court has construed the term "container" to mean any thing, somehow distinguishable from the well treatment composition it is intended to enclose, that is inert to the composition and of suitable size, shape, and substance to deliver the composition. Something is equivalent to a "container," as defined, if:
1. it performs substantially the same function,
2. in substantially the same way,
3. to produce the same result.
In deciding whether the Poly-Drill stick contains the equivalent of a "container," as defined, you should review the evidence from the perspective of a person of ordinary skill in the art. The test is objective, that is, whether at the time of the claimed infringement, a person of ordinary skill in the art would have considered the differences insubstantial. You should consider the context of the entire claim, including the Wald patent drawings, written descriptions, application and history as well as prior art and all of the circumstances of the case.

(*Id.*, Jury Instruction No. 7.)

Defendants contend that the Poly Drill Stick does not contain the equivalent of a container because it does not perform "the function of allowing the well treatment composition of polymer to dissolve below the surface" in substantially the same way as a "patented stick" or achieve the same result "in performing the function of allowing the well treatment composition to dissolve below the surface." (Defs.' Br. at 6-7.) In support of their argument, Defendants identify testimony that the Poly Drill Stick dissolves at a different rate than a product sold by one of the Plaintiffs and covered by the Wald patent.

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 733 (2002). "An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *Aquatex Indus., Inc. v. Techniche Solutions,* 419 F.3d 1374, 1382 (Fed.Cir.2005) *(quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950)).

*3 Accepting that Defendants have articulated a proper function of the Wald patent's container (i.e., of allowing the well treatment composition of polymer to dissolve below the surface), the Court cannot find that there was insubstantial evidence to support the jury's infringement verdict. With respect to Defendants' "way" argument, Defendants have not identified evidence that a difference in the dissolution rates would, when viewed from the perspective of one of ordinary skill in the art, preclude the Poly Drill's container equivalent from performing the container function in substantially the same way. As an initial matter, the jury was not required to accept that there was a difference in dissolution rates. Specifically, the jury was entitled to credit Defendant Brook's deposition testimony that the Poly Drill Stick dissolves "pretty quickly" over his in-trial testimony and other evidence that the Poly Drill Stick dissolved slowly or incompletely before "eventually" being dissolved at the drill bit. (Tr. at 156; 252-53; 266.) Further, even if the jury believed that there was a difference in rates, it need not have found that the difference would be considered a "substantial difference" to one of ordinary skill in the applicable art. There was evidence, unquestioned at trial or in the present motion, that the polymer contained in a Poly Drill Stick was released below surface. (Tr. at 93; 253-54.) There also was testimony offered regarding the value of polymer after the polymer/drilling fluid mix exits the drill bit. (Tr. at 59-67.) Therefore, the jury could have reasonably concluded that whatever difference there was between the dissolution rates of the Wald patent's partially soluble container and the

Slip Copy                                                                                                      Page 3
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
**(Cite as: Slip Copy)**

Poly Drill Stick, both dissolved below surface and completely by the time the drill bit was reached.

Considering the "way" the polymer is released, as a bubble or gradually, as opposed to the rate of dissolution, does not change the analysis or ruling. (*See* Defs.' Reply at 2 (complaining that Plaintiffs' response misses the point).) First, the Wald patent discloses a partially soluble container that encloses a well treatment composition in either a powdered or liquid form. Defendants did not produce evidence of when the Wald container would be "compromised" (as it dissolves) or that the result necessarily would produce a true pocket or bubble of treatment composition in the drilling fluid. (*See* Defs.' Br. at 5 ("Logic dictates that in any ... embodiment within the scope of the patented claim of a container ... as soon as the integrity of the container is compromised by the solvent, its entire content of well treatment composition will rapidly be exposed to the drilling mud, thereby creating a 'bubble,' if you will, of polymer (or other concentrated treatment composition) in the drilling mud at whatever depth the integrity of the container is compromised by dissolution.")) The Court declines to draw inferences against the non-movant, especially when Defendants failed to present their "bubble" theory to the jury but would instead have the Court upset the verdict as illogical.

**\*4** Second, there was simply no evidence that a person of ordinary skill in the applicable art would necessarily consider the difference in a bubble versus "slow" release substantial in how the Poly Drill Stick performs the function of introducing polymer below surface. The Court recognizes the need to not confuse the overall function of the Poly Drill Stick (accused device) with the function of a container equivalent. Still, given the purpose of the invention and evidence about the industry need for a method of introducing polymer below-surface, which is a container function, the jury could have found that whatever difference there may be in the manner in which polymer is introduced below surface is not a substantial difference. Accordingly, for the reasons set out above, the jury was entitled to find that elements of the Poly Drill Stick performed the dissolution-below-surface function of the Wald patent's container and in substantially the same way.

Defendants' "result" argument also fails. There was evidence at trial that the Poly Drill Stick delivered a well treatment composition of polymer below surface. Thus, the jury could have reasonably found that the Poly Drill Stick achieved substantially the same result as would have been achieved through the use of a literal container. Specifically, based on the evidence, it would have been reasonable to conclude that the solid-stick structure and soap additives of the Poly Drill Stick allowed for a safer and more cost-effective means of introducing polymer than previously existed. (Tr. at 67-72.) Defendant Brooks testified that the Poly Drill Sticks are a *better* product than what is disclosed in the Wald patent in terms of accidental breakage (on the rig floor) and "blowback." (Tr. at 243-45.) However, the jury need not have considered those differences significant because Brooks did not quantify the advantage and the Poly Drill Stick did not eliminate problems associated with above-surface breakage and blowback. Moreover, the jury was entitled to credit other evidence that the Wald patent does show an improvement over prior methods of introducing polymer and that the Poly Drill Stick's solid structure and soap additives allow it to accomplish the same end, namely, through easy transport and below-surface dissolution. Because there was evidence that elements of the Poly Drill Stick performed the function of the Wald patent container in substantially the same way to achieve the same result, Defendants' motion for JMOL on the infringement verdict is denied.

### 2. "All Limitations" Rule

Defendants also argue that because the entire Poly Drill Stick is a treatment composition corresponding to the treatment composition element of the Wald patent, the infringement verdict vitiates the Wald patent requirement that the treatment composition be "in" or "enclosed in" a container. (Defs.' Br. at 10.) Thus, Defendants contend that the jury's verdict conflicts with the "all limitations" rule, which prohibits application of the doctrine of equivalents if the result would be to " 'effectively eliminate [an] element in its entirety.' " (Defs.' Br. at 8 (*quoting* <u>Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997)</u> (emphasis omitted))).

**\*5** As an initial matter, Plaintiffs complain that this argument was not raised earlier, including in Defendants' pre-verdict motion for JMOL, and was therefore waived. <u>Rule 50</u> requires that the law and facts on which a movant relies be specified, at least with " 'sufficient certainty to apprise the court and opposing counsel of the movant's position.' " (<u>United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1229 (10th Cir.2000)</u> (*quoting* <u>9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2533 (1995)</u>, 310). "The requirement for specificity is not simply the rule-drafter's choice of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
(Cite as: Slip Copy)

phrasing. In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL." *Duro-Last, Inc. v. Custom Seal, Inc.,* 321 F.3d 1098, 1107 (Fed.Cir.2003).

Here, counsel referred to the insufficiency of the evidence with respect to any potential container-equivalent, but in no way alluded to the legal contention described above. The Court had the authority to take the issue of infringement away from the jury based on this limitation, if warranted. *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 763 (Fed.Cir.1988) ( "[T]here is no question that the court may take the issue from the jury on a directed verdict or JNOV motion at least in the same circumstances where it could have granted summary judgment."); *Warner-Jenkinson Co.,* 520 U.S. at 39 n. 8 ("[U]nder the particular facts of a case, ... if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve."). However, Defendants failed to identify their argument in the pre-verdict motion for JMOL. *See Newell,* 862 F.2d at 764 n. 6 (emphasizing that a litigant is responsible for seeking a ruling on a legal issue and the court is not obligated to act sua sponte).

Nor did Defendants raise this issue at summary judgment or in the pretrial report or assert it as a basis for an objection to the jury instructions or verdict form. Defendants did not simply omit this argument from their pre-verdict motion for JMOL; they failed to raise the issue *at all* before the case went to the jury. Although a question of law need not be raised in a pre-verdict motion for JMOL to be preserved, it does need to be identified at some point before the case goes to the jury. *See Ruyle v. Cont'l Oil Co.,* 44 F.3d 837, 841 (10th Cir.1994) (explaining that question of law raised before the case goes to the jury need not be included as an issue in a motion for a directed verdict); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,* 175 F.3d 1221, 1249 n. 37 (10th Cir.1999) (objecting to verdict form preserved question of law omitted from pre-verdict JMOL for appeal). Thus, the Court agrees that Defendants failed to advance a legal argument that is not appropriately raised, for the first time, in a post-verdict motion for JMOL.

*6 However, even if Defendants' argument were properly before the Court, it is flawed in two critical respects. First, there was sufficient evidence that the polymer was held together or bound by the soap/surfactant in the Poly Drill Stick. There was testimony that a Poly Drill Stick is formed by adding a fine-powdered polymer to melted surfactant, poured into a stick form, and allowed to harden (Tr. at 224-25, 228, 232-234), and that a stick is comprised of 40 % polymer and 60% surfactant (Tr. at 232). Plaintiffs' expert testified that the polymer (PHPA) molecules are effectively "held in place by the soap, so the soap ... [is] actually acting as a container for the PHPA. Otherwise, we would have powder [rather than a stick]." (Tr. at 155.) Based on this evidence, the jury could have reasonably found that the polymer was contained by the surfactant, even if it was not within the confines of a literal container.

Second, the surfactant could be part of the treatment composition and a binding agent without effectively eliminating any limitation of the Wald patent container. "Every limitation of the claim must have an equivalent within the accused device, although it need not necessarily have a corresponding component. A single structure in the accused device may perform the functions of two or more claim limitations. Thus, there need not be a one-to-one correspondence of components." *Judin v. United States,* 27 Fed. Cl. 759, 786 (1993) (citations omitted). Instead, "courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1359 (Fed.Cir.2005), *cert. denied,* 126 S.Ct. 1167 (2006).

Based on the testimony that the surfactant keeps otherwise loose, powdered polymer together, allowing easy transport, the jury could have reasonably found that the surfactant performed, in an insubstantially different way, the enclosing function of a literal container. That the surfactant also serves some additional treatment purpose does not vitiate a claim limitation. Therefore, even if Defendants' argument that the infringement verdict effectively and entirely eliminates a claim limitation was not waived, it is without merit. Their motion for JMOL on that ground is denied.

### 3. Obvious Combination of Prior Art

Based on evidence that polymer had been added to drilling mud, through other methods, and that soap or drill bit sticks were in use at the time the Wald patent issued, Defendants contend that Mr. Wald could not have secured a patent that would have covered the

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
(Cite as: Slip Copy)

Poly Drill Sticks. A patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art...." 35 U.S.C. § 103(a). Thus, Defendants cite the legal limitation on the doctrine of equivalents that there cannot be infringement " 'if the asserted scope of equivalency of what is literally claimed would encompass the prior art.' " (Defs.' Br. at 11 (quoting Wilson Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677, 683 (Fed.Cir.1990)).) [FN1]

> FN1. Wilson Sporting Goods has been overruled in part on other grounds in Cardinal Chem. Co. v. Morton Int'l, 508 U.S. 83 (1993).

*7 However, again, Defendants did not identify this legal limitation in their pre-verdict motion for JMOL. Defendants noted in their seven-page brief in support of a motion for partial summary judgment that "a patent owner cannot use the doctrine to cover subject matter that could not have been patented because of [ ] prior art," but they did not develop that argument. (Dkt. No. 45 at 4.) Nor did they identify this contention as an issue in the pretrial report or object to the instructions given to the jury. Passing references to relevant facts at trial (i.e., the use of soap sticks and polymer in wells) and an instruction that the jury could consider prior art, among other things, in determining whether a person of ordinary skill in the art would find the Poly Drill Stick to possess a container equivalent did not meaningfully identify or articulate the argument Defendants now advance. Defendants simply did not assert this legal limitation, in a coherent and cogent fashion, at any time before the case went to the jury. Thus, the Court agrees that the argument is not appropriately raised, for the first time, in a post-verdict motion for JMOL.

In any event, Defendants' argument fails. The purpose of the limitation that prior art restricts the scope of equivalency is to prevent a party from obtaining coverage that could not lawfully have been obtained by the literal claims. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1576-77 (Fed.Cir.1994) (overturning grant of summary judgment that was based on conclusion that disclosure of equivalent element in prior art precluded plaintiff from asserting a range of equivalents that would encompass that prior art).[FN2] However, "the mere existence of an element in the prior art [does not] automatically preclude[ ]

[Plaintiffs] from asserting a scope of equivalency sufficient to encompass the corresponding element in the accused devise." Id. at 1577. Thus, the fact that soapsticks (the container equivalent) have been used for years does not, as a matter of law, preclude Plaintiff's infringement argument under the doctrine of equivalents.

> FN2. Wilson Sporting Goods established an analytical framework, hypothetical claim analysis, to determine the extent to which prior art restricts the application of the doctrine of equivalents.
> Under a hypothetical claim analysis, a patentee proposes a hypothetical claim that is sufficiently broad in scope to literally encompass the accused product or process. If that claim would have been allowed by the [Patent and Trademark Office] over the prior art, then the prior art does not bar the application of the doctrine of equivalents. Conversely, if that claim would not have been allowed, the prior art bars application of the doctrine and infringement by equivalence may not be found.
> Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co., 204 F.3d 1360, 1364-65 (Fed.Cir.2000) (citations omitted).

To the extent that Defendants argue that the Poly Drill Stick would have been unpatentable at the time the Wald patent issued because it was obvious [FN3], the need to have identified that argument earlier is evident because the legal conclusion of obviousness rests on underlying factual considerations, see Graham v. John Deere Co., 383 U.S. 1, 17 (1966), which were not before the jury.[FN4] Moreover, at a minimum, there was sufficient evidence in the record that there was no motivation in the prior art to make a polymer-soapstick (in this case, objective evidence of nonobviousness).

> FN3. "Accordingly, it would have been obvious to anyone skilled in the art to add polymer as an ingredient to a soap stick since were [sic] both were well treatment compositions that performed related functions." (Defs.' Br. at 13-14.)

> FN4. These underlying findings of fact are: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

art; and (4) objective evidence of nonobviousness." *Riverwood Int'l Corp. v. Mead Corp.,* 212 F.3d 1365, 1366 (Fed.Cir.2000).

Even if all the limitations could be found in prior art references, an invention is not obvious absent "a demonstration of the existence of a motivation to combine those references at the time of the invention. This requirement prevents a court from labeling as obvious in hindsight a solution that was not obvious to one of ordinary skill at the time of the invention." *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,* 357 F.3d 1319, 1337 (Fed.Cir .2004) (citation omitted). "The presence or absence of a motivation to combine references in an obviousness determination ... [is a] question[ ] of fact." *In re Thomas,* 151 Fed. Appx. 930, 933 (Fed.Cir.2005).

**\*8** Plaintiffs introduced evidence that the very idea of containing polymer to allow a below-surface introduction was met with skepticism. (Tr. at 177). Thus, for this reason alone, the Court cannot now, based on the evidence identified by Defendants, find that there was substantial evidence of motivation that the jury would not have been entitled to disregard. Therefore, Defendants' motion for JMOL on the basis of obviousness/prior art is denied.

### 4. Willfulness

Finally, Defendants argue that there was not clear and convincing evidence that Defendants' infringement was willful because the Poly Drill Stick did not literally infringe the Wald patent, Defendants had a good faith belief that the Wald patent was invalid or not infringed, and conduct occurring before the patent issued is not relevant. Defendants cannot prevail.

Defendants cannot now challenge the sufficiency of the evidence supporting the willfulness finding. They neglected to include that challenge in their pre-verdict motion for JMOL. Their assertion that by arguing that no reasonable jury would find that the equivalent container is present they necessarily challenged the sufficiency of the evidence with respect to willfulness is without merit. The Federal Circuit has rejected the contention that a pre-verdict motion for JMOL on infringement encompasses a challenge to the sufficiency of the evidence with respect to willfulness. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1579 (Fed.Cir.1986) (addressing content of a motion for directed verdict). "Infringement and willful infringement are not the

same thing, and Rules 50(a) and 50(b) mandate specificity." *Id.* Thus, the Defendants' challenge was waived.

However, even so, the Court does not agree with Defendants' assessment of the evidence. The jury heard testimony that suggested Defendant Brooks was aware of Plaintiff Wald's idea before he developed the Hole Sweep and Poly Drill Stick products, a fact he denied at trial. The jury also heard testimony that Defendants continued to sell the Poly Drill Sticks after learning of the Wald patent. Although Defendant Brooks might harbor the personal belief that the Wald patent is invalid, an idea he shared with the jury (Tr. at 258), the jury was not required to believe that his belief was reasonable or that the continued marketing and sales of the Poly Drill Sticks were taken in good faith. Defendants also elected not to present evidence of a reliance on the advice of counsel at trial. Therefore, regardless of whether the letter Defendants attach to their motion (indicating that the counsel believed the Wald patent was not valid) would have been admissible or whether Plaintiffs' withdrawn motion in limine to exclude such evidence would have been sustained, that evidence was not before the jury. 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (2d ed.2006) (explaining that the moving party may not introduce new evidence post-trial as support for a renewed motion). Considering the evidence that was available to the jury, the Court cannot find that the jury was not entitled to find clear and convincing evidence of willfulness. Thus, Defendants' motion is denied with respect to the willfulness finding.

### CONCLUSION

**\*9** Accordingly, Defendants' Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(b) (Dkt. No. 79) is DENIED.

IT IS SO ORDERED this 27th day of July, 2006.

W.D.Okla.,2006.
Wald v. Mudhopper Oilfield Services, Inc.
Slip Copy, 2006 WL 2128835 (W.D.Okla.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1506580 () Declaration (May 3, 2006) Original Image of this Document (PDF)
• 2006 WL 814376 (Trial Motion, Memorandum and Affidavit) Brief in Support of Defendants' Motion for Partial Summary Judgment (Feb. 15, 2006) Original

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2006 WL 2128835 (W.D.Okla.)
**(Cite as: Slip Copy)**

Image of this Document (PDF)
• 2006 WL 497655 (Trial Pleading) Answer to Second
Amended Complaint (Jan. 13, 2006) Original Image
of this Document (PDF)
• 2005 WL 176533 (Trial Pleading) Answer (Jan. 5,
2005) Original Image of this Document (PDF)
• 5:04cv01693 (Docket) (Dec. 14, 2004)
• 2004 WL 3139204 (Trial Pleading) Complaint (2004)
Original Image of this Document (PDF)
• 2004 WL 3139216 (Trial Pleading) Amended
Complaint (2004) Original Image of this Document
(PDF)
• 2004 WL 3778215 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Brief in Opposition to Motion for
Partial Summary Judgment (2004) Original Image of
this Document (PDF)
• 2004 WL 3778216 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Trial Brief (2004) Original Image
of this Document (PDF)
• 2004 WL 3804383 () Declaration (2004) Original
Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.