# EXHIBIT G

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

The Court of Appeals reviews the district court's denial of a motion for judgment as a matter of law (JMOL) without deference, applying the same standard employed by the district court. Fed.Rules Civ.Proc.Rule 50(a)(1), 28 U.S.C.A.

**[6] Federal Courts 170B 🔗0**

170B Federal Courts
Whether lost profits are legally compensable in a particular situation is a question of law that the Court of Appeals reviews de novo.

**[7] Federal Courts 170B 🔗0**

170B Federal Courts
Interpretation of contract terms is a matter not unique to the exclusive jurisdiction of the Federal Circuit and is therefore reviewed under regional circuit law.

**[8] Contracts 95 🔗0**

95 Contracts
Whether ambiguity exists in contract terms is considered a question of law.

**[9] Patents 291 🔗0**

291 Patents
"Hollow spherically-shaped portion," in patent claim reciting pedicle screw used in spinal surgeries, included the edge of that portion and the screw head was "pressed against" the "hollow spherically-shaped portion" if it pressed against all or any part of that portion, including the edge; claim language did not indicate that "hollow spherically-shaped portion" had to be limited so as not to include the edge of that portion, nor did it indicate how much of the hollow spherically-shaped portion had to be "pressed against" the screw head, and specification did not indicate that "hollow spherically-shaped portion" had to be limited to exclude the edge of that portion or that "pressed against" required a certain amount of contact between the spherically-shaped portion and the screw head.

**[10] Patents 291 🔗0**

291 Patents
In determining the meaning of the disputed claim limitation, the Court of Appeals looks principally to the intrinsic evidence of record, examining the patent claim language itself, the written description, and the prosecution history, if in evidence.

**[11] Patents 291 🔗0**

291 Patents
Neither comparisons, showing that a curved surface could appear angular at varying degrees of magnification or abstraction, nor declarations of expert witness, acknowledging that engineering drawing of alleged device showed either a "conically-shaped" hollow portion or a ledge, constituted evidence of a portion of alleged device literally met the "spherically-shaped" limitation of patent claim for head of pedicle screw used in spinal surgeries.

**[12] Patents 291 🔗0**

291 Patents
Under the doctrine of equivalents, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention.

**[13] Patents 291 🔗0**

291 Patents
The doctrine of equivalents recognizes that the language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty.

**[14] Patents 291 🔗0**

291 Patents
One limit on the doctrine of equivalents is the "all elements" rule, which attempts to balance the doctrine of equivalents with the basic patent law principle that claim language defines the scope of an invention and every limitation is material.

**[15] Patents 291 🔗0**

291 Patents
Under the "all elements" rule, each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.

**[16] Patents 291 🔗0**

291 Patents
As a practical matter, the "all elements" rule informs a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doctrine of equivalents analysis by requiring that equivalence be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, and that no limitation be read completely out of the claim.

**[17] Patents 291 ⚓0**

291 Patents
Any analysis of infringement under the doctrine of equivalents necessarily deals with subject matter that is beyond, ignored by, and not included in the literal scope of a patent claim.

**[18] Patents 291 ⚓0**

291 Patents
Applying the doctrine of equivalents to cylindrical-conical shape of accused device would not vitiate or read out the "spherically-shaped" limitation of patent claim for head of pedicle screw used in spinal surgeries; licensee did not propose that any shape would meet the "spherically-shaped" limitation, but rather its expert presented particularized declarations demonstrating its theory that a specific element of the accused device, namely the hollow conically-shaped portion of the receiver member, was insubstantially different from the corresponding "spherically-shaped" limitation because it supported the screw head, allowed for flexible movement, and, when the compression member was engaged, created a rigid lock between the screw head and the receiver.

**[19] Federal Civil Procedure 170A ⚓0**

170A Federal Civil Procedure
Genuine issue of material fact as to whether the difference between the "spherically-shaped" limitation of patent claim for head of pedicle screw used in spinal surgeries and the alleged equivalent in the accused device was substantial precluded summary judgment of non-infringement under the doctrine of equivalents for accused device.

**[20] Patents 291 ⚓0**

291 Patents
"Opening" limitation in patent involving pedicle screws and receiver members used in spinal surgeries meant that there had to be an opening in the receiver member that was opposite the bore and was capable of inserting the screw.

**[21] Patents 291 ⚓0**

291 Patents
Given that alleged device could not be inserted through aperture at the top of the bottom-loaded screw models, it could not meet the functional restriction of the "opening" limitation in patent involving pedicle screws and receiver members used in spinal surgeries, which required an opening in the receiver member that was opposite the bore and was capable of inserting the screw.

**[22] Patents 291 ⚓0**

291 Patents
Whether accused device possessed an equivalent to the "spherically-shaped" limitation in patent involving pedicle screws and receiver members used in spinal surgeries and literally pressed against that equivalent were questions for jury in patent infringement action.

**[23] Patents 291 ⚓0**

291 Patents
Means-plus-function claiming applies in patent infringement action only to purely functional limitations that do not provide the structure that performs the recited function.

**[24] Patents 291 ⚓0**

291 Patents
A claim term that does not use "means" will trigger the rebuttable presumption that statute under which a claim using the means-plus-function format will cover only the corresponding step or structure disclosed in the written description, as well as that step or structure's equivalents, does not apply; this presumption can be rebutted by showing that the claim element recites a function without reciting sufficient structure for performing that function. 35 U.S.C.A. § 112.

**[25] Patents 291 ⚓0**

291 Patents
"Compression member" limitation in patent involving pedicle screws and receiver members used in spinal surgeries did not use the term "means," and presumption against means-plus-function treatment was not overcome; overall impression of claims and specification of patent, as shown by intrinsic record and confirmed by extrinsic evidence, was that "compression member" implied structure to one of ordinary skill in the art. 35 U.S.C.A. § 112.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

**[26] Patents 291 ⟡0**

291 Patents
Unambiguous terms of technology agreement established that licensee was the exclusive licensee to patent involving pedicle screws and receiver members used in spinal surgeries, such that licensee was entitled to lost profit damages as a result of infringement of patent.

**[27] Licenses 238 ⟡0**

238 Licenses
Determining whether a licensee is an exclusive licensee or a bare licensee is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant.

**[28] Licenses 238 ⟡0**

238 Licenses
In determining whether a licensee is an exclusive licensee or a bare licensee, the use of the word "exclusive" is not controlling; what matters is the substance of the arrangement.

**[29] Patents 291 ⟡0**

291 Patents
Because patent rights are rights to "exclude others," a licensee is an exclusive licensee only if the patentee has promised, expressly or impliedly, that others shall be excluded from practicing the invention within the field covered by the license; put another way, an exclusive license is a license to practice the invention accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave.

**[30] Contracts 95 ⟡0**

95 Contracts
Under Indiana law, the terms of a contract are ambiguous only when reasonably intelligent persons would honestly differ as to the meaning of those terms.

**Patents 291 ⟡328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents

291k328 Patents Enumerated
    291k328(2) k. Original Utility. Most Cited Cases
5,207,678. Cited.

Appealed from United States District Court for the District of Massachusetts, Senior Judge Edward F. Harrington.

Kenneth R. Adamo, Jones Day, of Dallas, TX, argued for plaintiffs-appellants. With him on the brief were Calvin P. Griffith, Robert C. Kahrl, and Patrick J. Norton, of Cleveland, OH; Gregory A. Castanias, of Washington, DC; and Brian J. Murray, of Chicago, IL. Dirk D. Thomas, Robins, Kaplan, Miller & Ciresi L.L.P., of Washington, DC, argued for defendants-cross appellants. With him on the brief were Robert A. Auchter and André J. Bahou; and David E. Marder, of Boston, MA.

Before NEWMAN, LINN, and PROST, Circuit Judges.
LINN, Circuit Judge.
*1 DePuy Spine, Inc. (formerly DePuy AcroMed, Inc.) and Biedermann Motech GmbH (collectively "DePuy") appeal from grants of summary judgment that the Vertex® and bottom-loaded types of devices marketed by Medtronic Sofamor Danek, Inc. and Medtronic Sofamor Danek USA, Inc. (collectively "Medtronic") do not infringe U.S. Patent No. 5,207,678 ('678 patent). *DePuy Acromed, Inc. v. Medtronic Sofamor Danek*, Inc., No. 01-10165-EFH (D.Mass. Apr. 14, 2003) (*"All Models Order"*); *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.*, No. 01-10165-EFH (D.Mass. Feb. 24, 2004) (*"Vertex Order"*). Medtronic cross-appeals from the denial of its motion for judgment as a matter of law (JMOL) and the final judgment entered after a jury verdict finding that Medtronic's MAS polyaxial pedicle screws infringe the 678 patent by equivalents and awarding lost profit damages. *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.*, No. 01-10165-EFH (D.Mass. Feb. 10, 2005). We conclude that the district court erred in granting summary judgment of non-infringement on the Vertex® model. We also conclude that district court's judgment of non-infringement for the bottom-loaded screw devices was proper and that it correctly determined that Medtronic was not entitled to judgment as a matter of law on the issues of non-infringement or lost profit damages for the MAS polyaxial pedicle screws and correctly entered judgment of infringement as to the MAS device. Thus, we affirm-in-part, reverse-in-part, and remand.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## BACKGROUND

DePuy Spine and Biedermann Motech are the exclusive licensee and assignee, respectively, of the 678 patent. The 678 patent involves pedicle screws and receiver members used in spinal surgeries. Pedicle screws are implanted into the vertebrae during surgery. The head of each pedicle screw is connected to a receiver portion, and a threaded rod connects the receiver portions of several screws. Together, the screws, receiver portions, and rods are used to stabilize spinal column segments.

In the prior art, it was difficult for surgeons to rigidly install the screws into adjacent vertebrae in the exact positions needed to properly align the receiver portions to receive the threaded rod. To overcome this problem, improved structures were developed that used a spherical screw head and a halved receiver portion with a spherical cavity. This allowed pivoted movement of the receiver portion much like a ball-and-socket joint, but required precise machining of matching spherical portions of different sizes and therefore resulted in high stocking costs.

The 678 patent attempts to reduce stocking costs for pedicle screws by using a uniform receiver portion that can be placed on different sizes of spherical heads. Claim 1 is representative of all claims on appeal:

1. Device for stabilizing spinal column segments, comprising a pedicle screw (1) having a threaded shaft portion (3) and a *spherically-shaped head (4)* at the end of said threaded shaft portion, a receiver member (5) flexibly connected to said head (4), said receiver member being provided with two holes for receiving a rod 916) [sic:(16) ], a receiver chamber (7) being provided within said receiver member (5), the receiver chamber (7) having at one end thereof *a bore (8) for passing the threaded shaft portion (3) therethrough* and *an inner hollow spherically-shaped portion (9)* for receiving the head (4) of said screw (1), *an opening (10) being provided opposite said bore (8) for inserting said screw (1)*, said device further comprising *a compression member (18)* for exerting a force onto said head (4) such that said head is *pressed against the hollow spherically-shaped portion (9)*.

*2 678 patent, col. 4, ll. 9-24 (emphasis added). The highlighted limitations are at issue on appeal and are termed, respectively, as the "bore," "spherically-shaped," "opening," "compression member," and "pressed against" limitations. The invention is illustrated in figures 1 through 3 of the 678 patent, which are reproduced below:



On January 26, 2001, DePuy filed suit against Medtronic asserting infringement of the 678 patent based on Medtronic's MAS, Vertex® , M8, M10, and Sextant models of polyaxial pedicle screws. The MAS and Vertex® models are assembled by placing the screw through a top opening in the receiver member and then securing the top with a crown. In the Vertex® model, the interior portion of the receiver member adjacent to the screw head is of an approximately conical shape; the same area in the MAS model is shaped like a portion of a toroid. The receiver portions for the MAS and Vertex® models are depicted below, with arrows indicating the relevant conical and toroidal portions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 6



**MAS Model**



**Vertex® Model**

The M8, M10, and Sextant models ("the bottom-loaded screw models") are assembled by first inserting the crown and screw head into the bottom of the receiver member and then inserting a "snap ring." The snap ring in the bottom-loaded screw models retains the screw head in a manner similar to how the conical or toroidal areas in the MAS and Vertex® models retain the screw head. In the bottom-loaded screw models, the screw head is too large to pass through the opening at the top of the receiver member.

Medtronic filed three motions seeking summary judgment of non-infringement in January 2003. The first motion asserted that all models lacked the "compression member" limitation, and the second motion asserted that the Vertex® and MAS models lacked the "spherically-shaped" limitation. Both motions were denied. *All Models Order,* slip op. at 1. The third motion asserted that the bottom-loaded screw models did not possess either the "bore" or "opening" limitations. The district court granted the third motion, concluding that the bottom-loaded screw models lacked the "bore" limitation literally and that the doctrine of equivalents could not be applied without vitiating that limitation. *Id.,* slip op. at 2-3.

The court then conducted a hearing on claim construction and construed two terms at issue in this appeal. The court's construction of those terms is contained in a Memorandum Opinion and Order dated October 27, 2003. *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.,* No. 01-10165-EFH (D.Mass. Oct. 27, 2003) ("Claim *Construction Order").* The court construed the "spherically-shaped" limitation to mean "approximately spherical, such as a globe or basketball." *Id.,* slip op. at 17. The court also construed the "compression member" limitation and held that it was not a means-plus-function claim limitation; instead, it construed that limitation "to

require an intermediate piece (or member) that applies compression force to the head of the screw." *Id.*

**\*3** Based on the court's construction of the "spherically-shaped" limitation, Medtronic filed a motion for summary judgment of non-infringement for the Vertex® model. *Vertex Order,* slip op. at 1. The court concluded that the Vertex® model did not literally infringe the 678 patent because the inner hollow space of the receiver member had a conical shape that was not approximately spherical. *Id.,* slip op. at 2. The court also concluded that the Vertex® model did not infringe under the doctrine of equivalents. *Id.,* slip op. at 3. Citing *Tronzo v. Biomet, Inc., 156 F.3d 1154 (Fed.Cir.1998),* the court held that under the "all elements" rule, it could not find a conical shape to be equivalent to a spherical shape without reading the limitation out of the claim. *Id.,* slip op. at 4. The court also found that the Vertex® model did not do "substantially the same thing" as the device in the 678 patent because the screw head contacts an edge of the receiver member rather than a larger area. *Id.,* slip op. at 5.

The case proceeded to a jury trial on the MAS model. The jury verdict found that the MAS model infringed the 678 patent under the doctrine of equivalents and awarded lost profits and reasonable royalty damages. Medtronic moved for judgment as a matter of law that the MAS model did not infringe under the doctrine of equivalents and that DePuy was not entitled to lost profit damages; both motions were denied.

On appeal, DePuy challenges the court's finding that no issue of material fact exists as to whether the bottom-loaded screw and Vertex® models infringe the 678 patent and the court's application of the "all elements" rule. On cross-appeal, Medtronic challenges the court's construction of the "compression member" limitation and the court's denial of its motions for JMOL. We have jurisdiction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 7

under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. Standard of Review

[1] This court reviews a district court's grant of summary judgment of non-infringement *de novo. Hilgraeve Corp. v. McAfee Assocs., Inc.,* 224 F.3d 1349, 1352 (Fed.Cir.2000). Summary judgment is proper only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[2][3][4] Claim construction is an issue of law, *see Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo. See Phillips v. AWH Corp.,* 415 F.3d 1303, 1328 (Fed.Cir.2005) (*en banc* ); *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (*en banc* ). Infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Ferguson Beauregard v. Mega Sys., Inc.,* 350 F.3d 1327, 1338 (Fed.Cir.2003). The determination of infringement under the doctrine of equivalents is limited by two primary legal doctrines, prosecution history estoppel and the "all elements" rule, the applications of which are questions of law. *Seachange Int'l, Inc. v. C-COR, Inc.,* 413 F.3d 1361, 1378 (Fed.Cir.2005).

*4 [5] "We review the district court's denial of a motion for JMOL without deference, applying the same standard employed by the district court." *Honeywell, Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 1139 (Fed.Cir.2004) (*en banc* ). Federal Rule of Civil Procedure 50(a)(1) provides that a court may grant a motion for JMOL only where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-movant]." Fed.R.Civ.P. 50(a)(1).

[6] "Whether lost profits are legally compensable in a particular situation is a question of law that we review *de novo.*" *Poly-America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303, 1311 (Fed.Cir.2004).

[7][8] Interpretation of contract terms is a matter not unique to our exclusive jurisdiction and is therefore reviewed under regional circuit law. *See Sun Studs Inc. v. Applied Theory Assocs., Inc.,* 772 F.2d 1557,

1561 (Fed.Cir.1985). The First Circuit treats interpretation of contract terms as a legal question reviewed *de novo,* unless there is such ambiguity in the language as to create a question of fact. *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.,* 417 F.3d 193, 196-97 (1st Cir.2005). Whether ambiguity exists is considered a question of law. *Id.*

II. Vertex® Model

DePuy argues that the district court improperly granted summary judgment of non-infringement on the Vertex® model because a genuine issue of material fact exists on both literal infringement and infringement under the doctrine of equivalents. With respect to the doctrine of equivalents, DePuy argues that the court erred in applying both the "all elements" rule and the function-way-result test.

Medtronic counters that the receiver member of the Vertex® device has a conically-shaped hollow portion, rather than a spherically-shaped portion, and therefore does not literally infringe. Medtronic also counters that the court properly applied the relevant law in examining infringement by equivalents. Alternatively, Medtronic counters that even if a "spherically-shaped" equivalent is present in the Vertex® model, the Vertex® model does not meet the "pressed against" limitation because the screw head rests against an edge of the equivalent and not against the actual spherically-shaped portion equivalent. We will begin our analysis with Medtronic's alternative argument.

A. "Spherically-Shaped" and "Pressed Against"

[9] Claim 1 recites that the screw "head is pressed against the hollow spherically-shaped portion." The court construed "spherically-shaped" to mean "approximately spherical, such as a globe or a basketball." The parties do not dispute this construction on appeal. The parties dispute, however, whether the "pressed against" limitation requires that the screw head engage the entire spherically-shaped portion or whether it is enough that the head engage just the "edge" of the spherically-shaped portion.

[10] In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence. *See Phillips,* 415 F.3d at 1312-17. First, the claim language does not indicate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that "hollow spherically-shaped portion" must be limited so as not to include the edge of that portion, nor does it indicate how much of the hollow spherically-shaped portion must be "pressed against" the screw head. Claim 4, which depends from claim 1, requires that "the radii of the hollow spherically-shaped portions (9, 19) and of the spherically-shaped screw head (4)[be] substantially equal." 678 patent, col. 4, ll. 37-40. That implies that independent claim 1 must be broad enough to read on a device with components of unequal radii that nonetheless are pressed against each other. If the screw head has a smaller radius than the hollow spherically-shaped portion, the only part of the spherically-shaped portion against which the screw head would be pressed would be the edge of the hollow spherically-shaped portion.

*5 Second, the specification does not indicate that the "hollow spherically-shaped portion" must be limited to exclude the edge of that portion or that "pressed against" requires a certain amount of contact between the spherically-shaped portion and the screw head. In the absence of a stated reason to exclude the edge, it would ordinarily and customarily be understood that the referenced portion includes any and all parts of the structure. Similarly, in the absence of a stated reason to require a certain amount of contact, it would ordinarily and customarily be understood that the referenced portion is pressed against a screw head when any amount of that portion presses against the screw head. Figures 1 and 2 of the 678 patent depict hollow spherically-shaped portion 9 in crosshatching that appears to include the edge of the portion. The corresponding description of that portion does not exclude the edge, noting that "[a] portion 9 in the form of a hollow spherical segment is provided in the interior immediately adjacent to the bore ." 678 patent, col. 2, ll. 21-23. That description indicates that the

relevant portion extends all the way to the bore, which necessarily implies that it includes the edge. Further, the description does not indicate how much of the spherically-shaped portion presses against the screw head; rather, it notes only that there is "contact" between the components. Id., col. 2, ll. 33-34. The prosecution history provides no further guidance.

For the foregoing reasons, we find Medtronic's argument unpersuasive, and we conclude that "hollow spherically-shaped portion" includes the edge of that portion and that the screw head is "pressed against" the "hollow spherically-shaped portion" if it presses against all or any part of that portion-including the edge.

### B. Conical Walls

[11] The district court found that there was not a genuine issue of material fact as to literal infringement because the shape of the inner hollow space in the Vertex® model is conical, with "angular rather than spherical" walls. *Vertex Order,* slip op. at 2-3. The court also found that even if a portion of the shape is spherical, that spherically-shaped portion does not contact the head of the screw. *Id.,* slip op. at 3.

On appeal, DePuy points to two comparisons as evincing a question of fact regarding a spherically-shaped portion in the Vertex® model. First, DePuy points to pictures of a basketball and a selected portion of the basketball, which DePuy submitted as exhibits before the district court. DePuy argues that the picture of the selected portion demonstrates that a thin slice of a sphere creates a profile that appears conical. Depictions of those exhibits are shown below:



Second, DePuy points to a comparison of a cross section of the Vertex® model and Figure 3 of the 678

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 9

patent. That comparison is shown in the following figures, with arrows added to indicate the relevant conical and spherical walls:



**Vertex® Model**



**Figure 3 of the '678 Patent**

*6 DePuy argues that, like the selected portion of the basketball, the Vertex® model could be viewed as possessing a spherically-shaped portion that appears conical in profile.

Although these comparisons do highlight that at varying degrees of magnification or abstraction a curved surface can appear angular, they do not create a genuine issue of material fact as to whether the Vertex® model possesses the "spherically-shaped" limitation. DePuy points to no evidence that specifically identifies a region in the Vertex® model as "spherical." Indeed, DePuy's expert acknowledged that the engineering drawing of the Vertex® model shows a "conically-shaped" hollow portion, and that a photomicrograph of the Vertex® receiver shows a ledge-not a sphere-even if it contains some rounding at the edges. At best, these declarations identify a conical or ledge structure; they do not constitute evidence of a portion that meets the literal terms "approximately spherical, such as a globe or a basketball." Therefore, the district court did not err in concluding that there was no genuine issue of material fact as to literal infringement.

C. Doctrine of Equivalents

The district court determined that it "cannot find that the cylindrical-conical shape of [the Vertex® model's] receiver member is equivalent to the spherically-shaped portion disclosed in the 678 patent." *Vertex Order,* slip op. at 4. The court first applied the "all elements" rule and concluded that, as

in *Tronzo,* treating a conical shape as the equivalent of a spherical shape would vitiate the "spherically-shaped" limitation. *Id.* The court also applied the function-way-result test and determined that, because the screw head in the Vertex® model "is merely pressed against an edge or lip on the receiver member," the Vertex® model does not do "substantially the same thing" as the device in the 678 patent. *Id.,* slip op. at 5.

[12][13] Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). The doctrine recognizes that

[t]he language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 731, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002); *Graver Tank,* 339 U.S. at 605 ("[T]o permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))    Page 10
**(Cite as: --- F.3d ----)**

*7 [14][15][16] One limit on the doctrine of equivalents is the "all elements" rule. The "all elements" rule attempts to balance the doctrine of equivalents with the basic patent law principle that claim language defines the scope of an invention and every limitation is material.

Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*Warner-Jenkinson,* 520 U.S. at 29. Thus, as a practical matter, the "all elements" rule informs a doctrine of equivalents analysis by requiring that equivalence be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, and that no limitation be read completely out of the claim. *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1358 (Fed.Cir.2005).

In *Warner-Jenkinson,* the Supreme Court provided guidance for determining when resort to the doctrine of equivalents is precluded as a matter of law. First, the Court noted that "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner-Jenkinson,* 520 U .S. at 39 n. 8 (citing Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Second, the Court noted that "under the particular facts of a case, ... if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court." *Id .* at 39 n. 8.

Informed by this guidance, we have held that in certain instances, the "all elements" rule forecloses resort to the doctrine of equivalents because, on the facts or theories presented in a case, a limitation would be read completely out of the claim-*i.e.,* the limitation would be effectively removed or "vitiated." For instance, we have concluded that in some cases, the evidence was such that no reasonable jury could determine a proffered equivalent to be insubstantially different from the claimed limitation. *See, e.g., Freedman Seating,* 420 F.3d at 1361 (holding that a limitation was vitiated in part because the structural difference in the accused device "is not a 'subtle difference in degree,' but rather 'a clear, substantial difference or difference in kind' " (internal citation

omitted)); *Ethicon,* 149 F.3d 1309, 1319 (Fed.Cir.1998) (holding that the "all elements" rule barred application of the doctrine of equivalents because, on the facts presented, no reasonable jury could find the differences to be insubstantial). We have also concluded that in some cases, the patentee's theory of equivalence was legally insufficient because, rather than demonstrate an insubstantial difference between a limitation and an element in the accused device, the theory effectively eliminated a limitation in its entirety. *See, e.g., Tronzo,* 156 F.3d at 1160 (holding that the patentee's theory of equivalence-that *"any* shape would be equivalent to the conical limitation"-would write such a limitation out of the claims (emphasis in original)); *Forest Labs., Inc. v. Abbot Labs.,* 239 F.3d 1305, 1313 (Fed.Cir.2001) (holding that the patentee's theory of equivalence-that a limitation on the percentages of water in a composition was "irrelevant" when compared to the accused composition-vitiated such a limitation). Thus, the "all elements" rule generally is not met-and therefore a claim limitation can be said to be vitiated-if the theory or evidence of equivalence is legally incapable of establishing that the differences between the limitation in the claim and the accused device are insubstantial; *i.e.,* if the theory or evidence is so legally insufficient as to warrant a holding of non-infringement as a matter of law. *Warner-Jenkinson,* 520 U.S. at 39 n. 8; *Metro. R.R. Co. v. Moore,* 121 U.S. 558, 569, 7 S.Ct. 1334, 30 L.Ed. 1022 (1887) ("Strictly speaking, evidence is said to be insufficient in law only in those cases where there is a total absence of such proof, either as to its quantity or kind, as in the particular case some rule of law requires as essential to the establishment of the fact."); *see also Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425-26, 1429-30 (Fed.Cir.1997).

*8 Our decision in *Sage Products,* decided shortly after *Warner-Jenkinson,* illustrates the genesis of such an analysis. For one invention in that case, we held that resort to the doctrine of equivalents was foreclosed because no reasonable jury could find that the differences in the accused device were insubstantial. *Sage Products,* 126 F.3d at 1423-26. In considering equivalence, we noted the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time the claim was filed. *Id.* at 1425 ("No subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this limitation at the time of its incorporation."). Because under these particular facts, no reasonable jury could find that the differences in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

the accused device were insubstantial, we concluded that a finding of infringement by equivalents would effectively remove the relevant limitations from the claim and affirmed the district court's summary judgment of non-infringement. *Id.* at 1425-26.

For a second invention at issue in *Sage Products,* we held that the doctrine of equivalents was foreclosed because the patentee's theory of infringement was improper. *Id.* at 1429-30. In considering equivalence for a means-plus-function limitation, we noted that the claimed function included the ability to control access by moving between open and closed positions. *Id.* at 1428-29. The accused product used a permanently locking lid that could not move back to an open position. *Id.* at 1427. We noted that the patentee's theory of equivalence-that a permanently locking lid is equivalent to an openable lid-was unsustainable in that it did not offer a "function equivalent to that expressly recited in the claimed element." *Id.* at 1429. Because that theory could not support a conclusion of equivalence regardless of the evidence, we concluded that the theory was legally insufficient, declined to apply the doctrine of equivalents, and affirmed the court's summary judgment of non-infringement. *Id.* at 1429-30.

[17] It is important to note that when we have held that the doctrine of equivalents cannot be applied to an accused device because it "vitiates" a claim limitation, it was not to hold that the doctrine is always foreclosed whenever a claim limitation does not literally read on an element of an accused device; such an interpretation of the "all elements" rule would swallow the doctrine of equivalents entirely. *See Ethicon,* 149 F.3d at 1316-17 (holding that a similar interpretation "would force the All Elements rule to swallow the doctrine of equivalents, reducing the application of the doctrine to nothing more than a repeated analysis of literal infringement" (footnote omitted)). "[A]ny analysis of infringement under the doctrine of equivalents *necessarily* deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim." *Id.* at 1317 (emphasis in original). A holding that the doctrine of equivalents cannot be applied to an accused device because it "vitiates" a claim limitation is nothing more than a conclusion that the evidence is such that no reasonable jury could conclude that an element of an accused device is equivalent to an element called for in the claim, or that the theory of equivalence to support the conclusion of infringement otherwise lacks legal sufficiency.

**\*9** [18] Here, in applying the "all elements" rule, the

district court relied solely on *Tronzo* and concluded that "the cylindrical-conical shape of the [Vertex® model] cannot infringe the 678 patent without *reading out* of the claim the express requirement that the screw head be 'pressed against the hollow, spherically-shaped portion.' " *Vertex Order,* slip op. at 4 (emphasis added). The court also noted that "permitting the cylindrical-conical shape of the [Vertex® model] to be considered equivalent to the spherical shape required by the 678 patent *vitiates* the 678 patent requirement that the spherically-shaped head ... be pressed against an inner, hollow, spherically-shaped portion of the receiver member." *Id.,* slip op. at 4 n. 3 (emphasis added). The district court also determined that this conclusion was supported by the function-way-result test because the conically-shaped portion of the Vertex® model and the "spherically-shaped" limitation of the claim do not "do 'substantially the same thing.' " *Id.,* slip op. at 5.

We find no support in the present case for the district court's conclusion that applying the doctrine of equivalents would vitiate or read out the "spherically-shaped" limitation. Our decision in *Tronzo* is factually distinguishable.[FN1] In *Tronzo,* the invention related to artificial hip sockets and the patent at issue was a continuation-in-part. 156 F.3d at 1156-57. The independent claims that were added in the continuation covered a prosthesis socket with no specific shape. *Id.* at 1157-58. Because the written description only disclosed a conical shape for the prosthesis and characterized other shapes as "prior art" and "inferior" to a conical shape, we held that the independent claims were unsupported by the written description, not entitled to the parent's filing date, and thus invalid in view of intervening prior art. *See id.* at 1158-60. The only valid claims at issue in *Tronzo* were dependent claims that limited the prosthesis body to having "a generally conical outer surface." The patentee attempted to prove infringement of an accused product with a hemispherical outer surface under the doctrine of equivalents because, "[a]ccording to the expert testimony, *any* shape would be equivalent to the conical limitation." *Id.* at 1160 (emphasis in original). The theory of equivalence, therefore, did not identify a specific element of the accused product as an equivalent to the "generally conical" limitation; rather, the patentee argued that *any* shape would be equivalent to a conical shape, despite clear indications in the written description to the contrary. We concluded that such a theory was insufficient as a matter of law and thus "would write the 'generally conical outer surface' limitation out the claims." *Id.* (citing *Warner-Jenkinson,* 520 U.S. at 39 n. 8). Accordingly, we reversed the finding of

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 12

infringement under the doctrine of equivalents. *Id.*

*10 Here, unlike the patentee in *Tronzo,* DePuy did not propose that any shape would meet the "spherically-shaped" limitation. Rather, DePuy's expert presented particularized declarations demonstrating its theory that a specific element of the accused device-the hollow conically-shaped portion of the receiver member-was insubstantially different from the corresponding "spherically-shaped" limitation because it supported the screw head, allowed for flexible movement, and-when the compression member is engaged-creates a rigid lock between the screw head and the receiver. Indeed, the expert expressly identified certain shapes that were different from the accused device but would *not* be capable of supporting the screw head, allowing flexible movement, and creating a rigid lock when the compression member is engaged. Also, unlike the patent at issue in *Tronzo,* the written description in the 678 patent does not label other shapes as "prior art" and "inferior." Thus, unlike the theory presented in *Tronzo,* DePuy's theory of equivalence was not improper.

[19] The district court also erred in concluding that no reasonable jury could find the conically-shaped portion to be an equivalent to the "spherically-shaped" limitation because it does not do "substantially the same thing." The district court's conclusion rested solely on the fact that the screw head in the Vertex® model contacts an edge of the hollow portion as opposed to pressing against a much larger area. *Vertex Order,* slip op. at 5. As discussed above, properly construed, the "hollow spherically-shaped portion" includes the edge of that portion. Because the screw head in the Vertex® model presses against an edge of a hollow conically-shaped portion argued to be an equivalent of the "spherically-shaped" limitation, a question of fact exists as to whether the difference in the equivalent is substantial.

Because DePuy's theory of equivalence is not legally insufficient, and because we find that a question of fact exists as to whether the difference between the "spherically-shaped" limitation and the alleged equivalent is substantial, we hold that the district court erred in granting summary judgment of non-infringement under the doctrine of equivalents for the Vertex® model.

### III. Bottom-Loaded Screw Models

DePuy argues that the district court erred in granting

summary judgment of non-infringement for the bottom-loaded screw models because the court reached its determination without construing the "bore" limitation on which the decision was based. DePuy also argues that, to the extent a de facto construction was used in the court's analysis, the construction incorrectly added a process limitation to a product claim by construing "passing" to mean that a screw shaft must move through the bore. DePuy argues that "passing" means that the screw shaft is positioned to extend through the bore and does not imply movement. Alternatively, DePuy argues that even if "passing" does imply movement, the screw shaft moves through a snap ring element that meets the "bore" limitation literally or as an equivalent.

*11 Medtronic counters that DePuy's argument that "passing" means "extending" was waived because it was first advanced on a motion for reconsideration and not originally argued in opposition to Medtronic's summary judgment motion. Medtronic also counters that the district court correctly construed the "bore" limitation as requiring a bore that is part of the receiver chamber when a threaded screw shaft moves through it, and that such a construction does not import a process limitation into the claims. In passing, Medtronic asserts that the district court recognized that the bottom-loaded screw models also lacked the "opening" limitation and that this limitation provides a further basis for affirming summary judgment of non-infringement.

Although the district court quoted language from claim 1 of the 678 patent that included the "opening" limitation, it is clear that the court based its conclusion on the "bore" limitation and not the "opening" limitation. *See All Models Order,* slip op. at 2 ("In particular, the defendant's [bottom-loaded screw models] lack '... the receiver chamber (7) having at one end thereof a bore for passing the threaded shaft portion (3) therethrough.' "). Indeed, the entirety of the infringement analysis was focused on whether the bottom-loaded screw models possessed the "bore" limitation:

It is important to the Court's conclusion that claim 1 requires the bore, through which the threaded shaft of the screw must pass, to be part of the receiver chamber.... Because Medtronic's [bottom-loaded screw models] do not embody this limitation, they do not literally infringe claim 1. Nor can infringement be found through application of the doctrine of equivalents."

*Id.,* slip op. at 2-3 (citations omitted). Thus, nothing in the district court's summary judgment opinion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

addresses the "opening" limitation. However, "[w]e sit to review judgments, not opinions." *Strataflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed.Cir.1983). The issue was fully argued below and has been raised by Medrad on appeal; we therefore may address the "opening" limitation. *See Glaxo, Inc. v. Torpharm, Inc.*, 153 F.3d 1366, 1371-72 (Fed.Cir.1998) ("When a matter comes before an appellate court following summary judgment, the appellate court is free to adopt a ground advanced by the appellee in seeking summary judgment but not adopted by the trial court.").

[20] The language of claim 1 of the 678 patent claims a receiver member with a bore at one end and an opening "opposite said bore (8) for inserting said screw." The claim language therefore identifies two clear requirements for the opening: (1) it must be physically located opposite from the bore and (2) it must be "for inserting said screw." The specification indicates that the opening 10 and hollow cylindrical portion 11 must be of sufficient size to allow the screw head 4 to be inserted into the hollow spherical-segment-shaped portion 9. 678 patent, col. 2, ll. 21-34. Thus, when read in view of the specification, "for inserting said screw" is a functional limitation that requires that the opening be capable of inserting the screw. We therefore construe the "opening" limitation to mean that there must be an opening in the receiver member that is opposite the bore and is capable of inserting the screw.

*12 Medtronic asserts-and DePuy does not contest-that the aperture at the top of the bottom-loaded screw models is not capable of inserting the screw because the diameter of that aperture is smaller than the diameter of the screw head. Medtronic argues that this aperture does not meet the requirements of the "opening" limitation. DePuy appears to counter that the interior space of the receiver member-and not the top aperture-meets the requirement of the "opening" limitation.

[21] We agree with Medtronic. DePuy's theory of infringement argues that the snap ring in the bottom-loaded screw models satisfies the "bore" limitation. Once assembled, the interior space of the receiver member is located next to such bore, not opposite to it. The only aperture that is opposite to the "bore" that DePuy advances is the aperture at the top of the receiver member. However, because it is uncontested that the screw cannot be inserted through that aperture, it cannot meet the functional restriction of the "opening" limitation. Therefore, we conclude as a matter of law that the bottom-loaded screw models

do not posses the "opening" limitation and affirm the district court's summary judgment on that basis. Because we affirm summary judgment of no infringement on the basis of the "opening" limitation, we need not address DePuy's arguments with respect to the "bore" limitation.

### IV. MAS Model

On cross-appeal, Medtronic argues that the district court erred in denying its motion for JMOL of non-infringement of the MAS model because DePuy failed to offer evidence that the MAS model possessed an equivalent to the "pressed against" limitation that performed substantially the same function, in substantially the same way, to achieve substantially the same result. Specifically, Medtronic acknowledges that DePuy offered function-way-result evidence related to the "hollow spherically-shaped portion" limitation, but argues that no function-way-result evidence was offered demonstrating that pressing against an edge of a hollow portion is the equivalent of pressing against a hollow portion. Medtronic also argues that the court erred in denying its motion because the jury's finding of infringement by equivalence vitiated the "spherically-shaped" limitation. Medtronic argues that here, as in *Tronzo*, DePuy's expert offered a theory that "any shape" would meet the "spherically-shaped" limitation, which reads "spherically-shaped" out of the claim.

DePuy counters that it introduced expert testimony that the MAS device possessed an equivalent to the "spherically-shaped" limitation and that the screw head literally presses against that equivalent. DePuy also counters that its expert did not testify to an "any shape will do" theory of equivalence.

[22] Medtronic's arguments are unpersuasive. First, as discussed in Part II.A, *supra*, the proper construction of "hollow spherically-shaped portion" includes the edge of that portion. There is no dispute that DePuy presented sufficient evidence that the MAS models possessed the "hollow spherically-shaped portion" or its equivalent. DePuy also presented evidence that the MAS model literally meets the "pressed against" limitation when its expert testified that the screw head presses against an edge of a hollow spherically-shaped portion or the edge of an equivalent. That evidence, together with reasonable inferences in favor of the verdict, make clear that Medtronic was not entitled to judgment as a matter of law on this issue.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

**\*13** Second, DePuy's expert did not offer an "any shape will do" theory of equivalence similar to the theory offered in *Tronzo*. In *Tronzo*, the expert did not identify a specific element in the accused device that was an equivalent to the "generally conical" limitation, but rather testified that any shape would be an equivalent to such a limitation. *156 F.3d at 1160.* Here, DePuy's expert testified that the specific hollow shape of the MAS model was equivalent to the "spherically-shaped" limitation according to the function-way-result test. The "any shape" testimony cited by Medtronic was a reference to earlier deposition testimony on cross-examination and ignores the witness's explanation on redirect. On redirect, the expert explained that at the deposition, he believed the question was directed to whether the "spherically-shaped" limitation had to be literally present in an accused device. His answer reflected his belief that an equivalent would meet the same limitation. Such an exchange at trial does not constitute an assertion or admission that "any shape" meets the "spherically-shaped" limitation. Because DePuy did not offer a legally insufficient theory of equivalence, Medtronic is not entitled to judgment as a matter of law on this issue.

### V. All Accused Devices

Finally, Medtronic argues that the district court failed to properly construe the "compression member" limitation as a means-plus-function limitation, and that under a proper construction, all three accused devices do not infringe. Relying on *Mas-Hamilton Group v. Lagard, Inc.,* 156 F.3d 1206, 1213 (Fed.Cir.1998), Medtronic argues on cross-appeal that "compression member" is properly construed as a means-plus-function limitation despite the absence of the term "means" and that when the claims are so construed, none of the accused structures infringe. Specifically, Medtronic argues that claim 1 of the 678 patent identifies "compression member" only in terms of function, not structure, and that no credible extrinsic evidence demonstrates that the term has a well-understood structural meaning in the relevant art.

DePuy counters that the absence of the term "means" creates a presumption that "compression member" is not a means-plus-function limitation, that all testifying engineers recognized that the term "compression member" referred to a well-known class of structures, that claim 1 itself imposes certain constraints on the structure of the compression member, and thus the district court's construction was correct.

[23][24] "Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips,* 415 F.3d at 1311 (citing *Watts v. XL Sys. Inc.,* 232 F.3d 877, 880-81 (Fed.Cir.2000)). "[A] claim term that does not use 'means' will trigger the rebuttable presumption that [35 U.S.C.] § 112 ¶ 6 does not apply." *CCS Fitness v. Brunswick Corp.,* 288 F.3d 1359, 1369 (Fed.Cir.2002). This presumption can be rebutted "by showing that the claim element recite[s] a function without reciting sufficient structure for performing that function." *Watts,* 232 F.3d at 880. "Our cases make clear, however, that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1358 (Fed.Cir.2004).

**\*14** [25] Here, the "compression member" limitation does not use the term "means," and the presumption against means-plus-function treatment is not overcome. The claims and the specification unmistakably establish that "compression member" refers to particular structure. The claim language demonstrates that the compression member must fit inside the cylindrical opening and be of sufficient size to exert a force on the screw head, which implies structure. 678 patent, col. 4, ll. 22-24. The specification likewise makes clear that the term "compression member" refers to a particular cylindrical insert and is not simply a general reference to any structure that will perform a particular function. *See id.,* col. 2, l. 58-col. 3, l. 16, col. 3, l. 44-col. 4, l. 6. The prosecution history, while in evidence, provides no further guidance one way or the other. However, dictionary definitions and experts on *both* sides confirm that "compression member" is an expression that was understood by persons of ordinary skill in the art to describe a kind of structure. *See Lighting World,* 382 F.3d at 1358 ("The task of determining whether the limitation in question should be regarded as a means-plus-function limitation ... is a question on which evidence from experts may be relevant.").

Moreover, *Mas-Hamilton* is not applicable here. In that case, no other claim terms attributed structural significance to the elements at issue, and there was no evidence that the term at issue had an understood structural meaning in the art. *Mas-Hamilton,* 156 F.3d at 1213-15 ("[W]e do not see that the remaining terms in the claim limitation ... provide any structure necessary to remove this limitation from the ambit of section 112, ¶ 6."); *id. at* 1215 ("The district court determined that there was no evidence that a 'movable link member' has a well-understood structural

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 15

meaning in the art."). That is not the case here. Instead, the overall impression of the claims and specification of the 678 patent is that "compression member" implied structure to one of ordinary skill in the art. This is shown by the intrinsic record and confirmed by the extrinsic evidence. Accordingly, we reject Medtronic's argument that the district court erred in not construing "compression member" as a means-plus-function limitation and in not finding non-infringement of all three models on that basis.

VI. JMOL on Lost Profit Damages

Medtronic argues on cross-appeal that the court erred in denying its motion for JMOL on the subject of lost profits because DePuy Spine did not become an exclusive licensee of Biedermann Motech's 678 patent until the 1999 Exclusive License Agreement was entered into on August 31, 1999. Because Biedermann Motech lacked manufacturing and marketing capacity to meet demand, Medtronic argues that neither party can claim lost profit damages prior to that date and that the jury's judgment awarding damages from before that date should be adjusted.

**\*15** DePuy counters that determining an exclusive licensee relationship is a factual matter and that substantial evidence supports the jury's finding that an exclusive licensee relationship was created by a 1993 Technology Agreement that became operative with respect to the 678 patent in January 1998. DePuy argues that the 1999 Exclusive License Agreement merely confirmed the rights created by the 1993 Technology Agreement.

Medtronic replies that determining the date when lost profits are legally compensable is a question of law and that the district court determined when DePuy Spine became an exclusive licensee in an Order dated November 18, 2002. Medtronic replies that a 1993 Exclusive License Agreement specifically addressed patent rights whereas the 1993 Technology Agreement did not, and that therefore the 1993 Technology Agreement could not form the basis for an exclusive license under the 678 patent.

Whether DePuy Spine is entitled to lost profits is a question of law. *Poly-America*, 383 F.3d at 1310-11. DePuy's assertion that determining whether an exclusive license exists is a factual matter is based on *Wang Laboratories v. Mitsubishi Electronics*, 103 F.3d 1571 (Fed.Cir.1997). *Wang Laboratories* dealt with whether an implied license was created as a result of the parties' conduct. *Id.* at 1578. Though the parties

in *Wang Laboratories* agreed to submit that question to the jury, *id.*, we recognized that the ultimate conclusion was a legal one that was based on underlying findings of fact regarding the parties' conduct and the existence of consideration, *id.* at 1579-80. Here, the underlying facts are not in dispute. Accordingly, we review this issue *de novo*.

Medtronic limits its cross-appeal to a challenge of the jury's lost profit award during the period prior to the 1999 Exclusive License Agreement, arguing that (1) DePuy Spine was not an exclusive licensee during the relevant time period, and therefore its lost profits were not recoverable; and (2) Biedermann Motech lacked manufacturing and marketing capacity to meet demand, and therefore it had no basis to recover its own lost profits. Medtronic does not contest that if DePuy Spine was an exclusive licensee during the relevant time period, it is entitled to the lost profits at issue here. *See Weinar v. Rollform Inc.*, 744 F.2d 797, 806-08 (Fed.Cir.1984) (affirming an award of lost profit damages to a licensee with the exclusive right to sell in the entire United States). We begin our analysis by determining whether DePuy Spine was an exclusive licensee of the 678 patent during the relevant time period.

Medtronic's assertion that the district court ruled on this issue with finality in its November 18, 2002 Order is incorrect. In that Order, the court stated that "[t]he standing of Plaintiff DePuy Acromed, Inc., commenced on August 31, 1999, when Biedermann Motech granted DePuy Acromed an exclusive license to the 678 patent." *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.*, No. 01-10165-EFH (D.Mass. Nov. 18, 2002). To the extent this order reflected the court's initial conclusion, that conclusion was apparently reversed. In denying Medtronic's motion in limine to exclude evidence of lost profits damages before August 31, 1999, the district court found that "Biedermann Motech can recover lost profits [before August 31, 1999] because it was 'closely tied' via a joint venture to the manufacturer, DePuy Acromed, Inc." *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.*, No. 01-10165-EFH (D.Mass. Sept. 14, 2004) (citing *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1361 (Fed.Cir.1999)). In denying Medtronic's renewed motion for JMOL on the subject of lost profit damages, the court noted that DePuy "introduced extensive evidence that DePuy had an exclusive license to the patent in suit as of January 23, 1998." *DePuy Acromed, Inc. v. Medtronic Sofamor Danek, Inc.*, No. 01-10165-EFH (D.Mass. Feb. 15, 2005). Thus, the court ultimately concluded that DePuy was an exclusive licensee as of January 1998.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

**\*16** [26][27][28][29] We must therefore examine the 1993 Technology Agreement to determine if it supports the conclusion that DePuy was an exclusive licensee to the 678 patent under its terms.

Determining whether a licensee is an exclusive licensee or a bare licensee is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant. The use of the word "exclusive" is not controlling; what matters is the substance of the arrangement. Because patent rights are rights to "exclude others," a licensee is an exclusive licensee only if the patentee has promised, expressly or impliedly, that "others shall be excluded from practicing the invention" within the field covered by the license. Put another way, an exclusive license is "a license to practice the invention accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave."

*Textile Prods. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed.Cir.1998) (internal citations omitted).

[30] The 1993 Technology Agreement provides that it shall be construed in accordance with Indiana law. Indiana follows the "four corners rule" of contract interpretation in which courts do not look beyond the instrument in question to determine the parties' intent if the terms of the instrument are unambiguous. *Schmidt v. Schmidt*, 812 N.E.2d 1074, 1080 (Ind.Ct.App.2004); see also *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind.2006). "The terms of a contract are ambiguous only when reasonably intelligent persons would honestly differ as to the meaning of those terms." *Schmidt*, 812 N.E.2d at 1080; see also *Baker*, 843 N.E.2d at 532.

The terms of the 1993 Technology Agreement unambiguously provide an exclusive license to DePuy Spine for all of Biedermann Motech's current and *future* knowledge, techniques, processes, data designs, prints, drawings, specifications, procedures and other information relating to the manufacture of any product for use in the treatment of the human spine. In January 1998, Biedermann Motech acquired the 678 patent, which covers a particular design of pedicle screw for use in the treatment of the human spine. It follows that in 1998, when Biedermann Motech acquired the 678 patent, it acquired the design of the products covered by that patent as well. That design is a "future" design under the express terms of the 1993 Technology Agreement and provides a basis for the jury's lost profit award.

The terms of the 1993 and 1999 Exclusive License Agreements do not affect this conclusion. First, the 1993 Exclusive License Agreement is a license between *Ort-Med*, the licensor, and DePuy Spine, the licensee. Ort-Med never was-nor became-the owner of the 678 patent. Thus, the 1993 Exclusive License Agreement is not relevant to any determination of rights as between *Biedermann Motech* and DePuy Spine. Second, the 1999 Exclusive License Agreement was entered into on August 31, 1999; it is thus not relevant to the rights that were created between the parties by the 1993 Technology Agreement entered into on February 4, 1993. Therefore, we conclude that DePuy was entitled to lost profit damages prior to August 31, 1999, and the court did not err in denying Medtronic's motion for JMOL on this issue.

CONCLUSION

**\*17** Because the district court erred in construing the scope of the "hollow spherically-shaped portion" in the 678 patent to exclude the edge thereof, and because the court erred in limiting application of the doctrine of equivalents, we reverse the district court's summary judgment of non-infringement under the doctrine of equivalents on the Vertex® model and remand for further proceedings. We affirm the district court's grant of summary judgment of no literal infringement for the Vertex® model.

Because we conclude that the bottom-loaded screw models lack the "opening" limitation as a matter of law, we affirm the district court's grant of summary judgment of non-infringement for the bottom-loaded screw models.

Because the jury verdict finding that the MAS model infringed the 678 patent under the doctrine of equivalents was supported by substantial evidence and because the theory of equivalence was not legally insufficient, we hold that the district did not err in denying Medtronic's motion for JMOL of non-infringement. Because the district court correctly determined that DePuy became an exclusive licensee of the 678 patent prior to August 31, 1999, the district court did not err in denying Medtronic's motion for JMOL to preclude an award of lost profit damages prior to that date. We therefore affirm the jury verdict and damages award on the MAS model.

*AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))
**(Cite as: --- F.3d ----)**

Page 17

COSTS

Costs to DePuy.

   FN1. As we noted in *Optical Disc Corp. v. Del Mar Avionics*, "*Tronzo* does not stand for the proposition that a claim limitation describing a specific shape of a claimed structure cannot be infringed under the doctrine of equivalents by a differently shaped structure." 208 F.3d 1324, 1337 (Fed.Cir.2000). Instead, *Tronzo* is limited to the facts and theories of equivalence presented in that case.

C.A.Fed. (Mass.),2006.
Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.
--- F.3d ----, 2006 WL 3346155 (C.A.Fed. (Mass.))

Briefs and Other Related Documents (Back to top)

• 2006 WL 951883 (Appellate Brief) Corrected Non-Confidential Reply Brief of Defendants-Cross-Appellants Medtronic Sofamor Danek, Inc. and Medtronic Sofamor Danek USA, Inc. (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 422371 (Appellate Brief) Non-Confidential Reply Brief of Defendants-Cross-Appellants Medtronic Sofamor Danek, Inc. and Medtronic Sofamor Danek USA, Inc. (Jan. 31, 2006) Original Image of this Document (PDF)
• 2005 WL 3609048 (Appellate Brief) Non-Confidential Reply Brief for Plaintiffs-Appellants Depuy Spine, Inc. and Biedermann Motech GmbH (Dec. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3018519 (Appellate Brief) Non-Confidential Brief of Defendants-Cross-Appellants Medtronic Sofamor Danek, Inc. and Medtronic Sofamor Danek USA, Inc. (Oct. 11, 2005) Original Image of this Document (PDF)
• 2005 WL 2156933 (Appellate Brief) Non-Confidential Opening Brief For Plaintiffs-Appellants Depuy Spine, Inc. and Biedermann Motech Gmbh (Jul. 15, 2005) Original Image of this Document (PDF)
• 05-1335 (Docket) (Apr. 8, 2005)
• 05-1311 (Docket) (Mar. 29, 2005)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Dbt f !2;16.dw 11375.SI  D!!!!!Epdvn f ou444!!!!!Gjmf!180!803117!!!!!Qbhf !2!pg3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| FINISAR CORP., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 1:05-CV-264 |
| v. | § | |
| | § | |
| THE DIRECTV GROUP, INC., ET AL., | § | JUDGE RON CLARK |
| | § | |
| *Defendants.* | § | |
| | § | |

## FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury verdict delivered on June 23, 2006 and the Court's oral findings and conclusions entered on the record July 6, 2006, the Court hereby enters judgment for Plaintiff Finisar Corp. and against Defendants The DirecTV Group, Inc., DirecTV Holdings, LLC, DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network Systems, Inc. for infringement of U.S. Patent No. 5,404,505, claims 16, 17, 22, 24, 26, 39, and 44.  **IT IS THEREFORE ORDERED** that Plaintiff Finisar Corp. shall have and recover from Defendants The DirecTV Group, Inc., DirecTV Holdings, LLC, DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network Systems, Inc., jointly and severally, the total sum of $103,920,250.25, plus prejudgment interest at the agreed rate of 6%, calculated as stated on the record at the July 6, 2006 hearing, on the damages found by the jury, said prejudgment interest totaling $13,359,276.00, together with post judgment interest on the entire sum calculated pursuant to 28 U.S.C. § 1961.

For the reasons stated at the July 6, 2006 hearing, the Court denied Plaintiff's motion for injunctive relief and granted a compulsory license.  Defendants are hereby **ORDERED**, for the

remaining life of the ` 505 patent, to pay Plaintiff an ongoing royalty of $1.60 per Integrated

Receiver Decoder, commonly referred to as a set top box, activated by or on behalf of or for any

of the named Defendants or their present or future affiliates or subsidiaries after June 16,2006.

Royalties shall be paid quarterly accompanied by a statement in accordance with the provisions

of paragraph 3.8 of the MPEG-2 Patent Portfolio License, dated February 22, 2001, granted to

Hughes Network Systems, Inc. Payments shall begin three months after the date of signing of

this judgment and shall be made quarterly thereafter. Payments not made within 14 days of the

date due shall accrue interest at the rate of 10% , compounded monthly. Finisar shall have the

right to request audits in accordance with the provisions of paragraph 3.9 of said MPEG-2 Patent

Portfolio License. It is anticipated that, as sophisticated entities with experience in licensing

agreements, the parties may wish to agree to more comprehensive or convenient terms. The

parties shall promptly notify the court of any such agreement. The court maintains jurisdiction

to enforce this portion of the Final Judgment.

Costs are taxed against Defendants The DirecTV Group, Inc., DirecTV Holdings, LLC,

DirecTV Enterprises, LLC, DirecTV Operations, LLC, DirecTV, Inc., and Hughes Network

Systems, Inc. jointly and severally. All relief not specifically granted herein is denied. All

pending motions not previously ruled on are denied. This is a Final Judgment and is appealable.

So **ORDERED** and **SIGNED** this 8 day of Kvm-!3117/

_Ron Clark_

_____

Ron Clark, United States District Judge

2

FINISAR CORPORATION VS DIRECTV GROUP, INC., ET AL
07/06/06

1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     BEAUMONT DIVISION                    F I L E D
                                                        U.S. DISTRICT COURT
 3                                                      EASTERN DISTRICT OF TEXAS

 4   FINISAR CORPORATION        )    CIVIL ACTION NO.      JUL 1 2 2006
                                )    1:05-CV-00264
                                )                        DAVID J. MALAND, CLERK
 5          PLAINTIFF,          )    BEAUMONT, TEXAS    DEPUTY
                                )
 6   VS.                        )    JULY 6, 2006
                                )    9:30 A.M.
 7   DIRECTV GROUP, INC., ET    )
     AL                         )
 8                              )
            DEFENDANTS.         )
 9

10   ************************************************************
                        TRANSCRIPT OF HEARING
11          BEFORE THE HONORABLE JUDGE RON CLARK
                 UNITED STATES DISTRICT JUDGE
12   ************************************************************

13   APPEARANCES:

14   FOR PLAINTIFF:      MR. C J VEVERKA
                         MR. CHARLES L. ROBERTS
15                       WORKMAN NYDEGGER & SEELEY
                         60 EAST SOUTH GATE TOWER
16                       SALT LAKE CITY, UT 84111

17                       MR. LAWRENCE LOUIS GERMER
                         GERMER & GERTZ
18                       550 FANNIN, SUITE 500
                         BEAUMONT, TX 77701
19
                         MS. LUDMILA YAMALOVA
20                       FINISAR CORPORATION
                         1389 MOFFETT PARK DRIVE
21                       SUNNYVALE, CA 94089

22
     FOR DEFENDANTS:     MR. VICTOR GEORGE SAVIKAS
23                       MR. LOUIS TOUTON
                         MR. GROGORY A. CASTANIAS
24                       JONES DAY
                         555 FLOWER STREET, 5TH FLOOR
25                       LOS ANGELES, CA 90071
```

334

1    EARLIER STATED OF THE 25 MILLION, AND THEN POST JUDGMENT

2    INTEREST ON ALL OF THAT AT THE STATUTORY RATE UNDER, I BELIEVE,

3    IT'S 28 USC, SECTION 1961.

4              THE NEXT ISSUE WE GET INTO IS WHETHER OR NOT

5    THERE SHOULD BE AN INJUNCTION.  AND THERE WAS SOME INDICATION,

6    DISCUSSION ABOUT ALL THE DIFFICULTIES IN FIGURING OUT THESE

7    DAMAGES AND WHETHER THERE SHOULD BE AN INJUNCTION AND SO FORTH.

8    BUT THE SCHEDULING ORDER MADE IT CLEAR THAT DAMAGES DISCOVERY

9    WAS SUPPOSED TO HAVE BEEN DONE EARLIER.  OBVIOUSLY WHETHER OR

10   NOT THERE SHOULD BE AN INJUNCTION OR A COMPULSORY LICENSE OR

11   WHATEVER IS SOMETHING THE PARTIES KNOW ABOUT IT, AND THE COURT

12   SEES IN THIS CASE GIVEN THE AMOUNT OF EVIDENCE, IT HAS NO

13   REASON TO BELIEVE THAT AT SOME FUTURE DATE -- I THINK I CAN

14   MAKE THAT DECISION NOW.

15             NOW 35 USC, SECTION 283 PROVIDES THAT THE COURTS

16   HAVING JURISDICTION, CAN GRANT INJUNCTION AND, OF COURSE, THE

17   PRINCIPLES OF EQUITY.  AND THE EBAY CASE WITH EBAY, INC.,

18   VERSUS MERCEXCHANGE, 126 SUPREME COURT 1837, THE SUPREME COURT

19   HAS SAID LET'S GO BACK TO THE -- WE WILL GO BACK TO THE

20   STANDARD FACTORS.  IN GOING THROUGH THESE, WE HAVE IRREPARABLE

21   INJURY.  THE EVIDENCE INDICATES TO THIS COURT THAT THERE IS

22   REALLY NO IRREPARABLE INJURY TO THE PLAINTIFF.  THEY HAVE

23   RAISED THIS ARGUMENT OF THE RIGHT TO EXCLUDE EVERYBODY ELSE,

24   AND THAT THAT PERHAPS COULD BE PRICELESS AND SHOULD BE PART OF

25   THE CONSIDERATION.  BUT IT'S ALSO UNCONTESTED THEY NEVER SOLD

1   THE RIGHTS TO THE PATENT, NEVER MADE THE SLIGHTEST EFFORT TO

2   EVER USE THE PATENT.  WITH NO SUCCESS AT ALL IN THE PAST, IT'S

3   A LITTLE FAR FETCHED TO SAY THEY CAN SELL EXCLUSIVE RIGHTS TO

4   COMPETITORS WHO WEREN'T INVOLVED IN THE SUIT.  IT'S EASY -- AND

5   YES, AS A PRACTICAL MATTER HAVING THIS VERDICT IS HELPFUL, BUT

6   THIS JUDGMENT DOESN'T DECLARE -- AND AS FAR AS I KNOW DISTRICT

7   COURTS DON'T DECLARE PATENTS VALID FOR ALL PURPOSES FOR EVEN

8   THE NEXT CASE.  WE KNOW THAT IN THIS CASE, THE PLAINTIFF PROVED

9   BY A PREPONDERANCE OF THE EVIDENCE THAT DIRECTV INFRINGES SEVEN

10   CLAIMS.  AND WE KNOW THAT DIRECTV FAILED TO PROVE INVALIDITY BY

11   CLEAR AND CONVINCING EVIDENCE.  THAT GIVES FINISAR AN ENHANCED

12   BARGAINING POSITION.  BUT IT'S NOT AN AUTOMATIC TICKET TO CASH

13   IN ON THE PATENT WITH OTHERS OR TO EXCLUDE EVERYONE.

14           AND THE COURT HAS TO BE A LITTLE CONCERNED ABOUT

15   THIS IDEA OF EXCLUSION IN A FIELD WHERE THERE ARE TWO

16   COMPETITORS.  AND THEN TAKING IN MIND CONGRESS THROUGH THE

17   ANTI-TRUST LAW HAS INDICATED AN AVERSION TO MONOPOLY,

18   ESPECIALLY A MONOPOLY THAT AFFECTS SO MANY PEOPLE.  AND IF THE

19   COURT WAS TO GRANT AN INJUNCTION, YES, MAYBE SOMETHING COULD BE

20   WORKED OUT; BUT FOR WHATEVER PERIOD THE INJUNCTION WAS IN

21   PLACE, YOU'D HAVE ONE COMPANY AS THE SOLE SATELLITE PROVIDER.

22   AND IT'S ALSO GOT TO BE RECOGNIZED IN ANTI-TRUST LAW, WHICH THE

23   COURT IS FAMILIAR WITH, KIND OF DEPENDS ON WHAT ADMINISTRATION

24   IS PUSHING IT.  SOME ADMINISTRATIONS PUSH HARDER THAN OTHERS.

25   WHO THE ATTORNEY GENERAL OF THE COUNTRY -- WHAT FOCUS THEY WANT

1   TO MAKE ON IT.  BUT CONGRESS HAS THAT ACT IN PLACE.  IT DOES

2   SEEM PERHAPS IMPRUDENT FOR A DISTRICT COURT TO SIMPLY DECIDE

3   THAT IT'S GOING TO ISSUE AN INJUNCTION THAT RESULTS IN A TOTAL

4   MONOPOLY OF SOMETHING LIKE SATELLITE TV FOR THE NATION.

5               AND IN TERMS OF IRREPARABLE INJURY, GIVEN THE

6   FACT THAT THERE ARE DAMAGES AVAILABLE AND FUTURE DAMAGES

7   AVAILABLE, IT DOESN'T SEEM IRREPARABLE.

8               REMEDIES AT LAW, FINISAR HAS GOT THE JUDGMENT

9   FOR THE FULL AMOUNT FOUND BY THE JURY, PLUS PREJUDGMENT

10  INTEREST, PLUS A SUBSTANTIAL ENHANCEMENT, PLUS COST OF COURT

11  WHICH THE COURT IS GOING TO AWARD, ALSO.  IT'S HARD TO ARGUE

12  THAT IT'S NOT BEEN FULLY COMPENSATED FOR DAMAGES TO DATE.  AND

13  THEN AS TO FUTURE, THE COURT IS GOING TO FIND A COMPULSORY

14  LICENSE TO ADEQUATELY COMPENSATE FINISAR FOR DIRECTV'S USE OF

15  THE INVENTIONS, ESPECIALLY SINCE FINISAR EVIDENTLY NEVER HAD

16  THE WILL NOR THE MEANS TO IMPLEMENT THE PATENT ITSELF.

17              SO, HARDSHIP, THE HARDSHIP INVOLVED IN ENJOINING

18  DIRECTV WOULD BE ENORMOUS.  YES, IT'S TRUE THAT YOU CAN'T

19  REALLY CONSIDER YOURSELF TOO MUCH ABOUT PROFITS TO

20  CORPORATIONS.  IF YOU'VE GOT A THOUSAND EMPLOYEES, THOUSANDS OF

21  EMPLOYEES OUT OF WORK, RIPPLE EFFECT ON ALL THE CONTENT

22  PROVIDERS PROBABLY INCALCULABLE.  15 MILLION PEOPLE LOSE THE

23  AVAILABILITY TO VIEW THEIR TV.  SOME WOULD SAY THIS IS A

24  BLESSING, AND ONE OF THE BRIEFS SAID SOMETHING ABOUT THAT.  BUT

25  IT'S NOT A BLESSING TO INVALIDS OR SHUT-INS OR MILLIONS OF

1    RURAL PEOPLE WHO DEPEND ON TV FOR NEWS AND EVERYTHING ELSE.  ON

2    THE OTHER HAND, FINISAR IS HARD PRESSED TO SHOW A HARDSHIP IN

3    RECEIVING OVER A $100 MILLION FROM A PATENT WHICH HAS BEEN ON A

4    SHELF FOR SOME TEN YEARS WITH NO RETURN AT ALL, ESPECIALLY WHEN

5    THERE HASN'T BEEN A PENNY INVESTED IN ITS DEVELOPMENT OR

6    IMPLEMENTATION AFTER ISSUANCE ACCORDING TO -- ACCORDING TO THE

7    EVIDENCE.  AN APPROPRIATELY WORDED COMPULSORY LICENSE COULD

8    CONTINUE THE FLOW OF INCOME AND STILL ALLOW FINISAR TO MARKET

9    THE PATENT NOW, AND IT HAS THE ANTI-BARGAINING TOOL OF THE JURY

10   VERDICT AND JUDGMENT.

11            AND THEN AS FAR AS PUBLIC INTERESTS, THE COURT

12   CAN'T SEE ANY PUBLIC INTEREST SERVED BY ENJOINING DIRECTV.  THE

13   PUBLIC POLICY OF THE TERM INFRINGEMENT HAS FOR REASONS

14   PREVIOUSLY DISCUSSED AND ADDRESSED BY THE MONEY JUDGMENT.

15   THERE'S NO PUBLIC INTEREST IN ARBITRARILY LIMITING SATELLITE TV

16   TO MILLIONS OF VIEWERS.  THE WHOLE PATENT SYSTEM ITSELF IS A

17   PUBLIC INTEREST IN TECHNOLOGY BEING USED AND IMPROVED UPON.  SO

18   THE COURT DOESN'T SEE THAT THERE'S -- PUBLIC INTEREST WOULD BE

19   SERVED BY AN INJUNCTION.  SO THE REQUEST FOR AN INJUNCTION IS

20   DENIED.

21            THEN WE GET INTO THE COMPULSORY LICENSE, AND

22   WE'VE HAD A LOT OF TESTIMONY ABOUT THAT TODAY.  COMPULSORY

23   LICENSE CAN BE GRANTED TO A PATENTEE WHO'S BEEN UNABLE TO

24   PREVAIL IN A REQUEST FOR INJUNCTIVE RELIEF.  AND FOSTER VERSUS

25   AMERICAN MACHINE AND FOUNDRY COMPANY, 492 FED. 2D. 1317, PAGE

# EXHIBIT I

LEXSEE 2006 U.S. DIST. LEXIS 60575

**LITECUBES, L.L.C., et al., Plaintiffs, vs. NORTHERN LIGHT PRODUCTS, INC., Defendant.**

**Case No. 4:04CV00485 ERW**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 60575*

**August 25, 2006, Decided**
**August 25, 2006, Filed**

**COUNSEL:** [*1] For Litecubes, L.L.C., Carl R. VanderSchuit, Plaintiffs: Douglas R. Wilner, Matthew L. Cutler, Rudolph A. Telscher, Jr., Molly B. Edwards, Kara R. Yancey, HARNESS AND DICKEY, St. Louis, MO.

For Northern Light Products, Inc. doing business as GlowProducts.com, Defendants: F. Ross Boundy, Mark P. Walters, CHRISTENSEN AND O'CONNOR, Seattle, WA; Michael R. Annis, Adam S. Hochschild, BLACKWELL SANDERS PEPER, MARTIN LLP, St. Louis, MO.

For Northern Light Products, Inc., Counter Claimant: F. Ross Boundy, Mark P. Walters, CHRISTENSEN AND O'CONNOR, Seattle, WA; Adam S. Hochschild, Michael R. Annis, BLACKWELL SANDERS PEPER, MARTIN LLP, St. Louis, MO.

For Litecubes, L.L.C., Carl R. VanderSchuit, Counter Defendants: Kara R. Yancey, Matthew L. Cutler, HARNESS AND DICKEY, St. Louis, MO.

**JUDGES:** E. RICHARD WEBBER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** E. RICHARD WEBBER

**OPINION:**

### MEMORANDUM AND ORDER

This matter comes before the Court upon Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [doc. # 195]; Defendant's Motion for Judgment as a Matter of Law Regarding Copyright Infringement, or Alternatively, for Remittitur [doc. # 197]; Plaintiffs' Motion for Attorney [*2] Fees, Costs and Interest [doc. # 199]; Plaintiffs' Supplemental Motion for Bill of Costs [doc. # 201]; Defendant's Motion to Stay Briefing for all Motions for Attorneys' Fees, Costs and Interest [doc. # 202]; Plaintiffs' Motion for Permanent Injunction [doc. # 205]; Defendant's Motion for Judgment as a Matter of Law Regarding Patent Infringement, or Alternatively, for a New Trial [doc. # 213]; Defendant's Motion for Bill of Costs [doc. # 216]; and Defendant's Cross-Motion for Attorneys' Fees and Costs [doc. # 218].

On April, 23, 2004, Plaintiffs filed suit alleging various intellectual property violations by Defendant. On September 24, 2004, Plaintiffs filed their first Amended Complaint alleging patent infringement, copyright infringement, unfair competition, and trademark infringement. A five-day jury trial was held in this case from October 3, 2005 through October 7, 2005. All claims were submitted to the jury for determination, except for the unfair competition claim. On October 7, 2005, a verdict was entered. The jury found that: (1) the Diefenbach reference did not anticipate the *'198 Patent*; (2) neither the Diefenbach reference nor the Kolb patent rendered the [*3] *'198 Patent* obvious; (3) Defendant's EXA cube and ICM cube willfully infringed Plaintiffs' *'198 Patent*, but that Plaintiffs were not entitled to lost profits or a reasonable royalty; (4) Defendant willfully infringed Plaintiffs' copyright, and Plaintiffs were entitled to $ 30,000 in statutory damages and $ 120,000 in exemplary damages; and (5) Defendant did not infringe Plaintiffs' valid trademark. The parties filed several post-trial motions, and the Court will address each below.

### MOTIONS FOR JUDGMENT AS A MATTER OF LAW

"In a motion for [a judgment as a matter of law], the question is a legal one, whether there is sufficient evidence to support a jury verdict." *Summit v. S-B Power Tool, 121 F.3d 416, 420 (8th Cir. 1997).* Rule 50 of the *Federal Rules of Civil Procedure* ("Rule") provides that

2006 U.S. Dist. LEXIS 60575, *

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as [*4] a matter of law by filing a motion no later than 10 days after entry of judgment

*Fed. R. Civ. Pro. 50(b)*. In an intellectual property case, the district court applies the standard for a "judgment as a matter of law ("JMOL") under the law of the regional circuit where the appeal from the district court normally would lie." *MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1348 (Fed. Cir. 2005)* (internal quotations omitted); *see also nCube Corp. v. SeaChange Int'l, Inc., 436 F.3d 1317, 1319 (Fed. Cir. 2006)*. A district court sitting in the Eighth Circuit will only grant a motion for JMOL

if there is insufficient evidence to support a jury verdict in the plaintiff's favor. When reviewing a motion for judgment as a matter of law, this Court must: (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be [*5] drawn.

*Winskowski v. City of Stephen, 442 F.3d 1107, 1109 (8th Cir. 2006)* (quoting *City Nat'l Bank of Fort Smith v. Unique Structures, Inc., 929 F.2d 1308, 1312 (8th Cir.1991))*; *see also Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 963 (8th Cir. 2006)* (discussing standard); *Margolies v. McCleary, Inc., 447 F.3d 1115, 1123 (8th Cir. 2006)* (same). "Thus, judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 417 (8th Cir. 2005)*.

### Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [doc. # 195]

Defendant claims that the Court has no subject matter jurisdiction over Plaintiffs' claims because Plaintiffs failed to introduce evidence that (1) Defendants directly, contributed to, or induced the infringement of the *'198 patent* in the United States; (2) Defendants distributed copyrighted works in the United States; and (3) Defendant's activities implicate American interests under the Lanham Act.

This Court finds that evidence of direct [*6] infringement under *35 U.S.C. § 271* is sufficient to establish subject matter jurisdiction in this Court. n1 Defendant clearly imported the accused products into the United States; thus, this Court has subject matter jurisdiction over the claims in Plaintiffs' Amended Complaint. n2 According to *35 U.S.C. § 271*, infringement of a patent occurs when, "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Defendant primarily relies on *Cybiotronics, LTD. v. Golden Source Electronics, LTD., 130 F. Supp.2d 1152 (D.C. Cal. 2001)* to argue that Defendant is not an "importer" of the accused product. In *Cybiotronics,* the plaintiff, a Hong Kong corporation, owned the rights under patents relating to telephone and caller identification technology. The defendant, also a Hong Kong corporation, was approached by a New York Corporation ("NAFT") about starting to produce phones with caller identification technology. [*7] All of the negotiations took place in Hong Kong. Engineers designed the phone in Korea, and the phones were manufactured at facilities located in China. Once the products passed inspection in China, they were shipped NAFT in Hong Kong. NAFT would then sell the phones to United States' company, BellSouth. Defendant argued that it could not be liable for direct infringement because all of its activities relating to the accused products took place in Hong Kong, China, or Korea. The Federal Circuit agreed, finding, *inter alia,* that defendant was not an "importer" because "[a]ny and all activity that might be considered 'import[ing] into the United States' was conducted by either NAFT or by BellSouth, and [defendant] itself was not the 'importer' of the accused products." *Id. at 1175*. The court relied on another case, *Pfizer, Inc. v. Aceto Corp., 853 F. Supp 104 (S.D.N.Y 1994)*, which interpreted the term "imports" as it appeared in another section of *35 U.S.C. § 271*. In *Pfizer,* Anhui, a Chinese manufacturer sold a flavor enhancer to another Chinese corporation, which in turn, sold the product to American companies. The [*8] court held that Anhui was not an importer of the product. Relying on the *Pfizer* court's analysis, the *Cybiotronics* court held that "NAFT remained at all times the legal 'importer' of these goods 'into the United States,' and the statute does not reach [defendant's] behavior in this case." *Id. at 1176*.

2006 U.S. Dist. LEXIS 60575, *

n1 It is not necessary for the Court to address Defendant's other arguments since the Court finds that this Court has subject matter jurisdiction because Defendant is an "importer" under 35 U.S.C. § 271(a).

n2 Defendant argues that Plaintiffs' theory that Defendant was an "importer" under 35 U.S.C. § 271 was an "afterthought." The Court disagrees. While the "importer" theory is not specifically pled in Plaintiffs' Amended Complaint, the issue was raised at trial, and thus, shall be treated as if it was raised in the Pleadings. See Fed. R. Civ. Pro. 15(b); Triple Five of Minnesota, Inc. v. Simon, 404 F.3d 1088, 1095 (8th Cir. 2005) (motion to amend the pleadings to conform to the evidence can be made at any time, even after judgment). Plaintiffs are granted leave to file a Second Amended Complaint so that Count I conforms to the evidence presented at trial. Furthermore, the amendment will relate back to the date of the original pleading. See Fed. R. Civ. Pro. 15(c).

[*9]

The Court finds that the instant case is easily distinguishable. In both Pfizer and Cybiotronics, the defendant was not an "importer" because, in each case, an intermediary company was acting as the importer. See also MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1377 (Fed. Cir. 2005) (no direct infringement where defendant, SUMCO, manufactured accused product in its facilities in Japan, and then sold the products to a party in Japan, Samsung Japan, who then employed a third-party packaging company to package and send the products to the United States). In Pfizer, the Chinese corporation that purchased the flavor enhancer from Anhui was the importer. n3 In Cybiotronics, the court found that NAFT was the legal importer of the goods. Here, Defendant took orders for the accused products over the telephone at the number published on its website. Once Defendant received an order from a customer in the United States, the Defendant shipped the product at the direction and expense of the purchaser. Bob Bryant, the President of Northern Light Products, testified that the large majority of the sales in U.S. dollars were [*10] sales to customers in the United States. Thus, unlike Cybiotronics and Pfizer, there was no intermediary; here, Defendant was the importer. n4 Therefore, the Court has subject matter jurisdiction.

n3 The American companies purchasing the product may also have been the importer if title to

the product was transferred before the product left China. The court does not address this issue, but indicates that the American defendant may be liable if plaintiff is able to establish infringement.

n4 There was evidence during the trial that an Ebay seller located in Canada, known as "kick-chick" was selling Defendant's accused products to customers in the United States. This situation is much closer to the facts in Cybiotronics and Pfizer. Because "kick_chick" is an intermediary that receives title to the accused products before they reach the United States, Defendant would not be considered an "importer" of the lighted ice cubes sold by "kick_chick." Notably, Plaintiffs did not seek relief for the accused products sold by "kick_chick." Plaintiffs sought relief only for those products directly shipped by Defendant.

[*11]

**Defendant's Motion for Judgment as a Matter of Law Regarding Copyright Infringement, or Alternatively, for Remittitur [doc. # 197]**

Defendant argues that the jury's verdict of willful copyright infringement with respect to the EXA cubes is not supported by substantial evidence, and on this basis, Defendant is entitled to judgment as a matter of law. Alternatively, Defendant asks that the Court reduce the jury's damage award if the Court holds that Defendant is not entitled to judgment as a matter of law.

The court makes a determination of willfulness based upon the totality of the circumstances. Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1342 (Fed. Cir. 2004). "In respect [to] willfulness, there cannot be hard and fast per se rules. The district court, considering the evidence before it and the testimony and demeanor of the witnesses, must in each case determine whether an infringer has discharged its affirmative duty of exercising due care." Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1110 (Fed. Cir. 1986). "Actual notice of another's patent rights triggers an affirmative duty of due care to [*12] avoid infringement." nCube Corp. v. SeaChange Intern., Inc., 436 F.3d 1317, 1324 (Fed. Cir. 2006). Indeed, the question of willfulness "hinges on when the defendants had actual knowledge of plaintiff's patent rights, and their actions after that time." Id. If a defendant solicits legal advice, his argument against willfulness is strengthened; however, failure to seek out legal advice does not give rise to an inference of willfulness. Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1378 (Fed. Cir. 2005) (citing Knorr-Bremse, 383 F.3d at 1345-46).

2006 U.S. Dist. LEXIS 60575, *

This Court holds that Plaintiffs presented sufficient evidence so that a reasonable factfinder could find that Defendant willfully infringed Plaintiffs' copyright. Defendant claims that the only evidence supporting willful infringement of the copyright was the evidence of the additional sale of the EXA cubes after Defendant received a cease and desist email on November 12, 2003. In Plaintiffs' response to the Defendant's motion, Plaintiffs highlighted several pieces of evidence presented at trial the supported the jury's verdict including:

(a) the striking [*13] similarity in the outside shape of the EXA cube to the Litecube copyright (*i.e.* virtually identical);

(b) documentation reflecting Glowproducts' knowledge of Litecubes' website containing notices of its intellectual property *before* it ever sold the EXA cube to customers in the United States (P. Ex. 257);

(c) an email admission of Bryant to his supplier indicating that it was "dangerous" for Glowproducts to sell the EXA cubes after receiving a cease and desist notification from Litecubes, but requesting that additional cubes be shipped for future sale nonetheless (P. Ex. 263);

(d) Glowproducts' strategy to delay shipment of the EXA cubes in an intentional course of conduct to hide its infringing conduct (Kensit testimony);

(e) continued sales of the EXA cubes to customers in the United States despite notification and despite clear recognition of infringement (P. Ex. 270);

(f) preparation of intentionally misleading financial documents that deliberately sought to disguise the sales of EXA cubes after Glowproducts received further notice of the copyright in November, 2003 (P. Ex. 270);

(g) the inconsistent testimony of Glow-Products' owner and president, [*14] Bob Bryant, regarding when and why Glow-Products stopped selling the EXA cubes; and

(h) the lack of any plausible defense to the copyright infringement.

Defendant argues that the inferences advanced by Plaintiffs are "speculative." The Court disagrees. While none of these pieces of evidence is conclusive evidence of willful infringement on its own, the Court finds that a jury, viewing all of this evidence together and drawing reasonable inferences from such evidence, could have reasonably believed that Defendant willfully infringed on Plaintiffs' copyright.

Defendant complains that the EXA cubes only constituted 4.4% of the accused products in this case. This fact is irrelevant to the issue of whether the EXA infringed Plaintiffs' copyright, and Defendant has provided no authority showing otherwise.

Next, Defendant argues that it made good faith efforts to minimize copyright injury to Plaintiffs. Based on the verdict, it is clear that the jury made credibility determinations of the witnesses and did not believe that Defendant attempted to minimize infringement. The Court may not review the jury's credibility determinations once the Court has found that sufficient evidence [*15] exists to support the jury's verdict.

Defendant also claims that it was unfair that Plaintiffs argued that trial exhibit 270, listing the number of EXA cube sales, was misleading. Defendant argues that both parties simply misread the exhibit prior to trial. Defendant further contends that Plaintiffs should be estopped from arguing willful copyright infringement since Plaintiffs entered into a stipulation prior to trial regarding the number of EXA sold. The Court is not persuaded. The pre-trial stipulation was based on inaccurate information, and Plaintiffs only learned of this inaccuracy during trial. Plaintiffs were properly permitted to introduce evidence, and draw inferences therefrom, showing that exhibit 270 showed more sales of EXA cubes than was apparent upon the parties' prior interpretations of the exhibit.

Finally, Defendant argues that Plaintiffs' characterization of the evidence supporting copyright infringement is speculative, (a) n5 Defendant argues that it generally requested "battery operated ice cubes" and did not specify the shape of the cube it wanted to purchase. While the similarity in shape between the two cubes may not go to show willfulness, the evidence does [*16] provide evidence that the copyright was infringed. (b) Defendants argue that they did not know of Plaintiffs' copyright prior to the cease and desist email sent on November 12, 2003. One of Defendant's employees sent an email referencing the Litecubes' website on March 18, 2002. Defendant claims that the only exhibit in evidence showing Litecubes' website is DX 225, and the exhibit has no general

Case 1:05-cv-00160-KAJ-MPT    Document 210-3    Filed 12/08/2006    Page 31 of 42

Page 5
2006 U.S. Dist. LEXIS 60575, *

intellectual property notice and no reference to Plaintiffs' copyright. n6 However, the Court notes that Carl VanderSchuit testified during the trial that Plaintiffs' website included notifications of the intellectual property rights owned by Plaintiffs. When asked "[w]hat measures did you take to notify the public about your patent and copyrights?," he replied that "[w]e put them on just about everything. We had them on all our emails at the company, actually, all the invoicing. I believe it's on the website. It's also on the bottom of the cube." The jury could have inferred that Defendant was aware of the copyright based on this testimony. (c, d) Next, Defendant posits that the jury could not have drawn an inference supporting copyright infringement from the email in which Defendant's [*17] President, Bob Bryant, noted that it would be "dangerous" to sell the EXA cubes since Defendant had received the cease and desist email. The Court disagrees. The context of Mr. Bryant's statement is damning. He stated that "I will agree to buy the remaining cubes from our order. Please tell me how many are left and how much is owing. It is very dangerous for my company to sell this ice cube at this time, so I request you do not ship them before January 31, 2004." The language in Mr. Bryant's email could have been interpreted by the jury to mean that Defendant knew of the risk of violating Plaintiffs' copyright, but still agreed to purchase the remaining cubes that the company had ordered after pushing back the date of delivery. The evidence showed that Defendant made attempts to appear as if the company no longer sold the EXA cubes after Plaintiffs' November 12, 2003 cease and desist email. n7 Indeed, one of Defendant's employees confirmed his deposition testimony at trial indicating that

> ...Bob [Bryant] thought that Litecube was -- I don't know, for lack of a better word, watching our company very closely at the time, and I think he felt that they may have put some sort [*18] of stop-shipping request or didn't want -- Bob didn't want to have the stock in the warehouse because he felt that -- how am I going to put this? -- that Litecube might place a couple of orders with us under assumed names to see if we were still selling them or somehow find out that we were still selling these things and proceed from there. So Bob didn't want to have these things in the warehouse just in case Litecube was going to do something like that. . .

n5 The lettering scheme corresponds to the letters of Plaintiffs' facts quoted *supra*.

n6 Upon the Court's independent review of the exhibit, the Court only saw that the name "Litecubes" was protected by a trademark. However, there was also testimonial evidence introduced about the contents of the website by Plaintiff Carl VanderShuit

n7 Both Carl VanderShuit and Terry Hickey testified that they believed that Defendant stopped selling the EXA cubes when the product was removed from the website.

The jury could have inferred that Mr. Bryant [*19] moved the shipment date to January 31, 2004 because he believed it was "dangerous," specifically "at this time," and Defendant hoped that Plaintiffs would no longer be watching the company's website a couple of months later. This effort of concealment supports a finding of willfulness. (e) It is undisputed that Defendant sold 3,618 more cubes after receiving the cease and desist email. Defendant argues that it did not conceal sales after receiving the cease and desist letter, since the response specifically indicated that it would continue to sell the product until the company was able to "determine a position regarding infringement." There was evidence presented that the product was removed from the website. There was also evidence that Defendant did buy the remaining EXA cubes that had been ordered, but the date was pushed back. Finally, there was evidence offered that the financial documents were misleading regarding the sales of the EXA cubes following the cease and desist letter; indeed, it was only during the trial that Plaintiffs learned of the additional sales of EXA cubes. Regardless, "openly" infringing sales do not foreclose a finding that the infringement was willful, (f) [*20] Defendant argues that the financial documents detailing the sales of the EXA and ICM cubes are not misleading. Plaintiffs presented evidence that the description for the sales of EXA cubes in Defendant's bookkeeping system changed as of November 5, 2003, right around the time of the November 12, 2003 cease and desist email. Furthermore, it was the mid-portion of the description that was missing in the new entries, and it is unclear why the computer program would remove the mid-portion of the description if it was too long, instead of truncating one of the ends. Drawing all inferences in favor of Plaintiffs, the jury could have reasonably found the documents to be misleading or altered. (g) Defendant claims that Mr. Bryant's testimony on the stand during trial only changed because he had relied on the parties' stipulation as to the number EXA cubes sold after Defendant received the cease and desist letter. The Court is not persuaded. Mr. Bryant was the President of Northern Light Products, and it was reasonable for the jury to disbelieve that he did not know that his company

continued to sell the infringing product after receiving the email from Plaintiffs. (h) The Court finds that [*21] Plaintiffs' claim that Defendant lacked any plausible defense to the copyright infringement is basically a summarization of the preceding facts discussed by the Court in (a) - (g).

Drawing all reasonable inferences in favor of Plaintiffs, the jury could have inferred, based on the totality of the circumstances, that Defendant knowingly sold infringing products and deliberately concealed the sales. Thus, the Court finds that there was sufficient evidence to support a verdict that Defendant had willfully infringed Plaintiffs' copyright.

Defendant argues alternatively that the jury's award of damages was unreasonably high, and as such, the Court should reduce the award of damages. Relying on *Feltner v. Columbia Pictures Television, Inc.,* Defendant argues that Congress never intended for a jury to determine the appropriate amount of statutory damages. *523 U.S. 340, 345, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998).* Defendant's analysis of *Feltner* is incomplete. In that case, the Supreme Court analyzed whether there was a statutory right to a jury trial when a copyright owner elects to recover statutory damages, only to determine whether the court could avoid reaching the constitutional analysis under [*22] the *Seventh Amendment. Id. at 1284.* After the court found that no such statutory right existed, the court went on to analyze the constitutional issue, finding that the *Seventh Amendment* does grant the right a jury trial, including the right to have a jury determine the amount of statutory damages. *Id. at 342.* Thus, Plaintiffs clearly had the right to have a jury determine the amount of copyright damages.

The Court will not grant remittitur of the award. A court should only reduce a jury award if the "verdict is so grossly excessive the result is monstrous or shocking." *Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 800 (8th Cir. 2003)* (quoting *Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1133-34 (8th Cir.2001)).* Here, the jury properly awarded damages within the range designated by statute for willful copyright infringement. *See 17 U.S.C. § 504(c).* Based on the evidence presented at trial, the jury acted within its discretion in awarding $ 150,000 for copyright damages and exemplary damages for willful infringement.

**Defendant's Motion for Judgment as a Matter of Law Regarding Patent Infringement,** [*23] **or Alternatively, for a New Trial [doc. # 213]**

Defendant argues that the jury's verdict of willful patent infringement was not supported by sufficient evidence. It is undisputed that the *'198 patent* claims include limitations that within the patented device, the "filler within said cavity, said filler adapted to retain heat when

said device is heated" and "filler within said cavity, said filler adapted to retain cold when said device is cooled." Defendant claims that the only evidence presented during the trial relating to the filler in the EXA cube was that the EXA cube's filler did not have the "ability to retain heat or cold" when compared to other materials. Defendant further argues that even if the EXA and ICM cubes did infringe the *'198 patent,* the infringement was not willful.

The Court finds that sufficient evidence was introduced during trial to support the jury's finding of willful infringement of the *'198 patent.*

*Infringement*

There was evidence presented during the trial that the EXA cube met all the limitations of claim 31 of the Litecubes' patent. Defendant admits that both the EXA and ICM cubes met every limitation of claims 1 and 16, except for the "adapted [*24] to retain heat/cold" limitation. Claim 31 did not have the "adapted to retain heat/cold" limitation, and the only additional limitation in claim 31 was that the device have a "power source to reciprocally translate therein from an open light-on mode to a closed light-off mode." Mr. VanderSchuit testified that before sending the cease and desist letter to Defendant, he believed that the EXA cube infringed Claims 1, 16, and 31 of the *'198 patent.* He explained that the EXA cube had a "tap on/tap off switch" as is described in Claim 31 as the "reciprocally translating power source." In the Reply to Plaintiffs' Response, Defendant does not dispute that the EXA cube met all the limitations of Claim 31 of the *'198 patent.*

Defendant does contend that Plaintiffs presented insufficient evidence to support a jury verdict that the ICM cube was "adapted to retain heat/cold." The Court disagrees. After reviewing the trial transcript, the Court finds that there is substantial evidence supporting Plaintiffs' allegation that the ICM cube retains heat/cold. Most persuasive is the evidence that Defendant's website included advertisements for the ICM cube, touting that the cube's ability to keep a drink [*25] cool. Plaintiffs introduced excerpts from Defendant's website, Glowproducts.com, as they appeared three days prior to Plaintiffs filing this lawsuit. The excerpts included statements such as:

. "The 8 Mode Multi-Cube is a great lighted ice cube for livening up your drinks. Not only will it amuse your guests, but it will keep their drink warm or cool with its internal gel."

. "The lighted ice cubes are our best seller. People love to buy them, not only because

2006 U.S. Dist. LEXIS 60575, *

they keep their drinks cool but because they have eight different color settings to play with."

. "Our light-up cube, our light-up ice cube is a best seller. Keep these drinks cool while entertaining.. . .Keep their drinks cool while entertaining them.. . .Eight different color settings."

. "If you're wondering, 'Can I put these ice cubes in the freezer,' the answer is yes. Our battery-operated ice cubes adapt to any temperature."

The statements were removed right around the time that Plaintiffs filed the instant lawsuit. While Defendant argued during trial that the statements were on their website, but were wrong, it is likely that the jury did not find Defendant's argument to be credible, and instead [*26] believed Defendant's arguments to be litigation-induced.

There was also evidence presented that after Plaintiffs filed the lawsuit, Defendant's lawyer wrote on May 5, 2004 that "[w]e have to prove that we do not have heat retaining or cold retaining to defend ourselves." Then, in this same time frame, Defendant began attempting to "check with labs to determine whether or not labs had an opinion regarding whether your filler retained heat or cold" and at least one of the labs gave Defendant "an answer [its] lawyer didn't want to hear," telling Defendant that "every material is capable of retaining heat or cold to either a greater or lesser degree." The jury also heard evidence from Plaintiffs' expert, Kevin Trankler, that he performed three different tests on the ICM cubes, and in his opinion, the cubes were "adapted to retain heat/cold." Mr. VanderSchuit also testified that he believed that the ICM cubes retain heat/cold.

Furthermore, the evidence showed that there are "practical issues" that restrict the type of filler that can be used. For example, while water does retain heat/cold better than the gel inside the ICM cube, water "has bacteria and can yellow over the course of [*27] time." Additionally, Plaintiffs exposed that "the latent heat number [was] incorrect" in Defendant's calculation of one ice cube of frozen water. After correcting for the mistake, ratio was reduced to seven-to-one. However, after the mistake was exposed, Defendant's expert, Dr. Ann Mescher, indicated that the ratio would still be 60-to-1 if the volume of the gel being measured equaled the volume of the ice cube. The jury may have discounted Dr. Mescher's alternative basis for finding the 60-to-1 ratio, and believed that the ratio would be closer to the 7-to-1 ratio suggested by Plaintiffs.

*Willfulness*

Defendant argues that Plaintiffs are estopped from arguing that Defendant sold EXA cubes after receiving the cease and desist email on November 12, 2003. Relying on *Sims v. Wyrick, 743 F.2d 607 (8th Cir. 1984)*, Defendant claims that Plaintiffs should not be able to contradict its pretrial stipulation that no additional EXA cubes were sold after Defendant received the November 12 email. In *Sims*, the court enforced upon the parties a pretrial stipulation that "there was in effect in 1977 a policy flatly banning [*28] all written material referring to the Black Panther Party." *Id. at 611.* The court explained that "[h]ere, there is no claim of fraud or unfairness....Nor is this a case in which the stipulation is flatly contrary to all of the evidence on the subject it covers." *Id. at 610.* This case is completely different. Here, the Plaintiffs have claimed that they entered into the stipulation because the financial document was misleading and possibly altered. n8 Furthermore, it is undisputed that the stipulation is based on incorrect information. Thus, Defendant's argument that Plaintiffs are barred by estoppel from arguing that sales of EXA cubes occurred after Defendant received the November 12, 2003 letter is not persuasive. Additional evidence of willfulness is discussed *supra* in the Court's analysis of copyright infringement.

n8 Defendant makes the argument that Plaintiffs knew prior to trial that the stipulation was inaccurate, but waited until trial to reveal the error in order to ambush Defendant. Defendant presents no credible evidence supporting their allegation. In Plaintiffs' Response in Opposition to Defendant's Motion for JMOL Regarding Patent Infringement [doc. # 225], Plaintiffs claim that "[i]t came to light at trial that, after having been formally advised of the *'198 patent* in November, 2003, GlowProducts continued to sell the EXA cubes."

[*29]

A reasonable jury could have also found willful infringement of the *'198 patent* by the ICM cubes. Defendant had notice of Plaintiffs' intellectual property rights no later than November 2003. See *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1377 (Fed. Cir. 2005)* (recognizing that "[a]ctual notice of another's patent rights triggers an affirmative duty of due care"). Indeed, Defendant's defense to infringement was that the ICM cubes are not "adapted to retain heat/cold," a contention that is belied by Defendant's own advertising on its website. Furthermore, Defendant only sought the advice of counsel as to whether the ICM cubes infringed after Plaintiffs had filed suit.

2006 U.S. Dist. LEXIS 60575, *

Reasonable jurors could draw different conclusions about whether Defendant's infringement was willful. Therefore, this Court holds that JMOL is not proper.

*New Trial*

A motion for a new trial is governed by the standard set forth by the Eighth Circuit. *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1182 (Fed.Cir.2002)* ("The denial of a motion for a new trial is a procedural issue not unique to patent law which this [*30] court reviews under the law of the appropriate regional circuit[.]"). "The grant of a motion for a new trial is inappropriate unless 'the verdict is against the weight of the evidence and [] allowing it to stand would result in a miscarriage of justice." *Lampkins v. Thompson, 337 F.3d 1009, 1016 (8th Cir. 2003)*. The Court has considered all of the evidence presented at trial and finds that the jury's verdict was not against the weight of the evidence. Thus, Defendant's Motion for a New Trial will be denied.

## PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION [doc. # 205]

The Patent Act gives federal courts the authority to grant permanent equitable relief to patent holders. *35 U.S.C. § 283* provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable. Congress gave federal courts similar authority relating to copyrights. According to *17 U.S.C. § 502*, "[a]ny court having jurisdiction of a civil action arising under this title [*31] may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." In *eBay, Inc. v. MercExchange, L.L.C.,* reiterated that the traditional principles of equity apply when a court is deciding whether to award a permanent injunction against an infringing party. *U.S.  , 126 S.Ct. 1837, 164 L. Ed. 2d 641 (2006)*. Specifically, the plaintiff must show

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id. at 1839.*

In this case, Plaintiffs have demonstrated that they suffered an irreparable injury. Potential customers in the United States were buying infringing devices sold and imported by Defendant, instead of purchasing the products sold by Plaintiffs. Furthermore, damages are inadequate to compensate Plaintiff. If [*32] the Court fails to grant equitable relief, Defendants will be able to continue to sell and import its products in violation of Plaintiffs' intellectual property rights unless Plaintiffs file another lawsuit to enforce their rights. While Defendant claims that it has no intention of selling EXA cubes to consumers in the United States, the Court notes that Defendant admits that it still has in its warehouse inventory to be sold, and based upon Defendant's sales history, it is likely those products may find their way to the United States. Next, the Court finds that after balancing the hardships faced by both parties, Plaintiffs are entitled to equitable relief. Plaintiff VanderShuit went through the time and expense of developing the patented device and obtaining legal protections for his invention in the form of a patent, trademark and copyright. Defendant has no such protection and seeks to poach customers in the United States in violation of Plaintiffs' rights. The Court believes that an injunction is necessary in order to prevent Defendant from continuing to sell and import its infringing products in the future. Finally, the Court finds that the public interest would not be disserved [*33] by a permanent injunction. Thus, the Court will grant Plaintiffs equitable relief.

The parties disagree as to the scope of the injunction. The Court will enter an injunction with the following terms:

> GlowProducts and each of its agents, affiliates, successors, servants, and employees, and any and all other persons or entities acting under GlowProducts' authority, are hereby enjoined from (1) at any time on or before July 28, 2020, making, using, offering for sale or selling in the United States or importing into the United States products which infringe *U.S. Patent No. 6,416,198* ("the *'198 patent*") or (2) infringing U.S. Copyright Registration No. VA 1-117-699 ("the '699 copyright") by reproduction, preparing a derivative work, distribution, display, or claim authorship of any work that is substantially similar to the work depicted in the '699 copyright.

## MOTIONS FOR FEES, COSTS, AND INTEREST

### Prevailing Party

As a preliminary matter, the Court will determine if either Plaintiff or Defendant can be considered a prevailing party in this matter. "In designating those parties eligible for an award of litigation costs, Congress employed the term 'prevailing [*34] party,' a legal term of art." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 603, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001).* In this case, both parties have filed motions for attorney fees and costs.

"What counts as prevailing for purposes of an award of costs is a question of law." *Leonard v. Southwestern Bell Corp. Disability Income Plan, 408 F.3d 528, 533 (8th Cir. 2005).* The Supreme Court has defined a "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Buckhannon Bd. and Care Home, Inc., 532 U.S. at 603; see also Hillside Enterprises v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995)* (defendant won judgment against plaintiff on counterclaim but plaintiff won larger judgment so plaintiff "logically" was considered the "prevailing party"). As used here, a "judgment" is a "a court-ordered chang[e][in] the legal relationship between [the plaintiff] and the defendant" leading to a "material alteration of the legal relationship of the parties." *Id.* at 604 (alteration in original); *see also Republican Party of Minn. v. White, 456 F.3d 912, 2006 WL 1687468, at *2 (8th Cir. 2006)* [*35] (because Republican Party is now freely able to endorse candidates without risking an ethics violation, there was a material alteration in the relationship of the parties); *Forest Park II v. Hadley, 408 F.3d 1052, 1060 (8th Cir. 2005)* (winning declaratory judgment action did not change relationship between the parties because prior to the suit, the defendant had not taken any action against plaintiff).

Plaintiffs' Complaint alleged (1) patent infringement, (2) copyright infringement, (3) unfair competition, and (4) trademark infringement. The Court did not submit the claim of unfair competition to the jury, finding that insufficient evidence as a matter of law. All the other claims were submitted to the jury. First, the jury rejected all of Defendant's affirmative defenses. On the patent infringement claim, the jury found that Defendant willfully infringed Plaintiffs' patent, but awarded no damages. The jury also found willful copyright infringement and awarded Plaintiffs $ 30,000 in statutory damages and $ 120,000 in exemplary damages. Although the jury found that Defendant did not infringe Plaintiffs' trademark, the jury did find Plaintiffs' [*36] trademark to be valid.

This Court finds that Plaintiffs are the prevailing party. While both parties each "won" two claims, Plaintiffs changed their relationship with Defendant by being awarded $ 150,000. *See Leonard, 408 F.3d at 532 n.3* (holding that plaintiff winning one of her claims and being awarded $ 20,000 in damages sufficed to make her a prevailing party).

**Plaintiffs' Motion for Attorney Fees, Costs and Interest [doc. # 199]**

Plaintiffs seek reimbursement pursuant to *17 U.S.C. § 505* and *35 U.S.C. § 285* for reasonable attorney fees incurred throughout this litigation. The fees awarded under the statutes are "for 'reasonable' fees based on a lodestar figure represented by the reasonable hourly rate multiplied by the hours expended in the litigation." *Pinkham, 84 F.3d 292, 294.* n9

> n9 In *Junker v. Eddings,* the Federal Circuit noted that "'[t]he purpose of § 285 is. . .to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit[,]' and that 'attorney fees. . .include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit.'" *396 F.3d 1359, 1365 (Fed. Cir. 2005).* Reasonable fees are determined by multiplying the number of hours expended on the litigation by a reasonable hourly fee. The number of hours expended must be reasonable in light of the "tasks [which had to be] performed in connection with the litigation" and supported by documentation evidencing "hourly time records [and] full expense statements." *Id.* The hourly fees requested must be supported by "documentation of attorney hourly billing rates in the community for the particular type of work involved [and] the attorney's particular skills and experience."

[*37]

*Fees Under the Copyright Act*

The Copyright Act provides that attorney fees may be awarded to the prevailing party. Specifically, *17 U.S.C. § 505* provides that

> [i]n any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

The Eighth Circuit has not adopted a definitive standard for when to award attorney's fees under the Copyright Act. *See Applied Innovations, Inc. v. Regents of the University of Minnesota, 876 F.2d 626, 638 (8th Cir.*

2006 U.S. Dist. LEXIS 60575, *

*1989)* (noting that there is no standard); *United Telephone Co. v. Johnson Publishing Co., 855 F.2d 604, 612 (8th Cir.1988)* (reference to abuse of discretion standard in general). So, while "[t]here is no precise rule or formula for making these determinations," the court must consider certain factors when determining whether to award fees. *Fogerty v. Fantasy, Inc., 510 U.S. 517, 534-35, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).* These [*38] factors include (1) whether the litigation involved complex or novel questions; (2) whether the parties litigated in good faith; (3) frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case); and (4) the need in particular circumstances to advance considerations of compensation and deterrence. *See Applied Innovations, Inc., 876 F.2d at 638; Mary Ellen Enterprises v. Camex, Inc., 68 F.3d 1065, 1072 (8th Cir. 1995); Pinkham v. Camex, Inc., 84 F.3d 292, 294 (8th Cir. 1996); Fogerty, 510 U.S. at 534 n.19.* Other circuits have also considered "(1) the defendant's status as innocent, rather than [as a] willful or knowing, infringer (2) the plaintiff's prosecution of the case in bad faith, and (3) the defendant's good faith attempt to avoid infringement. *See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1583 (Fed. Cir. 1992)* (quoting *McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 323 (9th Cir. 1987)).* Furthermore, the Court notes that "[b]ad faith or wilfulness is not a prerequisite to an award of attorneys' [*39] fees." *Mary Ellen Enterprises, 68 F.3d at 1072.*

Based on these factors, the Court holds that Plaintiff is entitled to attorney's fees and costs n10 under *17 U.S.C. § 505.* This case did not include novel questions of fact or law. The cubes were virtually identical. Infringement was clear; indeed, the jury found the infringement to be willful. Also, as Defendant noted, this case involved "an extremely simple novelty item." The Court finds that the Plaintiffs did not prosecute the case in bad faith, and there was a lack of good faith by Defendant in attempting to avoid infringement. The Court also finds that there is a need to deter future copyright infringement when the infringement is as clear as the infringement was in this case and actual damages are negligible.

---

n10 The costs allowable under *17 U.S.C. § 505* are limited to the costs expressly identified in *28 U.S.C. § 1920. Pinkham, 84 F.3d at 295.* Since the Court found *supra* that Plaintiffs are the prevailing party, Plaintiffs are also entitled to costs under *28 U.S.C. § 1920.* For simplicity, since the same costs are recoverable under *28 U.S.C. § 1920* and *17 U.S.C. § 505,* the Court will analyze all of Plaintiffs' requests fofr costs in the *infra* analysis of "Plaintiffs' Supplemental Motion for Bill of Costs" [doc. # 201].

[*40]

*Fees Under the Patent Act*

Courts are also permitted to award attorney fees in certain "exceptional" cases. According to *35 U.S.C. § 285,* "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The court must complete a two step process. First, the court must determine whether the prevailing party has proved by clear and convincing evidence that the case is "exceptional." *See Stephens v. Tech Intern., Inc., 393 F.3d 1269, 1273 (Fed. Cir. 2004); Forest Laboratories, Inc. v. Abbott Laboratories, 339 F.3d 1324, 1327 (Fed. Cir. 2003).* "The criteria for declaring a case exceptional include willful infringement, bad faith, litigation misconduct and unprofessional behavior." *Imonex Services, Inc., 408 F.3d at 1378; see also Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1339-40 (Fed. Cir. 2004)* ("willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional'"); *nCube Corp., 436 F.3d at 1325* (same); *Union Carbide Chemicals & Plastics Technology Corp., 425 F.3d 1366, 1372* [*41] ("A finding of willful infringement may qualify a case as exceptional under *35 U.S.C. § 285 (1952),* thereby allowing a party to obtain enhanced damages.").

Second, if the court finds the case to be "exceptional," the court "must then determine whether an award of attorney's fees is appropriate[.]" *Stephens, 393 F.3d at 1273.* The fact that actual damages are not awarded in a case does not make an award of attorney fees improper. *Knorr-Bremse, 383 F.3d at 1347.* "Attorney fees are compensatory, and may provide a fair remedy in appropriate cases. Upon a finding of willful infringement, the award of attorney fees is within the district court's sound discretion." *Id.* However,

> [a] jury finding of willful infringement merely *authorizes,* but does not *mandate,* an award of increased damages. Furthermore, a court is not required to award attorney fees, even when there is an express finding of willful infringement. An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial court denies attorney fees in spite of a finding of willful infringement, [*42] the court must explain why the case is *not* 'exceptional' within the meaning of the statute.

*Group One, Ltd. v. Hallmark Cards, Inc., 407 F.3d 1297, 1308 (Fed. Cir. 2005)* (internal citations and quotations

2006 U.S. Dist. LEXIS 60575, *

omitted); *see also Rite-Hite Corp. v. Kelley Co., Inc., 819 F.2d 1120, 1126 (Fed. Cir. 1987)* (the court's decision of whether to award fees is based on the "court's familiarity with the matter in litigation and the interest of justice").

The purpose of awarding attorney's fees under *35 U.S.C. § 285* is two-fold; it deters infringement by penalizing the infringer and prevents "gross injustice" when parties litigate in bad faith. *See Forest Laboratories, Inc., 339 F.3d at 1328; Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1552 (Fed. Cir. 1989).* Indeed, "[w]hen infringement is found to be willful, the policy behind § 285 of discouraging infringement might justify imposing all of the patent owner's attorney fees on the infringer, even if the infringer prevailed as to some of the claims in suit." *Beckman Instruments, Inc., 892 F.2d at 1553* (noting [*43] that in other situations, the extent of the parties' success should be taken into account in determining fees); *see also Mathis v. Spears, 857 F.2d 749, 755 (Fed. Cir. 1988)* (attorney should be awarded full compensatory fee).

The Court finds this case to be "exceptional" based on the jury's verdict of willfulness. n11 Furthermore, the Court believes that awarding attorney's fees in this case comports with the purpose behind *35 U.S.C. § 285.* Intellectual property enforcement litigation is extremely complicated, and thus, becomes expensive very quickly. Such litigation is virtually unaffordable for relatively small companies seeking to protect their intellectual property rights, especially because the litigation costs will often dwarf the actual damages. In this case in particular, the actual damages awarded by the jury was $ 150,000.00, which is not an insubstantial amount. However, the over $ 400,000 in attorney's fees far exceeds the actual damages. Defendant in this case willfully infringed Plaintiffs' patent and copyright. Without an award of attorney fees in cases of this type, willful infringers will know that enforcement of intellectual [*44] property rights will be cost prohibitive due to the high cost of litigation. An award of attorney's fees is proper in cases such as this case, so that willful infringers will be punished and deterred.

n11 All of Defendant's arguments against awarding fees relate to the jury's finding of willfulness. The Court thoroughly discussed the evidence supporting willfulness *supra,* when discussing the merit of Defendant's motions for JMOL.

### Plaintiffs' Supplemental Motion for Bill of Costs [doc. # 201]

"[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise

directs." *Fed. R. Civ. P. 54(d).* "However, such costs must be set out in *28 U.S.C. § 1920* or some other statutory authorization." *Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 889 (8th Cir. 2006).* Pursuant to *28 U.S.C. § 1920,* costs may be taxed for:

> (1) Fees of the clerk or [*45] marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

*28 U.S.C. § 1920 (2000).* The Court may not award costs not authorized by *§ 1920* because *§ 1920* "imposes 'rigid controls on cost-shifting in federal courts.'" *Brisco-Wade v. Carnahan, 297 F.3d 781, 782 (8th Cir. 2002)* (citation omitted).

Plaintiffs seeks an award of $ 17,649.35 to be taxed against Defendant for various costs incurred in prosecuting this action prior to and during trial.

*Fees of the Clerk*

Plaintiffs seek an Order taxing Defendant $ 150 for fees of the Clerk. Plaintiffs have provided documentation that such fees were incurred in filing this action. This Court will tax Plaintiff $ 150 for fees of the Clerk. [*46]

*Fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case*

Plaintiffs seek an Order taxing Defendant $ 6,831.11 for fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case. Plaintiffs incurred fees of $ 170.60 for the deposition of Lawrence Kamm taken on March 28, 2005; $ 850.05 for the depositions of Carl VanderSchuit and Ed Galicki taken on March 28, 2005; $ 341.65 for the deposition of David Warren VanderSchuit taken on April 6, 2005; $ 1,708.50 for the deposition of Bob Bryant taken on April 26, 2005; $ 270.60 for the deposition of Derek Pettigrew taken on April 26, 2005; $ 832.75 for the deposition of Leonard Kensit and Huston Hill taken on April 26, 2005; $ 656.20 for the deposition of Ann Mescher taken on April 29, 2005; $ 25.00 for the deposition of Ed Galicki taken on

May 16, 2005; $ 576.71 for the video deposition of Anke Kolb taken on July 11, 2005; $ 486.95 for the deposition of Scott Hampton taken on July 14, 2005; $ 620.70 for the deposition of Anke Kolb taken on July 19, 2005; and $ 291.40 for the deposition of Bob Bryant taken on July 28, 2005.

A district court [*47] has the discretion to tax costs incurred incident to the taking of depositions when the depositions are "necessarily obtained for use in the case." *Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 363 (8th Cir. 1997).* Furthermore,

> the determination of necessity must be made in light of the facts known at the time of the deposition, without regard to intervening developments that later render the deposition unneeded for further use. In other words, the underlying inquiry is whether the depositions reasonably seemed necessary at the time they were taken.

*Id.* (internal citations and quotations omitted). "Unless the opposing party interposes a specific objection that a deposition was improperly taken or unduly prolonged, deposition costs will be taxed as having been 'necessarily obtained for the use in the case' within the meaning of *28 U.S.C. § 1920*." *Meder v. Everest & Jennings, Inc., 553 F. Supp. 149, 150 (E.D. Mo. 1982).* "A district court may tax transcription costs if a deposition was 'necessarily obtained for use in a case' and was not 'purely investigative.'" *Marmo v. Tyson Fresh Meats, Inc.,    F.3d  , 457 F.3d 748, 2006 U.S. App. LEXIS 19609, 2006 WL 2165734, at *10 (8th Cir. August 3, 2006).* [*48]

Defendant argues that many of the depositions were unnecessary because they were purely discovery in nature and others were not used at trial. Defendant noticed up Mr. Kamm, Mr. Carl VanderSchuit, Mr. Galicki, and David VanderSchuit for deposition. The costs requested by Plaintiffs are limited to the cost of a copy of the transcript of the depositions. Defendant cannot call the depositions and then claim that the depositions were not necessary. Furthermore, the standard is not whether a deposition is introduced or referred to during trial. Costs of a deposition are taxable if it was necessarily obtained for use in the case. The other three deponents, Mr. Bryant, Dr. Mescher, and Mr. Hampton were all called during trial, and the depositions were necessary for impeachment purposes. The Court finds that all of the depositions were reasonably necessary.

Of the $ 6,831.11 requested for transcripts, $ 141.86 is for shipping and handling costs. A recent Eighth Circuit case holds that "*Section 1920* does not authorize taxing [the non-prevailing party] for the [prevailing party's] postage and delivery expenses." *Smith, 436 F.3d at 889;* [*49] see also *Hollenbeck v. Falstaff Brewing Corp., 605 F.Supp. 421, 439 (E.D. Mo. 1984)* (postage fees ordinarily not taxable as costs). The $ 141.86 for shipping and handling will be deducted from the $ 6,831.11 requested. Therefore, this Court will tax Plaintiff a total of $ 6,689.25 for fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case.

*Fees for witnesses*

Plaintiffs seek an Order taxing Defendant $ 4,890.00 for witness fees of Anke Kolb, Scott Hampton, and Kevin Trankler. Title *28, United States Code, Section 1821* mandates the circumstances when witness expenses are taxable as costs and to be awarded to the prevailing party. "A witness shall be paid an attendance fee of $ 40 for each day's attendance." *28 U.S.C. § 1821(b).* The statute also provides for, *inter alia,* transportation by common carrier (*§ 1821(c)(1)*), cab fares and parking fees (*§ 1821(c)(3)*), and all normal travel expenses (*§ 1821(c)(4)*). "[T]he taxing of fees and mileage for witnesses in federal courts is within the sound discretion of the trial court." *Spiritwood Grain Co. v. Northern Pac. Ry. Co., 179 F.2d 338, 344 (8th Cir. 1950).* [*50] "This Court has awarded expert witness fees, however, under *Fed.R.Civ.P. 54(d)* if, after carefully scrutinizing the prevailing party's bill of costs, the district court determines that the expert's testimony was crucial to the issues decided and the expenditures were necessary to the litigation." *Nebraska Public Power Dist. v. Austin Power, Inc., 773 F.2d 960, 975 (8th Cir. 1985).*

In this case, the Court uses its discretion and deems the witness was reasonably necessary in this case. *See Linneman Constr., Inc. v. Montana-Dakota Utilities Co., 504 F.2d 1365, 1372 (8th Cir. 1974)* (holding that the Eighth Circuit allows expenses for only such number of witnesses and for the number of days as the court deems reasonable). First, Plaintiffs seek $ 40 for the attendance of Anke Kolb at deposition and $ 10.00 for travel costs. The Court finds the witness was reasonably necessary. Next, Plaintiffs request $ 900 for "Deposition charges by Campos & Stratis, Inc. for Scott Hampton Deposition." It is unclear what the $ 900 fee is, from the documentation submitted to the Court. Thus, because the Court may not award costs [*51] not authorized by *§ 1920*, the cost will not be taxed to Defendant. *See Marmo, 2006 U.S. App. LEXIS 19609, 2006 WL 2165734, at *11* (district court refused to award costs that were described insufficiently). Finally, Plaintiffs seek $ 3,940.00 for costs associated with the expert witness fees of Dr. Trankler. The Court finds that his testimony was "crucial" to the issue of

2006 U.S. Dist. LEXIS 60575, *

whether Defendant's cubes were "adapted to retain heat/cold." Thus, his expert fees will be taxed to Defendant. Therefore, this Court will tax Defendant $ 3,990.00 for witness fees.

### Fees for exemplification and copies of papers necessarily obtained for use in the case

Plaintiffs seeks an Order taxing Defendant $ 5,778.24 for fees for exemplification and copies of papers necessarily obtained for use in the case. "To recover for costs associated with photocopying, it is incumbent on the Defendant to show *at least* what the documents were and what use was made of these documents." *Glastetter v. Sandoz,* 2000 WL 34017154, at *1 (E.D. Mo. October 3, 2000) (emphasis added). Here, Plaintiffs list the number of copies, the cost of the copies and what the copies were. The copies were documents requested during [*52] discovery, copies of documents produced by Defendant for use at depositions and in briefing, service copies, and copies of Plaintiffs' trial exhibits for use at trial. In Plaintiffs' briefing, Plaintiffs further represent that they made every attempt to keep copying costs at a minimum by not having a working set of discovery documents for their convenience. The Court finds the amount requested by Plaintiffs is reasonable. Therefore, this Court will tax Defendant $ 5,778.24 for fees for exemplification and copies of papers necessarily obtained for use in the case.

### Interest on Money Judgment

#### Statutory Post-Judgment Interest

Pursuant to *28 U.S.C. § 1961(a),* "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Plaintiffs are entitled to interest on the $ 150,000.00 Clerk's Judgment entered on October 7, 2005. The amount of "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. [*53] *28 U.S.C. § 1961(a).* The statutory post-judgment rate for the calendar week preceding the judgment was 3.97%. "Interest shall be computed daily to the date of payment. . .and shall be compounded annually. *28 U.S.C. § 1961(b).*

#### Pre-Judgment Interest

This Court holds that Plaintiffs are also entitled to pre-judgment interest on the $ 150,000 statutory copyright infringement damages at a rate of 1.41%. n12 *See Paramount Pictures Corp. v. Metro Program Network, Inc., 1991 U.S. Dist. LEXIS 20497, 1991 WL 348168, at *12 (N.D. Iowa Apr. 8, 1991), aff'd 962 F.2d 775 (8th Cir. 1992)* (noting that there is no Eighth Circuit authority, but electing to follow other well-reasoned opinions from other courts); *see also Saturn Mfg., Inc. v. Williams Patent*

*Crusher & Pulverizer Co., 713 F.2d 1347 (8th Cir. 1983)* (relating to pre-judgment interest for patent infringement). The amount of interest shall be calculated from the date of the filing of this lawsuit, April 23, 2004, through October 7, 2005, the date of the entry of the judgment.

n12 1.41% is the interest rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date the lawsuit was filed.

[*54]

### Defendant's Motion for Bill of Costs [doc. # 216]

As the Court set forth earlier, "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *Fed. R. Civ. P. 54(d).* As the Court held *supra,* Plaintiffs are the prevailing party in this action. Defendant is not entitled to costs under *Rule 54(d) of the Federal Rules of Civil Procedure.*

### Defendant's Cross-Motion for Attorneys' Fees and Costs [doc. # 218]

Defendant argues that it is entitled to fees and costs as a prevailing party under the Lanham Act, *15 U.S.C. § 1051, et seq.* and under *Rule 68 of the Federal Rules of Civil Procedure.* The Court will address each argument.

#### Rule 68 Offers

Defendant claims that it is entitled to all costs incurred after it made an Offer of Judgment prior to trial. According to *Rule 68 of the Federal Rules of Civil Procedure,*

At any time more than 10 days before the trial begins, a party defending against a claim may serve [*55] upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally ob-

2006 U.S. Dist. LEXIS 60575, *

tained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer. When the liability of one party to another has been determined by verdict or order or judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the [*56] commencement of hearings to determine the amount or extent of liability.

The Court has reviewed the exhibits submitted to the Court by Defendant in support of its request for costs under *Rule 68*. Defendant purports that there were three Offers of Judgment made pursuant to *Rule 68*. The Court will address each seriatim.

Chronologically, the first purported offer was made in an email dated August 10, 2005. In the email, sent by Bob Bryant to Carl VanderSchuit, Mr. Bryant suggested that the three "principals" from Litecubes, L.L.C., Northern Light Products, and Chemical Light n13 meet in Chicago to discuss settlement. Mr. Bryan makes what he calls a "proposal," suggesting that the terms "can be accomplished in a relatively short time with no out of pocket expense to Litecube or Chemical Light." Defendant points to a particular "term" in support of its claim that it gave Plaintiffs an offer more favorable than the ultimate judgment. In its Reply Brief in Support of GlowProducts' Cross-Motion for Attorneys' Fees and Costs, Defendant argues that "[t]he referenced e-mail where GlowProducts offered $ 400,000 for settlement came months before trial[.]" After scouring the emails [*57] provided to the Court, the Court found a "term" providing that "Chemical Light pays the difference between 'actual product cost' and an agreed purchase price to NLP [Northern Light Products] totaling US $ 400,000 paid in equal monthly installments over the same predetermined time. The Court finds that the $ 400,000 "offer" is not an offer at all. The provision referenced by Defendant is not an offer of $ 400,000 to Plaintiffs; it is an "offer" that Chemical Light pay Defendant $ 400,000.

n13 The Court is not familiar with "Chemical Light" since it has not played a role in this lawsuit. The Court guesses that Chemical Light is another seller of lighted ice cubes.

The second purported offer was a document titled "Defendant's Offer of Judgment," dated September 20, 2005. The Court finds that this offer satisfies the requirements of *Rule 68*. The offer is timely and written. The offer states, "[f]or infringement based on the sale of products referred to in this litigation as the 'EXA cubes,' of which only 9,520 [*58] are agreed between the parties to have been sold, GlowProducts agrees to the amount of $ 5,000 in total damages exclusive of fees and costs." In this case, Plaintiffs were awarded by the jury no damages for patent and trademark infringement, but were awarded $ 150,000 for copyright infringement. The *Rule 68* Offer of $ 5,000 for "infringement" is clearly not as favorable as the $ 150,000 that jury awarded to Plaintiffs. n14

n14 Defendant argues that the *Rule 68* Offer was for patent infringement only, and thus, the $ 5,000 was more favorable than the jury's award of $ 0. However, the Court finds that the plain language of the offer includes all infringement, and is not limited to patent infringement.

The final purported offer was made by Defendant on September 23, 2006. The Court finds that the offer was not timely under *Rule 68*. Trial started in this case on October 3, 2005. Ten days prior to trial, taking into account *Rule 6 of the Federal Rules of Civil Procedure*, n15 was [*59] September 20, 2005. Thus, any offers made after that date are ineffectual. Since Defendant's offer was not made until September 23, 2005, it is not a valid offer under *Rule 68*. Therefore, Defendant is not entitled to costs for any purported offer made pursuant to *Rule 68*.

n15 *Rule 6* provides, *inter alia*, that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation" and "[w]henever a party must or may act within a prescribed period after service and service. . .3 days are added after the prescribed period would otherwise expire under subdivision (a)."

*Exceptional Case under Lanham Act, 15 U.S.C. § 1117(a)*

Defendant argues it should be awarded fees and costs for its "victory" on the trademark and unfair competition claims, pursuant to *15 U.S.C. § 1117(a)*.S ection 1117(a) provides, in relevant part, "[t]he court in exceptional cases may award reasonable [*60] attorney fees to the prevailing party." Under the Lanham Act, "[a]n exceptional

2006 U.S. Dist. LEXIS 60575, *

case is one where the plaintiff's claim "'is groundless, unreasonable, vexatious, or pursued in bad faith.'" *Blue Dane Simmental Corp. v. American Simmental Ass'n, 178 F.3d 1035, 1043 (8th Cir. 1999); see also Scott Fetzer Co. v. Williamson, 101 F.3d 549, 555 (8th Cir. 1996).* Defendant argues that Plaintiffs' claims of trademark infringement and unfair competition were groundless.

Under the Lanham Act, "any person who. . .uses in commerce any word, term, [or] name. . .which. . .is likely to cause confusion. . .shall be liable in a civil action[.]" *15 U.S.C. § 1125(a)(1); see also Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir. 2005).* In *SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980)*, the Eighth Circuit set forth the factors that a court should consider when assessing likelihood of confusion.

These can be enumerated as: 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product [*61] competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion.

*Davis, 430 F.3d at 903 (citing SquirtCo, 628 F.2d at 1086).* In order "to protect persons engaged in commerce against. . .unfair competition," the Lanham Act also prohibits "[a]ny person who,. . .in connection with any. . .services,. . .uses in commerce any. . .false or misleading representation of fact, which. . .in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities. . .[of] another person's. . .services." *Allsup, Inc. v. Advantage 2000 Consultants Inc., 428 F.3d 1135, 1138 (8th Cir. 2005)* (quoting *15 U.S.C. § 1125(a)(1)(B)*). "Full and fair competition requires that those who invest time, money and energy in the development of good will and a favorable reputation be allowed to reap the advantages of their investment. *Armstrong Cork Co. v. Armstrong Plastic Covers Co., 434 F.Supp. 860, 871 (E.D. Mo. 1977).*

The Court finds that Plaintiffs' unfair competition [*62] and trademark infringement claims were not "groundless, unreasonable, vexatious, or pursued in bad faith." Defendant argues that Plaintiffs' claims were "groundless." A case will not necessarily be considered exceptional simply because a plaintiff does not prevail. *See Blue Dane Simmental Corp., 178 F.3d at 1043* (holding the trademark infringement case was not exceptional following a grant of JMOL); *Scott Fetzer Co., 101*

*F.3d at 555* (finding that case was not exceptional, regardless of the grant of JMOL, because there was some evidence in the record to support plaintiff's claims); *Beckman Instruments, Inc., 892 F.2d at 1551-52* ("With respect to the other defense and counterclaim which were dropped, the mere fact that an issue was pleaded and then dropped prior to trial does not in itself establish vexatious litigation.").

In this case, prior to the Court instructing the jury, Plaintiffs voluntarily withdrew their claim of unfair competition. The Court instructed the jury on the issue of trademark infringement. While the jury found no infringement, it did find the trademark to be valid.

The Court holds that Plaintiffs' claims were [*63] not baseless. Plaintiffs set forth evidence relating to the likeliness of confusion between Plaintiffs' and Defendant's products. The strength of the mark was underscored by the jury's finding that Plaintiffs' trademark was valid. Also, Plaintiffs presented evidence that Defendant purchased the term "Litecubes" as a search term on Yahoo!, Google, and MSN, evidencing the "similarity" between the marks. There was a significant amount of evidence presented demonstrating that Plaintiffs' and Defendant's products were in direct competition. Finally, Plaintiff Carl VanderSchuit testified about actual confusion of customers trying to distinguish between Plantiffs and Defendant's products. Thus, the Court holds that this case is not exceptional under the Lanham Act, and the Defendant is not entitled to fees and costs.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [doc. # 195] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Judgment as a Matter of Law Regarding Copyright Infringement, or Alternatively, for Remittitur [doc. # 197] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' [*64] Motion for Attorney Fees, Costs and Interest [doc. # 199] is **GRANTED.** The Court will award all reasonable attorney's fees plus lawful interest. The Court makes no finding as to a reasonable amount of fees at this time. Plaintiff shall provide complete billing records and supporting documentation n16 to the Court no later than September 18, 2006 in order for the Court to make a determination as to the reasonable attorney's fees incurred in this case. Defendant shall file any objections to the reasonableness of such fees requested within 10 days thereafter.

n16 *See supra* footnote 9 for a description of the necessary documentation.

**IT IS FURTHER ORDERED** that Plaintiffs' Supplemental Motion for Bill of Costs [doc. # 201] is **GRANTED in Part, and DENIED in Part.** It is Ordered that the Clerk of this Court shall tax costs against Defendant Northern Light Products in favor of Plaintiffs Litecubes, L.L.C. and Carl VanderSchuit in the amount of **$ 16,607.49** constituting: $ 150 for Fees [*65] of the Clerk; $ 6,689.25 for Fees of the court reporter for all or any part of the transcript necessarily obtained or use in the case; $ 3,990.00 for Witness fees; and $ 5,778.24 for Fees for exemplification and copies of papers necessarily obtained for use in the case.

**IT IS FURTHER ORDERED** that Defendant's Motion to Stay Briefing for all Motions for Attorneys' Fees, Costs and Interest [doc. # 202] is **DENIED as Moot.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Permanent Injunction [doc. # 205] is **GRANTED.** GlowProducts and each of its agents, affiliates, successors, servants, and employees, and any and all other persons or entities acting under GlowProducts' authority, are hereby enjoined from (1) at any time on or before July 28, 2020, making, using, offering for sale or selling in the United States or importing into the United States products which infringe *U.S. Patent No. 6,416,198* ("the *'198 patent*") or (2) infringing U.S. Copyright Registration No. VA 1-117-699 ("the '699 copyright") by reproduction, preparing a derivative work, distribution, display, or claim authorship of any work that is substantially similar to the work depicted in the '699 [*66] copyright.

**IT IS FURTHER ORDERED** that Defendant's Motion for Judgment as a Matter of Law Regarding Patent Infringement, or Alternatively, for a New Trial [doc. # 213] is **DENIED**

**IT IS FURTHER ORDERED** that Defendant's Motion for Bill of Costs [doc. # 216] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Attorneys' Fees and Costs [doc. # 218] is **DENIED.**

Dated this 25th day of August, 2006.

E. RICHARD WEBBER

UNITED STATES DISTRICT JUDGE